# EXHIBIT 6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

SOL-MM III LLC, as administrative agent,

                    Plaintiff,

          - against -

JPMORGAN CHASE BANK, N.A., D5 HAWKS LLC,
WE TAHOE 1 LLC, WE TAHOE 2 LLC, NEW WEM
HOLDINGS AFFILIATE 1 LTD., NEW WEM
HOLDINGS AFFILIATE 2 LTD., and NEW WEM
HOLDINGS LTD., MOA HOLDINGS III, LLC,

               Defendants.

Index No.: 651509/2023

---

# COMPLAINT

Plaintiff, SOL-MM III LLC ("**Plaintiff**"), through its attorneys, for a Complaint against defendants JP Morgan Chase Bank, National Association ("**JPMorgan**"), D5 Hawks LLC ("**JPM-D5**"), WE Tahoe 1 LLC ("**JPM-WEM 1**"), WE Tahoe 2 LLC ("**JPM-WEM 2**"), New WEM Holdings Affiliate 1 Ltd. ("**WEM-1**"), New WEM Holdings Affiliate 2 Ltd. ("**WEM-2**"), New WEM Holdings Ltd. ("**WEM-3**"),[1] and MOA Holdings III, LLC ("**MOA Guarantor**," together with the WEM Guarantors, the "**WEM-MOA Guarantors**," and collectively with JPMorgan, JPM-D5, JPM-WEM 1 and JPM-WEM 2, "**Defendants**"), alleges:

---

[1] WEM-1, WEM-2, and WEM-3 are collectively referred to as the "**WEM Guarantors**."

Case 1:23-cv-06479  Document 1-7  Filed 07/26/23  Page 3 of 51

## NATURE OF THE ACTION

1.      This action arises out of Defendants' convoluted and commercially unreasonable efforts in the first quarter of 2021 to prevent Plaintiff, and the lenders it represents as agent (the "**Lenders**"), from being repaid on a loan of hundreds of millions of dollars that the Lenders made to support the development of the American Dream Mall in East Brunswick, New Jersey.

2.      Plaintiff's loan was one of several loans made in support of the same project, and was to be repaid after a more senior loan by JPMorgan was repaid.  Plaintiff's loan was guaranteed by several entities affiliated with the Ghermezian family, the then owners of the American Dream Mall, including the WEM-MOA Guarantors.

3.      However, JPMorgan and the Ghermezians worked out a deal between themselves, pursuant to which JPMorgan took the collateral critical to satisfy Plaintiff's loan, thus providing JPMorgan with a massive windfall and shielding the Ghermezians, and their affiliated WEM-MOA Guarantors, from having to repay Plaintiff for years.

4.      In 2019, the Lenders, with Plaintiff as their Administrative Agent, executed a Junior Mezzanine Loan Agreement ("**Plaintiff Loan Agreement**") with Ameream Mezz I, LLC (the "**American Dream Borrower**"), loaning $300,000,000 to finance the development of a portion of the American Dream Mall (the "**Plaintiff Loan**").   JPMorgan and other lenders provided $1,195,000,000 in senior secured financing (the "**JPMorgan Loan**") to AMEREAM, LLC ("**Ameream**"), an indirect-wholly owned subsidiary of the American Dream Borrower and the owner of American Dream Mall.  AB American Dream Mall Syndicate Joint Venture LP ("**Senior Mezz Lender**") provided a $475,000,000 senior mezzanine loan to Ameream Mezz, LLC

1

Case 1:23-cv-06479   Document 1-7   Filed 07/26/23   Page 4 of 51

("**Ameream Mezz**"), an intermediary entity which wholly owns Ameream and is wholly owned by American Dream Borrower.[2]

5.       As a material inducement to the Lenders to provide the Plaintiff Loan, the Ghermezians and their affiliated entities, including the WEM-MOA Guarantors, provided a payment guaranty pursuant to which they guaranteed the American Dream Borrower's obligation to repay the Plaintiff Loan (the "**Payment Guaranty**"). The WEM-MOA Guarantors also provided Plaintiff with an irrevocable letter of direction, dated August 2, 2019 (the "**Irrevocable Direction Letter**"), directing JPMorgan and the Senior Mezz Lender to pay any excess proceeds from the sale or other disposition of certain collateral—specifically the WEM-MOA Guarantors' 49% equity interests in the West Edmonton Mall and Mall of America (the "**WEM-MOA 49% Equity**")—directly to the Plaintiff.

6.       The American Dream Borrower currently owes Plaintiff over $400 million. After the American Dream Borrower failed to make required interest payments on the Plaintiff Loan, Plaintiff sued American Dream Borrower earlier this year for breach of the Plaintiff Loan Agreement. On May 3, 2023, the Supreme Court of the State of New York entered judgment in favor of Plaintiff in the amount of $404,399,512.87 (the "**American Dream Judgment**"). The American Dream Judgment remains outstanding and interest accrues at the New York state statutory rate.

7.       The WEM-MOA Guarantors each guaranteed the Plaintiff Loan. They are obligated to pay the amounts due under the American Dream Judgment. However, because of a provision in an intercreditor agreement with JPMorgan (the "**Intercreditor Agreement**") which was negotiated at the time of the Plaintiff Loan and corresponding agreements, Plaintiff cannot sue the WEM-MOA Guarantors (other than WEM-3 (see footnote 14)) to collect on the guarantees until

---

[2] As described in ¶ 109, on October 24, 2022, the Senior Mezz Lender consummated a foreclosure on Ameream Mezz thereby extinguishing the Senior Mezz Loan. The JPMorgan Loan and Plaintiff Loan remain outstanding.

JPMorgan, whose loan is secured, among other collateral, by the American Dream Mall, is paid in full.

8.      Ameream defaulted on the JPMorgan Loan in 2020.  Under the terms of the JPMorgan Loan documents, JPMorgan's recourse was to foreclose on the American Dream Mall and sue the Ghermezian family members and their affiliated entities as guarantors.  The aggregate value of the American Dream Mall, much less the value of all three malls pledged as collateral to JPMorgan, greatly exceeded the loan amounts owed to JPMorgan.  Thus, had JPMorgan foreclosed on the American Dream Mall, it would have been paid in full, with enough left over for Plaintiff to recover substantially all of the amounts owed to it.

9.      Rather than foreclose on the American Dream Mall, JPMorgan, its affiliate-Defendants, and the Ghermezian family cut a deal to benefit only themselves, to the detriment of Plaintiff.  Specifically, in exchange for JPMorgan not suing the Ghermezian family, not foreclosing on the American Dream Mall, not foreclosing on the WEM 25% Cash Flow Pledge (defined in ¶ 57), and releasing the WEM-MOA Guarantors from their guarantee obligations, the WEM-MOA Guarantors gave JPMorgan their 49% equity stakes in the West Edmonton Mall and Mall of America (the "**2021 Agreement**").

10.      In March 2021, the value of the WEM-MOA 49% Equity transferred to JPMorgan affiliates was worth over $1 billion.  Had the Defendants properly accounted for that transfer, JPMorgan Loan would have been reduced by that full amount, thereby accelerating repayment of the JPMorgan Loan and freeing up more value to pay Plaintiff.  It also would have enabled Plaintiff

to bring an action against the WEM-MOA Guarantors to recover on the Plaintiff Loan, without having to delay on account of the Intercreditor Agreement.

11.       Defendants and the Ghermezians were well aware of this dynamic, and thus structured their transactions to ensure that the Ghermezians, and their WEM-MOA Guarantor affiliates, could avoid paying Plaintiff. They did so in two ways. *First*, they stipulated to value the transferred 49% equity stake in the West Edmonton Mall and Mall of America for only $50 million, approximately 5% of the actual value. By doing so, JPMorgan only had to "credit" $50 million against its loan obligations. This left JPMorgan with an artificially larger loan amount still outstanding, which prevents Plaintiff from recovering on the Plaintiff Loan since, as discussed, the Intercreditor Agreement bars Plaintiff from asserting a claim against the WEM-MOA Guarantors (other than WEM-3 (see footnote 14)) until the JPMorgan Loan is fully paid. *Second*, the artificial $50 million valuation also lowered the WEM-MOA Guarantors' subrogation/reimbursement rights against Ameream, the owner of the American Dream Mall and obligor to JPMorgan, which deprived Plaintiff of a source of recovery.

12.       Compounding the absurdity of the transaction, JPMorgan did not even reduce the outstanding loan obligations by the artificially low $50 million valuation. JPMorgan reported in July 2021 that while crediting $50 million as a "paydown" of the $1.145 billion loan balance, JPMorgan added back to the loan balance $52,509,096.84 as "WEM/MOA Purchase Price & Preferred Return." Functionally, JPMorgan took a $1 billion asset for zero consideration.

13.       Through this scheme, Defendants aimed, among other things, to produce an end result that ensures the WEM-MOA Guarantors have no assets other than $50 million in subrogation/reimbursement claims, while JPMorgan can continue to claim it holds loans that should have been reduced by at least $1 billion. Plaintiff has thereby been blocked from enforcing the

4

guarantees on the Plaintiff Loan, since it is not permitted to do so under the Intercreditor Agreement while the JPMorgan Loan is still outstanding, and, even if Plaintiff could assert claims against the WEM-MOA Guarantors, any recovery would be limited to the purported $50 million subrogation/reimbursement asset. With Plaintiff blocked from recovering the amount it is owed from the WEM-MOA Guarantors, the Ghermezian family continues to profit from the three malls, JPMorgan owns a valuable stake in the West Edmonton Mall and Mall of America and still collects on the full amount of its loan, and Plaintiff is left holding the bag.

