UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOL-MM III LLC,

                                        Plaintiff,

                        - against -

JPMORGAN CHASE BANK, N.A., D5 HAWKS LLC,
WE TAHOE 1 LLC, WE TAHOE 2 LLC, NEW WEM
HOLDINGS AFFILIATE 1 LTD., NEW WEM
HOLDINGS AFFILIATE 2 LTD., NEW WEM
HOLDINGS LTD., and MOA HOLDINGS III, LLC,

                                        Defendants.

No. 1:23-cv-06479-JGK

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY JPMORGAN
CHASE BANK, N.A., D5 HAWKS LLC, WE TAHOE 1 LLC AND WE TAHOE 2 LLC**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 4

    A.    The Senior Lenders Extend Financing For The Project And Obtain Secured Payment Guaranties From The WEM-MOA Guarantors ........................ 4

    B.    Plaintiff Enters The Loan Structure And Executes The ICA As A Subordinate Lender ................................................................................................ 6

    C.    By Its Express Terms, The ICA Undermines Plaintiff's Claims ........................... 7

    D.    JPMorgan Exercised its Contractual Right to Enter Into The January 2021 Agreement ........................................................................................................ 8

    E.    The Junior Mezzanine Loan Default ................................................................. 10

    F.    Plaintiff Commences This Action, Wielding Rights It Never Bargained For And Attempting To Litigate Its Way To The Front Of The Repayment Line ................................................................................................................ 11

ARGUMENT ................................................................................................................. 11

I.    PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS FAIL (COUNTS I & II) ......... 12

    A.    Plaintiff Lacks Standing To Pursue Fraudulent Transfer Claims Under Both Minnesota And Alberta Law ................................................................... 12

    B.    Even If Plaintiff Had Standing, It Has Not Stated A Claim For Fraudulent Transfer ....................................................................................................... 18

    C.    Plaintiff's Claim for Fraudulent Transfer Of The WEM Equity (Count I) Is Time Barred ................................................................................................. 22

II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE (COUNT III) ................................................................................ 24

    A.    Plaintiff Does Not Allege That JPMorgan Intentionally Procured A Breach Of The Junior Payment Guaranty ................................................................... 24

    B.    JPMorgan's Entry Into The 2021 Agreement Was Justified ............................... 25

    C.    Plaintiff Has Not Sustained Actual Damages From Any Alleged Breach Of The Junior Payment Guaranty ................................................................... 26

III.    THE COMPLAINT'S MARSHALING CLAIM FAILS AS A MATTER OF LAW (COUNT IV) ........................................................................................................ 27

IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT V) ........ 29

V.    THE COMPLAINT'S CLAIMS FOR DECLARATORY JUDGMENT ARE BASED ON A FUNDAMENTAL MISUNDERSTANDING OF THE ICA (COUNTS VI AND VII) ........................................................................................... 31

    A.    Count Six Fails As A Matter Of Law ................................................................. 31

    B.    Count Seven Fares No Better ............................................................................. 32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Able Energy, Inc. v. Marcum & Kliegman LLP*,
    69 A.D.3d 443 (N.Y. App. Div. 2010) ...................................................................30

*Ahlgren v. Cap. One Bank (USA), N.A.*,
    No. CV 19-1607, 2020 WL 618236 (D. Minn. Feb. 10, 2020) .............................20

*Ahlgren v. Muller*,
    555 F. Supp. 3d 688 (D. Minn. 2021).....................................................................18

*Alerus Fin., N.A. v. Martin Holdings, LLC*,
    No. A13-0407, 2013 WL 6390337 (Minn. Ct. App. 2013) ....................................13

*Am. Fed. Bank v. W. Cent. Ag. Servs.*,
    530 F. Supp.3d 780 (D. Minn. 2021).......................................................................13

*In re Arlco, Inc.*,
    239 B.R. 261 (Bankr. S.D.N.Y. 1999).............................................................28, 29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................11

*Audax Credit Opportunities Offshore v. Tmk Hawk Parent*,
    No. 656123/2020, 2021 WL 3671541 (N.Y. Sup. Ct. Aug. 16, 2021)...................25

*Burrowes v Combs*,
    25 A.D.3d 370 (N.Y. App. Div. 2006) ...................................................................27

*Canon Inc. v. Tesseron Ltd.*,
    146 F. Supp. 3d 568 (S.D.N.Y. 2015).....................................................................29

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)................................................................................4, 12

*Ciccone v. One W. 64th St., Inc.*,
    No. 651748/16, 2017 N.Y. Slip Op. 32001(U) (N.Y. Sup. Ct. Sept. 14, 2017) .....31

*Finn v. Alliance Bank*,
    860 N.W.2d 638 (Minn. 2015).................................................................................19

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994)................................................................26

*Foster v. Churchill*,
   87 N.Y.2d 744 (1996) ....................................................................25

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
   720 F.3d 84 (2d Cir. 2013)...............................................................29

*Gerlich v. Countrywide Home Loans, Inc.*,
   No. CIV. 10-4520 DWF/LIB, 2011 WL 3920235 (D. Minn. Sept. 7, 2011) .........16

*Glover v. Bob's Disc. Furniture, LLC*,
   621 F. Supp. 3d 442 (S.D.N.Y. 2022)...................................................11

*Hesse v. Godiva Chocolatier, Inc.*,
   463 F. Supp. 3d 453 (S.D.N.Y. 2020)...................................................23

*Heuman (Next friend of) v. Andrews*,
   2005 ABQB 832 .............................................................................22

*Joan Hansen & Co., Inc. v Everlast World's Boxing Headquarters Corp.*,
   296 A.D.2d 103 (N.Y. App. Div. 2002) ................................................24

*In re Joint E. & S. Dist. Asbestos Litig.*,
   14 F.3d 726 (2d Cir. 1993)...............................................................31

*K&G Elec. Motor & Pump Corp. v. Ingersoll-Rand Co.*,
   No. 18 Civ. 2308 (DRH), 2019 WL 4089546 (E.D.N.Y. Aug. 27, 2019)...........29

*Kelley as Tr. for PCI Liquidating Tr. v. Boosalis*,
   974 F.3d 884 (8th Cir. 2020) ...........................................................19

*Kelly v. Armstrong*,
   206 F.3d 794 (8th Cir. 2000) ...........................................................21

*Knopf v. Meister, Seelig & Fein, LLP*,
   No. 15CV5090 (DLC), 2016 WL 1166368 (S.D.N.Y. Mar. 22, 2016)...............21

*Lariat Companies, Inc. v. Wigley*,
   No. A17-0210, 2020 WL 5507811 (Minn. Ct. App. Sept. 14, 2020)...............22

*Lay v. Lay*,
   2023 ABKB 354  .............................................................................18

*LC Footwear, L.L.C. v. L.C. Licensing, Inc.*,
   No. 651907/2010, 2011 WL 11085363 (N.Y. Sup. Ct. Nov. 16, 2011)............30

*Lewis Tree Serv. v. Lucent Techs.*,
   239 F. Supp. 2d 322 (S.D.N.Y. 2002) ..................................................................12

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...........................................................................................16

*In re Medina*,
   619 B.R. 236 (B.A.P. 9th Cir. 2020) ..................................................................14

*Meyer, Suozzi, English & Klein, P.C. v. Higbee*,
   No. 18-cv-03353, 2019 U.S. Dist. LEXIS 80414 (E.D.N.Y. May 13, 2019) .........32

*MTI/The Image Grp., Inc. v. Fox Studios E., Inc.*,
   262 A.D.2d 20 (N.Y. App. Div. 1999) ..............................................................25

*Murphy v. Int'l Bus. Machines Corp.*,
   No. 10 CIV. 6055 LAP, 2012 WL 566091 (S.D.N.Y. Feb. 21, 2012) ...................23

*Neuman v. Garcia*,
   No. 20-CV-10723 (PKC), 2022 WL 4448722 (S.D.N.Y. Sept. 23, 2022) ............21

*In re Petters Co.*,
   557 B.R. 711 (Bankr. D. Minn. 2016) ................................................................19

*Prospect Funding Holdings, LLC v. Vinson*,
   256 F. Supp.3d 318 (S.D.N.Y. 2017) .................................................................25

*Ray v. Ray*,
   799 F. App'x 29 (2d Cir. 2020) .........................................................................20

*Richards v. Select Ins. Co.*,
   40 F. Supp. 2d 163 (S.D.N.Y. 1999) .................................................................32

*Rocanova v. Equitable Life Assur. Soc'y of U.S.*,
   83 N.Y.2d 603 (1994) .......................................................................................27

*Royal Bank of Canada v. Laughlin*,
   2001 ABCA 78 ................................................................................................14

*Salter et al v. Wyo-Ben Products Inc.*
   (1972) 25 D.L.R. (3d) 626 (Alta. S.C.T.D.) .......................................................14

*Saltini v. North Sea Dev. LLC*,
   No. 604265-18, 2019 N.Y. Misc. LEXIS 4906 (N.Y. Sup. Ct. Sept. 9, 2019) .......26

*Scheuerman v. Scheuerman*
   (1915), 8 Alta. L.R. 417 (Alta. S.C., App. Div.) ...............................................14

*In re Se. Waffles, LLC*,
  702 F.3d 850 (6th Cir. 2012) ...........................................................................19

*In re Sharp Int'l Corp.*,
  403 F.3d 43 (2d Cir. 2005).................................................................................20

*Servus Credit Union v. JRD Investments Inc.*,
  2020 ABQB 249 ................................................................................................18

