UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOL-MM III LLC,

                              Plaintiff,

            - against -

JPMORGAN CHASE BANK, N.A., D5 HAWKS LLC,
WE TAHOE 1 LLC, WE TAHOE 2 LLC, NEW WEM
HOLDINGS AFFILIATE 1 LTD., NEW WEM
HOLDINGS AFFILIATE 2 LTD., NEW WEM
HOLDINGS LTD., and MOA HOLDINGS III, LLC,

                              Defendants.

1:23-cv-06479-JGK

The Declaration of Neil Wittmann K.C. Follows:

# Declaration of Neil Wittmann K.C.

### I.    Qualifications

1.  I am a retired judge, an Alberta lawyer and King's Counsel. I was appointed to the Court of Appeal of Alberta in 1999. In 2005, I was appointed Associate Chief Justice of the Court of King's Bench of Alberta (the Superior Trial Court of the Province of Alberta). In 2009, I was appointed as Chief Justice of the Court of King's Bench and served as its Chief Justice until 2017. During my term as judge, I was a director of the Canadian Superior Courts Judges Association and Vice Chair of the Canadian Judicial Council's Conduct Committee.

2.  Before my appointment to the Court of Appeal of Alberta in 1999, I practiced law for approximately 31 years. I served as a Bencher of the Law Society of Alberta and as its President. I was the founding Chair of the Canadian Lawyers' Insurance Association and President of the Canadian Bar Insurance Association. I have served as the Chair of the Standards Advisory Board of the Canadian Institute of Chartered Accountants. I have acted as the Chair of the Alberta Law Reform Institute.

3.  I have a Bachelor of Commerce (1964) from the University of Manitoba, a Bachelor of Laws (1967) from the University of Alberta, and a Doctorate of Laws (Hon.) (2013) from the University of Lethbridge.

4.  Among other professional associations, I am a fellow of the American College of Trial Lawyers. I currently maintain an active practice in private mediations and arbitrations.

### II.    Background

5.  On March 23, 2023, SOL-MM III LLC ("**Plaintiff**") filed its initial Summons with Notice in the Supreme Court of the State of New York, designating New York County as the place of trial. On July 18, 2023, the Plaintiff filed a complaint ("**Complaint**") against Defendants JP Morgan Chase Bank, National Association ("**JPMorgan**"), D5 Hawks LLC ("**JPM-D5**"), WE Tahoe 1 LLC ("**JPM-WEM 1**") WE Tahoe 2 LLC ("**JPM-WEM 2**"), New WEM Holdings Affiliate 1 Ltd. ("**WEM-1**"), New WEM Holdings Affiliate 2 Ltd. ("**WEM-2**"), New WEM Holdings Ltd. ("**WEM-3**")[1], and MOA Holdings III, LLC ("**MOA Guarantor**", together with the WEM Guarantors, the "**WEM-MOA Guarantors**", and collectively with JPMorgan, JPM-D5, JPM-WEM1 and JPM-WEM 2, the "**Defendants**").

6.  The following summary of the relevant facts are taken from the Complaint.

7.  The Plaintiff alleges that the Defendants made efforts in the first quarter of 2021 to prevent the Plaintiff and the lenders it represents as agent ("**Lenders**") from being repaid on a loan that the Lenders made to support the development of the American Dream Mall in New

---

[1] WEM-1, WEM-2, and WEM-3 are collectively referred to as the "**WEM Guarantors**".

Jersey. The American Dream Mall was developed and is operated by a group of entities owned and controlled by members of the Ghermezian family.

8.  On or about August 2, 2019, the Lenders with Plaintiff as their Administrative Agent executed a Junior Mezzanine Loan Agreement ("**Plaintiff Loan Agreement**") with Ameream Mezz I, LLC ("**American Dream Borrower**"), loaning $300,000,000 to finance the development of a portion of the American Dream Mall ("**Plaintiff Loan**"). To evidence and secure the Plaintiff Loan Agreement, American Dream Borrower executed five promissory notes ("**Plaintiff Loan Notes**").

