**UNITED STATES DISTRICT COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

---

SOL-MM III LLC, as administrative agent,

                  Plaintiff,

      - against -

JPMORGAN CHASE BANK, N.A., D5 HAWKS LLC,
WE TAHOE 1 LLC, WE TAHOE 2 LLC, NEW WEM
HOLDINGS AFFILIATE 1 LTD., NEW WEM
HOLDINGS AFFILIATE 2 LTD., and NEW WEM
HOLDINGS LTD., MOA HOLDINGS III, LLC,
AMEREAM LLC,

                  Defendants.

Case No. 23-CV-06479-ALC

---

## FIRST AMENDED COMPLAINT

Plaintiff, SOL-MM III LLC ("**Plaintiff**"), through its attorneys, for a Complaint against

defendants JP Morgan Chase Bank, National Association ("**JPMorgan**"), D5 Hawks LLC ("**JPM-**

**D5**"), WE Tahoe 1 LLC ("**JPM-WEM 1**"), WE Tahoe 2 LLC ("**JPM-WEM 2**"), New WEM

Holdings Affiliate 1 Ltd. ("**WEM-1**"), New WEM Holdings Affiliate 2 Ltd. ("**WEM-2**"), New

WEM Holdings Ltd. ("**WEM-3**," together with WEM-1 and WEM-2, the "**WEM Guarantors**"),

MOA Holdings III, LLC ("**MOA Guarantor**" together with the WEM Guarantors, the "**WEM-**

**MOA Guarantors**"), and Ameream LLC ("**Ameream**," together and collectively with the WEM-

MOA Guarantors, JPMorgan, JPM-D5, JPM-WEM 1 and JPM-WEM 2, "**Defendants**"), alleges:

## NATURE OF THE ACTION

1.    This action arises out of Defendants' convoluted, deceitful, and commercially unreasonable efforts to secure benefits for themselves while preventing Plaintiff, and the lenders it represents as agent (the "**Lenders**"), from being repaid on hundreds of millions of dollars of loans to the owners of the American Dream Mall in East Brunswick, New Jersey (the "**Plaintiff Loan**").

2.    Defendant JPMorgan and Plaintiff both made loans in support of developing and opening the American Dream Mall, which is one of the largest shopping and entertainment complexes in North America.  JPMorgan was the more senior lender and was to be repaid first.  The mall owners, the Ghermezian family, personally guaranteed both loans, as did several of the family's affiliated entities, including the WEM-MOA Guarantors.

3.    The Ghermezians, through one of their affiliated entities, Ameream, defaulted on the JPMorgan Loan in 2020.  JPMorgan's appropriate recourse, under the terms of its loan agreement with Ameream, was to foreclose on its collateral—primarily the mortgages on the American Dream Mall and related parcels—and sue the Ghermezian family members and their affiliated entities as guarantors for any shortfall.  But JPMorgan saw an opportunity to instead secure a windfall for itself by taking advantage of the Ghermezians' desire to retain control and ownership of the American Dream Mall, as well as two other extremely valuable shopping and entertainment complexes—the Mall of American in Minnesota and the West Edmonton Mall in Alberta, Canada—and to avoid having to make good on their personal guarantees to Plaintiff.

4.    JPMorgan worked out an arrangement with the Ghermezians, pursuant to which the Ghermezians, via the WEM-MOA Guarantors, transferred a 49% ownership stake to JPMorgan in the Mall of America and the West Edmonton Mall.  Those were key assets that were supposed to

remain available to repay the Plaintiff Loan.  To make matters worse, the transfer occurred at a false valuation of just $50 million, even though JPMorgan had received more than $1 billion in value.[1]

5.      This arrangement provided JPMorgan with a massive windfall.  Indeed, JPMorgan did not credit any amount from the transfer towards its loan—not even the artificially reduced $50 million valuation—and thereby kept the full amount of its loan, which exceeded $1 billion, outstanding.  This in turn permitted the Ghermezians to avoid repaying the Plaintiff Loan by hiding behind JPMorgan, since Plaintiff's enforcement rights are limited as long as the JPMorgan Loan is outstanding.

6.      The arrangement between JPMorgan and the Ghermezians also permitted the Ghermezians to retain their ownership of the American Dream Mall, and thereby skip ahead of the Lenders by receiving income on an asset that was meant to serve as collateral available to repay the Plaintiff Loan.  And the arrangement took out of play two other key assets—substantial ownership in the Mall of America and the West Edmonton Mall and corresponding reimbursement rights against Ameream—that also would have otherwise been available to repay the defaulted Plaintiff Loan.  In short, JPMorgan and the Ghermezians worked out a plan whereby each benefited entirely at Plaintiff's expense.

***The Loan Terms***:

7.      The Plaintiff Loan was made in 2019, for $300 million, to one of the Ghermezians' affiliated entities, Ameream Mezz I, LLC (the "**American Dream Borrower**").  Plaintiff and the Lenders understood the Plaintiff Loan was subordinated to the JPMorgan Loan, which was a $1.195 billion senior secured loan by JPMorgan to Ameream in 2017 (the "**JPMorgan Loan**").  The Plaintiff Loan was also subordinated, until October 2022, to a $475 million senior mezzanine loan

---

[1]  As described in ¶ 141, through manipulative accounting practices, JPMorgan did not even reduce the outstanding amount of the JPMorgan Loan by the meager $50 million.

("**Senior Mezz Loan**") by AB American Dream Mall Syndicate Joint Venture LP (the "**Senior Mezz Lender**") to Ameream Mezz, LLC ("**Ameream Mezz**").

8.     Plaintiff and the Lenders bargained for credit support from the Ghermezian family empire to provide maximum assurance that the Plaintiff Loan would be repaid, notwithstanding that it was junior to the JPMorgan Loan and the Senior Mezz Loan.  For example, Plaintiff's loan was guaranteed, on a full recourse basis, by several of the Ghermezians' affiliated entities, including Defendants WEM-MOA Guarantors, which directly or indirectly owned 49% of the equity in the West Edmonton Mall and Mall of America (the "**WEM-MOA 49% Equity**").  Other Ghermezian-affiliated guarantors were Triple Five Investment Ltd. and 7 Crowns Corporation (the "**Non-Shared Guarantors**").  Plaintiff also obtained personal guarantees from the Ghermezian family members themselves.

9.     The American Dream Borrower currently owes Plaintiff over $400 million.  After the American Dream Borrower failed to make required interest payments on the Plaintiff Loan, Plaintiff sued American Dream Borrower earlier this year for breach of the Plaintiff Loan Agreement. On May 3, 2023, the Supreme Court of the State of New York entered judgment in favor of Plaintiff in the amount of $404,399,512.87 (the "**American Dream Judgment**"). The American Dream Judgment remains outstanding, and interest accrues at the New York state statutory rate.

### *The Intercreditor Agreement & Irrevocable Direction Letter*:

10.     At the same time Plaintiff and Lenders advanced the Plaintiff Loan, they entered into an intercreditor agreement (the "**Intercreditor Agreement**") with JPMorgan and the Senior Mezz Lender, which placed certain limitations on Plaintiff's rights to enforce its loan and guarantees while the JPMorgan Loan and Senior Mezz Loan were outstanding.  Plaintiff agreed that, absent full repayment of the JPMorgan Loan and the Senior Mezz Loan, or termination (including termination

thereof by operation of law) or release of the guarantees by JPMorgan and the Senior Mezz Lender, Plaintiff would not sue any "shared guarantors," which included the WEM-MOA Guarantors.

11.     To protect its subordinate position, Plaintiff bargained for critical protections in respect of the shared guarantors, most notably the WEM-MOA Guarantors. For example, the WEM-MOA Guarantors covenanted, for Plaintiff's benefit, to maintain ownership of the WEM-MOA 49% Equity and maintain an aggregate net worth of at least $680,000,000.00. Further, the Intercreditor Agreement incorporated JPMorgan's agreement that it could not sell the WEM-MOA 49% Equity without undertaking a value-maximizing public sale.

12.     The WEM-MOA Guarantors, together with other Ghermezian affiliates, also provided Plaintiff with an irrevocable letter of direction, dated August 2, 2019 (the "**Irrevocable Direction Letter**"), directing JPMorgan and the Senior Mezz Lender to pay the excess proceeds from "any collection, sale or other disposition" of the WEM-MOA 49% Equity, as well as from the sale of other assets (including the equity in Ameream), directly to Plaintiff. The Irrevocable Direction Letter functionally acts as a lien on the WEM-MOA 49% Equity, by ensuring that if there were defaults, before the Ghermezians could keep their ownership stake, all sale proceeds would first have to be paid to satisfy the Plaintiff Loan. In other words, the Irrevocable Direction Letter ensures that the Ghermezian family could not leap-frog ahead of Plaintiff and the Lenders on account of its equity interests.

**JPMorgan and the Ghermezian family team up in 2021 to harm Plaintiff and the Lenders**:

13.     Ameream defaulted on the JPMorgan Loan in May 2020. Under the terms of the JPMorgan Loan documents, JPMorgan, like any commercial lender, could foreclose on the loan collateral and sue the Ghermezian family members and their affiliated entities as guarantors. In early 2021, the aggregate value of the American Dream Mall collateral, much less the value of the other

two malls pledged as collateral, greatly exceeded the loan amounts owed to JPMorgan. Thus, had JPMorgan foreclosed on the American Dream Mall and/or its other available collateral, it would have been paid in full, with enough left over for Plaintiff to recover all or substantially all of the amounts owed to it from the WEM-MOA Guarantors and other guarantors.

14.　　But JPMorgan understood that it could secure a windfall for itself by taking advantage of the Ghermezians' desire to retain control and ownership of all three malls, and to avoid facing immediate liability under their personal guarantees. Thus, rather than foreclose on the mortgages encumbering the American Dream Mall, JPMorgan cut a deal with the Ghermezians, which benefited both parties, to the detriment of Plaintiff (the "**2021 Agreement**"). In exchange for JPMorgan not suing the Ghermezian family, not foreclosing on the American Dream Mall mortgages, and foregoing various other available recourse against the Ghermezians and their affiliated entities, the WEM-MOA Guarantors gave JPMorgan ownership of the WEM-MOA 49% Equity. But JPMorgan was not supposed to simply be given this collateral; rather, under the terms of its pledge agreements and the Intercreditor Agreement, it was supposed to liquidate it through a public sale, with the proceeds available to pay, not only its loan, but the Plaintiff Loan as well.

15.　　Even worse, JPMorgan, the WEM-MOA Guarantors, Ameream, and the Ghermezians intentionally, and *falsely*, valued the WEM-MOA 49% Equity for only $50 million instead of its true value, which exceeded $1 billion. The transfers and false valuation harmed Plaintiff and the Lenders' rights. It did so in two ways.

16.　　***First***, by purportedly crediting only $50 million against the JPMorgan Loan,[2] the 2021 Agreement kept the outstanding balance of the JPMorgan Loan artificially high (and ultimately unreduced by even a dime). This hindered and delayed Plaintiff from being able to assert a claim

---

[2] As noted in ¶ 141, JPMorgan did not even "credit" this paltry amount, instead recording its entire loan balance as outstanding. *See also* footnote 1.

against the WEM-MOA Guarantors because, under the Intercreditor Agreement, Plaintiff cannot pursue enforcement against the WEM-MOA Guarantors until the JPMorgan Loan is fully repaid. **Second**, by falsely valuing the WEM-MOA 49% Equity at a mere $50 million, Defendants destroyed the valuable subrogation, contribution, and reimbursement claims the WEM-MOA Guarantors hold against Ameream (the "**Reimbursement Claims**"), which leaves the WEM-MOA Guarantors with virtually no remaining assets remotely sufficient to repay the Plaintiff Loan.

17. Defendants negotiated the 2021 Agreement in secret, without Plaintiff's involvement. By doing so, JPMorgan secured a massive windfall for itself, and, in exchange, shielded the Ghermezians and their affiliated WEM-MOA Guarantors from having to repay Plaintiff indefinitely. Indeed, the assets the WEM-MOA Guarantors were supposed to preserve to repay Plaintiff are now in the control of the JPMorgan Defendants, who have no incentive to sell them (which would make the proceeds available to repay the Plaintiff Loan), and have done nothing with any portion of the WEM-MOA 49% Equity in over two years. For their part, the Ghermezian family continues to own a majority of the West Edmonton Mall and Mall of America, and continues to control and own the American Dream Mall, free of the threat of losing everything to JPMorgan, and, most critically, Plaintiff and the Lenders.

**_Plaintiff's Claims for Relief_**:

18. Plaintiff asserts claims for fraudulent transfer, a claim for tortious interference with the guarantees provided by the WEM-MOA Guarantors, a claim for breach of the covenant of good faith and fair dealing in the Intercreditor Agreement, and claims for declaratory relief. While those claims set forth different legal theories, there is a common thread: if JPMorgan, acting as a fair secured lender, wanted the WEM-MOA 49% Equity, it was not entitled to take it at a false valuation, and reward the Ghermezians for that windfall by helping them evade their obligations to other

lenders. Rather, JPMorgan's recourse was to market that asset in a commercially reasonable manner as required under its loan documents, and credit the full sale proceeds against its JPMorgan Loan, with any excess to be paid to Plaintiff. JPMorgan took the opposite tact, concocting a scheme to enrich itself at the expense of Plaintiff and the Lenders.

19. Plaintiff brings this action to right these wrongs.[3]

## PARTIES AND RELEVANT NON-PARTIES

20. Plaintiff SOL-MM III LLC is a Delaware limited liability company, having a registered office at c/o Cogency Global Inc., 850 New Burton, Suite 201, Dover, Delaware 19904. SOL-MM III LLC is the successor to Western Asset Mortgage Capital Corporation, the original Administrative Agent of the Plaintiff Loan. Reference to "Administrative Agent" herein includes Plaintiff and its predecessor in interest.

