**UNITED STATES DISTRICT COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOL-MM III LLC, as administrative agent, | |
| Plaintiff, | Case No. 23-CV-06479-ALC |
| - against - | |
| JPMORGAN CHASE BANK, N.A., D5 HAWKS LLC, WE TAHOE 1 LLC, WE TAHOE 2 LLC, NEW WEM HOLDINGS AFFILIATE 1 LTD., NEW WEM HOLDINGS AFFILIATE 2 LTD., NEW WEM HOLDINGS LTD., MOA HOLDINGS III, LLC, AMEREAM LLC, MEADOW A-B OFFICE LLC, MEADOW C-D OFFICE LLC, MEADOW HOTEL LLC, and MEADOW BASEBALL LLC | |
| Defendants. | |

**SECOND AMENDED COMPLAINT**

Plaintiff, SOL-MM III LLC ("**Plaintiff**"), through its attorneys, for a Complaint against Defendants JPM Morgan Chase Bank, National Association ("**JPMorgan**"), D5 Hawks LLC ("**JPM-D5**"), WE Tahoe 1 LLC ("**JPM-WEM 1**"), WE Tahoe 2 LLC ("**JPM-WEM 2**," and, together with JPMorgan, JPM-D5, and JPM-WEM 1, the "**JPMorgan Defendants**"), New WEM Holdings Affiliate 1 Ltd. ("**WEM-1**"), New WEM Holdings Affiliate 2 Ltd. ("**WEM-2**"), New WEM Holdings Ltd. ("**WEM-3**," and, together with WEM-1 and WEM-2, the "**WEM Guarantors**"), MOA Holdings III, LLC ("**MOA Guarantor**," and, together with the WEM Guarantors, the "**WEM-MOA Guarantors**"), AMEREAM, LLC ("**Ameream**"), Meadow A-B Office, LLC, Meadow C-D Office, LLC, Meadow Hotel, LLC, and Meadow Baseball, LLC (together, the "**Outparcel Entities**"), alleges:[1]

## NATURE OF THE ACTION

1.      This action arises out of Defendants' convoluted and fraudulent efforts to secure benefits for themselves while preventing Plaintiff, and the lenders it represents as agent, from being repaid on a $300 million loan such lenders made to the owners of the American Dream Mall in East Brunswick, New Jersey to support the construction and development of that project (the "**Plaintiff Loan**").

2.      Before agreeing to make the Plaintiff Loan, and as a condition for doing so, Plaintiff bargained for a suite of contractual protections and collateral.  Among other protections, Plaintiff secured guarantees and equity pledges from the owners of the American Dream Mall—*i.e.*, the Ghermezian family and their affiliated entities, including the WEM-MOA Guarantors—backed by

---

[1]  Defendants and the Ghermezian family created numerous entities, many with confusingly similar names, in connection with the transactions at issue in this action.  For the Court's convenience, Plaintiff has prepared a glossary of the defined terms used herein, which is attached as **Appendix "A"** to this Second Amended Complaint.

their highly valuable stakes in two of the largest and most successful malls in North America: the West Edmonton Mall in Alberta, Canada, and the Mall of America in Minnesota.

3.     Defendants have taken numerous byzantine steps—involving multiple agreements, side agreements, and transfers between and among Defendants, the Ghermezians, and an alphabet soup of their affiliated entities—aimed at destroying Plaintiff's rights and collateral and eviscerating those bargained-for protections.   Through their machinations, Defendants have (a) materially breached and/or tortiously interfered with multiple contracts entitling Plaintiff to be repaid on its loan, and (b) knowingly transferred assets out of Plaintiff's reach that were supposed to be available to ensure such repayment, giving rise to fraudulent transfers and conveyances under applicable Canadian and Minnesota law.

*The Plaintiff Loan and Supporting Guarantees*

4.     Plaintiff, Defendant JPMorgan, and AB American Dream Mall Syndicate Joint Venture (the "**AB AD Lender**") all made loans in support of developing and opening the American Dream Mall, which is one of the largest shopping and entertainment complexes in North America. JPMorgan was the most senior lender and was to be repaid first.  The AB AD Lender was the next in line, as a "senior mezz" lender.  Plaintiff was the "junior mezz" lender, due to have its loan repaid immediately behind JPMorgan and the AB AD Lender, but subject to key contractual protections and collateral rights.

5.     Plaintiff made its loan in 2019, for $300 million, to one of the Ghermezians' affiliated entities, Ameream Mezz I, LLC (the "**American Dream Borrower**").  The American Dream Borrower owned Ameream Mezz, LLC ("**Ameream Mezz**"), which in turn owned Ameream, LLC ("**Ameream**") (the direct owner of the American Dream Mall).  The Plaintiff Loan was subordinated to (a) JPMorgan's loan in the amount of $1.195 billion to Ameream (the "**JPM**

Loan"), and (b) the AB AD Lender's $475 million loan to Ameream Mezz (the "**2017 Mezz Loan**"). Plaintiff was contractually subordinated *only* to the JPM Loan and the 2017 Mezz Loan—not to any other loan and not to any refinancings or replacements of either the JPM Loan or the 2017 Mezz Loan—and above all, structurally and contractually, ahead of the Ghermezian families' equity interests in American Dream Mall.

6.      Plaintiff bargained for credit support from the Ghermezian family empire to provide maximum assurance that the Plaintiff Loan would be repaid, notwithstanding that it was junior to the JPM Loan and the 2017 Mezz Loan.  For example, several members of the Ghermezian family personally guaranteed the Plaintiff Loan.  The Plaintiff Loan was also guaranteed pursuant to a Payment Guaranty (the "**Payment Guaranty**"), attached hereto as **Exhibit A**, by several Ghermezian affiliated entities, including Defendants WEM-MOA Guarantors, which directly or indirectly owned 49% of the equity in the West Edmonton Mall and Mall of America (the "**WEM-MOA 49% Equity**").  The WEM-MOA Guarantors covenanted in the Payment Guaranty, for Plaintiff's benefit, to at all times retain ownership of the WEM-MOA 49% Equity and maintain an aggregate net worth of at least $680,000,000.00.  Additionally, the Payment Guaranty expressly prohibited the WEM-MOA Guarantors from entering into or effectuating any transaction with an Affiliate which would cause them to violate their net worth covenant.  Thus, similar to the capital structure for the American Dream Mall, the Plaintiff Loan was structurally and contractually ahead of the Ghermezian families' interests with respect to the WEM-MOA 49% Equity.

7.      The WEM-MOA Guarantors, the Meadow Outparcels Developer, LLC (the "**Outparcel Owner**") (a Ghermezian affiliate that owns the Outparcel Entities (which themselves owned development rights near the American Dream Mall)), and Ameream Mezz also provided Plaintiff with the Irrevocable Letter of Direction dated August 2, 2019 (the "**Irrevocable Direction**

Letter"), attached hereto as **Exhibit B**.  The Irrevocable Direction Letter irrevocably directed JPMorgan and the AB AD Lender, upon having their loans satisfied, to pay the excess proceeds from "any collection, sale or other disposition" of the WEM-MOA 49% Equity and JPMorgan's liens on the ownership of Ameream and the Outparcel Entities directly to Plaintiff "within 10 business days of receipt."

8.      The Irrevocable Direction Letter functionally acted as a lien on the WEM-MOA 49% Equity and the ownership of Ameream and the Outparcel Entities by ensuring that, after repayment of the JPM Loan and 2017 Mezz Loan and before the Ghermezians could keep their ownership stake in the American Dream Mall, all proceeds from any disposition of such collateral would be used to satisfy the outstanding balance on the Plaintiff Loan.  In other words, the Irrevocable Direction Letter ensured that the Ghermezian family could not leap-frog ahead of Plaintiff and retain ownership interests that were designated as collateral for repayment of the Plaintiff Loan.

9.      In addition to the above agreements, Plaintiff, JPMorgan, and the AB AD Lender entered into the Intercreditor Agreement in 2019 (the "**Intercreditor Agreement**"), attached hereto as **Exhibit C**, pursuant to which Plaintiff agreed that, until the JPM Loan and the 2017 Mezz Loan were repaid, Plaintiff would not sue any "Shared Guarantors" (as defined in the Intercreditor Agreement), which included the WEM-MOA Guarantors and the nine Ghermezian family members. In return, the Intercreditor Agreement provided important protections to Plaintiff, including a requirement that, in the event JPMorgan foreclosed on the WEM-MOA 49% Equity (which served as collateral for both the JPM Loan and the Plaintiff Loan), JPMorgan would dispose of those

valuable assets in a commercially reasonable manner designed to maximize value. In other words, JPMorgan was required to conduct a public sale of the WEM-MOA 49% Equity.

10.     The American Dream Borrower defaulted on the Plaintiff Loan in May 2021 after it failed to make required interest payments, and currently owes Plaintiff over $400 million. Plaintiff sued the American Dream Borrower for breach of the Plaintiff Loan Agreement on May 3, 2023, and the Supreme Court of the State of New York entered judgment in Plaintiff's favor in the amount of $404,399,512.87 (the "**Judgment**"). That Judgment remains outstanding, with interest accruing at the New York state statutory rate.

### *JPMorgan and the Ghermezian Family Team Up to Harm Plaintiff and the Lenders under the Plaintiff Loan*

11.     *The 2021 Agreement*. The Ghermezian empire defaulted on the JPM Loan in 2020. JPMorgan's appropriate recourse, under the terms of the JPM Loan agreement with Ameream, was to foreclose on its primary collateral—the mortgages on the American Dream Mall and certain properties held by the Outparcel Entities—and sue the Ghermezian family members and their affiliated entities as guarantors to cover any shortfall. In early 2021, the aggregate value of the American Dream Mall alone greatly exceeded the amounts due to JPMorgan. Thus, had JPMorgan foreclosed on the American Dream Mall, it would have been paid in full, with enough left over for Plaintiff to recover all or substantially all of the amounts owed to it from the WEM-MOA Guarantors and the Ghermezians.

12.     But JPMorgan saw an opportunity to instead secure a windfall for itself by taking advantage of the Ghermezians' greed to retain control and ownership of the American Dream Mall (which they would have lost had either JPMorgan or AB AD Lender foreclosed), as well as the two other malls, and to avoid having to make good on their personal guarantees to Plaintiff. Thus, rather

than foreclose on the American Dream Mall, JPMorgan cut a deal with the Ghermezians.  That deal, by design, benefited JPMorgan and the Ghermezians at Plaintiff's expense.

13.     As the first step in this arrangement, in January 2021, JPMorgan, AB AD Lender, and the Ghermezians (including their affiliated WEM-MOA Guarantors) entered into an agreement, attached hereto as **Exhibit D**, pursuant to which JPMorgan agreed not to sue the Ghermezians, and the Ghermezians used their control over the WEM-MOA Guarantors to transfer to the JPMorgan Defendants ownership of the WEM-MOA 49% Equity (the "**2021 Agreement**").  After the pledge of equity in Ameream Mezz pursuant to the Plaintiff Pledge Agreement, and in Ameream as set forth in the Irrevocable Direction Letter, the WEM-MOA 49% Equity was the main collateral that was supposed to remain available to repay the Plaintiff Loan.  To make matters worse, the transfer occurred at a false valuation of just $50 million, even though JPMorgan received more than $1 billion in value.

14.     This secretly negotiated 2021 Agreement has provided JPMorgan with a massive windfall.  JPMorgan did not credit any amount from the $1 billion+ value transfer towards its loan— not even the artificially reduced $50 million valuation—and thereby kept the full amount of its loan, which exceeded $1.5 billion, outstanding.  As JPMorgan and the Ghermezians understood and intended, this violated Plaintiff and the lenders' contractual rights, and harmed them, in at least two ways.

15.     ***First***, by failing to credit any amount against the JPM Loan, notwithstanding that JPMorgan had taken ownership of a $1 billion asset, the 2021 Agreement artificially inflated the outstanding balance of the JPM Loan.  The JPM Loan should have been less than $500 million, but this scheme kept it in excess of $1.5 billion.  This hindered and delayed Plaintiff from being able to assert a claim against the WEM-MOA Guarantors to recover on the Plaintiff Loan because, under

the Intercreditor Agreement, Plaintiff cannot pursue enforcement against the WEM-MOA Guarantors or the Ghermezians (as they are "Shared Guarantors" under the Intercreditor Agreement) until the JPM Loan is fully repaid.

16.     ***Second***, by falsely valuing the WEM-MOA 49% Equity at a mere $50 million, Defendants destroyed valuable subrogation, contribution, and reimbursement claims the WEM-MOA Guarantors hold against the borrower on the JPM Loan (*i.e.*, Ameream) ("**Reimbursement Claims**").  Since Ameream's debt was guaranteed by the WEM-MOA Guarantors, when their WEM-MOA 49% Equity was transferred to JPMorgan, the WEM-MOA Guarantors held contingent Reimbursement Claims against Ameream equal to the amount of the reduction of the JPM Loan.  By falsely valuing the WEM-MOA 49% Equity at $50 million, the WEM-MOA Guarantors intentionally reduced their Reimbursement Claims from over $1 billion to $50 million.  The Reimbursement Claims are unencumbered assets of the WEM-MOA Guarantors.  Had the WEM-MOA Guarantors not conspired with JPMorgan to give away their $1 billion assets for $50 million and received the fair value of $1 billion, then the WEM-MOA Guarantors today would have nearly $600 million even after fully repaying the Plaintiff Loan.

17.     Defendants negotiated the 2021 Agreement in secret, without Plaintiff's involvement or consent.  By doing so, JPMorgan secured a massive windfall for itself, and, in exchange, shielded the Ghermezians from having to repay Plaintiff for years, if ever.  Indeed, the assets that the WEM-MOA Guarantors were supposed to preserve to repay Plaintiff were transferred to JPMorgan at a small fraction of their true value.  And for their part, the Ghermezians continue to own a majority of the West Edmonton Mall and Mall of America, and to own 100% and control the

American Dream Mall, free of the threat of losing those assets to JPMorgan and, most critically, Plaintiff and the lenders.

18.    ***The October 2022 Agreements***.  Defendants' schemes did not end with the 2021 Agreement.  There was (as admitted by several Defendants) a "step two" 18 months later.  In order to further ensure that the Ghermezians would be able to retain their ownership interests in the malls, notwithstanding their obligations to repay the defaulted Plaintiff Loan, Defendants and the Ghermezians entered into a series of agreements in October 2022, namely the Standstill Agreement, attached hereto as **Exhibit E**, and the 7th Amendment, attached hereto as **Exhibit F** (together, the "**October 2022 Agreements**").  Those agreements had the intended effect of conclusively eliminating Plaintiff's interests in the WEM-MOA 49% Equity, Ameream and the Outparcel Entities, in violation of the Payment Guaranty, the Irrevocable Direction Letter, and the Intercreditor Agreement.  Plaintiff is supposed to receive any and all excess from any collections, sales, or other dispositions of such assets immediately after the JPM Loan and 2017 Mezz Loan were repaid.  The October 2022 Agreements interfere with these rights, even though Defendants have confirmed the validity and enforceability of these rights as recent as March of this year.

19.    The October 2022 Agreements took effect immediately after the AB AD Lender foreclosed on Ameream Mezz's ownership of Ameream (the "**Strict Foreclosure**").

20.    Plaintiff knew about the Strict Foreclosure, and understood that, with the 2017 Mezz Loan now fully satisfied, all of the AB AD Lender's rights under all of its 2017 Mezz Loan documents and the Intercreditor Agreement were terminated.  From the moment of the Strict

Foreclosure, the Plaintiff Loan was only junior to the JPM Loan. The Plaintiff Loan is ahead of the Ghermezians and is ahead of any refinancing of the JPM Loan or any replacement loans.

21.      What Plaintiff did not know was that, simultaneously with the Strict Foreclosure, Defendants entered into the October 2022 Agreements, which were designed to eliminate the rights of Plaintiff that vested in Plaintiff upon completion of the Strict Foreclosure, as the lender to be repaid immediately after satisfaction of the JPM Loan, now that the 2017 Mezz Loan is fully satisfied.

22.      Despite the 2017 Mezz Loan being fully discharged as a result of the Strict Foreclosure, the October 2022 Agreements mandate that JPMorgan, upon repayment of its loan, transfer ownership of the WEM-MOA 49% Equity, or any excess funds from the collections, sales, or other disposition of the WEM-MOA 49% Equity, Ameream and the Outparcel Entities, to the AB AD Lender instead of Plaintiff, in violation of the Intercreditor Creditor Agreement and the Irrevocable Direction Letter, which requires that such collateral or funds be directed to Plaintiff to satisfy its loan. All of this was done with the full cooperation of the Ghermezians and their affiliates, who secretly retained ownership in the American Dream Mall.

23.      JPMorgan also obtained extra, undeserved benefits through the October 2022 Agreements, at the expense of Plaintiff and the lenders. The October 2022 Agreements provide that if the JPM Loan is refinanced, the WEM-MOA 49% Equity can be pledged to support it, without regard to Plaintiff's rights. This is not permitted by the contracts with Plaintiff, which provide that any funds available from the WEM-MOA 49% Equity after payment of the JPM Loan are to be directed to satisfy the Plaintiff Loan. And the 7th Amendment states that WEM-3 (which owns 51% of the West Edmonton Mall and is a guarantor of the Plaintiff Loan) is to receive a $48.5 million distribution of cash but immediately give it away to support operating costs of the American Dream

Mall.  This extraordinarily non-commercial provision makes no sense for WEM-3 and violates the Payment Guaranty.

24.    Thus, Defendants used the 2021 Agreement, with its false valuation of the WEM-MOA 49% Equity, to create an artificial cushion ahead of repayment on the Plaintiff Loan; and Defendants used the October 2022 Agreements to remove Plaintiff from having access to its collateral securing its loan and contractual rights altogether.

### *Plaintiff's Claims for Relief*

25.    Plaintiff asserts multiple claims arising out of Defendants' scheme, including claims for fraudulent transfer; breach of contract and/or tortious interference with the Payment Guaranty, the Irrevocable Direction Letter, and the Intercreditor Agreement; breach of the covenant of good faith and fair dealing; and declaratory relief.

26.    While these claims set forth different legal theories, and involve a complex array of agreements and Defendants' and the Ghermezians' affiliated entities, there is a common thread: JPMorgan's recourse following default should have been to either dispose of collateral in a commercially reasonable manner, with all excess value available to pay the Plaintiff Loan, or to seek and obtain Plaintiff's consent to a restructuring of the parties' rights on their respective loans. JPMorgan did neither.  It instead conspired with the Ghermezians to secure a windfall for itself, at Plaintiff's expense.

27.    Plaintiff brings this action to right these wrongs.

## PARTIES AND RELEVANT NON-PARTIES

28.    Plaintiff SOL-MM III LLC is a Delaware limited liability company, having a registered office at c/o Cogency Global Inc., 850 New Burton, Suite 201, Dover, Delaware 19904. SOL-MM III LLC is the successor to Western Asset Mortgage Capital Corporation, the original

Administrative Agent of the Plaintiff Loan.  Reference to "Administrative Agent" herein includes Plaintiff and its predecessor in interest.

### The JPMorgan Defendants

29.    Defendant JPMorgan Chase Bank N.A. is a national banking association with a home office in Columbus Ohio and an address at c/o CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.  JPMorgan is the administrative agent under the JPM Loan documents and also a lender thereunder.  It is a party to the 2021 Agreement and the October 2022 Agreements.

30.    Defendant D5 Hawks LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan with an address at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, (ii) was formed on February 26, 2021, and (iii) as a result of the consummation of the 2021 Agreement, is the sole member of MOA Holdings II LLC, which owns a 49% equity interest in MOA Holdings I LLC, the indirect sole owner of the Mall of America.

31.    Defendant WE Tahoe 1 LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan with an address at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, (ii) was formed on February 26, 2021, and (iii) as a result of the consummation of the 2021 Agreement, owns 970 common shares of West Edmonton Mall Properties Inc. ("**WEMPI**"), the owner of the West Edmonton Mall.

32.    Defendant WE Tahoe 2 LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan with an address at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, (ii) was formed on February 26, 2021, and (iii) as a result of the consummation of the 2021 Agreement, owns 10 common shares of WEMPI.

33.     At all times relevant to this action and currently, on information and belief, JPMorgan owns, operates, and controls Defendants JPM-D5, JPM-WEM 1, and JPM-WEM 2. These entities received the WEM-MOA 49% Equity at the direction of JPMorgan and would be "designees or nominees" under the 2021 Agreement.

*West Edmonton Mall Guarantor Defendants*

34.     Defendant New WEM Holdings Affiliate 1 Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, and an address at c/o CT Corporation System, 28 Liberty Street, New York, New York 10005, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPM Loan and the foreclosed and discharged 2017 Mezz Loan, and (iv) a party to the 2021 Agreement and the 7th Amendment.  It previously indirectly owned 24.5 % of the West Edmonton Mall.

35.     Defendant New WEM Holdings 2 Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, and an address at c/o CT Corporation System, 28 Liberty Street, New York, New York 10005, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPM Loan and the foreclosed and discharged 2017 Mezz Loan, and (iv) a party to the 2021 Agreement and the 7th Amendment.  It previously indirectly owned 0.5 % of the West Edmonton Mall.

