**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**SOL-MM III LLC,**

                    **Plaintiff,**          **23-cv-6479 (JGK)**

        **- against -**                     **MEMORANDUM OPINION**
                                            **AND ORDER**
**JPMORGAN CHASE BANK, N.A., ET AL.,**

                    **Defendants.**
────────────────────────────────

**JOHN G. KOELTL, District Judge:**

    This case concerns the financing for the development of the
American Dream Mall in New Jersey (the "Project"), which is the
second largest retail and entertainment center in the United
States. The plaintiff, SOL-MM III LLC, is the administrative
agent for a group of junior lenders that made a $300 million
loan in 2019 (the "Plaintiff Loan") to the owners of the
American Dream Mall.

    The financing structure for the Project had three tiers:
(1) a $1.195 billion loan from JPMorgan Chase Bank, N.A.
("JPMorgan") in 2017 (the "JPM Loan"), the senior-most loan; (2)
a $475 million loan from the AB American Dream Mall Syndicate
Joint Venture (the "AB AD Lender") in 2017 (the "2017 Mezz
Loan"), subordinate to the JPM Loan; and (3) the Plaintiff Loan,
the junior-most loan. As security for their loans, JPMorgan and
the AB AD Lender each received payment guarantees, which were
secured by first- and second-priority pledges, respectively, of

collateral. The plaintiff also obtained protections for the Plaintiff Loan, which was secured by payment guarantees and pledges. Among other protections, the lenders agreed in the Irrevocable Direction Letter and the Intercreditor Agreement that, upon repayment of the JPM Loan and the 2017 Mezz Loan, JPMorgan would deliver to the plaintiff any excess funds from the disposition of the collateral backing the loans.

The plaintiff has sued two sets of defendants, the JPM Defendants[1] and the American Dream Defendants.[2] The plaintiff claims that the defendants engaged in a scheme—through a series of convoluted contractual maneuvers in 2021 and 2022—to secure a windfall for themselves by destroying the plaintiff's liens and contractual rights to be repaid on the Plaintiff Loan. The defendants respond that the plaintiff is simply a disgruntled junior lender seeking to jump to the front of the repayment priority queue.

The defendants have moved to dismiss the plaintiff's Second Amended Complaint (the "SAC") for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure

---

[1] The JPM Defendants are: JPMorgan, D5 Hawks LLC, WE Tahoe 1 LLC, and WE Tahoe 2 LLC.

[2] The American Dream Defendants are: New WEM Holdings Affiliate 1 Ltd. ("WEM-1"), New WEM Holdings Affiliate 2 Ltd. ("WEM-2"), New WEM Holdings Ltd. ("WEM-3"; together with WEM-1 and WEM-2, the "WEM Guarantors"); MOA Holdings III, LLC (the "MOA Guarantor"; together with the WEM Guarantors, the "WEM-MOA Guarantors"); Ameream LLC ("Ameream"), Meadow A-B Office LLC, Meadow C-D Office LLC, Meadow Hotel LLC, and Meadow Baseball LLC (collectively, the "Outparcel Entities").

12(b)(1), and for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the defendants' motions are **granted in part** and **denied in part**.

## I. Factual and Procedural Background

Unless otherwise noted, the following facts are taken from the SAC and are accepted as true for purposes of these motions.

### A. The Parties

The plaintiff, defendant JPMorgan, and the AB AD Lender each made loans to support the development of the American Dream Mall. SAC ¶ 4, ECF No. 73.

In addition to the American Dream Mall, two other large shopping malls in North America are relevant to this case: the Mall of America in Minnesota, and the West Edmonton Mall in Alberta, Canada. Id. ¶ 69. All three malls are owned or managed by the Ghermezian family, which has established various corporate entities to hold its ownership stakes in the three malls. See id. ¶¶ 69-70.

Defendant Ameream is an entity affiliated with the Ghermezian family and the direct owner of the American Dream Mall. Id. ¶ 5.[3]

Before 2021, defendants WEM-MOA Guarantors, also affiliated with the Ghermezian family, held 49% of the equity in the West

---

[3] Ameream was owned by non-party Ameream Mezz, LLC ("Ameream Mezz"), which in turn was owned by non-party Ameream Mezz I, LLC (the "American Dream Borrower")—all Ghermezian-affiliated entities. SAC ¶ 5.

Edmonton Mall (the "WEM Equity") and the Mall of America (the "MOA Equity"; together with the WEM Equity, the "WEM-MOA 49% Equity"). See id. ¶¶ 6, 34-38, 84. The plaintiff alleges that, in March 2021, the WEM-MOA 49% Equity had a value of at least $1.045 billion. Id. ¶ 91.

Defendants Outparcel Entities are affiliates of Ameream that own development rights to leasehold properties, zoned for office and hotel complexes and a baseball stadium, near the American Dream Mall. Id. ¶¶ 40-44, 76.

### 1. The JPM Loan

In 2017, JPMorgan and other lenders provided a $1.195 billion secured loan to Ameream for the Project. Id. ¶ 87. As security for its loan, JPMorgan received, among other things, mortgages covering Ameream's rights and title to the American Dream Mall, together with the future development rights to the properties owned by the Outparcel Entities; pledges of the WEM-MOA 49% Equity; a pledge of operating and capital proceeds with respect to an additional 25% equity in the West Edmonton Mall; and a second mortgage in the amount of $425 million in Canadian currency on the West Edmonton Mall. Id. ¶¶ 87, 90-93.

The WEM-MOA Guarantors each guaranteed, and pledged assets as collateral for, the JPM Loan, as did nine individual members of the Ghermezian family (the "Individual Guarantors"; together with the WEM-MOA Guarantors, the "Payment Guarantors"). Id.

4

¶¶ 90, 95. The plaintiff alleges that the WEM-MOA Guarantors held valuable subrogation, contribution, and reimbursement claims (the "Reimbursement Claims") against Ameream, the borrower on the JPM Loan and the direct owner of the American Dream Mall. See id. ¶ 16. If any of the WEM-MOA Guarantors paid JPMorgan to satisfy or reduce the JPM Loan, such Guarantor would hold a Reimbursement Claim in the same dollar amount against Ameream. Id. ¶ 94. And, the plaintiff alleges, once the JPM Loan was fully repaid, each WEM-MOA Guarantor could assert any existing Reimbursement Claim against Ameream. Id. The payment guaranty executed in connection with the JPM Loan (the "JPM Payment Guaranty") provided that the WEM-MOA Guarantors waived any Reimbursement Claims "until such time as the [JPM Loan] shall have been paid in full and the Guaranteed Obligations shall have been paid and performed in full." Ex. 15 to Decl. of Janice Mac Avoy ("Mac Avoy Decl.") § 1.10, ECF No. 90-15.

Pursuant to the relevant loan documents (the "JPM Loan Documents"), JPMorgan had an array of remedies available in the event of a default. See id. ¶ 97. Among other options, upon default, JPMorgan could take title to or otherwise foreclose on the WEM-MOA 49% Equity in full or partial satisfaction of the JPM Loan. See Ex. 2 to Mac Avoy Decl. ("JPM Loan Agreement") § 8.2, ECF No. 90-2; Ex. 3 to Mac Avoy Decl. ("MOA-JPMorgan Pledge Agreement") § 3.4, ECF No. 90-3; Ex. 4 to Mac Avoy Decl.

("WEM-JPMorgan Pledge Agreement") § 4.1, ECF No. 90-4; Ex. 5 to Mac Avoy Decl. § 4.1, ECF No. 90-5. If JPMorgan elected to sell the WEM-MOA 49% Equity, the JPM Loan Documents allegedly required JPMorgan to do so at a public sale in accordance with procedures specified in the JPM Loan Documents. See MOA-JPMorgan Pledge Agreement §§ 3.4(c), 3.5(b), 3.5(d); WEM-JPMorgan Pledge Agreement §§ 4.1(b), 5; Ex. 5 to Mac Avoy Decl. §§ 4.1(b), 5.

The Payment Guarantors and JPMorgan also entered into an environmental indemnity agreement (the "Environmental Indemnity"), pursuant to which the Payment Guarantors agreed to defend, indemnify, and hold harmless JPMorgan for certain environmental hazards. SAC ¶ 100. In relevant part, the plaintiff alleges that, under § 30 of the Environmental Indemnity, WEM-3's liability under the Environmental Indemnity would be discharged if WEM-3 disposed of its equity guaranteeing the JPM Loan to a JPM Defendant. See id. ¶ 100 n.12.

## 2. The 2017 Mezz Loan

In 2017, the AB AD Lender loaned $475 million to Ameream Mezz in financing for the Project. See id. ¶ 88. The 2017 Mezz Loan was secured by an interest in Ameream Mezz's ownership interests in Ameream. Id. The WEM-MOA Guarantors guaranteed the 2017 Mezz Loan as they did the JPM Loan. Id. ¶ 90.

The 2017 Mezz Loan was subordinate to the JPM Loan. Id. ¶ 89. In the event of a default, the AB AD Lender could

foreclose on the equity interests of Ameream and become the new equity owner of the American Dream Mall only after meeting a list of conditions, including curing all defaults under the JPM Loan, and replacing the guarantees provided by the Ghermezian-affiliated entities. Id.

### 3. The Plaintiff Loan

In 2019, the plaintiff loaned $300 million to the American Dream Borrower to provide additional funding for the Project. Id. ¶ 102. The Plaintiff Loan was secured by the American Dream Borrower's pledge of its ownership stake in Ameream Mezz. Id. ¶ 108. The plaintiff alleges that this pledge was designed to ensure that all three loans—the JPM Loan, the 2017 Mezz Loan, and the Plaintiff Loan—would be repaid before the Ghermezians could retain ownership in the American Dream Mall. Id. ¶ 109. The Plaintiff Loan was subordinate to the JPM Loan and the 2017 Mezz Loan. See id. ¶¶ 4-5, 107.

In connection with the Plaintiff Loan, the Payment Guarantors—the WEM-MOA Guarantors and the Individual Guarantors—entered into a payment guaranty for the benefit of the plaintiff (the "Plaintiff Payment Guaranty"). See id. ¶¶ 45-54, 110; see also Ex. A to SAC ("Plaintiff Payment Guaranty"), ECF No. 73-1. In relevant part, the WEM-MOA Guarantors covenanted to: (i) maintain a net worth for the WEM-MOA 49% Equity of at least $680 million (the "Net Worth Covenant"); and (ii) continue to own at

7

least 49% interest in the Mall of America and the West Edmonton Mall (the "Ownership Covenant"). SAC ¶ 114; see also Plaintiff Payment Guaranty § 6.2. Furthermore, § 6.3 of the Plaintiff Payment Guaranty prohibited the WEM-MOA Guarantors from transacting with any "Affiliate"[4] if the transaction would cause the Net Worth Covenant to be violated. SAC ¶ 114; see also Plaintiff Payment Guaranty § 6.3. As with the JPM Payment Guaranty, the Plaintiff Payment Guaranty provided that the Payment Guarantors waived any Reimbursement Claims "until such time as the Debt shall have been paid in full and the Guaranteed Obligations shall have been paid and performed in full." Plaintiff Payment Guaranty § 1.4.

Also in 2019, the WEM-MOA Guarantors, Ameream Mezz, and the owner of the Outparcel Entities entered into the Irrevocable Direction Letter (the "IDL") with JPMorgan and the AB AD Lender. SAC ¶ 120.[5] The IDL directed JPMorgan and the AB AD Lender to pay to the plaintiff any excess proceeds from the collections, sale, or other disposition of the WEM-MOA 49% Equity and other collateral—as defined in specified pledges and security

---

[4] The term "Affiliate" means "(i) the Guarantors, (ii) the Ghermezian Family Members (Ameream), (iii) any trusts established for the benefit of the Persons described in the foregoing clauses (i) and (ii), and (iv) any Person in which any of the Persons described in the foregoing clauses (i) through (iii) owns or holds ten percent (10%) or more of the direct or indirect ownership interests." SAC ¶ 114 n.15.

[5] The plaintiff was not a party to the IDL, although the plaintiff claims that it was a beneficiary of that agreement. See id. ¶¶ 120-23, 377.

agreements, which were all in favor of JPMorgan or the AB AD Lender (collectively, the "IDL Pledges")—but only if the JPM Loan and the 2017 Mezz Loan had been "satisfied in full." Id. (quoting Ex. B to SAC ("IDL"), ECF No. 73-2).

Simultaneously, the plaintiff, JPMorgan, and the AB AD Lender signed the Intercreditor Agreement (the "ICA"). Id. ¶ 125. The purpose of the ICA was to "provide for the relative priority of, and to evidence certain agreements with respect to," the three loans. Id. ¶ 126; see also Ex. C to SAC ("ICA"), ECF No. 73-3. Section 6(b) of the ICA would survive in the event of the termination of the ICA. See SAC ¶ 129. Section 6(b), which incorporated the IDL by reference, (i) entitled the plaintiff to any proceeds remaining after the disposition of the WEM-MOA 49% Equity and the repayment of the JPM Loan and the 2017 Mezz Loan, and (ii) precluded the plaintiff from suing any "Shared Guarantor"—including the WEM-MOA Guarantors and the Individual Guarantors—as long as the JPM Loan remained outstanding. Id. ¶¶ 127-28; ICA § 6(b). If there was a default on the JPM Loan, the ICA gave the plaintiff the right to cure the default or to purchase the defaulted JPM Loan to protect the plaintiff's junior investment. See ICA §§ 12(b), 14.