14.     Plaintiff brings claims to right these wrongs.[3]

### PARTIES AND RELEVANT NON-PARTIES

15.     Plaintiff SOL-MM III LLC is a Delaware limited liability company, having a registered office at c/o Cogency Global Inc., 850 New Burton, Suite 201, Dover, Delaware 19904. SOL-MM III LLC is the successor to Western Asset Mortgage Capital Corporation, the original Administrative Agent of the Plaintiff Loan. Reference to "Administrative Agent" herein includes Plaintiff and its predecessor in interest.

*The JPMorgan Defendants*

16.     Defendant JPMorgan Chase Bank N.A. is a national banking association with a home office in Columbus Ohio and has an address at 1111 Polaris Pkwy, Columbus, Ohio 43240. JPMorgan is the administrative agent under the JPMorgan Loan documents and also a lender thereunder.

17.     Defendant D5 Hawks LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan and (ii) is the sole member of MOA Holdings II LLC, which owns 49% equity interest in MOA Holdings I LLC, the indirect sole owner of the Mall of America.

---

[3] Plaintiff has brought an action in Canada against individual Ghermezian family members and the WEM Guarantors asserting an oppression claim.

18.     Defendant WE Tahoe 1 LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan and (ii) owns 970 common shares of West Edmonton Mall Properties Inc., the owner of West Edmonton Mall ("**WEMPI**").

19.     Defendant WE Tahoe 2 LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan and (ii) owns 10 common shares of WEMPI.

20.     JPMorgan, JPM-D5, JPM-WEM 1, and JPM-WEM 2 collectively are referred to as the "**JPMorgan Defendants**."

### *West Edmonton Mall Guarantor Defendants*

21.     Defendant New WEM Holdings Affiliate 1 Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPMorgan Loan and the foreclosed Senior Mezz Loan, and (iv) a party to the 2021 Agreement.

22.     Defendant New WEM Holdings 2 Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPMorgan Loan and the foreclosed Senior Mezzanine Loan, and (iv) a party to the 2021 Agreement.

23.     Defendant New WEM Holdings Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, and (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPMorgan Loan and the foreclosed Senior Mezzanine Loan, and (iii) a party to the 2021 Agreement.

24.     WEM-1, WEM-2, and WEM-3 are collectively referred to as the "**WEM Guarantors**."

6

### *Mall Of America Guarantor*

25.    Defendant MOA Holdings III, LLC is (i) a Delaware limited liability company with its principal place of business in Bloomington, Minnesota, and has an address at 60 East Broadway, Bloomington, Minnesota 55425-5550, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPMorgan Loan and the foreclosed Senior Mezz Loan, and (iv) a party to the 2021 Agreement.

### *Non-Party Individual Guarantors*

26.    Non-party Don Ghermezian is (i) a natural person, having an address at 14A Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a director or officer of one or more of the WEM-MOA Guarantors, and (iv) a party to the 2021 Agreement.

27.    Non-party Eskandar Ghermezian is (i) a natural person, having an address at 17 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement.

28.    Non-party David Ghermezian is (i) a natural person, having an address at 14A Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement.

29.    Non-party Syd Ghermezian is (i) a natural person, having an address at 722 W. 232nd Street, Bronx, New York 10463, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement.

30.    Non-party Bahaman Ghermezian is (i) a natural person, having an address at 15 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement.

7

Case 1:23-cv-06479  Document 1-7  Filed 07/26/23  Page 10 of 51

31.     Non-party Raphael Ghermezian is (i) a natural person, having an address at 18 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement.

32.     Non-party Nader Ghermezian is (i) a natural person, having an address at 16 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement.

33.     Non-party Marshall Ghermezian is (i) a natural person, having an address at 17 Wellington Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement.

34.     Non-party Tony Ghermezian is (i) a natural person, having an address at 14B Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) member of the board of directors of WEM-1 and WEM-2, and (iv) a party to the 2021 Agreement.

35.     Each Ghermezian family member named in this section ***Non-Party Individual Guarantors*** is an "**Individual Guarantor**" and collectively the "**Individual Guarantors**."

36.     Non-party Original WEMPI Inc ("**Original WEMPI**") is (i) an Alberta corporation, having an address at 8882-170 Street North West, Edmonton, Alberta, T5T 4M2, Canada, and also has an address at c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011, (ii) a guarantor under the payment guarantee for the JPMorgan Loan, and (iii) a party to the 2021 Agreement.

## JURISDICTION

37.     This Court has jurisdiction over this action and over the Defendants pursuant to CPLR §§ 301 and 302.  Venue is proper here per Section 7.3 of the Payment Guaranty, Section 18(g)

8

of the Intercreditor Agreement, CPLR § 501, and CPLR § 503.  Jurisdiction and venue are proper because (i) JPMorgan does substantial business in this County, (ii) JPMorgan derives substantial revenue from activities carried out in this County, (iii) JPMorgan (pursuant to Section 18(g) of the Intercreditor Agreement) and the WEM-MOA Guarantors (pursuant to Section 7.3 of the Payment Guaranty) consented to the jurisdiction of New York State or federal courts in New York County.

## FACTUAL BACKGROUND

### A.  American Dream Mall, Mall of America, and West Edmonton Mall

38.    The claims Plaintiff brings relate to three of the largest and most valuable shopping malls in North America—the American Dream Mall in New Jersey; Mall of America in Minnesota; and the West Edmonton Mall in Alberta, Canada.  Each mall has been owned and/or managed by the Ghermezian family, which has developed and operated several of the world's largest shopping malls since the 1970s.  The Ghermezian family operates through its family investment group, the Triple Five Group, of which Don Ghermezian is currently the President.  Don Ghermezian is also purportedly the CEO and President of American Dream Mall.

39.    Over the years, the Ghermezian family established an elaborate web of companies to hold their ownership stakes in the three malls.  Appendix Chart A is the tangled corporate organization existing immediately prior to the 2021 Agreement.  Appendix Chart B is the corporate organization after (i) the JPMorgan's foreclosure of WEM-MOA 49% Equity in March 2021 and (ii) Senior Mezz Lender's foreclosure of Ameream in October 2022.

#### *American Dream Mall*

40.    The American Dream Mall is a 3.3-million square foot retail and entertainment complex in East Rutherford, New Jersey.  It is the second largest retail and entertainment center in the United States (behind Mall of America), boasting an impressive array of entertainment, shopping,

9

and dining experiences.  American Dream Mall features a Nickelodeon Indoor Theme Park with more than 35 rides and attractions, an NHL-regulation-size ice skating rink, a DreamWorks Water Park, North America's only indoor-year-round ski and snow resort, a Legoland Discovery Center, a Sea Life Aquarium, and the world's only indoor surfing wave pool.[4]

41.    At the time of the Plaintiff Loan in 2019, the American Dream Mall was valued at $4.3 billion upon completion and $5.6 billion upon post completion and stabilization.[5]

42.    Prior to October 2022, before the foreclosure by the Senior Mezz Lender (as described in ¶ 54), the American Dream Mall was owned by, and to this day continues to be run by, the Ghermezian family.

43.    While the American Dream Mall, like virtually all shopping malls around the globe, suffered during the COVID-19 pandemic, it has come back strong.  Earlier this year, Don Ghermezian bragged about the Mall's success in 2022 and the fact that high-end retailers were seeking to open stores within the Mall.[6]  The American Dream Mall itself is worth far more than the amount owed to JPMorgan.

44.    American Dream Mall reported generating $421.8 million in gross sales in 2022, and, according to American Dream Mall's public statements, 84% of the property was leased as of March 2023.[7]

---

[4] Loving New York, *The Ultimate 2023 Guide To The American Dream Mall*, Mar. 2, 2023, https://loving-newyork.com/american-dream-mall-nj/.

[5] Additionally, Ameream, through its affiliates, Meadow A-B Office, LLC, Meadow C-D Office, LLC, Meadow Hotel, LLC, and Meadow Baseball, LLC, each a Delaware limited liability company (collectively, the "**American Dream Mall Out Parcel Owners**") and Meadow Outparcels Developer, LLC, a Delaware limited liability company, own valuable adjacent leasehold properties zoned for office and hotel complexes, a minor league baseball stadium, as well as other expansion rights, including an option to purchase land.

[6] *See* David Moin, "American Dream, Post-COVID-19, Capturing Crowds," WOMEN'S WEAR DAILY, Jan. 23, 2023, available at http://wwd.com/business-news/real-estate/american-dream-progress-report-1235481459/.

[7] American Dream Leasing Status Update As of March 31, 2023, ELECTRONIC MUNICIPAL MARKET ACCESS, posted April 4, 2023, https://emma.msrb.org/P21688815-P21299708-P21730570.pdf.

10

Case 1:23-cv-06479 Document 1-7 Filed 07/26/23 Page 13 of 51

### *Mall of America*

45. Prior to March 2021, the Ghermezian family, through various corporate entities, also owned 100% of Mall of America and the West Edmonton Mall. The Ghermezian family continues to operate both malls today.

46. Mall of America is the United States' largest retail and entertainment complex, which spans 5.6 million square feet.[8] Mall of America currently attracts over 40 million visitors annually and has a $1.9 billion economic impact annually. Mall of America has more than 520 stores, two hotels, and a theme park.