*SHIR Cap., LLC v. Fortress Credit Advisors LLC*,
  No. 160069/2019, 2020 N.Y. Misc. LEXIS 2664 (N.Y. Sup. Ct. June 11, 2020)..................29

*Tolofson v. Jensen*,
  3 S.C.R. 1022 [1994] .........................................................................................22

*In re Trinsum Grp., Inc.*,
  460 B.R. 379 (Bankr. S.D.N.Y. 2011)...................................................................18

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*,
  No. 18 Civ. 4044 (VM), 2019 WL 4744220 (S.D.N.Y. Aug. 26, 2019) .................................25

*Ultramar Energy v. Chase Manhattan Bank*,
  179 A.D.2d 592 (N.Y. App. Div. 1992) ................................................................25

*Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*,
  455 F. App'x. 102 (2d Cir. 2012) ........................................................................24

*Vargas v. Boston Chicken, Inc.*,
  269 F. Supp. 2d 92 (E.D.N.Y. 2003) ...................................................................32

*Walther v. Bank of New York*,
  772 F. Supp. 754 (S.D.N.Y. Aug. 22, 1991)..........................................................28

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*,
  8 N.Y.3d 422 (2007) ..........................................................................................25

*Woodard v. Reliance Worldwide Corp.*,
  No. 18-CV-9058, 2019 WL 3288152 (S.D.N.Y. July 22, 2019) ........................................30

*In re Yahweh Ctr., Inc.*,
  27 F.4th 960 (4th Cir. 2022) ...............................................................................19

## Statutes and Rules

Minnesota Uniform Voidable Transactions Act, Minn. Stat. §§ 513.41 - 513.51.......13, 18, 19, 20

New York Debtor & Creditor Law § 279(b) .............................................................13

Uniform Commercial Code Section 9-620 .............................................................5, 9, 10

Uniform Commercial Code Section 9-625 ................................................................16

Federal Rule of Civil Procedure 9(b)...........................................................11, 20, 21

Federal Rule of Civil Procedure 12 .......................................................1, 11, 18, 23

Federal Rule of Civil Procedure 44.1 ......................................................................1

**Other Authorities**

Can. Alta. Limitations Act, RSA 2000, c L-12, Section 3(1).................................22, 23

Can. Alta. Personal Property Security Act, RSA 2000, c P-7 § 62 ...............................15

37 C.J.S. Fraudulent Conveyances § 8 ....................................................................14

James Gadsden & Alan Kolod, Supplementary Practice Commentaries,
    N.Y. Debt. & Cred. Law § 278 ........................................................................22

Defendants JPMorgan, JPM-D5, JPM-WEM 1 and JPM-WEM 2 (collectively, the "JPM Defendants") respectfully submit this memorandum of law, together with the accompanying declaration of Janice Mac Avoy, dated November 8, 2023 ("Mac Avoy Declaration") with attached exhibits and the declaration of the Hon. Neil Wittmann K.C., dated November 7, 2023 ("Wittmann Declaration"),[1] in support of their motion to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[2]

## PRELIMINARY STATEMENT

Plaintiff is the disgruntled, junior-most lender on the American Dream Mall project in New Jersey (the "Project"). By this action, Plaintiff seeks to upend the priority of payments to which it agreed in the Intercreditor Agreement (the "ICA")—which was still in existence at the time of the challenged transaction—and skip to the front of the contractually established repayment priority line. Plaintiff's efforts should be rejected.

Plaintiff entered the Project with eyes wide open pursuant to the ICA, which expressly subordinated Plaintiff's repayment rights to those of JPMorgan and the Senior Mezz Lender (together, the "Senior Lenders"). Plaintiff acknowledged that the Senior Lenders could execute against the Senior Lenders' collateral—which included the 49% equity interests in WEM and

---

[1]    The Wittmann Declaration, submitted pursuant to Federal Rule of Civil Procedure 44.1, sets forth salient aspects of Alberta's two (overlapping) fraudulent-transfer regimes: the Fraudulent Preferences Act (the "FPA") and the Statute of Elizabeth. Wittmann Declaration ¶¶ 15-51. All exhibits referenced herein are attached to the Mac Avoy Declaration.

[2]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Complaint dated July 18, 2023 and filed in this action on July 26, 2023 as ECF No. 1-7 ("Complaint"). The Complaint is attached as Exhibit 1 to the Mac Avoy Declaration.

MOA (the "<u>WEM-MOA Equity</u>")—at their discretion.  Likewise, Plaintiff agreed that it would have no rights to the WEM-MOA Equity unless and until the Senior Lenders were fully and indefeasibly repaid.  In fact, Plaintiff agreed that any proceeds it *did* receive from the WEM-MOA Guarantors (through litigation or otherwise) must immediately be turned over to the Senior Lenders so long as their loans remained outstanding.  It is undisputed that JPMorgan's loan remains outstanding to this day.[3]

In May 2020, with the retail industry reeling from the COVID-19 pandemic, the senior borrowers defaulted on the JPMorgan Loan and the Senior Mezz Loan.  Unless those defaults were cured (they were not), the WEM-MOA Guarantors would be immediately and primarily liable to the Senior Lenders for more than $2 billion.  Plaintiff's bargained-for contractual right to protect its junior position was to purchase the defaulted loans or otherwise cure those defaults; it declined to do so.

Ultimately, JPMorgan entered into the Agreement (the "<u>2021 Agreement</u>"), with its borrower and the Senior Mezz Lender to safeguard the value of the collateral.  Under the 2021 Agreement, JPMorgan agreed to accept custody of the WEM-MOA Equity in full satisfaction of the WEM-MOA Guarantors' $2 billion-plus liability (though the underlying loan remains outstanding).  JPMorgan also provided $75 million in protective advances to salvage the project, and agreed to forbear on further collection efforts.  Meanwhile, the 2021 Agreement fully preserved Plaintiff's contingent and residual interest in the WEM-MOA Equity: JPMorgan could

---

[3]    Although the ICA was terminated as a result of the Senior Mezz's foreclosure against its borrower in October 2022, Section 6(b) thereof—which contains the aforementioned turnover obligation—expressly survived termination.  Ex. 6 § 6(b).

never receive one dime beyond what it was owed on its loan, and any surplus proceeds generated by a sale of the WEM-MOA Equity (after the Senior Lenders were repaid) would be distributed to Plaintiff in accordance with the ICA and Irrevocable Letter of Direction. *See* Ex. 8 §§ 3(a)(i), (b)(i); Ex. 6 § 6(b); Ex. 7.

Plaintiff, seemingly content that the 2021 Agreement preserved its preexisting rights (because it did), sat on its hands for more than two years. Now, however, Plaintiff asserts claims that ignore the parties' bargained-for rights and attempts to leapfrog JPMorgan to improperly collect on its now-defaulted junior loan. None of Plaintiff's claims withstands scrutiny.

*First*, Plaintiff's fraudulent transfer claims fail for a host of reasons. As a threshold matter, Plaintiff lacks standing to prosecute those claims: The WEM-MOA Equity was fully encumbered by more than $2 billion of senior liens at the time of the 2021 Agreement—well in excess of the roughly $1 billion that Plaintiff claims the WEM-MOA Equity was worth—and therefore its transfer to JPMorgan inflicted no prejudice on the WEM-MOA Guarantors' unsecured creditors (like Plaintiff). In any event, Plaintiff fails to allege the necessary elements of a fraudulent transfer claim—including, among others, insolvency and fraudulent intent.

*Second*, the tortious interference claim should be dismissed because Plaintiff fails to allege that JPMorgan "procured" the WEM-MOA Guarantors' alleged breach of Plaintiff's Junior Payment Guaranty (Ex. 13, the "Junior Payment Guaranty") "intentionally and without justification"—the essential elements of such a claim. The Complaint is devoid of factual support for the allegation that JPMorgan's specific objective in entering into the 2021 Agreement was to cause a breach of the Junior Payment Guaranty (because it was not). Additionally, JPMorgan's actions were at all times justified because JPMorgan was entitled to exercise its contractual right

to take possession of its collateral, thereby preserving its value for all constituencies (including Plaintiff).  Last, Plaintiff's hypothetical "loss of assurance" damages are fatally speculative.

*Third*, Plaintiff's implied covenant claim impermissibly seeks to alter the unambiguous terms of the ICA—which was in force at the time of the 2021 Agreement, and which empowered JPMorgan to take possession of the collateral securing its defaulted senior loan.  Moreover, JPMorgan was at all times acting in its own legitimate self-interest to protect its secured interest in the WEM-MOA Equity, and the Complaint does not adequately allege otherwise.

*Finally*, Plaintiff's remaining claims fare no better.  Plaintiff waived any requirement for marshaling under the ICA, and otherwise lacks standing to pursue such a claim as an unsecured creditor of the WEM-MOA Guarantors (unlike JPMorgan, whose interest is secured).  Plaintiff's declaratory judgment claims should be dismissed because they are not independent causes of action and are based on a fundamental misreading of the ICA.  Plaintiff has already breached the ICA by initiating this lawsuit—and its declaratory counts aim to further distort the parties' agreement by erasing the provisions Plaintiff dislikes and vesting Plaintiff with contractual rights it never had.

The Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

### A.    The Senior Lenders Extend Financing For The Project And Obtain Secured Payment Guaranties From The WEM-MOA Guarantors

The loans at issue were made in connection with the Project, a large retail and entertainment complex located in East Rutherford, New Jersey, that features, among other things, a theme park,

ice skating rink, water park and ski resort.  Ex. 1 ¶ 40.[4]  The American Dream Mall is indirectly owned by the Ghermezians, who also developed and indirectly own the Mall of America ("MOA") and the West Edmonton Mall ("WEM"), two other significant retail and entertainment complexes. Ex. 1 ¶¶ 45-46, 49-51.

The Project was originally financed in 2017 with two tranches of senior debt: (i) the $1.195 billion JPMorgan Loan from JPMorgan and a syndicate of other lenders to Ameream; and (ii) the $475 million Senior Mezz Loan from the Senior Mezz Lender to Ameream Mezz.  To further secure their loans, both JPMorgan and the Senior Mezz Lender received secured payment guaranties (the "Senior Pledge Agreements") from the WEM-MOA Guarantors, affiliates of their borrowers.  Ex. 1 ¶¶ 53, 54; Exs. 3-5.  Specifically, JPMorgan and the Senior Mezz Lenders were granted first-priority and second-priority pledges, respectively, in the WEM-MOA Guarantors' 49% equity interests in WEM and MOA—*i.e.*, the WEM-MOA Equity.  Ex. 1 ¶¶ 55-56.

Pursuant to the Senior Pledge Agreements and its loan documents, JPMorgan had broad rights to execute against the WEM-MOA Equity in the event of a default.  Among other things, JPMorgan was permitted to foreclose upon or otherwise take title to the WEM-MOA Equity, including through a strict foreclosure under Section 9-620 of the Uniform Commercial Code, in full or partial satisfaction of its debt.  Ex. 2 § 8.2; Ex. 3 § 3.4(a); Ex. 4 § 4.1(b); Ex. 5 § 4.1(b). Indeed, nothing in the JPMorgan Loan Agreement or the Senior Pledge Agreements required JPMorgan to exercise its rights in any particular way.  Instead, as is customary, JPMorgan had a

---

[4]     The facts set forth in this memorandum derive from the allegations in the Complaint and the unambiguous terms of documents relied upon in, or otherwise integral to, the Complaint.  *See Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002).

menu of permissive options available to it in the event of a default—including, as it did in connection with the 2021 Agreement, to take possession of its collateral.  Ex. 2 § 8.2; Ex. 3 § 3.4(a); Ex. 4 § 4.1(b); Ex. 5 § 4.1(b).

### B.    Plaintiff Enters The Loan Structure And Executes The ICA As A Subordinate Lender

In August 2019, Plaintiff's predecessor-in-interest entered the capital stack in a deeply subordinated position by issuing the $300 million Plaintiff Loan to the Junior Mezz Borrower, resulting in the following loan structure:



When it entered the Project, and as further explained below, Plaintiff executed the ICA to memorialize its subordinated position in the capital structure.  Among other things, Plaintiff "consent[ed] to and approve[d]" the terms of the JPMorgan Loan Documents, including the Senior Pledge Agreements and the JPMorgan Loan Agreement.  Ex. 6 § 3(b).

Like the Senior Lenders, Plaintiff also received a payment guaranty from the WEM-MOA Guarantors.  Ex. 13.  Unlike the Senior Lenders, however, Plaintiff's guaranty was 100% unsecured.  Ex. 1 ¶¶ 66-72; Ex. 13.  Plaintiff does not have—and has *never* had—any security interest in the WEM-MOA Equity.

### C.    By Its Express Terms, The ICA Undermines Plaintiff's Claims

The ICA, which remained in effect at the time of the challenged 2021 Agreement, sets forth the respective rights, obligations, and priorities of repayment under the Project's three-tiered loan structure.  The ICA contains several provisions that are fatal to Plaintiff's claims.

*First*, the ICA confirmed that Plaintiff—a "sophisticated lender" and "investor in real estate"—agreed that its repayment rights would be subordinate to the Senior Lenders' rights to be repaid on their loans, "and all rights, remedies, terms and covenants contained therein."  Ex. 6 §§ 9(a), 10(a), 18(p).

*Second,* Plaintiff agreed that its rights and remedies in connection with the Plaintiff Loan would be severely restricted unless and until the Senior Lenders were repaid in full.  Specifically, Plaintiff was precluded from "accept[ing] or receiv[ing]" payments prior to the date that all obligations under the JPMorgan Loan and the Senior Mezz Loan "are paid in full in cash."  Ex. 6 § 10(a).  Similarly, Plaintiff was prohibited from seeking to collect any amounts from a "Shared Guarantor" (including the WEM-MOA Guarantors) until the JPMorgan Loan and the Senior Mezz Loan were paid in full.  *Id*. §§ 6(a), 6(b).  And, indeed, any such amounts that were recovered by the Plaintiff were required to be immediately turned over to the Senior Lenders so long as their loans remained outstanding.  Plaintiff does not allege that the JPMorgan Loan has been paid in full (it has not), thus conceding that Plaintiff has no right to recover from the WEM-MOA Guarantors.

*Third*, in the event of a default, JPMorgan was empowered to foreclose upon or otherwise take title to the WEM-MOA Equity.  Ex. 6 § 12(a).  The ICA did not require JPMorgan to execute upon the WEM-MOA Equity in a specific manner, such as through a public foreclosure sale.  However, in the event the WEM-MOA Equity *were* sold, the ICA specified that any excess proceeds (once the Senior Lenders were repaid) would be distributed pursuant to a previously agreed waterfall.  *Id*. § 6(b); Ex. 1 ¶ 74.  That waterfall—as effectuated by the Irrevocable Letter

of Direction (Ex. 7), and specifically preserved in the 2021 Agreement (Ex. 8 § 3(a)(vi))—represented Plaintiff's sole, residual interest in any surplus proceeds generated from a sale of the WEM-MOA Equity.

*Fourth*, Plaintiff acknowledged that JPMorgan "shall have the right without the consent of [Plaintiff], in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver…of the [JPMorgan] Loan or [JPMorgan] Loan Documents," subject to certain limitations that Plaintiff does not allege are applicable here.  Ex. 6 § 8(a).

*Finally*, the ICA provided Plaintiff with various means of protecting its subordinated junior position following a default under the Senior Loan or Senior Mezz Loan: (i) curing the defaults under both loans, (Ex. 6 § 12(b)); (ii) acquiring the JPMorgan Loan in full, subject to certain conditions, (*id*. § 14(a)); or (iii) foreclosing on its own security interests in the Senior Mezz Borrower and assuming ownership of its collateral, (*id*. § 6(a)).  Plaintiff chose to exercise none of those remedies.

As a result of an October 25, 2022 foreclosure in connection with the Senior Mezz Loan, the ICA terminated—except for Section 6(b) (*i.e.*, the waterfall, subordination and turnover provision), which expressly survives termination. Ex. 1 ¶¶ 79, 109; Ex. 6 § 6(b).  However, when the challenged 2021 Agreement was executed, the ICA was in full force and effect and thus governs Plaintiff's claims.

### D.    JPMorgan Exercised its Contractual Right to Enter Into The January 2021 Agreement

In May 2020, JPMorgan informed Plaintiff that Ameream had defaulted under the JPMorgan Loan and, as a result, a Purchase Option Event had occurred pursuant to Section 14 of the ICA. Ex. 1 ¶ 80.  However, as set forth above, Plaintiff elected not to cure the JPMorgan Loan

default or exercise any of its other rights (*e.g.*, purchasing the defaulted loan) to protect its junior investment. Ex. 6 §§ 12(b), 14. Plaintiff was well aware that, unless those defaults were cured, the WEM-MOA Guarantors would be immediately and primarily liable for more than \$2 billion on the Senior Loan and Senior Mezz Loan. Ex. 3, Recital C; Ex. 4, Recital D; Ex. 5, Recital D; Ex. 8, Schedules 4, 5.

On January 29, 2021, with the Project facing significant uncertainty, JPMorgan, the Senior Mezz Lender, each of their respective borrowers, the WEM-MOA Guarantors, and others entered into the 2021 Agreement in an effort to avoid significant harm to the Project while ensuring that the junior creditors' preexisting rights were preserved.[5] Ex. 8.

The 2021 Agreement's relevant terms include, among others:

- The WEM-MOA Guarantors' \$2-billion-plus liability was fully discharged. In exchange, JPMorgan accepted custody[6] of its collateral—the WEM-MOA Equity—"to facilitate the partial satisfaction" of its debt, pursuant to Section 9-620 of the Uniform Commercial Code. Ex. 1 ¶¶ 4, 87; Ex. 8, Recital I.

- JPMorgan and the Senior Mezz Lender agreed to forbear from exercising further collection remedies, including "prosecuting a foreclosure, exercising any power of sale, or taking any other enforcement action" against all parties, including the WEM-MOA Guarantors. Ex. 8, Recital I.

- In addition to the \$108 million in protective advances previously funded, JPMorgan agreed to fund an additional \$75 million for the completion and stabilization of the Project. Ex. 8, Recital I, § 5(c).

- The 2021 Agreement preserved Plaintiff's residual interest in any surplus proceeds generated by the WEM-MOA Equity by explicitly maintaining and reaffirming the waterfalls agreed to in the ICA—and specified that, should the WEM-MOA Equity

---

[5]    Plaintiff received a copy of the 2021 Agreement on February 1, 2021, two days after it was executed. Ex. 11.