9.  In 2017, prior to the execution of the Plaintiff Loan Agreement, JPMorgan and other lenders provided $1,195,000,000 in senior secured financing to Ameream, LLC ("**JPMorgan Loan**"), and AB American Dream Mall Syndicate Joint Venture LP ("**Senior Mezz Lender**") provided a $475,000,000 senior mezzanine loan to Ameream Mezz, LLC, an intermediary entity which wholly owns Ameream and is wholly owned by American Dream Borrower.

10. The Ghermezians and their affiliated entities, including the WEM-MOA Guarantors, provided a payment guaranty whereby they guaranteed the American Dream Borrower's obligation to repay the Plaintiff Loan.

11. On May 10, 2021, American Dream Borrower failed to remit the regularly scheduled monthly payment of interest due under the Plaintiff Loan Notes, resulting in an event of default. On February 7, 2023, the Plaintiff sued American Dream Borrower in New York state court, filing a summary judgment motion in lieu of filing a complaint and, on April 10, 2023, the New York state court granted the Plaintiff's motion for summary judgment and ordered to submit judgment on notice. On May 3, 2023, the New York state court entered the judgment in favour of the Plaintiff in the amount of $404,399,512.87.

12. The Plaintiff claims, among other causes of action, that a transfer by the WEM Guarantors to JPMorgan of 49% equity stakes in the West Edmonton Mall ("**WEM Equity**"), pursuant to an agreement dated January 29, 2021 ("**2021 Agreement**") is a fraudulent transfer. On March 25, 2021, JPMorgan, through other JPMorgan Defendants, acquired the 49% equity stake of the WEM-MOA Guarantors in the West Edmonton Mall and Mall of America pursuant to the 2021 Agreement ("**WEM-MOA Equity Transfer**"). The Plaintiff alleges that JPMorgan and the WEM-MOA Guarantors entered into the 2021 Agreement with the intent to defraud, hinder and delay creditors of the WEM-MOA Guarantors.

13. I have been retained to provide an opinion to this Court about Alberta Law and Practice on behalf of the Defendants and have been asked by counsel to assume that the fraudulent transfer claims relating to the WEM Equity will be governed by Alberta law, pursuant to U.S. choice-of-law principles.

14. In particular, I have been asked to provide my opinion on 1) the relevant law that governs fraudulent transfer claims in Alberta, 2) the elements that must be pled and proven to

succeed on fraudulent transfer claims in Alberta, and 3) the Alberta statute of limitations as applied to fraudulent transfer actions.

### III.    Legal Opinion

#### A.    <u>Fraudulent Transfers in Alberta</u>

15. The *Fraudulent Preferences Act*, RSA 2000, C F-24 ("**FPA**") and *Fraudulent Conveyances Act,* 1571, (U.K.), 13 Eliz I, c 5, ("**Statute of Elizabeth**"), as well as the common law interpreting both of these statutes govern claims alleging fraudulent transfers in Alberta.

16. Generally, the FPA operates alongside the Statute of Elizabeth, and it is common in Alberta that a transaction is challenged under both statutes (*Lay v Lay*, 2023 ABKB 354 ("***Lay***") at para 30).

17. The purpose of both statutes has been described as protecting creditors by permitting courts to "strike down all conveyances of property made with the intention of defrauding creditors, except for conveyances made for good consideration and *bona fide* to persons not having notice of fraud" (*Krumm v McKay*, 2003 ABQB 437 ("***Krumm***") at para 13).

18. By way of general overview, the elements that must be pled to establish a fraudulent conveyance under the FPA and the Statute of Elizabeth are similar, as both require, for example, proof of fraudulent intent to defeat creditors on the part of a transferor. However, the Statute of Elizabeth has broader application because it does not require proof of insolvency. For the FPA to apply, the subject transaction must be effected "when the person is in insolvent circumstances or is unable to pay the person's debts in full or knows that the person is on the eve of insolvency" (FPA ss 1, 2, and 3).