### *The JPMorgan Defendants*

21. Defendant JPMorgan Chase Bank N.A. is a national banking association with a home office in Columbus Ohio and an address at c/o CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219. JPMorgan is the administrative agent under the JPMorgan Loan documents and also a lender thereunder.

22. Defendant D5 Hawks LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan with an address at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, (ii) was formed on February 26, 2021, and (iii) is the sole member of MOA Holdings II LLC, which owns a 49% equity interest in MOA Holdings I LLC, the indirect sole owner of the Mall of America.

---

[3] Plaintiff has also brought an action in Canada against individual Ghermezian family members and the WEM Guarantors, asserting an oppression claim under Canadian law.

23.     Defendant WE Tahoe 1 LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan with an address at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, (ii) was formed on February 26, 2021, and (iii) owns 970 common shares of West Edmonton Mall Properties Inc. ("**WEMPI**"), the owner of the West Edmonton Mall.

24.     Defendant WE Tahoe 2 LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan with an address at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, (ii) was formed on February 26, 2021, and (iii) owns 10 common shares of WEMPI.

25.     At all times relevant to this action and currently, on information and belief, JPMorgan owns, operates, and controls Defendants JPM-D5, JPM-WEM 1, and JPM-WEM 2 (collectively, the "**JPMorgan Designees**").  These entities received the WEM-MOA 49% Equity at the direction of JPMorgan and would be "designees or nominees" under the 2021 Agreement.

26.     JPMorgan, JPM-D5, JPM-WEM 1, and JPM-WEM 2 collectively are referred to as the "**JPMorgan Defendants**."

### *West Edmonton Mall Guarantor Defendants*

27.     Defendant New WEM Holdings Affiliate 1 Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, and an address at c/o CT Corporation System, 28 Liberty Street, New York, New York 10005, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPMorgan Loan and the foreclosed Senior Mezz Loan, and (iv) a party to the 2021 Agreement.

28.     Defendant New WEM Holdings 2 Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, and an address at c/o CT Corporation

System, 28 Liberty Street, New York, New York 10005, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPMorgan Loan and the foreclosed Senior Mezz Loan, and (iv) a party to the 2021 Agreement.

29.     Defendant New WEM Holdings Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, and an address at c/o CT Corporation System, 28 Liberty Street, New York, New York 10005, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPMorgan Loan and the foreclosed Senior Mezz Loan, and (iv) a party to the 2021 Agreement.

30.     WEM-1, WEM-2, and WEM-3 are collectively referred to as the "**WEM Guarantors**."

### *Mall Of America Guarantor*

31.     Defendant MOA Holdings III, LLC is (i) a Delaware limited liability company with its principal place of business in Bloomington, Minnesota, and an address at 60 East Broadway, Bloomington, Minnesota 55425-5550, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPMorgan Loan and the foreclosed Senior Mezz Loan, and (iv) a party to the 2021 Agreement.

### *American Dream Mall Owner*

32.     Defendant Ameream, LLC (i) is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073, (ii) is the borrower of the JPMorgan Loan, (iii) is a party to the 2021 Agreement, and (iv) prior to the foreclosure of the stock owned by Ameream Mezz by the Senior Mezz Lender, was indirectly wholly owned by the American Dream Borrower whose 100% ownership was pledged to Plaintiff as collateral for the Plaintiff Loan.

*Non-Party Guarantors*

33.     Non-party Don Ghermezian is (i) a natural person, having an address at 14A Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a director or officer of one or more of the WEM-MOA Guarantors, and (iv) a party to the 2021 Agreement.

34.     Non-party Eskandar Ghermezian is (i) a natural person, having an address at 17 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement.

35.     Non-party David Ghermezian is (i) a natural person, having an address at 14A Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement.

36.     Non-party Syd Ghermezian is (i) a natural person, having an address at 722 W. 232nd Street, Bronx, New York 10463, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement.

37.     Non-party Bahaman Ghermezian is (i) a natural person, having an address at 15 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement.

38.     Non-party Raphael Ghermezian is (i) a natural person, having an address at 18 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement.

39.     Non-party Nader Ghermezian is (i) a natural person, having an address at 16 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement.

40.     Non-party Marshall Ghermezian is (i) a natural person, having an address at 17 Wellington Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement.

41.     Non-party Tony Ghermezian is (i) a natural person, having an address at 14B Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-1 and WEM-2, and (iv) a party to the 2021 Agreement.

42.     Each Ghermezian family member named in this section *Non-Party Guarantors* is an "**Individual Guarantor**" and collectively the "**Individual Guarantors**."

43.     Non-party Original WEMPI Inc. ("**Original WEMPI**") is (i) an Alberta corporation, having an address at 8882-170 Street North West, Edmonton, Alberta, T5T 4M2, Canada, and an address at c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011, (ii) a guarantor under the payment guarantee for the JPMorgan Loan, and (iii) a party to the 2021 Agreement.

44.     Non-party Triple Five Investment Ltd. is (i) a British Columbia corporation, having an address at 8882 170 Street, Edmonton, Alberta, Canada T5T 4M2, and an address at c/o Ameream LLC, One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073, and (ii) a Non-Shared Guarantor for the Plaintiff Loan.

45.     Non-party 7 Crowns Corporation is (i) an Alberta corporation, having an address at 8882 170 Street, Edmonton, Alberta, Canada T5T 4M2, and an address at c/o Ameream LLC, One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073, and (ii) a Non-Shared Guarantor for the Plaintiff Loan.

## JURISDICTION

46.     This action was originally brought in New York state court (the "**New York Action**") by filing a notice and summons on March 23, 2023, with a complaint subsequently filed on July 18, 2023 (the "**Original Complaint**").

47.     On July 26, 2023, Defendants removed the New York Action to this Court pursuant to 12 U.S.C. § 611, *et seq.* (the "**Edge Act**").  This Court has jurisdiction pursuant to the Edge Act.

48.     Venue is proper in this district by agreement of the parties per Section 7.3 of the Payment Guaranty and Section 18(g) of the Intercreditor Agreement, pursuant to which JPMorgan and the WEM-MOA Guarantors consented to the jurisdiction of New York State and federal courts in New York County.  Venue is also proper under 28 U.S.C. § 1391(b)(3), CPLR § 501, and CPLR § 503, including on grounds that JPMorgan does substantial business in this County, and derives substantial revenue from activities carried out in this County.

## FACTUAL BACKGROUND

### A.     American Dream Mall, Mall of America, and West Edmonton Mall

49.     The claims Plaintiff brings relate to three of the largest and most valuable shopping malls in North America—the American Dream Mall in New Jersey; the Mall of America in Minnesota; and the West Edmonton Mall in Alberta, Canada.  Each mall has been owned and/or managed by the Ghermezian family, which has developed and operated several of the world's largest shopping malls since the 1970s.  The Ghermezian family operates through its family investment group, the Triple Five Group, of which Don Ghermezian is currently the President.  Don Ghermezian is also purportedly the CEO and President of American Dream Mall.

50.     Over the years, the Ghermezian family established an elaborate web of companies to hold its ownership stakes in the three malls.  **Appendix Chart "A"** is the tangled corporate

organization existing immediately prior to the 2021 Agreement. **Appendix Chart "B"** is the purported corporate organization after the consummation of JPMorgan's acquisition of WEM-MOA 49% Equity in March 2021, based on a notice provided to Plaintiff by the Senior Mezz Lender in October 2022. **Appendix Chart "C"** is the corporate organization after the consummation of JPMorgan's acquisition of WEM-MOA 49% Equity in March 2021, based on an audited financial statement dated April 29, 2023, which was recently produced to Plaintiff ("**WEM 2022 Audited Financial Statement**").[4]

### *American Dream Mall*

51.     The American Dream Mall is a 3.3-million square foot retail and entertainment complex in East Rutherford, New Jersey. It is the second largest retail and entertainment center in the United States (behind Mall of America), boasting an impressive array of entertainment, shopping, and dining experiences. American Dream Mall features a Nickelodeon Indoor Theme Park with more than 35 rides and attractions, an NHL-regulation-size ice skating rink, a DreamWorks Water Park, North America's only indoor-year-round ski and snow resort, a Legoland Discovery Center, a Sea Life Aquarium, and the world's only indoor surfing wave pool.[5]

52.     At the time of the Plaintiff Loan in 2019, the American Dream Mall was valued at $4.3 billion upon completion, and $5.6 billion upon post completion and stabilization.[6]

---

[4] Appendix Chart "C" in this Amended Complaint depicts a significantly different ownership structure than the one provided by the Senior Mezz Lender in October 2022, which Plaintiff relied on for Appendix Chart "B" in the Original Complaint.

[5] Loving New York, *The Ultimate 2023 Guide To The American Dream Mall* (Mar. 2, 2023), https://loving-newyork.com/american-dream-mall-nj/.

[6] Additionally, Ameream, through its affiliates, Meadow A-B Office, LLC, Meadow C-D Office, LLC, Meadow Hotel, LLC, and Meadow Baseball, LLC, each a Delaware limited liability company (collectively, the "**American Dream Mall Out Parcel Owners**"), and Meadow Outparcels Developer, LLC, a Delaware limited liability company, own valuable adjacent leasehold properties zoned for office and hotel complexes, a minor league baseball stadium, as well as other expansion rights, including an option to purchase land.

53.     At all relevant times, the Ghermezian family has owned Ameream, the entity that owns the American Dream Mall.  Indeed, the Ghermezian family has sought to hide the Ghermezian family's ownership following the foreclosure by the Senior Mezz Lender in October 2022, described in ¶¶ 168-69 below.  Thus, the Ghermezians continue not only to run the American Dream Mall, but also continue to own the American Dream Mall.

54.     While the American Dream Mall, like virtually all shopping malls around the globe, suffered during the COVID-19 pandemic, it has come back strong.  Earlier this year, Don Ghermezian bragged about the mall's success in 2022 and the fact that high-end retailers were seeking to open stores within the mall.[7]  The American Dream Mall itself was, in early 2021, and remains, worth far more than the amount owed to JPMorgan under the JPMorgan Loan, even without accounting for the more than $1 billion in value associated with the WEM-MOA 49% Equity that JPMorgan intentionally refused to credit against the JPMorgan Loan.

55.     According to American Dream Mall's public statements disclosed in October 2023, the American Dream Mall has generated $520.8 million in gross sales in the last 12 months, with 86.0% of the property leased.[8]

### Mall of America

56.     Prior to March 2021, the Ghermezian family, through various corporate entities, owned 100% of Mall of America.  The Ghermezian family continues to operate this mall.

---

[7] *See* David Moin, *American Dream, Post-COVID-19, Capturing Crowds*, WOMEN'S WEAR DAILY (Jan. 23, 2023), http://wwd.com/business-news/real-estate/american-dream-progress-report-1235481459/.

[8] Gross Sales Report as of November 1, 2023, ELECTRONIC MUNICIPAL MARKET ACCESS (Nov. 2, 2023), https://emma.msrb.org/P21743801-P21339131-P21773617.pdf; American Dream Leasing Status Update as of October 2, 2023, ELECTRONIC MUNICIPAL MARKET ACCESS (Oct. 4, 2023), https://emma.msrb.org/P21731041-P21329945-P21763647.pdf.

57.     Mall of America is the United States' largest retail and entertainment complex, spanning 5.6 million square feet.[9]  Mall of America currently attracts over 40 million visitors annually and has a $1.9 billion economic impact annually.  Mall of America has more than 520 stores, two hotels, and a theme park.

58.     Based on company-provided financial statements, Mall of America's revenue and net operating income for 2021 were $176,749,907 and $80,288,227, respectively.

59.     The value of Mall of America has increased since 2020.  As of March 2021, Mall of America was valued at approximately $1.99 billion.  As of October 2022, it was valued at approximately $2.1 billion.  With approximately $1.38 billion in debt as of March 2021, there is (and was at the time of the 2021 Agreement) a sizeable equity cushion in the ownership of Mall of America.

60.     Mall of America's revenue and net operating income for 2022 were $210.6 million and $97.6 million, respectively, per company-provided financial statements.

***West Edmonton Mall***

61.     Prior to March 2021, the Ghermezian family, through various corporate entities, also owned 100% of the West Edmonton Mall.  The Ghermezian family continues to operate this mall.

62.     West Edmonton Mall, referred to by its owners as "the greatest indoor show on earth," is an entertainment and retail "city" that spans 5.3 million square feet, hosting more than 30 million people annually.[10]  West Edmonton Mall has over 800 stores and services, including a hotel, over 100 dining venues, and is "accredited as a zoo."  West Edmonton Mall also includes (i) the

[9] TripleFive Group of Companies, *Mall of America® Today*, https://www.triplefive.com/moa/moa-today/ (last visited Mar. 27, 2023).
[10] TripleFive Group of Companies, *West Edmonton Mall*, https://www.triplefive.com/wem/.

world's largest indoor amusement park, (ii) a triple loop rollercoaster, (iii) a lake (complete with a replica of Christopher Columbus' Santa Maria), (iv) a wave pool, and (v) a permanent bungee tower.

63.     Until March 2021, WEM-3 owned 75% of the West Edmonton Mall, and WEM-1 and WEM-2 collectively owned 25% of the West Edmonton Mall.  As a result of the 2021 Agreement and subsequent transfers, only WEM-3 retains ownership, which ownership was reduced to 51%.

64.     The Ghermezians have boasted that West Edmonton Mall is the number one tourist attraction in Alberta and "remains the ultimate entertainment and shopping experience."[11]  Three high end major luxury brands joined West Edmonton Mall since the summer of 2019—Louis Vuitton, Saint Laurent, and Gucci—and all three have experienced remarkable success, despite the pandemic, leading to other luxury retailers exploring opening locations.[12]  More recently, Nike announced plans to open a flagship store at West Edmonton Mall, which upon opening will be its largest store in Canada.[13]

65.     West Edmonton Mall has generated an enormous economic benefit for the province of Alberta.  West Edmonton Mall's revenue and net operating income for 2021 were Canadian $230 million and Canadian $140 million, respectively, per company-provided financial statements.