36.     Defendant New WEM Holdings Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, and an address at c/o CT Corporation System, 28 Liberty Street, New York, New York 10005, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPM Loan and the foreclosed and discharged 2017 Mezz Loan, and (iv) a party to the 2021 Agreement and the 7th Amendment.  It

previously indirectly owned 100% of the West Edmonton Mall and now owns only 51% of the West Edmonton Mall.

37.     WEM-1, WEM-2, and WEM-3 are collectively referred to as the "**WEM Guarantors**."

### *Mall Of America Guarantor Defendant*

38.     Defendant MOA Holdings III, LLC is (i) a Delaware limited liability company with its principal place of business in Bloomington, Minnesota, and an address at 60 East Broadway, Bloomington, Minnesota 55425, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPM Loan and the foreclosed and discharged 2017 Mezz Loan, and (iv) a party to the 2021 Agreement and the 7th Amendment.  It previously indirectly owned 49% of the Mall of America.

### *Ameream and the Outparcel Entities*

39.     Defendant Ameream, LLC (i) is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073, (ii) is the borrower of the JPM Loan, (iii) is a party to the 2021 Agreement and the 7th Amendment, and (iv) prior to the Strict Foreclosure, was indirectly wholly owned by Ameream Mezz, whose 100% ownership was pledged to Plaintiff as collateral for the Plaintiff Loan.  According to the 7th Amendment, Ameream is now owned by the newly created entity, AB AMEREAM MEMBER LLC ("**Successor Ameream Mezz**").

40.     MEADOW A-B OFFICE, LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073.  It is a party to the 7th Amendment.

41.     MEADOW C-D OFFICE, LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073.  It is a party to the 7th Amendment.

42.     MEADOW HOTEL, LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073.  It is a party to the 7th Amendment.

43.     MEADOW BASEBALL, LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073.  It is a party to the 7th Amendment.

44.     Meadow A-B Office, LLC, Meadow C-D, LLC, Meadow Hotel, LLC, and Meadow Baseball, LLC are collectively referred to as the "**Outparcel Entities**."

### *Relevant Non-Parties*

45.     Non-party Don Ghermezian is (i) a natural person, having an address at 14A Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a director or officer of one or more of the WEM-MOA Guarantors, and (iv) a party to the 2021 Agreement and the 7th Amendment.

46.     Non-party Eskandar Ghermezian is (i) a natural person, having an address at 17 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement and the 7th Amendment.

47.     Non-party David Ghermezian is (i) a natural person, having an address at 14A Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment

Guaranty, (iii) a member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement and the 7th Amendment.

48.    Non-party Syd Ghermezian is (i) a natural person, having an address at 722 W. 232nd Street, Bronx, New York 10463, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement and the 7th Amendment.

49.    Non-party Bahaman Ghermezian is (i) a natural person, having an address at 15 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement and the 7th Amendment.

50.    Non-party Raphael Ghermezian is (i) a natural person, having an address at 18 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement and the 7th Amendment.

51.    Non-party Nader Ghermezian is (i) a natural person, having an address at 16 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement and the 7th Amendment.

52.    Non-party Marshall Ghermezian is (i) a natural person, having an address at 17 Wellington Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement and the 7th Amendment.

53.    Non-party Tony Ghermezian is (i) a natural person, having an address at 14B Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-1 and WEM-2, and (iv) a party to the 2021 Agreement and the 7th Amendment.

54.     Each Ghermezian family member listed in paragraphs 45-53 is an "**Individual Guarantor**," and collectively the "**Individual Guarantors**".

55.     Non-party Original WEMPI Inc. ("**Original WEMPI**") is (i) an Alberta corporation, having an address at 8882-170 Street North West, Edmonton, Alberta, T5T 4M2, Canada, and an address at c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011, (ii) a guarantor under the payment guarantee for the JPM Loan, and (iii) a party to the 2021 Agreement and the 7th Amendment.  Original WEMPI wholly owns WEM-3.

56.     Non-party Triple Five Investment Ltd. ("**Triple Five**") is (i) a British Columbia corporation, having an address at 8882 170 Street, Edmonton, Alberta, Canada T5T 4M2, and an address at c/o Ameream LLC, One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073, and (ii) a Non-Shared Guarantor for the Plaintiff Loan.

57.     Non-party 7 Crowns Corporation ("**7 Crowns**") is (i) an Alberta corporation, having an address at 8882 170 Street, Edmonton, Alberta, Canada T5T 4M2, and an address at c/o Ameream LLC, One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073, and (ii) a Non-Shared Guarantor for the Plaintiff Loan.

58.     Non-party MEADOW OUTPARCELS DEVELOPER, LLC, is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073.  It is a party to the Irrevocable Direction Letter and wholly owns the Outparcels Entities.

59.     Non-party TRIPLE FIVE OF MINNESOTA, INC. is (i) a Minnesota corporation with its principal place of business in Bloomington, Minnesota, and an address at 60 East Broadway, Bloomington, Minnesota 55425, and (ii) a party to the 7th Amendment.

60.     Non-party REGENT MOA MANAGEMENT LLC is (i) a Delaware limited liability company with its principal place of business in Bloomington, Minnesota, and an address at 60 East Broadway, Bloomington, Minnesota 55425, and (ii) a party to the 7th Amendment.

61.     Non-party ROYCE MOA HOLDINGS I, LLC is (i) a Delaware limited liability company with its principal place of business in Bloomington, Minnesota, and an address at 60 East Broadway, Bloomington, Minnesota 55425, and (ii) a party to the 7th Amendment.

62.     Non-party AB AMEREAM MEMBER PARENT LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073.  It was formed in September 2022 and wholly owns AB AMEREAM MEMBER LLC.  According to the 7th Amendment, AB AMEREAM MEMBER PARENT LLC is indirectly wholly owned by the Ghermezian family through T5 AD, LLC, and the AB AD Lender owns all of the preferred equity of AB AMEREAM MEMBER PARENT LLC.  AB AMEREAM MEMBER PARENT LLC is the alleged borrower under a new $475 million loan provided by the AB AD Lender.  Plaintiff asserts that AB AMEREAM MEMBER PARENT LLC is the successor to American Dream Borrower.  It is a party to the 7th Amendment.

63.     AB AMEREAM MEMBER LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073.  It was formed in September 2022 and wholly owns AMEREAM.  Its parent company is AB AMEREAM MEMBER PARENT LLC.  Plaintiff asserts that AB AMEREAM MEMBER LLC is the successor to Ameream Mezz.  It is a party to the 7th Amendment.

64.     Non-party T5 AD, LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073.  At all times, T5 AD, LLC, through its ultimate beneficiaries, has indirectly wholly owned the American Dream Mall, first through American Dream Borrower, and now through its successor, AB AMEREAM MEMBER PARENT LLC.  T5 AD, LLC is wholly owned by Individual Guarantors and other Ghermezian family members.

65.     Non-party AB ADM Syndicate Joint Venture LP, also known as the AB AD Lender, is a Delaware limited partnership with its principal place of business in New York, New York, and an address at 645 5th Avenue, 8th Floor, New York, New York 10019.  AB ADM Syndicate Joint Venture LP provided the 2017 Mezz Loan to Ameream Mezz in 2017.  It purportedly made a $475 million loan to AB AMEREAM MEMBER PARENT LLC in connection with the execution of the October 2022 Agreements and owns preferred equity in AB AMEREAM MEMBER PARENT LLC.  AB ADM Syndicate Joint Venture LP is a party to the Intercreditor Agreement, 2021 Agreement, and the Standstill Agreement, and conducted the Strict Foreclosure.

## JURISDICTION

66.     This action was originally brought in New York state court (the "**New York Action**") by filing a notice and summons on March 23, 2023, with the Initial Complaint subsequently filed on July 18, 2023, and the First Amended Complaint filed on November 29, 2023.

67.     On July 26, 2023, Defendants removed the New York Action to this Court pursuant to 12 U.S.C. § 611, *et seq.* (the "**Edge Act**").  This Court has jurisdiction pursuant to the Edge Act.

68.     Venue is proper in this district by agreement of the parties per Section 7.3 of the Payment Guaranty and Section 18(g) of the Intercreditor Agreement, pursuant to which JPMorgan and the WEM-MOA Guarantors consented to the jurisdiction of New York State and federal courts

in New York County.  Venue is also proper under 28 U.S.C. § 1391(b)(3), CPLR § 501, and CPLR § 503, including on grounds that all Defendants do substantial business in this County, their contracts are governed by New York law with New York venue selection clauses, and all Defendants derive substantial revenue from activities carried out in this County.

## FACTUAL BACKGROUND

### A.    American Dream Mall, Mall of America, and West Edmonton Mall

69.    The claims Plaintiff brings relate to three of the largest and most valuable shopping malls in North America—the American Dream Mall in New Jersey; the Mall of America in Minnesota; and the West Edmonton Mall in Alberta, Canada.  Each mall has been owned and/or managed by the Ghermezian family, which has developed and operated several of the world's largest shopping malls since the 1970s.  The Ghermezian family operates through its family investment group, the Triple Five Group, of which Don Ghermezian is currently the President.  Don Ghermezian is also purportedly the CEO and President of American Dream Mall.

70.    Over the years, the Ghermezian family established an elaborate web of companies to hold its ownership stakes in the three malls.  **Appendix Chart "B"** is the tangled corporate organization for all three malls existing immediately prior to the 2021 Agreement—when the JPM Loan, 2017 Mezz Loan, and Plaintiff Loan were all still in place.  **Appendix Chart "C"** is the corporate organization after (a) the consummation of JPMorgan's acquisition of WEM-MOA 49% Equity in March 2021 pursuant to the 2021 Agreement, and (b) the Strict Foreclosure, based on a notice provided to Plaintiff by the AB AD Lender in October 2022.  **Appendix Chart "D"** is the corporate organization of the three malls after the consummation of the October 2022 Agreements.

*American Dream Mall*

71.     The American Dream Mall is a 3.3-million square foot retail and entertainment complex in East Rutherford, New Jersey.  It is the second largest retail and entertainment center in the United States (behind Mall of America), boasting an impressive array of entertainment, shopping, and dining experiences.  American Dream Mall features a Nickelodeon Indoor Theme Park with more than 35 rides and attractions, an NHL-regulation-size ice skating rink, a DreamWorks Water Park, North America's only indoor-year-round ski and snow resort, a Legoland Discovery Center, a Sea Life Aquarium, and the world's only indoor surfing wave pool.[2]

72.     At the time of the Plaintiff Loan in 2019, the American Dream Mall was valued at $4.3 billion upon completion, and $5.6 billion upon post-completion and stabilization.

73.     At all relevant times, the Ghermezian family has, through corporate entities, owned Ameream, the entity that owns the American Dream Mall.  The Ghermezian family and Defendants sought to hide the Ghermezian family's continued ownership following the Strict Foreclosure by the AB AD Lender in October 2022, described in ¶¶ 182-187 below.  The Strict Foreclosure should have extinguished the Ghermezians' ownership interest, but, as a result of the breaches described herein, did not.  Thus, the Ghermezians continue to own and run the American Dream Mall even today.

74.     While the American Dream Mall, like virtually all shopping malls around the globe, suffered during the COVID-19 pandemic, it has come back strong.  In 2023, Don Ghermezian bragged about the mall's success in 2022 and the fact that high-end retailers were seeking to open stores within the mall.[3]  The American Dream Mall itself was, in early 2021, and remains, worth far more than the amount owed to JPMorgan under the JPM Loan, even without accounting for the more

---

[2] Loving New York, *The Ultimate 2023 Guide To The American Dream Mall* (Mar. 2, 2023), https://loving-newyork.com/american-dream-mall-nj/.
[3] *See* David Moin, *American Dream, Post-COVID-19, Capturing Crowds*, WOMEN'S WEAR DAILY (Jan. 23, 2023), http://wwd.com/business-news/real-estate/american-dream-progress-report-1235481459/.

than $1 billion in value associated with the WEM-MOA 49% Equity that JPMorgan intentionally refused to credit against the JPM Loan.

75.     According to American Dream Mall's public statements disclosed in October 2023, the American Dream Mall generated $520.8 million in gross sales in the previous 12 months, with 86.0% of the property leased.[4]

76.     Additionally, Ameream's affiliates, the Outparcel Entities, own valuable adjacent leasehold properties zoned for office and hotel complexes, a minor league baseball stadium, as well as other expansion rights, including an option to purchase land.

### *Mall of America*

77.     Prior to March 2021, the Ghermezian family, through various corporate entities, owned 100% of Mall of America.  The Ghermezian family continues to operate this mall.

78.     Mall of America is the United States' largest retail and entertainment complex, spanning 5.6 million square feet.[5]  Mall of America currently attracts over 40 million visitors annually and has a $1.9 billion economic impact annually.  Mall of America has more than 520 stores, two hotels, and a theme park.

79.     Based on company-provided financial statements, Mall of America's revenue and net operating income for 2021 were $176,749,907 and $80,288,227, respectively.

80.     The value of Mall of America has increased since 2020.  As of March 2021, Mall of America was valued at approximately $1.99 billion.  As of October 2022, it was valued at approximately $2.1 billion.  With approximately $1.38 billion in debt as of March 2021, there is

---

[4] Gross Sales Report as of November 1, 2023, ELECTRONIC MUNICIPAL MARKET ACCESS (Nov. 2, 2023), https://emma.msrb.org/P21743801-P21339131-P21773617.pdf; American Dream Leasing Status Update as of October 2, 2023, ELECTRONIC MUNICIPAL MARKET ACCESS (Oct. 4, 2023), https://emma.msrb.org/P21731041-P21329945-P21763647.pdf.

[5] TripleFive Group of Companies, *Mall of America® Today*, https://www.triplefive.com/moa/moa-today/ (last visited Mar. 27, 2023).

(and was at the time of the 2021 Agreement) a sizeable equity cushion in the ownership of Mall of America.

81.     Mall of America's revenue and net operating income for 2023 were $208.7 million and $92.7 million, respectively, per company-provided financial statements.

### *West Edmonton Mall*

82.     Prior to March 2021, the Ghermezian family, through various corporate entities, also owned 100% of the West Edmonton Mall.  The Ghermezian family continues to operate this mall.

83.     West Edmonton Mall, referred to by its owners as "the greatest indoor show on earth," is an entertainment and retail "city" that spans 5.3 million square feet, hosting more than 30 million people annually.[6]  West Edmonton Mall has over 800 stores and services, including a hotel, and over 100 dining venues, and is "accredited as a zoo."  West Edmonton Mall also includes (i) the world's largest indoor amusement park, (ii) a triple loop rollercoaster, (iii) a lake (complete with a replica of Christopher Columbus' Santa Maria), (iv) a wave pool, and (v) a permanent bungee tower.

84.     Until March 2021, WEM-3 owned 75% of the West Edmonton Mall, and WEM-1 and WEM-2 collectively owned 25% of the West Edmonton Mall.  As a result of the 2021 Agreement and subsequent transfers, only WEM-3 retains ownership, which ownership was reduced to 51%, with the JPMorgan Defendants owning the other 49%.

85.     The Ghermezians have boasted that West Edmonton Mall is the number one tourist attraction in Alberta and "remains the ultimate entertainment and shopping experience."[7]  Three high-end major luxury brands joined West Edmonton Mall since the summer of 2019—Louis Vuitton, Saint Laurent, and Gucci—and all three have experienced remarkable success, despite the

---

[6] TripleFive Group of Companies, *West Edmonton Mall*, https://www.triplefive.com/wem/.
[7] *Id.*

pandemic, leading to other luxury retailers exploring opening locations.[8]  Nike announced plans to open a flagship store at West Edmonton Mall, which upon opening will be its largest store in Canada.[9]

86.     West Edmonton Mall has generated an enormous economic benefit for the province of Alberta and has experienced steady growth.  West Edmonton Mall's revenue and net operating income for 2021 were Canadian $230 million and Canadian $140 million, respectively, per company-provided financial statements.  West Edmonton Mall's revenue and net operating income for 2022 were the highest since 2015, reaching Canadian $295.8 million and Canadian $168.7 million, respectively, per company-provided financial statements.  West Edmonton Mall's revenue and net operating income for 2023 were Canadian $311.8 million and Canadian $171.3 million, respectively, per company-provided financial statements.

**B.      The American Dream Mall Financing**

*The JPM Loan and 2017 Mezz Loan*

87.     In 2017, JPMorgan and other lenders provided the JPM Loan, a $1,195,000,000 senior secured financing, to Ameream, the direct owner of the American Dream Mall.  The collateral supporting the JPM Loan, as discussed further below, primarily consisted of (a) mortgages covering Ameream's rights, title, and interest to, *inter alia*, the American Dream Mall together with the future development rights to the properties owned by the Outparcel Entities, (b) a pledge of Ameream Mezz's ownership interests in Ameream, (c) pledges of the WEM-MOA 49% Equity as described in ¶¶ 90-92, (d) a pledge of an additional 25% cash flow in the West Edmonton Mall as described in

---

[8] Craig Patterson, *West Edmonton Mall Looking to Add More Luxury Retailers After Seeing Success with 3 Big Players*, Retail Insider (Mar. 22, 2022), https://retail-insider.com/retail-insider/2022/03/west-edmonton-mall-looking-to-add-more-luxury-retailers-after-seeing-success-with-3-big-players/.
[9] Craig Patterson, *Nike to Open Largest Store in Canada at West Edmonton Mall*, Retail Insider (June 18, 2023), https://retail-insider.com/retail-insider/2023/06/nike-to-open-largest-store-in-canada-at-west-edmonton-mall/.

¶ 93, and (e) a second mortgage in the amount of Canadian $425 million on the West Edmonton Mall (the "**WEM Second Mortgage**").  There is no doubt that at all times the JPM Loan has been overcollateralized.

88.    At the same time, in 2017, the AB AD Lender provided the 2017 Mezz Loan, a $475,000,000 loan, to Ameream Mezz, which owned 100% of the equity interests of Ameream.  The AB AD Lender was assigned JPMorgan's first priority security interest in all of Ameream Mezz's ownership interests in Ameream.

89.    Thus, the AB AD Lender was subordinated to JPMorgan with respect to the American Dream Mall, but if there was a default, the AB AD Lender was positioned to foreclose on the equity interests of Ameream and become the new equity owner of the American Dream Mall, subject to a list of conditions that heavily favored JPMorgan, including (a) curing all monetary defaults under the JPM Loan, and (b) replacing the guarantees provided by the Ghermezian family with credit worthy entities.[10]

### *WEM-MOA Guarantors' and Ghermezian Family's Credit Support for the JPM Loan and 2017 Mezz Loan*

90.    The WEM-MOA Guarantors each guaranteed, and pledged assets as collateral for, the JPM Loan, pursuant to the WEM-JPMorgan Pledge Agreement and the MOA-JPMorgan Pledge Agreement provided to JPMorgan by each of the respective WEM-MOA Guarantors.  The WEM-MOA Guarantors each similarly guaranteed the 2017 Mezz Loan.

91.    As noted above, the WEM-MOA Guarantors owned the WEM-MOA 49% Equity, which consisted of 49% of the equity in the West Edmonton Mall and Mall of America.  The WEM-

---

[10] When the AB AD Lender did foreclose in October 2022, JPMorgan waived all such requirements (including being owed at least a $100 million payment) and permitted such foreclosure.  The AB AD Lender also had a right to purchase the JPM Loan, but it did not exercise that right.

MOA 49% Equity was an incredibly valuable asset, having a value of at least $1.045 billion as of March 2021.

92.    In the case of WEM-3 (the 75% owner of the West Edmonton Mall prior to the 2021 Agreement consummation), JPMorgan's recourse under its payment guaranty was limited to WEM-3 24% Equity, which constituted 24% of WEM-3's then 75% ownership stake in WEMPI. Thus, under any circumstances and regardless of whether the JPM Loan was in default, JPMorgan could, as to WEM-3, only foreclose on the WEM-3 24% Equity.

93.    In addition to the WEM-MOA 49% Equity, Original WEMPI, which wholly owns WEM-3, guaranteed and pledged, as collateral for a portion of the JPM Loan, operating and capital proceeds with respect to an additional 25% equity in the West Edmonton Mall received by Original WEMPI, pursuant to the WEM 25% Cash Flow Pledge provided to JPMorgan by Original WEMPI.

94.    Once the JPM Loan had been repaid, or once a WEM-MOA Guarantor is released (or terminated by operation of law or otherwise) from its obligations and liabilities under the JPMorgan payment guaranty, each WEM-MOA Guarantor could assert any existing Reimbursement Claims against Ameream. If any Payment Guarantor either paid to satisfy or reduce the JPM Loan, or used its assets to pay JPMorgan under the JPM Loan, such Payment Guarantor would hold a Reimbursement Claim in the same dollar amount against Ameream—the owner of the American Dream Mall.[11]  That would provide an unencumbered asset to satisfy the Plaintiff Loan whenever the JPM Loan was paid in full or in the event any guarantor was otherwise released (including a termination of such guaranty by operation of law or otherwise) from its obligations and liabilities to JPMorgan.

---

[11] This would also be true for the 2017 Mezz Loan, though because it was fully discharged via the Strict Foreclosure, the WEM-MOA Guarantors hold no Reimbursement Claims relating to the 2017 Mezz Loan.

95.    In addition to the guarantees by the WEM-MOA Guarantors, the Individual Guarantors—the key nine individual members of the Ghermezian family—personally guaranteed the JPM Loan and the foreclosed 2017 Mezz Loan (and Plaintiff Loan, as described below).