### B. The 2021 Agreement

The American Dream Mall struggled during the COVID-19 pandemic. SAC ¶ 74. In May 2020, JPMorgan informed the plaintiff

9

that Ameream had defaulted on the JPM Loan. Id. ¶ 131. Around
that time, Ameream Mezz also defaulted on the 2017 Mezz Loan.
See Ex. D to SAC ("2021 Agreement") at Sched. 1-B, ECF No. 73-4.

In January 2021, JPMorgan, the AB AD Lender, Ameream Mezz,
the American Dream Defendants, and Ghermezian family members and
affiliates entered into an agreement (the "2021 Agreement"). SAC
¶ 139. The plaintiff alleges that the defendants, the AB AD
Lender, and the Ghermezian family members and affiliated
entities negotiated and executed the 2021 Agreement in secret to
conceal that they were "freezing out" the plaintiff. Id.
According to the plaintiff, JPMorgan recognized the significant
risks facing the Ghermezian family—which allegedly stood to lose
all of its equity in the American Dream Mall—and saw an
opportunity to secure a windfall for itself in exchange for
allowing the Ghermezians to continue to operate and own the
American Dream Mall. See id. ¶¶ 132–40.

The 2021 Agreement provided that JPMorgan would not
prosecute a foreclosure, exercise any power of sale, or take any
other enforcement action against the WEM-MOA Guarantors. Id.
¶ 141. In exchange for extinguishing the WEM-MOA Guarantors' now
$2 billion-plus liability in connection with the defaulted
loans,[6] the WEM-MOA Guarantors would convey to JPMorgan the WEM-

---

[6] The SAC does not allege the dollar amount of the WEM-MOA Guarantors'
liabilities, only that these liabilities were discharged under the 2021
Agreement. See SAC ¶ 167. Citing Schedules 4 and 5 of the 2021 Agreement, the

MOA 49% Equity (the "WEM-MOA 49% Equity Transfers"). Id. ¶¶ 141, 167. JPMorgan and the WEM-MOA Guarantors stipulated the aggregate value of the WEM-MOA 49% Equity to be $50 million. Id. ¶ 144. However, the plaintiff alleges that this stipulated value was false and that the WEM-MOA 49% Equity was in fact worth approximately $1.045 billion. See id.

According to the plaintiff, because the 2021 Agreement was a "purely private arrangement," JPMorgan violated the provisions of the WEM-JPMorgan Pledge Agreement and the MOA-JPMorgan Pledge Agreement that allegedly required JPMorgan to engage in a public sale of the WEM-MOA 49% Equity in the event of a default. Id. ¶¶ 143-44, 148. The plaintiff claims that a public sale would have resulted in a "vastly higher value" for the WEM-MOA 49% Equity than the "false" $50 million valuation agreed to by JPMorgan and the WEM-MOA Guarantors. Id. ¶¶ 144-48.

The plaintiff also alleges that the transfers of the WEM-MOA 49% Equity at the stipulated value, as provided for in the 2021 Agreement, capped any Reimbursement Claims that the WEM-MOA Guarantors might have against Ameream at just $50 million—rather than their "actual" value of $1.045 billion. Id. ¶ 150. As a result, the WEM-MOA Guarantors allegedly were left with only $50

---

JPM Defendants assert that this amount was over $2 billion. See JPM Defs. Br. at 9-10, ECF No. 92; 2021 Agreement at Scheds. 4, 5 (stating that the total amount due on the JPM Loan, including late fees and interest, was over $1.43 billion, and that the total amount due on the 2017 Mezz Loan was over $630 million).

million in Reimbursement Claims available to satisfy their payment obligations on the Plaintiff Loan—nowhere near enough to repay the Plaintiff Loan, which now purportedly exceeds $400 million with interest. See id. ¶¶ 150–52.

The plaintiff alleges that the 2021 Agreement was "problematic" in several additional respects. Id. ¶ 153. For example, the plaintiff claims that JPMorgan failed to credit any amount of the WEM-MOA 49% Equity—let alone the $50 million in stipulated value—as a payment on the JPM Loan balance. Id. ¶¶ 171–72. In other words, JPMorgan received the WEM-MOA 49% Equity without applying the value of that asset to reduce the balance on the JPM Loan. Id. Also, the transfers of the WEM-MOA 49% Equity at the stipulated value allegedly violated the Plaintiff Payment Guaranty: the WEM-MOA Guarantors no longer owned 49% of the West Edmonton Mall and the Mall of America, no longer held equity worth at least $680 million, and had effectuated transactions with "Affiliates" that the Plaintiff Payment Guaranty expressly prohibited. See id. ¶ 155.

Moreover, the 2021 Agreement was allegedly designed to ensure that the WEM-MOA Guarantors, although released and discharged from all obligations owed to JPMorgan, remained "Shared Guarantors" under the ICA. Id. ¶ 157. The plaintiff alleges that this was because the WEM-MOA Guarantors were not released from the Environmental Indemnity, which kept intact

12

certain of their obligations to JPMorgan—even though, at the very least, WEM-3 had transferred the equity backing the JPM Loan to a JPM Defendant under the 2021 Agreement, and should have been released from the Environmental Indemnity as a result. See id. ¶¶ 157, 342. This purported machination improperly blocked the plaintiff from suing the WEM-MOA Guarantors until the JPM Loan was fully repaid. Id. ¶¶ 157, 173.

In addition, the plaintiff alleges that the 2021 Agreement modified the Individual Guarantors' payment guarantees on the JPM Loan so that those guarantees were enforceable only as a last resort after the realization of the value of all JPM Loan collateral. Id. ¶ 158. According to the plaintiff, this modification allowed the Ghermezian family to retain control and ownership of the American Dream Mall and its equity stake in the West Edmonton Mall and the Mall of America, notwithstanding the family's default on multiple loans, and effectively released the Individual Guarantors from their repayment obligations. Id. ¶¶ 158, 180. However, the Individual Guarantors, like the WEM-MOA Guarantors, remained "Shared Guarantors" under the ICA, which meant that the plaintiff could not sue the Individual Guarantors until the JPM Loan was repaid in full. Id. ¶ 180.

In all, through the 2021 Agreement, JPMorgan purportedly obtained a "massive windfall": the plaintiff alleges that JPMorgan gained assets worth over $1 billion at minimal expense

and with zero reduction of the JPM Loan, while the plaintiff remained barred from seeking immediate recourse against the Payment Guarantors. Id. ¶ 181. The plaintiff alleges that, although the 2021 Agreement was entered into in January 2021, the plaintiff did not learn about it until March 2021. Id. ¶¶ 142, 166.

The transfers provided for in the 2021 Agreement were consummated in late March 2021. Id. ¶¶ 161–62. The plaintiff alleges that it did not learn about the consummation of the transfers until June 2021. Id. ¶¶ 253, 280.

### C. The 2022 Agreements

The plaintiff alleges that, in May through July 2022, the defendants and the plaintiff attempted to negotiate a consensual restructuring of the loans. Id. ¶¶ 242, 382. These negotiations were unsuccessful. See id. ¶ 383.

In October 2022, the AB AD Lender foreclosed on Ameream Mezz's interest in Ameream (the "Strict Foreclosure"). Id. ¶¶ 182–83. The plaintiff received notice of the Strict Foreclosure on October 3, 2022. Id. ¶ 182. As a result of the Strict Foreclosure, the 2017 Mezz Loan was satisfied, which meant that the only debt that should have remained senior to the Plaintiff Loan was the JPM Loan. Id. ¶¶ 185–86. Furthermore, the Strict Foreclosure caused the ICA to terminate; the only surviving provision of the ICA is § 6(b). Id. ¶ 188.

Alongside the Strict Foreclosure, the defendants executed two agreements: (1) the Omnibus Agreement and Seventh Amendment to Loan Agreement (the "7th Amendment"), and (2) the Standstill Agreement (together, the "2022 Agreements"). See id. ¶¶ 187, 204, 222. The plaintiff claims that the 2022 Agreements, allegedly executed in secret, were part of the defendants' purported plan to "destroy" the plaintiff's lien on equity in the American Dream Mall; to redirect to the AB AD Lender funds that the plaintiff claims should have been available to repay the Plaintiff Loan; and to ensure—improperly—that the Ghermezian family retained ownership in the American Dream Mall, notwithstanding that the AB AD Lender had supposedly foreclosed on the family's ownership stake in that mall. Id. ¶ 187. The plaintiff alleges that it did not receive copies of the 2022 Agreements until May 2024—almost two years later. See id. ¶ 196.

### 1. The 7th Amendment

The 7th Amendment was an agreement between JPMorgan, Ameream, the Outparcel Entities, the WEM-MOA Guarantors, members of the Ghermezian family, and various other non-parties to this action. See id. ¶¶ 18, 204; see also Ex. F to SAC ("7th Amendment"), ECF No. 73-6. The plaintiff alleges that the 7th Amendment was not only an amendment to the JPM Loan but also a "substantial reshuffling" of rights between JPMorgan, the AB AD Lender, and the Ghermezians. SAC ¶ 204. The plaintiff claims

15

that certain provisions of the 7th Amendment violated or otherwise interfered with the plaintiff's rights pursuant to the IDL, the Plaintiff Payment Guaranty, and § 6(b) of the ICA. Id.

The 7th Amendment referred to a new "Mezzanine Loan" in the amount of $475 million between the AB AD Lender and a Ghermezian-affiliated borrower (the "2022 Mezz Loan"). Id. ¶ 205. The 7th Amendment supposedly pledged, as collateral to the AB AD Lender for the 2022 Mezz Loan, the WEM-MOA 49% Equity, as well as the equity interests of Ameream and the Outparcel Entities. Id. ¶ 206. The plaintiff alleges that the 2022 Mezz Loan was a "fictional version" of the 2017 Mezz Loan, which had already been fully discharged through the Strict Foreclosure. Id. ¶ 207. The plaintiff further alleges that the AB AD Lender provided no additional funds in support of this supposed "new" 2022 Mezz Loan, bolstering the plaintiff's assertion that the 2022 Mezz Loan was a "phantom" investment. See id. ¶¶ 207, 216.

Section 7 of the 7th Amendment required JPMorgan to distribute any excess proceeds realized from any disposition of the WEM-MOA 49% Equity to the AB AD Lender (to repay amounts outstanding under the 2022 Mezz Loan) after the JPM Loan was repaid in full. Id. ¶ 209. According to the plaintiff, this provision violated the IDL, because the IDL required JPMorgan to distribute this excess cash to the plaintiff, not to the AB AD Lender. See id. ¶ 210.

16

Section 7(b) of the 7th Amendment provided for the transfer of the WEM-MOA 49% Equity from JPMorgan to the AB AD Lender once the JPM Loan was paid in full. Id. ¶¶ 212-15. The plaintiff alleges that this provision of the 7th Amendment violated the IDL and § 6(b) of the ICA. Id. ¶ 213.

Section 4(c) of the 7th Amendment provided for a one-time distribution of $48.5 million in cash by WEM-3 to Ameream to fund the operations of the American Dream Mall, rather than to reduce the JPM Loan. Id. ¶ 220. The plaintiff claims that this cash distribution violated the Plaintiff Payment Guaranty and constituted a fraudulent conveyance. Id.

Section 4(b) of the 7th Amendment provided for over $170 million in additional funding from JPMorgan and the AB AD Lender for the Project. See 7th Amendment § 4(b). To secure this commitment, WEM-3 entered into new guarantees. See id. § 5(b).

### 2. The Standstill Agreement

The Standstill Agreement between JPMorgan and the AB AD Lender effectuated what the plaintiff characterizes as "artificial" and "sham[]" transactions, which the defendants allegedly designed in secret to "end-run" the plaintiff's rights under the IDL and the ICA. See SAC ¶¶ 223-41 & n.26.

In relevant part, the Standstill Agreement terminated any existing pledges held by the AB AD Lender as collateral for the 2022 Mezz Loan. Id. ¶ 229 (quoting Ex. E to SAC ("Standstill

17

Agreement") §§ 2, 4). Through § 8(c) of the Standstill
Agreement, JPMorgan allegedly obtained for itself the ability to
obtain those same pledges—including the same collateral that the
plaintiff claims was intended to be available to repay the
Plaintiff Loan—as collateral securing any future refinancing of
the JPM Loan. See id. ¶¶ 237–38.

Pursuant to § 13(b) of the Standstill Agreement, JPMorgan
and the AB AD Lender agreed that excess proceeds received in
connection with any transfer of collateral securing the JPM Loan
would be delivered to the AB AD Lender for application against
amounts outstanding under the 2022 Mezz Loan. Id. ¶¶ 230–31.
Also, like the 7th Amendment, § 7(c) of the Standstill Agreement
required JPMorgan to transfer the WEM-MOA 49% Equity to the AB
AD Lender if the JPM Loan had been paid in full. Id. ¶ 235.