47. Based on company provided financial statements, Mall of America's revenue and net operating income for 2021 were $176,749,907 and $80,288,227, respectively.

48. The value of Mall of America has increased every year since 2020. As of March 2021, Mall of America was valued at approximately $1.99 billion. As of October 2022, it was valued at approximately $2.1 billion. With approximately $1.38 billion in debt as of March 2021, there is (and was at the time of the 2021 Agreement) a sizeable equity cushion in the ownership of Mall of America.

### *West Edmonton Mall*

49. West Edmonton Mall, referred to by its owners as "the greatest indoor show on earth," is an entertainment and retail "city" that spans 5.3 million square feet, hosting more than 30 million people annually.[9] West Edmonton Mall has over 800 stores and services, including a hotel, over 100 dining venues, and is "accredited as a zoo." West Edmonton Mall also includes (i) the world's largest indoor amusement park, (ii) a triple loop rollercoaster, (iii) a lake (complete with a

---

[8] TripleFive Group of Companies, *Mall of America® Today*, (last viewed 3/27/2023), https://www.triplefive.com/moa/moa-today/.
[9] TripleFive Group of Companies, *West Edmonton Mall*, https://www.triplefive.com/wem/.

11

Case 1:23-cv-06479  Document 1-7  Filed 07/26/23  Page 14 of 51

replica of Christopher Columbus' Santa Maria), (iv) a wave pool, and (v) a permanent bungee tower. The West Edmonton Mall is an expanding project, with recent plans announced for a $7.1 billion investment for the construction of a Universal Studios theme park.[10]

50.    Until March 2021, WEM-3 owned 75% of the West Edmonton Mall and WEM-1 and WEM-2 collectively owned 25% of the West Edmonton Mall.  As a result of the 2021 Agreement, only WEM-3 retains ownership, which ownership was reduced to 51%.

51.    The Ghermezians, who have been the ultimate owners of the West Edmonton Mall, have boasted that West Edmonton Mall is the number one tourist attraction in Alberta and "remains the ultimate entertainment and shopping experience."[11]  Three high end major luxury brands joined West Edmonton Mall since the summer of 2019—Louis Vuitton, Saint Laurent, and Gucci—and all three have experienced remarkable success, despite the pandemic, leading to other luxury retailers exploring opening locations.[12]

52.    West Edmonton Mall has generated an enormous economic benefit for the province of Alberta. West Edmonton Mall's revenue and net operating income for 2021 were Canadian $230 million and Canadian $140 million, respectively, per company-provided financial statements.

## B.    The American Dream Mall Financing

### The American Dream Mall Senior Loans

53.    In 2017, JPMorgan and other lenders provided $1,195,000,000 in senior secured financing to Ameream, the direct owner of the American Dream Mall, to finance the development of the mall.  The collateral supporting the JPMorgan Loan, as discussed further below, primarily

---

[10] Kenneth Chan, "$7.1 billion Universal Studios theme park coming to West Edmonton Mall," Daily Hive, Apr. 1, 2023, https://dailyhive.com/vancouver/universal-studios-west-edmonton-mall-theme-park
[11] *Id.*
[12] Retail Insider, *West Edmonton Mall Looking to Add More Luxury Retailers After Seeing Success with 3 Big Players*, Mar. 22, 2022, https://retail-insider.com/retail-insider/2022/03/west-edmonton-mall-looking-to-add-more-luxury-retailers-after-seeing-success-with-3-big-players/.

12

consisted of (i) the WEM-MOA 49% Equity, (ii) an additional 25% cash flow in the West Edmonton Mall as described in ¶ 57, (iii) a second mortgage in the amount of Canadian Dollar $425 million on the West Edmonton Mall (the "**West Edmonton Mall Mortgage**") and (iv) Ameream's rights, title and interest to, *inter alia*, the American Dream Mall together with the future development rights adjacent to the Mall for hotels, office buildings, and a minor league baseball stadium.

54.     At the same time, the Senior Mezz Lender provided a $475,000,000 senior mezzanine loan (the "**Senior Mezz Loan**") to Ameream Mezz, which owned 100% of the equity interests of Ameream.  Senior Mezz Lender was granted a first priority security interest in all of Ameream Mezz ownership interests in Ameream.

55.     The WEM-MOA Guarantors each guaranteed, and pledged assets as collateral for, the JPMorgan Loan and Senior Mezz Loan, pursuant to Pledge and Security Agreements provided to JPMorgan by each of the respective WEM Guarantors (the "**WEM-JPMorgan Pledge Agreement**") and the MOA Guarantor (the "**MOA-JPMorgan Pledge Agreement**").  The agreements set forth remedies available to JPMorgan in an event of default under the loan agreements and specific standards for sale of the pledged equity interests in the malls in an event of default.

56.     In the case of WEM-3, JPMorgan's recourse under its payment guaranty was limited to 24% of WEM-3's then 75% ownership stake in WEM-3 (the "**WEM-3 24% Equity**").  Thus, under any circumstances and regardless of whether the JPMorgan Loan was in default, JPMorgan could only foreclose on the WEM-3 24% Equity.

57.     In addition to the WEM-MOA 49% Equity, Original WEMPI, which wholly owns WEM-3, guaranteed and pledged, as collateral for a portion of the JPMorgan Loan, operating and capital proceeds with respect to an additional 25% equity in the West Edmonton Mall received by

13

Original WEMPI, pursuant to the Pledge and Security Agreements provided to JPMorgan by Original WEMPI (the "**WEM 25% Cash Flow Pledge**").

58.    Section 4.1(b) of the WEM-JPMorgan Pledge Agreement allows, in an event of default, for JPMorgan to effect the transfer of any or all of the collateral through a sale in accordance with procedures specified in Section 5 of the agreement.  Section 5.6 of the WEM-JPMorgan Pledge Agreement requires collateral to be sold through a public auction or public tender, and not via a private sale.  Section 5.10 of the WEM-JPMorgan Pledge Agreement sets forth that "Pledgor [WEM-Guarantor] hereby agrees that any sale conducted in accordance with the provisions therein shall be considered a commercially reasonable sale."

59.    Sections 3.4(c), 3.5(b), and 3.5(d) of the MOA-JPMorgan Pledge Agreement similarly requires public sale or deemed public sale only to "a restricted group of [highly qualified] offerees and purchasers who fulfill certain suitability standards."

60.    In addition to the guarantees by the WEM-MOA Guarantors, the Individual Guarantors—all individual members of the Ghermezian family—personally guaranteed the JPMorgan Loan and the foreclosed Senior Mezz Loan.

61.    Finally, the Payment Guarantors (defined in ¶ 66) also provided an environmental indemnity (the "**Environmental Indemnity**"), pursuant to which the Payment Guarantors agreed to defend, indemnify and hold harmless JPMorgan for certain environmental hazards.  On information and belief, the Payment Guarantors have never been called to defend, indemnify or hold harmless JPMorgan under the Environmental Indemnity.  In the case of WEM-3, pursuant to the express provisions of Section 30 of the Environmental Indemnity, JPMorgan's recourse was limited to the WEM-3 24% Equity.  Thus, if WEM-3 disposed of that 24% to a JPMorgan Defendant, then WEM-3's liability under the Environmental Indemnity was necessarily discharged.

Case 1:23-cv-06479   Document 1-7   Filed 07/26/23   Page 17 of 51

*The Plaintiff Loan*

62.     In 2019, Plaintiff entered into the $300 million Plaintiff Loan to provide additional funding for the American Dream Mall.

63.     To evidence and secure the Plaintiff Loan Agreement, American Dream Borrower executed five promissory notes (the "**Plaintiff Loan Notes**").  Pursuant to the express terms of the Plaintiff Loan Notes, American Dream Borrower was required to make monthly payments of interest to Plaintiff, followed by a final payment of principal and outstanding interest due upon the maturity date, June 29, 2021.

64.     Failure to make any regularly scheduled monthly payment of interest on the payment date was an Event of Default under the Plaintiff Loan Agreement.  Following an Event of Default, the full debt became immediately due and payable, and interest accrued at a contractually defined Default Rate.  The Plaintiff is empowered to exercise all rights under the Plaintiff Loan Agreement on behalf of the Lenders.

65.     The Plaintiff Loan Agreement incorporates by reference two agreements—the Payment Guaranty and the Intercreditor Agreement (each as described below).  These agreements, together with the Irrevocable Direction Letter, worked to ensure Plaintiff and Lenders' interests were protected and their rights delineated from the JPMorgan Loan and Senior Mezz Loan, especially with respect to the valuable collateral which secured or provided credit support for all of the loans.

*The Guarantees of the American Dream Mall Loans*

66.     In connection with the Plaintiff Loan Agreement, the WEM-MOA Guarantors and Individual Guarantors (collectively, "**Payment Guarantors**") executed the Payment Guaranty as credit support for the Plaintiff Loan.

15

Case 1:23-cv-06479 Document 1-7 Filed 07/26/23 Page 18 of 51

67.     The Payment Guaranty was a key component of the Plaintiff Loan structure and a material inducement to Plaintiff to enter into the Plaintiff Loan Agreement. The Payment Guarantors acknowledged that the Lenders were not willing to make the Plaintiff Loan to American Dream Borrower *but for* the Payment Guarantors' unconditional guarantee of certain obligations, including, among other things, payment to Plaintiff of all amounts due in accordance with the Plaintiff Loan Agreement.