[6]    Ex. 8 § 3(c) (providing that, for tax purposes, JPMorgan shall be treated as "agent" of the WEM-MOA Guarantors, "and not as a beneficial owner" of the WEM-MOA Equity).

be sold, any excess proceeds (after the Senior Lenders were repaid) would be distributed to Plaintiff in accordance with the Irrevocable Letter of Direction. Ex. 8 § 3(a)(vi); Ex. 7.

- Similarly, any cashflows generated by the WEM-MOA Equity absent a sale would be received by JPMorgan, as holder of the WEM-MOA Equity, and applied to the JPMorgan Loan; upon repayment of the JPMorgan Loan, the remainder would be turned over to the Senior Mezz Lender for the repayment of the Senior Mezz Loan, and then to Plaintiff consistent with the ICA and Irrevocable Letter of Direction. Ex. 9 §§ 2(d), (e), Ex. 10 §§ 2(e), (f); Ex. 6 § 6(b).

- Finally, in accordance with Section 9-620 of the Uniform Commercial Code, the 2021 Agreement ascribed book values of $1 million and $49 million to the MOA Equity and WEM Equity, respectively. Ex. 8 §§ 3(a)(i), (b)(i). But that $50 million book value does not mean, as Plaintiff appears to believe, that JPMorgan somehow stood to gain a windfall if the WEM-MOA Equity proved to be worth more than $50 million. Quite the opposite. Under the 2021 Agreement, any proceeds generated from the WEM-MOA Equity (through a sale or otherwise) would be used first to repay the JPMorgan Loan, then the Senior Mezz Loan, and then the Plaintiff Loan—all as contemplated by the ICA and Irrevocable Letter of Direction. Ex. 8 §§ 3(a)(vi), (b)(vi). In the meantime, the book value ascribed to those assets— whether it be $50 million, $500 million, or 5 cents—had no bearing whatsoever on the junior lenders' residual waterfall rights.

### E.    The Junior Mezzanine Loan Default

In May 2021, Plaintiff notified the Junior Mezz Borrower that an Event of Default had occurred under the Plaintiff Loan. Ex. 1 ¶¶ 112-113. Plaintiff was well aware of the 2021 Agreement, *see* Ex. 11, yet did not challenge its propriety. Doubtless for the same reason that the Senior Mezz Lender voluntarily *joined* the 2021 Agreement: the transaction did nothing to vitiate junior creditors' preexisting rights.

Years later, Plaintiff commenced an action on February 7, 2023 against the Junior Mezz Borrower by way of summary judgment in lieu of complaint in New York County Supreme Court. As a result, Plaintiff obtained the American Dream Judgment in the amount of $404,399,512.87. As mandated by the ICA, Plaintiff is required to hold any funds received in connection with the American Dream Judgment in trust for the benefit of, and immediately pay over such proceeds to,

JPMorgan (or, after payment in full of the JPMorgan Loan, the Senior Mezz Lender).  Ex. 1 ¶¶ 114-117; Ex. 6 §6(b).

### F.    Plaintiff Commences This Action, Wielding Rights It Never Bargained For And Attempting To Litigate Its Way To The Front Of The Repayment Line

On March 23, 2023, after sitting idly for two years, while JPMorgan and the syndicate of lenders helped fund and maintain the Project Plaintiff commenced this action in New York County Supreme Court (Index No. 651509/2023) by filing a Summons with Notice.  On July 18, 2023, Plaintiff filed the Complaint asserting seven counts against the JPMorgan Defendants—including fraudulent conveyance, tortious interference, breach of the implied covenant of good faith and fair dealing, marshaling, and two declaratory judgment claims.[7]  As set forth below, permitting Plaintiff to recover in these circumstances is not only contrary to settled law, but would upend the settled priority of complex commercial financing structures to which Plaintiff—a highly sophisticated lender—agreed.

## ARGUMENT

To survive a Rule 12(b)(6) motion to dismiss, Plaintiff's Complaint must set forth factual allegations that "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[M]ere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action," are insufficient.  *Id.* at 678.  A plaintiff alleging a fraud claim must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *Glover v. Bob's Disc. Furniture, LLC,* 621 F. Supp. 3d 442, 452-53 (S.D.N.Y. 2022).  In addition to the complaint's allegations, the court may also consider documents referenced therein, documents plaintiff relied

---

[7]    On July 26, 2023, Defendants removed the action to this Court.

upon in the complaint and that are either in plaintiff's possession or that plaintiff knew of when bringing suit, and matters of which judicial notice may be taken. *Chambers*, 282 F.3d at 153.[8]

## I.     PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS FAIL (COUNTS I & II)

### A.     Plaintiff Lacks Standing To Pursue Fraudulent Transfer Claims Under Both Minnesota And Alberta Law

Plaintiff alleges that the transfer of the WEM-MOA Equity pursuant to the 2021 Agreement was a fraudulent transfer. Ex 1. ¶¶ 119-41. That is a nonstarter. When the 2021 Agreement was executed, the WEM-MOA Equity was fully encumbered by more than $2 billion of secured obligations. *Supra* at 3. It is hornbook law that fully encumbered property is immune to fraudulent-transfer attack, precisely because such property was never available to satisfy the claims of unsecured creditors (like Plaintiff) in the first place.

For similar reasons, Plaintiff failed to suffer any cognizable injury from the WEM-MOA Equity transfer: The 2021 Agreement did nothing to alter Plaintiff's rights (or lack thereof) in the WEM-MOA Equity under the preexisting loan agreements and ICA. Plaintiff is unhappy that it cannot presently enforce its guaranty or otherwise be repaid before the Senior Lenders. But that is not because anyone committed a fraudulent transfer. It is because Plaintiff signed a contract *agreeing* not to enforce its guaranty or otherwise be repaid before the Sender Lenders.

---

[8]     The parties agreed that New York substantive law applies to Plaintiff's second through seventh causes of action. Ex. 6 § 18(b)(iii)(g); *Lewis Tree Serv. v. Lucent Techs.*, 239 F. Supp. 2d 322, 327 (S.D.N.Y. 2002) ("Both federal and New York State choice of law rules require that such contractual choice of law provisions be honored, provided that there is some relationship between the law chosen and the transaction.").

1.    **Plaintiff lacks standing because the WEM-MOA Equity was fully encumbered.**

a.    In New York, fraudulent transfer claims are governed by the local law of the transferor.  N.Y. Debt. & Cred. Law § 279(b).  Thus, Count I (WEM Equity) and Count II (MOA Equity) are governed by Alberta and Minnesota law, respectively.[9]  Under both bodies of law, a fraudulent-transfer claim may not lie where, as here, the property in question was fully encumbered at the time of the transfer.

**Minnesota**.  Pursuant to Minnesota's codification of the Uniform Voidable Transactions Act (the "MUVTA"), a "transfer" entails the "disposing of or parting with an asset or interest in an asset."  Minn. Stat. § 513.41(17).  The term "asset," in turn, is defined to *exclude* "property to the extent it is encumbered by a valid lien."  *Id*. § 513.41(2)(i).  Against that statutory backdrop, courts have affirmed that fully encumbered property (like the WEM-MOA Equity) is outside the reach of the MUVTA.  *Am. Fed. Bank v. W. Cent. Ag. Servs.*, 530 F. Supp.3d 780, 782 (D. Minn. 2021) (payment from fully encumbered account "d[id] not qualify as a transfer of an asset as required to bring a claim under MUVTA"); *accord Alerus Fin., N.A. v. Martin Holdings, LLC*, No. A13-0407, 2013 WL 6390337, at *3 (Minn. Ct. App. 2013); MUVTA § 1 Cmt. ¶ 2.

**Alberta**.  Property that is fully encumbered by a valid security interest is likewise beyond the reach of unsecured creditors under Alberta law.  Although Alberta's fraudulent-transfer laws do not expressly exempt encumbered property, they nevertheless require that the plaintiff-creditor suffer some concrete *prejudice* on account of the challenged transfer.  Wittmann Declaration ¶ 39;

---

[9]    The WEM Guarantors are incorporated and have their principal places of business in Alberta, Canada, Ex. 1 ¶¶ 21-24, 120, whereas the MOA Guarantor is located in Minnesota, *id*. ¶¶ 25, 133-135.

*Scheuerma*n *v. Scheuerman* (1915), 8 Alta. L.R. 417 (Alta. S.C., App. Div.) at 422 (e).  In Alberta, this precept has been explored most extensively in the context of "exempt" property—*i.e.*, property, like a homestead, that is exempt from execution by creditors. Wittmann Declaration ¶¶ 27-29.  In this context, it is *"*very clearly established that a conveyance of property not exigible under any form of execution is not … a fraud upon creditors." *Scheuerma*n *v. Scheuerman* (1915), 8 Alta. L.R. 417 (Alta. S.C., App. Div.) at 422; *Salter et al v. Wyo-Ben Products Inc.* (1972), 25 D.L.R. (3d) 626 (Alta. S.C.T.D.), at 628.  Alberta courts have applied this principle broadly, finding that even where "[the] effect [of a transfer] may be to deprive [] a creditor of its expectation that the exempt property would eventually mature into an interest to which its security would attach," the transfer is "not unlawful or fraudulent" so long as, at the time of the transfer, the "full value of the property" was "exempt." *Royal Bank of Canada v. Laughlin*, 2001 ABCA 78 at para. 32-33.