19. With respect to the FPA, my instructions are to opine on the applicability of Sections 1 and 2 only, and not Section 3, presumably because Section 3 applies with respect to "any action that within one year after the transaction is brought to impeach or set aside the transaction" (FPA s 3).  Hereafter, reference to the FPA unless otherwise noted will be confined to Sections 1 and 2.

##### 1.  The FPA

###### a.  *Required Elements*

20. Pursuant to Sections 1 and 2 of the FPA, courts in Alberta may avoid both fraudulent conveyances and preferences.

21. A fraudulent <u>conveyance</u> is "void as against any creditor or creditors injured, delayed or prejudiced" if the applicant shows (1) that there was a transaction; (2) when the person is in insolvent circumstances or is unable to pay the person's debts in full or knows that the person is on the eve of insolvency; (3) for nominal value; and (4) with the intent to defeat, hinder, delay or prejudice the debtor's creditors (FPA s 1; *Lay* at para 38).

22. A fraudulent <u>preference</u> is "void as against the creditor or creditors injured, delayed, prejudiced or postponed" if the applicant can show "(1) that there was a transfer of property, (2) by an insolvent person or a person who is on the eve of insolvency, (3) to a creditor, (4) with the intent of giving that creditor a preference" (FPA s 2; *Re Titan Investments Limited Partnership, (Judicature Act)*, 2005 ABQB 637 ("**Titan Investments**") at para 13).

23. Both Sections 1 and 2 of the FPA are subject to the saving provisions in Sections 6 to 9 of the FPA.

*1) Injury, Delay, Prejudice or Postponement*

24. Under the FPA, fraudulent conveyances may be void against any creditor or creditors "injured, delayed or prejudiced" (FPA s 1) and fraudulent preferences against creditors "injured, delayed, prejudiced or postponed" (FPA s 2).

25. It appears that courts in Alberta have not yet considered whether fully encumbered assets are susceptible to a fraudulent transfer challenge. However, courts have explored the analogous circumstance in which property is statutorily exempt from execution or seizure.

26. Alberta Courts have held that a transfer of property that is exempt from execution or seizure pursuant to the *Civil Enforcement Act*, RSA 2000, c C-15 ("**Civil Enforcement Act**") cannot be attacked as a fraudulent preference or conveyance (*Re Melnychuk*, 1997 CanLII 24606 (ABKB), *Re Abba*, 1998 ABQB 730 (CanLII) ("**Abba**"), both referred to as sound law in *Royal Bank v Laughlin*, 2001 ABCA 78 ("**Laughlin**")).

27. In *Laughlin,* the debtor, Ms. Laughlin, lived on and farmed lands, which were exempt from enforcement proceedings pursuant to the *Civil Enforcement Act*. She was indebted to the Royal Bank of Canada, which held a general security entitling it to claim the proceeds of a sale of the lands. Ms. Laughlin gave charging orders to her two solicitors and her daughter. The daughter foreclosed on the lands, and the balance, after paying priority charges, was held in trust. The result of these transactions was to effect a disposition of the lands without creating any proceeds subject to the bank's claim. The bank challenged the three charges as fraudulent preferences or conveyances.

28. The Court of Appeal of Alberta determined that Ms. Laughlin's disposition of exempt property was "not unlawful or fraudulent notwithstanding that its effect may be to deprive a creditor of its expectation that the exempt property would eventually mature into an interest to which its security would attach" (at para 33). The Court further concluded that the impugned transaction did not defeat, hinder or delay the bank because Ms. Laughlin had been "free to dispose of her exempt equity as she saw fit" at the time of the challenged transfer (at para 33).

29. In coming to these conclusions, the Court discussed the relevant case law and rationale behind the principle that the transfer of exempt property cannot affect creditor's rights and repeated (at para 29) the following quotation contained in *Abba*:

> Exempt property is not available to creditors since they have not been injured, delayed, prejudiced or postponed by reason of dealings with exempt property which they had no right to in any event. No creditor is prejudiced by exempt property being given away. A settlement of exempt property cannot affect creditors' rights.