66.     West Edmonton Mall's revenue and net operating income for 2022 were the highest since 2015, reaching Canadian $295.8 million and Canadian $168.7 million, respectively, per company-provided financial statements.

---

[11] *Id.*
[12] Craig Patterson, *West Edmonton Mall Looking to Add More Luxury Retailers After Seeing Success with 3 Big Players*, RETAIL INSIDER (Mar. 22, 2022), https://retail-insider.com/retail-insider/2022/03/west-edmonton-mall-looking-to-add-more-luxury-retailers-after-seeing-success-with-3-big-players/.
[13] Craig Patterson, *Nike to Open Largest Store in Canada at West Edmonton Mall*, RETAIL INSIDER (June 18, 2023), https://retail-insider.com/retail-insider/2023/06/nike-to-open-largest-store-in-canada-at-west-edmonton-mall/.

## B.     The American Dream Mall Financing

### *The American Dream Mall Senior Loans*

67.     In 2017, JPMorgan and other lenders provided the JPMorgan Loan, a $1,195,000,000 senior secured financing, to Ameream, the direct owner of the American Dream Mall, to finance the development of the mall.  The collateral supporting the JPMorgan Loan, as discussed further below, primarily consisted of (i) pledges of the WEM-MOA 49% Equity as described in ¶¶ 69-70, (ii) a pledge of an additional 25% cash flow in the West Edmonton Mall as described in ¶ 72, (iii) a second mortgage in the amount of Canadian $425 million on the West Edmonton Mall (the "**West Edmonton Mall Mortgage**"), and (iv) mortgages covering Ameream's rights, title and interest to, *inter alia*, the American Dream Mall together with the future development rights adjacent to the Mall for hotels, office buildings, and a minor league baseball stadium.  There is no doubt that at all times, the JPMorgan Loan has been overcollateralized.

68.     At the same time, in 2017, the Senior Mezz Lender provided the Senior Mezz Loan, a $475,000,000 senior mezzanine loan, to Ameream Mezz, which owned 100% of the equity interests of Ameream.  The Senior Mezz Lender was granted a first priority security interest in all of Ameream Mezz's ownership interests in Ameream.[14]  Thus, the Senior Mezz Lender was subordinated to JPMorgan with respect to the American Dream Mall, and was not a direct creditor of Ameream, but if there was a default, the Senior Mezz Lender was positioned to foreclose on the stock of Ameream and become the new equity owner of the American Dream Mall.[15]

---

[14]  JPMorgan actually assigned to the Senior Mezz Lender a preexisting pledge of the stock in Ameream owned by Ameream Mezz.

[15]  Any such action by the Senior Mezz Lender was subject to various requirements, including (i) curing all monetary defaults under the JPMorgan Loan and (ii) replacing the guarantees provided by the Ghermezian family with credit worthy entities as conditions precedent to foreclose on Ameream Mezz.  When the Senior Mezz Lender did foreclose in October 2022, on information and belief, none of these conditions were satisfied, and yet JPMorgan permitted such foreclosure.  The Senior Mezz Lender also had a right to purchase the JPMorgan Loan, but it did not exercise that right.

***WEM-MOA Guarantors' and Ghermezian Family's Credit Support for the Senior Loans***

69.     The WEM-MOA Guarantors each guaranteed, and pledged assets as collateral for, the JPMorgan Loan and Senior Mezz Loan, pursuant to Pledge and Security Agreements provided to JPMorgan by each of the respective WEM Guarantors (the "**WEM-JPMorgan Pledge Agreement**") and the MOA Guarantor (the "**MOA-JPMorgan Pledge Agreement**").

70.     As noted above, the WEM-MOA Guarantors owned the WEM-MOA 49% Equity, which was 49% of equity in the West Edmonton Mall and Mall of America.  The WEM-MOA 49% Equity was an incredibly valuable asset, having a value of at least $1.045 billion.

71.     In the case of WEM-3 (the 75% owner of the West Edmonton Mall), JPMorgan's recourse under its payment guaranty was limited to 24% of WEM-3's then 75% ownership stake in WEMPI (the "**WEM-3 24% Equity**").   Thus, under any circumstances and regardless of whether the JPMorgan Loan was in default, JPMorgan could, as to the WEM-3 guarantor, only foreclose on the WEM-3 24% Equity.

72.     In addition to the WEM-MOA 49% Equity, Original WEMPI, which wholly owns WEM-3, guaranteed and pledged, as collateral for a portion of the JPMorgan Loan, operating and capital proceeds with respect to an additional 25% equity in the West Edmonton Mall received by Original WEMPI, pursuant to the Pledge and Security Agreements provided to JPMorgan by Original WEMPI (the "**WEM 25% Cash Flow Pledge**").

73.     Under the WEM-JPMorgan Pledge Agreement and the MOA-JPMorgan Pledge Agreement, each WEM-MOA Guarantor waived rights to assert Reimbursement Claims until the JPMorgan Loan had been repaid.  But once the JPMorgan Loan had been repaid, or once a WEM-MOA Guarantor is released (or terminated by operation of law or otherwise) from its obligations

and liabilities under the JPMorgan payment guaranty, each WEM-MOA Guarantor could assert Reimbursement Claims against Ameream.

74.     In addition to the guarantees by the WEM-MOA Guarantors, the Individual Guarantors—the key nine individual members of the Ghermezian family—personally guaranteed the JPMorgan Loan and the foreclosed Senior Mezz Loan (and Plaintiff Loan, as described below).

75.     Given the pledges above, JPMorgan was poised to take over majority ownership of the West Edmonton Mall and 49% ownership of the Mall of America, if there was a default by Ameream. And with personal guarantees provided by the Ghermezian family members, JPMorgan could ensure that they too faced substantial economic hardship if there was a default.

76.     These agreements gave JPMorgan immense leverage, providing it with an array of remedies in an event of default under the JPMorgan Loan. Because there were also junior lenders supporting the American Dream Mall, however, these agreements also specified the standards that would apply for sale of the pledged equity interests in the malls in an event of default. JPMorgan could not simply do anything it wanted following a default by Ameream.

77.     For example, Section 4.1(b) of the WEM-JPMorgan Pledge Agreement allows, in an event of default, for JPMorgan to effect the transfer of any or all of its loan collateral through a sale in accordance with procedures specified in Section 5 of that agreement. Section 5.6 of the WEM-JPMorgan Pledge Agreement requires loan collateral to be sold through a public auction or public tender, and prohibits a private sale.

78.     Sections 3.4(c), 3.5(b), and 3.5(d) of the MOA-JPMorgan Pledge Agreement similarly require a public sale or deemed public sale only to "a restricted group of [highly qualified] offerees and purchasers who fulfill certain suitability standards."

79.     Finally, the Payment Guarantors (defined in ¶ 86) also provide an environmental indemnity (the "**Environmental Indemnity**"), pursuant to which the Payment Guarantors agreed to defend, indemnify, and hold harmless JPMorgan for certain environmental hazards. [16]   On information and belief, the Payment Guarantors have never been called to defend, indemnify, or hold harmless JPMorgan under the Environmental Indemnity.

80.     In all, JPMorgan, as senior secured lender, received substantial and interrelated collateral relating to ownership of three of the most well-known and valuable malls in North America, along with guarantees from the ultimate owners of all three malls.  JPMorgan thus was not only oversecured, but also had significant leverage over the Ghermezian family in the event of financial difficulties for Ameream.  If the American Dream Mall project failed, or had any financial distress leading to a default, JPMorgan had the power to strip the Ghermezians of their mall empire.

### *The Plaintiff Loan*

81.     In 2019, Plaintiff entered into the $300 million Plaintiff Loan to provide additional funding for the American Dream Mall.

82.     To evidence and secure the Plaintiff Loan Agreement, American Dream Borrower executed five promissory notes (the "**Plaintiff Loan Notes**").  Pursuant to the express terms of the Plaintiff Loan Notes, American Dream Borrower was required to make monthly payments of interest to Plaintiff, followed by a final payment of principal and outstanding interest due upon the maturity date, June 29, 2021.

83.     Failure to make any regularly scheduled monthly payment of interest on the payment date was an Event of Default under the Plaintiff Loan Agreement.  Following numerous

---

[16] In the case of WEM-3, pursuant to the express provisions of Section 30 of the Environmental Indemnity, JPMorgan's recourse was limited to the WEM-3 24% Equity.  Thus, if WEM-3 disposed of that 24% to a JPMorgan Defendant, then WEM-3's liability under the Environmental Indemnity was necessarily discharged.

Events of Default, including the cross defaults resulting from Ameream's defaults under the JPMorgan Loan, the full debt became immediately due and payable, and interest accrued at a contractually defined Default Rate. Plaintiff is empowered to exercise all rights under the Plaintiff Loan Agreement on behalf of the Lenders.

84. The Plaintiff Loan Agreement incorporates by reference two agreements—the Payment Guaranty and the Intercreditor Agreement (each as described below). These agreements, together with the Irrevocable Direction Letter, worked to ensure Plaintiff and Lenders' interests were protected and their rights delineated from the JPMorgan Loan and Senior Mezz Loan, especially with respect to the valuable collateral which secured or provided credit support for all of the loans.

85. The Plaintiff Loan is junior in priority to the JPMorgan Loan, but the Plaintiff Loan is also undoubtedly ahead of the Ghermezians and all of its affiliates in the capital structure insofar as the Ghermezians, in the event of a default, cannot retain ownership and control of their available collateral rather than ceding that collateral to Plaintiff. The Plaintiff Loan also enjoys substantial protections, including the Irrevocable Direction Letter that gave Plaintiff a unique interest in the WEM-MOA 49% Equity and interests in additional pledges (including JPMorgan's pledge of the stock in Ameream) and the protections under the Intercreditor Agreement concerning "Shared Guarantors" and the "Non-Shared Guarantors" (as defined in the Intercreditor Agreement).

### The Guarantees of the Plaintiff Loan

86. In connection with the Plaintiff Loan Agreement, the WEM-MOA Guarantors and Individual Guarantors (collectively, "**Payment Guarantors**") executed the Payment Guaranty as credit support for the Plaintiff Loan. The Payment Guaranty is a full recourse guarantee.

87. The Payment Guaranty was a key component of the Plaintiff Loan structure and a material inducement to Plaintiff to enter into the Plaintiff Loan Agreement. The Payment Guarantors

acknowledged that the Lenders were not willing to make the Plaintiff Loan to American Dream Borrower *but for* the Payment Guarantors' unconditional guarantee of certain obligations, including, among other things, payment to Plaintiff of all amounts due in accordance with the Plaintiff Loan Agreement.

88.     The Payment Guarantors also acknowledged that beneficial owners of the WEM-MOA Guarantors are beneficial owners of the American Dream Borrower and that the Payment Guarantors will benefit from the agreement by the Lenders in making the Plaintiff Loan.

89.     The Payment Guaranty provides that:

> each [Payment] Guarantor hereby irrevocably and unconditionally guarantees to [Plaintiff] for the benefit of Lenders the payment of the Guaranteed Obligations. (b) If all or any part of the Guaranteed Obligations shall not be paid when due . . . pursuant to the Loan Agreement, . . . [Payment] Guarantor shall, within ten (10) Business Days after demand . . . pay the amount then due on account of the Guaranteed Obligations . . . .

Payment Guaranty at § 1.2.

90.     Each Payment Guarantor agreed that it would be liable for guaranteed obligations as a primary obligor and would satisfy monetary obligations of the American Dream Borrower, to the extent not paid when due, within ten days of demand by Plaintiff as the Administrative Agent.

91.     If any Payment Guarantor either paid JPMorgan, or used its assets to pay JPMorgan, such Payment Guarantor would hold a Reimbursement Claim in the same dollar amount against Ameream—the owner of the American Dream Mall.  That would provide an unencumbered asset to satisfy the Plaintiff Loan whenever the JPMorgan Loan was paid in full or in the event any guarantor was otherwise released (including a termination of such guaranty by operation of law or otherwise) from its obligations and liabilities to JPMorgan.

92.     Until the Guaranteed Obligations under the Plaintiff Loan are satisfied, pursuant to Section 6.2 of the Payment Guaranty, the WEM-MOA Guarantors covenanted to (i) ensure that the

collective value of the WEM-MOA 49% Equity was at least $680,000,000.00[17] and (ii) continue to own at least 49% interest in Mall of America and the West Edmonton Mall. These covenants were not in any way limited by the JPMorgan Loan or the Intercreditor Agreement.

93.     Similar to JPMorgan's payment guaranty, in the case of WEM-3, Plaintiff's recourse was limited to the identical WEM-3 24% Equity that provided credit support for JPMorgan. Thus, under any circumstances, Plaintiff could only seek from WEM-3, as guarantor, the WEM-3 24% Equity to satisfy the Plaintiff Loan.

94.     No provision of the Payment Guaranty allows the WEM-MOA Guarantors to enter into a private agreement voluntarily divesting their equity interests in favor of JPMorgan. Rather, to ensure Plaintiff and Lenders were protected from abuse by the senior lenders ahead of them, JPMorgan had to act in a commercially reasonable manner in taking the WEM-MOA 49% Equity in partial or total satisfaction of the JPMorgan Loan.

95.     As a practical matter, one of the most valuable sources of collateral for Plaintiff was the Payment Guaranty provided by, among others, the WEM-MOA Guarantors, backed by the WEM-MOA 49% Equity, because of the immense value of the West Edmonton Mall and Mall of America.