96.    Given the pledges above, JPMorgan was poised to directly take over 49% ownership of the West Edmonton Mall (and receive a majority of the cash flow) and 49% ownership of the Mall of America, if there was a default by Ameream.  And having provided personal guarantees, the Ghermezian family members would face substantial personal exposure in the event of a default.

97.    These agreements gave JPMorgan immense leverage, providing it with an array of remedies upon an event of default under the JPM Loan.  Because there were also junior secured lenders supporting the American Dream Mall, however, these agreements also set standards that would apply for sale of the pledged equity interests in the malls if there were such an event of default. JPMorgan could not simply do anything it wanted following a default by Ameream, but needed to take measures to maximize the value of the collateral used to repay its loan to ensure that amounts would be left over to pay the junior creditors, including Plaintiff.

98.    For example, Section 4.1(b) of the WEM-JPMorgan Pledge Agreement allows, upon an event of default, for JPMorgan to effectuate the transfer of any or all of the WEM Guarantors' collateral through a sale in accordance with procedures specified in Section 5 of that agreement.  Section 5.6 of the WEM-JPMorgan Pledge Agreement requires loan collateral to be sold through a public auction or public tender and prohibits a private sale under any circumstances.

99.    Sections 3.4(c), 3.5(b), and 3.5(d) of the MOA-JPMorgan Pledge Agreement similarly require a public sale or deemed public sale of the MOA 49% Equity only to "a restricted group of [highly qualified] offerees and purchasers who fulfill certain suitability standards."

26

100.    Finally, the Payment Guarantors (defined in ¶ 110) also provided an environmental indemnity (the "**Environmental Indemnity**"), pursuant to which the Payment Guarantors agreed to defend, indemnify, and hold harmless JPMorgan for certain environmental hazards.[12]    On information and belief, the Payment Guarantors have never been called to defend, indemnify, or hold harmless JPMorgan under the Environmental Indemnity.

101.    In all, JPMorgan, as senior secured lender, received substantial and interrelated collateral relating to ownership of three of the most well-known and valuable malls in North America, along with guarantees from the ultimate owners of all three malls.  JPMorgan thus was not only oversecured, but also had significant leverage over the Ghermezian family in the event of financial difficulties for Ameream.  If the American Dream Mall project failed, or had any financial distress leading to a default, JPMorgan had the power to strip the Ghermezians of their mall empire.

### *The Plaintiff Loan*

102.    In 2019, Plaintiff entered into the $300 million Plaintiff Loan, pursuant to a loan agreement (the "**Plaintiff Loan Agreement**") and secured by the collateral under the Plaintiff Pledge Agreement and additional credit support, to provide additional funding for the American Dream Mall.

103.    To evidence and secure the Plaintiff Loan Agreement, American Dream Borrower executed five loan notes (the "**Plaintiff Loan Notes**").  Pursuant to the express terms of the Plaintiff Loan Notes, American Dream Borrower was required to make monthly payments of interest to Plaintiff, followed by a final payment of principal and outstanding interest due upon the maturity date, June 29, 2021.

---

[12] In the case of WEM-3, pursuant to the express provisions of Section 30 of the Environmental Indemnity, JPMorgan's recourse was limited to the WEM-3 24% Equity.  Thus, if WEM-3 disposed of that 24% to a JPMorgan Defendant, then WEM-3's liability under the Environmental Indemnity was discharged.

104.    Failure to make any regularly scheduled monthly payment of interest on the payment date was an event of default under the Plaintiff Loan Agreement. Following numerous Events of Default, including the cross defaults resulting from Ameream's defaults under the JPM Loan, the Plaintiff Loan became immediately due and payable, and interest accrued at a contractually defined Default Rate. Plaintiff is empowered to exercise all rights under the Plaintiff Loan Agreement on behalf of the lenders.

105.    The Plaintiff Loan Agreement contained a covenant (at Section 5.2.13) that, at all times, American Dream Borrower remains a special purpose company, prohibiting it from incurring any debt other than the Plaintiff Loan. As described below, the 2022 Mezz Loan (which did not actually advance any money) to Successor American Dream Borrower violates the Plaintiff Loan Agreement.

106.    The Plaintiff Loan Agreement incorporates by reference three agreements—the Payment Guaranty, Plaintiff Pledge Agreement, and the Intercreditor Agreement (each described further below). These agreements, together with the Irrevocable Direction Letter (also described below), worked to ensure Plaintiff and the lenders' interests were protected and their rights delineated from the JPM Loan and 2017 Mezz Loan, especially with respect to the valuable collateral which secured or provided credit support for all of the loans.

107.    The Plaintiff Loan is currently junior only in priority to the JPM Loan,[13] and the Plaintiff Loan is ahead of the Ghermezians and all of their affiliates in the capital structure; the Ghermezians, in the event of a default under the Plaintiff Loan, cannot retain ownership and control or the benefits of the collateral they granted secured interest in or designated to guarantee payment of the Plaintiff Loan. The Plaintiff Loan also enjoys substantial protections, including the

---

[13]    The Plaintiff Loan was also junior in priority to the 2017 Mezz Loan prior to the Strict Foreclosure (described below).

Irrevocable Direction Letter that gave Plaintiff a unique interest in the WEM-MOA 49% Equity and interests in additional pledges (including the pledge in favor of JPMorgan of the equity in Ameream and the Outparcel Entities) and the protections under the Intercreditor Agreement concerning "Shared Guarantors" and the "Non-Shared Guarantors" (each as defined in the Intercreditor Agreement).

### Plaintiff Pledge Agreement

108.    Pursuant to the Plaintiff Pledge Agreement, American Dream Borrower pledged its ownership stake in Ameream Mezz (including any successors to Ameream Mezz) to Plaintiff as collateral to secure repayment of the Plaintiff Loan.

109.    This pledge was designed to ensure that before the Ghermezians could retain ownership in the American Dream Mall, they would have to ensure that all three loans—the JPM Loan, the 2017 Mezz Loan, and the Plaintiff Loan—were repaid.

### The Guarantees of the Plaintiff Loan

110.    In connection with the Plaintiff Loan Agreement, the Payment Guarantors (constituting the WEM-MOA Guarantors and Individual Guarantors) executed the Payment Guaranty as credit support for the Plaintiff Loan.  The Payment Guaranty is a full recourse guarantee. It states:

> each [Payment] Guarantor hereby irrevocably and unconditionally guarantees to [Plaintiff] for the benefit of Lenders the payment of the Guaranteed Obligations. (b) If all or any part of the Guaranteed Obligations shall not be paid when due . . . pursuant to the Loan Agreement, . . . [Payment] Guarantor shall, within ten (10) Business Days after demand . . . pay the amount then due on account of the Guaranteed Obligations . . . .

Payment Guaranty § 1.2.

111.    The Payment Guaranty was a key component of the Plaintiff Loan structure and a material inducement to Plaintiff to enter into the Plaintiff Loan Agreement.  The Payment Guarantors

acknowledged that the lenders were not willing to make the Plaintiff Loan to American Dream Borrower *but for* the Payment Guarantors' unconditional guarantee of certain obligations, including, among other things, payment to Plaintiff of all amounts due in accordance with the Plaintiff Loan Agreement.

112.    The Payment Guarantors also acknowledged that beneficial owners of the WEM-MOA Guarantors are beneficial owners of the American Dream Borrower and that the Payment Guarantors will benefit from the agreement by the lenders in making the Plaintiff Loan.

113.    Each Payment Guarantor agreed that it would be liable for guaranteed obligations as a primary obligor and would satisfy monetary obligations of the American Dream Borrower, to the extent not paid when due, within ten days of demand by Plaintiff as the Administrative Agent.

114.    Until the guaranteed obligations under the Plaintiff Loan are satisfied, pursuant to Section 6.2 of the Payment Guaranty, the WEM-MOA Guarantors covenanted to (i) ensure that the collective value of the WEM-MOA 49% Equity was at least $680,000,000.00[14] and (ii) continue to own at least 49% interest in Mall of America and West Edmonton Mall.  Further, Section 6.3 of the Payment Guaranty expressly prohibits any WEM-MOA Guarantor from entering into, or effectuating, any transaction with an "Affiliate"[15] if it would cause the net worth covenant to be violated.[16]

---

[14] This covenant thus excluded from the net equity calculation 51% of the West Edmonton Mall equity owned by WEM-3.

[15] The term "Affiliate," as used in the Payment Guaranty, is defined in the Plaintiff Loan Agreement as:  as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person. The following Persons shall be deemed to constitute "Affiliates" of the Borrower: (i) the Guarantors, (ii) the Ghermezian Family Members (Ameream), (iii) any trusts established for the benefit of the Persons described in the foregoing clauses (i) and (ii), and (iv) any Person in which any of the Persons described in the foregoing clauses (i) through (iii) owns or holds ten percent (10%) or more of the direct or indirect ownership interests.

[16] As described in paragraphs 155, 299, 390-391 below, that is precisely what happened in both the 2021 Agreement and the 7th Amendment.

115.    These covenants were not in any way limited by the JPM Loan or the Intercreditor Agreement.

116.    Similar to JPMorgan's payment guaranty, in the case of WEM-3, Plaintiff's recourse was limited to the identical WEM-3 24% Equity that provided credit support for JPMorgan. Thus, under any circumstances, Plaintiff could only seek from WEM-3, as guarantor, the WEM-3 24% Equity to satisfy the Plaintiff Loan.

117.    No provision of the Payment Guaranty allows the WEM-MOA Guarantors to enter into a private agreement voluntarily divesting their equity interests in favor of JPMorgan. Rather, to ensure Plaintiff and the lenders were protected from abuse by the senior lenders ahead of them, JPMorgan had to act in a commercially reasonable manner in taking the WEM-MOA 49% Equity in partial or total satisfaction of the JPM Loan. Further, the WEM-MOA Guarantors could not enter into agreements that had the effect of giving away the WEM-MOA 49% Equity. As described below, both the 2021 Agreement and the 2022 Agreements violate the Payment Guaranty.

118.    Multiple Ghermezian corporate affiliates provided corporate guarantees to Plaintiff but purposefully did not provide guarantees to JPMorgan or the AB AD Lender. This "Non-Shared Guarantor" status was a material element in inducing the lenders to make the Plaintiff Loan, since Plaintiff can enforce its remedies against the Non-Shared Guarantors should any of Ameream, Ameream Mezz, or the American Dream Borrower commit any bad acts described in the recourse guaranty, even if the JPM Loan is outstanding. JPMorgan was keenly aware of the importance to Plaintiff of these Non-Shared Guarantors.

119.    These Non-Shared Guarantors are Triple Five Investment Ltd. and 7 Crowns Corporation. However, as described in paragraph 194 hereof, JPMorgan attempted to convert a Non-Shared Guarantor into a Shared Guarantor. In September 2022, the Ghermezians caused the

Non-Shared Guarantors to deliver a similar guaranty to JPMorgan. As the Non-Shared Guarantors were not Shared Guarantors at the time the Plaintiff Loan was made, the Non-Shared Guarantors can never become Shared Guarantors.

### *The Irrevocable Direction Letter*

120.     The Irrevocable Direction Letter, dated August 2, 2019, further protected Plaintiff in the event of a default on the Plaintiff Loan. The WEM-MOA Guarantors and other Ghermezian family affiliates, including the Outparcel Owner and Ameream Mezz, directed JPMorgan and the AB AD Lender, as applicable, to pay any excess proceeds from the collections, sale, or other disposition of the WEM-MOA 49% Equity and JPMorgan's liens on the ownership of Ameream and the Outparcel Entities directly to Plaintiff. This irrevocable direction protected Plaintiff in the circumstances where senior loans were paid off because it made sure that whatever was remaining collateral securing such senior loans, Plaintiff would receive the value, not the Ghermezians, and not any third party. The Irrevocable Direction Letter states, "[i]f proceeds of any collection, sale or other disposition under the Pledge remain after the [JPM Loan and 2017 Mezz Loan] are satisfied in full, you are authorized and instructed to pay such excess proceeds over directly to [Plaintiff] within 10 business days of receipt, to be applied to repayment of the [Plaintiff Loan], notwithstanding any contrary direction in the Pledge or any related Loan Document (as defined in the respective Pledge)."

121.     The Irrevocable Direction Letter provides Plaintiff a unique interest in, among other things, the WEM-MOA 49% Equity, the Ameream equity, and the Outparcel Entities' equity.

122.     The critical protections provided by the Irrevocable Direction Letter are now front and center in light of Defendants' scheming. With the 2017 Mezz Loan fully discharged following the Strict Foreclosure (as described in paragraphs 182-186), the Irrevocable Direction Letter ensures that if JPMorgan collects, sells, or otherwise disposes of collateral securing the JPM Loan that is

listed in the Irrevocable Direction Letter, any excess proceeds must be paid to Plaintiff and the lenders; such proceeds cannot first go to the Ghermezians or AB AD Lender as the lender of the so-called new Junior Loan in the Standstill Agreement (or anyone else, such as a replacement lender).

123.    The Irrevocable Direction Letter also expressly acknowledges that it, like the Payment Guaranty, was "a material inducement" to Plaintiff and the lenders to make the Plaintiff Loan.  And JPMorgan understood that the Irrevocable Direction Letter, which it signed, was critical to Plaintiff, and a key inducement for the Plaintiff Loan.

124.    On information and belief, all Defendants were at all times aware of the terms of the Irrevocable Direction Letter.  During the negotiations over the Plaintiff Loan, for instance, JPMorgan made clear to Plaintiff that it understood that the Irrevocable Direction Letter was unconditional and irrevocable.  As described in paragraphs 204-242, the October 2022 Agreements are designed to breach, and in fact cause parties to breach, the Irrevocable Direction Letter.

### *The Intercreditor Agreement*

125.    In 2019, JPMorgan, the AB AD Lender, and Plaintiff signed the Intercreditor Agreement.

126.    The purpose of the Intercreditor Agreement was to "provide for the relative priority of, and to evidence certain agreements with respect to. . . [the Plaintiff Loan]," including the documents which protected Plaintiff's and the lenders' rights under the Plaintiff Loan—*i.e.*, the Payment Guaranty and the Irrevocable Direction Letter.

127.    Section 6(b) of the Intercreditor Agreement echoes the rights set forth in the Payment Guaranty and Irrevocable Direction Letter to protect Plaintiff and the lenders in the event of a foreclosure of assets of the WEM-MOA Guarantors under the JPM Loan or the 2017 Mezz Loan:

In the event that (i) [JPMorgan] and/or [AB AD Lender] hold proceeds received pursuant to the foreclosure of, with respect to [JPMorgan], the MOA Pledge and the WEM Pledges (each as defined in the Senior Loan Agreement), or, with respect to [AB AD Lender], foreclosure of the MOA Pledge and the WEM Pledges (each as defined in the Mezzanine Loan Agreement (Senior)), and (ii) both the [JPM] Loan and the [2017 Mezz Loan] have been fully and indefeasibly repaid, then [JPMorgan] or [AB AD Lender], as applicable, shall disburse such excess proceeds in accordance with the terms of the letters of direction from MOA Guarantor and WEM Guarantor (each as defined in the Senior Loan Agreement), respectively.

128.    This provision entitles Plaintiff to any amount remaining after collections, sale, or other disposition of the WEM-MOA 49% Equity and repayment of the JPM Loan and the 2017 Mezz Loan, but also precludes Plaintiff from suing any "Shared Guarantor" (which includes the WEM-MOA Guarantors and the Individual Guarantors) as long as the JPM Loan is outstanding.  The Intercreditor Agreement works with the Irrevocable Direction Letter, binding both JPMorgan and the AB AD Lender to the Irrevocable Direction Letter's terms.

129.    The Intercreditor Agreement terminated in October 2022 when the AB AD Lender conducted the Strict Foreclosure, and the 2017 Mezz Loan was extinguished.[17]  The only provision that survived termination was Section 6(b).  No other provision of the Intercreditor Agreement survives termination, including any waivers of rights, including with respect to marshaling.

130.    But for the limitation in Section 6(b), Plaintiff would have sued the WEM-MOA Guarantors and the Ghermezian family members to collect on the Payment Guaranty after American Dream Borrower defaulted in 2021.

---

[17]    The WEM-MOA Guarantors (falsely) suggested in one filing with this Court that the Intercreditor Agreement did not terminate because the 2017 Mezz Loan remained outstanding.

**C.    Ameream Defaults in 2020 on the JPM Loan, Causing Substantial Exposure for the Ghermezians**

131.    On or around May 13, 2020, JPMorgan informed Plaintiff that an event of default had occurred under the JPM Loan.

132.    As a result of such event of default, JPMorgan had the right to seek recovery from Ameream and the Ghermezian family, including by enforcing various corporate and personal guarantees, and by foreclosing against the American Dream Mall mortgages.  The Ghermezians also faced personal exposure as Individual Guarantors.

133.    Thus, the Ghermezian family was at risk of losing (a) all of its equity in the American Dream Mall, (b) all of its leasehold interests owned by Outparcel Entities, (c) the WEM-MOA 49% Equity, and (d) operating and capital proceeds with respect to an additional 25% equity in the West Edmonton Mall pursuant to the WEM 25% Cash Flow Pledge.  Simultaneously, nine members of the Ghermezian family (*i.e.*, the Individual Guarantors) faced immediate enforcement against their respective personal guarantees for the repayment of the JPM Loan.

134.    Further, on information and belief, the Ghermezian family and their affiliates feared that in a public sale, as required under the WEM-JPMorgan Pledge Agreement and MOA-JPMorgan Pledge Agreement, there would be legitimate third-party purchasers who would acquire the WEM-MOA 49% Equity at fair market value, meaning that an unaffiliated third party would own the WEM-MOA 49% Equity, reaping 49% of the economic and voting rights with respect to the West Edmonton Mall and Mall of America.

135.    The Ghermezians, the WEM-MOA Guarantors, and Ameream could have sought insolvency protection.  Indeed, Ameream engaged well-known restructuring counsel who often represent corporate families as debtors in United States bankruptcy proceedings.

136.    However, an insolvency filing would be expensive and time-consuming, and likely embarrassing to the Ghermezians, even though it would ultimately be a means to maximize value and treat creditors and stockholders fairly.

137.    Recognizing the risks facing the Ghermezians, JPMorgan saw an opportunity for a windfall for itself resulting from Ameream's default while continuing to have favorable relationships with the Ghermezian family, including future lending opportunities.    The path to this windfall opportunity was by means of abusing the rights of Plaintiff and the lenders.

138.    Thus, rather than exercise remedies like a traditional lender would following default, JPMorgan negotiated in secret a two-step sweetheart deal, in which it would secure substantial upside in exchange for permitting the Ghermezians to avoid making good on their personal guarantees, shielding them from suit by Plaintiff and letting them continue to operate, control, and own the American Dream Mall.    JPMorgan, the AB AD Lender, and the Ghermezian family spent years secretly negotiating such a deal, benefitting themselves to the detriment of Plaintiff and the lenders, and violating JPM Loan documents and promises therein, on which Plaintiff relied.

**D.    JPMorgan and the Ghermezian Family Execute the 2021 Agreement and, in March 2021, Improperly Transfer a Billion Dollars of Value Away from the WEM-MOA Guarantors, Harming Plaintiff and the Lenders**

139.    On or about January 29, 2021, JPMorgan, the AB AD Lender, Ameream Mezz, the other Ghermezian-affiliated Defendants, the Ghermezian family members (as Individual Guarantors), and various Ghermezian affiliates, entered the 2021 Agreement.    Even though Plaintiff and the lenders were important parties to the financing of the American Dream Mall and parties to multiple contracts with signatories to the 2021 Agreement, the Defendants, the AB AD Lender, and

36

the Ghermezian family members negotiated and entered into the 2021 Agreement in secret.  They did so to conceal that they were freezing out and knowingly harming Plaintiff and the lenders.

140.    By design, the 2021 Agreement called for JPMorgan to forego exercising its available remedies as a lender, including foreclosure through a public sale of the WEM-MOA 49% Equity that it was required to conduct under its own agreements, in exchange for the windfall described below.

### The Planned WEM-MOA 49% Equity Transfer

141.    The 2021 Agreement expressly provided that JPMorgan would not prosecute a foreclosure, exercise any power of sale, or take any other enforcement action.  The 2021 Agreement provided that, "[i]n lieu of" JPMorgan exercising those rights, the WEM-MOA Guarantors would convey to JPMorgan their most valuable assets—the 49% ownership stakes in Mall of America and the West Edmonton Mall.

142.    Plaintiff was not a party to the 2021 Agreement.  It did not even know of it until after it had been executed.

143.    The transfer of ownership of the WEM-MOA 49% Equity is a violation of the pledge agreements that required JPMorgan to engage in a public sale of those assets in the event of a default, which Plaintiff was entitled to rely on under the Intercreditor Agreement.  It also violated the WEM-MOA Guarantors' covenants in the Payment Guaranty.

144.    Key to the transfer scheme was that the parties to the 2021 Agreement invented an aggregate value of the assets transferred to JPMorgan that was absurdly, and intentionally, low—a price far below what would have been realized through a public sale.  The WEM 49% Equity was "stipulated" to be worth only $49 million, when, in fact, it was worth approximately $800 million.

And the MOA 49% Equity was "stipulated" to be worth only $1 million, when, in fact, it was worth approximately $245 million.