According to the plaintiff, these convoluted maneuvers
interfered with the plaintiff's rights under the IDL and § 6(b)
of the ICA to receive any excess proceeds relating to the WEM-
MOA 49% Equity and other pledged collateral once the JPM Loan
was repaid in full. See id. ¶¶ 232–39. In other words, the
plaintiff alleges that the Standstill Agreement essentially
permitted the "fake" 2022 Mezz Loan and any future refinancing
of the JPM Loan to jump ahead of the Plaintiff Loan in the
repayment queue—when, as alleged by the plaintiff, at that

point, the Plaintiff Loan should have been subordinate only to
the existing JPM Loan. See id.

### D. The Dispute

In May 2021, the American Dream Borrower defaulted on the
Plaintiff Loan. Id. ¶ 189. In February 2023, the plaintiff sued
the American Dream Borrower in New York state court, and in May
2023, the plaintiff obtained a judgment against the American
Dream Borrower in the amount of $404,399,512.87 (the "American
Dream Judgment"). Id. ¶¶ 190-91. The American Dream Judgment
remains outstanding, with interest accruing at the state
statutory rate. Id. ¶ 191.

On March 23, 2023, the plaintiff filed this action in New
York state court, and the defendants removed the action to this
Court on July 26, 2023. Id. ¶¶ 66-67. On November 8, 2024, the
plaintiff filed the First Amended Complaint. See ECF No. 44. On
June 25, 2024, the plaintiff filed the SAC, which is the
operative complaint. See ECF No. 73.

The SAC asserts eleven causes of action against the
defendants: (1) fraudulent transfer against JPMorgan and the WEM
Guarantors ("Count I"); (2) fraudulent transfer against Ameream
("Count II"); (3) fraudulent transfer against JPMorgan, JPM-D5,
and the MOA Guarantor ("Count III"); (4) tortious interference
against JPMorgan ("Count IV"); (5) marshaling against JPMorgan
("Count V"); (6) breach of the implied covenant of good faith

and fair dealing against JPMorgan ("Count VI"); (7) declaratory relief with respect to the ICA against JPMorgan ("Count VII"); (8) declaratory relief as to the Reimbursement Claims against all the defendants ("Count VIII"); (9) anticipatory breach of the IDL and the ICA against JPMorgan ("Count IX"); (10) tortious interference with the IDL and the ICA against Ameream and the Outparcel Entities ("Count X"); and (11) tortious interference with the Plaintiff Payment Guaranty against JPMorgan, Ameream, and the Outparcel Entities ("Count XI").

The defendants have moved to dismiss Counts I and III, and portions of Counts VII and VIII, for lack of standing pursuant to Rule 12(b)(1). The defendants have also moved to dismiss all claims pursuant to Rule 12(b)(6). <u>See</u> ECF Nos. 89, 94.

## II. Legal Standard

To prevail against a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence. <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000).[7] In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true. <u>See</u> <u>J.S. ex rel. N.S. v. Attica Cent. Schs.</u>, 386 F.3d 107,

---

[7] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

110 (2d Cir. 2004). However, the Court does not draw all reasonable inferences in the plaintiff's favor. Id.

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in

bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

When presented with a motion under both Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the Court should consider the jurisdictional challenge to a given claim first. See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990); see also United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir. 1999) ("Whether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit.").

### III. Rule 12(b)(1) Motions

As a threshold matter, the defendants argue that Counts I and III, and certain claims under Counts VII and VIII, should be dismissed pursuant to Rule 12(b)(1) for lack of standing.

### A. Counts I and III

The defendants claim that the plaintiff has failed to allege injury in fact caused by the WEM-MOA 49% Equity Transfers and thus lacks Article III standing to bring Counts I and III. In Counts I and III, the plaintiff claims that the WEM-MOA 49% Equity Transfers were fraudulent transfers.

22

The plaintiff has alleged that the WEM-MOA 49% Equity Transfers caused an injury in fact. According to the plaintiff, the WEM-MOA 49% Equity Transfers stripped the WEM-MOA Guarantors of valuable assets. SAC ¶ 150. Furthermore, stipulating to a $50 million valuation of the WEM-MOA 49% Equity capped the WEM-MOA Guarantors' Reimbursement Claims at just $50 million—with no reduction to the JPM Loan balance. Id. ¶¶ 151-52, 175.[8] The plaintiff alleges that the undervaluing of the WEM-MOA 49% Equity by almost $1 billion, and the corresponding capping of the Reimbursement Claims, have left the WEM-MOA Guarantors with insufficient assets to repay the Plaintiff Loan. See id. ¶¶ 150-52, 170, 175.

In essence, the plaintiff claims that WEM-MOA 49% Equity Transfers have made repayment of the Plaintiff Loan—now with a balance over $400 million, see id. ¶ 10—impossible. This is a "classic pocketbook injury" sufficient to confer standing. Tyler v. Hennepin Cnty., 598 U.S. 631, 636 (2023). Monetary harms "readily qualify as concrete injuries under Article III." TransUnion LLC v. Ramirez, 594 U.S. 413, 425 (2021); see also Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman, 277 B.R. 20, 33 (S.D.N.Y. 2002) (finding that creditors had standing to challenge transactions where the complaint

---

[8] As explained above, Reimbursement Claims were contingent claims that the WEM-MOA Guarantors could assert against Ameream to recoup payments that the WEM-MOA Guarantors made to creditors.

alleged that the transactions left insufficient funds in a reserve account to pay the outstanding claims of almost 90,000 creditors). At this point, the plaintiff "need not definitively prove [its] injury or disprove the [defendants'] defenses." Tyler, 598 U.S. at 637. The plaintiff "has plausibly pleaded on the face of [the] complaint that [the plaintiff] suffered financial harm" from the WEM-MOA 49% Equity Transfers, "and that is enough for now." Id.

The defendants resist this conclusion on several grounds, but none of them has merit. To start, the defendants contend that the alleged effect of the WEM-MOA 49% Equity Transfers was not an "injury" suffered by the plaintiff but was instead simply a "feature" of the plaintiff's status as the junior creditor. JPM Defs. Br. at 25, ECF No. 92; see also American Dream Defs. Br. at 22, ECF No. 95. However, the defendants' proposed framing ignores the SAC's allegations. The plaintiff's complaint is not merely that it was the junior creditor. Rather, the plaintiff alleges that the challenged transfers occurred at false valuations and improperly hindered repayment of the Plaintiff Loan.

The defendants also argue that, even had the plaintiff's preferred valuation of the WEM-MOA 49% Equity been credited against the JPM Loan balance, the JPM Loan still would not have been paid in full (although the outstanding balance would have

been smaller). See American Dream Defs. Reply at 11–12, ECF No. 105. Therefore, the defendants assert that the plaintiff suffered no injury because the plaintiff would have been in the same position even in the absence of any alleged wrongdoing in connection with the WEM-MOA 49% Equity Transfers: the JPM Loan would be intact, and the plaintiff would still be precluded from pursuing claims against the Payment Guarantors. But this argument overlooks the SAC's allegations. Specifically, the plaintiff alleges that, had JPMorgan credited the true value of the WEM-MOA 49% Equity to the JPM Loan balance, JPMorgan would have been owed less than $500 million (rather than over $1 billion), "secured by the American Dream Mall, which was worth far in excess of that amount [$500 million] and would have provided a sufficient cushion to ensure repayment of the Plaintiff Loan." SAC ¶ 170.

In addition, the defendants contend that any alleged injury based on the purported capping of the Reimbursement Claims at $50 million is too speculative to establish Article III standing. See JPM Defs. Br. at 25–26; American Dream Defs. Br. at 22–23. According to the defendants, the WEM-MOA Guarantors have no Reimbursement Claims against Ameream yet because the WEM-MOA Guarantors have waived any Reimbursement Claims until the JPM Loan has been repaid.

However, that the assertion of any Reimbursement Claims was subject to a condition—the full repayment of the JPM Loan—does not mean that the Reimbursement Claims themselves did not exist. Cf. Attestor Master Value Fund LP v. Argentina, 113 F.4th 220, 230 & n.6 (2d Cir. 2024) (observing that whether a debtor "can exercise . . . reversionary interests and gain access to excess collateral is separate from the question whether a creditor can attach those interests"). Whether the fact that the JPM Loan remains outstanding precludes the plaintiff from obtaining relief based on its Reimbursement Claims theory may bear on the merits of the plaintiff's claims, namely the resulting damages the plaintiff will be able to prove, but not the threshold standing issue.

Accordingly, the plaintiff has Article III standing to bring Counts I and III. The defendants' motions to dismiss those claims pursuant to Rule 12(b)(1) are **denied.**

### B. Counts VII and VIII

The defendants contend that the plaintiff lacks standing to seek declarations that: WEM-3 has fully performed under the Environmental Indemnity and is therefore no longer a Shared Guarantor (Count VII), see SAC ¶ 344;[9] and the WEM-MOA Guarantors

---

[9] In Count VII, the plaintiff also seeks a declaration that any limitations under § 6(b) of the ICA are null and void. SAC ¶ 343. That part of Count VII is addressed in the context of the defendants' Rule 12(b)(6) motions. See infra section IV.G.

have Reimbursement Claims against Ameream in the amounts of
$1.045 billion and $48.5 million in connection with the WEM-MOA
49% Equity Transfers and the $48.5 million cash transfer,
respectively (Count VIII), see id. ¶¶ 354-58.

The Declaratory Judgment Act (the "DJA") provides: "In a
case of actual controversy within its jurisdiction, . . . any
court of the United States, upon the filing of an appropriate
pleading, may declare the rights and other legal relations of
any interested party seeking such declaration, whether or not
further relief is or could be sought." 28 U.S.C. § 2201(a). The
DJA "does not expand jurisdiction" and provides no independent
cause of action; its "operation is procedural only—to provide a
form of relief previously unavailable." In re Joint Eastern &
Southern Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir. 1993).

In Count VII, the plaintiff's request for a declaration
that WEM-3 has fully performed under the Environmental Indemnity
would improperly "expand the range of factual disputes that may
be decided by a district court sitting in diversity." Richards
v. Select Ins. Co., 40 F. Supp. 2d 163, 169 (S.D.N.Y. 1999).
"Under New York law, the terms of a contract may be enforced
only by contracting parties or intended third-party
beneficiaries of the contract." Andrews v. Sony/ATV Music
Publishing, LLC, No. 15-cv-7544, 2017 WL 770614, at *7 (S.D.N.Y.
Feb. 24, 2017). It follows that "[p]arties who lack standing to

enforce an agreement also lack standing to seek a declaration of rights under the contract." Id. In this case, the plaintiff has alleged that the Environmental Indemnity was an agreement between JPMorgan and the Payment Guarantors—but not that the plaintiff was a party to that agreement. See SAC ¶ 100. The plaintiff is not entitled to a declaration of rights under a contract to which it was not a party.

For similar reasons, in Count VIII, the plaintiff lacks the ability to seek declaratory relief as to the proper valuation of Reimbursement Claims that the WEM-MOA Guarantors may have against Ameream. The SAC does not allege that the plaintiff was a party to the agreements giving rise to the Reimbursement Claims. As explained above, a non-party to a contract may not sue to enforce that contract or for a declaration of rights under that contract. See Andrews, 2017 WL 770614, at *7; see also Highlands Ins. Co. v. PRG Brokerage, Inc., No. 01-cv-2272, 2004 WL 35439, at *14 (S.D.N.Y. Jan. 6, 2004) ("[A] claimant generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

Therefore, the defendants' motions to dismiss the portion of Count VII addressed above and Count VIII in its entirety pursuant to Rule 12(b)(1) are **granted.**

### IV. Rule 12(b)(6) Motions

Turning to the merits, the defendants seek dismissal of the SAC for failure to state a claim.

### A. Fraudulent Conveyance Claims (Counts I, II, and III)

The defendants move to dismiss the plaintiff's fraudulent conveyance claims. In Counts I and III, the plaintiff asserts fraudulent transfer claims in connection with the transfers of the WEM-MOA 49% Equity in 2021. See SAC ¶¶ 250–65, 277–91. In Count II, the plaintiff challenges the transfer of $48.5 million from WEM-3 to Ameream in 2022. See id. ¶¶ 266–76.

### 1. Counts I and III (WEM-MOA 49% Equity Transfers)

The defendants contend that the plaintiff has failed to state a claim for fraudulent conveyance as to the WEM-MOA 49% Equity Transfers.