68.     The Payment Guarantors also acknowledged that beneficial owners of the WEM-MOA Guarantors are beneficial owners of the American Dream Borrower and that the Payment Guarantors will benefit from the agreement by Lenders in making the Plaintiff Loan.

69.     The Payment Guaranty provides that:

> each [Payment] Guarantor hereby irrevocably and unconditionally guarantees to [Plaintiff] for the benefit of Lenders the payment of the Guaranteed Obligations. (b) If all or any part of the Guaranteed Obligations shall not be paid when due . . . pursuant to the Loan Agreement, . . . [Payment] Guarantor shall, within ten (10) Business Days after demand . . . pay the amount then due on account of the Guaranteed Obligations. . . .

Payment Guaranty at § 1.2.

70.     Each Payment Guarantor agreed that it would be liable for guaranteed obligations as a primary obligor and would satisfy monetary obligations of the American Dream Borrower, to the extent not paid when due, within ten days of demand thereof by the Plaintiff as the Administrative Agent.

71.     Until the Guaranteed Obligations are satisfied, pursuant to Section 6.2 of the Payment Guaranty, the WEM-MOA Guarantors covenanted to (i) ensure that the collective value of

16

the WEM-MOA 49% Equity was at least $680,000,000.00[13] and (ii) continue to own at least 49% interest in Mall of America and the West Edmonton Mall.

72.      Similar to JPMorgan's payment guaranty, in the case of WEM-3, Plaintiff's recourse was limited to the identical WEM-3 24% Equity that provided credit support for JPMorgan. Thus, under any circumstances, Plaintiff could only seek from WEM-3, as guarantor, the WEM-3 24% Equity to satisfy the Plaintiff Loan.

73.      No provision of the Payment Guaranty allows the WEM-MOA Guarantors to enter into a private agreement divesting their equity interests in favor of JPMorgan.

74.      The relationship and purpose of these agreements is set forth in the Irrevocable Direction Letter, dated August 2, 2019, from the WEM-MOA Guarantors directing JPMorgan and the Senior Mezz Lender to pay any excess proceeds from the sale or other disposition of the WEM-MOA 49% Equity directly to the Plaintiff.  During the negotiations over the Plaintiff Loan, JPMorgan made clear that the Irrevocable Direction Letter was unconditional and irrevocable.

75.      The Irrevocable Direction Letter was ratified and confirmed in the 2021 Agreement. The Irrevocable Direction Letter also acknowledges that it, like the Payment Guaranty, was "a material inducement" to the Plaintiff and Lenders to make the Plaintiff Loan.

### The Intercreditor Agreement

76.      Plaintiff, JPMorgan, and Senior Mezz Lender agreed to the Intercreditor Agreement, pursuant to which Plaintiff contractually agreed to limit its enforcement rights against the Payment Guarantors in certain circumstances.  Relevant to the claims asserted herein, Plaintiff agreed to refrain from suing the WEM-MOA Guarantors as long as the JPMorgan Loan was outstanding, but

---

[13] This covenant thus excluded from the net equity calculation 51% of the West Edmonton Mall equity owned by WEM-3.

17

in return JPMorgan owed, among other things, duties to Plaintiff to act in good faith and deal fairly with Plaintiff.

77.     The purpose of the Intercreditor Agreement was to "provide for the relative priority of, and to evidence certain agreements with respect to. . . [the Plaintiff Loan]" including the documents which protected Plaintiff and Lenders' rights in the event of default under the Plaintiff Loan—the Payment Guaranty and the Irrevocable Direction Letter.

78.     Section 6(b) of the Intercreditor Agreement echoes the rights set forth in the Payment Guaranty and the Irrevocable Direction Letter to protect Plaintiff and Lenders in the event of a foreclosure under the Senior Loan or the Senior Mezz Loan:

> In the event that (i) Senior Agent and/or Mezzanine Lender (Senior) hold proceeds received pursuant to the foreclosure of, with respect to Senior Agent, the MOA Pledge and the WEM Pledges (each as defined in the Senior Loan Agreement), or, with respect to Mezzanine Lender (Senior), foreclosure of the MOA Pledge and the WEM Pledges (each as defined in the Mezzanine Loan Agreement (Senior)), and (ii) both the Senior Loan and the Mezzanine Loan (Senior) have been fully and indefeasibly repaid, then Senior Agent or Mezzanine Lender (Senior), as applicable, shall disburse such excess proceeds in accordance with the terms of the letters of direction from MOA Guarantor and WEM Guarantor (each as defined in the Senior Loan Agreement), respectively.

79.     The Intercreditor Agreement terminated in October 2022.  The only provision that survives termination is section 6(b), which provides for payment to Plaintiff of any amount remaining after sale of the WEM-MOA 49% Equity and repayment of the senior loans, but also precludes Plaintiff (and the Lenders) from suing any "Shared Guarantor" (which includes the WEM-MOA Guarantors) as long as the JPMorgan Loan is outstanding.  But for this provision, Plaintiff would have sued WEM-MOA Guarantors to collect on the Payment Guaranty after American Dream Borrower defaulted in 2021.

**C.     Ameream defaults in 2020 on the JPMorgan Loan**

18

80.     On or around May 13, 2020, JPMorgan informed Plaintiff that Ameream had "failed to fund the Monthly Debt Service Payment Amount due May 11, 2020, which failure constitutes an Event of Default pursuant to Section 8.1(a) of the JPMorgan Loan Agreement." Additional Events of Default occurred in 2020.

81.     As a result of such Events of Default, JPMorgan had the right to seek recovery from Ameream using certain enforcement rights, including by enforcing various corporate and personal guarantees, and by foreclosing against the American Dream Mall.

82.     Thus, the Ghermezian family was at risk of losing (i) all of its equity in the American Dream Mall, (ii) all of its leasehold interests owned by the American Dream Mall Out Parcel Owners, (iii) the WEM-MOA 49% Equity, and (iv) operating and capital proceeds with respect to an additional 25% equity in the West Edmonton Mall pursuant to the WEM 25% Cash Flow Pledge.   Simultaneously, nine members of the Ghermezian family (*i.e.*, the Individual Guarantors) faced immediate enforcement against their respective personal guaranties for the repayment of the JPMorgan Loan.

83.     Further, on information and belief, the Ghermezian family and their affiliates feared that in a public sale, as required under the WEM-JPMorgan Pledge Agreement and MOA-JPMorgan Pledge Agreement, there would be legitimate third party purchasers who would acquire the WEM-MOA 49% Equity at fair market value, meaning that an unaffiliated third party would have 49% of  economic and voting rights with respect to the West Edmonton Mall and Mall of America.

84.     Recognizing the risks facing the Ghermezians, JPMorgan saw an opportunity for a windfall for itself resulting from Ameream's default.  Thus, rather than exercise remedies like a traditional lender might, JPMorgan sought to negotiate a sweetheart deal, in which it would secure

19

substantial upside in exchange for permitting the Ghermezians to avoid making good on their personal guarantees, shielding them from suits by Plaintiff and letting them continue to operate and control American Dream Mall. JPMorgan and the Ghermezian Family spent months negotiating a work-out that benefited them, to the detriment of Plaintiff and the Lenders.

### D.   JPMorgan and Ghermezian Family Execute the 2021 Agreement to Improperly Transfer a Billion Dollars of Value Away From the Plaintiff and Lenders

85.   On or about January 29, 2021, JPMorgan, Senior Mezz Lender, Ameream, Ameream Mezz, the WEM-MOA Guarantors, Original WEMPI, the Ghermezian family members who were Individual Guarantors, and various affiliates, secretly entered the 2021 Agreement. They agreed that, "[i]n lieu of [JPMorgan] making demand under the Payment Guaranty and prosecuting a foreclosure, exercising any power of sale, or taking any other enforcement action against the MOA Guarantor and/or the WEM Guarantor," the WEM-MOA Guarantors would convey to JPMorgan their 49% ownership stakes in Mall of America and the West Edmonton Mall. The WEM-MOA Guarantors confirmed this transfer of ownership by, among other things, waiving any right of redemption.

86.   Key to the transaction was that the contractually mandated, aggregate value of the economic interests transferred to JPMorgan was absurdly, and intentionally, low. This way, the JPMorgan Loan would not be recorded as paid off and JPMorgan would thereby retain its senior secured claim against Ameream unreduced by any amount, while gaining the upside of owning nearly 50% of two valuable malls. For their part, the WEM-MOA Guarantors would be shielded from any collection action by Plaintiff (other than WEM-3 (see footnote 14)), since Plaintiff would be barred under the Intercreditor Agreement from asserting such claims while JPMorgan's Loan remained outstanding. The Ghermezians (i) are shielded from any immediate action by JPMorgan seeking to enforce the payment guaranties against the Individual Guarantors, (ii) continued to receive

20

base and incentive management fees and (iii) retained the large sum of management fees accrued prior to the opening of the American Dream Mall.