In the end, Alberta's "prejudice" requirement effectuates the same outcome as the MUVTA's encumbered-property carveout:  Where assets are outside the reach of unsecured creditors at the time of the challenged transfer—such as where, as here, they are fully encumbered by senior obligations—unsecured creditors are necessarily unharmed by their transfer.  *See, e.g.*, 37 C.J.S. Fraudulent Conveyances § 8 ("A transfer of property in which the debtor has no equity cannot be the subject of a fraudulent transfer action because creditors cannot show that they would have received anything by avoiding the transfer, and cannot show that they were injured thereby."); *accord ln re Medina*, 619 B.R. 236, 245 (B.A.P. 9th Cir. 2020) (describing interplay between

UVTA's encumbered-property exemption and the requirement that plaintiff have been injured by transfer). And unharmed creditors have no standing under Alberta's fraudulent-transfer laws.[10]

b.      Plaintiff's claims fail on that basis.  Even accepting Plaintiff's allegations as true, the WEM-MOA Equity was fully and indisputably encumbered by the Senior Lenders at the time of the transfer.  There is no dispute that the JPMorgan Loan and Senior Mezz Loan were in default when the 2021 Agreement was executed, and, as a result, the WEM-MOA Guarantors faced an immediate and primary liability of more than $2 billion.  Ex. 8 § 2(a)(viii)-(ix) (acknowledging that JPMorgan was "unconditionally entitled to exercise all available remedies," including executing on the WEM-MOA Equity); *id*. Schedules 4, 5 (senior loan balance exceeded $2 billion).  Nor is there any dispute that the only assets the WEM-MOA Guarantors pledged as security for that liability were the WEM-MOA Equity interests—which, even using Plaintiff's ambitious valuations,[11] were worth roughly $1 billion in the aggregate.  Ex. 1 ¶¶ 55, 189-90.  Thus, at the time of the 2021 Agreement—and even using Plaintiff's own valuation—the WEM-MOA Equity

---

[10]      This truism is reinforced elsewhere in Alberta law.  For example, Alberta's Personal Property Security Act provides that, in the event of a default, secured creditors may seize their collateral without so much as notifying unsecured creditors.  RSA 2000, c P-7 § 62.  And where, as here, the collateral is fully encumbered—*i.e.*, "the market value of the collateral is less than the total amount owing to the secured party and the costs of disposition"—even junior *secured* creditors lack standing to challenge its disposition.  *Id*.

[11]      Plaintiff's valuations should be taken with a grain (or two) of salt.  In trumpeting the value of the West Edmonton Mall, Plaintiff openly relies upon a satirical news article that was posted as an April's Fools prank.  Ex. 1 ¶ 49 n.10.

was fully encumbered nearly twice over.  In fact, Plaintiff *concedes* that there was no surplus value in the WEM-MOA Equity when it was transferred to JPMorgan.  Ex. 1 ¶ 96 (alleging that, even had JPMorgan liquidated the WEM-MOA collateral, there would be no surplus proceeds for junior creditors).[12]

Plaintiff attempts to deflect this problem by changing the subject.  Specifically, Plaintiff insists that "had JPMorgan foreclosed on the ***American Dream Mall***"—rather than the WEM-MOA Equity—then "it would have been paid in full," with enough left over for Plaintiff to recover substantially all of the amounts owed to it."  Ex. 1 ¶ 8 (emphasis added).  That argument fails.  For one thing, Plaintiff expressly waived any right to marshaling under the ICA.  *See infra* Section III. In any event, the fact that the Senior Lenders had *other* potential remedies against *other* co-obligors does not vitiate the Senior Lenders' repayment rights vis-à-vis the WEM-MOA Guarantors.  Quite obviously, the WEM-MOA Guarantors could not have satisfied *their* obligation to the Senior Lenders with assets—such as the American Dream Mall—that did not belong to them.

2.    **Plaintiff lacks standing because it has not alleged (nor suffered) a concrete injury in fact.**

For like reasons, Plaintiff fails to articulate any injury that was caused by the WEM-MOA Equity transfer.  That, too, defeats Plaintiff's claims.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Gerlich v. Countrywide Home Loans, Inc.*, No. CIV. 10-4520 DWF/LIB, 2011

---

[12]    It is therefore not surprising—though it is telling—that Plaintiff does not seek to unwind the WEM-MOA Equity transfer or otherwise restore the parties to the status quo ante prior to the 2021 Agreement (nor could Plaintiff seek such relief under UCC § 9-625).  Ex. 1 at 46 (Prayer). Unwinding the 2021 Agreement would get Plaintiff nowhere because Plaintiff had no legal right to the WEM-MOA Equity in the first place.

WL 3920235, at *2 (D. Minn. Sept. 7, 2011) (dismissing claim for lack of Article III standing where plaintiff failed to allege facts sufficient to "demonstrate that he ha[d] suffered an injury in fact as a result of the purported fraudulent transfer").

Plaintiff professes to have injuries aplenty.  But, critically, none of those alleged injuries were *caused* by the WEM-MOA Equity transfer.  Rather, Plaintiff's woes are attributable to the carefully negotiated intercreditor relationship to which Plaintiff freely entered.  So, for example, Plaintiff bemoans that the ICA prohibits it from pursuing claims against the WEM-MOA Guarantors until the Senior Lenders have been repaid.  Ex. 1 ¶ 7.  Plaintiff also takes issue with JPMorgan's decision to foreclose on the WEM-MOA collateral as opposed to exercising other contractual remedies that Plaintiff might have preferred (*e.g.*, foreclosing instead on the American Dream Mall).  *Id.* ¶ 8.  But these "harms" were not caused by the WEM-MOA Equity transfer; they are inherent features of being a junior, unsecured creditor.  When it entered into the ICA, Plaintiff agreed that JPMorgan would have wide discretion in its choice of remedies upon a default, including that JPMorgan could foreclose on the WEM-MOA Equity (as it did here).  Ex. 6 § 6(b).  Plaintiff had carefully negotiated protections designed to prevent JPMorgan from exercising its rights and remedies, either by purchasing the Senior Loan and the Senior Mezz Loan or curing the defaults thereunder, yet it chose to exercise none of them.  Ex. 6 § 12(b), 14.

In any event, the 2021 Agreement did nothing to alter Plaintiff's rights vis-à-vis the WEM-MOA Equity.  To the contrary, the 2021 Agreement preserved Plaintiff's rights to pursue collection remedies against the WEM-MOA Guarantors and to receive any surplus proceeds generated by a sale of the WEM-MOA Equity—but, as to both, *only* once the Senior Lenders were repaid.  *See* Ex. 6 § 6(b); Ex. 8 §§ 3(a)(vi), 3(b)(vi).  Those are exactly the same residual rights in the WEM-MOA Equity that Plaintiff had *before* the 2021 Agreement.  By this action, Plaintiff

wishes to arrogate to itself novel rights in the WEM-MOA Equity.  But Plaintiff cannot litigate its way out of its contractual subordination.[13]   Counts I and II fail for want of Article III standing. See Fed. R. Civ. P. 12(b)(1).

**B.   <u>Even If Plaintiff Had Standing, It Has Not Stated A Claim For Fraudulent Transfer</u>**

**1.   Plaintiff fails to plead insolvency (Counts I & II).**

Insolvency of the transferor is a necessary element of constructive fraud claims under the MUVTA, as well as claims brought under Alberta's FPA.  Minn. Stat. § 513.45; *Ahlgren v. Muller*, 555 F. Supp. 3d 688, 708–09 (D. Minn. 2021); Wittmann Declaration ¶¶ 32-38; *Servus Credit Union v. JRD Investments Inc.*, 2020 ABQB 249 at para. 63.  To plead insolvency, a plaintiff must allege that "at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets," or that the "debtor is generally not paying the debtor's debts as they become due."  Minn. Stat. §§ 513.45(a), (b); Wittman Declaration ¶ 36; *accord Lay v. Lay*, 2023 ABKB 354 at para. 63 (insolvency under FPA analyzed similarly).

Here, Plaintiff's conclusory allegation that each of the WEM-MOA Guarantors was "rendered insolvent by or left with unreasonably small capital as a consequence of their respective transfers of the [WEM-MOA Equity]," Ex. 1 ¶¶ 131, 141, falls short of the plausibility standard necessary to survive a motion to dismiss, *In re Trinsum Grp., Inc.*, 460 B.R. 379, 392–93 (Bankr. S.D.N.Y. 2011).  Even were this allegation supported by facts (and it isn't), it would still flunk under Alberta law:  Under the FPA, insolvency of the transferor is evaluated without reference to

---

[13]     Even were Plaintiff to obtain a recovery in this action, it would be contractually bound to turn that money back over to JPMorgan toward its outstanding loan balance.  Ex. 6 § 6(b).

the effect of the challenged transfer.  Wittmann Declaration ¶ 33.  And Plaintiff does not even attempt to plead that the WEM-MOA Guarantors were insolvent *prior* to the 2021 Agreement.

### 2. Plaintiff fails to plead lack of reasonably equivalent value (Count II).

Under Minnesota law, to plead a constructive fraudulent transfer, the plaintiff "must allege that the value exchanged [through the transfer] was not reasonably equivalent and plead facts to support that allegation." *In re Petters Co.*, 557 B.R. 711, 728 (Bankr. D. Minn. 2016); MN St. §§ 513.44(a)(2) & 513.45(a).