### 2) Intent

30. The intent to "defeat, hinder, delay or prejudice" creditors for the purpose of Section 1(b) of the FPA is challenging to prove based on direct evidence, given that debtors are unlikely to admit such an intent publicly. As such, courts in Alberta imply or infer intent from suspicious facts or circumstances surrounding the imputed transaction, which typically include elements which have been classified as badges of fraud in decisions relating to the Statute of Elizabeth (*Servus Credit Union v JRD Investments Inc*, 2020 ABQB 249 at para 45, citing *Canada (Attorney General) v Samuel Doz Professional Corp* (1993), 139 AR 198, 9 Alta LR (3d) 201 (Alta QB)). The badges of fraud will be discussed below.

31. Section 2 of the FPA, relating to preferences, does not require courts to consider the intention of the creditors (*Titan Investments*, at paras 25 and 26). The dominant intention of the transferor must be to prefer the creditor to whom the impugned assignment is made (*Mako Megbiz, KFT v Osprey Energy Ltd*, 2006 ABQB 630 ("**Mako Megbiz**") at paras 26-31). As such, a preferential transaction may be legitimate if a debtor has made it to continue in business and meet its obligations (*Tiamat Resources* at para 79; *Mako Megbiz* at para 27).

### 3) Insolvency

32. For a transaction to be voidable under the FPA, the debtor must also have been insolvent, on the eve of insolvency, or unable to pay the person's debts in full when the transfer was made.

33. The insolvency requirement pursuant to the FPA is analyzed at the time of the impugned transaction. The effect of the impugned transaction on the solvency of the debtor is rarely considered. In *Alberta (Attorney General) v Samuel Doz Professional Corp*., 1993 CanLII 7049 (AB KB), the Court stated in paragraph 19:

> Section 1 of the *Fraudulent Preferences Act* states that a conveyance is void only if the person making the conveyance does so at a time when he is in insolvent circumstances or is unable to pay his debts in full or knows that he is on the eve of insolvency. <u>The relevant time is the time of the conveyance.</u> It is therefore incumbent upon the Appellant to show that the Respondent, Samuel Doz Professional Corporation, was either insolvent, unable to pay its debts in full or was on the eve of insolvency. The Appellant need not establish all three of these

> elements or any combination of them but must set forth a prima facie case of at least one. [emphasis added]

34. This principle was also cited with approval in *Titan Investments* at paragraph 15:

> In order for a transaction to be impeached under the FPA, the debtor must have been either insolvent, on the eve of insolvency, or unable to pay the person's debts in full at the time that the transfer was made.

35. Courts have held that this portion of the FPA warrants a disjunctive reading, such that an applicant is only required to prove one of either insolvency, eve of insolvency, or inability to pay debts in full (*Servus Credit Union v JRD Investments Inc*, 2020 ABQB 249 ("***Servus Credit Union***") at para 37; *Stihl Ltd v Motion Engine Services Ltd*, 1990 CanLII 5932 ABKB ("***Stihl***") at paras 14-16).

36. There are two principal approaches to determining insolvency in Alberta: the balance sheet test and the cash flow test (*Lay* at para 62, citing Janis P Sarra and Justice Barbara Romaine, ed, *Annual Review of Insolvency Law 2017* (Toronto: Carswell, 2018) at 20 and 21). Generally, the balance sheet test is a point-in-time test where insolvency occurs when a debtor's liabilities exceed the fair market value of their assets. The cash flow test is forward-looking, and under this test, insolvency occurs when the debtor cannot pay their debts as they become due in the ordinary course because they lack financial liquidity (*Lay* at paras 63-67).