96.     Multiple Ghermezian corporate affiliates provided corporate guarantees to Plaintiff but purposefully did not provide guarantees to JPMorgan or the Senior Mezz Lender. This Non-Shared Guarantor status was a material element in inducing the Lenders to make the Plaintiff Loan, and JPMorgan was keenly aware of the importance to Plaintiff. Plaintiff can enforce its remedies

---

[17] This covenant thus excluded from the net equity calculation 51% of the West Edmonton Mall equity owned by WEM-3.

against the Non-Shared Guarantors even if the JPMorgan Loan is outstanding. These Non-Shared Guarantors are Triple Five Investment Ltd. and 7 Crowns Corporation.

### *The Irrevocable Direction Letter*

97.     The relationship and purpose of the agreements benefitting Plaintiff are also set forth in the Irrevocable Direction Letter, dated August 2, 2019. The WEM-MOA Guarantors and other Ghermezian family affiliates, including Ameream Mezz, directed JPMorgan and the Senior Mezz Lender, as applicable, to pay any excess proceeds from the collections, sale or other disposition of the WEM-MOA 49% Equity, and other assets, directly to Plaintiff. During the negotiations over the Plaintiff Loan, JPMorgan made clear that the Irrevocable Direction Letter was unconditional and irrevocable.

98.     The Irrevocable Direction Letter provides Plaintiff a unique interest in, among other things, the WEM-MOA 49% Equity. It ensures that if JPMorgan collects, sells, or otherwise disposes of collateral securing the JPMorgan Loan that is also listed in the Irrevocable Direction Letter, any excess proceeds must be paid to Plaintiff and the Lenders; such sale proceeds cannot first go to the owner of the collateral.

99.     The Irrevocable Direction Letter also expressly acknowledges that it, like the Payment Guaranty, was "a material inducement" to Plaintiff and the Lenders to make the Plaintiff Loan. And JPMorgan understood that the Irrevocable Direction Letter was critical to Plaintiff, and a key inducement for the Plaintiff Loan.[18]

### *The Intercreditor Agreement*

100.     Plaintiff, JPMorgan, and the Senior Mezz Lender agreed to the Intercreditor Agreement, pursuant to which Plaintiff contractually agreed to limit its enforcement rights against,

---

[18]   The Irrevocable Direction Letter was ratified and confirmed in the 2021 Agreement and to this Court.

among others, the Payment Guarantors in certain circumstances. Specifically, Plaintiff agreed to refrain from suing the WEM-MOA Guarantors (and other "Shared Guarantors" under the Intercreditor Agreement) to collect on the Plaintiff Loan as long as the JPMorgan Loan was outstanding, but in return, JPMorgan owed, among other things, duties to act in good faith and deal fairly with Plaintiff, including honoring the Irrevocable Direction Letter, disposing of WEM-MOA Guarantor collateral in the proper manner, and not interfering with the WEM-Guarantors' covenants.

101.    The purpose of the Intercreditor Agreement was to "provide for the relative priority of, and to evidence certain agreements with respect to. . . [the Plaintiff Loan]," including the documents which protected Plaintiff and the Lenders' rights in the event of default under the Plaintiff Loan—the Payment Guaranty and the Irrevocable Direction Letter.

102.    Section 6(b) of the Intercreditor Agreement echoes the rights set forth in the Payment Guaranty and Irrevocable Direction Letter to protect Plaintiff and the Lenders in the event of a foreclosure of assets of the WEM-MOA Guarantors under the Senior Loan or the Senior Mezz Loan:

> In the event that (i) Senior Agent and/or Mezzanine Lender (Senior) hold proceeds received pursuant to the foreclosure of, with respect to Senior Agent, the MOA Pledge and the WEM Pledges (each as defined in the Senior Loan Agreement), or, with respect to Mezzanine Lender (Senior), foreclosure of the MOA Pledge and the WEM Pledges (each as defined in the Mezzanine Loan Agreement (Senior)), and (ii) both the Senior Loan and the Mezzanine Loan (Senior) have been fully and indefeasibly repaid, then Senior Agent or Mezzanine Lender (Senior), as applicable, shall disburse such excess proceeds in accordance with the terms of the letters of direction from MOA Guarantor and WEM Guarantor (each as defined in the Senior Loan Agreement), respectively.

103.    The Intercreditor Agreement terminated in October 2022 when, as further described in ¶¶ 151-52, the Senior Mezz Loan was extinguished.[19]   The only provision that survives termination is Section 6(b), which provides for payment to Plaintiff of any amount remaining after

---

[19]   As further elaborated in ¶¶ 153-54 hereof, the WEM-MOA Guarantors (falsely) suggested in one filing with this Court that the Intercreditor Agreement did not terminate because the Senior Mezz Loan remained outstanding.

sale of the WEM-MOA 49% Equity and repayment of the senior loans, but also precludes Plaintiff (and the Lenders) from suing any "Shared Guarantor" (which includes the WEM-MOA Guarantors and the Individual Guarantors) as long as the JPMorgan Loan is outstanding, or if, by operation of law or otherwise, any such guarantor is released from its obligations and liabilities to JPMorgan. But for this provision, Plaintiff would have sued the WEM-MOA Guarantors to collect on the Payment Guaranty after American Dream Borrower defaulted in 2021.

104. No other provision of the Intercreditor Agreement survives termination, including any waivers of rights, including with respect to marshaling.

**C. Ameream defaults in 2020 on the JPMorgan Loan**

105. On or around May 13, 2020, JPMorgan informed Plaintiff that Ameream had "failed to fund the Monthly Debt Service Payment Amount due May 11, 2020, which failure constitutes an Event of Default pursuant to Section 8.1(a) of the JPMorgan Loan Agreement." Additional Events of Default occurred in 2020.

106. As a result of such Events of Default, JPMorgan had the right to seek recovery from Ameream and the Ghermezian family, including by enforcing various corporate and personal guarantees, and by foreclosing against the American Dream Mall mortgages.

107. Thus, the Ghermezian family was at risk of losing (a) all of its equity in the American Dream Mall, (b) all of its leasehold interests owned by the American Dream Mall Out Parcel Owners (*see* footnote 6, supra), (c) the WEM-MOA 49% Equity, and (d) operating and capital proceeds with respect to an additional 25% equity in the West Edmonton Mall pursuant to the WEM 25% Cash Flow Pledge. Simultaneously, nine members of the Ghermezian family (*i.e.*, the Individual Guarantors) faced immediate enforcement against their respective personal guarantees for the repayment of the JPMorgan Loan.

108. Further, on information and belief, the Ghermezian family and their affiliates feared that in a public sale, as required under the WEM-JPMorgan Pledge Agreement and MOA-JPMorgan Pledge Agreement, there would be legitimate third-party purchasers who would acquire the WEM-MOA 49% Equity at fair market value, meaning that an unaffiliated third party would have 49% of the economic and voting rights with respect to the West Edmonton Mall and Mall of America.

109. The Ghermezians, the WEM-MOA Guarantors, and Ameream could have sought insolvency protection. Indeed, Ameream engaged well-known restructuring counsel who often represent corporate families as debtors in United States bankruptcy proceedings.

110. However, an insolvency filing would be expensive and time-consuming, even though it would ultimately be a means to maximize value and treat creditors and stockholders fairly.

111. Recognizing the risks facing the Ghermezians, JPMorgan saw an opportunity for a windfall for itself resulting from Ameream's default while continuing to have favorable relationships with the Ghermezian family, including future lending opportunities. The path to this windfall opportunity was by means of abusing the rights of Plaintiff and the Lenders.

112. Thus, rather than exercise remedies like a traditional lender following default would, JPMorgan sought to negotiate in secret a sweetheart deal, in which it would secure substantial upside in exchange for permitting the Ghermezians to avoid making good on their personal guarantees, shielding them from suits by Plaintiff and letting them continue to operate, control, and own the American Dream Mall (which they do to this day, even after the Senior Mezz Lender's foreclosure in October 2022). JPMorgan, the Senior Mezz Lender, and the Ghermezian family spent months secretly negotiating a work-out that benefited them, to the detriment of Plaintiff and the Lenders, and which violated JPMorgan's own loan documents, which Plaintiff relied on.

**D.     JPMorgan and Ghermezian Family Execute the 2021 Agreement and, in March 2021, Improperly Transfer a Billion Dollars of Value Away From the WEM-MOA Guarantors, Harming Plaintiff and the Lenders**

113.     On or about January 29, 2021, JPMorgan, the Senior Mezz Lender, Ameream, Ameream Mezz, the WEM-MOA Guarantors, Original WEMPI, the Ghermezian family members (who were Individual Guarantors), and various affiliates, entered the 2021 Agreement. Even though Plaintiff and the Lenders were important parties to the financing of the American Dream Mall and to multiple contracts with all signatories to the 2021 Agreement, the Defendants, the Senior Mezz Lender, and the Ghermezian family members negotiated and entered into the 2021 Agreement in secret. They did so to conceal that they were freezing out and knowingly harming Plaintiff and the Lenders.

114.     By design, the 2021 Agreement called for JPMorgan to forego exercising its available remedies as a lender, including foreclosure through a public sale of the WEM-MOA 49% Equity, in exchange for the windfall described below. Indeed, the agreement expressly stated that JPMorgan would not prosecute a foreclosure, exercise any power of sale, or take any other enforcement action.

*The Planned WEM-MOA 49% Equity Transfer*

115.     The parties to the 2021 Agreement agreed that, "[i]n lieu of [JPMorgan] making demand under the Payment Guaranty and prosecuting a foreclosure, exercising any power of sale, or taking any other enforcement action against the MOA Guarantor and/or the WEM Guarantor," the WEM-MOA Guarantors would convey to JPMorgan their most valuable asset—the 49% ownership stakes in Mall of America and the West Edmonton Mall. This act is a violation of the pledge agreements that required JPMorgan to engage in a public sale of that set of assets in the event of a default, which Plaintiff was entitled to rely on under the Intercreditor Agreement.

116.    Key to the transfer scheme was that the parties to the 2021 Agreement, but not Plaintiff, made up a contractually mandated, aggregate value of the economic interests transferred to JPMorgan that was absurdly, and intentionally, low—a price far below what would have been realized through a public sale.  The WEM 49% Equity was "stipulated" to be worth only $49 million, when, in fact, it was worth approximately $800 million.  And the MOA 49% Equity was "stipulated" to be worth only $1 million, when, in fact, it was worth approximately $245 million.

117.    Thus, JPMorgan and the WEM-MOA Guarantors severely undervalued the 49% equity interests in both the West Edmonton Mall and Mall of America.  Fully embracing these false valuations, the 2021 Agreement states that the parties, including the WEM-MOA Guarantors, "irrevocably and unconditionally agree[d]" among themselves that $50 million "is a reasonable estimate of the sale proceeds that [JPMorgan] would have received pursuant to a sale of the [WEM-MOA 49% Equity] through a public auction conducted on commercially reasonable terms."

118.    JPMorgan knew the "stipulated" values were false.  Each Borrower Party (as defined in the 2021 Agreement) represented and warranted that all financial data with respect to the WEM-MOA Guarantors was true and accurate as of (a) January 29, 2021 and (b) March 25, 2021, as a condition precedent to consummate the WEM-MOA 49% Equity transfer.  The financial data, including the appraisals of WEM and MOA, delivered to JPMorgan by March 2021 show vastly higher value for the WEM-MOA 49% Equity.  Therefore, the parties knew they were using a massively reduced valuation in the 2021 Agreement, contrary to their depiction of $50 million as a "reasonable estimate" of what would result from a public sale of the WEM-MOA 49% Equity.

119.    No reasonable borrower or guarantor acting in its own interests or for the interests of its creditors ever would have agreed to these made-up values.  The only reason the WEM-MOA Guarantors "agreed" to these fake values is because JPMorgan was providing their equity owners,

the Ghermezian family, with numerous benefits, including, chief among them, the ability to avoid their obligations to Plaintiff.

120. The 2021 Agreement was a purely private arrangement. The parties to the agreement, acting contrary to the WEM-JPMorgan Pledge Agreement and the MOA-JPMorgan Pledge Agreement, failed to conduct a public auction or tender for the WEM-MOA 49% Equity. Had they done so, they would have realized far more than their false $50 million valuation.

121. JPMorgan accepted the WEM-MOA 49% Equity in exchange for releasing and discharging the WEM-MOA Guarantors of their guaranty obligations under the payment guaranty for the JPMorgan Loan. JPMorgan provided no reasonably equivalent value, *inter alia*, because of the improper capping of Reimbursement Claims as described in ¶¶122-23. It would have been better for the WEM-MOA Guarantors and their creditors if the WEM-MOA Guarantors had not been released and discharged from their guaranty obligations and kept their Reimbursement Claims uncapped.

### The 2021 Agreement's Planned Destruction of Reimbursement Claims Held by WEM-MOA Guarantors

122. The anticipated transfer of the WEM-MOA 49% Equity called for in the 2021 Agreement not only deprived the WEM-MOA Guarantors of their most valuable asset, but the artificial "stipulated" values also had the effect of capping Reimbursement Claims at $50 million. This utterly destroyed any ability of the WEM-MOA Guarantors to repay Plaintiff on account of the Payment Guaranty because the Reimbursement Claims—an important asset of each WEM-MOA Guarantor—would be worth far less than their actual value and far less than the debt owed to Plaintiff and the Lenders.

123. When the transfers contemplated by the 2021 Agreement were consummated in late March 2021, the WEM-MOA Guarantors necessarily were rendered balance sheet insolvent—they

had $50 million in improperly capped, contingent Reimbursement Claims to pay the defaulted Plaintiff Loan, and the now $400 million owed to Plaintiff and the Lenders. Moreover, because all three loans (JPMorgan Loan, Senior Mezz Loan and Plaintiff Loan) were in default and immediately due and payable, and the WEM-MOA Guarantors had guaranteed all three loans, prior to 2021 Agreement and the resulting transfers, the WEM-MOA Guarantors lacked reasonable capital to pay the Plaintiff Loan.