145.    Thus, JPMorgan and the WEM-MOA Guarantors severely undervalued the 49% equity interests in both the West Edmonton Mall and Mall of America.  Fully embracing these false valuations, the 2021 Agreement states that the parties, including the WEM-MOA Guarantors, "irrevocably and unconditionally agree[d]" among themselves that $50 million "is a reasonable estimate of the sale proceeds that [JPMorgan] would have received pursuant to a sale of the [WEM-MOA 49% Equity] through a public auction conducted on commercially reasonable terms."

146.    JPMorgan knew the "stipulated" values were false.  Each "Borrower Party" (as defined in the 2021 Agreement) represented and warranted that all financial data with respect to the WEM-MOA Guarantors was true and accurate as of (a) January 29, 2021 and (b) March 25, 2021, as a condition precedent to consummate the WEM-MOA 49% Equity transfer.  The financial data, including the appraisals of the West Edmonton Mall and Mall of America, delivered to JPMorgan by March 2021 show vastly higher value for the WEM-MOA 49% Equity.  Therefore, the parties knew they were using a massively reduced valuation in the 2021 Agreement, contrary to their depiction of $50 million as a "reasonable estimate" of what would result from a public sale of the WEM-MOA 49% Equity.

147.    No reasonable borrower or guarantor acting in its own interests or for the interests of its creditors ever would have agreed to these made-up values, at least not without some improper incentive.  One of the reasons the WEM-MOA Guarantors "agreed" to these fake values is because JPMorgan was providing the Ghermezian family members (*i.e.*, the owners of the WEM-MOA Guarantors) with numerous benefits, including, chief among them, the ability to avoid their obligations to Plaintiff.

148.    The 2021 Agreement was a purely private arrangement.    The parties to the agreement, acting contrary to the WEM-JPMorgan Pledge Agreement and the MOA-JPMorgan Pledge Agreement, failed to conduct a public auction or tender for the WEM-MOA 49% Equity. Had they done so, they would have realized far more than their false $50 million valuation.

149.    JPMorgan accepted the transfer of ownership of the WEM-MOA 49% Equity in exchange for releasing and discharging the WEM-MOA Guarantors of their guaranty obligations under the payment guaranty for the JPM Loan.  JPMorgan provided no reasonably equivalent value, *inter alia*, because of the improper capping of Reimbursement Claims as described in ¶¶ 150, 160-164.  It would have been better for the WEM-MOA Guarantors and their creditors if the WEM-MOA Guarantors had not been released and discharged from their guaranty obligations and kept their Reimbursement Claims uncapped.

### The 2021 Agreement's Planned Destruction of Reimbursement Claims Held by the WEM-MOA Guarantors

150.    The anticipated transfer of the WEM-MOA 49% Equity called for in the 2021 Agreement not only deprived the WEM-MOA Guarantors of their most valuable asset, but the artificially "stipulated" values also had the effect of capping Reimbursement Claims at $50 million. This utterly destroyed any ability of the WEM-MOA Guarantors to repay Plaintiff on account of the Payment Guaranty because the Reimbursement Claims—an important asset of each WEM-MOA Guarantor—would be worth far less than their actual value and far less than the debt owed to Plaintiff and the lenders.  Conversely, had the Reimbursement Claims reflected the actual value of at least $1.045 billion, then the WEM-MOA Guarantors would have retained close to $600 million even after fully repaying the Plaintiff Loan.

151.    When the transfers contemplated by the 2021 Agreement were consummated in late March 2021, the WEM-MOA Guarantors necessarily were rendered balance sheet insolvent—they

had, at most, $50 million in improperly-capped, contingent Reimbursement Claims to pay the defaulted Plaintiff Loan, and they now owed $400 million to Plaintiff and the lenders.

152.    Moreover, following consummation of the 2021 Agreement, the WEM-MOA Guarantors lacked reasonable capital to pay the Plaintiff Loan—they will never have sufficient assets to repay the Judgment, which is an obligation of theirs under the Payment Guaranty.

### The 2021 Agreement's Additional Problematic Provisions

153.    The 2021 Agreement has numerous other problematic provisions. These include:

154.    A recital that "Secured Party [JPMorgan] has agreed to accept the MOA Interests and be admitted as a member of MOA Holdings II (the 'MOA Conveyance') to hold in custody to facilitate the partial satisfaction of the Debt pursuant to Section 9-620 of the Uniform Commercial Code as in effect in the State of New York." A similar representation is made with respect to the WEM 49% Equity. The 2021 Agreement, however, does not indicate for whom JPMorgan is holding the WEM-MOA 49% Equity in "custody." It *cannot be* for the WEM-MOA Guarantors, because under the 2021 Agreement, the only way for the WEM-MOA Guarantors (who gave up any right of redemption) or any other third person or entity to get the WEM-MOA 49% Equity is by paying the purchase price that a third-party buyer would pay, pursuant to a marketing and sales process solely conducted and controlled by JPMorgan.

155.    The 2021 Agreement contains a representation and warranty by, among others, the WEM-MOA Guarantors that the "execution, delivery and performance of this Agreement by such Borrower Party . . . does not conflict with or constitute a breach of, or constitute a default under, any contract, agreement or other instrument by which such Borrower Party is bound or to which it is a party." This was necessarily false because performance under the 2021 Agreement, including transferring the WEM-MOA 49% Equity at a false valuation, breached covenants under the Payment

Guaranty.  Following the 2021 Agreement, the WEM-MOA Guarantors would no longer own the WEM-MOA 49% Equity, would no longer be worth at least $680 million, and had effectuated a transaction (the 2021 Agreement transactions) with Affiliates (as defined in the Payment Guaranty) that the Payment Guaranty expressly prohibited.

156.    The WEM-MOA Guarantors, MOA Holdings II LLC, WEMPI, other Borrower Parties, and JPMorgan agreed on an "Intended Tax Treatment" in Section 3(c) of the 2021 Agreement that provides that, for federal, state, and local income tax purposes, the WEM-MOA Guarantors will remain as the beneficial owners, even though all economic ownership rights, including all capital and operating income generated by the direct owners of the Mall of America and the West Edmonton Mall, shall be paid to and retained by the JPMorgan Defendants, together with all voting rights.  The parties to the 2021 Agreement further covenanted that in any income tax audits by the Internal Revenue Service or any state tax authority, each of the WEM-MOA Guarantors and JPMorgan "shall not permit any of its Affiliates to take, any position on any income tax return or in connection with any income tax audit that is inconsistent with the Intended Tax Treatment."

157.    Even though the WEM-MOA Guarantors were released and discharged from "all liability and/or obligations from the beginning to the end of time" owed to JPMorgan under their payment guaranty, the 2021 Agreement was designed to ensure that they remained "Shared Guarantors" under the Intercreditor Agreement, thus blocking Plaintiff from suing the WEM-MOA Guarantors.  Specifically, they were not released under the Environmental Indemnity.  This ploy operated to bar Plaintiff, under the provision of the Intercreditor Agreement precluding suit against Shared Guarantors, from suing the WEM-MOA Guarantors until the falsely inflated balance of the JPM Loan was repaid.

158.    JPMorgan also agreed to modify the Individual Guarantors' payment guarantees of the JPM Loan obligations so that they were enforceable only as a last resort after realization of the value of all JPM Loan collateral, including after mortgage foreclosure of the American Dream Mall—a highly unusual concession by a traditional lender, which, as a practical matter, operated to release the Individual Guarantors of their repayment obligations.  This is further evidence of the private, sweetheart deal nature of the 2021 Agreement—a benefit to the Ghermezian family members in exchange for the windfall to JPMorgan.

### The 2021 Agreement Parties Consummate the Transfers in March 2021

159.    The 2021 Agreement was subject to several conditions precedent, including several outside the control of the parties thereto.  Section 8(b) stated that the "release of the Transaction Documents is conditioned upon the satisfaction or the written waiver of each of the following conditions. . . as determined by [JPMorgan] in its reasonable discretion."  The conditions required, *inter alia*, that "(i) The representations and warranties contained in this [2021] Agreement shall be true and correct in all material respects; (ii) The conditions set forth in Section 15.2.3 of the WEM Indenture shall have been satisfied; and (iii) The notice requirement set forth in the MOA Senior Loan Agreement shall have been satisfied."  The deliverables in Sections 8(b)(ii) and (iii) were not waivable by JPMorgan, and the parties were not certain whether the Borrower Parties (as defined in the 2021 Agreement) could satisfy those third-party conditions.

160.    It took nearly two months for the parties to complete the transfers of the WEM-MOA 49% Equity and the resulting capping of the Reimbursement Claims.  These transfers, detailed below, are referred to as the "**Challenged Transfers**."

161.    On or about March 25, 2021, and consistent with the 2021 Agreement, the MOA Guarantor transferred the MOA 49% Equity to JPM-D5 (the "**MOA Interests Transfer**"), and JPM-

D5 was admitted as the sole member of MOA Holdings II LLC (which indirectly owns 49% of the Mall of America).

162.    As part of the MOA Interests Transfer, the MOA Guarantor's Reimbursement Claim was capped at $1 million.

163.    On the same date, the WEM Guarantors—WEM-1, WEM-2, and WEM-3— conveyed their common shares in WEMPI, the direct owner of the West Edmonton Mall, as follows (collectively, the "**WEM Interests Transfer**"): WEM-3 conveyed 480 of its 1500 Common Shares in WEMPI to JPM-WEM 1, WEM-1 conveyed all of its 490 Common Shares in WEMPI to JPM-WEM 2, and WEM-2 conveyed all of its 10 Shares in WEMPI to JPM-WEM 2.

164.    As part of the WEM Interests Transfer, the WEM Guarantors' Reimbursement Claims were capped at $49 million.

165.    Pursuant to March 25, 2021 amendments to the limited liability agreements of MOA Holdings I LLC and WEMPI,[18] JPM-D5, JPM-WEM 1, and JPM-WEM 2 confirmed their rights to dividends on account of the WEM-MOA 49% Equity, even after the JPM Loan is repaid. This is further evidence that the WEM-MOA Guarantors transferred ownership of the WEM-MOA 49% Equity when the 2021 Agreement transactions were consummated.

166.    Both JPMorgan and the WEM-MOA Guarantors failed to timely deliver to Plaintiff the two amendments described in ¶ 165, in violation of the Intercreditor Agreement and the Payment Guaranty, respectively.  In fact, Plaintiff only received the two amendments on June 2, 2021; the Ghermezians sent the amendments to Plaintiff and the lenders in connection with the lenders proposing to make a new $250 million loan, which is when Plaintiff first learned that the Challenged Transfers had been completed in March 2021.

---

[18]   As set forth in Appendix C, the JPMorgan Defendants received the benefits of the WEM-MOA 49% Equity through their ownership in MOA Holdings I LLC and WEMPI.

167.    To this date, the Defendants have failed to deliver, notwithstanding Plaintiff's demands, the remaining Transaction Documents (as defined in the 2021 Agreement), including an amendment to the JPMorgan payment guaranty known to exist, which contains the termination and release of the WEM-MOA Guarantors from all obligations and liabilities under the JPMorgan payment guaranty.  Such release makes the WEM-MOA Guarantors no longer Shared Guarantors.

### *The Materially Adverse Effects of the 2021 Agreement and Contemplated Transfers on Plaintiff and the Lenders*

168.    There were multiple effects of the 2021 Agreement that benefitted Defendants while harming Plaintiff.

169.    **One**, because the so-called "partial satisfaction of the JPM Loan" amount was a meager $50 million, JPMorgan would retain its senior secured JPM Loan against Ameream in the full amount of $1.5 billion, while gaining the upside of owning nearly 50% of two valuable malls. In fact, JPMorgan did not even reduce its loan by a dime.  This harms Plaintiff and the lenders because its ensures that the JPM Loan is recorded as still outstanding, which, pursuant to the Intercreditor Agreement, precludes Plaintiff from pursuing enforcement actions against the Shared Guarantors.

170.    JPMorgan should have credited the true value, in excess of $1 billion, of the WEM-MOA 49% Equity to the outstanding amount of the JPM Loan, which would have reduced the JPM Loan by at least $1 billion and would have reduced interest expenses.  JPMorgan would have been owed less than $500 million, secured by the American Dream Mall, which was worth far in excess of that amount and would have provided a sufficient cushion to ensure repayment of the Plaintiff Loan.

171.    JPMorgan not only failed to credit the true value of the WEM-MOA 49% Equity, it also did not even credit the artificial $50 million value assigned in the 2021 Agreement.  Indeed,

JPMorgan's own July 2021 "Total Outstanding Principal Balance of the Loan" statements show *no reduction whatsoever* to the JPM Loan resulting from the receipt of a $1 billion asset. These statements show the JPM Loan balance before the March 2021 transfer of the WEM-MOA Equity as $1,145,000,000. After the transfer, it is reduced by $50 million to $1,095,000,000; however, the same $50 million is added back to the total amount due as a *new line item* of "Purchase Price & Preferred Return" plus Preferred Return thereon on the post-transfer statements.

172.    This is nonsensical—it leaves the JPM Loan totally intact, notwithstanding JPMorgan's receipt of a $1 billion asset. JPMorgan is now reaping the benefits of the ownership of the WEM-MOA 49% Equity without applying the value of that asset to reduce the balance of the JPM Loan. With the JPM Loan intact, Plaintiff remains precluded from suing the Individual Guarantors to enforce repayment of the Plaintiff Loan, or to otherwise obtain satisfaction of the Judgment. Defendants' scheme demonstrates the lengths to which JPMorgan and the Ghermezians have gone to harm Plaintiff. As described in Sections E and G below, such machinations continued 18 months later, when Defendants undertook "step two" and executed the October 2022 Agreements.

173.    **Two**, by virtue of keeping the WEM-MOA Guarantors as guarantors under the Environmental Indemnity, Defendants sought to shield the WEM-MOA Guarantors from any collection action by Plaintiff, since Plaintiff would be barred under the Intercreditor Agreement from asserting such claims against "Shared Guarantors" while the JPM Loan remains outstanding.[19]

174.    **Three**, the Ghermezians likewise (a) would be shielded from any immediate action by JPMorgan (and Plaintiff) seeking to enforce the payment guarantees against the Individual Guarantors, (b) would continue to receive management fees, (c) would retain the large sum of management fees accrued prior to the opening of the American Dream Mall, and (d) most

---

[19] As described in ¶ 167, the WEM-MOA Guarantors are in fact no longer Shared Guarantors, and Count 7 seeks a declaration to this effect.

importantly, would be in a position to continue to *own* all three malls, even after the New York state court in the New York Action rendered the Judgment to repay the Plaintiff Loan and despite the Ghermezians' contractually guaranteed obligations and secured obligations to use their mall equity interests to repay the Plaintiff Loan.

175.    ***Four***, by stripping the WEM-MOA Guarantors of their most valuable asset, *i.e.*, the WEM-MOA 49% Equity, the 2021 Agreement leaves those guarantors without assets sufficient to repay the Plaintiff Loan, in violation of the Payment Guaranty.  And by stipulating the value of the transfer at just $50 million, the 2021 Agreement leaves the WEM-MOA Guarantors with Reimbursement Claims against Ameream capped at that artificially low amount.  This further destroyed any ability by the WEM-MOA Guarantors to repay Plaintiff because the Reimbursement Claims would be worth far less than their actual value and far less than the debt owed to Plaintiff and the lenders.

176.    ***Five***, JPMorgan took steps to undermine its obligations under the Irrevocable Direction Letter.  As stated above, the 2021 Agreement mandated that JPMorgan would become the owner of 49% of the equity in each mall but could also assign that equity ownership to any designee or nominee.  Whatever "designee or nominee" ended up owning the 49% would be entitled to keep all distributions or dividends.  JPMorgan did in fact assign such equity ownership to the other JPMorgan Defendants, which are affiliates of JPMorgan created *after* the 2021 Agreement was entered into, but are not, on information and belief, lenders to Ameream.

177.    ***Sixth***, nothing in the 2021 Agreement requires the JPMorgan Defendants to take any steps to sell the WEM-MOA 49% Equity, even after the JPM Loan is paid in full, thereby defeating one of the central purposes of the Irrevocable Direction Letter, which provided, *inter alia*, that all proceeds from any collections, sale, or other disposition exceeding the outstanding balance

of the JPM Loan would be paid to Plaintiff. In effect, the 2021 Agreement permits the JPMorgan Defendants to indefinitely own the WEM-MOA 49% Equity, earning dividends on account of the WEM-MOA 49% Equity, even after the JPM Loan is fully repaid, all while depriving Plaintiff of the benefit of the collateral backing the Plaintiff Loan. And, as described in Section G, *infra*, Defendants took the added measure of entering into the October 2022 Agreements for the purpose of "directing" proceeds from any collections, sales, or other dispositions of the WEM-MOA 49% Equity, away from satisfying the Plaintiff Loan, notwithstanding that Defendants had committed to use the proceeds for that purpose in the Irrevocable Direction Letter, and knowing that the terms of the Irrevocable Direction Letter mandate JPMorgan to comply notwithstanding any contrary direction in any JPM Loan document, including the 7th Amendment.

178.    These arrangements flatly contradict JPMorgan's representation to this Court that it would "never receive one dime beyond what it was owed on its loan, and any surplus proceeds generated by a sale of the WEM-MOA Equity (after the Senior Lenders were repaid) would be distributed to Plaintiff in accordance with the ICA and Irrevocable Letter of Direction."

179.    In fact, the 2021 Agreement was engineered to provide JPMorgan with indefinite ownership of the WEM-MOA 49% Equity, with a right to receive 49% of distributions or dividends from MOA Holdings II LLC and WEMPI, even after the JPM Loan is fully repaid, and the October 2022 Agreements, discussed below, further ensured that JPMorgan would never provide Plaintiff with its stake in the WEM-MOA 49% Equity.

180.    The schemes papered by the 2021 Agreement allowed the Ghermezian family to save face, avoid any public relations nightmare of insolvency proceedings, retain control and ownership of the American Dream Mall, and retain its 51% equity stake intact in the West Edmonton Mall and Mall of America, notwithstanding that the Ghermezians have defaulted on multiple loans.

The Individual Guarantors, all of whom are members of the Ghermezian family, benefitted by converting the Individual Guarantors' guaranty obligations into a last resort payment obligation while remaining "Shared Guarantors," meaning Plaintiff cannot sue them until the JPM Loan is repaid in full (or such guarantees are released or terminated by operation of law or otherwise), which, on account of the false valuation of the WEM-MOA 49% Equity, has been stalled indefinitely.

181.    Through this scheme, JPMorgan secured a massive windfall.  It gained, at zero expense, and with no reduction of the JPM Loan, assets worth over $1 billion, while concurrently blocking Plaintiff from immediate recourse against the WEM-MOA Guarantors and Individual Guarantors.

**E.    The AB AD Lender Strictly Forecloses on Ameream Mezz's 100% Ownership of Ameream, Resulting in Termination of the Intercreditor Agreement**

182.    On October 3, 2022, Plaintiff received notice of the Strict Foreclosure. Specifically, the AB AD Lender delivered notice that, on September 30, 2022, the AB AD Lender had exercised its option to have the equity interests in Ameream registered in its name (or the name of its designee); that it was pursuing a strict foreclosure pursuant to N.Y. U.C.C. § 9-620; and that it would retain the equity interests in Ameream in full satisfaction of its 2017 Mezz Loan.  The AB AD Lender further advised that Ameream Mezz had 20 days to object.  The 20th day would have been October 20, 2022.

183.    On October 25, 2022, the AB AD Lender provided notice that it had acquired title to Ameream through the Strict Foreclosure noticed on October 3, 2022.  The AB AD Lender further reported that AB AMEREAM MEMBER LLC (the "**Successor Ameream Mezz**"), at the same address as the AB AD Lender, had become the owner of Ameream.

184.    The AB AD Lender did not disclose to Plaintiff the existence of the October 2022 Agreements, which had been executed four days earlier, on October 21, and did not disclose that the

Ghermezians actually owned, via AB AMEREAM MEMBER PARENT LLC (the "**Successor American Dream Borrower**"), Successor Ameream Mezz and, in turn, Ameream.

185.    As a result of the Strict Foreclosure, the 2017 Mezz Loan is satisfied.  The AB AD Lender was (and is) no longer owed anything by Ameream Mezz, or any guarantor (including the Individual Guarantors and the WEM-MOA Guarantors), and has no right to receive any proceeds from the collections, sale, or other disposition of the WEM-MOA 49% Equity, or any other proceeds from the pledges listed in the Irrevocable Direction Letter.

186.    From the moment of the Strict Foreclosure through the present, the **only** debt senior to the Plaintiff Loan is the JPM Loan.  Thus, under the terms of the Irrevocable Direction Letter, if the JPM Loan were paid in full, the Plaintiff Loan would be next in line to be repaid through all available collateral, including specifically any excess proceeds from the disposition of the WEM-MOA 49% Equity.

187.    Although Plaintiff did not know it yet, Defendants executed the October 2022 Agreements alongside the Strict Foreclosure, and did so as part of a plan to destroy Plaintiff's lien on its collateral pursuant to the Plaintiff Pledge Agreement; to redirect funds that should have been available for repayment of the Plaintiff Loan to the AB AD Lender (through its newly created Successor American Dream Borrower); and to keep the Ghermezians in ownership of the American Dream Mall, notwithstanding that they should have lost their ownership stake through the Strict Foreclosure.  As explained below, this all started to come to light when Plaintiff sued American Dream Borrower and various Ghermezian entities in Canada (the "**Canadian Proceeding**"), and pursued discovery to enforce the Judgment it secured in its favor.