### a. Count I

Count I, brought against the JPM Defendants, alleges that the transfer of the WEM Equity in 2021 and the resulting "capping" of the corresponding Reimbursement Claims at $49 million constituted fraudulent transfers. See SAC ¶¶ 262–64. Under Alberta law,[10] claims for fraudulent transfers are governed

---

[10] The parties agree that the law of Alberta—where the transferor (WEM-3) and the disputed assets were located—governs Count I. See JPM Defs. Br. at 20; American Dream Defs. Br. at 10; Pltf. Opp. at 16 & n.8, ECF No. 101. The Court can accept that assertion. See Alphonse Hotel Corp. v. Tran, 828 F.3d 146, 152 (2d Cir. 2016) ("In a diversity case such as this one, the choice-of-law rules of New York, the forum state, govern. . . . Under New York

by the Fraudulent Preferences Act, R.S.A. 2000, c F-24 (the
"FPA"), and the Fraudulent Conveyances Act 1571, 13 Eliz. 1 c 5
(the "Statute of Elizabeth"), and the common law interpreting
the two statutes. See Decl. of Neil Wittmann ("Wittmann Decl.")
¶ 17, ECF No. 91; Decl. of Bonnie Rawlins ("Rawlins Decl.")
¶ 21, ECF No. 102. The purpose of both statutes is to protect
creditors by allowing courts to "strike down all conveyances of
property made with the intention of defrauding creditors, except
for conveyances made for good consideration and bona fide to
persons not having notice of fraud." Lay v. Lay, 2023 ABKB 354,
2023 CarswellAlta 1714, para. 36 (Can. Alta. K.B.).

To state a claim for fraudulent conveyance under § 1 of the
FPA, a plaintiff must establish that (1) there was a transfer of
property (2) made by a person who is "in insolvent circumstances
or is unable to pay the person's debts in full or knows that the
person is on the eve of insolvency," and (3) the transfer was
done "with intent to defeat, hinder, delay or prejudice the
person's creditors." FPA s 1; see also, e.g., Westcorp Inc. v. H
& H Stucco & Siding Ltd., 2016 ABQB 650, 2016 CarswellAlta 2233,
para. 11 (Can. Alta. Q.B.).

To state a claim for fraudulent preference under § 2 of the
FPA, a plaintiff must show that (1) there was a transfer of

---

choice-of-law rules, where the parties agree that a certain jurisdiction's
law controls, this is sufficient to establish choice of law.").

property, (2) by an insolvent person or a person who is on the eve of insolvency, (3) to a creditor, (4) with the intent of giving that creditor a preference. FPA s 2; see also, e.g., Re Titan Invs. Ltd. P'ship, 2005 ABQB 637, 2005 CarswellAlta 1153, para. 13 (Can. Alta. Q.B.).

The test for a fraudulent conveyance claim under the Statute of Elizabeth is similar but not identical to the test for a claim under § 1 of the FPA. To state a claim for fraudulent conveyance under the Statute of Elizabeth, a plaintiff must establish: (1) a conveyance of property; (2) for nominal or no consideration; (3) with intent to defraud, delay, or hinder creditors; (4) the party challenging the conveyance must be a creditor or someone with a legal or equitable right to claim against the transferor; and (5) the conveyance must have had the intended effect. Westcorp, 2016 ABQB 650 at para. 33; see also Palechuk v. Fahrlander, 2006 ABCA 242, 2006 CarswellAlta 1062, para. 31 (Can. Alta. C.A.).

The defendants challenge the plaintiff's fraudulent transfer claims in Count I on three grounds.[11] Specifically, the defendants argue that: the WEM Equity was fully encumbered at the time of the transfer, and—according to the defendants—fully encumbered property is immune from fraudulent transfer claims

---

[11] As to Count I, the defendants do not contest that the plaintiff has adequately pleaded that there was a transfer of property or that there was the requisite intent to defraud, delay, or hinder the plaintiff.

under Alberta law; the WEM Guarantors were not insolvent; and the claims are time-barred under Alberta law. Each of these arguments misses the mark.

### (i) Fully Encumbered Assets

First, the defendants cite no on-point authority for the proposition that, under Alberta law, fully encumbered assets cannot be the subject of a fraudulent conveyance claim. As the JPM Defendants' Canadian law expert concedes, "courts in Alberta have not yet ruled directly on the precise question of whether fully encumbered assets are susceptible to a fraudulent transfer or fraudulent preference challenge." Wittmann Decl. ¶ 40. Instead, the JPM Defendants rely on cases from "the analogous circumstance in which property is statutorily exempt from execution or seizure" pursuant to the Civil Enforcement Act, RSA 2000, c C-15 (the "CEA"). See Wittmann Decl. ¶¶ 41-45, 57.

However, as the plaintiff's Canadian law expert persuasively argues, an "exemption" is different from an "encumbrance," and therefore the analogy that the JPM Defendants' expert attempts to draw fails. See Rawlins Decl. ¶¶ 59-73. "Exempt" property has a specific definition under Canadian law: Part 10 of the CEA sets forth the types of property that are "exempt from writ proceedings." CEA § 88. In the bankruptcy context, the purpose of the CEA's statutory exemptions is "to permit a bankrupt to retain some small portion

of their assets in order to give them a minimal financial stake in life when they emerge from the bankruptcy process." Chan (Re), 2022 ABQB 424, 2022 CarswellAlta 1554, para. 68 (Can. Alta. Q.B.). Many of the cases cited by the defendants concern statutorily exempt property. See, e.g., Royal Bank v. Laughlin, 2001 ABCA 78, 2001 CarswellAlta 402, para. 33 (Can. Alta. C.A.) ("[A] disposition by a debtor of property, the full value of which is exempt, is not unlawful or fraudulent . . . ."). But those cases are inapplicable to this case because the WEM Equity is not exempt under the CEA; at the time of the challenged transfer, the WEM Equity was allegedly encumbered by the claims of JPMorgan and the AB AD Lender.[12]

In addition, the plaintiff has identified persuasive authority from another Canadian jurisdiction that supports its argument. In Wilson v. Gill, the British Columbia Court of Appeal, responding to the appellant's argument that there can be no intent to defraud where the encumbrances on land that is conveyed exceed the market value of the land, stated that: "[I]f the point has merit, one would have thought that in the now 427 years since the enactment of the Fraudulent Conveyance Act, the

---

[12] Smith v. Rutledge, the one case cited by the defendants that does not involve exempt property, does not help the defendants. 2023 ABKB 571, 2023 Carswell Alta 2627 (Can. Alta. K.B.). As the defendants acknowledged at oral argument, the Smith court did not hold that encumbered property is immune from a fraudulent transfer challenge. See id. at paras. 32-33. In fact, the court in Smith ultimately concluded that the challenged transaction was a fraudulent transfer under § 1 of the FPA. Id. at para. 37.

point would have been made." 49 B.C.L.R. 3d 137, 1998 CarswellBC 584, para. 36 (Can. B.C. A.C.). Accordingly, the contention that fully encumbered property is immune from fraudulent transfer claims under Alberta law is without merit.

### (ii) Insolvency

Second, the plaintiff has alleged insolvency, which is an element of a claim under the FPA.[13] Section 1 of the FPA requires that the challenged transfer be made "by a person at a time when the person is in insolvent circumstances or is unable to pay the person's debts in full or knows that the person is on the eve of insolvency." FPA § 1; see also Servus Credit Union v. JRD Invs. Inc., 2020 ABQB 249, 2020 CarswellAlta 673, para. 37 (Can. Alta. Q.B.). Plaintiffs in an FPA action "must establish that [the debtor] either was insolvent at the time of the [transactions] or was rendered insolvent by them." Lay, 2023 ABKB 354 at para. 60 (emphasis added); see also Rawlins Decl. ¶¶ 44-48. To establish this element, the plaintiff "need only prove facts that will warrant a reasonable inference of insolvency, at which point the defendant would need to adduce evidence to rebut that prima facie evidence." Servus, 2020 ABQB 249 at para. 37.

There are two approaches to measuring insolvency: the balance sheet test and the cash flow test. Lay, 2023 ABKB 354 at

---

[13] Insolvency is not an element of a claim under the Statute of Elizabeth. See Fish Creek Finish Carpentry Ltd. v. Lindner, 2021 ABCA 348, 2021 CarswellAlta 2580, para. 22 (Can. Alta. C.A.).

para. 63. "Under the balance sheet test, insolvency occurs when an individual debtor's liabilities exceed the fair market value of their assets." Id. at para. 64. "Under the cash flow test, also known as the 'ability to pay' test, insolvency occurs when [a debtor] cannot pay [its] debts as they become due in the ordinary course because [the debtor] lack[s] financial liquidity." Id. at para. 66.

The SAC sufficiently alleges that the WEM Guarantors were rendered balance sheet insolvent by the transfer of the WEM Equity. See SAC ¶ 151 ("When the transfers contemplated by the 2021 Agreement were consummated in late March 2021, the WEM-MOA Guarantors necessarily were rendered balance sheet insolvent— they had, at most, $50 million in improperly-capped, contingent Reimbursement Claims to pay the defaulted Plaintiff Loan, and they now owed $400 million to Plaintiff . . . ."); see also id. ¶ 263. In short, as a result of the challenged transfer, the WEM Guarantors' "aggregate debt exceed[ed] the aggregate value of their assets." Lay, 2023 ABKB 354 at para. 61. Therefore, the facts alleged "warrant a reasonable inference of insolvency." Servus, 2020 ABQB 249 at para. 37.

### (iii) Statute of Limitations

Third, the defendants argue that Count I is time-barred. The defendants entered into the 2021 Agreement on or about January 29, 2021. SAC ¶ 139. Counsel for JPMorgan sent a copy of

the 2021 Agreement to the plaintiff on February 1, 2021. See Ex. 11 to Mac Avoy Decl., ECF No. 90-11. Because the contemplated transfers of the WEM-MOA 49% Equity were subject to conditions precedent, however, the plaintiff alleges that the WEM Equity transfer was not completed until March 25, 2021. See SAC ¶¶ 159–61. The plaintiff further alleges that it did not learn about the consummation of the WEM Equity transfer until June 2, 2021. Id. ¶ 166. The plaintiff filed the initial Summons with Notice in state court on March 23, 2023. See ECF Nos. 1-1, 1-2.

The Alberta Limitations Act requires that claims be brought within two years after the plaintiff "first knew, or in the circumstances ought to have known, (i) that the injury for which the [plaintiff] seeks a remedial order had occurred, (ii) that the injury was attributable to conduct of the defendant, and (iii) that the injury . . . warrants bringing a proceeding." RSA 2000, c L-12, § 3(1). In other words, "the limitations clock begins to run not when the event happens, but when the injury is discovered." Lay, 2023 ABKB 354 at para. 75. Because "[i]t is possible that there will be separate claims based on different injuries arising from the same event," applicable limitations periods "may begin at different times for different injuries for which remedial orders are sought." Sun Gro Horticulture Canada Ltd. v. Abe's Door Serv. Ltd., 2006 ABCA 243, 2006 CarswellAlta 1067, para. 10 (Can. Alta. C.A.). "Determining when a claimant

becomes aware of an injury that warrants bringing an action is a fact specific exercise turning on the facts of each case." Aseniwuche Winewak Nation of Canada v. Ackroyd LLP, 2023 ABCA 60, 2023 CarswellAlta 399, para. 11 (Can. Alta. C.A.).

In this case, the key question is when the plaintiff learned of the injury underlying the claims asserted in Count I. According to the defendants, the two-year statute of limitations period started to run on February 1, 2021, when the plaintiff purportedly learned of the execution of the 2021 Agreement. The plaintiff argues that the limitations period began to run on June 2, 2021, when the plaintiff allegedly first learned of the consummation of the WEM Equity transfer.

There are, at least, issues of fact as to whether Count I is time-barred. The injury for which the plaintiff seeks relief occurred when the WEM Equity was transferred, because the transfer allegedly left the WEM Guarantors with assets "woefully inadequate to repay the Plaintiff Loan." SAC ¶ 263. There could not have been any fraudulent conveyance claim until a conveyance occurred. After all, the purpose of the FPA and the Statue of Elizabeth is to protect creditors by allowing courts to "strike down all conveyances of property made with the intention of defrauding creditors." Lay, 2023 ABKB 354 at para. 36 (emphasis added). As the Alberta Court of Appeal put it, "[i]t is not the knowledge of any injury that suffices. Nor is knowledge of the

37

risks enough. To invoke s.3(1)(a) of the [Alberta Limitations] Act . . . , knowledge of <u>the injury for which the claimant seeks a remedial order</u> is required." <u>Sun Gro</u>, 2006 ABCA 243 at para. 5 (emphasis added). To the extent that the defendants argue that the plaintiff should have known that JPMorgan would likely take the WEM Equity before June 2021, there is no requirement that "a claimant who has a potential claim must commence a 'placeholder action' as soon as the <u>possibility</u> of an injury becomes apparent." <u>Aseniwuche</u>, 2023 ABCA 60 at paras. 25, 35 (emphasis added). Accordingly, the two-year statute of limitations on the plaintiff's Count I claims began to run on June 2, 2021—when the plaintiff allegedly first learned of the consummation of the WEM Equity transfer.

For all of these reasons, the defendants' motion to dismiss Count I is **denied**.[14]

### b. Count III

Count III, asserted against the JPM Defendants and the MOA Guarantor, alleges that the transfer of the MOA Equity in 2021 and the "capping" of the corresponding Reimbursement Claims at $1 million constituted fraudulent transfers. <u>See</u> SAC ¶¶ 277–91.