87.       Pursuant to the terms of the 2021 Agreement, JPMorgan and the Ghermezian family made the following arrangements:

- JPMorgan agreed not to make formal demands on the WEM-MOA Guarantors and instead JPMorgan accepted the WEM-MOA 49% Equity in exchange for releasing and discharging the WEM-MOA Guarantors of their guaranty obligations under the payment guaranty for the JPMorgan Loan;

- The parties to the 2021 Agreement, acting contrary to the WEM-JPMorgan Pledge Agreements and the MOA-JPMorgan Pledge Agreement, did not conduct a public auction or tender for the WEM-MOA 49% Equity, but instead "irrevocably and unconditionally agree[d]" among themselves that $50 million "is a reasonable estimate of the sale proceeds that [JPMorgan] would have received pursuant to a sale of the [WEM-MOA 49% Equity] through a public auction conducted on commercially reasonable terms";

- In the agreement, JPMorgan and the WEM-MOA Guarantors severely undervalued the 49% equity interests in both the West Edmonton Mall and Mall of America. JPMorgan and the WEM Guarantors purported to value a 49% equity stake worth at least $800 million at just $49 million; and JPMorgan and the MOA Guarantor purported to value a $245 million equity stake at just $1 million;

- JPMorgan agreed to modify the Individual Guarantors' payment guaranties of the JPMorgan Loan obligations so that they were enforceable only as a last resort after realization of the value of all JPMorgan Loan collateral, including after foreclosure

21

of the American Dream Mall—a highly unusual concession by a traditional lender, which, as a practical matter, operated to release the Individual Guarantors of their repayment obligations;

- Even though the WEM-MOA Guarantors were released and discharged from the obligations owed to JPMorgan under their payment guaranty, to ensure that they remained "Shared Guarantors" under the Intercreditor Agreement (thus blocking Plaintiff from suing the WEM-MOA Guarantors) (other than WEM-3),[14] they were not released under the Environmental Indemnity, ensuring that Plaintiff remained barred under the Intercreditor Agreement from suing the WEM-MOA Guarantors until the inflated JPMorgan Loan was repaid.

- Nothing in the 2021 Agreement requires JPMorgan to take any steps to sell the WEM-MOA 49% Equity, thereby defeating one of the central purposes of the Irrevocable Direction Letter, which provided, inter alia, that all amounts from such a sale exceeding the outstanding balance of the JPMorgan Loan would be paid to Plaintiff. In effect, JPMorgan can indefinitely own the WEM-MOA 49% Equity, earning dividends on account of the WEM-MOA 49% Equity, even after the JPMorgan Loan is repaid, all while depriving Plaintiff of the benefit of the collateral backing the Plaintiff Loan. JPM-D5, JPM-WEM 1 and JPM-WEM 2 crystalized their rights to dividends on account of the WEM-MOA 49% Equity, even after the JPMorgan Loan is repaid, in Sections 2(d) and (e) of the AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF MOA

---

[14] Notwithstanding JPMorgan's purportedly intentionally not releasing the WEM-MOA Guarantors under the Environmental Indemnity, WEM-3 was released from the Environmental Indemnity pursuant to Section 30 of the Environmental Indemnity and by operation of law simultaneously with the transfer of WEM-3 24% Equity under the 2021 Agreement.

Case 1:23-cv-06479  Document 1-7  Filed 07/26/23  Page 25 of 51

HOLDINGS I LLC and Sections 2(e) and (f) of the AMENDMENT TO WEST EDMONTON MALL PROPERTY INC. SHAREHOLDER AGREEMENT, each dated as of March 25, 2021.

88.    The $50 million "reasonable estimate" of what would result in a sale was entirely artificial, and far too low.  Indeed, the parties must have known that they were using a massively reduced valuation because in the same 2021 Agreement, each Borrower Party (as defined in the 2021 Agreement) represented and warranted that all financial data with respect to the WEM-MOA Guarantors was true and accurate as of (i) January 29, 2021 and (ii) March 25, 2021, as a condition precedent to consummate the WEM-MOA 49% Equity transfer.  The financial data, including the appraisals of WEM and MOA, delivered to JPMorgan by March 2021 show vastly higher value for the WEM-MOA 49% Equity.

89.    For example, the $1 million "reasonable estimate" for the value of 49% equity in Mall of America, as set forth in the 2021 Agreement, was no more than 0.5% of the actual value of the MOA 49% Equity.  Mall of America was worth approximately $1.99 billion in March 2021, with an equity value of over $500 million.  Thus, a 49% equity stake was worth at least $245 million.

90.    On or about March 25, 2021, and consistent with the 2021 Agreement, MOA Guarantor transferred the MOA Interests to JPM-D5, and JPM-D5 was admitted as the sole member of MOA Holdings II LLC.

91.    On the same date, the other WEM Guarantors—WEM-1, WEM-2, and WEM-3—conveyed their common shares in West Edmonton Property Inc., the direct owner of the West Edmonton Mall, to defendant entities controlled by JPMorgan.  WEM-3, conveyed 480 of its 1500 Common Shares in WEMPI to JPM-WEM 1.  WEM-1 conveyed all of its 490 Common Shares in

23

WEMPI to JPM-WEM 2; WEM-2 conveyed all of its 10 Shares in WEMPI to JPM-WEM 2. As of March 2021, the WEM 49% Equity was estimated to be at least $800 million.

92.     At all times relevant to this action and currently JPMorgan owns, operates, and controls Defendants JPM-D5, JPM-WEM 1, and JPM-WEM 2—who directly received the WEM-MOA 49% Equity interests.

93.     The deal allowed the Ghermezian family to save face, avoid any public relations nightmare of insolvency proceedings, retain control of the American Dream Mall, and retain its 51% equity stake intact, via WEM-3, in West Edmonton Mall, notwithstanding the existence of Event of Default under the WEM 25% Cash Flow Pledge given by Original WEMPI. Individual Guarantors, all of whom are members of the Ghermezian family, benefitted by converting the Individual Guarantors' guaranty obligations into a last resort payment obligation.

94.     On information and belief, there likely are additional, hidden agreements to benefit the Ghermezian family. For example, approximately a week prior to the March 25, 2021 transfer of the WEM-MOA 49% Equity, Kurt Hagen, senior vice president for Triple Five, reported to a joint meeting of the Bloomington, Minnesota City Council and its port authority that "once we return to profitability, 49% of those profits would go to the American Dream lenders until such time as that collateral is released."[15] Mr. Hagen made these representations to officials who are "closely monitor[ing] the ownership of Mall of America"[16] because of the outsized importance it plays in the

---

[15]  Allison Pries, *American Dream's owner secures financing through 2026 with group led by JP Morgan*, Nov. 8, 2022, NJ.com,, https://www.nj.com/news/2022/11/american-dreams-owner-secures-financing-through-2026-with-group-led-by-jp-morgan.html; https://www.youtube.com/watch?t=3498&v=AuBnSvjBEW8&feature=youtu.be&ab_channel=CityofB

[16]  Esther Fung, *American Dream's Owner Defaulted. That Could Cost It Revenue From Other Malls*, Apr. 6, 2021, THE WALL STREET JOURNAL, https://www.wsj.com/articles/american-dreams-owner-defaulted-that-could-cost-it-revenue-from-other-malls-11617710401.

local economy.[17]  Mr. Hagen's comments that there may be a release of the WEM-MOA 49% Equity are inconsistent with the 2021 Agreement that was consummated by the Borrower Parties in January of 2021, and indicative of a side agreement.

95.     Through this scheme, JPMorgan secured a massive windfall.  It gained at zero expense, and with no reduction of the JPMorgan Loan, assets worth $1 billion, while concurrently blocking Plaintiff from immediate recourse against the WEM-MOA Guarantors and Individual Guarantors.

96.     JPMorgan should have credited the true value of the WEM-MOA 49% Equity to the outstanding amount of the JPMorgan Loan, which would have reduced the JPMorgan Loan by at least $1 billion, and JPMorgan would have been owed only approximately $500 million, secured by the American Dream Mall, which was worth far in excess of that amount.

97.     JPMorgan not only failed to credit the true value of the WEM-MOA 49% Equity, it did not even credit the artificial $50 million value assigned in the 2021 Agreement.  Indeed, JPMorgan's own July 2021 "Total Outstanding Principal Balance of the Loan" statements show *no reduction whatsoever* to the JPMorgan Loan resulting from the receipt of a $1 billion asset.  These statements show the Original Facility UPB before the March 2021 transfer of the WEM-MOA Equity as $1,145,000,000.  After the transfer, it is reduced by $50 million to $1,095,000,000; however, the same $50 million is added back to the total amount due as a *new line item* of "Purchase Price & Preferred Return" plus Preferred Return thereon on the post transfer statements.

98.     This is nonsensical—it leaves JPMorgan's loan totally intact, notwithstanding its receipt of a $1 billion asset.  JPMorgan is now reaping the benefits of the ownership of the WEM-

---

[17]  *See* Bloomington.org, stating "Officials estimate the Mall of America is a huge economic boon for the state of Minnesota, generating more than $2 billion in economic activity annually."
https://www.bloomingtonmn.org/General-Landing-Pages/moa-special-offers%20page/1/mall-of-america-facts.jsp

MOA 49% Equity without applying such benefits to reduce the balance of the JPMorgan Loan. With the JPMorgan Loan intact, moreover, Plaintiff is precluded under the terms of the Intercreditor Agreement from bringing an action against most of the WEM-MOA Guarantors (other than WEM-3) to enforce repayment of the Plaintiff Loan, or to otherwise obtain satisfaction of the American Dream Judgment already rendered against the American Dream Borrower by a New York court. Defendants' scheme demonstrates the lengths to which JPMorgan and the Ghermezians have gone to harm Plaintiff.

99.     In the case of WEM-3, WEM-3 was released from the Environmental Indemnity by Section 30 of the Environmental Indemnity and by operation of law simultaneously with the transfer of the WEM-3 24% Equity to JPM-WEM 1, thereby allowing Plaintiffs to pursue recourse under the Payment Guaranty.