Here, the WEM-MOA Equity transfer easily meets that standard.  The WEM-MOA Equity was pledged as security for the WEM-MOA Guarantors' obligations to the Senior Lenders.  At the time of the 2021 Agreement, with both the JPMorgan Loan and Senior Mezz Loan in default, the WEM-MOA Guarantors were immediately and primarily liable for more than $2 billion.  Ex. 3, Recital C; Exs. 4 and 5, Recital D; Ex. 8, Schedules 4 and 5.  In *full satisfaction* of that liability, JPMorgan accepted custody of the WEM-MOA Equity—which Plaintiff values at only $1.045 billion.  Ex. 1 ¶¶ 189-90; *id*. ¶ 87 (acknowledging that WEM-MOA Guarantors were "releas[ed] and discharge[ed] … of their guaranty obligations" in exchange for WEM-MOA Equity).

Under Minnesota fraudulent transfer law, satisfaction of an antecedent debt constitutes "value."  Minn. Stat. § 513.43(a); *Finn v. Alliance Bank*, 860 N.W.2d 638, 650 (Minn. 2015); *Kelley as Tr. for PCI Liquidating Tr. v. Boosalis*, 974 F.3d 884, 888 (8th Cir. 2020).  In that vein, courts have held that a dollar-for-dollar reduction in debt constitutes reasonably equivalent value as a matter of law.  *In re Se. Waffles, LLC,* 702 F.3d 850, 855 (6th Cir. 2012) (stating "dollar-for-dollar reduction in debt is sufficient to establish equivalent value for purposes of the fraudulent transfer statutes"); *accord In re Yahweh Ctr., Inc.,* 27 F.4th 960, 968 (4th Cir. 2022).

Some cases present thorny factual questions surrounding reasonably equivalent value.  This is not one of them.  By Plaintiff's own admission, the WEM-MOA Guarantors managed to fully

19

satisfy a $2 billion liability with only $1.045 billion in assets.  This basic arithmetic should settle this matter.[14]

### 3. Plaintiff fails to plead fraudulent intent with the requisite particularity (Counts I & II).

Under the MUVTA, claims of actual fraudulent transfer require "actual intent to hinder, delay[,] or defraud any creditor of the debtor," and therefore are subject to Fed. R. Civ. P. 9(b)'s heightened pleading standard.  Minn. Stat. § 513.44(a).; *Ahlgren v. Cap. One Bank (USA), N.A.*, No. CV 19-1607 (JRT/LIB), 2020 WL 618236, at *3 (D. Minn. Feb. 10, 2020); *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005).  The FPA and Statute of Elizabeth[15] contain analogous scienter requirements.  Wittmann Declaration ¶¶ 18, 30, 40-41, 44; *Canada Life Assurance Co. v. 494708 Alberta Ltd.*, at para. 84; *Krum*, 2003 ABQB 437, at para. 15.

Thus, to successfully plead a claim of actual fraudulent transfer, Plaintiff must allege facts sufficient to give rise to a "*strong inference*" of fraudulent intent.  *Ray v. Ray*, 799 F. App'x 29, 32 (2d Cir. 2020).  Here, Plaintiff's passing references to certain "badges of fraud" lack the specificity necessary to support an inference—much less a "strong" one—of fraudulent intent.

---

[14]    Plaintiff attempts to muddy these waters by claiming that JPMorgan should likewise have reduced, by some unspecified amount, the amount outstanding on the underlying JPMorgan Loan. However, because Plaintiff is challenging a transfer from the WEM-MOA Guarantors to JPMorgan, the relevant inquiry is whether the **WEM-MOA Guarantors** received reasonably equivalent value in exchange for the transfer.  And they plainly did.

[15]    Under the Statute of Elizabeth, where (as here) a transfer is supported by more than "no or nominal consideration," a plaintiff must establish not only intent on the part of the transferor, but also that the transferee was privy to the alleged fraud.  Wittmann Declaration ¶¶ 41, 50.

*Knopf v. Meister, Seelig & Fein, LLP*, No. 15CV5090 (DLC), 2016 WL 1166368, at *6 (S.D.N.Y. Mar. 22, 2016), *aff'd*, 721 F. App'x 96 (2d Cir. 2018) (dismissing fraudulent transfer claim where plaintiff's "allegations of badges of fraud…[did] not give rise to a strong inference of fraudulent intent, as required by Rule 9(b)."); *Neuman v. Garcia,* No. 20-CV-10723 (PKC), 2022 WL 4448722, at *11 (S.D.N.Y. Sept. 23, 2022) (same).

*First*, Plaintiff's allegation that the 2021 Agreement "benefitted insiders" because the WEM-MOA Guarantors "do not face any immediate risk of suit on their individual guarantees" does not support an inference of fraudulent intent.  Ex. 1 ¶ 136.  As Plaintiff concedes, it is the ICA—*not* the 2021 Agreement—that prohibits Plaintiff from immediately suing on its guaranties. *Id*. ¶¶ 7, 123; Ex. 6 § 6(b).

*Second*, Plaintiff's allegation that, at the time of 2021 Agreement, the WEM-MOA Guarantors "were on notice that Ameream had defaulted" and thus "faced immediate risk of suit on their guarantees," is insufficient to establish fraudulent intent.  Ex. 1 ¶ 138.  That the WEM-MOA Guarantors were immediately liable for the $2 billion senior loan balance is undisputed— and does not aid Plaintiff, because it was the very satisfaction of that antecedent liability that served as ample consideration for the transfer.

*Third*, Plaintiff does not allege that the WEM-MOA Guarantors retained control over the WEM-MOA Equity after its transfer.  Rather, Plaintiff alleges generally that the "the Ghermezian family and related entities…retain[ed] control over the "the West Edmonton Mall, among others." Ex. 1 ¶ 123.  But that would be true even *without* the 2021 Agreement—the WEM-MOA Equity represented only a minority (49%) stake in the mall properties.

In short, even a cursory reading of the Complaint reveals that the 2021 Agreement was motivated by legitimate commercial considerations—not fraud.  *See infra* Section II(B); *Kelly v.*

*Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000) ("While there is no precise number of badges that must be present to create a presumption of fraudulent intent, there must at least be a 'confluence of the 'badges of fraud.'"); *Lariat Companies, Inc. v. Wigley*, No. A17-0210, 2020 WL 5507811, at *4 (Minn. Ct. App. Sept. 14, 2020) (inference of fraudulent intent arising out of the presence of several badges of fraud may be rebutted by clear evidence of a legitimate purpose for the transaction).

### C.    Plaintiff's Claim for Fraudulent Transfer Of The WEM Equity (Count I) Is Time Barred

Plaintiff's fraudulent transfer claim with respect to the WEM Equity also fails because it is barred by Alberta's statute of limitations.[16]

The Alberta Limitations Act bars claims brought more than two years after the plaintiff knew (or should have known) of the alleged injury. RSA 2000, c L-12, Section 3(1). Canadian courts have confirmed that this limitations period is a matter of substantive, not procedural, law. Wittmann Declaration ¶¶ 54-55; *accord Tolofson v. Jensen*, [1994] 3 S.C.R. 1022; *Heuman (Next friend of) v. Andrews*, 2005 ABQB 832 ("where, as here, we are dealing with a limitation period in a limitations statute, the provision is substantive"). Plaintiff therefore had only two years to bring a fraudulent transfer claim based on the WEM Equity.

Plaintiff missed its deadline. The two-year clock began running when Plaintiff "first knew, or in the circumstances ought to have known," of its supposed "injury." RSA 2000, c L-12, Section

---

[16]    The New York UVTA instructs New York courts to "apply the applicable statute of repose when it is applying the UVTA-based voidable transactions law of another jurisdiction pursuant to Section 279." James Gadsden & Alan Kolod, Supplementary Practice Commentaries, N.Y. Debt. & Cred. Law § 278.

3(1)(a). And Plaintiff learned of the execution of the 2021 Agreement (which forms the basis for Plaintiff's fraudulent conveyance claim) on February 1, 2021, when counsel for JPM emailed a copy of the 2021 Agreement to Plaintiff. Ex. 11.[17] At the very least, Plaintiff "ought to have known" of its alleged injury by March 12, 2021, when the media was publicly reporting that American Dream's lenders were likely "tak[ing] the collateral that was pledged by [the Guarantors] – a 49% stake in [the] Mall of America and the West Edmonton Mall."[18] Plaintiff's two-year deadline to file a claim thus expired no later than March 12, 2023.

---

[17]    The Court can take judicial notice of the fact (readily determinable from Ex. 11) that Plaintiff received the 2021 Agreement by email on February 1, 2021. Ex. 11; *Murphy v. Int'l Bus. Machines Corp.*, No. 10 CIV. 6055 LAP, 2012 WL 566091, at *9 n.4 (S.D.N.Y. Feb. 21, 2012) (citing Fed. R. Evid. 201(b)). Alternatively, given that the effect of the Alberta Limitations Act would be to dispose of Count I entirely, the Court may consider converting this portion of the motion to dismiss into a summary judgment motion (pursuant to Fed. R. Civ. P. 12(d)) or permitting limited discovery solely to resolve this threshold issue of timing.

[18]    Allison Pries, *Cash crisis at American Dream will likely lead developer to lose 49% stake in Mall of America*," NJ.COM (Mar. 12, 2021, 9:18 AM), https://www.nj.com/news/2021/03/cash-crisis-at-american-dream-will-likely-lead-developer-to-lose-49-stake-in-mall-of-america.html (attached as Ex. 12). On a motion to dismiss, courts may take "judicial notice of materials in the public record," including "newspaper articles," "webpages," and "media reports." *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462-63 (S.D.N.Y. 2020).