37. The burden of proving insolvency or imminent insolvency when an alleged fraudulent transfer was made rests with the claimant. The claimant must allege and prove facts that will "warrant a reasonable inference of insolvency, at which point the defendant would need to adduce evidence to rebut that *prima facie* evidence" (*Servus Credit Union v JRD Investments Inc*, 2020 ABQB 249 at paras 37-41, citing *Titan Investments Ltd Partnership, Re,* 2005 ABQB 637 at para 15; *Coopers & Lybrand Ltd v Alcan Canada Products Ltd* (1982), 46 AR 32, 16 ACWS (2d) 4 (QB) at paras 15-17, citing from *Kozan v Countrywide Factors Ltd*, 1977 CanLII 175 (SCC), [1978] 1 SCR 753).

*38.* It is not sufficient for a petitioning creditor to prove that an unpaid debt is owed to them alone; evidence is required that the debtor has ceased to meet its liabilities to others, and the allegation must be strictly proven (*Servus Credit Union v JRD Investments Inc*, 2020 ABQB 249 at para 40, citing *HolmesRe Sinclair*, (1976), 9 OR (2d) 240, 1975 CanLII 667 (Ont SCJ)).

### b. *Opinion on the Application of the FPA*

39. A plaintiff creditor that has not been injured, delayed, prejudiced, or postponed by reason of dealings with encumbered property will not succeed under the FPA. The Complaint alleges an event of default with respect to the Plaintiff Loan occurred on May 10, 2021. The American Dream Borrower was solvent at the time of the WEM-MOA Equity Transfer in March of 2021. There is no allegation the WEM Guarantors were insolvent,

on the eve of insolvency, or unable to pay debts in full at or before the time of the WEM-MOA Equity Transfer.

**2.  Statute of Elizabeth**

**a.  *Required Elements***

40. The following elements are required for the application of the *Statute of Elizabeth*:

> 1. There must be a conveyance of either real or personal property;
>
> 2. The transaction must have been for no or nominal consideration;
>
> 3. It must have been the intent of the settlor to defraud, hinder or delay his creditors;
>
> 4. The intent of the settlor may be inferred from his circumstances and the circumstances of the settlement or may be the result of direct evidence;
>
> 5. The fact that there was no consideration or voluntary consideration will in most cases justify the inference of necessary intent absent evidence rebutting that inference;
>
> 6. Inference of intent will be strong if the settlor was insolvent at the time of settlement or the settlement effectively denuded him of assets sufficient to cover the existing obligations;
>
> 7. The party challenging the conveyance must be a creditor or someone with a legal or equitable right to claim against the settlor;
>
> 8. The conveyance must have had the intended effect.
>
> (*Proulx v Proulx*, 2002 ABQB 151 at para 14; *Lay* at para 42).

41. A threshold question is whether a transfer is for no or nominal consideration. As stated in para 15 of *Krumm*:

> [w]hile the *Statute of Elizabeth* includes an exception for *bona fide* transfers for consideration, it is restricted to transferees who do not have knowledge of fraud. With respect to a transfer for value, a creditor attempting to rely on the *Statute of Elizabeth* must establish that the transferor had the necessary fraudulent intention and that the transferee was privy to the fraud.

42. Thus, in cases of a transfer for consideration, there must be a "concurrence of intent" to invalidate a transfer under the Statute of Elizabeth (*Krumm* at para 16).

43. While the Statute of Elizabeth is not directed against fraudulent preferences, the Statute of Elizabeth will apply if, in the course of preferring one creditor over another, the debtor obtains some benefit for itself. Such a transfer will be struck "if it is a mere cloak to secure a benefit to the grantor" (*Krumm* at para 32).

44. Alberta Courts have found that the intent required under the Statute of Elizabeth can be determined by examining "badges of fraud", which are a collection of diverse suspicious circumstances.

45. These badges of fraud may establish a *prima facie* case of fraudulent conveyance. Generally, the more badges of fraud that are proven, the stronger the *prima facie* case of fraudulent intent (*Lay* at para 49). Alberta courts are thus called to determine "on a balance of probabilities, that fraudulent intent has been proved in circumstances where there is no credible and cogent evidence to counter the strong inferences of fraudulent intent that are raised by the factual circumstances of the case" (*Lay* at para 49, citing *Moody v Ashton*, 2004 SKBQ 488 ("***Moody***") [2]).