### The 2021 Agreement's Additional Problematic Provisions

124.    The 2021 Agreement had numerous other problematic provisions. These include:

125.    A recital that "Secured Party [JPM] has agreed to accept the MOA Interests and be admitted as a member of MOA Holdings II (the 'MOA Conveyance') to hold in custody to facilitate the partial satisfaction of the Debt pursuant to Section 9-620 of the Uniform Commercial Code as in effect in the State of New York." A similar representation is made with respect to the WEM 49% Equity. The 2021 Agreement, however, does not indicate for whom JPMorgan is holding the WEM-MOA 49% in "custody." It *cannot be* for the WEM-MOA Guarantors, because under the 2021 Agreement, the only way for the WEM-MOA Guarantors or any other third person or entity to get the WEM-MOA 49% Equity is by paying the purchase price that a third-party buyer would pay, pursuant to a marketing and sales process solely conducted and controlled by JPMorgan.

126.    On information and belief, JPMorgan is holding the WEM-MOA 49% Equity on behalf of the Ghermezians or one or more of their affiliated entities. Indeed, that explains public pronouncements by Ghermezian affiliate representatives that the Ghermezians are "partnered" with JPMorgan, and that the Ghermezians continue to own the West Edmonton Mall and Mall of America, notwithstanding the fact that they defaulted on multiple loans for which their interests in those properties were meant to serve as collateral. In other words, through the 2021 Agreement, JPMorgan

and the Ghermezians plotted to keep the WEM-MOA 49% Equity in the Ghermezians' hands, notwithstanding that the asset was supposed to be liquidated with the proceeds used to repay Plaintiff.

127. The 2021 Agreement contained a representation and warranty by, among others, the WEM-MOA Guarantors that the "execution, delivery and performance of this Agreement by such Borrower Party . . . does not conflict with or constitute a breach of, or constitute a default under, any contract, agreement or other instrument by which such Borrower Party is bound or to which it is a party." This was necessarily false because performance under the 2021 Agreement, including transferring the WEM-MOA 49% Equity, would breach covenants under the Payment Guaranty.

128. The WEM-MOA Guarantors, MOA Holdings II LLC, WEMPI, other Borrower Parties, and JPMorgan agreed on an "Intended Tax Treatment" in Section 3(c) of the 2021 Agreement that provides that, for federal, state and local income tax purposes, the WEM-MOA Guarantors will remain as the beneficial owners, even though all economic ownership rights, including all capital and operating income generated by MOA Holdings II LLC and WEMPI, shall be paid to and retained by the JPMorgan Designees, together with all voting rights. The parties to the 2021 Agreement further covenanted that in any income tax audits by the Internal Revenue Service or any state tax authority, each of the WEM-MOA Guarantors and JPMorgan "shall not permit any of its Affiliates to take, any position on any income tax return or in connection with any income tax audit that is inconsistent with the Intended Tax Treatment."

129. Even though the WEM-MOA Guarantors were released and discharged from "all liability and/or obligations from the beginning to the end of time" owed to JPMorgan under their payment guaranty, the 2021 Agreement was designed to ensure that they remained "Shared Guarantors" under the Intercreditor Agreement, thus blocking Plaintiff from suing the WEM-MOA Guarantors. Specifically, they were not released under the Environmental Indemnity, even though

each of the remaining WEM-MOA Guarantors is a special purposes entity with no assets. This ploy operated to bar Plaintiff, under the provision of the Intercreditor Agreement precluding suit against Shared Guarantors, from suing the WEM-MOA Guarantors until the falsely inflated balance of the JPMorgan Loan was repaid.

130.　　JPMorgan agreed to modify the Individual Guarantors' payment guarantees of the JPMorgan Loan obligations so that they were enforceable only as a last resort after realization of the value of all JPMorgan Loan collateral, including after mortgage foreclosure of the American Dream Mall—a highly unusual concession by a traditional lender, which, as a practical matter, operated to release the Individual Guarantors of their repayment obligations. This is further evidence of the private, sweetheart deal nature of the 2021 Agreement.

### *The 2021 Agreement Parties Consummate the Transfers in March 2021*

131.　　The 2021 Agreement was subject to several conditions precedent, including several outside the control of the parties thereto. Section 8(b) stated that the "release of the Transaction Documents is conditioned upon the satisfaction or the written waiver of each of the following conditions. . . as determined by the Administrative Agent in its reasonable discretion." The conditions required, *inter alia*, that "(i) The representations and warranties contained in this [2021] Agreement shall be true and correct in all material respects; (ii) The conditions set forth in Section 15.2.3 of the WEM Indenture shall have been satisfied; and (iii) The notice requirement set forth in the MOA Senior Loan Agreement shall have been satisfied." The deliverables in Sections 8(b)(ii) and (iii) were not waivable by JPMorgan, and the parties were not certain whether the Borrower Parties (defined in the 2021 Agreement) could satisfy those third party conditions.

132.　　It took nearly two months for the parties to complete the transfers of the WEM-MOA 49% Equity and the resulting capping of the Reimbursement Claims.

133.    On or about March 25, 2021, and consistent with the 2021 Agreement, the MOA Guarantor transferred the MOA Interests to JPM-D5, and JPM-D5 was admitted as the sole member of MOA Holdings II LLC (the "**MOA Interests Transfer**").  As part of the MOA Interests Transfer, the MOA Guarantor's Reimbursement Claim was capped at $1 million.

134.    On the same date, the other WEM Guarantors—WEM-1, WEM-2, and WEM-3—conveyed their common shares in West Edmonton Property Inc., the direct owner of the West Edmonton Mall, to defendant entities controlled by JPMorgan.  WEM-3 conveyed 480 of its 1500 Common Shares in WEMPI to JPM-WEM 1.  WEM-1 conveyed all of its 490 Common Shares in WEMPI to JPM-WEM 2.  WEM-2 conveyed all of its 10 Shares in WEMPI to JPM-WEM 2 (the "**WEM Interests Transfer**" together with the MOA Interests Transfer, the "**Challenged Transfers**").  As part of the WEM Interests Transfer, the WEM Guarantors' Reimbursement Claims were capped at $49 million.

135.    Pursuant to March 25, 2021 amendments to the limited liability agreements of MOA Holdings I LLC and WEMPI,[20] JPM-D5, JPM-WEM 1, and JPM-WEM 2 confirmed their rights to dividends on account of the WEM-MOA 49% Equity, even after the JPMorgan Loan is repaid.

136.    Both JPMorgan and the WEM-MOA Guarantors failed to timely deliver to Plaintiff the two amendments described in ¶ 135, in violation of the Intercreditor Agreement and the Payment Guaranty, respectively.  In fact, Plaintiff only received the two amendments on June 2, 2021, when the Ghermezians sent them to the Lenders in connection with the Lenders making a new $250 million loan, which is when Plaintiff first learned that the Challenged Transfers had been completed in March 2021.

---

[20]    As set forth in Appendix Chart C, the JPMorgan Defendants received the WEM-MOA 49% Equity through ownership in MOA Holdings I LLC and WEMPI.

137. To this date, the Defendants have failed to deliver, notwithstanding demands therefor, the remaining Transaction Documents to the 2021 Agreement, including a known amendment to the JPMorgan payment guaranty, which contains the termination and release of the WEM-MOA Guarantors from all obligations and liabilities under the JPMorgan payment guaranty.

### *The Materially Adverse Effects of the 2021 Agreement and Contemplated Transfers on Plaintiff and the Lenders.*

138. There were multiple effects of the 2021 Agreement that benefitted Defendants while harming Plaintiff.

139. ***One***, because the so called "partial satisfaction of the JPMorgan Loan" amount was a meager $50 million, JPMorgan would retain its senior secured JPMorgan Loan against Ameream in the full amount of $1.5 billion, while gaining the upside of owning nearly 50% of two valuable malls. In fact, JPMorgan did not even reduce its loan by a dime. This harms Plaintiff and the Lenders because its ensures that the JPMorgan Loan is recorded as still outstanding, which, pursuant to the Intercreditor Agreement, precludes Plaintiff from pursuing enforcement actions against the Shared Guarantors.

140. JPMorgan should have credited the true value, in excess of $1 billion, of the WEM-MOA 49% Equity to the outstanding amount of the JPMorgan Loan, which would have reduced the JPMorgan Loan by at least $1 billion and would have reduced interest expenses. JPMorgan would have been owed less than $500 million, secured by the American Dream Mall, which was worth far in excess of that amount and would have provided a sufficient cushion to ensure repayment of the Plaintiff Loan.

141. JPMorgan not only failed to credit the true value of the WEM-MOA 49% Equity, it did not even credit the artificial $50 million value assigned in the 2021 Agreement. Indeed, JPMorgan's own July 2021 "Total Outstanding Principal Balance of the Loan" statements show *no*

*reduction whatsoever* to the JPMorgan Loan resulting from the receipt of a $1 billion asset. These statements show the JPMorgan Loan balance before the March 2021 transfer of the WEM-MOA Equity as $1,145,000,000. After the transfer, it is reduced by $50 million to $1,095,000,000; however, the same $50 million is added back to the total amount due as a *new line item* of "Purchase Price & Preferred Return" plus Preferred Return thereon on the post-transfer statements.

142. This is nonsensical—it leaves the JPMorgan Loan totally intact, notwithstanding JPMorgan's receipt of a $1 billion asset. JPMorgan is now reaping the benefits of the ownership of the WEM-MOA 49% Equity without applying the value of that asset to reduce the balance of the JPMorgan Loan. With the JPMorgan Loan intact, moreover, Plaintiff is precluded under the terms of the Intercreditor Agreement from bringing an action against most of the WEM-MOA Guarantors (other than WEM-3) to enforce repayment of the Plaintiff Loan, or to otherwise obtain satisfaction of the American Dream Judgment. Defendants' scheme demonstrates the lengths to which JPMorgan and the Ghermezians have gone to harm Plaintiff. As described in Section G below, such machinations continued even after the March 25, 2021 transfer.

143. *Two*, by virtue of keeping the WEM-MOA Guarantors as guarantors under the Environmental Indemnity, the WEM-MOA Guarantors would be shielded from any collection action by Plaintiff (other than WEM-3 (*see* footnote 16)), since Plaintiff would be barred under the Intercreditor Agreement from asserting such claims against "Shared Guarantors" while the JPMorgan Loan remained outstanding (absent a release by JPMorgan or a termination of such indemnity by operation of law or otherwise).

144. *Three*, the Ghermezians likewise (a) would be shielded from any immediate action by JPMorgan seeking to enforce the payment guarantees against the Individual Guarantors, (b) would continue to receive management fees, (c) would retain the large sum of management fees

accrued prior to the opening of the American Dream Mall, and (d) most importantly, would be in a position to continue to *own* all three malls.

145.    ***Four***, by stripping the WEM-MOA Guarantors of their most valuable asset, *i.e.*, the WEM-MOA 49% Equity, the 2021 Agreement leaves those guarantors without assets sufficient to repay the Plaintiff Loan. And by stipulating the value of the transfer at just $50 million, the 2021 Agreement leaves the WEM-MOA Guarantors with Reimbursement Claims against Ameream capped at that artificial amount.  This further destroyed any ability to repay Plaintiff because the Reimbursement Claims would be worth far less than their actual value and far less than the debt owed to Plaintiff and the Lenders.

146.    ***Five***, JPMorgan took steps to undermine its obligations under the Irrevocable Direction Letter.  As stated above, the 2021 Agreement mandated that JPMorgan would become the owner of 49% of the equity in each mall but could also assign that equity ownership to any designee or nominee.  Whatever "designee or nominee" ended up owning the 49% would be entitled to keep all distributions or dividends.  JPMorgan did in fact assign such equity ownership to the other JPMorgan Defendants, which are affiliates of JPMorgan created *after* the 2021 Agreement was entered into, but are not, on information and belief, lenders to Ameream.

147.    ***Sixth***, nothing in the 2021 Agreement requires the JPMorgan Defendants to take any steps to sell the WEM-MOA 49% Equity, even after the JPMorgan Loan is paid in full, thereby defeating one of the central purposes of the Irrevocable Direction Letter, which provided, *inter alia*, that all amounts from such a sale exceeding the outstanding balance of the JPMorgan Loan would be paid to Plaintiff.  In effect, the JPMorgan Defendants can indefinitely own the WEM-MOA 49% Equity, earning dividends on account of the WEM-MOA 49% Equity, even after the JPMorgan Loan is fully repaid, all while depriving Plaintiff of the benefit of the collateral backing the Plaintiff Loan.

148.    These arrangements flatly contradict JPMorgan's representation to this Court that it would "never receive one dime beyond what it was owed on its loan, and any surplus proceeds generated by a sale of the WEM-MOA Equity (after the Senior Lenders were repaid) would be distributed to Plaintiff in accordance with the ICA and Irrevocable Letter of Direction." In fact, the 2021 Agreement is engineered to provide JPMorgan with indefinite ownership of the WEM-MOA 49% Equity, with a right to receive 49% of distributions or dividends from MOA Holdings II LLC and WEMPI, even after the JPMorgan Loan is fully repaid.

149.    The schemes papered by the 2021 Agreement have allowed the Ghermezian family to save face, avoid any public relations nightmare of insolvency proceedings, retain control and ownership of the American Dream Mall, and retain its 51% equity stake intact, via WEM-3, in West Edmonton Mall, notwithstanding that the Ghermezians have defaulted on multiple loans. The Individual Guarantors, all of whom are members of the Ghermezian family, benefitted by converting the Individual Guarantors' guaranty obligations into a last resort payment obligation while remaining "Shared Guarantors," meaning Plaintiff cannot sue them until the JPMorgan Loan is repaid in full (or such guarantees are released or terminated by operation of law or otherwise).

150.    Through this scheme, JPMorgan secured a massive windfall. It gained at zero expense, and with no reduction of the JPMorgan Loan, assets worth over $1 billion, while concurrently blocking Plaintiff from immediate recourse against the WEM-MOA Guarantors and Individual Guarantors.