188.     The Strict Foreclosure caused the Intercreditor Agreement to automatically terminate in accordance with Section 18(m) thereto.[20]  The only surviving provision is Section 6(b).

**F.     Plaintiff Sues American Dream Borrower for Defaults under the Plaintiff Loan**

189.     American Dream Borrower failed to remit the regularly scheduled monthly payment of interest due on the Plaintiff Loan in full on May 10, 2021.  On or about May 26, 2021, Plaintiff notified American Dream Borrower in writing of this event of default and demanded payment in full of all amounts then due.  American Dream Borrower did not pay.

190.     On February 7, 2023, Plaintiff sued American Dream Borrower in New York state court, filing a summary judgment motion in lieu of a complaint.  American Dream Borrower did not oppose Plaintiff's summary judgment motion.

191.     On April 10, 2023, the New York state court granted Plaintiff's motion for summary judgment and, on May 3, 2023, entered the Judgment.  As of the date the Judgment was entered, American Dream Borrower owed Plaintiff $404,399,512.87.  The Judgment remains outstanding, and interest accrues at the New York state statutory rate.

192.      After obtaining the Judgment against the American Dream Borrower, Plaintiff sought post-judgment discovery.  Counsel representing the American Dream Borrower is the same counsel representing the WEM-MOA Guarantors and Ameream in this proceeding, despite an apparent conflict.  Specifically, the WEM-MOA Guarantors hold Reimbursement Claims against Ameream, and as discussed herein, WEM-3 gave away $48.5 million to pay for operating costs of the American Dream Mall.

---

[20]   The JPMorgan Defendants and WEM-MOA Defendants have confirmed that the Strict Foreclosure automatically terminated the Intercreditor Agreement (save Section 6(b)), despite JPMorgan's prior counsel threatening to seek enforcement against Plaintiff for purported breach of Sections 5, 6(a), 10(a) and 10(b) when Plaintiff commenced the New York Action, and the WEM-MOA Guarantors' flip-flopping in submissions to this Court.

193.     As part of the discovery, Plaintiff sought (a) the JPM Loan documents in connection with JPMorgan's loan extension, which the WEM-MOA Defendants publicly touted, and (b) the documents executed in connection with the Strict Foreclosure.  This would have called for production of the October 2022 Agreements, but the American Dream Borrower refused to produce them and did not disclose their existence to Plaintiff.  The American Dream Borrower did, however, produce the WEM 2022 Audited Financial Statements, dated April 29, 2023.  Those statements depict a significantly different ownership structure than the one depicted in Appendix Chart "C," which was set forth in a notice provided to Plaintiff by the AB AD Lender on or about October 25, 2022.

194.     Plaintiff learned from the same statements that in September 2022, just before the AB AD Lender conducted the Strict Foreclosure and assumed ownership of Ameream, JPMorgan obtained a new Recourse Guaranty from the Non-Shared Guarantors.  This appears to be an improper attempt to turn the Non-Shared Guarantors into "Shared Guarantors" under the Intercreditor Agreement, which would further block Plaintiff's avenues for satisfaction of the Judgment.

**G.     Plaintiff Obtains Copies of the October 2022 Agreements, Which Give Rise to Additional Claims and Confirm Plaintiff's Suspicions**

195.     On or about October 21, 2022, JPMorgan, the AB AD Lender, the WEM-MOA Guarantors, the Individual Guarantors, the Outparcel Entities, Ameream, the other Mall of America 51% owner Ghermezian affiliates, and the Successor Entities entered into one or both October 2022 Agreements.

196.     Plaintiff received copies of the October 2022 Agreements, for the first time, in May 2024, only after they were revealed to exist in the Canadian Proceeding.  Until this revealing by certain of the WEM-MOA Guarantors, Defendants had gone out of their way to hide the existence of the October 2022 Agreements.

197.    The October 2022 Agreements are each described in detail below.  Two key predicates to each agreement were the Strict Foreclosure and the formation of entities to ensure that the Ghermezians would never lose ownership of the American Dream Mall.

198.    For example, shortly before execution of the October 2022 Agreements, an entity known as T5 AD LLC ("**T5**") was formed.  T5 is solely owned by Ghermezian family members.

199.    Notwithstanding the Strict Foreclosure, which was supposed to wipe out the Ghermezian family's ownership in the American Dream Mall, T5 is the managing member and the 100% owner of Successor American Dream Borrower, which itself was formed in September 2022, on information and belief, by the AB AD Lender.  T5's formation certificate is signed by Alan Glazer, an Associate Counsel of Triple Five Group.  An amendment to the certificate to Successor American Dream Borrower was filed in February 2023 and signed by Daniel Ghermezian.

200.    Successor American Dream Borrower owns 100% interest in Successor Ameream Mezz, who in turn owns Ameream, the owner of the American Dream Mall.  Thus, AB AD Lender is not the owner of Successor American Dream Borrower, but it purposely misled Plaintiff to believe it is in connection with the Strict Foreclosure.  Indeed, Appendix "C" depicts the capital structure of the American Dream Mall following the Strict Foreclosure as represented to Plaintiff by AB AD Lender; T5 is not disclosed, even though (as Plaintiff now knows) it had been formed before the Strict Foreclosure.

201.    These facts were hidden from Plaintiff for nearly a year.  Indeed, the Ghermezian affiliates have consistently refused to deliver documentation relating to Successor American Dream Borrower in order to hide the fact that the Ghermezian family continues to own Ameream and how they have managed to do so after the Strict Foreclosure.

202.     It was only by coincidence, in separate proceedings between several parties to this action that are ongoing in Canada, that Plaintiff learned of the October 2022 Agreements.  On April 25, 2024, the defendants in the Canadian Proceeding, which includes the WEM Guarantors but not the JPMorgan Defendants, submitted a joint "Statement of Defence."  In this document, the WEM Guarantors **_admitted_** that the 2021 Agreement was merely the first part of a bigger transaction, the second phase of which occurred in October 2022.  The Statement of Defence expressly referred to two documents Plaintiff had not heard of previously—the October 2022 Agreements.  Plaintiff immediately requested they be provided, and on May 7, 2024, Plaintiff received copies of each, thereby learning for the first time the full extent of Defendants' scheme.

203.     Further, there have been a number of agreements executed either immediately before or in conjunction with the October 2022 Agreements that Plaintiff has not seen, including several listed on a schedule to the Standstill Agreement.

### The 7th Amendment

204.     The 7th Amendment is one of the two October 2022 Agreements.  It is an amendment to the JPM Loan but also a substantial reshuffling of rights between JPMorgan, AB AD Lender, and the Ghermezians.  The 7th Amendment contains numerous provisions that cause breaches of, or otherwise interfere with, the Irrevocable Direction Letter, the Payment Guaranty, and Section 6(b) of the Intercreditor Agreement.

205.     For example, the 7th Amendment refers to a new "Mezzanine Loan," in the amount of $475 million and between the "Mezzanine Lender" (the AB AD Lender) and "Mezz Borrower" (the Successor American Dream Borrower) (the "**2022 Mezz Loan**").[21]

---

[21] This Mezz Loan is called the "Junior Loan" in the Standstill Agreement.

206.    The 7th Amendment purports to pledge as collateral or transfer, to the AB AD Lender to repay the newly created 2022 Mezz Loan, the WEM-MOA 49% Equity and the equity interests of Ameream and the Outparcel Entities, which are designated in the Irrevocable Direction Letter to repay the Plaintiff Loan.

207.    This 2022 Mezz Loan is simply a fictional version of the 2017 Mezz Loan, payable to the AB AD Lender (using the same address as in the 2017 Mezz Loan), despite the 2017 Mezz Loan being fully discharged as a result of the Strict Foreclosure.  The AB AD Lender provided no funds in support of this new loan, and all Defendants knew and understood that the assets committed as collateral for this (false) loan had already been committed as collateral for repayment of the Plaintiff Loan and cannot be redirected to AB AD Lender.

208.    No party to the Irrevocable Direction Letter was permitted to pledge or contract to give any excess value from its assets to support this (false) "new" 2022 Mezz Loan.  Defendants clearly engineered the October 2022 Agreements (including contracts that have not been disclosed to Plaintiff but are listed as existing as of October 2022) to do exactly what the Irrevocable Direction Letter bars until the Plaintiff Loan is paid in full.

209.    Further, Section 7 of the 7th Amendment states: "the Borrower Parties hereby acknowledge and agree that in connection with any Realization Event, to the extent [JPMorgan] receive[s] cash in excess of the amount necessary for the indefeasible repayment in full of the Senior Loan Liabilities, [JPMorgan] will cause such excess to be delivered to [AB AD] Lender for application against amounts outstanding under the [2022 Mezz] Loan."  The term "Borrower Parties," as used in the 7th Amendment, includes the WEM-MOA Guarantors and other parties (including the Outparcel Entities) that are parties to the Irrevocable Direction Letter.  By its plain language, Section 7 of the 7th Amendment mandates that the WEM-MOA Guarantors and the

Outparcel Entities contract to give up cash that should be used to pay Plaintiff, in favor of the AB AD Lender on account of a newly created fictional loan.[22]

210.    Under the terms of the Irrevocable Direction Letter, this excess cash belongs to Plaintiff, not to the AB AD Lender, and cannot be designated as collateral to repay a loan that was already fully discharged and no longer exists.  Thus, Section 7 of the 7th Amendment directly causes a breach of the Irrevocable Direction Lender.

211.    Because the 2017 Mezz Loan was fully satisfied upon the Strict Foreclosure and *before* the 7th Amendment, there was no debt senior to the Plaintiff Loan other than the JPM Loan. By requiring JPMorgan to use excess proceeds from the sale of the WEM-MOA 49% Equity to pay the new (false) 2022 Mezz Loan, the WEM-MOA Guarantors, the Outparcel Entities, and Ameream caused a breach of the Irrevocable Direction Letter.

212.    Further, Section 7(b) of the 7th Amendment also expressly addresses the WEM-MOA 49% Equity and causes breaches of contracts with Plaintiff.  First, it ratifies and incorporates Section 3(a) (MOA Interests) and Section 3(b) (WEM Interests) of the 2021 Agreement, meaning that it confirms that JPMorgan owns the WEM-MOA 49% Equity but remains subject to the Irrevocable Direction Letter.[23]

213.    Yet Section 7(b) of the 7th Amendment provides, in direct violation of the Irrevocable Direction Letter and Section 6(b) of the Intercreditor Agreement, that JPMorgan will

---

[22] Because Successor Ameream Mezz is the successor to Ameream Mezz, Successor Ameream Mezz likewise is bound to honor the Irrevocable Direction Letter.  Plaintiff intends to proceed in New York state court to seek successor liability as against both Successor American Dream Borrower and Successor Ameream Mezz.  Plaintiff notes Defendants admit successor liability in Section 7(e) of the Standstill Agreement, which expressly deems the 2022 Mezz Loan to be the same as the 2017 Mezz Loan, and deems Successor Ameream Mezz as successor to Ameream Mezz.  Additionally, in Section 11(b) of the 7th Amendment, the Successor Ameream Mezz irrevocably and unconditionally confirms and ratifies all aspects of the JPM Loan agreement, including the 2021 Agreement, in its capacity as the successor to Ameream Mezz.

[23]  The JPMorgan Defendants have repeatedly represented that Plaintiff's rights under the Irrevocable Direction Letter have been preserved, but this simply cannot be true in light of what they concocted in the October 2022 Agreements.

cause the WEM-MOA 49% Equity to be transferred to AB AD Lender when the JPM Loan is paid in full.  Section 7(b)(iv) of the 7th Amendment provides: "[JPMorgan] and the Borrower Parties hereby acknowledge and agree that, upon the monetary Senior Loan Liabilities being Paid in Full (as defined in the Standstill and Recognition Agreement), (i) [JPMorgan] shall convey all of its right, title and interests in the [WEM-MOA 49% Equity] to [AB AD] Lender (or its designee) subject to and in accordance with the terms and conditions of Section 7(c) and Section 8(c) of the Standstill and Recognition Agreement[.]"  This provision directly contradicts the obligations of the "Borrower Parties," which JPMorgan understood, to transfer all proceeds of the WEM-MOA 49% Equity to Plaintiff once the JPM Loan had been paid in full.[24]

214.    JPMorgan further agreed in Section 7(b)(i) of the 7th Amendment that it "shall not cause or permit (1) any sale of all or any portion of the MOA 49% Interests or the WEM 49% Interests or (2) commence or complete a foreclosure, or commence or complete any other realization, upon the WEM Property pursuant to the WEM Second Mortgage, in either case, prior to the occurrence of a Trigger Default[.]"  No mention is made of Plaintiff's rights to those assets under the Irrevocable Direction Letter anywhere in the 7th Amendment.

215.    Section 7(b) of the 7th Amendment further states that from "and after the occurrence of a Trigger Default, and notwithstanding anything to the contrary in the MOA JV Agreement or WEM Shareholder Agreement," JPMorgan may commence and complete any transfer of the WEM-MOA 49% Equity.  Again, there is no mention of the Irrevocable Direction Letter or that, under the Intercreditor Agreement, JPMorgan must sell or otherwise dispose of the WEM-MOA 49% Equity in a commercially reasonable manner to maximize value.

---

[24] Section 7(b) refers only to JPMorgan, not the other JPMorgan Defendants, even though it was other JPMorgan Defendants who hold the WEM-MOA 49% Equity.  This confirms JPMorgan fully controls all JPMorgan Defendants.

216.    It was not enough that JPMorgan fraudulently took the WEM-MOA 49% Equity at a false valuation in March 2021 to put that asset out of reach to repay the Plaintiff Loan, Defendants expanded on that initial fraudulent conveyance by these sections of the 7th Amendment, which provide that any funds generated from the collection, sale, or other disposition of that asset be directed, not to Plaintiff (as required under the Irrevocable Direction Letter), but to AB AD Lender on a phantom loan and a phantom preferred equity investment in the amount of $25 million.

217.    Several provisions of the 7th Amendment confirm the JPMorgan Defendants *own* the WEM-MOA 49% Equity, and will not credit the fair value of it to reduce the amount owed under the JPM Loan.

218.    For example, in Section 7(b)(iii), WEM-3 is obligated to hold all of its received "Capital Transactions" cash for the benefit of JPMorgan, on account of its 51% ownership in the West Edmonton Mall, and the 51% owners of Mall of America do the same with their cash and distribute such cash to JPMorgan to pay down the JPM Loan.  But the same *does not* happen with respect to the WEM-MOA 49% Equity.  The only way 49% of cash distributed from the West Edmonton Mall and Mall of America do not reduce the JPM Loan (whereas 51% does) is if the JPMorgan Defendants own the WEM-MOA 49% Equity.

219.    Further, nowhere in the 7th Amendment does it provide that the WEM-MOA Guarantors ever get back this asset, even after the JPM Loan is repaid from other sources.  In other words, the WEM-MOA 49% Equity was transferred to JPMorgan, and the purported "custody" was (and is) a farce.

220.    Defendants in Section 4(c) of the 7th Amendment brazenly commit another fraudulent conveyance, resulting in a fraudulent conveyance 2.0; they cause WEM-3 to transfer its cash to fund operations of the American Dream Mall.  According to this Section, the West Edmonton

Mall was sitting on $48.5 million in cash as of March 2022.  Rather than using such $48.5 million to reduce the JPM Loan (as JPMorgan owns the WEM 49% Interest and has the right to the 51% operating cash under the cashflow pledge from WEM-3 as described in paragraph 218), Section 4(c) provides that cash is distributed all to WEM-3.  And instead of that cash being used to repay debt, WEM-3 *gives all $48.5 million to pay for operating costs of the American Dream Mall*.  Other than the fact that both are ultimately owned by the Ghermezians, there is no connection or reason why WEM-3 would give away its cash for Ameream's benefit.  This transfer of cash for the benefit of an "Affiliate" violates the Payment Guaranty.

221.    Thus, the 7th Amendment did the following, all in derogation of Plaintiff's rights:

- Confirms that JPMorgan, vested with the power to transfer the WEM-MOA 49% Equity, took *ownership* of those assets through the consummation of the 2021 Agreement, confirming violations of the Payment Guaranty's covenants;

- Obligates JPMorgan to transfer, upon payment in full of the JPM Loan, to AB AD Lender, instead of Plaintiff, the WEM-MOA 49% Equity, other assets, and cash, which violates the Irrevocable Direction Letter and Intercreditor Agreement; and

- Permits WEM-3 to give away $48.5 million in cash to its "Affiliate," in violation of the Payment Guaranty.

*The Standstill Agreement*

222.    On the same date the 7th Amendment was executed, JPMorgan and the AB AD Lender (acting as the "new" "Mezzanine Lender" and as "Investor" in Successor American Dream Borrower, and labeled the "Junior Lender") signed the Standstill Agreement.

223.    The problems with the Standstill Agreement start in the WHEREAS clauses.  The Standstill Agreement falsely states that as of October 21, 2022, AB AD Lender succeeded to the

ownership of the Successor Ameream Mezz, which owns Ameream. AB AD Lender never succeeded to the ownership of Successor Ameream Mezz. Indeed, the very next page states that T5 is the equity owner of the Successor American Dream Borrower, which in turn is the owner of Successor Ameream Mezz.[25]

224.    In another "WHEREAS" clause, the Standstill Agreement discloses that the AB AD Lender and T5 had entered into an operating agreement for Successor American Dream Borrower, and that AB AD Lender received preferred equity in Successor American Dream Borrower and purportedly provided a new $475 million loan to Successor American Dream Borrower (and apparently $25 million of this (fake) $475 million loan was converted into preferred membership interests in Successor American Dream Borrower).

225.    These transactions are artificial and shams. The AB AD Lender advanced no money to Successor American Dream Borrower pursuant to this supposed "loan," and there is no legitimate reason that a sophisticated financial lender like AB AD Lender would trade an equity interest it already owned (resulting from the Strict Foreclosure) in Ameream for an unsecured loan in a structurally subordinate entity (Successor American Dream Borrower) and a mere preferred member status.

226.    The true explanation for this transaction is revealed by the October 2022 Agreements, which show that the Ghermezians are the owners of the Ameream equity and confirm that the new loan the AB AD Lender claims to have made does not exist.

---

[25]    For the scheme to work, it was critical that the Ghermezians stay as owners. Section 8(a) of the Standstill Agreement states that AB AD Lender shall not do anything that would result in a change of control of Successor American Dream Borrower, which means it is a violation under the Standstill Agreement if the Ghermezians no longer own the American Dream Mall. This provision establishes that the Strict Foreclosure was a mere name change.

227.     The Standstill Agreement expressly states that as a result of the Strict Foreclosure, the 2017 Mezz Loan had been fully discharged, and that the AB AD Lender had no claims against any guarantor, including the WEM-MOA Guarantors.  That means, at the moment of the Strict Foreclosure, the 2017 Mezz Loan is no longer ahead of the Plaintiff Loan in respect of the WEM-MOA 49% Equity or any of the collateral listed in the Irrevocable Direction Letter.[26]

228.     Unbeknownst to Plaintiff, JPMorgan consented to the Strict Foreclosure only through working with the AB AD Lender (in its brand new capacity as investor in Successor American Dream Borrower), the Ghermezians, and Defendants to harm rights that belong to Plaintiff.

229.     As described in footnote 26, one immediate improper benefit JPMorgan obtained for itself was Successor Ameream Mezz giving the pledge of the equity in Ameream to JPMorgan to secure the JPM Loan, no doubt gearing up for a future refinancing, to delve out to future mezzanine lenders.  This was effectuated through Sections 2 and 4 of the Standstill Agreement. Section 2 states that AB AD Lender confirms that every one of its existing liens on the equity of Ameream and the Outparcel Entities had been extinguished.  In Section 4(b)(x), AB AD Lender "hereby irrevocably and unconditionally relinquishes and disclaims the existence of any interest, whether direct or indirect, perfected or unperfected, fixed or contingent or present or future, by [AB AD] Lender in and to either or both of [Ameream and the Outparcel Entities equity]."

230.     To the extent that the Standstill Agreement was harsh towards AB AD Lender—it gave up its ownership in Ameream and the pledge of the Outparcel Entities in exchange for an

---

[26]  The one exception would be the pledge of Ameream ownership to secure the JPM Loan, since that pledge was assigned by JPMorgan to AB AD Lender and presumably was the basis for the Strict Foreclosure.  However, it is obvious that the Strict Foreclosure itself was designed to end-run the Irrevocable Direction Lender because AB AD Lender is credited with making the fake 2022 Mezz Loan, and Successor Ameream Mezz immediately pledged Ameream ownership to secure the JPM Loan.

unsecured (and fake) loan to Successor American Dream Borrower—Section 13(b) was JPMorgan's way of rewarding AB AD Lender.  Section 13(b) states that "[JPMorgan] and Senior Lender hereby acknowledge and agree that in connection with any Transfer of the [American Dream Mall], the Equity Collateral **and/or any other collateral** securing the [JPM] Loan to the extent [JPMorgan] or Senior Lenders receive cash in excess of the amount necessary for the Discharge of Senior Loan Liabilities, [JPMorgan] will cause such excess to be delivered to [AB AD] Lender for application against amounts outstanding under the [2022 Mezz] Loan." (emphasis added).