---

[14] Having concluded that the SAC states a claim in Count I for fraudulent conveyance with respect to the WEM Equity transfer, it is unnecessary to reach the parties' arguments regarding the plaintiff's Reimbursement Claims theory of fraudulent conveyance.

Under the Minnesota Uniform Voidable Transactions Act (the
"MUVTA"),[15]

> A transfer made . . . by a debtor is voidable as to a
> creditor, whether the creditor's claim arose before or
> after the transfer was made or the obligation was
> incurred, if the debtor made the transfer . . . :
>
> > (1) with actual intent to hinder, delay, or
> > defraud any creditor of the debtor; or
> >
> > (2) without receiving a reasonably equivalent
> > value in exchange for the transfer or
> > obligation, and the debtor:
> >
> > > (i) was engaged or was about to
> > > engage in a business or a
> > > transaction for which the remaining
> > > assets of the debtor were
> > > unreasonably small in relation to
> > > the business or transaction; or
> > >
> > > (ii) intended to incur, or believed
> > > or reasonably should have believed
> > > that the debtor would incur, debts
> > > beyond the debtor's ability to pay
> > > as they became due.

Minn. St. § 513.44(a); see also id. § 513.45(a) ("A transfer

made . . . is voidable as to a creditor whose claim arose before

the transfer was made . . . if the debtor made the transfer

. . . without receiving a reasonably equivalent value in

exchange for the transfer . . . and the debtor was insolvent at

that time or the debtor became insolvent as a result of the

transfer . . . ."). The MUVTA defines a "[t]ransfer" as "every

---

[15] The parties agree that Count III is governed by Minnesota law. See JPM
Defs. Br. at 20; American Dream Defs. Br. at 22 n.13; Pltf. Opp. at 16 n.8,
20.

mode, direct or indirect, absolute or conditional, voluntary or
involuntary, of disposing of or parting with an asset or an
interest in an asset, and includes payment of money, release,
lease, license, and creation of a lien or other encumbrance,"
subject to exceptions not relevant in this case. Id.
§ 513.41(16). The term "[a]sset," meanwhile, "means property of
a debtor, but . . . does not include . . . property to the
extent it is encumbered by a valid lien." Id. § 513.41(2)(i).

    In moving to dismiss Count III, the defendants principally
advance two arguments: (1) because the MOA Equity was fully
encumbered, it is outside the reach of the MUVTA; and (2) the
plaintiff has failed to allege the lack of reasonably equivalent
value, an element of a claim under the MUVTA.

### (i) Actionable Transfer

    With respect to the defendants' first argument, the
plaintiff does not dispute that the transfer of the MOA Equity
is not a voidable transfer under the MUVTA. Nor could the
plaintiff contend otherwise: fully encumbered property falls
outside the scope of the statute; the MOA Equity was fully
encumbered and thus not an "asset" as defined in the MUVTA. See
id. §§ 513.44(a), 513.45(a), 513.41(2)(i), (16); see also Am.
Fed. Bank v. W. Central Ag Servs., 530 F. Supp. 3d 780, 782,
788-89 (D. Minn. 2021) ("Because the payment at issue was made
using funds from a fully encumbered deposit account, . . . the

40

payment does not qualify as a transfer of an asset as required to bring a claim under MUVTA."). Therefore, insofar as Count III raises claims based on the transfer of the MOA Equity, the defendants' motions to dismiss are **granted**.

However, that is not the end of the inquiry. To avoid dismissal of Count III, the plaintiff argues that, in addition to the MOA Equity, the MOA Guarantor's unencumbered Reimbursement Claims are also among the "assets" that were fraudulently "transferred." See Pltf. Opp. at 18-19 ("[T]he Reimbursement Claims are unencumbered assets, and the [d]efendants' transactions in 2021 destroyed them.").

The defendants respond that the alleged capping of the MOA Guarantor's Reimbursement Claims at $1 million is not an actionable "transfer" under the MUVTA. But this argument cannot be reconciled with the statute's broad definition of "transfer": "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, license, and creation of a lien or other encumbrance." Minn. St. § 513.41(16) (emphasis added). The MUVTA "is a remedial statute and is meant to be construed broadly." Landmark Cmty. Bank, N.A. v. Klingelhutz, 874 N.W.2d 446, 450 (Minn. Ct. App. 2016). The plaintiff alleges that, through the MOA Equity transfer, the defendants "destroyed" the

41

corresponding Reimbursement Claims, reducing the value of the
MOA Guarantor's Reimbursement Claims from over $245 million to
$1 million. SAC ¶¶ 16, 285; see also id. ¶¶ 94, 149, 150, 160,
162. As alleged, the capping of the Reimbursement Claims at $1
million could be viewed as an "indirect" and "conditional"
"parting with an asset"—over $244 million in Reimbursement
Claims—by the MOA Guarantor. See Minn. St. § 513.41(16).

In addition, the JPM Defendants argue that they are not
proper defendants for the alleged fraudulent "transfer" of the
Reimbursement Claims. The MUVTA permits recovery against a
"transferee" of the asset or "the person for whose benefit the
transfer was made." Id. § 513.48(b). The JPM Defendants
correctly assert that the "transferee" in the alleged "transfer"
of the Reimbursement Claims is Ameream—not JPMorgan. Therefore,
the question is whether JPMorgan was a "person for whose benefit
the transfer was made." Id.

On this point, the JPM Defendants have the better argument.
The plaintiff has failed to allege that JPMorgan was "the person
for whose benefit the transfer was made." Id. Beneficiary
liability under the MUVTA will lie only where the benefit is
"direct, ascertainable[,] and quantifiable." In re RFC & ResCap
Liquidating Trust Litig., No. 13-cv-3451, 2017 WL 1483374, at
*12 (D. Minn. Apr. 25, 2017). In this case, the plaintiff
asserts summarily that "JPMorgan was the intended beneficiary of

the capped Reimbursement Claims because it wanted to keep its
loan as inflated as possible." Pltf. Opp. at 20 (citing SAC
¶¶ 15, 334). However, it is unclear how the alleged capping of
the Reimbursement Claims inflated the balance remaining on the
JPM Loan, and even if there were such a benefit, it would not be
"direct." As the plaintiff's allegations demonstrate, the
purported inflation of the JPM Loan balance resulted from the
transfer of the MOA Equity at what the plaintiff alleges was an
artificially low value, not the capping of the associated
Reimbursement Claims. The plaintiff also argues that "$1 billion
in Reimbursement Claims would . . . make it very difficult to
refinance the JPM Loan." Id. at 20. But that fact is not alleged
in the SAC. In short, the SAC's allegations are insufficient to
show that JPMorgan was a person for whose benefit the "transfer"
of the Reimbursement Claims was made. Accordingly, the motions
to dismiss Count III are **granted** as to the JPM Defendants.

### (ii) Lack of Reasonably Equivalent Value

As to the defendants' second argument, the plaintiff has
alleged that the MOA Guarantor did not receive reasonably
equivalent value in exchange for the alleged "transfer" of the
Reimbursement Claims.[16] The SAC alleges that the MOA Guarantor

---

[16] The JPM Defendants further argue that, because the SAC alleges that
JPMorgan obtained the WEM-MOA 49% Equity in exchange for discharging the WEM-
MOA Guarantors of over $2 billion in liability under the JPM Payment
Guaranty, see SAC ¶ 149, reasonably equivalent value was exchanged: assets
worth $1.045 billion in exchange for the extinguishment of $2 billion in

released Reimbursement Claims worth approximately $245 million for only $1 million. <u>See</u> SAC ¶¶ 144, 149–151, 283, 285. These allegations are sufficient to plead lack of reasonably equivalent value. <u>See</u> <u>In re RFC</u>, 2017 WL 1483374, at *7 (finding pleading burden satisfied where the plaintiffs alleged that the defendant "ostensibly paid for office furniture," but received much more than that—a going concern with millions of dollars in annual revenue—from the debtor in return).

For these reasons, the motions to dismiss Count III are **denied** as to the MOA Guarantor.

### 2. Count II (2022 Cash Distribution)

In Count II, the plaintiff brings fraudulent transfer claims against Ameream under Alberta law, challenging WEM-3's October 2022 transfer of $48.5 million in cash to Ameream to fund the operations of the American Dream Mall (the "2022 Cash Distribution"). <u>See</u> SAC ¶¶ 220, 266–76.

#### a. Statute of Elizabeth

With respect to the plaintiff's claim for fraudulent conveyance under the Statute of Elizabeth, the defendants argue that the plaintiff has failed to allege that: (1) the 2022 Cash

---

liability. However, that the MOA Guarantor received reasonably equivalent value for the <u>transfer of the MOA Equity</u> does not mean that the MOA Guarantor also received reasonably equivalent value for the alleged <u>release of the corresponding Reimbursement Claims</u>. As the JPM Defendants recognize, Minnesota fraudulent transfer claims require a strict "asset-by-asset and transfer-by-transfer" analysis. <u>Finn v. All. Bank</u>, 860 N.W.2d 638, 647 (Minn. 2015).

Distribution was made "for nominal or no consideration"; and (2) WEM-3 had the requisite "intent to defraud, delay, or hinder" its creditors. Westcorp, 2016 ABQB at para. 33 (setting forth the elements of a claim for fraudulent conveyance under the Statute of Elizabeth).

The parties dispute whether the 2022 Cash Distribution was made for consideration. However, as relevant cases from Alberta demonstrate, whether a challenged transfer was made for no or nominal consideration is not dispositive of a fraudulent conveyance claim under the Statute of Elizabeth. See Rawlins Decl. ¶ 116; Wittmann Decl. ¶¶ 22-23. In cases involving transfers made for no or nominal consideration, courts may apply a presumption of fraudulent intent. Krumm v. McKay, 2003 ABQB 437, 2003 CarswellAlta 961, para. 14 (Can. Alta. Q.B.). Where a transfer was made for consideration, a court may still strike the transfer if the creditor can establish that the transferor had the necessary fraudulent intent. See id. at paras. 15-16 ("[N]o presumption of law is available to establish fraud in situations of transfer for value, and a creditor must prove an actual intent to defraud.").

Therefore, the dispositive question is whether Ameream entered into the 2022 Cash Distribution with the intent to defraud, delay, or hinder its creditors. Courts determine fraudulent intent by examining "badges of fraud, which are

suspicious factual circumstances that suggest fraud." Lay, 2023
ABKB 354 at para. 49. Badges of fraud, which "are simply a
collection of diverse suspicious circumstances that have been
identified by the case law," include: the transfer was made
pending a creditor's efforts to collect; secrecy respecting the
transfer; the grantor retains some benefit in the property;
grossly inadequate consideration; "unusual haste" to make the
transfer; and a close relationship between the parties to the
transfer. See id. at paras. 50-52; Krumm, 2003 ABQB 437 at para.
18.

     In this case, the plaintiff has plausibly alleged that WEM-
3 made the 2022 Cash Distribution with the intent to defraud,
delay, or hinder the plaintiff's ability to collect on the
Plaintiff Loan. The SAC alleges that the 2022 Cash Distribution
displayed several badges of fraud. For example, both parties to
the transaction—Ameream and WEM-3—were allegedly controlled by
the Ghermezian family (or affiliates of the family). See SAC
¶¶ 270, 272. Also, the 2022 Cash Distribution was purportedly
done in secret: the plaintiff did not know about the 2022 Cash
Distribution at the time and only learned about the transaction
in May 2024. See id. ¶¶ 269, 273. In addition, at the time of
the 2022 Cash Distribution, the Plaintiff Loan was in default.
Id. ¶ 274. Hence, even setting aside the plaintiff's allegation
that the 2022 Cash Distribution was made for no consideration,

there are issues of fact as to whether Ameream acted with the intent to defraud, hinder, or delay the plaintiff.

Accordingly, the motion to dismiss the Count II claim for fraudulent conveyance under the Statute of Elizabeth is **denied.**

### b. FPA

The defendants also contend that, with respect to the plaintiff's claim under the FPA, the plaintiff has failed to allege that: (1) the plaintiff was a "creditor . . . injured, delayed, prejudiced or postponed" by the 2022 Cash Distribution, FPA § 1; and (2) WEM-3 was insolvent at the time of the 2022 Cash Distribution. See Westcorp, 2016 ABQB at para. 11 (setting forth the elements of a claim under § 1 of the FPA).

The plaintiff has failed to allege that WEM-3 was insolvent at the time of the 2022 Cash Distribution. On this element, the SAC supplies a single conclusory allegation: that the 2022 Cash Distribution was "completed at a time when the Plaintiff Loan was in default." SAC ¶ 274. However, this does not mean that WEM-3, which was one of the guarantors of the Plaintiff Loan, was itself insolvent under either the balance-sheet test or the cash-flow test for measuring insolvency. See Lay, 2023 ABKB 354 at paras. 63-66. By the plaintiff's own allegations, in October 2022, WEM-3 continued to own (indirectly) 51% of the equity in the West Edmonton Mall. See SAC ¶¶ 23, 36. Also, the plaintiff alleges that the West Edmonton Mall's revenue and net operating

income for 2022 were Canadian $295.8 million and Canadian $168.7 million, respectively; and for 2023, Canadian $311.8 million and Canadian $171.3 million, respectively. Id. ¶ 86. These allegations are insufficient to establish WEM-3's insolvency in October 2022.