### *Effect of the 2021 Agreement and the WEM-MOA Equity Transfers*

100.     The effect of the 2021 Agreement is devastating on the Plaintiff's and the Lenders' ability to be repaid on account of the Plaintiff Loan. The Plaintiff's borrower (American Dream Borrower) was not a party to the 2021 Agreement. The Plaintiff was not part of the negotiations and did not know of the existence of the 2021 Agreement until well after it had been signed.

101.     Prior to March 2021, the only meaningful asset of the WEM-MOA Guarantors available to the Plaintiff and the Lenders was the WEM-MOA 49% Equity (which the WEM-MOA Guarantors covenanted would always be worth at least $680 million). This asset was transferred to JPMorgan for only $50 million, and by virtue of the transfer, JPMorgan owns this asset outright. Plaintiff's recourse against MOA Guarantor, WEM-1, and WEM-2 is now effectively zero, since each transferred their equity stakes to JPMorgan affiliates. Plaintiff's recourse against WEM-3 was

26

limited to the WEM 24% Equity, and that too was transferred to a JPMorgan affiliate leaving Plaintiff with a small subrogation claim.

102.    By contrast, in addition to the WEM-MOA 49% Equity, which JPMorgan took, the JP Morgan Loan is secured (with respect to the West Edmonton Mall) by the WEM 25% Cash Flow Pledge and the West Edmonton Mall Mortgage, in addition to the main collateral, American Dream Mall.

103.    The WEM-MOA Guarantors now have effectively no ability to repay anything close to the full value of the defaulted Plaintiff Loan and judgment for which they are liable as guarantors.

104.    Further, by artificially setting the "value" to be credited to the JPMorgan Loan at $50 million, Defendants stripped the WEM-MOA Guarantors of otherwise valuable subrogation/reimbursement rights against Ameream, which Plaintiff would have relied on as a source for repayment of the Plaintiff Loan.    Each WEM-MOA Guarantor is entitled to subrogation/reimbursement claims against Ameream.    With the WEM-MOA 49% Equity falsely valued at just $50 million, however, Ameream would insist that $50 million would be the maximum amount of the WEM-MOA Guarantors' subrogation/reimbursement claims against it, thus creating an artificially low cap on any prospective recovery by Plaintiff against Ameream.

105.    The outstanding balance of the JPMorgan Loan against Ameream, which is already inflated because JPMorgan did not reduce that balance by the true value of the WEM-MOA 49% Equity that it received, continues to increase, thus operating as a buffer preventing Plaintiff from enforcing its rights under the Payment Guaranty.    And the Ghermezian family, shielded from having to pay what they owe, continue to manage the American Dream Mall, Mall of America, and the West Edmonton Mall and take for themselves the operating cashflow from those properties.

27

106. By contrast to Plaintiff and Lenders, JPMorgan had many options for recourse because the JPMorgan Loan is secured by not only the same WEM-MOA 49% Equity (which JPMorgan took) but is secured by the main collateral, the American Dream Mall, and additionally, secured with respect to the West Edmonton Mall by the WEM 25% Cash Flow Pledge and the West Edmonton Mall Mortgage.

107. The purpose and effect of the 2021 Agreement was therefore to (i) ensure that Plaintiff and Lenders cannot collect from the WEM-MOA Guarantors what is owed to them by hindering their collection efforts against WEM-MOA Guarantors; and (ii) prevent any claim by Plaintiff and the Lenders in seeking a $1 billion or more in subrogation/reimbursement claim against Ameream.

108. The "stipulated values" set forth in the 2021 Agreement of just $50 million in total were clearly false given that, as explained above (*see supra* ¶ 48), the combined true market value of the 49% ownership in Mall of America and the West Edmonton Mall was approximately $1 billion at or around the time of the 2021 Agreement. JPMorgan was aware that these values were false as it received, from the Ghermezian family, financial data and reports regarding Mall of America and the West Edmonton Mall in connection with the 2021 Agreement.

### E. The Senior Mezz Lender Forecloses on Ameream Mezz's 100% Ownership of Ameream, Resulting in Termination of the Intercreditor Agreement

109. On October 25, 2022, the Senior Mezz Lender provided notice that it had acquired title to Ameream through a foreclosure under the applicable Uniform Commercial Code. By doing so, Senior Mezz Lender is no longer owed anything by Ameream Mezz, or any guarantor, including the Individual Guarantors and WEM-MOA Guarantors, and has no right to receive any proceeds from the sale or other disposition of the WEM-MOA 49% Equity. These actions caused the Intercreditor Agreement to automatically terminate in accordance with Section 18(m) thereto.

28

110.     Despite the Ghermezian family apparently losing their equity ownership in the American Dream Mall, they continue to operate the American Dream Mall and continue to serve as senior officers.  On information and belief, they receive compensation for such services, meaning that they continue to profit from their relationship with American Dream Mall.

111.     In fact, despite Senior Mezz Lender foreclosing on the equity ownership of the American Dream Mall, the Ghermezian family and Triple Five continue to hold themselves out as owners of American Dream Mall to media and the public.[18]  They even tout in public statements that JPMorgan is a "partner,"[19] and that JPMorgan agreed to amend the JPMorgan Loan.  Don Ghermezian bragged about this deal, as reported in one news article: "[w]e are pleased that our lenders…share in our vision and recognize Triple Five and American Dream's successful and impactful contribution to the global retail and entertainment landscape.  Under the terms of the deal announced November 7 by Triple Five, its lenders group led by JPMorgan & Chase Co, agreed to a four-year extension on repayments, setting a new maturity date of October 2026."[20]

**F.     The Plaintiff Sues American Dream Borrower For Defaults Under the Plaintiff Loan**

112.     American Dream Borrower failed to remit the regularly scheduled monthly payment of interest due under the Plaintiff Loan Notes in full on May 10, 2021, resulting in an Event of Default.  As a result of such Event of Default, interest began accruing at the Default Rate on May 10, 2021.

---

[18]  *See generally*, Allison Pries, "American Dream's owner secures financing through 2026 with group led by JP Morgan," NJ.com, Nov. 8, 2022, https://www.nj.com/news/2022/11/american-dreams-owner-secures-financing-through-2026-with-group-led-by-jp-morgan.html; Rich Bockmann, "American Dream mall debtor must repay $390M: judge," THE REAL DEAL, Apr. 12, 2023, https://therealdeal.com/new-york/tristate/2023/04/12/american-dream-mall-must-repay-390m-loan-judge/
[19]  David Moin, *American Drea, Post Covid-19, Capturing Crowds*, WOMEN'S WEAR DAILY, Janr. 23, 2023, https://wwd.com/business-news/real-estate/american-dream-progress-report-1235481459/
[20]  Kimberly Redmond, "Triple Five gets extension on American Dream construction debt," NJBiz.com, https://njbiz.com/triple-five-gets-extension-on-american-dream-construction-debt/.

Case 1:23-cv-06479  Document 1-7  Filed 07/26/23  Page 32 of 51

113.    On or about May 26, 2021, Plaintiff notified American Dream Borrower in writing of the default under the Plaintiff Loan and demanded payment in full of all amounts then due. American Dream Borrower did not pay.

114.    On February 7, 2023, Plaintiff sued American Dream Borrower in New York state court, filing a summary judgment motion in lieu of filing a complaint.

115.    American Dream Borrower did not object to Plaintiff's summary judgment motion.

116.    On April 10, 2023, the New York state court granted the Plaintiff's motion for summary judgment and ordered to submit judgment on notice.

117.    On May 3, 2023, the New York state court entered the American Dream Judgment. As of May 3, 2023, American Dream Borrower owed Plaintiff the amount of $404,399,512.87. The American Dream Judgment remains outstanding and interest accrues at the New York state statutory rate.

118.    The WEM-MOA Guarantors and the Individual Guarantors are liable to the Plaintiff for the full amount of the American Dream Judgment plus interest thereon until paid in full.

30

## FIRST CAUSE OF ACTION

### *(*Fraudulent Transfer – WEM Guarantor Transfer Against JPMorgan, JPM-WEM 1**, and JPM-WEM 2**)*

119.     Plaintiff repeats and realleges each allegation in paragraph(s) "1" through "118" as if fully set forth herein.

120.     The transfer by the WEM Guarantors to JPMorgan of 49% equity ownership in the West Edmonton Mall, pursuant to the 2021 Agreement, is a fraudulent transfer, and Plaintiff should be paid the value of the WEM 49% Equity up to at least $404,399,512.87 plus interest thereon at the statutory rate, which is less than the value of such transferred assets.

121.     Plaintiff was a creditor of the WEM Guarantors at the time the 2021 Agreement was signed by virtue of the debt owed under the Payment Guaranty.

122.     JPMorgan and the WEM Guarantors entered into the 2021 Agreement with the intent to defraud, hinder and delay creditors of the WEM Guarantors, particularly Plaintiff and Lenders (who were not informed of the 2021 Agreement until well after it was signed), as evidenced by multiple "badges of fraud" or equivalents under applicable law.

123.     The 2021 Agreement and the transfers thereunder benefitted insiders of the WEM Guarantors:

- The Ghermezian family and related entities have been allowed to retain control of and retain benefits of the operations of the West Edmonton Mall, among others;

- WEM-3 itself, as holder of the remaining 51% interest in the West Edmonton Mall, continues to receive higher operating cash flows from WEMPI, which also benefits affiliates of the WEM-MOA Guarantors, and;

31

- Four of the nine Individual Guarantors who received a stay on enforcement of their individual guarantees against them are directors of one or more of the WEM Guarantors.