## II.   THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE (COUNT III)

Under New York law, to state a tortious interference claim, a Plaintiff must adequately allege: (1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge thereof, (3) defendant's intentional procurement of breach of the contract without justification, (4) actual breach, and (5) damages resulting therefrom. *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.,* 455 F. App'x. 102, 104 (2d Cir. 2012).   The Complaint falls short.

### A.   Plaintiff Does Not Allege That JPMorgan Intentionally Procured A Breach Of The Junior Payment Guaranty

Plaintiff's tortious interference claim fails because it is premised on the conclusory and false assertion that JPMorgan "intentionally and without justification" entered into the 2021 Agreement for the purpose of inducing a breach of the Junior Payment Guaranty's covenant "to (i) ensure that the collective value of the WEM-MOA Equity was at least $680,000,000, and (ii) continue to own at least 49% interest in the Mall of America and the West Edmonton Mall."  Ex. 1 ¶¶ 144, 150.

To satisfy the intent element, Plaintiff must allege facts showing that the defendant's *objective* was to procure such a breach, and "it is not enough that a defendant engaged in conduct with a third party that happened to constitute a breach of the third party's contract with the plaintiff." *Roche Diagnostics GmbH v. Enzo Biochem,* Inc., 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013).   Plaintiff's boilerplate allegation that JPMorgan entered into the 2021 Agreement to "intentionally and without justification induce" a breach is insufficient. Ex. 1 ¶ 150; *Joan Hansen & Co., Inc. v Everlast World's Boxing Headquarters Corp.,* 296 A.D.2d 103, 109-110 (N.Y. App. Div. 2002).   Plaintiff does not allege that breach of the Junior Payment Guaranty was anything more than an incidental consequence of the 2021 Agreement, nor has Plaintiff alleged facts to

suggest that JPMorgan was doing anything beyond exercising its bargained-for rights under its loan documents and the ICA. *Prospect Funding Holdings, LLC v. Vinson,* 256 F. Supp.3d 318, 328 (S.D.N.Y. 2017) ("[M]erely acting with knowledge that a third party may breach a contract with some other party is not sufficient to constitute procurement of the breach.").

**B.    JPMorgan's Entry Into The 2021 Agreement Was Justified**

Plaintiff's tortious interference claim also fails for the separate reason that JPMorgan was privileged to take the actions underlying this claim. Under New York law, the economic interest doctrine creates a qualified privilege that allows an entity to interfere with a third-party contract in order to protect its own economic relations. *MTI/The Image Grp., Inc. v. Fox Studios E., Inc.*, 262 A.D.2d 20, 23 (N.Y. App. Div. 1999). [19] Where, as here, the economic justification defense applies, liability for tortious interference can be imposed only by "a showing of either malice on the one hand, or fraudulent or illegal means on the other." *Foster v. Churchill*, 87 N.Y.2d 744, 750 (1996). Therefore, a tortious interference claim cannot survive when the defendant "acted to protect its own legal or financial stake in the breaching parties' business." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.,* 8 N.Y.3d 422, 426 (2007); *Ultramar Energy v. Chase Manhattan Bank,* 179 A.D.2d 592, 592-93 (N.Y. App. Div. 1992) (tortious interference claim dismissed where

---

[19]    "Although economic interest is cast as a defense, courts routinely dismiss tortious interference claims at the pleading stage when it is evident, on the face of the complaint, that the doctrine applies." *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 18 Civ. 4044 (VM), 2019 WL 4744220, at *8 (S.D.N.Y. Aug. 26, 2019); *Audax Credit Opportunities Offshore v. Tmk Hawk Parent,* No. 656123/2020, 2021 WL 3671541, at *11 (N.Y. Sup. Ct. Aug. 16, 2021).

defendant, as the breaching party's creditor, was merely "attempting to protect its secured interest" which "cannot be construed as malicious").

Here, JPMorgan—as a secured creditor of the WEM-MOA Guarantors—was protecting its own economic interests in entering into the 2021 Agreement. Instead of conducting a UCC foreclosure on the WEM-MOA Equity that would entirely wipe out Plaintiff's subordinated interests, as it was entitled to do, Ex. 6 § 6(b), JPMorgan entered into the 2021 Agreement to take title to its collateral while preserving the waterfall agreed upon in the ICA (and effectuated by the Irrevocable Letter of Direction), which directly benefited Plaintiff. By Plaintiff's reasoning, JPMorgan and the Senior Mezz Lender could *never* exercise their superior contractual right to foreclose upon their collateral because doing so would disrupt Plaintiff's unsecured Junior Payment Guaranty. That is not the law. In any event, as to the 2021 Agreement, it is evident that the economic interest defense applies and JPMorgan was privileged to "interfere" with the Junior Payment Guaranty. Accordingly, for its tortious interference claim to survive, Plaintiff would have had to allege malice, fraud or illegal means. Plaintiff has failed to do so. *Foster*, 87 N.Y.2d at 744; *Saltini v. North Sea Dev. LLC*, No. 604265-18, 2019 N.Y. Misc. LEXIS 4906, at *12 (N.Y. Sup. Ct. Sept. 9, 2019) ("the Lender's actions in attempting to protect its security interest [in a senior loan] cannot be construed as malicious or carried out with the intent to harm the plaintiff['s interest in a subordinated mezzanine loan]").

## C.    Plaintiff Has Not Sustained Actual Damages From Any Alleged Breach Of The Junior Payment Guaranty

Plaintiff's conjecture that it will be damaged due to purported "loss of assurance" because the collective value of the WEM-MOA Equity will never be at least $680,000,000 is pure speculation and therefore must be dismissed under New York law. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) (rejecting argument that lender was "damaged

simply by being undersecured" and finding "with respect to those loans not yet foreclosed, the actual damages, it will suffer, if any, are yet to be determined"). It is undisputed that Plaintiff has yet to collect on its Junior Payment Guaranty against the WEM-MOA Guarantors, because it is contractually forbidden to do so until the Senior Lenders are repaid. Ex. 6 § 6(b). Nor has the WEM-MOA Equity been sold. Thus, any "injury" based on the hypothetically low value of a future sale is imaginary and too speculative to form the basis of a damages claim. *Burrowes v Combs*, 25 A.D.3d 370, 373 (N.Y. App. Div. 2006). Nor has Plaintiff alleged sufficient facts to justify its far-fetched request for punitive damages, which requires Plaintiff to "demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." *Rocanova v. Equitable Life Assur. Soc'y of U.S.,* 83 N.Y.2d 603 (1994).

## III.   THE COMPLAINT'S MARSHALING CLAIM FAILS AS A MATTER OF LAW (COUNT IV)

A claim for marshaling requires: (1) the existence of two <u>secured</u> creditors with a common debtor, (2) the existence of two funds belonging to the debtor, and (3) the right of the senior secured creditor to receive payment from more than one fund while the junior secured creditor can only resort to one fund. *In re Arlco, Inc.,* 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999). Far from being a "just and equitable response," Plaintiff's marshaling claim fails for several reasons. Ex. 1 ¶¶ 153, 159.

*First*, the marshaling claim should be dismissed because Plaintiff "waive[d] any requirement for marshaling" under the ICA, which remained in full force and effect at the time as of which marshaling is sought (*i.e.*, March 2021). Ex. 6 § 11(a); Ex. 1 ¶ 153 (asserting marshaling claim "[a]s of March 2021"). But, even more fatal, Plaintiff lacks standing to assert marshaling because it is an unsecured creditor of the WEM-MOA Guarantors—whereas only "*secured*

creditors with a common debtor" can assert a marshaling claim. *Arlco,* 239 B.R. at 274 (emphasis added); *Walther v. Bank of New York*, 772 F. Supp. 754, 767 (S.D.N.Y. Aug. 22, 1991) (unsecured creditor lacks standing to bring a marshaling claim); *In re Am.'s Hobby Ctr., Inc.,* 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998).

   *Second*, even assuming (contrary to fact) Plaintiff and JPMorgan were both secured creditors of the WEM-MOA Guarantors, Plaintiff would still need to allege (1) that two or more funds belong to the debtor that could satisfy Plaintiff's indebtedness and (2) for one of those funds, only JPMorgan has a security interest. It cannot do so. While Plaintiff identifies a laundry list of collateral that secures the JPMorgan Loan (*i.e.*, the WEM 25% Cash Flow Pledge, the West Edmonton Mall Mortgage, and the American Dream Mall), (Ex. 1 ¶ 154), Plaintiff does not (and cannot) allege that any of this collateral belongs to the WEM-MOA Guarantors.[20] Because Plaintiff has identified only ***one*** source of collateral actually belonging to the WEM-MOA Guarantors (the WEM-MOA Equity), Plaintiff cannot allege "the existence of two funds belonging to the [common] debtor." Nor can Plaintiff allege that the "senior secured creditor" (*i.e.*, JPMorgan) has the right "to receive payment from more than one fund" belonging to the common debtor. *Arlco,* 239 B.R. at 274. Thus, Plaintiff fails to establish the second and third elements of marshaling.

---

[20]    The collateral package from the WEM-MOA Guarantors did not include the 25% WEM Cash Flow Pledge, which was pledged by the parent of WEM-3 (Original WEMPI Inc.) and ***not*** the WEM-MOA Guarantors. Ex. 5, Schedule 1; Ex. 1, Annex A, B.

IV.    **THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT V)**

Plaintiff alleges that JPMorgan breached the covenant of good faith and fair dealing implied in the ICA by ascribing too low a book value to the WEM-MOA Equity, and by electing not to liquidate those assets to reduce the amount of the JPMorgan Loan.  Ex. 1 ¶¶ 168-72.  Plaintiff's implied covenant claim fails for several reasons.