46. Importantly, badges of fraud "simply invoke an evidentiary presumption which will not apply where there is cogent and credible evidence to show that the conveyance is *bona fide*" (*Lay* at para 50, citing *Moody*).

47. The Saskatchewan Court of King's Bench in *Moody* enumerated the following badges of fraud at para 143:

> (a) a transfer is made pending a writ;
>
> (b) there was secrecy respecting the transaction;
>
> (c) the grantor retains some benefit in the property;
>
> (d) the consideration was grossly inadequate;
>
> (e) the grantor continued in possession after the transfer;
>
> (f) the transfer amounted to a trust of the property;
>
> (g) the deed contained false statements as to the consideration;
>
> (h) there was unusual haste in making the transfer;
>
> (i) the property is shown as an asset of the grantor after the transfer; and

---

[2] The Saskatchewan Court of King's Bench in *Moody* conducted a thorough review of the Saskatchewan FPA (which is similar to the FPA) and the Statute of Elizabeth. *Moody* has been considered with approval by courts in both Saskatchewan and Alberta: *Paragon Capital Corporation Ltd v Morgan*, 2014 ABCA 363 at para 10; *Johnson v Johnson*, 2012 SKCA 87 at paras 80 – 82; *1007374 Alberta Ltd v Ruggieri*, 2013 ABQB 420 at paras 32 – 35; and *Nature Conservancy of Canada v Waterton Land Trust Ltd*, 2014 ABQB 303 at para 468.

(j) the transfer substantially reduces the property of the grantor that would be available to his creditors otherwise.

48. In a recent case, *Vestacon Limited v Huszti Investments (Canada) Ltd. o/a Eyewatch*, et al, 2022 ONSC 2104, the trial judge examined whether the plaintiff Vestacon's claim, grounded in the *Fraudulent Conveyances Act* of Ontario, was appropriate for summary judgment. Vestacon argued that the conveyance by Huszti Investments of three commercial units to a numbered company ("**260**") was fraudulent and that there were a number of badges of fraud that raised a genuine issue requiring a trial. The trial judge addressed each badge of fraud in turn and determined that 260 had successfully established that there was no genuine issue requiring a trial. In addressing one of the badges of fraud, whether Huszti Investments effectively dispossessed itself of its last remaining asset that could have been used to pay its outstanding debts to credits, the trial judge stated in paragraph 48:

> While imminent insolvency and dispossessing oneself of one's last remaining asset are recognized badges of fraud, in my view, they create a stronger suspicion of fraud when the conveyance at issue is of an unencumbered asset. In this case, Huszti Investments' last remaining assets – the units – were encumbered by three separate mortgages. The Statement of Adjustments indicates that, after paying out the mortgagees and discharging the arrears of property taxes, Huszti Investments was left with only about $80,000. In effect, Huszti Investments did use its last remaining asset to pay its creditors. It just paid out its secured creditors, which it was required to do. Vestacon, by failing to avail itself of its statutory lien rights, ranked below the creditors that were paid out on closing. Selling the asset and paying out creditors is not indicative of a fraudulent intention on the part of Huszti Investments, and certainly does not suggest that 260 knew or should have known that Huszti Investments was conveying the units to it for good consideration to defeat creditors.

49. The trial judge further determined that while 260 likely knew that Huszti Investments had an outstanding debt to Vestacon, "it was not 260's job to determine how to prioritize or satisfy Huszti Investments' unsecured creditors" (at para 49).

### b. *Opinion on the Application of the Statute of Elizabeth*

50. This is not a case of a transfer for no or nominal consideration. In addition, the impugned transaction does not establish a *prima facie* case of fraudulent intent because many of the "badges of fraud" are absent in the Complaint. For example, the consideration was not grossly inadequate. The Complaint alleges that the JPMorgan Loan was for $1,195,000,000 and the Senior Mezz Lender loan was for $475,000,000. The WEM-MOA Guarantors allegedly transferred 49% of Equity worth "over $1 billion" to discharge their guaranty obligation to these lenders. The consideration appears reasonable. Additionally, there is no trust alleged, and the grantor did not continue in possession after the transfer.