E.    **The Senior Mezz Lender Forecloses on Ameream Mezz's 100% Ownership of Ameream, Resulting in Termination of the Intercreditor Agreement**

151.    On October 25, 2022, the Senior Mezz Lender provided notice that it had acquired title to Ameream through a strict foreclosure under the New York Uniform Commercial Code. By doing so, the Senior Mezz Lender is no longer owed anything by Ameream Mezz, or any guarantor,

including the Individual Guarantors and WEM-MOA Guarantors, and has no right to receive any proceeds from the sale or other disposition of the WEM-MOA 49% Equity or the WEM Second Mortgage, or any other proceeds from the pledges listed on the Irrevocable Direction Letter.

152. Further, these actions caused the Intercreditor Agreement to automatically terminate in accordance with Section 18(m) thereto.

153. In a letter sent to this Court on October 9, 2023, the WEM-MOA Guarantors asserted that the Senior Mezz Loan is still outstanding. They also asserted that under the Intercreditor Agreement, Plaintiff could not sue the WEM-MOA Guarantors until all senior loans (*i.e.*, including the Senior Mezz Loan) were paid in full. They added: "Plaintiff now seeks to jump ahead of JPMorgan and the Senior Mezzanine Lender—who still have not been paid in full—by bringing this lawsuit against the JPMorgan Defendants and the WEM-MOA Guarantors to unwind the 2021 Agreement."

154. The statement that the Senior Mezz Loan is still outstanding was false, which Plaintiff pointed out in a filing to this Court on October 10, 2023. In their motion to dismiss filed on November 8, 2023, the WEM-MOA Guarantors took a 180-degree turn and confirmed that the Senior Mezz Lender foreclosed on Ameream Mezz's interest in Ameream and that the Senior Mezz Loan is fully repaid.

### The Ghermezians Secretly Retain Ownership of Ameream Through More Dealings With JPMorgan and the Senior Mezz Lender

155. The foreclosure by the Senior Mezz Lender in October 2022, described in ¶ 151, was supposed to have ended the Ghermezian family's ownership in the American Dream Mall. The Senior Mezz Lender became the owner of Ameream, cutting off the ownership interests of Ameream Mezz, Ameream Mezz I, and, ultimately, the Ghermezian family. But that is not what has happened.

156.     When Plaintiff commenced this action, Plaintiff believed, but did not know for sure, that there likely were additional, hidden agreements with JPMorgan and/or the Senior Mezz Lender to benefit the Ghermezian family.  For example, approximately a week prior to the March 25, 2021 transfer of the WEM-MOA 49% Equity, Kurt Hagen, senior vice president for Triple Five, reported to a joint meeting of the Bloomington, Minnesota City Council and its port authority that "once we return to profitability, 49% of those profits would go to the American Dream lenders until such time as that collateral is released."[21]  Mr. Hagen made these representations to officials who were "closely monitor[ing] the ownership of Mall of America"[22]  Mr. Hagen's comments that there may be a release of the WEM-MOA 49% Equity back to the Ghermezians were inconsistent with the express terms of 2021 Agreement, and indicative of a side agreement.

157.     In fact, despite the Senior Mezz Lender foreclosing on the equity ownership of the American Dream Mall, the Ghermezian family and Triple Five continued to hold themselves out as owners of American Dream Mall to the media and the public.[23]  The Ghermezians even touted in public statements that JPMorgan is a "partner,"[24] and that JPMorgan agreed to amend the JPMorgan Loan.  Don Ghermezian bragged about this deal, as reported in one news article: "[w]e are pleased that our lenders . . . share in our vision and recognize Triple Five and American Dream's successful

---

[21]  Allison Pries, *American Dream's owner secures financing through 2026 with group led by JP Morgan*, NJ.COM (Nov. 8, 2022), https://www.nj.com/news/2022/11/american-dreams-owner-secures-financing-through-2026-with-group-led-by-jp-morgan.html; https://www.youtube.com/watch?t=3498&v=AuBnSvjBEW8&feature=youtu.be&ab_channel=CityofB.

[22]  Esther Fung, *American Dream's Owner Defaulted. That Could Cost It Revenue From Other Malls*, THE WALL STREET JOURNAL (Apr. 6, 2021), https://www.wsj.com/articles/american-dreams-owner-defaulted-that-could-cost-it-revenue-from-other-malls-11617710401.

[23]  *See generally*, Allison Pries, *American Dream's owner secures financing through 2026 with group led by JP Morgan*, NJ.COM (Nov. 8, 2022), https://www.nj.com/news/2022/11/american-dreams-owner-secures-financing-through-2026-with-group-led-by-jp-morgan.html; Rich Bockmann, *American Dream mall debtor must repay $390M: judge*, THE REAL DEAL (Apr. 12, 2023), https://therealdeal.com/new-york/tristate/2023/04/12/american-dream-mall-must-repay-390m-loan-judge/.

[24]  David Moin, *American Dream, Post Covid-19, Capturing Crowds*, WOMEN'S WEAR DAILY (Jan. 23, 2023), https://wwd.com/business-news/real-estate/american-dream-progress-report-1235481459/.

and impactful contribution to the global retail and entertainment landscape."[25]  Under the terms of the deal announced November 7 by Triple Five, its lenders group led by JPMorgan & Chase Co. agreed to a four-year extension on repayments, setting a new maturity date of October 2026.[26]

158.     As it turns out, Plaintiff's suspicions were accurate.  The Ghermezian family ***does*** continue to own Ameream, by virtue of another secret agreement with the Senior Mezz Lender and, on information and belief, with JPMorgan (as further described in ¶¶ 169-73).  JPMorgan, the Senior Mezz Lender, and the Ghermezians have succeeded in doing what should never have happened— the equity owners of the three malls have put themselves ahead of Plaintiff and the Lenders without first paying off the Plaintiff Loan.

**F.     Plaintiff Sues American Dream Borrower For Defaults Under the Plaintiff Loan**

159.     American Dream Borrower failed to remit the regularly scheduled monthly payment of interest due under the Plaintiff Loan Notes in full on May 10, 2021.  As a result of this Event of Default, interest began accruing at the Default Rate on May 10, 2021.

160.     On or about May 26, 2021, Plaintiff notified American Dream Borrower in writing of the default under the Plaintiff Loan and demanded payment in full of all amounts then due. American Dream Borrower did not pay.

161.     On February 7, 2023, Plaintiff sued American Dream Borrower in New York state court, filing a summary judgment motion in lieu of a complaint.

162.     American Dream Borrower did not oppose Plaintiff's summary judgment motion.

163.     On April 10, 2023, the New York state court granted Plaintiff's motion for summary judgment and, on May 3, 2023, entered the American Dream Judgment.  As of the date

---

[25]  Kimberly Redmond, *Triple Five gets extension on American Dream construction debt*, NJBiz.com (Nov. 11, 2022), https://njbiz.com/triple-five-gets-extension-on-american-dream-construction-debt/.
[26]  *Id.*

the judgment was entered, American Dream Borrower owed Plaintiff the amount of $404,399,512.87. The American Dream Judgment remains outstanding, and interest accrues at the New York state statutory rate.

164.     The WEM-MOA Guarantors, the Individual Guarantors, and the Non-Shared Guarantors are liable to Plaintiff for the full amount of the American Dream Judgment plus interest thereon until paid in full.

165.     These Guarantors have all been able to evade their liability, however, because of the scheme set forth in the 2021 Agreement, pursuant to which they are all "Shared Guarantors" under the Intercreditor Agreement, such that Plaintiff cannot sue to enforce their various guarantees.

**G.     Plaintiff Takes Discovery of American Dream Borrower and Learns New Facts**

166.     After obtaining judgment against the American Dream Borrower, and after filing the Original Complaint, Plaintiff sought post-judgment discovery.   Counsel representing the American Dream Borrower with respect to responding to discovery is the same counsel representing the WEM-MOA Guarantors, even though WEM-MOA Guarantors and Ameream have adverse interests.

167.     American Dream Borrower subsequently produced documents, including the WEM 2022 Audited Financial Statements, dated April 29, 2023.   Those statements depict a significantly different ownership structure than the one depicted in Appendix Chart "B," which was set forth in a notice provided to Plaintiff by the Senior Mezz Lender on or about October 25, 2022.   This new structure is reflected in Appendix Chart "C".

168.     Plaintiff learned from this discovery that in September 2022, just before the Senior Mezz Lender foreclosed on its loan to take over ownership of Ameream, JPMorgan obtained a new recourse guaranty from the Non-Shared Guarantors.   This appears to be another improper attempt to

turn the Non-Shared Guarantors into "Shared Guarantors" under the Intercreditor Agreement, which would further block Plaintiff's avenues for satisfaction of the American Dream Judgment.

169. Further, recently produced documents reveal that in October 2022, an entity known as T5 AD LLC was formed and is the managing member of AB Ameream Member LLC, which itself was formed in September 2022 by, on information and belief, the Senior Mezz Lender. AB Ameream Member LLC is the current owner of the American Dream Mall (following the Senior Mezz Lender's foreclosure) as the successor entity to Ameream Mezz. The owners of T5 AD LLC are members of the Ghermezian family. Its formation certificate is signed by Alan Glazer, an Associate Counsel of Triple Five Group. An amendment to the certificate to AB Ameream Member LLC was filed in February 2023 and signed by Daniel Ghermezian.

170. These facts were hidden from Plaintiff for nearly a year. Indeed, the Ghermezian affiliates have consistently refused to deliver documentation relating to AB Ameream Member LLC in order to hide the fact that the Ghermezian family continues to own Ameream LLC.

171. These additional entity formations strongly suggest that one of the purposes of the 2021 Agreement was to eliminate the Lenders' security interest in the ownership of Ameream Mezz, while ensuring that the Ghermezian family retains ownership of Ameream LLC (and the American Dream Mall).

172. For example, the WEM 2022 Audited Financial Statements recently produced to Plaintiff point to dubious transactions involving the Senior Mezz Lender, the Senior Mezz Borrower, and the Ghermezian family in October 2022. The Senior Mezz Lender, which by foreclosing took 100% of ownership interest in Ameream, is inexplicably referred to as a preferred interest holder with a maturity date of October 21, 2030. A senior mezzanine loan, in the same original principal amount of $475 million as the Senior Mezz Loan, is stated as outstanding as of April 29, 2023, even

though the WEM-MOA Guarantors recently represented to this Court that the Senior Mezz Loan is fully repaid, with all guarantees and collaterals released.

173.     Further, the WEM 2022 Audited Financial Statements disclose that "the preferred member can enforce the $425,000,000 WEM Second Mortgage guaranty." Thus, even though the Senior Mezz Lender, by foreclosing, was supposed to only own 100% equity interest in Ameream and have no further loans or guarantees of loans, it appears that the Senior Mezz Lender received a preferred equity interest in AB Ameream Member LLC , which wholly owns Ameream, and a second lien mortgage against the West Edmonton Mall; in exchange, the Ghermezian family continues to own Ameream, through T5 AD LLC.

174.     What Plaintiff learned through post-judgment discovery confirms what Plaintiff suspected in its Original Complaint—that beginning with the 2021 Agreement and continuing through the foreclosure by the Senior Mezz Lender in October 2022, there has been a concerted effort by Defendants to permit the Ghermezian family to continue to have substantial economic benefits in three malls while blocking Plaintiff from satisfying its Plaintiff Loan and, now, its American Dream Judgment.

175.     This latest set of transactions in October 2022 could not, on information and belief, have happened without JPMorgan's participation and consent. As described in footnote 15, in order for the Senior Mezz Lender to foreclose on Ameream, it had to do certain things first, including curing all monetary defaults under the JPMorgan Loan, which is a significant amount, and replacing the guarantees provided by the Ghermezian family with credit worthy entities. When the Senior Mezz Lender did foreclose in October 2022, on information and belief, none of these conditions were satisfied, and yet JPMorgan permitted such foreclosure.

176.     It is now evident that JPMorgan has permitted the Ghermezian family, which was supposed to be deeply subordinate to the Lenders, to improperly leap-frog ahead of the Plaintiff Loan and benefit from owning three malls that should have been used to repay that loan.  In return, JPMorgan received a windfall that it has continued to reap.

## FIRST CAUSE OF ACTION

### *(*Fraudulent Transfer – WEM Guarantor Transfer, Against JPMorgan, JPM-WEM 1**, and JPM-WEM 2**)*

177.     Plaintiff repeats and realleges each allegation in paragraph(s) "1" through "176" as if fully set forth herein.

178.     The WEM Interests Transfer by the WEM Guarantors to JPMorgan is a fraudulent transfer and a fraudulent preference under Alberta law, and Plaintiff should be paid the value of the WEM 49% Equity up to at least $404,399,512.87 plus interest thereon at the statutory rate, which is less than the value of such transferred assets.

179.     Plaintiff and the Lenders were creditors of the WEM Guarantors at the time the 2021 Agreement was signed and at the time that the 2021 Agreement closed in March 2021, by virtue of the debt owed under the Payment Guaranty.  They remain creditors today.

180.     Plaintiff did not learn of the consummation of the WEM Interests Transfer contemplated by the 2021 Agreement until June 2, 2021.

181.     In March 2021, the true value of the WEM 49% Equity and accompanying Reimbursement Claims exceeded the amount owed on account of the JPMorgan Loan.  This is because the value of Ameream exceeded the amount of the JPMorgan Loan and, regardless of whether JPMorgan first foreclosed on the WEM 49% Equity, the WEM Guarantors would have recourse available to pay the Plaintiff Loan after payment in full of the JPMorgan Loan.