231.    By Section 13(b), JPMorgan agrees that after it has been paid in full, in the event it receives excess cash from the American Dream Mall, any equity interest in American Dream Mall or the Outparcel Entities, or any other collateral securing the JPM Loan (including those that are listed in the Irrevocable Direction Letter), JPMorgan will give that cash to AB AD Lender on account of its fake loan.[27]

232.    This very convoluted way of putting AB AD Lender into effectively the same position it had been in prior to January 2021 could only be accomplished through interfering with Plaintiff's rights under the Irrevocable Direction Letter, Intercreditor Agreement, and Payment Guaranty.  JPMorgan did not have the pledge of the equity of Ameream prior to the October 2022 Agreements, so it was keen to get it back.  JPMorgan and the AB AD Lender had already agreed in the Irrevocable Direction Letter to give this pledge to Plaintiff once their loans were discharged in full.

233.    By orchestrating the Strict Foreclosure, JPMorgan got back that very pledge (on Ameream equity) with Plaintiff cut out of the American Dream Mall ownership structure.  Now only JPMorgan has the liens on American Dream Mall.  The removal of encumbrances that favored

---

[27]  Section 13(b) acts in many ways as a version of the Irrevocable Direction Letter, just for the benefit of AB AD Lender.

Plaintiff was one of JPMorgan's driving goals, but in order to do so, JPMorgan had to violate the Irrevocable Direction Letter.[28]

234.    The Standstill Agreement has provisions concerning the WEM-MOA 49% Equity similar to the 7th Amendment that interfere with Plaintiff's rights.  Section 7(c), for example, states:

> If, as of the date on which the Discharge of Senior Loan Liabilities occurs, the Senior Lenders directly or indirectly own the MOA 49% Interests and/or the WEM 49% Interests, then, subject to the provisions of Section 8(c) hereof, the Senior Lenders shall thereafter convey the MOA 49% Interests and/or the WEM 49% Interests, as applicable, to [AB AD] Lender (or its designee) (without recourse, representations or warranties, except for representations as to power and authority to enter into the applicable assignment documentation and as to Secured Party's (or its designee's or nominee's) ownership and not having previously transferred its rights in such interests as of the consummation of such assignment). [AB AD] Lender shall accept the conveyance of the WEM 49% Interests subject to the terms and conditions of the WEM Shareholder Agreement and accept the conveyance of the MOA 49% Interests subject to the terms and conditions of the MOA JV Agreement, as applicable.

235.    Section 7(c) of the Standstill Agreement, like the 7th Amendment, thus provides that if the JPM Loan has been paid in full, JPMorgan must transfer the WEM-MOA 49% Equity to the "Junior Lender" (which is the AB AD Lender).  This (a) confirms that JPMorgan took ownership of the WEM-MOA 49% Equity by consummating the 2021 Agreement, (b) violates the Irrevocable Direction Letter, which expressly requires that JPMorgan transfer the WEM-MOA 49% Equity, not to the AB AD Lender, but to Plaintiff in satisfaction of the Plaintiff Loan, and (c) violates Section 6(b) of the Intercreditor Agreement.

236.    The Standstill Agreement, in Section 8(c), further interferes with Plaintiff's contractual rights.  The Intercreditor Agreement states that any limitation on Plaintiff's contractual rights ends when the JPM Loan is satisfied, including through a refinancing.  Section 8(c) purports

---

[28] JPMorgan demanded as part of the 7th Amendment's conditions precedent that it receive an insurance policy for this pledge of equity, but it could waive this requirement.  This is bizarre—no sophisticated lender to an enterprise such as the American Dream Mall would waive such insurance.

to undermine Plaintiff's rights by mandating that the JPM Loan could be refinanced and secured by collateral *ahead* of the Plaintiff Loan.

237.     In the event of a "Senior Loan Refinancing," JPMorgan and AB AD Lender agree that:

> [Ameream], Mezz Pledgor and/or AD Holdco shall have the right to transfer or pledge, or cause a transfer or pledge of, to the Refinancing Senior Lender the MOA 49% Interests, the WEM 49% Interests and/or [JPMorgan's] and Senior Lenders' interests in the WEM Second Mortgage, which such pledge shall be senior to any claim by the [AB AD] Lender or Investor thereto and shall be governed by the provisions of this Agreement or a Successor Recognition Agreement (as hereinafter defined), and upon request by [Ameream], the Senior Lenders shall convey the MOA 49% Interests, the WEM 49% Interests and/or [JPMorgan's] and Senior Lenders' interests in the WEM Second Mortgage and/or [JPMorgan's] and Senior Lenders' interests in the WEM Second Mortgage, as applicable, to such Refinancing Senior Lender upon Discharge of the Senior Loan Liabilities.

238.     Thus, Section 8(c) necessarily violates Plaintiff's contractual rights under the Irrevocable Direction Letter, Section 6(b) of the Intercreditor Agreement, and the Payment Guaranty. The Plaintiff Loan is only subordinated to the existing JPM Loan. If it is refinanced, JPMorgan cannot "otherwise dispose of" the collateral referenced in Section 8(c) of the Standstill Agreement without violating the Irrevocable Direction Letter, Section 6(b) of the Intercreditor Agreement, and the Payment Guaranty.

239.     As described in paragraphs 230-231 above, Section 13(b) of the Standstill Agreement, like the 7th Amendment, provides that if the JPM Loan is discharged in full and JPMorgan receives cash from any the collateral securing its loan, JPMorgan agrees to transfer such cash over to AB AD Lender. This violates the Irrevocable Direction Letter, Section 6(b) of the Intercreditor Agreement, and the Payment Guaranty because any excess cash relating to the WEM-MOA 49% Equity, or the collateral listed in the Irrevocable Direction Letter, must be transferred to Plaintiff.

240.     Similarly, Section 13(e) of the Standstill Agreement states "[u]pon Discharge of Senior Loan Liabilities, [JPMorgan] shall transfer to [AB AD] Lender all amounts then remaining and being held by [JPMorgan] in escrow, including, without limitation, all amounts on deposit in the Reserve Accounts."  Because JPMorgan could be holding amounts in escrow that are proceeds of assets listed in the Irrevocable Direction Letter, this provision too violates Plaintiff's rights.

241.     Defendants were careful not to reveal the existence of the October 2022 Agreements in any United States litigation or in response to any demand for information by Plaintiff. No Defendant disclosed the existence, much less the contents, of either October 2022 Agreement. To the contrary, JPMorgan touted that they were safeguarding Plaintiff's "unique interests" under the Irrevocable Direction Letter and the Intercreditor Agreement, when, in fact, JPMorgan was working to undermine those interests by securing assets for itself that had been designated as collateral for the Plaintiff Loan.

242.     The October 2022 Agreements were executed without Plaintiff's knowledge, much less consent.  Defendants knew that the provisions of the October 2022 Agreement would never be acceptable to Plaintiff, and would violate Plaintiff's contractual rights, because in May, June, and July 2022, Defendants and Plaintiff had worked on a consensual restructuring, and Defendants had proposed certain of the same provisions that are in the October 2022 Agreements, except that all of Plaintiff's rights were preserved, there was no contemplated Strict Foreclosure, and, importantly, Plaintiff was a party to the draft version of the Standstill Agreement that preserved Plaintiff's rights.

H.     **Defendants' Ever-Changing Stories to this Court**

243.     Since Plaintiff filed the Initial Complaint, Defendants made representations to this Court that turn out not to be true.

### *Whether the 2017 Mezz Loan Remains Outstanding*

244.    In a letter sent to this Court on October 9, 2023 (Dkt. No. 25), the WEM-MOA Guarantors asserted that the 2017 Mezz Loan is still outstanding.  They also asserted that under the Intercreditor Agreement, Plaintiff could not sue the WEM-MOA Guarantors until all senior loans (*i.e.*, including the 2017 Mezz Loan) were paid in full.  They added: "Plaintiff now seeks to jump ahead of JPMorgan and the [AB AD] Lender—who still have not been paid in full—by bringing this lawsuit against the JPMorgan Defendants and the WEM-MOA Guarantors to unwind the 2021 Agreement."

245.    The statement that the 2017 Mezz Loan is still outstanding was false, which Plaintiff pointed out in a filing to this Court on October 10, 2023 (Dkt. No. 26).  The WEM-MOA Guarantors acknowledged the falsity in their motion to dismiss filed on November 8, 2023 (Dkt. No. 39), when they confirmed that the AB AD Lender foreclosed on Ameream Mezz's interest in Ameream and that the 2017 Mezz Loan is fully repaid.  Counsel representing American Dream Borrower (the same counsel representing the WEM-MOA Guarantors and Ameream) also wrote to Plaintiff on November 23, 2023, confirming that the 2017 Mezz Loan had been repaid, in full:

> The statement by the WEM-MOA Guarantors on page 2 of their letter to Judge Koeltl dated October 9, 2023 that "Plaintiff now seeks to jump ahead of JPM[organ] and the [AB AD] Lender – who still have not been paid in full – by bringing this lawsuit against the JPM Defendants and the WEM-MOA Guarantors to unwind the 2021 Agreement" was in no way intended to suggest that the 2017 Mezz Loan is still outstanding. Rather, as set forth on page 3 of that letter, it is the *Senior* Loan that remains outstanding and not repaid in full.

246.    Yet the WEM Guarantors flip-flopped again in the Statement of Defence in the Canadian Proceedings, dated April 25, 2024.  In that filing, the WEM Guarantors asserted that the 2017 Mezz Loan was still outstanding.  Stunningly, the WEM Guarantors admit that through ***both*** sets of agreements, when the JPM Loan is paid in full, all of the WEM 49% Equity would be conveyed by JPMorgan "to the [AB AD] Lender to be held as security for the 2017 Mezz Loan."

This is the same "2017 Mezz Loan" that was fully repaid before October 21, 2022, which repayment has been confirmed by the AB AD Lender and Defendants.

247.    Noticeably, until the Canadian Proceeding, there was no mention of the October 2022 Agreements or the (fake) 2022 Mezz Loan.

### Whether the JPMorgan Defendants Own the WEM-MOA 49% Equity

248.    The JPMorgan Defendants have stridently asserted that they did not take ownership of the WEM-MOA 49% Equity, notwithstanding the terms of the 2021 Agreement.  And, like the WEM-MOA Guarantors, the JPMorgan Defendants were very deliberate not to reveal the existence of the October 2022 Agreements in their submission to this Court.

249.    As set forth in paragraphs 212-235 above, through the October 2022 Agreements, it is crystal clear that the JPMorgan Defendants *do* own the WEM-MOA 49% Equity.

## FIRST CAUSE OF ACTION

**(Fraudulent Transfer – 2021 WEM Guarantor Transfer, Against JPMorgan, JPM-WEM 1, and JPM-WEM 2)**

250.    Plaintiff repeats and realleges each allegation in paragraph(s) "1" through "249" as if fully set forth herein.

251.    The WEM Interests Transfer (defined in paragraph 163) by the WEM Guarantors to JPMorgan is a fraudulent transfer and a fraudulent preference under Alberta law, and Plaintiff should be paid the value of the WEM 49% Equity up to at least $404,399,512.87 plus interest thereon at the statutory rate, which is less than the value of such transferred assets.

252.    Plaintiff and the lenders were creditors of the WEM Guarantors at the time the 2021 Agreement was signed, and at the time that the 2021 Agreement closed in March 2021, by virtue of the debt owed under the Payment Guaranty.  They remain creditors today.

253.    Plaintiff did not learn of the consummation of the WEM Interests Transfer contemplated by the 2021 Agreement until June 2, 2021.

254.    In March 2021, the true value of the WEM 49% Equity and accompanying Reimbursement Claims exceeded the amount owed on account of the JPM Loan.  This is because the value of Ameream exceeded the amount of the JPM Loan, and, regardless of whether JPMorgan first foreclosed on the WEM 49% Equity, the WEM Guarantors would have recourse available to pay the Plaintiff Loan after payment in full of the JPM Loan.

255.    JPMorgan and the WEM Guarantors (controlled by the Ghermezian family) entered into and carried out the transfers contemplated by the 2021 Agreement with the intent to defraud, hinder, and delay creditors of the WEM Guarantors, particularly Plaintiff and the lenders, as evidenced by multiple "badges of fraud" or equivalents under applicable law, including the following:

256.    *First*, the nominal consideration allotted to the transfers was grossly inadequate:

- The $49 million "reasonable estimate" of the WEM 49% Equity set forth in the 2021 Agreement was artificial, not based on any objective value, and, at no more than 6% of its actual value, reflects no, or nominal, consideration;

- JPMorgan and the WEM Guarantors agreed that $49 million was a reasonable estimate of the proceeds JPMorgan would have received had the WEM 49% Equity been sold via a public auction.  This was knowingly false;

- JPMorgan did not apply the true value of the WEM 49% Equity, or even the paltry $49 million "credit," to reduce the JPM Loan by a single dollar; and

- The value of a 49% equity stake in the West Edmonton Mall was at least $800 million in and before March 2021, which was known to the JPMorgan Defendants in January 2021 and March 2021.

257.    *Second*, the 2021 Agreement and the transfers thereunder benefitted insiders of the WEM Guarantors:

- The Ghermezian family and related entities have retained control of and retained benefits of the operations of the West Edmonton Mall, among others;

- WEM-3 itself, as holder of the remaining 51% interest in the West Edmonton Mall, continues to receive higher operating cash flows from WEMPI, which also benefits affiliates of the WEM-MOA Guarantors;

- The liability of Ameream arising from the Reimbursement Claims has been capped at $50 million, making it easier for the Ghermezian family to retain ownership of the American Dream Mall without having to face liability from Plaintiff and the lenders; and

- Four of the nine Individual Guarantors who received a stay on enforcement of their individual guarantees are directors of one or more of the WEM Guarantors. As of March 2021, the Ghermezian family and WEM Guarantors were on notice that Ameream had defaulted, and they faced immediate risk on their guarantees, including to Plaintiff.

258. *Third*, the WEM Guarantors transferred to, or for the benefit of, JPMorgan, JPM-WEM 1, and JPM-WEM 2 substantially all of their assets, in a transfer designed to leave the WEM Guarantors with only a $49 million Reimbursement Claim that itself had been manipulated and reduced in value.

259. *Fourth*, the transfers were completed at a time when the Plaintiff Loan was in default, by way of the automatic cross-default caused by the default of the JPM Loan.

260. *Fifth*, the transfers were accomplished quickly, in the span of approximately two months between the signing of the 2021 Agreement in January 2021 and the transfers in March 2021.

261. *Sixth*, the transfers were completed secretly, without involvement of Plaintiff in the negotiation of the 2021 Agreement and without notice to Plaintiff that the transfer had been consummated until June 2021, and in violation of the Payment Guaranty.

262. The transfer of WEM 49% Equity for $49 million, and the capping of the Reimbursement Claim under and in furtherance of the 2021 Agreement, are also voidable as a fraudulent preference under Alberta law.

263. By virtue of the value of the American Dream Mall, but for the WEM Interests Transfers, each of the WEM Guarantors would be solvent, even after paying in full the Plaintiff Loan, given the true value of their Reimbursement Claims. However, by transferring the WEM 49%

Equity for a $49 million "credit," the WEM Guarantors' only asset is a $49 million Reimbursement Claim, which is woefully inadequate to repay the Plaintiff Loan.

264.    The conveyance of the WEM Interests Transfer left the WEM Guarantors with unreasonably small capital as a consequence of their respective transfers of the WEM 49% Equity, including the capping of the Reimbursement Claim at $49 million.

265.    Under applicable law of the Province of Alberta, Canada, Plaintiff is entitled either to money damages or to a declaration that the WEM Interests Transfer is void as against Plaintiff.

## SECOND CAUSE OF ACTION

### (**Fraudulent Transfer – October 2022 $48.5 Million Cash, Against Ameream**)

266.     Plaintiff repeats and realleges each allegation in paragraph(s) "1" through "265" as if fully set forth herein.

267.     WEM-3's transfer of $48.5 million in cash, as set forth in Section 4(c) of the 7th Amendment, to pay for operating costs of the American Dream Mall is a fraudulent transfer and a fraudulent preference under Alberta law.

268.     Plaintiff and the lenders were creditors of the WEM Guarantors at the time the 7th Amendment was signed, by virtue of the debt owed under the Payment Guaranty.  They remain creditors today.

269.     Plaintiff did not learn of the 7th Amendment until May 7, 2024.

270.     Ameream and WEM-3 (each controlled by the Ghermezian family and "Affiliates" under the Payment Guaranty) entered into and carried out the 7th Amendment with the intent to defraud, hinder, and delay Plaintiff and the lenders, as evidenced by multiple "badges of fraud" or equivalents under applicable law, including the following:

271.     *First*, WEM-3 received *no value* for giving away $48.5 million in cash to benefit Ameream.

272.     *Second*, the cash transfer benefitted insiders of the WEM Guarantors.  The Ghermezian family and related entities have retained control of and retained benefits of the operations of the West Edmonton Mall and Ameream.  They received significant benefits under the 7th Amendment.

273.     *Third*, Defendants knew that Plaintiff did not know about the transactions contemplated by the October 2022 Agreements and that the Strict Foreclosure was done in a way to mislead who owned Ameream.

274.    **Fourth**, the transfers were completed at a time when the Plaintiff Loan was in default.

275.    **Fifth**, the WEM-3 cash transfer violated the Payment Guaranty.

276.    Under applicable law of the Province of Alberta, Canada, Plaintiff is entitled to money damages equal to the amount of cash WEM-3 transferred to Ameream.

## THIRD CAUSE OF ACTION
### *(Fraudulent Transfer – 2021 MOA Guarantor Transfer, Against JPMorgan, JPM-D5, and MOA Guarantor)*

277.     Plaintiff repeats and realleges each allegation in paragraph(s) "1" through "276" as if fully set forth herein.

278.     The MOA Interests Transfer (defined in paragraph 161) by the MOA Guarantor to JPMorgan is both an actual and constructive fraudulent transfer under Minnesota law, and Plaintiff should be paid the value of the MOA 49% Equity up to at least $404,399,512.87 plus interest thereon at the statutory rate.

279.     Plaintiff and the lenders were creditors of the MOA Guarantor at the time the 2021 Agreement was signed, and at the time that the 2021 Agreement closed in March 2021, by virtue of the debt owed under the Payment Guaranty.  They remain creditors today.

280.     Plaintiff did not learn of the consummation of the MOA Interests Transfer contemplated by the 2021 Agreement until June 2, 2021.

281.     In March 2021, the value of the MOA 49% Equity and the accompanying Reimbursement Claim exceeded the amount owed on account of the JPM Loan.  This is because the value of Ameream exceeded the amount of the JPM Loan and, regardless of whether JPMorgan first foreclosed on the MOA 49% Equity, the MOA Guarantor would have recourse available to pay the Plaintiff Loan after payment in full of the JPM Loan.

282.     JPMorgan and the MOA Guarantor (controlled by the Ghermezian family) entered into and carried out the transfers contemplated by the 2021 Agreement with the intent to defraud, hinder, and delay creditors of the MOA Guarantor, particularly Plaintiff and the lenders, as evidenced by multiple "badges of fraud" or equivalents under applicable law, including the following:

283.    *First*, the nominal consideration allotted to the transfers was grossly inadequate:

- The $1 million "reasonable estimate" set forth as the value of MOA 49% Equity in the 2021 Agreement was no more than 0.5% of its actual value. Mall of America was worth approximately $1.99 billion in March 2021, with an equity value of over $500 million. The 49% equity stake in the Mall of America was worth at least $245 million, which meant that JPMorgan and the Ghermezian family, in a non-arm's length agreement in violation of the MOA-JPMorgan Pledge Agreement, decided the "value" was only $1 million. Adding salt to the wound, JPMorgan did not reduce its loan balance by even a dollar after acquiring the MOA 49% Equity for a mere $1 million.

- JPMorgan acquired the MOA 49% Equity in an agreement that $1 million was a reasonable estimate of the proceeds JPMorgan would have received had the MOA 49% Equity been sold via a public auction. This was knowingly false.

284.    *Second*, the 2021 Agreement and the transfers thereunder benefitted insiders of the MOA Guarantor:

- The Ghermezian family and related entities have retained control of and retained benefits of the operations of Mall of America, among others; and

- As of March 2021, the Ghermezian family and the MOA Guarantor were on notice that Ameream had defaulted, and they faced immediate risk on their guarantees, including to Plaintiff.

285.    *Third*, the MOA Guarantor transferred to, or for the benefit of, JPMorgan and JPM-D5 substantially all of its assets, in a transfer designed to leave the MOA Guarantor with only a $1 million Reimbursement Claim that itself had been manipulated and reduced in value.

286.    **Fourth**, the transfers were completed at a time when the Plaintiff Loan was in default, by way of the automatic cross-default caused by the default of the JPM Loan.

287.    **Fifth**, the transfers were accomplished quickly, in the span of approximately two months between the signing of the 2021 Agreement in January 2021 and the transfers in March 2021.

288.    **Sixth**, the transfers were completed secretly, without involvement of Plaintiff in the negotiation of the 2021 Agreement, and without notice to Plaintiff that the transfer had been consummated until June 2021.

289.    The MOA Interests Transfer for $1 million, and the capping of the Reimbursement Claim under and in furtherance of the 2021 Agreement, are also voidable as constructive fraudulent transfers under Minnesota fraudulent transfer law.