In any event, in its opposition papers, the plaintiff fails to address the American Dream Defendants' argument that the SAC does not allege WEM-3's insolvency. The plaintiff has therefore "concede[d] through silence" that the SAC fails to plead that WEM-3 was insolvent in 2022. In re UBS AG Secs. Litig., No. 07-cv-11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012); see also, e.g., Gortat v. Capala Bros., Inc., No. 07-cv-3629, 2010 WL 1423018, at *11 (E.D.N.Y. Apr. 9, 2010) (deeming an argument not addressed in an opposition brief forfeited).

For these reasons, the motion to dismiss the Count II claim for fraudulent conveyance under the FPA is **granted.**

## B. Tortious Interference Claim: 2021 Agreement (Count IV)

Count IV is a claim for tortious interference against JPMorgan in connection with the 2021 Agreement. The plaintiff alleges that, by taking the WEM-MOA 49% Equity at an allegedly false valuation that capped the WEM-MOA Guarantors' Reimbursement Claims at $50 million, JPMorgan caused the WEM-MOA Guarantors to breach the Plaintiff Payment Guaranty's Net Worth Covenant—which required the WEM-MOA Guarantors to maintain a net

worth of at least $680 million—and Ownership Covenant—which
required the WEM-MOA Guarantors to retain ownership of at least
49% of the West Edmonton Mall and the Mall of America. See SAC
¶¶ 292-306.

To state a claim for tortious interference under New York
law,[17] a plaintiff must allege: (1) the existence of a valid
contract between the plaintiff and a third party; (2) the
defendant's knowledge of that contract; (3) the defendant's
intentional procurement of the third party's breach of the
contract without justification; (4) actual breach of the
contract; and (5) damages resulting therefrom. Valley Lane
Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C., 455
F. App'x 102, 104 (2d Cir. 2012) (summary order) (quoting Lama
Holding Co. v. Smith Barney, 668 N.E.2d 1370, 1375 (N.Y. 1996)).
In addition, "the plaintiff must allege that the contract would
not have been breached 'but for' the defendant's conduct."
Washington Ave. Assoc. v. Euclid Equip., Inc., 645 N.Y.S.2d 511,
512 (App. Div. 1996); see also Burrowes v. Combs, 808 N.Y.S.2d
50, 53 (App. Div. 2006).

JPMorgan moves to dismiss Count IV on the grounds that: (i)
the plaintiff has failed to allege that JPMorgan intended to

---

[17] The parties agree that New York law govern Counts III through XI. See JPM
Defs. Br. at 29 n.15; American Dream Defs. Br. at 29 n.15; Pltf. Opp. at 39;
ICA § 18(g) (choice of law provision); Plaintiff Payment Guaranty § 7.3
(choice of law provision).

procure a breach of the Plaintiff Payment Guaranty; (ii) JPMorgan's challenged actions were economically justified; and (iii) the plaintiff has not alleged any resulting damages.

### 1. Intentional Procurement of Breach

JPMorgan contends that the SAC alleges no facts to suggest that JPMorgan intended to procure the WEM-MOA Guarantors' breach of the Plaintiff Payment Guaranty. According to JPMorgan, any breach of the Plaintiff Payment Guaranty was simply an incidental by-product of JPMorgan's execution of the 2021 Agreement. In entering into the 2021 Agreement, JPMorgan claims, JPMorgan did nothing more than exercise its own rights as the senior lender.

In support of its position, JPMorgan cites cases dismissing tortious interference claims on summary judgment for the proposition that "it is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third party's contract with the plaintiff. . . . Put simply, a defendant must specifically intend to interfere with the relevant contract." Roche Diagnostics GmbH v. Enzo Biochem, Inc., 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013); see also Prospect Funding Holdings, LLC v. Vinson, 256 F. Supp. 3d 318, 328 (S.D.N.Y. 2017) ("[M]erely acting with knowledge that a third party may breach a contract with some other party is not sufficient to constitute procurement of the breach."). Indeed,

to state a claim for tortious interference, a plaintiff must allege that the plaintiff's contractual arrangements with another party were the "target" of the defendant's conduct. High Falls Brewing Co., LLC v. Boston Beer Corp., 513 F. App'x 12, 13–14 (2d Cir. 2013) (summary order).

However, in this case, the plaintiff has alleged that JPMorgan acted with the requisite intent. See SAC ¶ 303 ("JPMorgan negotiated the 2021 Agreement with the WEM-MOA Guarantors and induced the WEM-MOA Guarantors to enter into the 2021 Agreement, intentionally and for the unjustified purpose of preventing Plaintiff from recovering on the Plaintiff Loan from the WEM-MOA Guarantors."); id. ¶ 304 ("In negotiating and executing the 2021 Agreement, JPMorgan intentionally did not act in a commercially reasonable way."); id. ¶ 305 ("JPMorgan took advantage of the desire of the WEM-MOA Guarantors and the Ghermezians to avoid their obligations to Plaintiff . . . ."). Additionally, the SAC contains allegations that: JPMorgan knew about the relevant provisions of the Plaintiff Payment Guaranty and the importance of these provisions to the plaintiff, see id. ¶ 302; JPMorgan and the other parties to the 2021 Agreement negotiated and entered into the 2021 Agreement in secret, see id. ¶ 139; and JPMorgan and the WEM-MOA Guarantors "severely undervalued" the WEM-MOA 49% Equity interests, id. ¶ 145.

Considered together and construed in the light most favorable to the plaintiff, these allegations support the inference that JPMorgan sought to procure the WEM-MOA Guarantors' breach of the Plaintiff Payment Guaranty. These allegations plausibly suggest that JPMorgan acted intentionally to undermine the WEM-MOA Guarantors' obligations to the plaintiff. To the extent JPMorgan disagrees with the plaintiff's characterization of JPMorgan's objectives in entering the 2021 Agreement, that presents a factual dispute inappropriate for resolution on a motion to dismiss. See Barnet v. Drawbridge Special Opportunities Fund LP, No. 14-cv-1376, 2014 WL 4393320, at *23 (S.D.N.Y. Sept. 5, 2014) ("Defendants' attempt to recharacterize plaintiffs' allegations in terms of defendants' own interest . . . improperly asserts factual arguments in the context of a motion to dismiss.").

## 2. Economic Interest Defense

JPMorgan also argues that the economic interest defense defeats the plaintiff's claims. JPMorgan contends that its conduct was justified because it acted to protect its own legitimate economic interests—namely, its financial stake in the Project and position as senior lender. In response, the plaintiff claims that the economic interest defense is not properly addressed on a motion to dismiss, and in any event is overcome in this case by the SAC's allegations of malice.

In New York, a defendant may raise "the economic interest defense—that it acted to protect its own legal or financial stake in the breaching party's business"—in response to a claim for tortious interference. White Plains Coat & Apron Co. v. Cintas Corp., 867 N.E.2d 381, 383 (N.Y. 2007). "The economic interest defense is unavailable, though, where there has been a 'showing of either malice on the one hand, or fraudulent or illegal means on the other.'" Quinn v. Jacobs, No. 12-cv-2423, 2012 WL 3000673, at *2 (S.D.N.Y. July 16, 2012) (quoting Foster v. Churchill, 665 N.E.2d 153, 157 (N.Y. 1996)).

Courts are divided on whether the economic interest defense is an affirmative defense not properly considered on a motion to dismiss. Compare, e.g., Barnet, 2014 WL 4393320, at *23 ("[T]he so-called 'economic interest' defense is an affirmative defense that is not properly addressed on a motion to dismiss."); Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., No. 11-cv-5832, 2012 WL 3542196, at *9 (S.D.N.Y. Aug. 15, 2012) ("Several courts in the Second Circuit have refused to apply the economic interest defense at the pleading stage to dismiss complaints for tortious interference with contract, explaining that the facts of the pleadings were not sufficiently developed to show entitlement to the defense."), with, e.g., U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC, No. 18-cv-4044, 2019 WL 4744220, at *8 (S.D.N.Y. Aug. 26, 2019) ("The economic interest

defense to a claim of tortious interference with contract may be raised at the motion to dismiss stage.").

It is unnecessary to decide whether the defense is properly addressed on a motion to dismiss, however, because the plaintiff has alleged malice sufficient to overcome the defense. The SAC alleges that JPMorgan negotiated the 2021 Agreement "in secret" with the other signatories to "conceal that they were freezing out and knowingly harming" the plaintiff. SAC ¶ 139; see also id. ¶ 142 (alleging that the plaintiff did not even learn about the 2021 Agreement until after it had been executed). The SAC also alleges that JPMorgan "took advantage of the desire of the WEM-MOA Guarantors and the Ghermezians to avoid their obligations to [p]laintiff" in order to secure a "windfall" for itself. See id. ¶¶ 11-14, 17, 158, 179-81, 305. The SAC additionally alleges that JPMorgan obtained, with zero reduction of the JPM Loan, assets worth over $1 billion at a fraction of the price, through a series of transactions that could be effectuated only if the WEM-MOA Guarantors breached the Plaintiff Payment Guaranty. See id. ¶¶ 181, 297-99, 304-05. Therefore, the SAC plausibly alleges that JPMorgan acted with malice in negotiating and executing the 2021 Agreement. See Quinn, 2012 WL 3000673, at *3 (finding the economic interest defense inapplicable on a motion to dismiss where the plaintiff alleged that the defendant, who "schemed" with others to

interfere with the plaintiff's employment, acted with malice sufficient to defeat the defense).

Accordingly, even assuming the economic interest defense may be invoked on a motion to dismiss, the plaintiff has alleged malice sufficient to overcome the defense.

### 3. Damages

#### a. Compensatory Damages

JPMorgan contends that the plaintiff has failed to allege damages resulting from JPMorgan's alleged tortious interference. According to JPMorgan, the plaintiff's claimed damages—loss in Reimbursement Claim value—are too speculative to be cognizable.

Damages for tortious interference with contract "are those recognized under the more liberal rules applicable to tort actions." Rich v. Fox News Network, LLC, 939 F.3d 112, 128 (2d Cir. 2019) (quoting Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 406 N.E.2d 445, 452 n.6 (N.Y. 1980)). "One who is liable to another for interference with a contract is liable for damages for (a) the pecuniary loss of the benefits of the contract . . . ; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably expected to result from the interference." Id. (quoting Restatement (Second) of Torts § 774A(1) (1979)).

In this case, the plaintiff has alleged damages sufficient to withstand a motion to dismiss. The SAC alleges that the WEM-MOA Guarantors violated their contractual obligations to own the WEM-MOA 49% Equity and to maintain a net worth of $680 million, which left them with insufficient assets to repay the Plaintiff Loan. SAC ¶ 175. The SAC further alleges that JPMorgan's conduct "diminish[ed] the value of the WEM-MOA Guarantors' Reimbursement Claims to a figure insufficient to repay" the judgment the plaintiff obtained in state court. Id. ¶ 306. Whether the plaintiff will be able to prove these alleged damages remains to be seen. However, accepting these allegations as true and drawing all inferences in the plaintiff's favor (as the Court must at this stage), the plaintiff has alleged "pecuniary loss of the benefits" of its contract with the WEM-MOA Guarantors. Rich, 939 F.3d at 128.

JPMorgan relies on First Nationwide Bank v. Gelt Funding Corp. for the proposition that a lender is not "damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer . . . are yet to be determined." 27 F.3d 763, 768 (2d Cir. 1994). However, First Nationwide is inapposite. That case concerned damages for common-law fraud claims in the RICO context. See id. It said nothing about the element of damages in a claim for tortious interference with contract.

56

Therefore, the plaintiff has adequately alleged monetary damages resulting from JPMorgan's alleged tortious interference.

### b. Punitive Damages

JPMorgan also opposes the plaintiff's request for punitive damages. JPMorgan claims that punitive damages are recoverable only when a plaintiff can demonstrate "egregious tortious conduct" that "was part of a pattern of similar conduct directed at the public generally." See JPM Defs. Br. at 34-35 (quoting Rocanova v. Equitable Life Assur. Soc. of U.S., 634 N.E.2d 940, 943-44 (N.Y. 1994)).

However, Rocanova was a contract case, and the standard JPMorgan proposes applies to claims for breach of contract, not to claims sounding in tort. See id.; see also Don Buchwald & Assocs., Inc. v. Rich, 723 N.Y.S.2d 8, 9 (App. Div. 2001) ("The limitation of an award for punitive damages to conduct directed at the general public applies only in breach of contract cases . . . ."). Rather, "[t]o sustain a claim for punitive damages in tort, one of the following must be shown: intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another." Buchwald, 723 N.Y.S.2d at 9; see also Int'l Minerals & Resources, S.A. v. Bomar Resources, Inc., 5 F. App'x 5, 9 (2d Cir. 2001) (summary order) ("As for punitive damages, in the context of an action

under New York law for tortious interference with contract, an injured party can recover punitive damages when the tortious act complained of involved a wanton or reckless disregard of the plaintiff's rights.").