124.    Second, the $49 million "reasonable estimate" of the WEM 49% Equity set forth in the 2021 Agreement was no more than 6% of its actual value.

125.    JPMorgan acquired the WEM 49% Equity indefinitely in exchange for a $49 million "credit" against the JPMorgan Loan, as well as agreements by JPMorgan not to make demands of the WEM Guarantors, and an agreement that $49 million was a reasonable estimate of the proceeds JPMorgan would have received had the WEM 49% Equity been sold via a public auction.

126.    The paltry credit JPMorgan and the Ghermezian family agreed to provide against the JPMorgan Loan is tiny compared to the true value of the WEM 49% Equity Stake, but JPMorgan did not apply that true value or even the paltry $49 million to reduce the JPMorgan Loan by a single dollar.

127.    The value of a 49% equity stake in the West Edmonton Mall was at least $800 million in March 2021, which was known to the JPMorgan Defendants.

128.    As of March 2021, the Ghermezian family and the WEM Guarantors were on notice that Ameream had defaulted and they faced immediate risk on their guarantees.

129.    The WEM Guarantors transferred to or for the benefit of JPMorgan, JPM-WEM 1, and JPM-WEM 2 substantially all of their assets, in a transfer designed to leave the WEM Guarantors with only a $49 million subrogation/reimbursement claim that itself had been manipulated and reduced in value.

Case 1:23-cv-06479   Document 1-7   Filed 07/26/23   Page 35 of 51

130.    Solely to the extent that the value, as of March 2021, of the American Dream Mall, West Edmonton Mall, and Mall of America collectively were insufficient to pay in full the Plaintiff Loan after paying in full all senior obligations secured by such Malls, Plaintiff pleads that the WEM 49% Equity Transfer for $49 million under the 2021 Agreement is voidable as a constructive fraudulent transfer.

131.    Solely to the extent that the value, as of March 2021, of the American Dream Mall, West Edmonton Mall, and Mall of America collectively were insufficient to pay in full the Plaintiff Loan after paying in full all senior obligations secured by such Malls, each WEM Guarantor was rendered insolvent by or left with unreasonably small capital as a consequence of their respective transfers of the WEM-MOA 49% Equity.

33

Case 1:23-cv-06479  Document 1-7  Filed 07/26/23  Page 36 of 51

## SECOND CAUSE OF ACTION
### *(Fraudulent Transfer – MOA Guarantor Transfer Against JPMorgan, JPM-D5, and MOA Guarantor)*

132.     Plaintiff repeats and realleges each allegation in paragraph(s) "1" through "118" as if fully set forth herein.

133.     The 2021 Agreement as to the 49% equity ownership in Mall of America Mall is a fraudulent transfer and Plaintiff should be paid the value of the MOA 49% Equity up to the lesser of the value of the MOA 49% Equity and the amount of the American Dream Judgment, which is at least $404,399,512.87 plus interest thereon at the statutory rate.

134.     Plaintiff was a creditor of the MOA Guarantor at the time that the 2021 Agreement was signed by virtue of the debt owed under the Payment Guaranty.

135.     JPMorgan and the WEM Guarantors entered into the 2021 Agreement with the intent to defraud, hinder and delay creditors of MOA Guarantor, particularly the Plaintiff and Lenders (who were not informed of the 2021 Agreement until well after it was signed), as evidenced by multiple "badges of fraud".

136.     First, the 2021 Agreement and the transfers thereunder benefitted insiders of the MOA Guarantor because they do not face any immediate risk of suit on their individual guarantees.

137.     Second, the $1 million "reasonable estimate" set forth as the value of MOA 49% Equity in the 2021 Agreement was no more than 0.5% of its actual value.  Mall of America was worth approximately $1.99 billion in March 2021, with an equity value of over $500 million.  A 49% equity stake in the Mall of America was worth at least $245 million, which meant JPMorgan and the Ghermezian family, in a non-arm's length agreement in violation of the MOA-JPMorgan Pledge Agreement, decided the "value" was only $1 million.  Adding salt to the wound, JPMorgan did not reduce its loan balance by even a dollar after acquiring the MOA 49% Equity for a mere $1 million.

34

Case 1:23-cv-06479   Document 1-7   Filed 07/26/23   Page 37 of 51

138.    As of March 2021, the Ghermezian family and the MOA Guarantor were on notice that Ameream had defaulted and they faced immediate risk on their guarantees.

139.    The MOA Guarantor transferred to or for the benefit of JPMorgan and JPM-D5 substantially all of its assets, in a transfer designed to leave the MOA Guarantor with only a $1 million subrogation/reimbursement claim that itself had been manipulated and reduced in value.

140.    Solely to the extent that the value, as of March 2021, of the American Dream Mall, West Edmonton Mall, and Mall of America collectively were insufficient to pay in full the Plaintiff Loan after paying in full all senior obligations secured by such Malls, Plaintiff pleads that the MOA 49% Equity Transfer for $1 million under the 2021 Agreement is voidable as a constructive fraudulent transfer.

141.    Solely to the extent that the value, as of March 2021, of the American Dream Mall, West Edmonton Mall, and Mall of America collectively were insufficient to pay in full the Plaintiff Loan after paying in full all senior obligations secured by such Malls, MOA Guarantor was rendered insolvent by or left with unreasonably small capital as a consequence of its transfer of the MOA 49% Equity.

35

## THIRD CAUSE OF ACTION
## *(*Tortious Interference Against JPMorgan)

142.     Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "118" as if fully set forth herein.

143.     Plaintiff and the WEM-MOA Guarantors are parties to the Payment Guaranty, which was and is a valid and enforceable contract.

144.     Until the Guaranteed Obligations are satisfied, pursuant to Section 6.2 of the Payment Guaranty, the WEM-MOA Guarantors covenanted to (i) ensure that the collective value of the WEM-MOA 49% Equity was at least $680,000,000.00 and (ii) continue to own at least 49% interest in Mall of American and the West Edmonton Mall.

145.     At all times JPMorgan was aware of Section 6.2 of the Payment Guaranty and its importance to Plaintiff.  Indeed, JPMorgan was heavily involved in the negotiations over all documents relating to the Plaintiff Loan, including the Payment Guaranty.

146.     JPMorgan is a party to the 2021 Agreement with the WEM-MOA Guarantors.

147.     Pursuant to the 2021 Agreement, MOA Guarantor no longer owns 49% of the Mall of America and the WEM Guarantors no longer own 49% of the West Edmonton Mall.

148.     As a result of WEM-MOA Guarantors entering into the 2021 Agreement, the collective value of the WEM-MOA 49% Equity owned by the WEM-MOA Guarantors is effectively zero and the WEM-MOA Guarantors have no ability to collectively maintain a value of $680 million.

149.     The WEM-MOA Guarantors have breached Section 6.2 of the Payment Guaranty.

150.     JPMorgan intentionally and without justification induced the WEM-MOA Guarantors to breach Section 6.2 of the Payment Guaranty.

151.     JPMorgan's conduct causing the WEM-MOA Guarantors to breach Section 6.2 of the Payment Guaranty has damaged Plaintiff because Plaintiff no longer has any assurances that the

36

collective value of the WEM-MOA 49% Equity is or will ever be at least $680,000,000.00 or even

an amount sufficient to pay the Plaintiff Loan obligations.

## FOURTH CAUSE OF ACTION
### *(*Marshaling Against JPMorgan)

152.     Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "118" as if fully set forth herein.

153.     As of March 2021, JPMorgan was a secured creditor of the WEM-MOA Guarantors, including being pledged the WEM-MOA 49% Equity, which until the 2021 Agreement secured the JPMorgan Loan.  Any excess of the WEM-MOA 49% Equity is to be applied to the Plaintiff Loan pursuant to the terms of the Intercreditor Agreement and the Irrevocable Direction Letter.

154.     The JPMorgan Loan was, and still is, secured by other collateral: the WEM 25% Cash Flow Pledge (just with respect to the West Edmonton Mall), the West Edmonton Mall Mortgage, and the American Dream Mall, together with the future development rights adjacent to the American Dream Mall for hotel, office buildings and a minor baseball league park, none of which secure the Plaintiff Loan.

155.     Under the JPMorgan loan documents, JPMorgan has the right to resort to both the WEM-MOA 49% Equity and its other collateral.

156.     Plaintiff does not have a right to such other collateral, which secured the JPMorgan Loan.

157.     JPMorgan would not be prejudiced by resorting to its other collateral before looking to the WEM-MOA 49% Equity to satisfy its debt.  In fact, the value of the American Dream Mall, which is collateral for the JPMorgan Loan, exceeds the amount of the JPMorgan Loan.

158.     Entry into the 2021 Agreement was inequitable conduct, overreaching, and/or fraud by JPMorgan.

159.     Applying marshaling to the JPMorgan Loan would be the just and equitable response to the efforts of JPMorgan and the WEM-MOA Guarantors, among others, to unfairly

38

deprive Plaintiff of the WEM-MOA 49% Equity through their non-arm's length agreement that artificially depresses the value of the WEM-MOA 49% Equity.

160.     Failure to apply marshaling to the defaults under the JPMorgan Loan would unfairly deprive Plaintiff of its right to enforce and collect from the WEM-MOA Guarantors on the Payment Guaranty that assured the repayment of the Plaintiff Loan.

39

## FIFTH CAUSE OF ACTION
### (Breach of the Intercreditor Agreement's Implied Covenant of Good Faith and Fair Dealing Against JPMorgan)

161.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "118" as if fully set forth herein.