Under New York Law, to sufficiently plead an implied covenant claim "a plaintiff must allege that defendant, in bad faith, engaged in behavior that effectually destroyed or injured the plaintiff's right to receive 'the fruits of the contract.'"  *K&G Elec. Motor & Pump Corp. v. Ingersoll-Rand Co.*, No. 18 Civ. 2308 (DRH), 2019 WL 4089546, at *7 (E.D.N.Y. Aug. 27, 2019).  But the covenant may not "be construed so broadly as effectively to nullify other express terms of a contract" or "to create independent contractual rights."  *SHIR Cap., LLC v. Fortress Credit Advisors LLC,* No. 160069/2019, 2020 N.Y. Misc. LEXIS 2664, at *16-17 (N.Y. Sup. Ct. June 11, 2020).

Plaintiff's implied covenant claim impermissibly asks this Court to imply obligations that are inconsistent with the express terms of the parties' contractual relationship.  *Canon Inc. v. Tesseron Ltd.,* 146 F. Supp. 3d 568, 581 (S.D.N.Y. 2015); *Gaia House Mezz LLC v. State St. Bank & Tr. Co.,* 720 F.3d 84, 93 (2d Cir. 2013).  Here, Plaintiff seeks to hold JPMorgan liable for exercising its right to take possession of the WEM-MOA Equity.  Ex. 1 ¶ 169.  However, Plaintiff ignores that the JPMorgan Loan Agreement (agreed and consented to by Plaintiff in the ICA) granted JPMorgan broad rights to foreclose on or take title of the WEM-MOA Equity following the occurrence of an Event of Default, as well as to dictate the manner in which such enforcement actions were executed, in its sole discretion.  Moreover, JPMorgan had the express contractual right to modify, defer, extend or amend the JPMorgan Loan and related documents, with certain

limitations (none of which is applicable here).  Ex. 6 § 8(a).  Had JPMorgan and Plaintiff intended to restrict JPMorgan's range of discretion to foreclose on or take title to the JPMorgan Loan collateral, they would have said so.  Plaintiff cannot now use the implied covenant to manufacture a right that it failed to bargain for at the negotiating table.  *Canon Inc. v. Tesseron Ltd.,* 146 F. Supp. 3d 568, 581 (S.D.N.Y. 2015); *LC Footwear, L.L.C. v. L.C. Licensing, Inc.*, No. 651907/2010, 2011 WL 11085363, at *30 (N.Y. Sup. Ct. Nov. 16, 2011).

Furthermore, Plaintiff's implied covenant claim fails because, at all times, JPMorgan was entitled to act in its own legitimate self-interest, even if such conduct is to the purported detriment of Plaintiff.  *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93-94 (2d Cir. 2013); *Woodard v. Reliance Worldwide Corp.*, No. 18-CV-9058, 2019 WL 3288152, at *4 (S.D.N.Y. July 22, 2019).  Plaintiff does not (and cannot) point to a specific contractual provision in the ICA or anywhere else that precluded JPMorgan from acting legitimately in its own self-interest by foreclosing on the WEM-MOA Equity.

Moreover, Plaintiff has not properly alleged the damages element of its implied covenant claim, which purports to seek damages equal to the amount of the American Dream Judgment. Ex. 1 ¶¶ 117-118, 174.  Plaintiff's admitted inability to recover on the American Dream Judgment is irrelevant to the 2021 Agreement because Plaintiff does not allege specific facts to establish that the 2021 Agreement impacts its subordinate position.  *Id.* ¶¶ 164-165.  Even without the 2021 Agreement, the JPMorgan Loan would remain outstanding and Plaintiff would not be permitted to recover against the WEM-MOA Guarantors.  *Able Energy, Inc. v. Marcum & Kliegman LLP,* 69 A.D.3d 443, 444 (N.Y. App. Div. 2010) (implied covenant claim was "properly dismissed for failure to allege actual ascertainable damages arising in connection" with the alleged breach);

*Ciccone v. One W. 64th St., Inc.*, No. 651748/16, 2017 N.Y. Slip Op. 32001(U), at *7 (N.Y. Sup. Ct. Sept. 14, 2017), *aff'd*, 171 A.D.3d 381 (N.Y. App. Div. 2019).

## V.    THE COMPLAINT'S CLAIMS FOR DECLARATORY JUDGMENT ARE BASED ON A FUNDAMENTAL MISUNDERSTANDING OF THE ICA (COUNTS VI AND VII)

The sixth and seventh counts should be dismissed because a declaratory judgment is not an independent cause of action, and cannot be awarded as relief unless a party has demonstrated a "substantive claim of right to such relief." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993).

### A.    Count Six Fails As A Matter Of Law

In an attempt to further end-run the unambiguous restrictions in Section 6(b) of the ICA, Plaintiff's sixth count seeks a declaration that, as a result of the alleged breaches of the implied covenant, the prohibitions on Plaintiff from "seeking enforcement actions and collections" from the Shared Guarantors (specifically with respect to WEM-3) contained in Section 6(b) of the ICA "are null and void." Ex. 1 ¶ 180. Such declaration would be an improper invocation of the Court's declaratory judgment power as it would function as a retroactive blessing of Plaintiff's violations of the ICA—and, indeed, rewrite the ICA altogether. Plaintiff's sixth count fails for the same reason that Plaintiff's implied covenant claim fails, and Plaintiff's wish that the ICA's restrictions were written more favorably is insufficient to impose a substantive right to relief.

Plaintiff's request for a declaration that WEM-3 "is not a Shared Guarantor by operation of law that WEM-3 has fully perform[ed] under the Environmental Indemnity" is equally meritless. Ex. 1 ¶ 181. As is commonplace in workouts for complex real estate transactions, the 2021 Agreement specifically did not release any claims under the Environmental Indemnity. Ex. 8 §§ 2(x)-(xi). The Complaint's irrelevant allegation that the WEM-3 24% Equity was transferred to a JPMorgan affiliate, Ex. 1 ¶ 179, does not change the fact that WEM-3 remains a Shared

Guarantor under the Loan Documents.  Ex. 6 § 1 (definition of "Shared Guarantor"), § 6.1(b).  In accordance with the ICA, Plaintiff remains prohibited from recovering from WEM-3.

### B.    Count Seven Fares No Better

Plaintiff's seventh count seeks a declaration regarding the value of the WEM-MOA Equity based on the misguided assertion that the WEM-MOA Guarantors hold subrogation/reimbursement claims against Ameream. But the seventh count fails because the terms of the Junior Payment Guaranty and the corresponding Senior Payment Guaranty expressly waived any right to subrogation until the JPMorgan Loan have been paid in full, which has indisputably not yet occurred.  Ex. 14 § 1.4; Ex. 16 § 1.10.  Therefore, the WEM-MOA Guarantors hold no such claims, and this declaratory judgment claim fails as a matter of law.

Additionally, Plaintiff lacks standing to seek a declaration regarding the hypothetical and premature obligations of Ameream (a non-party) to the WEM-MOA Guarantors, which have yet to be triggered and may never be triggered. *Richards v. Select Ins. Co.*, 40 F. Supp. 2d 163, 169 (S.D.N.Y. 1999) ("A declaratory judgment action is premature if standing to maintain such an action depends on a future event that is beyond the control of the parties and that may never occur."); *Vargas v. Boston Chicken, Inc.,* 269 F. Supp. 2d 92, 96 (E.D.N.Y. 2003).   Any hypothetical subrogation rights against Ameream cannot and should not be litigated in an action to which Ameream—the entity potentially most affected—is not a party. *Meyer, Suozzi, English & Klein, P.C. v. Higbee,* No. 18-cv-03353 (ADS) (ARL), 2019 U.S. Dist. LEXIS 80414, at *9 (E.D.N.Y. May 13, 2019).  In any event, so long as the JPMorgan Loan remains outstanding, Plaintiff's speculation that the 2021 Agreement ascribed too low a book value to the WEM-MOA Equity is purely academic.

## CONCLUSION

For the foregoing reasons, the JPM Defendants' motion should be granted.

Dated:    New York, New York          Respectfully submitted,
          November 8, 2023
                                      FRIED, FRANK, HARRIS, SHRIVER
                                        & JACOBSON LLP

                                      By :  /s/ *Janice Mac Avoy*
                                                     Janice Mac Avoy

                                      One New York Plaza
                                      New York, New York 10004-1980
                                      (212) 859-4000
                                      janice.macavoy@friedfrank.com

                                      KRAMER LEVIN NAFTALIS & FRANKEL
                                      LLP

                                      William J. Trunk
                                      2000 K Street NW
                                      Washington, DC 20006
                                      (202) 775-4517
                                      wtrunk@kramerlevin.com

                                      *Attorneys for Defendants JPMorgan Chase*
                                        *Bank, N.A., D5 Hawks LLC, WE Tahoe 1 LLC*
                                        *and WE Tahoe 2 LLC*

## **CERTIFICATE OF SERVICE**

On October 27, 2023, the Court signed an order granting permission for the JPM Defendants to file a memorandum of law containing up to 10,000 words.  The undersigned counsel hereby certifies that the within memorandum of law contains 9,859 words and complies with Judge Koeltl's Rules.

By: /s/ *Janice Mac Avoy*

*Counsel for Attorneys for Defendants JPMorgan Chase Bank, N.A., D5 Hawks LLC, WE Tahoe 1 LLC and WE Tahoe 2 LLC*

61300223