51. In any event, in this case, the allegations are that the WEM Guarantors agreed with the primary lender to avoid an imminent proceeding on the guaranty and to preserve reduced ownership of the West Edmonton Mall. These allegations themselves show, clearly and cogently, that the conveyance was *bona fide*.

**B.  Statute of Limitations**

52. The Complaint states that the 2021 Agreement was made on or about January 29, 2021, and that the WEM-MOA Equity was transferred on March 25, 2021. I have been asked to assume that a copy of the 2021 Agreement was sent to the Plaintiff on February 1, 2021. On March 23, 2023, the Plaintiff filed its initial Summons with Notice in the Supreme Court of the State of New York

**a.  *Required Elements***

53. Proceedings under fraudulent conveyances and fraudulent preferences law are subject to the limitation periods established in *Limitations Act*, RSA 2000, c L-12 ("**Limitations Act**").

54. The limitation period prescribed by Section 3 of the Limitations Act is two years after the date on which the claimant first knew, or in the circumstances ought to have known, that the injury for which a remedial order is sought has occurred and that it warrants bringing a proceeding, or ten years after the claim arose, whichever period expires first.

55. Alberta courts regard limitations provisions as substantive law, not procedural (*Moody Estate (Re)*, 2011 ABQB 222, at paras 25-28). In *Heuman (Next friend of) v Andrews*, 2005 ABQB 832, Rowbotham J (as she was then) thoroughly analyzed *Tolofson v Jensen*, 1994 CanLII 44 (SCC), a Supreme Court of Canada case which articulated this principle in the context of conflicts of laws, as well as the many cases decided in its wake. She stated in paragraph 36:

> In my view where, as here, we are dealing with a limitation period in a limitations statute, the provision is substantive. This ought to be so whether or not the case involves the conflict of laws. I agree with the observation of Huband JA in Michalski that the notion that a limitation provision bars the remedy rather than extinguishing a right "is an exercise in semantic gymnastics".

56. Section 1 (d) of the Limitations Act defines "injury" as "(i) personal injury, (ii) property damage, (iii) economic loss, (iv) non-performance of an obligation, or (v) in the absence of any of the above, the breach of a duty".

57. Section 3 of the Limitations Act codifies the principle of discoverability. The limitations clock therefore begins to run when the injury is discovered (*Lay* at para 75, citing *Sun Gro Horticulture Canada Ltd v Alberta Metal Building Sales Inc*, 2006 ABCA 243 at para 10). This happens when a claimant has discovered or ought to have discovered that the injury 1) had occurred; 2) was to some degree attributable to the conduct of the defendant; and 3) was sufficiently serious to have warranted commencing a proceeding (*Lay* at para 77).

A claimant is required to exercise due diligence (*Canadian Natural Resources* at paras 31 and 33; *Luscar Ltd v Pembina Resources Limited*, 1994 ABCA 356 at para 138; *Central Trust Co v Rafuse*, [1986] 2 SCR 147).

58. The level of subjective or objective knowledge that triggers the start of the limitation period is "the presence of sufficient information available to the claimant to put that person on inquiry" (*Lay* at para 77). What is required is knowledge of the injury, not knowledge of whether there is a cause of action (*Sun Gro Horticulture Canada Ltd v Alberta Metal Building Sales Inc*, 2006 ABCA 243 at para 11).

59. The test of when a claimant "ought to have known" calls for "reasonable diligence" on the claimant's part. Accordingly, "if claimants fail to make reasonable inquiries or exercise reasonable diligence to confirm matters during the limitation period, they do so at their own peril" (*Lay* at para 77, citing *inter alia, Canadian Natural Resources Ltd v Jensen Resources Ltd*, 2013 ABCA 399 at paras 46-48; *Geophysical Service Incorporated v Encana Corporation*, 2018 ABCA 384 at para 20).