182.     JPMorgan and the WEM Guarantors (controlled by the Ghermezian family) entered into and carried out the transfers contemplated by the 2021 Agreement with the intent to defraud, hinder, and delay creditors of the WEM Guarantors, particularly Plaintiff and the Lenders, as evidenced by multiple "badges of fraud" or equivalents under applicable law, including the following:

183.    ***First***, the nominal consideration allotted to the transfers was grossly inadequate:

- The $49 million "reasonable estimate" of the WEM 49% Equity set forth in the 2021 Agreement was artificial, not based on any objective value, and, at no more than 6% of its actual value, reflects no, or nominal, consideration;

- JPMorgan and the WEM Defendants agreed that $49 million was a reasonable estimate of the proceeds JPMorgan would have received had the WEM 49% Equity been sold via a public auction. This was knowingly false;

- JPMorgan did not apply the true value of the WEM 49% Equity, or even the paltry $49 million "credit," to reduce the JPMorgan Loan by a single dollar; and

- The value of a 49% equity stake in the West Edmonton Mall was at least $800 million in March 2021, which was known to the JPMorgan Defendants in January 2021 and March 2021.

184.    ***Second***, the 2021 Agreement and the transfers thereunder benefitted insiders of the WEM Guarantors:

- The Ghermezian family and related entities have retained control of and retained benefits of the operations of the West Edmonton Mall, among others;

- WEM-3 itself, as holder of the remaining 51% interest in the West Edmonton Mall, continues to receive higher operating cash flows from WEMPI, which also benefits affiliates of the WEM-MOA Guarantors;

- The liability of Ameream arising from the Reimbursement Claims has been capped at $50 million, making it easier for the Ghermezian family to retain ownership of the American Dream Mall without having to face liability from Plaintiff and the Lenders; and

- Four of the nine Individual Guarantors who received a stay on enforcement of their individual guarantees are directors of one or more of the WEM Guarantors. As of March 2021, the Ghermezian family and WEM Guarantors were on notice that Ameream had defaulted, and they faced immediate risk on their guarantees, including to Plaintiff.

185. **Third**, the WEM Guarantors transferred to, or for the benefit of, JPMorgan, JPM-WEM 1, and JPM-WEM 2 substantially all of their assets, in a transfer designed to leave the WEM Guarantors with only a $49 million Reimbursement Claim that itself had been manipulated and reduced in value.

186. **Fourth**, the transfers were completed at a time when the Plaintiff Loan was in default, by way of the automatic cross-default caused by the default of the JPMorgan Loan.

187. **Fifth**, the transfers were accomplished quickly, in the span of approximately two months between the signing of the 2021 Agreement in January 2021 and the transfers in March 2021.

188. **Sixth**, the transfers were completed secretly, without involvement of Plaintiff in the negotiation of the 2021 Agreement and without notice to Plaintiff that the transfer had been consummated until June 2021.

189. The transfer of WEM 49% Equity Transfer for $49 million and the capping of the Reimbursement Claim under and in furtherance of the 2021 Agreement are also voidable as a fraudulent preference under Alberta law.

190. By virtue of the value of the American Dream Mall, but for the WEM Interests Transfers, each of the WEM Guarantors would be solvent, even after paying in full the Plaintiff Loan, given the true value of their Reimbursement Claims. However, by transferring the WEM 49%

Equity for a $49 million "credit," the WEM Guarantors' only asset is a $49 million Reimbursement Claim, which is woefully inadequate to repay the Plaintiff Loan.

191.     The conveyance of the WEM Interests Transfer left the WEM Guarantors with unreasonably small capital as a consequence of their respective transfers of the WEM-MOA 49% Equity, including the capping of the Reimbursement Claim at $49 million.

192.     Under applicable law of the Province of Alberta, Canada, Plaintiff is entitled either to money damages or a declaration that the WEM Interests Transfer is void as against the Plaintiff.

## SECOND CAUSE OF ACTION
### (Fraudulent Transfer – MOA Guarantor Transfer, Against JPMorgan, JPM-D5, and MOA Guarantor)

193.     Plaintiff repeats and realleges each allegation in paragraph(s) "1" through "192" as if fully set forth herein.

194.     The MOA Interests Transfer by the MOA Guarantors to JPMorgan is both an actual and constructive fraudulent transfer under Minnesota law, and Plaintiff should be paid the value of the MOA 49% Equity up to at least $404,399,512.87 plus interest thereon at the statutory rate.

195.     Plaintiff and the Lenders were creditors of the MOA Guarantor at the time the 2021 Agreement was signed, and at the time that the 2021 Agreement closed in March 2021, by virtue of the debt owed under the Payment Guaranty.  They remain creditors today.

196.     Plaintiff did not learn of the consummation of the MOA Interests Transfer contemplated by the 2021 Agreement until June 2, 2021.

197.     In March 2021, the value of the MOA 49% Equity and the accompanying Reimbursement Claim exceeded the amount owed on account of the JPMorgan Loan.  This is because the value of Ameream exceeded the amount of the JPMorgan Loan and, regardless of whether JPMorgan first foreclosed on the MOA 49% Equity, the MOA Guarantor would have recourse available to pay the Plaintiff Loan after payment in full of the JPMorgan Loan.

198.     JPMorgan and the MOA Guarantor (controlled by the Ghermezian family) entered into and carried out the transfers contemplated by the 2021 Agreement with the intent to defraud, hinder, and delay creditors of the MOA Guarantor, particularly Plaintiff and the Lenders, as evidenced by multiple "badges of fraud" or equivalents under applicable law, including the following:

199.     ***First***, the nominal consideration allotted to the transfers was grossly inadequate:

- The $1 million "reasonable estimate" set forth as the value of MOA 49% Equity in the 2021 Agreement was no more than 0.5% of its actual value. Mall of America was worth approximately $1.99 billion in March 2021, with an equity value of over $500 million. The 49% equity stake in the Mall of America was worth at least $245 million, which meant JPMorgan and the Ghermezian family, in a non-arm's length agreement in violation of the MOA-JPMorgan Pledge Agreement, decided the "value" was only $1 million. Adding salt to the wound, JPMorgan did not reduce its loan balance by even a dollar after acquiring the MOA 49% Equity for a mere $1 million.

- JPMorgan acquired the MOA 49% Equity in an agreement that $1 million was a reasonable estimate of the proceeds JPMorgan would have received had the MOA 49% Equity been sold via a public auction. This was knowingly false.

200.     ***Second***, the 2021 Agreement and the transfers thereunder benefitted insiders of the MOA Guarantor:

- The Ghermezian family and related entities have retained control and retained benefits of the operations of Mall of America, among others; and

- As of March 2021, the Ghermezian family and the MOA Guarantor were on notice that Ameream had defaulted, and they faced immediate risk on their guarantees, including to Plaintiff.

201.     ***Third***, the MOA Guarantor transferred to, or for the benefit of, JPMorgan and JPM-D5 substantially all of its assets, in a transfer designed to leave the MOA Guarantor with only a $1 million Reimbursement Claim that itself had been manipulated and reduced in value.

202.    ***Fourth***, the transfers were completed at a time when Plaintiff's Loan was in default, by way of the automatic cross-default caused by the default of the JPMorgan Loan.

203.    ***Fifth***, the transfers were accomplished quickly, in the span of approximately two months between the signing of the 2021 Agreement in January 2021 and the transfers in March 2021.

204.    ***Sixth***, the transfers were completed secretly, without involvement of Plaintiff in the negotiation of the 2021 Agreement and without notice to Plaintiff that the transfer had been consummated until June 2021.

205.    The MOA 49% Equity Transfer for $1 million and the capping of the Reimbursement Claim under and in furtherance of the 2021 Agreement are also voidable as constructive fraudulent transfers under Minnesota fraudulent transfer law.

206.    By virtue of the value of the American Dream Mall, but for the MOA Interests Transfer, the MOA Guarantor would be solvent, even after paying in full the Plaintiff Loan, given the true value of its Reimbursement Claim.  However, by transferring the MOA 49% Equity for a $1 million "credit," the MOA Guarantor's only asset is a $1 million Reimbursement Claim, which is woefully inadequate to repay the Plaintiff Loan.

207.    The MOA Guarantor was rendered insolvent by or left with unreasonably small capital as a consequence of its MOA Interests Transfer, including the capping of the Reimbursement Claim at $1 million.

## THIRD CAUSE OF ACTION
### (Tortious Interference Against JPMorgan)

208.     Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "207" as if fully set forth herein.

209.     Plaintiff and the WEM-MOA Guarantors are parties to the Payment Guaranty, which was and is a valid and enforceable contract.

210.     Until the Guaranteed Obligations are satisfied, pursuant to Section 6.2 of the Payment Guaranty, the WEM-MOA Guarantors covenanted to (i) ensure that the collective value of the WEM-MOA 49% Equity was at least $680,000,000.00 and (ii) continue to own at least 49% interest in Mall of American and the West Edmonton Mall.

211.     No provision of the Payment Guaranty allowed the WEM-MOA Guarantors to enter into a private agreement voluntarily divesting their equity interests in favor of JPMorgan.

212.     Moreover, if any Payment Guarantor paid JPMorgan or used assets to pay JPMorgan, such Payment Guarantor would hold a Reimbursement Claim in the same dollar amount against Ameream, thereby preserving value for the repayment of other loans. The only condition to the assertion of the Reimbursement Claim is the repayment in full of the JPMorgan Loan or such guarantees are released or terminated by operation of law or otherwise.

213.     Pursuant to the 2021 Agreement, the MOA Guarantor no longer owns 49% of the Mall of America, and the WEM Guarantors no longer own 49% of the West Edmonton Mall.

214.     In the 2021 Agreement, the WEM 49% Equity was stipulated to be worth only $49 million, and the MOA 49% Equity was stipulated to be worth only $1 million, when the true value of these assets exceeded $800 million and $245 million, respectively.

215.     As a result of WEM-MOA Guarantors entering into the 2021 Agreement, the collective value of the WEM-MOA 49% Equity owned by the WEM-MOA Guarantors is effectively

zero, and the WEM-MOA Guarantors have no ability to collectively maintain a value of $680 million, as they committed to do under the Payment Guaranty.

216.     As a result of the false valuations in the 2021 Agreement, the JPMorgan Loan remains outstanding in full, and the stipulated value of the assets caps the WEM-MOA Guarantors' Reimbursement Claims at $50 million.

217.     The WEM-MOA Guarantors have breached Section 6.2 of the Payment Guaranty.

218.     At all times JPMorgan was aware of Section 6.2 of the Payment Guaranty and its importance to Plaintiff.   Indeed, JPMorgan was heavily involved in the negotiations over all documents relating to the Plaintiff Loan, including the Payment Guaranty.

219.     JPMorgan negotiated the 2021 Agreement with the WEM-MOA Guarantors and induced the WEM-MOA Guarantors to enter into the 2021 Agreement, intentionally and for the unjustified purpose of preventing Plaintiff from recovering on the Plaintiff Loan from the WEM-MOA Guarantors.

220.     In negotiating and executing the 2021 Agreement, JPMorgan intentionally did not act in a commercially reasonable way.  Had it done so, the WEM-MOA Guarantors would not have breached their Payment Guaranty to Plaintiff, and they would still hold valuable Reimbursement Claims against Ameream—the owner of the American Dream Mall.

221.     Instead, JPMorgan took advantage of the desire of the WEM-MOA Guarantors and the Ghermezians to avoid their obligations to Plaintiff, and negotiated an agreement whereby it received at least $1 billion in assets for zero consideration, while causing the WEM-MOA Guarantors to breach Section 6.2 of the Payment Guaranty.

222.     JPMorgan's conduct, which caused the WEM-MOA Guarantors to breach Section 6.2 of the Payment Guaranty, has damaged Plaintiff by diminishing the value of the WEM-MOA Guarantors' Reimbursement Claims to a figure insufficient to repay Plaintiff's outstanding judgment.

## FOURTH CAUSE OF ACTION
### *(*Marshaling Against JPMorgan)

223.     Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "222" as if fully set forth herein.

224.     As of March 2021, JPMorgan was a secured creditor of the WEM-MOA Guarantors, including being pledged the WEM-MOA 49% Equity, which until the 2021 Agreement secured the JPMorgan Loan.  Any excess of the WEM-MOA 49% Equity is to be applied to the Plaintiff Loan pursuant to the terms of the Intercreditor Agreement and the Irrevocable Direction Letter.

225.     The JPMorgan Loan was, and still is, secured by mortgages on the American Dream Mall.

226.     Under the JPMorgan Loan documents, JPMorgan has the right to resort to both the WEM-MOA 49% Equity and its mortgage collateral.

227.     Plaintiff does not have a right to such mortgage collateral, which secured the JPMorgan Loan.

228.     Plaintiff has a unique interest in the WEM-MOA 49% Equity by virtue of the Irrevocable Direction Letter, such that any sale of such asset by JPMorgan that produces sale proceeds in excess of the JPMorgan Loan must be paid to reduce the Plaintiff Loan.

229.     JPMorgan would not be prejudiced by resorting to its other collateral before looking to the WEM-MOA 49% Equity to satisfy its debt.  In fact, the value of the American Dream Mall, which is collateral for the JPMorgan Loan, alone exceeds the amount of the JPMorgan Loan.

230.     Entry into the 2021 Agreement was inequitable conduct, overreaching, and/or fraud by JPMorgan.

231.     Applying marshaling to the JPMorgan Loan would be the just and equitable response to the efforts of JPMorgan and the WEM-MOA Guarantors, among others, to unfairly

deprive Plaintiff of the WEM-MOA 49% Equity through their non-arm's length agreement that artificially depresses the value of the WEM-MOA 49% Equity.

232.     Failure to apply marshaling to the defaults under the JPMorgan Loan would unfairly deprive Plaintiff of its right to enforce and collect from the WEM-MOA Guarantors on the Payment Guaranty that assured the repayment of the Plaintiff Loan.

233.     Any waiver of marshaling by Plaintiff was terminated when the Intercreditor Agreement was terminated.

## FIFTH CAUSE OF ACTION
### (Breach of the Intercreditor Agreement's Implied Covenant of Good Faith and Fair Dealing Against JPMorgan)

234.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "233" as if fully set forth herein.