290.    By virtue of the value of the American Dream Mall, but for the MOA Interests Transfer, the MOA Guarantor would be solvent, even after paying in full the Plaintiff Loan, given the true value of its Reimbursement Claim.  However, by transferring the MOA 49% Equity for a $1 million "credit," the MOA Guarantor's only asset is a $1 million Reimbursement Claim, which is woefully inadequate to repay the Plaintiff Loan.

291.    The MOA Guarantor was rendered insolvent by, or left with unreasonably small capital as a consequence of, its MOA Interests Transfer, including the capping of the Reimbursement Claim at $1 million.

### FOURTH CAUSE OF ACTION
### *(*Tortious Interference Against JPMorgan – 2021 Agreement)

292.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "291" as if fully set forth herein.

293.    Plaintiff and the WEM-MOA Guarantors are parties to the Payment Guaranty, which was and is a valid and enforceable contract.

294.    Until the Guaranteed Obligations (as defined in the Payment Guaranty) are satisfied, pursuant to Section 6.2 of the Payment Guaranty, the WEM-MOA Guarantors covenanted to (i) ensure that the collective value of the WEM-MOA 49% Equity was at least $680,000,000.00, and (ii) continue to own at least 49% interest in Mall of American and the West Edmonton Mall.

295.    No provision of the Payment Guaranty allowed the WEM-MOA Guarantors to enter into a private agreement voluntarily divesting their equity interests in favor of JPMorgan.

296.    Moreover, if any Payment Guarantor paid JPMorgan or used assets to pay JPMorgan, such Payment Guarantor would hold a Reimbursement Claim in the same dollar amount against Ameream, thereby preserving value for the repayment of other loans.  The only condition to the assertion of the Reimbursement Claim is the repayment in full of the JPM Loan or such guarantees are released or terminated by operation of law or otherwise.

297.    Pursuant to the 2021 Agreement, the MOA Guarantor no longer owns 49% of the Mall of America, and the WEM Guarantors no longer own 49% of the West Edmonton Mall.

298.    In the 2021 Agreement, the WEM 49% Equity was stipulated to be worth only $49 million, and the MOA 49% Equity was stipulated to be worth only $1 million, when the true value of these assets exceeded $800 million and $245 million, respectively.

299.    As a result of WEM-MOA Guarantors entering into the 2021 Agreement, the collective value of the WEM-MOA 49% Equity owned by the WEM-MOA Guarantors is effectively

zero, and the WEM-MOA Guarantors have no ability to collectively maintain a value of $680 million, as they committed to do under the Payment Guaranty.

300.    As a result of the false valuations in the 2021 Agreement, the JPM Loan remains outstanding in full, and the stipulated value of the assets caps the WEM-MOA Guarantors' Reimbursement Claims at $50 million.

301.    The WEM-MOA Guarantors have breached Section 6.2 of the Payment Guaranty.

302.    At all times, JPMorgan was aware of Section 6.2 of the Payment Guaranty and its importance to Plaintiff. Indeed, JPMorgan was heavily involved in negotiations over all documents relating to the Plaintiff Loan, including the Payment Guaranty.

303.    JPMorgan negotiated the 2021 Agreement with the WEM-MOA Guarantors and induced the WEM-MOA Guarantors to enter into the 2021 Agreement, intentionally and for the unjustified purpose of preventing Plaintiff from recovering on the Plaintiff Loan from the WEM-MOA Guarantors.

304.    In negotiating and executing the 2021 Agreement, JPMorgan intentionally did not act in a commercially reasonable way. Had it done so, the WEM-MOA Guarantors would not have breached their Payment Guaranty to Plaintiff, and they would still hold valuable Reimbursement Claims against Ameream—the owner of the American Dream Mall.

305.    Instead, JPMorgan took advantage of the desire of the WEM-MOA Guarantors and the Ghermezians to avoid their obligations to Plaintiff, and negotiated an agreement whereby it received at least $1 billion in assets for zero consideration, while causing the WEM-MOA Guarantors to breach Section 6.2 of the Payment Guaranty.

306.    JPMorgan's conduct, which caused the WEM-MOA Guarantors to breach Section 6.2 of the Payment Guaranty, has damaged Plaintiff by diminishing the value of the WEM-MOA

Guarantors' Reimbursement Claims to a figure insufficient to repay Plaintiff's outstanding

Judgment.

## FIFTH CAUSE OF ACTION
### *(Marshaling Against JPMorgan)*

307.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "306" as if fully set forth herein.

308.    As of March 2021, JPMorgan was a secured creditor of the WEM-MOA Guarantors, including being pledged the WEM-MOA 49% Equity, which, until the 2021 Agreement, secured the JPM Loan.  Any excess of the WEM-MOA 49% Equity is to be applied to the Plaintiff Loan pursuant to the terms of the Intercreditor Agreement and the Irrevocable Direction Letter.

309.    The JPM Loan was, and still is, secured by mortgages on the American Dream Mall.

310.    Under the JPM Loan documents, JPMorgan has the right to resort to both the WEM-MOA 49% Equity and its mortgage collateral.

311.    Plaintiff does not have a right to such mortgage collateral, which secured the JPM Loan.

312.    Plaintiff has a unique interest in the WEM-MOA 49% Equity by virtue of the Irrevocable Direction Letter, such that any sale of such asset by JPMorgan that produces sale proceeds in excess of the JPM Loan must be paid to reduce the Plaintiff Loan.

313.    JPMorgan would not be prejudiced by resorting to its other collateral before looking to the WEM-MOA 49% Equity to satisfy its debt.  In fact, the value of the American Dream Mall, which is collateral for the JPM Loan, alone exceeds the amount of the JPM Loan.

314.    Entry into the 2021 Agreement was inequitable conduct, overreaching, and/or fraud by JPMorgan.

315.    Applying marshaling to the JPM Loan would be the just and equitable response to the efforts of JPMorgan and the WEM-MOA Guarantors, among others, to unfairly deprive Plaintiff

of the WEM-MOA 49% Equity through their non-arm's length agreement that artificially depresses the value of the WEM-MOA 49% Equity.

316.     Failure to apply marshaling to the defaults under the JPM Loan would unfairly deprive Plaintiff of its right to enforce and collect from the WEM-MOA Guarantors on the Payment Guaranty, which assured the repayment of the Plaintiff Loan.

317.     Any waiver of marshaling by Plaintiff was terminated when the Intercreditor Agreement was terminated.

## SIXTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing Against JPMorgan – 2021 Agreement)

318.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "317" as if fully set forth herein.

319.    Plaintiff, JPMorgan, and the AB AD Lender entered into the Intercreditor Agreement, which is governed by New York law.

320.    Implied in all contracts governed by New York law is a covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

321.    The Intercreditor Agreement provides that Plaintiff cannot proceed against the WEM-MOA Guarantors or any other "Shared Guarantors," even if American Dream Borrower has defaulted, if the JPM Loan or the 2017 Mezz Loan is outstanding, unless such guarantors are released, or the relevant guaranty is terminated by operation of law or otherwise.

322.    Section 6(b) of the Intercreditor Agreement provides that in the event JPMorgan and/or the AB AD Lender receive proceeds from a foreclosure of the WEM-MOA 49% Equity, and the JPM Loan and 2017 Mezz Loan are fully repaid, then excess proceeds shall be disbursed to Plaintiff.

323.    The Intercreditor Agreement, in conjunction with the Payment Guaranty and Irrevocable Direction Letter, ensured Plaintiff's interests were protected and its rights delineated from the JPM Loan and 2017 Mezz Loan, especially with respect to the collateral securing and providing credit support for the loans.

324.    Plaintiff's interests were protected in part because if a Payment Guarantor paid JPMorgan or used its assets to pay JPMorgan, such Payment Guarantor would hold a Reimbursement

81

Claim in the same dollar amount against Ameream, thereby preserving value to satisfy the Plaintiff Loan.

325.    The AB AD Lender's Strict Foreclosure resulted in the full satisfaction of the 2017 Mezz Loan.  Thus, the Intercreditor Agreement has terminated, except that Section 6(b) survives termination.

326.    At all relevant times, JPMorgan knew Section 6(b) was important to protect Plaintiff's interests under the Plaintiff Loan Agreement.  Plaintiff and the lenders were induced to provide the Plaintiff Loan because of the Payment Guaranty, the Intercreditor Agreement and the Irrevocable Direction Letter containing the same protections.

327.    At all times relevant to this litigation, JPMorgan owed a duty to Plaintiff to act in good faith and deal fairly with it under the Intercreditor Agreement, including (i) not unfairly abusing JPMorgan's rights under Section 6(b) by artificially lowering the value of the WEM-MOA 49% Equity, thereby failing to reduce the amount of the JPM Loan or reducing any subrogation/reimbursement rights of the WEM-MOA Guarantors against Ameream, (ii) conducting a public sale of assets, as required under its loan documents, to obtain the highest purchase price for the WEM-MOA 49% Equity, and (iii) properly applying the purchase price of the WEM-MOA 49% Equity to the reduction of the amount due under the JPM Loan.

328.    Rather than foreclose against these assets based on their actual value of approximately $1 billion, JPMorgan acquired the WEM-MOA 49% Equity at an artificially low valuation of $50 million and has the purported right to receive dividends on account of the WEM-MOA 49% Equity indefinitely, even after the JPM Loan is repaid.

329.    Plaintiff was not informed of the negotiations of the 2021 Agreement, and Plaintiff was not aware of the terms until after the 2021 Agreement had been signed.

330.    The 2021 Agreement was structured so that JPMorgan could purposefully avoid obligations under the Intercreditor Agreement and block Plaintiff's rights to recovery under the Intercreditor Agreement, Plaintiff Loan Agreement, Payment Guaranty, or the Irrevocable Direction Letter, which would have provided for payment to Plaintiff upon JPMorgan's foreclosure under the JPM Loan.

331.    JPMorgan compounded its bad faith mistreatment of Plaintiff by failing to credit even $50 million against the outstanding JPM Loan.

332.    JPMorgan breached its covenant to act in good faith and deal fairly with Plaintiff under the Intercreditor Agreement.

333.    As a result of JPMorgan's breaches, Plaintiff sustained damages because the WEM-MOA Guarantors no longer have sufficient assets to repay the Plaintiff Loan or satisfy the Judgment. The WEM-MOA Guarantors would have been able to assert Reimbursement Claims that would have repaid the Plaintiff Loan but for JPMorgan's bad faith actions.

334.    Additionally, as a result of JPMorgan's breach of the implied covenant, Plaintiff is damaged because its right to recover from the WEM-MOA Guarantors is blocked by JPMorgan's outstanding senior priority that should have been reduced by $1 billion, but instead remains outstanding at its full amount.

## SEVENTH CAUSE OF ACTION
### (Declaratory Relief Against JPMorgan – Intercreditor Agreement)

335.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "334" as if fully set forth herein.

336.    Plaintiff currently holds the Judgment in the amount of $404,399,512.87.    The Judgment remains outstanding, and interest accrues at the New York state statutory rate.

337.    Plaintiff, JPMorgan, and the AB AD Lender are parties to the Intercreditor Agreement, which is governed by New York law.

338.    Section 6(b) of the Intercreditor Agreement (i) limits Plaintiff's ability to pursue enforcement actions and collections against the WEM-MOA Guarantors or Individual Guarantors on account of the Payment Guaranty or otherwise, and (ii) contains a provision to pay JPMorgan any amount recovered by Plaintiff from the Payment Guarantors to the reduction of the JPM Loan.

339.    Implied in all contracts governed by New York law is a covenant of good faith and fair dealing.    The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

340.    JPMorgan breached the implied covenant of good faith and fair dealing when it negotiated and entered the 2021 Agreement, including by (i) unfairly abusing Plaintiff's rights under Section 6(b) by artificially lowering the value of the WEM-MOA 49% Equity, thereby failing to reduce the amount of the JPM Loan and reducing any Reimbursement Claim rights of the WEM-MOA Guarantors against Ameream, (ii) failing to conduct a public sale of assets, as required under its loan documents, to obtain the highest purchase price for the WEM-MOA 49% Equity, (iii) failing to properly apply the purchase price of the WEM-MOA 49% Equity to the reduction of the amount due under the JPM Loan, and (iv) on information and belief, knowingly facilitating (x) the AB AD

Lender to foreclose on the Ameream equity interest without complying with the curing of all monetary defaults under the JPM Loan and providing substitute guarantees, and (y) the Ghermezian family to leap-frog ahead of Plaintiff in the American Dream Mall capital structure.

341.    Because JPMorgan has breached the implied covenant, Plaintiff is excused from Section 6(b)'s limitations and provisions.

342.    Additionally, WEM-3's obligations under the Environmental Indemnity were satisfied upon the transfer to a JPMorgan affiliate of the WEM-3 24% Equity under the 2021 Agreement.  Section 30 of the Environmental Indemnity explicitly states that JPMorgan's recourse under the Environmental Indemnity is limited to the WEM-3 24% Equity.  Thus, under any circumstances, WEM-3 is no longer bound by the Environmental Indemnity.

343.    Plaintiff seeks a declaration that any limitations under Section 6(b) on Plaintiff and/or the lenders from seeking enforcement actions and collections from the Payment Guarantors are null and void, and Plaintiff shall be entitled to retain and keep any and all amounts or other consideration received from the Payment Guarantors for application to the reduction of the Plaintiff Loan, even if the JPM Loan has not been repaid or otherwise satisfied.

344.    Plaintiff seeks a declaration that WEM-3 is not a Shared Guarantor by operation of law because WEM-3 has fully performed under the Environmental Indemnity.

## EIGHTH CAUSE OF ACTION
### *(*Declaratory Relief Against All Defendants – Amount of Reimbursement Claims)

345.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "344" as if fully set forth herein.

346.    Plaintiff currently holds the Judgment in the amount of $404,399,512.87.   The Judgment remains outstanding, and interest accrues at the New York state statutory rate.

347.    Plaintiff was and is a creditor of each of the WEM Guarantors and the MOA Guarantor, who are guarantors to the American Dream Borrower.

348.    On March 25, 2021, the JPMorgan Defendants acquired the WEM-MOA 49% Equity.

349.    As a result of the WEM Guarantors and the MOA Guarantor having their property satisfy obligations Ameream owed to JPMorgan, each of the WEM Guarantors and the MOA Guarantor hold Reimbursement Claims against Ameream.

350.    The 2021 Agreement improperly valued the 49% equity ownership in the West Edmonton Mall at $49 million, which approximates 6% of the actual value of the WEM 49% Equity as of March 2021.

351.    The 2021 Agreement improperly valued the 49% equity ownership in Mall of America at $1 million, which approximates 0.5% of the actual value of the MOA 49% Equity as of March 2021.

352.    By virtue of the 2021 Agreement, each of the WEM Guarantors and the MOA Guarantor hold Reimbursement Claims against Ameream that, if the 2021 Agreement is enforced, may be limited to $50 million in the aggregate, with the WEM Guarantors collectively being limited to a $49 million Reimbursement Claim and the MOA Guarantor being limited to a $1 million Reimbursement Claim.

353.    Plaintiff was not a party to the 2021 Agreement and did not, and does not, consent to the capping of the Reimbursement Claims at $50 million.

354.    Plaintiff seeks a declaration that the value of the 49% equity stake in the West Edmonton Mall is worth at least $800 million as of March 2021, resulting in aggregate Reimbursement Claims of such amount.

355.    Plaintiff seeks a declaration that the value of the 49% equity stake in the Mall of America is worth at least $245 million as of March 2021, resulting in aggregate Reimbursement Claims of such amount.

356.    Further, to the extent that WEM-3's transfer of $48.5 million in cash is not a fraudulent conveyance, the transfer of $48.5 million in cash as required by Section 4(c) of the 7th Amendment gives rise to a Reimbursement Claim against Ameream.

357.    Plaintiff was not a party to the 7th Amendment and did not, and does not, consent to WEM-3 giving away its cash to Ameream.

358.    Plaintiff seeks a declaration that any cash WEM-3 transferred to Ameream, or to pay for costs of the American Dream Mall, gives rise to a Reimbursement Claim in like amount.

### NINTH CAUSE OF ACTION
**(Breach of the Irrevocable Direction Letter and Intercreditor Agreement Against JPMorgan – 2022 Agreements)**

359.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "358" as if fully set forth herein.

360.    JPMorgan is a party to the Intercreditor Agreement with Plaintiff.  Though it has terminated, Section 6(b) remains valid and enforceable.

361.    JPMorgan, among others, is a party to the Irrevocable Direction Letter, which was and is a valid and enforceable contract, which was confirmed by JPMorgan as recent as March 2024.

362.    The Irrevocable Direction Letter is a loan document under the Plaintiff Loan and is enforceable by Plaintiff.  It expressly states: "[a]s a material inducement to [Plaintiff] to make the Junior Mezz Loan to Borrower, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned, in connection with each Pledge under which it is a Pledgor, hereby irrevocably directs Senior Agent and [AB AD Lender] as follows as to each Pledge delivered for its benefit[.]"

363.    The Irrevocable Direction Letter further states: "you [JPMorgan and AB AD Lender] are authorized and instructed to pay such excess proceeds over directly to [Plaintiff] within 10 business days of receipt, to be applied to repayment of the Junior Mezz Loan [the Plaintiff Loan], notwithstanding any contrary direction in the Pledge [listed on Schedule A] or any related Loan Document [JPM Loan Documents or the 2017 Mezz Loan Documents, as applicable] (as defined in the respective Pledge)."

364.    Schedule A to the Irrevocable Direction Letter lists 11 pledges, including a pledge by Ameream Mezz of the equity in Ameream, pledges by the WEM-MOA Guarantors, and pledges by the Outparcel Owner of each Outparcel Entity.

365.    The Irrevocable Direction Letter obligates JPMorgan and AB AD Lender to pay over to Plaintiff and the lenders the proceeds of any collection, sale, or other disposition under each pledge after their "Obligations" (as defined in each pledge) are satisfied in full.

366.    Section 6(b) of the Intercreditor Agreement mandates that when the JPM Loan is satisfied in full, to the extent that JPMorgan holds or receives proceeds from the disposition of the WEM-MOA 49% Equity, it will pay such proceeds to Plaintiff.

367.    The 2017 Mezz Loan was satisfied in full when the AB AD Lender consummated the Strict Foreclosure.

368.    The only condition under either the Irrevocable Direction Letter or Section 6(b) of the Intercreditor Agreement for Plaintiff to receive such proceeds is the satisfaction in full of the JPM Loan.

369.    The Standstill Agreement and the 7th Amendment, which JPMorgan signed, provide that when the JPM Loan is satisfied in full, JPMorgan agrees to transfer to either (i) the AB AD Lender (not on account of the fully satisfied 2017 Mezz Loan, but on account of the "new" 2022 Mezz Loan) or (ii) the new lenders who take out the JPM Loan, in each case, all of the collateral pledged to support the JPM Loan.  This includes the WEM-MOA 49% Equity, excess cash, and the assets listed in the Irrevocable Direction Letter.

370.    The Standstill Agreement authorizes the pledging of the WEM-MOA 49% Equity as collateral for any refinancing of the JPM Loan, which is not permitted under Section 6(b) of the Intercreditor Agreement or the Irrevocable Direction Letter.

371.    JPMorgan has anticipatorily breached the Irrevocable Direction Letter.

372.    JPMorgan has anticipatorily breached Section 6(b) of the Intercreditor Agreement.

373.    As a result of these breaches, Plaintiff will sustain damages.

374.   Plaintiff is entitled to damages equal to the amount of the Judgment plus interest thereon at the statutory rate.

375.   Plaintiff is also entitled to a declaration that, notwithstanding the October 2022 Agreements or any other document, the WEM-MOA 49% Equity, the pledge of Ameream equity, any other assets covered pursuant to the Pledges listed in Schedule A of the Irrevocable Direction Letter, and their respective proceeds cannot be transferred by JPMorgan to any person other than Plaintiff when it has been repaid in full, or be pledged as collateral to secure any refinancing of the JPM Loan or any new loan (including the 2022 Mezz Loan).

## TENTH CAUSE OF ACTION
### *(Tortious Interference with the Irrevocable Direction Letter and Intercreditor Agreement – Ameream and Outparcel Entities)*

376.     Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "375" as if fully set forth herein.

377.     Plaintiff is a party to the Intercreditor Agreement and the beneficiary of the Irrevocable Direction Letter, each of which was and is a valid and enforceable contract.

378.     The Standstill Agreement and the 7th Amendment, which JPMorgan signed, provide that when the JPM Loan is satisfied in full, JPMorgan agrees to transfer to either (i) the AB AD Lender (not on account of the fully satisfied 2017 Mezz Loan, but on account of the "new" 2022 Mezz Loan) or (ii) the new lenders who take out the JPM Loan, in each case, all of the collateral pledged to support the JPM Loan.  This includes the WEM-MOA 49% Equity, excess cash, and the assets listed in the Irrevocable Direction Letter.

379.     The Standstill Agreement authorizes the pledging of the WEM-MOA 49% Equity as collateral for any refinancing of the JPM Loan, which is not permitted under Section 6(b) of the Intercreditor Agreement or the Irrevocable Direction Letter.