As explained above, the SAC plausibly alleges "intentional or deliberate wrongdoing" and an "evil motive"—or at least "a wanton or reckless disregard of the plaintiff's rights"—on the part of JPMorgan. Buchwald, 723 N.Y.S.2d at 9; Int'l Minerals, 5. F. App'x at 9. Moreover, "whether the plaintiff is entitled to punitive damages under the circumstances alleged in this complaint is a factual issue that cannot be determined on a motion to dismiss." RBG Mgmt. Corp. v. Village Super Market, Inc., 692 F. Supp. 3d 135, 156 (S.D.N.Y. 2023).

Accordingly, the plaintiff's allegations state a claim for tortious interference with contract against JPMorgan. The motion to dismiss Count IV is therefore **denied.**

### C. Marshaling Claim (Count V)

In Count V, the plaintiff brings a marshaling claim against JPMorgan. See SAC ¶¶ 307-17. The defendant has moved to dismiss this claim on several grounds.

The doctrine of marshaling is founded in equity, and "[i]ts purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." Meyer v. United States, 375 U.S. 233, 237

(1963). Marshaling "requir[es] a senior creditor, having two
funds available to satisfy a single debt, to resort first to the
fund that is not available to a junior creditor of the same
debtor in order to avoid the inequity which would result from
the senior creditor's election to proceed against the only fund
available to the junior creditor, thereby preventing the junior
creditor from obtaining any satisfaction of its debt." Walther
v. Bank of N.Y., 772 F. Supp. 754, 766-67 (S.D.N.Y. 1991). A
marshaling claim has three elements: (1) the existence of two
secured creditors with a common debtor, (2) the existence of two
funds belonging to the debtor, and (3) the right of the senior
creditor to receive payment from both funds belonging to the
debtor, while the junior creditor can resort to only one. In re
Arlco, Inc., 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999); see also
Walther, 772 F. Supp. at 767.

The plaintiff has failed to satisfy the first element of a
marshaling claim: the existence of two secured creditors with a
common debtor. Unlike JPMorgan, the plaintiff is an unsecured
creditor of the WEM-MOA Guarantors. The plaintiff does not
dispute this fact, but instead claims that it can invoke
marshaling because it has a "unique interest" in the WEM-MOA 49%
Equity. Pltf. Opp. at 55. However, the plaintiff cites no on-
point authority for the proposition that an unsecured creditor

with a "unique interest" in a debtor's property may bring a claim for marshaling.

The plaintiff has also failed to allege the second element of a marshaling claim: that JPMorgan has resort to two funds belonging to the WEM-MOA Guarantors. On its face, the SAC alleges that JPMorgan can resort to two sources of funds: (i) mortgages on the American Dream Mall, and (ii) the WEM-MOA 49% Equity. See SAC ¶¶ 309-10. However, as JPMorgan correctly argues, only one of those funding sources—the WEM-MOA 49% Equity—belongs to the WEM-MOA Guarantors; there is no allegation that the mortgages on the American Dream Mall also belong to the WEM-MOA Guarantors. See In re America's Hobby Ctr., Inc., 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("Ordinarily, [the element requiring the existence of two or more funds belonging to a common debtor] is not met where the two funds sought to be marshaled are held separately, such as by a corporation and its shareholder."); see also In re Tampa Chain Co., Inc., 53 B.R. 772, 778 (Bankr. S.D.N.Y. 1985). In short, the WEM-MOA 49% Equity and the mortgages on the American Dream Mall do not belong to a common debtor.

The plaintiff counters that the WEM-MOA Guarantors allegedly owned two assets: (i) the WEM-MOA 49% Equity, and (ii) the Reimbursement Claims. But this reframing does not help the plaintiff, because the plaintiff has failed to allege that

JPMorgan has resort to both these sources, while the plaintiff has resort to only one. The plaintiff repeatedly alleges that it also has rights in both the WEM-MOA 49% Equity and the Reimbursement Claims. See, e.g., SAC ¶¶ 149-51. Therefore, insofar as the plaintiff has identified the WEM-MOA 49% Equity and the Reimbursement Claims as the two funds belonging to a common debtor, the plaintiff has failed to allege the third element of a marshaling claim: "the right of the senior secured creditor to receive payment from more than one fund while the junior secured creditor can only resort to one fund." In re Arlco, 239 B.R. at 274 (emphasis added).

The plaintiff's failure to plead elements of a claim for marshaling requires dismissal of that claim. In view of these deficiencies, it is unnecessary to address JPMorgan's argument that the plaintiff waived marshaling under the terms of the ICA. The motion to dismiss Count V is **granted.**

### D. Implied Covenant Claim (Count VI)

Count VI alleges that JPMorgan breached the implied covenant of good faith and fair dealing in the ICA when it took the WEM-MOA 49% Equity in 2021 at what the plaintiff claims was an artificially low valuation. See SAC ¶¶ 318-34.

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995). The

implied covenant "prevents any party from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Gaia House Mezz LLC v. State St. Bank & Trust Co., 720 F.3d 84, 93 (2d Cir. 2013) (quoting Dalton, 663 N.E.2d at 291). To breach the implied covenant, "a party's action must directly violate an obligation that may be presumed to have been intended by the parties." Id.; see also Dalton, 663 N.E.2d at 291 ("Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included.").

The implied covenant "is not without limits," however. Dalton, 663 N.E.2d at 292. It "cannot be used . . . to imply an obligation inconsistent with other terms of a contractual relationship." Gaia, 720 F.3d at 93. Nor can it "extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990).

In support of dismissal, JPMorgan principally argues that the plaintiff's implied covenant claim creates obligations that are inconsistent with the terms of the parties' contractual relationship (as set forth in the ICA). According to JPMorgan, the plaintiff consented to the terms of the JPM Loan Agreement,

which granted JPMorgan various options to foreclose on or take title to the WEM-MOA 49% Equity in the event of a default. See ICA § 3(a); JPM Loan Agreement § 8.2. JPMorgan also claims that it had the express contractual right to modify or supplement the JPM Loan Documents. See ICA § 8(a). JPMorgan thus contends that it was entitled under the ICA to take the WEM-MOA 49% Equity in the way that it did, and that if the plaintiff intended to restrict how JPMorgan exercised its remedies, the plaintiff should have bargained for that right. Additionally, JPMorgan argues that the plaintiff could have exercised the plaintiff's cure rights upon the JPM Loan default, but chose not to.

The plaintiff responds that, even if the ICA gave JPMorgan a range of discretion following a default, the ICA did not authorize JPMorgan to secure a windfall for itself by acquiring the WEM-MOA 49% Equity—allegedly worth over $1 billion—at an artificially low valuation—$50 million, therefore destroying the WEM-MOA Guarantors' Reimbursement Claims and leaving the WEM-MOA Guarantors with insufficient assets to repay the Plaintiff Loan. See SAC ¶¶ 324-33. In particular, § 6(b) of the ICA provided that any proceeds remaining after the disposition of the WEM-MOA 49% Equity and the repayment of the JPM Loan and the 2017 Mezz Loan would go to the plaintiff. See id. ¶¶ 322, 326-27. Section 6(b) additionally precluded the plaintiff from suing any Shared

63

Guarantor while the two senior loans remained outstanding. See id. ¶ 321.[18]

Accepting the SAC's allegations as true, JPMorgan's conduct "deprived [the plaintiff] of the fruits of its agreement and would render its contractual promises illusory." S. Telecom Inc. v. ThreeSixty Brands Grp., 520 F. Supp. 3d 497, 509 (S.D.N.Y. 2021). "[A] reasonable person in the position of the [plaintiff] would be justified in understanding" that the ICA included an implied promise that, in the event of a default, JPMorgan would take title to (or otherwise dispose of) the WEM-MOA 49% Equity in a good faith, commercially reasonable manner. Dalton, 663 N.E.2d at 291. What is more, the ICA barred the plaintiff from taking action against any Shared Guarantor, lending support to the conclusion that the parties impliedly agreed that JPMorgan would act reasonably, rather than in a manner that would abuse the plaintiff's position as the junior-most lender, because the

---

[18] The plaintiff also alleges that JPMorgan breached the implied covenant of good faith and fair dealing by failing to conduct a public sale to obtain the highest price possible for the WEM-MOA 49% Equity, which the plaintiff claims was required under the JPM Loan Documents. See SAC ¶ 327. In opposition, JPMorgan contends that the relevant provisions in the JPM Loan Documents required JPMorgan to conduct a public sale only if JPMorgan elected to conduct any sale at all, and that the WEM-MOA 49% Equity Transfers constituted a "strict foreclosure" conducted pursuant to UCC § 9-620, not a "sale," which would be governed by separate sections of the UCC. See MOA-JPMorgan Pledge Agreement § 3(a), (c); WEM-JPMorgan Pledge Agreement to Mac Avoy Decl. § 4.1; Ex. 5 to Mac Avoy Decl. § 4.1; 2021 Agreement Recital I, § 3(a)(i) (providing that JPMorgan would "accept" the MOA Equity pursuant to UCC § 9-620). In any event, it is unnecessary to address whether the WEM-MOA 49% Equity Transfers constituted a prohibited private sale, as the plaintiff claims, because the SAC's allegations about JPMorgan's other conduct sufficiently plead a breach of the implied covenant of good faith and fair dealing.

plaintiff would be prevented from pursuing collection or other remedies. The plaintiff's allegations "clearly go beyond claiming only that [JPMorgan] should be precluded from exercising a contractual right; they support a claim that [JPMorgan] exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive" the plaintiff of the plaintiff's reasonable expectations. Richbell Info. Servs., Inc. v. Jupiter Partners, L.P., 765 N.Y.S.2d 575, 302 (App. Div. 2003).

JPMorgan also argues that the plaintiff has failed to allege its entitlement to damages for the alleged breach of the implied covenant. But this argument is without merit, for the reasons stated above. See supra section IV.B.3. In any event, nominal damages are available for implied covenant claims. See Kitchen Winners NY Inc. v. Rock Fintek LLC, No. 22-cv-5276, 2024 WL 3676931, at *17 (S.D.N.Y. Aug. 6, 2024) ("[I]nsofar as these claims are variants of a contract-breach claim, it is likely the case that nominal damages would be available to vindicate these legal rights as well."); cf. Luitpold Pharms., Inc. V. Ed. Geistlich Sohne A.G. Fur Chemische Industrie, 784 F.3d 78, 87 (2d Cir. 2015) ("Nominal damages are always available in breach of contract actions.").

Accordingly, the motion to dismiss Count VI is **denied.**

### E. Anticipatory Breach of Contract Claim (Count IX)

In Count IX, the plaintiff asserts an anticipatory breach claim against JPMorgan, alleging that JPMorgan, in negotiating and executing the 2022 Agreements, breached the plaintiff's future rights under the IDL and § 6(b) of the ICA to receive proceeds from a sale under the IDL Pledges (including from a sale of the WEM-MOA 49% Equity). See SAC ¶¶ 359–75.

In New York, anticipatory breach "occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002). An anticipatory breach "will relieve the non-repudiating party of its obligations of future performance." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 587 (2d Cir. 2005). Courts have described anticipatory breach—also known as breach by anticipatory repudiation—as "'a doctrine of accelerated ripeness' because it 'gives the plaintiff the option to have the law treat the promise to breach as a breach itself.'" Berardi v. Berardi, No. 23-1011-cv, 2024 WL 1269902, at *3 n.4 (2d Cir. Mar. 26, 2024) (quoting Perry Cap. LLC v. Mnuchin, 864 F.3d 591, 632–33 (D.C. Cir. 2017)).

The SAC plausibly pleads an anticipatory breach claim. The plaintiff alleges that, by signing the Standstill Agreement and the 7th Amendment in October 2022, JPMorgan agreed to transfer

all the collateral pledged to support the JPM Loan to the AB AD
Lender—on account of the "new" 2022 Mezz Loan—when the JPM Loan
was satisfied in full. SAC ¶ 369. Because the 2017 Mezz Loan was
allegedly satisfied in full when the AB AD Lender consummated
the Strict Foreclosure, the plaintiff alleges that the IDL and
§ 6(b) of the ICA required JPMorgan to turn over those same
assets to the plaintiff—not the AB AD Lender or any other
lender—after the JPM Loan was repaid. See id. ¶¶ 362-69. The
plaintiff claims that JPMorgan thus repudiated its obligations
under the IDL and the ICA when it entered into the 2022
Agreements.