162.    Plaintiff, JPMorgan, and Senior Mezz Lender entered into the Intercreditor Agreement, which is governed by New York law.

163.    Implied in all contracts governed by New York law is a covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

164.    The Intercreditor Agreement provides that Plaintiff cannot proceed against the WEM-MOA Guarantors, even if American Dream Borrower has defaulted, if the JPMorgan Loan or the Senior Mezz Loan is outstanding.

165.    Section 6(b) of the Intercreditor Agreement provides that in the event JPMorgan and/or Senior Mezz Lender receive proceeds from a foreclosure of the WEM-MOA 49% Equity and the JPMorgan Loan and Senior Mezz Loan are fully repaid, then excess proceeds shall be disbursed to the Plaintiff.

166.    Senior Mezz Lender has informed Ameream Mezz, and the Plaintiff on October 24, 2022 and October 25, 2022, respectively, that the Senior Mezz Loan has been fully repaid.  Thus, the Intercreditor Agreement has terminated except that Section 6(b) survives termination.

167.    At all relevant times JPMorgan and the Senior Mezz Lender knew Section 6(b) was important to protect Plaintiff's interests under the Plaintiff loan document because Plaintiff and the Lenders were induced to provide the Plaintiff Loan because of a Payment Guaranty, the Intercreditor Agreement and the Irrevocable Direction Letter containing the same protections.

40

Case 1:23-cv-06479 Document 1-7 Filed 07/26/23 Page 43 of 51

168.    At all times relevant to this litigation, JPMorgan owed a duty to Plaintiff to act in good faith and deal fairly with it under the Intercreditor Agreement, including (i) not unfairly abusing JPMorgan's rights under section 6(b) by artificially lowering the value of the WEM-MOA 49% Equity thereby failing to reduce the amount of the JPMorgan Loan or reducing any subrogation/reimbursement rights of the WEM-MOA Guarantors against Ameream, (ii) conducting a public sale of assets, as required under its loan documents, to obtain the highest purchase price for the WEM-MOA 49% Equity and (iii) properly applying the purchase price of the WEM-MOA 49% Equity to the reduction of the amount due under the JPMorgan Loan.

169.    Rather than foreclose against these assets based on their actual value of approximately $1 billion, JPMorgan acquired the WEM-MOA 49% Equity indefinitely at an artificially low valuation of $50 million and has the right to receive dividends on account of the WEM-MOA 49% Equity, even after the JPMorgan Loan is repaid.

170.    The 2021 Agreement was negotiated in secret and Plaintiff was not aware of the negotiations or terms until after they had been signed.

171.    The 2021 Agreement was structured so that JPMorgan could purposefully avoid obligations under the Intercreditor Agreement and block Plaintiff's rights to recovery under the Intercreditor Agreement, Plaintiff Loan, Payment Guaranty, or the Irrevocable Direction Letter, which would have provided for payment to Plaintiff upon JPMorgan's foreclosure under the JPMorgan Loan.

172.    JPMorgan compounded its bad faith mistreatment of Plaintiff by essentially failing to credit even $50 million against the outstanding JPMorgan Loan.  JPMorgan should have credited $50 million to the outstanding amount of the JPMorgan Loan.  However, JPMorgan reported in July 2021 that while crediting $50 million as a "paydown" of the $1.145 billion loan balance, JPMorgan

41

simultaneously added back to the loan balance $52,509,096.84 as "WEM/MOA Purchase Price & Preferred Return."

173.    JPMorgan breached its covenant to act in good faith and deal fairly with the Plaintiff under the Intercreditor Agreement.

174.    Plaintiff is entitled to damages equal to the amount of the American Dream Judgment plus interest thereon at the statutory rate.

## SIXTH CAUSE OF ACTION
### *(Declaratory Relief Against JPMorgan – Intercreditor Agreement)*

175.     Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "118" as if fully set forth herein.

176.     Plaintiff, JPMorgan, and Senior Mezz Lender entered into the Intercreditor Agreement, which is governed by New York law.

177.     Implied in all contracts governed by New York law is a covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

178.     Further, because JPMorgan has breached the implied covenant, Plaintiff is excused from Section 6(b)'s (i) all limitations on pursuing enforcement actions and collections against the WEM-MOA Guarantors or Individual Guarantors on account of the Payment Guaranty or otherwise, and (ii) provision to pay over to JPMorgan any amount recovered by Plaintiff from the Payment Guarantors to the reduction of the JPMorgan Loan.

179.     Additionally, WEM-3's obligations under the Environmental Indemnity was satisfied upon the transfer to a JPMorgan affiliate of the WEM-3 24% Equity under the 2021 Agreement. Section 30 of the Environmental Indemnity explicitly states that JPMorgan's recourse under the Environmental Indemnity is limited the WEM-3 24% Equity.  Thus, under any circumstances, WEM-3 is no longer bound by the Environmental Indemnity.

180.     Plaintiff seeks a declaration that (i) any limitations under Section 6(b) on Plaintiff and/or the Lenders from seeking enforcement actions and collections from the  Payment Guarantors are null and void, and (ii) Plaintiff shall retain and keep any and all amounts or other consideration

43

received from the Payment Guarantors for application to the reduction of the Plaintiff Loan, even if the JPMorgan Loan has not been repaid or otherwise satisfied.

181. Plaintiff seeks a declaration that WEM-3 is not a Shared Guarantor by operation of law that WEM-3 has fully perform under the Environmental Indemnity.

## SEVENTH CAUSE OF ACTION
### (Declaratory Relief Against All Defendants – Amount of Subrogation/Reimbursement Claim)

182.  Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "118" as if fully set forth herein.

183.  Plaintiff was a creditor of each of the WEM Guarantors and the MOA Guarantor.

184.  On March 25, 2021, JPMorgan, through other JPMorgan Defendants, acquired the 49% equity stake of the WEM-MOA Guarantors in the West Edmonton Mall and Mall of America pursuant to the 2021 Agreement.

185.  As a result of the WEM Guarantors and the MOA Guarantor having their property satisfy obligations Ameream owed to JPMorgan, each of the WEM Guarantors and the MOA Guarantor holds subrogation/reimbursement claims against Ameream.

186.  The 2021 Agreement improperly valued the 49% equity ownership in the West Edmonton Mall at $49 million which is about 6% of the actual value of the WEM 49% Equity as of March 2021.

187.  The 2021 Agreement valued the 49% equity ownership in Mall of America at $1 million which is about 0.5% of the actual value of the MOA 49% Equity as of March 2021.

188.  By virtue of the 2021 Agreement, each of the WEM Guarantors and the MOA Guarantor hold subrogation/reimbursement claims against Ameream that, if the 2021 Agreement is enforced, may be limited to $50 million in the aggregate, with the WEM Guarantors collectively being limited to a $49 million subrogation/reimbursement claim and the MOA Guarantor being limited to a $1 million subrogation/reimbursement claim.

189.  Plaintiff seeks a declaration that the value of the 49% equity stake in the West Edmonton Mall is worth at least $800 million as of March 2021.

45

190.     Plaintiff seeks a declaration that the value of the 49% equity stake in Mall of America is worth at least $245 million as of March 2021.

## PRAYER

WHEREFORE, Plaintiff SOL-MM III LLC requests that this Court enter judgment as follows:

(a)     Awarding Plaintiff a judgment against the applicable JPMorgan Defendants for the value of the WEM-MOA 49% Equity up to the amount of the American Dream Judgment plus interest thereon at the statutory rate;

(b)     Awarding Plaintiff a judgment against Defendants for compensatory and punitive damages in an amount to be proven at trial, plus interest thereon at the statutory rate;

(c)     Awarding Plaintiff statutory costs, expenses and reasonable attorneys' fees as against the Defendants plus interest thereon at the statutory rate;

(d)     Declaring that Section 6(b) of the Intercreditor Agreement does not bar Plaintiff from (i) seeking enforcement actions and collections from the Payment Guarantors and (ii) retaining and keeping any and all amounts and other considerations received from the Payment Guarantors for application to the reduction of the Plaintiff Loan, even if the JPMorgan Loan has not been repaid or otherwise satisfied;

(e)     Declaring that WEM-3 is not a Shared Guarantor by operation of law and that WEM-3 has fully performed under the Environmental Indemnity.

(f)     Declaring that the subrogation/reimbursement claim held by the WEM Guarantors is or exceeds $800 million, an amount to be proven at trial;

(g)     Declaring that the subrogation/reimbursement claim held by the MOA Guarantor is or exceeds $245 million, an amount to be proven at trial; and

46

      (h)     Granting such other and further legal and equitable relief as this Court may deem just and proper.

Dated: New York, New York
       July 18, 2023

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*/s/* Adam Abensohn
Adam Abensohn
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel:    (212) 849-7000
Fax:    (212) 849-7100

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/* Steven S. Fitzgerald
Steven S. Fitzgerald
500 Fifth Avenue
New York, NY 10110
Tel:    (212) 382-3300
Fax:    (212) 382-0050

*Attorneys for Plaintiff SOL-MM III LLC*

47

**Annex A**

### A. PRE-FORECLOSURE OF WEM-MOA 49% Equity BY JPMORGAN



## Annex B

### B. POST-FORECLOSURE OF (1) WEM-MOA 49% Equity BY JPMORGAN and (2) AMEREAM LLC 100% Equity BY SENIOR MEZZ LENDER