60. The test for whether injuries "warrant" bringing a proceeding "speaks not to the legal strength of a plaintiff's case for recovery, but to the circumstances of the plaintiff" (*HOOPP Realty Inc v Emery Jamieson LLP,* 2020 ABCA 159 ("**HOOPP Realty**"), at para 56). The question is: "in light of his or her own circumstances and interests, at what point could the plaintiff reasonably have brought an action?" (*HOOPP Realty* at para 56, citing *Novak v Bond*, [1999] 1 SCR 808 ("**Novak**" at para 81).

61. Accordingly, "[t]he reasonable person would only consider that the plaintiff could not have brought an action at the time the right to do so first arose if the plaintiff's own interests and circumstances were serious, significant, and compelling. Purely tactical considerations have no place in this analysis" (*Novak* at para 81).

62. In *Singh v Kaler*, 2017 ABCA 275, Slatter JA, in dissent, determined that the relevant "injury" was the denial that Ms. Singh had a beneficial interest in the land under the resulting trust that had arisen. Accordingly, the clock started to run "when she knew, or ought to have known, that the respondents were denying she had any interest in the land notwithstanding her contribution to the purchase money. Any act clearly inconsistent with her interest, or (as here) a clear denial she had any interest (coupled here with a refusal to reflect her interest on the title) would suffice" (at para 88).

63. Slatter JA rejected the view that "so long as the trustee remains in possession of the land, there is no 'injury'" as it could "potentially postpone the limitation period in cases like this for decades, even if there had been a clear denial by the trustee of the beneficiary's claim" (at para 90). Slatter JA's view on this point was cited with approval in *Mitchell v Pytel*, 2021 ABQB 403 at para 272.

64. Recently, in *Simmons v Homes by Avia (Edmonton) GP Inc*, 2023 ABKB 218 ("**Simmons**") the defendant applied for summary dismissal of a personal injury lawsuit based in part on a limitations argument. The lawsuit arose from the plaintiff's slip and fall on her own property on December 8, 2018. The Court of King's Bench determined that

the lawsuit was out of time given that the root cause of the lawsuit went back to the negligent or defective design and grading between Ms. Simmons' walkway and her garage because the "[b]ad design and grading were the source of the injury… both of which are types of injury" that "fall under the category of non-performance of a contractual obligation, or the breach of a duty" (at para 20). The Court stated in paragraph 22 that:

> The personal injury suffered by Ms. Simmons is an injury for the purposes of the *Limitations Act*. However, the injury for the purposes of this lawsuit is bad design and grading. In other words, the lawsuit is not really about the personal injury but about the conditions that gave rise to it.

65. The Court added in paragraph 24 that when "[f]aced with a known hazard, a Plaintiff cannot wait until the inevitable happens before doing anything about it."

**b.   *Opinion on the Application of the Limitations Act***

66. The issue of when the Plaintiff knew or ought to have known it had an injury attributable to the Defendants' conduct that warranted a proceeding is paramount. The resolution of this issue determines when time began to run for the purposes of calculating the 2-year limitation period.

67. The 2021 Agreement was sent to the Plaintiff on February 1, 2021. That date determined the commencement of the statute of limitations period. The Plaintiff knew or ought to have known it had an injury attributable to the Defendants that warranted a proceeding long before March 2021. The conditions that gave rise to the alleged injury warranting a proceeding were known to the Plaintiff when the 2021 Agreement was sent on February 1, 2021. As was the case in the recent *Simmons* case discussed above, "[f]aced with a known hazard," the Plaintiff is not entitled to "wait until the inevitable" (*i.e.*, the transfer in March 2021) "before doing anything about it."

68. Thus, the Plaintiff's fraudulent transfer claims under both the FPA and the Statute of Elizabeth, which were commenced on March 23, 2023, are barred by the Limitations Act.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is my true and correct opinion.

**Neil Wittmann K.C.**