235.    Plaintiff, JPMorgan, and the Senior Mezz Lender entered into the Intercreditor Agreement, which is governed by New York law.

236.    Implied in all contracts governed by New York law is a covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

237.    The Intercreditor Agreement provides that Plaintiff cannot proceed against the WEM-MOA Guarantors, even if American Dream Borrower has defaulted, if the JPMorgan Loan or the Senior Mezz Loan is outstanding unless such guarantors are released or the relevant guaranty is terminated by operation of law or otherwise.

238.    Section 6(b) of the Intercreditor Agreement provides that in the event JPMorgan and/or the Senior Mezz Lender receive proceeds from a foreclosure of the WEM-MOA 49% Equity, and the JPMorgan Loan and Senior Mezz Loan are fully repaid, then excess proceeds shall be disbursed to Plaintiff.

239.    The Intercreditor Agreement, in conjunction with the Payment Guaranty and Irrevocable Direction Letter, ensured Plaintiff's interests were protected and its rights delineated from the JPMorgan Loan and Senior Mezz Loan, especially with respect to the collateral securing and providing credit support for the loans.

240.    Plaintiff's interests were protected in part because if a Payment Guarantor paid JPMorgan or used its assets to pay JPMorgan, such Payment Guarantor would hold a Reimbursement

Claim in the same dollar amount against Ameream, thereby preserving value to satisfy Plaintiff's Loan.

241.	The Senior Mezz Lender informed Ameream Mezz and the Plaintiff on October 24, 2022 and October 25, 2022, respectively, that the Senior Mezz Loan had been fully repaid.  Thus, the Intercreditor Agreement has terminated except that Section 6(b) survives termination.

242.	On information and belief, the Senior Mezz Lender's foreclosure on the Ameream equity interest did not comply with provisions of the JPMorgan Loan requiring cure of all monetary defaults and providing substitute guarantees.

243.	Additionally, prior to the Senior Mezz Lender's foreclosure, JPMorgan facilitated amendments of the JPMorgan Loans that further eroded the protections of Section 6(b), by obtaining new recourse guarantees from Triple Five Investment Ltd. and 7 Crowns Corporation thereby attempting to convert them into "Shared Guarantors" and afford them protection under Section 6(b) of the Intercreditor Agreement.

244.	On information and belief, in October 2022, JPMorgan permitted a set of transactions that allowed the Ghermezian family to skip ahead of Plaintiff in the capital structure through the Ghermezian family's continued ownership of Ameream through an entity known as T5 AD LLC.  T5 AD LLC is the managing member of AB Ameream Member LLC, which granted a preferred equity interest in AB Ameream Member LLC to the Senior Mezz Lender.  These transactions further eroded the protections intended by the Intercreditor Agreement and the priority of lenders.

245.	At all relevant times, JPMorgan knew Section 6(b) was important to protect Plaintiff's interests under the Plaintiff Loan document.  Plaintiff and the Lenders were induced to

provide the Plaintiff Loan because of a Payment Guaranty, the Intercreditor Agreement and the Irrevocable Direction Letter containing the same protections.

246.     At all times relevant to this litigation, JPMorgan owed a duty to Plaintiff to act in good faith and deal fairly with it under the Intercreditor Agreement, including (i) not unfairly abusing JPMorgan's rights under Section 6(b) by artificially lowering the value of the WEM-MOA 49% Equity, thereby failing to reduce the amount of the JPMorgan Loan or reducing any subrogation/reimbursement rights of the WEM-MOA Guarantors against Ameream, (ii) conducting a public sale of assets, as required under its loan documents, to obtain the highest purchase price for the WEM-MOA 49% Equity, and (iii) properly applying the purchase price of the WEM-MOA 49% Equity to the reduction of the amount due under the JPMorgan Loan.

247.     Rather than foreclose against these assets based on their actual value of approximately $1 billion, JPMorgan acquired the WEM-MOA 49% Equity at an artificially low valuation of $50 million and has the purported right to receive dividends on account of the WEM-MOA 49% Equity indefinitely, even after the JPMorgan Loan is repaid.

248.     Plaintiff was not informed of the negotiations of the 2021 Agreement, and Plaintiff was not aware of the terms until after the 2021 Agreement had been signed.

249.     The 2021 Agreement was structured so that JPMorgan could purposefully avoid obligations under the Intercreditor Agreement and block Plaintiff's rights to recovery under the Intercreditor Agreement, Plaintiff Loan, Payment Guaranty, or the Irrevocable Direction Letter, which would have provided for payment to Plaintiff upon JPMorgan's foreclosure under the JPMorgan Loan.

250.     JPMorgan compounded its bad faith mistreatment of Plaintiff by failing to credit even $50 million against the outstanding JPMorgan Loan.

251.     JPMorgan has further eroded the protections provided to Plaintiff under the Intercreditor Agreement by, on information and belief, knowingly facilitating (i) the Senior Mezz Lender to foreclose on the Ameream equity interest without curing all monetary defaults under the JPMorgan Loan and without providing substitute guarantees, and (ii) the Ghermezian family to leap-frog ahead of Plaintiff in the American Dream Mall capital structure.

252.     JPMorgan breached its covenant to act in good faith and deal fairly with Plaintiff under the Intercreditor Agreement.

253.     As a result of JPMorgan's breach, Plaintiff sustained damages because the WEM-MOA Guarantors no longer have sufficient assets to repay the Plaintiff Loan or satisfy the American Dream Judgment.  The WEM-MOA Guarantors would have been able to assert Reimbursement Claims that would have repaid the Plaintiff Loan but for JPMorgan's bad faith actions.

254.     Additionally, as a result of JPMorgan's breach, Plaintiff is damaged because its right to recover from the WEM-MOA Guarantors is blocked by JPMorgan's outstanding senior priority that should have been reduced by $1 billion, but instead remains outstanding at its full amount.

255.     Plaintiff is entitled to damages equal to the amount of the American Dream Judgment plus interest thereon at the statutory rate.

## SIXTH CAUSE OF ACTION
### (Declaratory Relief Against JPMorgan – Intercreditor Agreement)

256.  Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "255" as if fully set forth herein.

257.  Plaintiff currently holds the American Dream Judgment in the amount of $404,399,512.87.  The American Dream Judgment remains outstanding, and interest accrues at the New York state statutory rate.

258.  Plaintiff, JPMorgan, and the Senior Mezz Lender are parties to the Intercreditor Agreement, which is governed by New York law.

259.  Section 6(b) of the Intercreditor Agreement (i) limits Plaintiff's ability to pursue enforcement actions and collections against the WEM-MOA Guarantors or Individual Guarantors on account of the Payment Guaranty or otherwise, and (ii) contains a provision to pay JPMorgan any amount recovered by Plaintiff from the Payment Guarantors to the reduction of the JPMorgan Loan.

260.  Implied in all contracts governed by New York law is a covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

261.  JPMorgan breached the implied covenant of good faith and fair dealing when it negotiated and entered the 2021 Agreement, including by (i) unfairly abusing Plaintiff's rights under Section 6(b) by artificially lowering the value of the WEM-MOA 49% Equity, thereby failing to reduce the amount of the JPMorgan Loan or reducing any Reimbursement Claim rights of the WEM-MOA Guarantors against Ameream, (ii) failing to conduct a public sale of assets, as required under its loan documents, to obtain the highest purchase price for the WEM-MOA 49% Equity, (iii) failing

to properly apply the purchase price of the WEM-MOA 49% Equity to the reduction of the amount due under the JPMorgan Loan, and (iv) on information and belief, knowingly facilitating (x) the Senior Mezz Lender to foreclose on the Ameream equity interest without complying with the curing of all monetary defaults under the JPMorgan Loan and providing substitute guarantees, and (y) the Ghermezian family to leap-frog ahead of Plaintiff in the American Dream Mall capital structure.

262.     Because JPMorgan has breached the implied covenant, Plaintiff is excused from Section 6(b)'s limitations and provisions.

263.     Additionally, WEM-3's obligations under the Environmental Indemnity were satisfied upon the transfer to a JPMorgan affiliate of the WEM-3 24% Equity under the 2021 Agreement.  Section 30 of the Environmental Indemnity explicitly states that JPMorgan's recourse under the Environmental Indemnity is limited to the WEM-3 24% Equity.  Thus, under any circumstances, WEM-3 is no longer bound by the Environmental Indemnity.

264.     Plaintiff seeks a declaration that any limitations under Section 6(b) on Plaintiff and/or the Lenders from seeking enforcement actions and collections from the Payment Guarantors are null and void, and Plaintiff shall be entitled to retain and keep any and all amounts or other consideration received from the Payment Guarantors for application to the reduction of the Plaintiff Loan, even if the JPMorgan Loan has not been repaid or otherwise satisfied.

265.     Plaintiff seeks a declaration that WEM-3 is not a Shared Guarantor by operation of law because WEM-3 has fully performed under the Environmental Indemnity.

## SEVENTH CAUSE OF ACTION
### *(*Declaratory Relief Against All Defendants – Amount of Reimbursement Claims)

266.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "265" as if fully set forth herein.

267.    Plaintiff currently holds the American Dream Judgment in the amount of $404,399,512.87.  The American Dream Judgment remains outstanding, and interest accrues at the New York state statutory rate.

268.    Plaintiff was and is a creditor of each of the WEM Guarantors and the MOA Guarantor, who were guarantors to the American Dream Borrower.

269.    On March 25, 2021, the JPMorgan Defendants acquired the WEM-MOA 49% Equity.

270.    As a result of the WEM Guarantors and the MOA Guarantor having their property satisfy obligations Ameream owed to JPMorgan, each of the WEM Guarantors and the MOA Guarantor holds Reimbursement Claims against Ameream.

271.    The 2021 Agreement improperly valued the 49% equity ownership in the West Edmonton Mall at $49 million, which approximates 6% of the actual value of the WEM 49% Equity as of March 2021.

272.    The 2021 Agreement improperly valued the 49% equity ownership in the Mall of America at $1 million, which approximates 0.5% of the actual value of the MOA 49% Equity as of March 2021.

273.    By virtue of the 2021 Agreement, each of the WEM Guarantors and the MOA Guarantor hold Reimbursement Claims against Ameream that, if the 2021 Agreement is enforced, may be limited to $50 million in the aggregate, with the WEM Guarantors collectively being limited

to a $49 million Reimbursement Claim and the MOA Guarantor being limited to a $1 million Reimbursement Claim.

274.     Plaintiff was not a party to the 2021 Agreement and did not, and does not, consent to the capping of the Reimbursement Claims at $50 million.

275.     Plaintiff seeks a declaration that the value of the 49% equity stake in the West Edmonton Mall is worth at least $800 million as of March 2021, resulting in aggregate Reimbursement Claims of such amount.

276.     Plaintiff seeks a declaration that the value of the 49% equity stake in the Mall of America is worth at least $245 million as of March 2021, resulting in aggregate Reimbursement Claims of such amount.

## PRAYER

WHEREFORE, Plaintiff SOL-MM III LLC requests that this Court enter judgment as follows:

(a)     Awarding Plaintiff a judgment against the JPMorgan Defendants for the value of the Challenged Transfers up to the amount of the American Dream Judgment plus interest thereon at the statutory rate;

(b)     Awarding Plaintiff a judgment against JPMorgan Defendants for compensatory and punitive damages in an amount to be proven at trial, plus interest thereon at the statutory rate;

(c)     Awarding Plaintiff statutory costs, expenses and reasonable attorneys' fees as against the JPMorgan Defendants plus interest thereon at the statutory rate;

(d)     Declaring void the Challenged Transfers under applicable law;

(e)     Declaring that Section 6(b) of the Intercreditor Agreement does not bar Plaintiff from (i) seeking enforcement actions and collections from the Payment Guarantors and (ii)

retaining and keeping any and all amounts and other considerations received from the Payment Guarantors for application to the reduction of the Plaintiff Loan, even if the JPMorgan Loan has not been repaid or otherwise satisfied;

(f)     Declaring that WEM-3 is not a Shared Guarantor by operation of law and that WEM-3 has fully performed under the Environmental Indemnity.

(g)     Declaring that the aggregate value of the Reimbursement Claims held by the WEM Guarantors is or exceeds $800 million, an amount to be proven at trial;

(h)     Declaring that the aggregate value of the Reimbursement Claims held by the MOA Guarantor is or exceeds $245 million, an amount to be proven at trial; and

(i)     Granting such other and further legal and equitable relief as this Court may deem just and proper.

Dated: New York, New York
November 28, 2023

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

Eric Winston (pro hac vice)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
213-443-3000 Main Office Number
213-443-3100 Fax
ericwinston@quinnemanuel.com

Adam Abensohn
Laura Santos-Bishop
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel:     (212) 849-7000
Fax:     (212) 849-7100
adamabensohn@quinnemanuel.com
laurasantosbishop@quinnemanuel.com

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Steven S. Fitzgerald*
Steven S. Fitzgerald
500 Fifth Avenue
New York, NY 10110
Tel:     (212) 382-3300
Fax:     (212) 382-0050

*Attorneys for Plaintiff SOL-MM III LLC*

# APPENDIX A

## A. PRE-FORECLOSURE OF WEM-MOA 49% Equity BY JPMORGAN



## B. POST-FORECLOSURE OF (1) WEM-MOA 49% Equity BY JPMORGAN and (2) AMEREAM LLC 100% Equity BY SENIOR MEZZ LENDER (SOLELY BASED ON SENIOR MEZZ LENDER'S REPRESENTATIONS)



## C. POST-FORECLOSURE OF (1) WEM-MOA 49% Equity BY JPMORGAN and (2) AMEREAM LLC 100% Equity BY SENIOR MEZZ LENDER (AS DEPICTED IN 2022 AUDITED FINANCIAL STATEMENT OF WEMPI PREPARED AND SIGNED BY GRANT THORNTON DATED APRIL 29, 2023)