380.     This violates the Irrevocable Direction Letter and Section 6(b) of the Intercreditor Agreement.

381.     At all times, Ameream and the Outparcel Entities were aware of the Irrevocable Direction Letter, the Intercreditor Agreement, and their importance to Plaintiff.  Indeed, affiliates of each Defendant were directly involved in the drafting of such documents.

382.     Plaintiff participated in negotiations in May, June, and July 2022, and expressly identified respecting Plaintiff's contractual rights (including the Irrevocable Direction Letter and Intercreditor Agreement) as critical to any such restructuring.

383.    The October 2022 Agreements, executed three months after Defendants stopped negotiating with Plaintiff, and done in secret, cause breaches of such contracts with Plaintiff.

384.    Each interfering Defendant received substantial benefits through the October 2022 Agreements.

385.    Each interfering Defendant entered into the October 2022 Agreements intentionally and for the unjustified purpose of preventing Plaintiff from recovering on the Plaintiff Loan and interfering with Plaintiff's contractual rights set forth in the Irrevocable Direction Letter and the Intercreditor Agreement.

386.    Each Defendant's conduct in entering into the October 2022 Agreements, which caused breaches of the Irrevocable Direction Letter and the Intercreditor Agreement, has damaged Plaintiff.

**ELEVENTH CAUSE OF ACTION**
**(Tortious Interference with the Payment Guaranty – JPMorgan, Ameream, and**
**Outparcel Entities)**

387.     Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "386" as if fully set forth herein.

388.     Plaintiff is a party to the Payment Guaranty, which was and is a valid and enforceable contract, which was confirmed by JPMorgan as recent as March 2024.

389.     The Payment Guaranty contains covenants mandating that the net worth of the WEM-MOA Guarantors is at least $680 million, that each own 49% of the equity of the West Edmonton and Mall of America, and that they do not enter into transactions with "Affiliates" that would have the effect of violating the net worth covenant.

390.     The October 2022 Agreements mandate JPMorgan to transfer the WEM-MOA 49% Equity (either to AB AD Lender or as collateral for a refinancing senior lender).  This confirms that the WEM-MOA Guarantors do not and will not own the WEM-MOA 49% Equity, in violation of the Payment Guaranty covenants.

391.     WEM-3's transfer of $48.5 million in cash to pay for costs of the American Dream Mall is a transaction with an Affiliate (as defined in the Payment Guaranty) that violates the net worth covenant because the WEM-MOA Guarantors are not worth $680 million following the consummation of the 2021 Agreement transactions, and as confirmed in the October 2022 Agreements.

392.     At all times, JPMorgan, Ameream, and the Outparcel Entities were aware of the Payment Guaranty and its importance to Plaintiff.  Indeed, affiliates of each Defendant were directly involved in the drafting of such document.

393.    Plaintiff participated in negotiations in May, June, and July 2022, and expressly identified respecting Plaintiff's contractual rights as critical to any such restructuring.

394.    The October 2022 Agreements were executed three months after Defendants stopped negotiating with Plaintiff, and done in secret, and caused parties to breach the Payment Guaranty with Plaintiff.

395.    Each interfering Defendant received substantial and undeserved benefits through the October 2022 Agreements.

396.    Each interfering Defendant entered into the October 2022 Agreements intentionally and for the unjustified purpose of preventing Plaintiff from recovering on the Plaintiff Loan and interfering with Plaintiff's contractual rights set forth in the Irrevocable Direction Letter and the Intercreditor Agreement.

397.    Each Defendant's conduct in entering into the October 2022 Agreements, which caused breaches of the Irrevocable Direction Letter and the Intercreditor Agreement, has damaged Plaintiff.

## PRAYER

WHEREFORE, Plaintiff SOL-MM III LLC requests that this Court enter judgment as follows:

(a)     Awarding Plaintiff a judgment against the JPMorgan Defendants for the value of the Challenged Transfers (defined in paragraph 160) up to the amount of the Judgment plus interest thereon at the statutory rate;

(b)     Awarding Plaintiff a judgment against all Defendants for compensatory and punitive damages in an amount to be proven at trial, plus interest thereon at the statutory rate;

(c)     Awarding Plaintiff statutory costs, expenses, and reasonable attorneys' fees as against all Defendants plus interest thereon at the statutory rate;

(d)     Declaring void the Challenged Transfers under applicable law;

(e)     Declaring that Section 6(b) of the Intercreditor Agreement does not bar Plaintiff from (i) seeking enforcement actions and collections from the Payment Guarantors, and (ii) retaining and keeping any and all amounts and other considerations received from the Payment Guarantors for application to the reduction of the Plaintiff Loan, even if the JPM Loan has not been repaid or otherwise satisfied;

(f)     Declaring that WEM-3 is not a Shared Guarantor by operation of law and that WEM-3 has fully performed under the Environmental Indemnity;

(g)     Declaring that the aggregate value of the Reimbursement Claims held by the WEM Guarantors is or exceeds $848.5 million, an amount to be proven at trial;

(h)     Declaring that the aggregate value of the Reimbursement Claims held by the MOA Guarantor is or exceeds $245 million, an amount to be proven at trial;

(i)      Declaring that notwithstanding the October 2022 Agreements or any other document, the WEM-MOA 49% Equity, the pledge of Ameream equity, any other assets covered pursuant to the Pledges (as defined in the Irrevocable Direction Letter) listed in Schedule A of the Irrevocable Direction Letter, and their respective proceeds cannot be transferred by JPMorgan to any person other than Plaintiff when the JPM Loan has been repaid in full, or be pledged as collateral to secure any refinancing of the JPM Loan or any new loan (including the 2022 Mezz Loan); and

(j)      Granting such other and further legal and equitable relief as this Court may deem just and proper.

Dated: New York, New York
June 25, 2024

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*/s/ Adam Abensohn*

Eric Winston (pro hac vice)
Savannah Slotkin (pro hac vice)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
213-443-3000 Main Office Number
213-443-3100 Fax
ericwinston@quinnemanuel.com
savannahslotkin@quinnemanuel.com

Adam Abensohn
Laura Santos-Bishop
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel:    (212) 849-7000
Fax:    (212) 849-7100
adamabensohn@quinnemanuel.com
laurasantosbishop@quinnemanuel.com

## Appendix A

**"2017 Mezz Loan"** means the $475 million senior mezzanine loan made on June 19, 2017 by AB AD Lender to Ameream Mezz.

**"2021 Agreement"** means an agreement, dated as of January 29, 2021, by and among JPMorgan, Ameream, Ameream Mezz, the WEM-MOA Guarantors, the Individual Guarantors, Original WEMPI, the Outparcel Entities, the Recourse Guarantors (as defined in the 2021 Agreement), and the AB AD Lender, involving, among other things, the transfer of the WEM-MOA 49% Equity.

**"2022 Mezz Loan"** means the new loan made to Successor American Dream Borrower by AB AD Lender under the October 2022 Agreements, in the amount of $475 million.

**"7th Amendment"** means that certain Omnibus Agreement and Seventh Amendment to Loan Agreement, dated as of October 21, 2022, by and among JPMorgan, Ameream, the WEM-MOA Defendants, the Individual Guarantors, Original WEMPI, the Outparcel Entities, the Recourse Guarantors (as defined in the 2021 Agreement), and the Successor Entities. The 7th Amendment is one of the October 2022 Agreements.

**"AB AD Lender"** means AB American Dream Mall Syndicate Joint Venture LP, the issuer of the 2017 Mezz Loan to Ameream Mezz and the purported 2022 Mezz Loan to Successor American Dream Borrower.

**"Administrative Agent"** means Plaintiff and its predecessor in interest, Western Asset Mortgage Capital Corporation.

**"Ameream"** means Ameream LLC, the direct owner of the American Dream Mall and the borrower of the JPM Loan.

**"Ameream Mezz"** means Ameream Mezz, LLC, borrower of the 2017 Mezz Loan and the sole owner of Ameream prior to the Strict Foreclosure.

**"American Dream Borrower"** means Ameream Mezz I, LLC, the borrower of the Plaintiff Loan, which wholly owns Ameream Mezz.

**"Borrower Party"** means Borrower Party, as such term is defined in the 2021 Agreement.

**"Canadian Proceeding"** means that certain litigation commenced by Plaintiff in Alberta, Canada against, among others, certain of the WEM-MOA Guarantors.

**"Challenged Transfers"** means collectively, the WEM Interests Transfer and the MOA Interests Transfer.

**"Defendants"** means JPMorgan Chase Bank, National Association, D5 Hawks LLC, WE Tahoe 1 LLC, WE Tahoe 2 LLC, New WEM Holdings Affiliate 1 Ltd., New WEM Holdings Affiliate 2

Ltd., New WEM Holdings Ltd., MOA Holdings III, LLC, Ameream, LLC, Meadow A-B Office, LLC, Meadow C-D Office, LLC, Meadow Hotel, LLC, and Meadow Baseball, LLC.

"**Environmental Indemnity**" means an agreement, dated as of June 19, 2017, pursuant to which the Payment Guarantors agreed to defend, indemnify, and hold harmless JPMorgan for certain environmental hazards with respect to the American Dream Mall.

"**First Amended Complaint**" means the first amended complaint filed on November 29, 2023 in the instant action, *SOL-MM III LLC v. JPMorgan Chase Bank, N.A., et al.*, No. 23-CV-06479-ALC (S.D.N.Y. 2023) (Dkt. 44).

"**Individual Guarantor**" and, collectively the "**Individual Guarantors**", means each of Don Ghermezian, Eskandar Ghermezian, David Ghermezian, Syd Ghermezian, Bahman Ghermezian, Raphael Ghermezian, Nader Ghermezian, Marshall Ghermezian, and Tony Ghermezian.

"**Initial Complaint**" means the original complaint filed on July 18, 2023 in the instant action, *SOL-MM III LLC v. JPMorgan Chase Bank, N.A., et al.*, No. 23-CV-06479-ALC (S.D.N.Y. 2023) (Dkt. 1-7).

"**Intercreditor Agreement**" means the contract entered into by Plaintiff, JPMorgan, and the AB AD Lender, dated as of August 2, 2019.

"**Irrevocable Direction Letter**" means the letter, dated as of August 2, 2019, provided by the WEM-MOA Guarantors, the Outparcel Owner, and Ameream Mezz to Plaintiff, which, among other things, directs JPMorgan and the AB AD Lender to pay certain proceeds of assets listed on Schedule A thereto to Plaintiff, in accordance with the terms and conditions thereof. Both JPMorgan and AB AD Lender signed the Irrevocable Direction Letter.

"**JPM Designees**" means Defendants JPM-D5, JPM-WEM 1, and JPM-WEM 2, each of which are entities owned, operated, and controlled by JPMorgan.

"**JPMorgan Defendants**" means Defendants JPMorgan, JPM-D5, JPM-WEM 1, and JPM-WEM 2.

"**JPM-D5**" means Defendant D5 Hawks LLC, a limited liability company owned and operated by JPMorgan and the sole member of MOA Holdings II LLC, which, following consummation of the 2021 Agreement, owns a 49% equity interest in MOA Holdings I LLC, the indirect sole owner of the Mall of America.

"**JPM Loan**" means that certain June 19, 2017 $1.195 billion senior secured loan by JPMorgan to Ameream, as borrower.

"**JPMorgan**" means Defendant JPMorgan Chase Bank, National Association, the administrative agent under the JPM Loan and also a lender thereunder.

"**JPM-WEM 1**" means Defendant WE Tahoe 1 LLC, a limited liability company owned and operated by JPMorgan, which, following consummation of the 2021 Agreement, owns 970 common shares of WEMPI, the sole owner of the West Edmonton Mall.

**"JPM-WEM 2"** means Defendant WE Tahoe 2 LLC, a limited liability company owned and operated by JPMorgan, which, following consummation of the 2021 Agreement, owns 10 common shares of WEMPI, the sole owner of the West Edmonton Mall.

**"Judgment"** means the May 3, 2023 judgment entered in the New York Action against the American Dream Borrower for $404,399,512.87, plus interest, in favor of Plaintiff.

**"MOA 49% Equity"** means the limited liability company interests in MOA Holdings II LLC, which owns an indirect 49% interest in the Mall of America.

**"MOA Guarantor"** means Defendant MOA Holdings III, LLC, which, prior to consummation of the 2021 Agreement, owned 100% of MOA Holdings II LLC, which in turn owned an indirect 49% interest in the Mall of America.

**"MOA Interests Transfer"** means the consummation of transactions set forth in the 2021 Agreement whereby the MOA Guarantor conveyed its interests in MOA Holdings II, LLC, to JPM-D5, resulting in JPM-D5 indirectly owning 49% of the Mall of America.

**"MOA-JPMorgan Pledge Agreement"** means the agreement pursuant to which the MOA Guarantor guaranteed, and pledged assets as collateral for, the JPM Loan.

**"New York Action"** means the action originally filed in New York state court on March 23, 2023, *SOL-MM III LLC v. JPMorgan Chase Bank, N.A., et al.*, No. 651509/2023.

**"Non-Shared Guarantors"** has the meaning assigned to it in the Intercreditor Agreement, and includes Ghermezian-affiliated guarantors (i) Triple Five Investment Ltd. and (ii) 7 Crowns Corporation.

**"October 2022 Agreements"** means collectively, (i) the 7th Amendment and (ii) the Standstill Agreement—entered into on October 21, 2022.

**"Original WEMPI"** means Original WEMPI Inc., an Alberta corporation indirectly owned by certain Individual Guarantors, a guarantor of the JPM Loan, and a party to the 2021 Agreement. Prior to consummation of the 2021 Agreement, Original WEMPI owned a 100% interest in WEM-3, which in turned owned an indirect 100% interest in the West Edmonton Mall (and directly owned 75% interest in the West Edmonton Mall). Following consummation of the 2021 Agreement, Original WEMPI's indirect ownership in the West Edmonton Mall was reduced to 51%.

**"Outparcel Entities"** means Defendants Meadow A-B Office, LLC, Meadow C-D Office, LLC, Meadow Hotel, LLC, and Meadow Baseball, LLC, each a Delaware limited liability company indirectly controlled by the Ghermezian family, and each a party to the 2021 Agreement and the October 2022 Agreements. Each Outparcel Entity owns leasehold interests and development rights related to the American Dream Mall.

**"Outparcel Owner"** means Meadow Outparcels Developer, LLC, a Ghermezian controlled entity that owns the Outparcel Entities and a party to the Irrevocable Direction Letter.

**"Payment Guarantors"** means the WEM-MOA Guarantors and Individual Guarantors who executed the Payment Guaranty as credit support for the Plaintiff Loan.

**"Payment Guaranty"** means an agreement, dated as of August 2, 2019, between the Payment Guarantors, on the one hand, and Plaintiff, on the other, pursuant to which the Payment Guarantors guaranteed the Plaintiff Loan on a full recourse basis.

**"Plaintiff"** means SOL-MM III LLC, successor to Western Asset Mortgage Capital Corporation, the original Administrative Agent of the Plaintiff Loan.

**"Plaintiff Loan Notes"** refers to the five notes executed by American Dream Borrower to secure the Plaintiff Loan Agreement, pursuant to which American Dream Borrower was required to make monthly payments of interest to Plaintiff, followed by a final payment of principal and outstanding interest due upon the maturity date, June 29, 2021.

**"Plaintiff Loan"** means the $300 million loan made on August 2, 2019 to American Dream Borrower.

**"Plaintiff Loan Agreement"** means the loan agreement, dated as of August 2, 2019, entered into by American Dream Borrower and Plaintiff concerning the Plaintiff Loan.

**"Plaintiff Pledge Agreement"** means the Pledge and Security Agreement, dated as of August 2, 2019, made by American Dream Borrower for the benefit of Plaintiff, pursuant to which American Dream Borrower pledged and granted a first priority security interest in all of its interest in Ameream Mezz.

**"Recourse Guaranty"** means an agreement, pursuant to which the Non-Shared Guarantors, in September 2022, delivered guarantees to JPMorgan.

**"Reimbursement Claims"** means any and all subrogation, contribution, and reimbursement claims the WEM-MOA Guarantors hold, including against Ameream.

**"Shared Guarantors"** means Shared Guarantors, as defined in the Intercreditor Agreement.

**"Standstill Agreement"** means the Standstill and Recognition Agreement by and among JPMorgan, AB AD Lender (as lender), and AB AD Lender (as investor), dated as of October 21, 2022.  The Standstill Agreement is one of the October 2022 Agreements.

**"Statement of Defence"** means the document submitted by the defendants in the Canadian Proceeding.

**"Strict Foreclosure"** means that certain October 2022 foreclosure, whereby the AB AD Lender took ownership of Ameream in exchange for the extinguishment and discharge of the 2017 Mezz Loan, immediately prior to the execution of the October 2022 Agreements.

**"Successor Ameream Mezz"** means AB Ameream Member LLC, a Delaware limited liability company formed in September 2022, which is wholly owned by Successor American Dream Borrower, and which wholly owns Ameream.  Successor Ameream Mezz is a party to the 7th

Amendment.  Plaintiff contends that Successor Ameream Mezz is the successor to Ameream Mezz.

**"Successor American Dream Borrower"** means AB Ameream Member Parent LLC, a Delaware limited liability company formed in September 2022, which is indirectly wholly owned by T5, and which wholly owns Successor Ameream Mezz.  Successor American Dream Borrower is a party to the 7th Amendment and the purported borrower of the 2022 Mezz Loan. Plaintiff contends that Successor American Dream Borrower is the successor to American Dream Borrower.

**"Successor Entities"** means collectively, the Successor American Dream Borrower and Successor Ameream Mezz.

**"T5"** means T5 AD LLC, a Delaware limited liability company formed prior to the October 2022 Agreements.  T5 is the managing member of, and 100% equity owner of, Successor American Dream Borrower.  T5 is wholly owned by affiliates of the Ghermezian family.

**"WEM-1"** means Defendant New WEM Holdings Affiliate 1 Ltd., a Canadian corporation wholly owned by WEM-3, and which, prior to consummation of the 2021 Agreement, owned a 24.5% indirect interest in the West Edmonton Mall.  WEM-1 is a Payment Guarantor and a guarantor for the JPM Loan, a party to the 2021 Agreement, and a party to the 7th Amendment.

**"WEM-2"** means Defendant New WEM Holdings Affiliate 2 Ltd., a Canadian corporation wholly owned by WEM-3, and which, prior to consummation of the 2021 Agreement, owned a 0.5% indirect interest in the West Edmonton Mall.  WEM-2 is a Payment Guarantor and a guarantor for the JPM Loan, a party to the 2021 Agreement, and a party to the 7th Amendment.

**"WEM 2022 Audited Financial Statements"** means those certain documents, dated April 29, 2023, produced by American Dream Borrower as part of post-judgment discovery in the New York Action.

**"WEM 25% Cash Flow Pledge"** means that certain pledge provided by Original WEMPI pursuant to which operating and capital proceeds resulting from 25% of the equity ownership in the West Edmonton Mall, was pledged as collateral for the JPM Loan.  The WEM 25% Cash Flow Pledge is in addition to the WEM-MOA 49% Equity pledged as collateral for the JPM Loan.

**"WEM-3 24% Equity"** means 24% of WEM-3's then 75% ownership stake in WEMPI, to which JPMorgan's recourse under its payment guaranty with WEM-3 was limited.

**"WEM-3"** means Defendant New WEM Holdings Ltd., a Canadian corporation wholly owned by Original WEMPI, and which, prior to consummation of the 2021 Agreement, owned a 75% direct interest in WEMPI, the 100% owner of the West Edmonton Mall.  WEM-3 also wholly owns WEM-1 and WEM-2.  WEM-3 is a Payment Guarantor and a guarantor for the JPM Loan, a party to the 2021 Agreement, and a party to the 7th Amendment.

**"WEM 49% Equity"** means 49% of the membership interests in WEMPI, the owner of the West Edmonton Mall.

**"WEM Guarantors"** means collectively, Defendants WEM-1, WEM-2, and WEM-3.

**"WEM Interests Transfer"** means the consummation of transactions set forth in the 2021 Agreement, whereby the WEM Guarantors conveyed their common shares in WEMPI, the direct owner of the West Edmonton Mall, to JPM-WEM 1 and JPM-WEM 2.

**"WEM-JPMorgan Pledge Agreement"** means that certain agreement, pursuant to which the WEM Guarantors each guaranteed, and pledged assets as collateral for, the JPM Loan.

**"WEM-MOA 49% Equity"** means the WEM-MOA Defendants' key assets, 49% of the equity in the West Edmonton Mall and Mall of America.

**"WEM-MOA Defendants"** means collectively, WEM-1, WEM-2, WEM-3, and MOA Guarantor, all of which are parties to the 2021 Agreement, which involved transferring the WEM-MOA 49% Equity, and parties to the 7th Amendment.

**"WEM-MOA Guarantors"** means collectively, the WEM Guarantors and MOA Guarantor.

**"WEMPI"** refers to West Edmonton Mall Properties Inc., the sole owner of the West Edmonton Mall.

**"WEM Second Mortgage"** refers to the second mortgage, totaling Canadian $425 million, on the West Edmonton Mall, which is collateral securing the JPM Loan.

**Appendix B**

## B. Capital Structure Prior to March 2021 Transactions



**Appendix C**

## C. Capital Structure Post March 21, 2021 Transactions and AB AD Lender's Representation After the Strict Foreclosure



**Appendix D**

## D. Capital Structure Post-October 2022 Agreements