JPMorgan's arguments to the contrary are without merit.
First, JPMorgan contends that the plaintiff's anticipatory
breach claim is premature because the plaintiff's contractual
rights to proceeds were subject to conditions precedent—most
notably, the requirement that the JPM Loan be repaid in full—
that have not been satisfied. However, it is well-established
that, "once it becomes clear that one party will not live up to
the contract, the aggrieved party is relieved from the
performance of futile acts, such as conditions precedent." 24/7
Records, Inc. v. Sony Music Ent., Inc., 566 F. Supp. 2d 305, 313
(S.D.N.Y. 2008); see also Alta Partners, LLC v. BRC Inc., No.
24-cv-3741, 2025 WL 567995, at *9 (S.D.N.Y. Feb. 18, 2025),
report & recommendation adopted, 2025 WL 722630 (S.D.N.Y. Mar.

6, 2025) ("[I]t would be pointless to require as a precondition to suit the non-repudiating party offer the futile and meaningless gesture of ceremoniously performing conditions precedent to the repudiating party's performance when the outcome is known: the repudiating party will not, in turn, perform."). The plaintiff has alleged that, in October 2022, JPMorgan repudiated its contractual obligations to the plaintiff by agreeing to give the collateral it had allegedly already promised to the plaintiff to another lender. The plaintiff was not required to "offer the futile and meaningless gesture" of waiting until the JPM Loan was repaid to file suit when the outcome was already known. Alta Partners, 2025 WL 567995, at *9.

In support of its conditions precedent argument, JPMorgan relies principally on Sidman v. Concord Arena Parking, LLC, No. 15-cv-7426, 2023 WL 2552831, at *7 (E.D.N.Y. Mar. 17, 2023), aff'd sub nom. Ginn v. Concord Arena Parking, LLC, No. 23-429-cv, 2024 WL 658836 (2d Cir. Feb. 16, 2024) (summary order). But Sidman is not on point. Sidman stands only for the proposition that a non-repudiating party cannot recover for anticipatory breach "if some condition precedent to performance fails even after repudiation," because in those circumstances "performance never became or would have become due." Id. at *7 (emphasis added). The Sidman court found the repudiating party's performance excused because post-repudiation developments meant

that the condition precedent "would never happen," and the court accordingly granted summary judgment to the defendant on the plaintiff's anticipatory repudiation claim. Id. at *6–11. In this case, by contrast, there is no allegation (and JPMorgan does not argue) that the condition precedent—full satisfaction of the JPM Loan—has failed or will never happen, only that full repayment may never happen.

Second, JPMorgan argues that New York law forbids a party from using the doctrine of anticipatory breach to accelerate a unilateral obligation for a future money payment. Although "New York courts have generally limited the doctrine of anticipatory breach to bilateral contracts requiring mutual and interdependent obligations," Lucente, 310 F.3d at 259 n.5, that principle does not require the dismissal of the claim in this case. This is because, when assessing whether there "existed some dependency of obligation," "[t]he fact that only money is owed by [the repudiating party] to the [non-repudiating party] is not determinative." Long Island R.R. Co. v. Northville Indus. Corp., 362 N.E.2d 558, 565 (N.Y. 1977). Rather, "[t]he focus must be on whether the [non-repudiating party] has any obligation from which it needs to be relieved." Id.

Drawing all inferences in the plaintiff's favor, the SAC plausibly alleges that the IDL and the ICA were bilateral, not unilateral, contracts. For example, in addition to directing

69

that excess proceeds from the disposition of the WEM-MOA 49% Equity be paid to the plaintiff (after satisfaction of the JPM Loan), § 6(b) of the ICA barred the plaintiff from suing any "Shared Guarantor" as long as the JPM Loan remained outstanding. SAC ¶¶ 127-28. Indeed, through the ICA and the IDL, the plaintiff agreed to subordinate its repayment rights to those of the more senior lenders. Therefore, the SAC alleges that these agreements "embod[ied] mutual and interdependent obligations" between the plaintiff and JPMorgan. Long Island R.R., 362 N.E.2d at 566. On these facts, the plaintiff's claim for anticipatory breach may proceed.

Accordingly, the motion to dismiss Count IX is **denied.**[19]

## F. Tortious Interference Claim: 2022 Agreements (Counts X and XI)

Counts X and XI raise tortious interference claims in connection with the 2022 Agreements.

---

[19] In support of dismissal, JPMorgan also asserts that all of the IDL Pledges were terminated no later than October 21, 2022, and that the IDL no longer remains in force and effect. See JPM Defs. Br. at 15-17. In response, the plaintiff argues that these arguments rely improperly on extrinsic documents not referred to in the SAC or, in some instances, not previously disclosed to the plaintiff. See Pltf. Opp. at 14-16, 43-44 (representing that Exhibits 17-24 in support of the JPM Defendants' brief, ECF Nos. 90-17–24, were either not referenced in the SAC or not made available to the plaintiff before this motion was filed). To the extent JPMorgan argues for dismissal of Count IX based on the alleged termination of the IDL Pledges, that challenge requires consideration of evidence outside the pleadings and raises factual disputes not properly resolved on a motion to dismiss.

## 1. Count X

As to Count X, the plaintiff alleges that, by entering into the 7th Amendment,[20] Ameream and the Outparcel Entities tortiously interfered with the plaintiff's rights under the IDL and the ICA. See SAC ¶¶ 376–86. According to the plaintiff, the 7th Amendment directed JPMorgan to deliver excess proceeds to the AB AD Lender for application against the balance on the "new" 2022 Mezz Loan—in breach of the provisions of the IDL and the ICA that allegedly required JPMorgan to deliver those proceeds to the plaintiff. See SAC ¶¶ 209–10, 380.

The defendants first argue that Count X must be dismissed on the ground that there was no actual breach, which is required to state a claim for tortious interference. However, for the reasons stated above with respect to the plaintiff's anticipatory breach claim against JPMorgan, the SAC plausibly alleges that JPMorgan breached the IDL and § 6(b) of the ICA. See supra section IV.E. Therefore, dismissal on this ground is not warranted.

The defendants next contend that the SAC fails to plead the requisite intent to procure a breach. In any event, the defendants continue, their allegedly tortious conduct was economically justified. They claim that they had a substantial

---

[20] Ameream and the Outparcel Entities were not parties to the Standstill Agreement; they were parties only to the 7th Amendment. See Standstill Agreement; 7th Amendment.

71

stake in the success of the Project and were entitled to engage in a restructuring of the financing to protect their own interests.

As discussed above, it is unclear whether the defense of economic justification can defeat a claim for tortious interference on a motion to dismiss. See supra section IV.B.2.

In any event, the economic justification defense is inapplicable in this case because the SAC plausibly alleges that Ameream and the Outparcel Entities were "motivated by malice." Foster, 665 N.E.2d at 156. The plaintiff alleges that the defendants participated in (ultimately unsuccessful) negotiations with the plaintiff regarding a potential restructuring earlier in 2022, and that Ameream and the Outparcel Entities knew how important the rights provided by IDL and the ICA were to the plaintiff, see SAC ¶¶ 242, 381–82; that the defendants executed the 2022 Agreements—in secret and without involving the plaintiff—just three months after the failed negotiations, see id. ¶¶ 242, 383; and that the defendants went out of their way to conceal the 2022 Agreements, which the plaintiff only learned about almost two years later, in May 2024, see id. ¶ 196. Considered together, these allegations support the plausible inference that Ameream and the Outparcel Entities "schemed with others" in secret to eliminate the plaintiff's rights to the pledged collateral. See Quinn,

2012 WL 3000673, at *3 (finding allegations that the defendant "schemed with others" to harm the plaintiff adequate to plead malice). For the same reasons, the plaintiff has also alleged that the defendants intended to procure the purported breach.

Therefore, the American Dream Defendants' motion to dismiss Count X is **denied**.

### 2. Count XI

As to Count XI, the plaintiff claims that, when JPMorgan, Ameream, and the Outparcel Entities entered into one (or both) of the 2022 Agreements, JPMorgan, Ameream, and the Outparcel Entities tortiously induced the WEM-MOA Guarantors' alleged breach of the Plaintiff Payment Guaranty. See SAC ¶¶ 387-97. The plaintiff alleges that: the 2022 Agreements required JPMorgan to transfer the WEM-MOA 49% Equity to the AB AD Lender after the JPM Loan was repaid, thus "confirm[ing]" that the WEM-MOA Guarantors did not own the WEM-MOA 49% Equity, in violation of the Ownership Covenant, id. ¶ 390; and WEM-3's transfer of $48.5 million in cash to Ameream under the 7th Amendment "confirmed" that the WEM-MOA Guarantors were no longer worth $680 million following the 2021 Agreement, in violation of the Net Worth Covenant, id. ¶ 391.

The defendants correctly argue that the SAC fails to allege that the defendants' conduct associated with the 2022 Agreements was a "but for" cause of the WEM-MOA Guarantors' supposed breach

of the Plaintiff Payment Guaranty. By the plaintiff's own allegations, the 2022 Agreements merely "confirmed" that breaches of the Plaintiff Payment Guaranty had occurred over a year before—as a result of the 2021 Agreement, which provided for the transfer of the WEM-MOA 49% Equity to JPMorgan and allegedly destroyed the value of the WEM-MOA Guarantors' Reimbursement Claims. See SAC ¶ 390 ("The October 2022 Agreements mandate JPMorgan to transfer the WEM-MOA 49% Equity (either to AB AD Lender or as collateral for a refinancing senior lender). This confirms that the WEM-MOA Guarantors do not and will not own the WEM-MOA 49% Equity, in violation of the Payment Guaranty covenants." (emphasis added)); id. ¶ 391 ("WEM-3's transfer of $48.5 million in cash to pay for costs of the American Dream Mall is a transaction with an Affiliate (as defined in the Payment Guaranty) that violates the net worth covenant because the WEM-MOA Guarantors are not worth $680 million following the consummation of the 2021 Agreement transactions, and as confirmed in the October 2022 Agreements." (emphasis added)). In short, the plaintiff has failed to allege that the defendant's conduct in connection with the 2022 Agreements caused a breach of the Plaintiff Payment Guaranty.

The SAC's failure to allege that the defendants' alleged conduct in 2022 caused the WEM-MOA Guarantors' purported breach of the Plaintiff Payment Guaranty is fatal to the plaintiff's

claim. See Burrowes, 808 N.Y.S.2d at 53 (dismissing a claim for tortious interference with contract where the plaintiff failed to allege that but for the defendants' actions, the contract would not have been breached); see also Carlyle, LLC v. Quik Park 1633 Garage LLC, 75 N.Y.S.3d 139, 141 (App. Div. 2018) (same). It is unnecessary to address the defendants' other arguments. Accordingly, the defendants' motions to dismiss Count XI are **granted**.

### G. Declaratory Judgment Claims (Counts VII and VIII)

Counts VII and VIII seek declaratory relief against JPMorgan regarding the ICA and the Environmental Indemnity, and against all the defendants regarding the value of the Reimbursement Claims, respectively. See id. ¶¶ 335–44 (Count VII); id. ¶¶ 345–58 (Count VIII). Having concluded that the plaintiff lacks standing to seek declaratory relief as to the Environmental Indemnity and as to the value of the Reimbursement Claims, see supra section III.B, it is unnecessary to address that aspect of Count VII, and Count VIII, further here. What remains is the plaintiff's request in Count VII for a declaration against JPMorgan that any limitations under § 6(b) of the ICA are null and void. See SAC ¶ 343.

It is well-established that "district courts possess discretion in determining whether and when to entertain an action under the [Declaratory Judgment Act], even when the suit

otherwise satisfies subject matter jurisdictional prerequisites." Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995). In deciding whether to entertain an action for declaratory judgment, district courts consider: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

Declaring any limitations under § 6(b) of the ICA null and void would not "serve a useful purpose in clarifying or settling the legal issues involved," Id. (emphasis added). In adjudicating the plaintiff's claim for anticipatory breach against JPMorgan (Count IX), the Court will necessarily have to decide whether JPMorgan breached § 6(b). See supra section IV.E. That determination will bear on whether the plaintiff's obligations under § 6(b) remain in effect, because "[u]nder New York law, a party's performance under a contract is excused where the other party . . . has committed a material breach." Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir. 2007). Therefore, because "[c]ourts generally reject a [DJA] claim when other claims in the suit will resolve the same issues," City of Perry v. Procter & Gamble Co., 188 F. Supp. 3d 276, 286 (S.D.N.Y. 2016), this declaration would be duplicative.

76

Accordingly, the motion to dismiss Count VII is **granted.**

\*    \*    \*

To summarize, the defendants' motions to dismiss are **granted** as to: Count II (as to the plaintiff's claim under the FPA only); Count III (against the JPM Defendants only); Count V; Count VII; Count VIII; and Count XI. The motions to dismiss are **denied** as to: Count I; Count II (as to the plaintiff's claim under the Statute of Elizabeth only); Count III (against the MOA Guarantor only); Count IV; Count VI; Count IX; and Count X.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the defendants' motions to dismiss are **granted in part** and **denied in part.** The parties are directed to submit a Rule 26(f) report by **April 11, 2025.** The Clerk is respectfully directed to close all pending motions.

**SO ORDERED.**

Dated:    **New York, New York**
          **March 27, 2025**

                                          **John G. Koeltl**
                                **United States District Judge**