UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOL-MM III LLC, as administrative agent,<br><br>                        Plaintiff,<br><br>- against -<br><br>JPMORGAN CHASE BANK, N.A., D5 HAWKS LLC, WE TAHOE 1 LLC, WE TAHOE 2 LLC, NEW WEM HOLDINGS AFFILIATE 1 LTD., NEW WEM HOLDINGS AFFILIATE 2 LTD., NEW WEM HOLDINGS LTD., MOA HOLDINGS III, LLC, AMEREAM LLC, MEADOW A-B OFFICE LLC, MEADOW C-D OFFICE LLC, MEADOW HOTEL LLC, and MEADOW BASEBALL LLC,<br><br>                        Defendants. | No. 23-CV-06479-JGK<br><br>**JPM DEFENDANTS' ANSWER AND DEFENSES TO SECOND AMENDED COMPLAINT AND COUNTERCLAIM** |

JPMorgan Chase Bank, National Association ("JPMorgan"), D5 Hawks LLC ("JPM-D5"), WE Tahoe 1 LLC ("JPM-WEM 1"), WE Tahoe 2 LLC ("JPM-WEM 2," and, together with JPMorgan, JPM-D5, and JPM-WEM 1, the "JPM Defendants") submit this Answer and Defenses to the Second Amended Complaint (ECF No. 73, the "SAC"), filed on June 25, 2024, by plaintiff SOL-MM III LLC ("Plaintiff").

The Answer is based on the current knowledge of the JPM Defendants, who reserve their rights to revise and/or supplement this Answer. Except as otherwise stated herein, the JPM Defendants deny every allegation in the SAC. The JPM Defendants also deny any averments in the headings and subheadings of the SAC. Unless otherwise noted, the JPM Defendants use defined terms consistent with their definitions in the SAC.

## NATURE OF THE ACTION[1]

1.      This action arises out of Defendants' convoluted and fraudulent efforts to secure benefits for themselves while preventing Plaintiff, and the lenders it represents as agent, from being repaid on a $300 million loan such lenders made to the owners of the American Dream Mall in East Brunswick, New Jersey to support the construction and development of that project (the "**Plaintiff Loan**").

**RESPONSE TO PARAGRAPH 1**: The JPM Defendants deny the allegations contained in Paragraph 1 of the SAC.

2.      Before agreeing to make the Plaintiff Loan, and as a condition for doing so, Plaintiff bargained for a suite of contractual protections and collateral. Among other protections, Plaintiff secured guarantees and equity pledges from the owners of the American Dream Mall—*i.e.*, the Ghermezian family and their affiliated entities, including the WEM-MOA Guarantors—backed by their highly valuable stakes in two of the largest and most successful malls in North America: the West Edmonton Mall in Alberta, Canada, and the Mall of America in Minnesota.

**RESPONSE TO PARAGRAPH 2**: The JPM Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of the SAC, and deny them on that basis.

3.      Defendants have taken numerous byzantine steps—involving multiple agreements, side agreements, and transfers between and among Defendants, the Ghermezians, and an alphabet soup of their affiliated entities—aimed at destroying Plaintiff's rights and collateral and eviscerating those bargained-for protections. Through their machinations, Defendants have (a) materially breached and/or tortiously interfered with multiple contracts entitling Plaintiff to be repaid on its loan, and (b) knowingly transferred assets out of Plaintiff's reach that were supposed to be available to ensure such repayment, giving rise to fraudulent transfers and conveyances under applicable Canadian and Minnesota law.

**RESPONSE TO PARAGRAPH 3**: The JPM Defendants deny the allegations contained in the first sentence of Paragraph 3 of the SAC.  To the extent the second sentence of Paragraph 3 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is

---

[1] For convenience and clarity, the JPM Defendants use the headings from the SAC.  In doing so, the JPM Defendants do not admit any of the allegations contained in the headings.  To the extent the headings from the SAC may be deemed to contain any allegations, the JPM Defendants deny those allegations.

required, the JPM Defendants deny the allegations contained in the second sentence of Paragraph 3 of the SAC.

***The Plaintiff Loan and Supporting Guarantees***

4.      Plaintiff, Defendant JPMorgan, and AB American Dream Mall Syndicate Joint Venture (the "**AB AD Lender**") all made loans in support of developing and opening the American Dream Mall, which is one of the largest shopping and entertainment complexes in North America. JPMorgan was the most senior lender and was to be repaid first. The AB AD Lender was the next in line, as a "senior mezz" lender. Plaintiff was the "junior mezz" lender, due to have its loan repaid immediately behind JPMorgan and the AB AD Lender, but subject to key contractual protections and collateral rights.

**RESPONSE TO PARAGRAPH 4**: The JPM Defendants admit the allegations contained in the first, second, and third sentences of Paragraph 4 of the SAC. The JPM Defendants deny the allegations contained in the fourth sentence of Paragraph 4 of the SAC, except admit that Plaintiff was the junior most lender at the Project due to have its loan repaid only after JPMorgan and the AB AD Lender were repaid in full.

5.      Plaintiff made its loan in 2019, for $300 million, to one of the Ghermezians' affiliated entities, Ameream Mezz I, LLC (the "**American Dream Borrower**"). The American Dream Borrower owned Ameream Mezz, LLC ("**Ameream Mezz**"), which in turn owned Ameream, LLC ("**Ameream**") (the direct owner of the American Dream Mall). The Plaintiff Loan was subordinated to (a) JPMorgan's loan in the amount of $1.195 billion to Ameream (the "**JPM Loan**"), and (b) the AB AD Lender's $475 million loan to Ameream Mezz (the "**2017 Mezz Loan**"). Plaintiff was contractually subordinated *only* to the JPM Loan and the 2017 Mezz Loan––not to any other loan and not to any refinancings or replacements of either the JPM Loan or the 2017 Mezz Loan—and above all, structurally and contractually, ahead of the Ghermezian families' equity interests in American Dream Mall.

**RESPONSE TO PARAGRAPH 5**: The JPM Defendants deny the allegations contained in the first, second, and third sentences of Paragraph 5 of the SAC, and respectfully refer the Court to the Plaintiff Loan documents, JPM Loan documents and 2017 Mezz Loan documents, which speak for themselves, except admit that Ameream, LLC is the direct owner of the American Dream Mall and that the Plaintiff Loan is subordinate to the JPM Loan and the 2017 Mezz Loan. To the extent the fourth sentence of Paragraph 5 of the SAC sets forth legal conclusions, no response is

required.  To the extent a response is required, the JPM Defendants deny the allegations contained in the fourth sentence of Paragraph 5 of the SAC.

6.      Plaintiff bargained for credit support from the Ghermezian family empire to provide maximum assurance that the Plaintiff Loan would be repaid, notwithstanding that it was junior to the JPM Loan and the 2017 Mezz Loan. For example, several members of the Ghermezian family personally guaranteed the Plaintiff Loan. The Plaintiff Loan was also guaranteed pursuant to a Payment Guaranty (the "**Payment Guaranty**"), attached hereto as **Exhibit A**, by several Ghermezian affiliated entities, including Defendants WEM-MOA Guarantors, which directly or indirectly owned 49% of the equity in the West Edmonton Mall and Mall of America (the "**WEM-MOA 49% Equity**"). The WEM-MOA Guarantors covenanted in the Payment Guaranty, for Plaintiff's benefit, to at all times retain ownership of the WEM-MOA 49% Equity and maintain an aggregate net worth of at least $680,000,000.00. Additionally, the Payment Guaranty expressly prohibited the WEM-MOA Guarantors from entering into or effectuating any transaction with an Affiliate which would cause them to violate their net worth covenant. Thus, similar to the capital structure for the American Dream Mall, the Plaintiff Loan was structurally and contractually ahead of the Ghermezian families' interests with respect to the WEM-MOA 49% Equity.

**RESPONSE TO PARAGRAPH 6**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 6 of the SAC, and deny them on that basis.  The JPM Defendants deny the remainder of the allegations contained in Paragraph 6 of the SAC, and respectfully refer the Court to the Payment Guaranty and the other referenced documents, which speak for themselves.

7.      The WEM-MOA Guarantors, the Meadow Outparcels Developer, LLC (the "**Outparcel Owner**") (a Ghermezian affiliate that owns the Outparcel Entities (which themselves owned development rights near the American Dream Mall)), and Ameream Mezz also provided Plaintiff with the Irrevocable Letter of Direction dated August 2, 2019 (the "**Irrevocable Direction Letter**"), attached hereto as **Exhibit B**. The Irrevocable Direction Letter irrevocably directed JPMorgan and the AB AD Lender, upon having their loans satisfied, to pay the excess proceeds from "any collection, sale or other disposition" of the WEM-MOA 49% Equity and JPMorgan's liens on the ownership of Ameream and the Outparcel Entities directly to Plaintiff "within 10 business days of receipt."

**RESPONSE TO PARAGRAPH 7**: The JPM Defendants admit that Paragraph 7 of the SAC contains selective quotes from the Irrevocable Direction Letter, and respectfully refer the Court to the referenced document, which speaks for itself.  To the extent the remainder of the allegations contained in Paragraph 7 of the SAC set forth legal conclusions, no response is

4

required. To the extent a response is required, the JPM Defendants deny the allegations contained

in Paragraph 7 of the SAC, except admit that the WEM-MOA Guarantors, the Meadow Outparcels

Developer, LLC, and Ameream Mezz provided Plaintiff with the Irrevocable Letter of Direction

dated August 2, 2019.

8.    The Irrevocable Direction Letter functionally acted as a lien on the WEM-MOA
49% Equity and the ownership of Ameream and the Outparcel Entities by ensuring that, after
repayment of the JPM Loan and 2017 Mezz Loan and before the Ghermezians could keep their
ownership stake in the American Dream Mall, all proceeds from any disposition of such collateral
would be used to satisfy the outstanding balance on the Plaintiff Loan. In other words, the
Irrevocable Direction Letter ensured that the Ghermezian family could not leap-frog ahead of
Plaintiff and retain ownership interests that were designated as collateral for repayment of the
Plaintiff Loan.

**RESPONSE TO PARAGRAPH 8**: To the extent the allegations contained in Paragraph

8 of the SAC set forth legal conclusions, no response is required. To the extent a response is

required, the JPM Defendants deny the allegations contained in Paragraph 8 of the SAC, and

respectfully refer the Court to the Irrevocable Direction Letter, which speaks for itself.

9.    In addition to the above agreements, Plaintiff, JPMorgan, and the AB AD Lender
entered into the Intercreditor Agreement in 2019 (the "**Intercreditor Agreement**"), attached
hereto as **Exhibit C**, pursuant to which Plaintiff agreed that, until the JPM Loan and the 2017
Mezz Loan were repaid, Plaintiff would not sue any "Shared Guarantors" (as defined in the
Intercreditor Agreement), which included the WEM-MOA Guarantors and the nine Ghermezian
family members. In return, the Intercreditor Agreement provided important protections to Plaintiff,
including a requirement that, in the event JPMorgan foreclosed on the WEM-MOA 49% Equity
(which served as collateral for both the JPM Loan and the Plaintiff Loan), JPMorgan would dispose
of those valuable assets in a commercially reasonable manner designed to maximize value. In other
words, JPMorgan was required to conduct a public sale of the WEM-MOA 49% Equity.

**RESPONSE TO PARAGRAPH 9**: The JPM Defendants deny the allegations contained

in Paragraph 9 of the SAC, except admit that the Intercreditor Agreement appears to attached as

Exhibit C to the SAC, and respectfully refer the Court to the Intercreditor Agreement, which speaks

for itself.

10.    The American Dream Borrower defaulted on the Plaintiff Loan in May 2021 after
it failed to make required interest payments, and currently owes Plaintiff over $400 million.
Plaintiff sued the American Dream Borrower for breach of the Plaintiff Loan Agreement on May

3, 2023, and the Supreme Court of the State of New York entered judgment in Plaintiff's favor in the amount of $404,399,512.87 (the "**Judgment**"). That Judgment remains outstanding, with interest accruing at the New York state statutory rate.

**RESPONSE TO PARAGRAPH 10**: The JPM Defendants admit that the American

Dream Borrower defaulted on the Plaintiff Loan in May 2021 and that, as a result, Plaintiff

obtained the Judgment from Ameream Mezz I on May 3, 2023 in the amount of $404,399,512.87

in an action commenced by Plaintiff against Ameream Mezz I captioned *SOL-MM III LLC v.*

*Ameream Mezz I, LLC*, Index No. 650741/2023 (Sup. Ct. N.Y. Cnty. May 3, 2023). The JPM

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

remainder of the allegations contained in Paragraph 10 of the SAC, and deny them on that basis.

### *JPMorgan and the Ghermezian Family Team Up to Harm Plaintiff and the Lenders under the Plaintiff Loan*

11. **The 2021 Agreement**. The Ghermezian empire defaulted on the JPM Loan in 2020. JPMorgan's appropriate recourse, under the terms of the JPM Loan agreement with Ameream, was to foreclose on its primary collateral—the mortgages on the American Dream Mall and certain properties held by the Outparcel Entities—and sue the Ghermezian family members and their affiliated entities as guarantors to cover any shortfall. In early 2021, the aggregate value of the American Dream Mall alone greatly exceeded the amounts due to JPMorgan. Thus, had JPMorgan foreclosed on the American Dream Mall, it would have been paid in full, with enough left over for Plaintiff to recover all or substantially all of the amounts owed to it from the WEM-MOA Guarantors and the Ghermezians.

**RESPONSE TO PARAGRAPH 11**: The JPM Defendants deny the allegations contained

in the first sentence of Paragraph 11 of the SAC, except admit that the JPM Loan went into default

in 2020. The JPM Defendants deny the remainder of the allegations contained in Paragraph 11 of

the SAC.

12. But JPMorgan saw an opportunity to instead secure a windfall for itself by taking advantage of the Ghermezians' greed to retain control and ownership of the American Dream Mall (which they would have lost had either JPMorgan or AB AD Lender foreclosed), as well as the two other malls, and to avoid having to make good on their personal guarantees to Plaintiff. Thus, rather than foreclose on the American Dream Mall, JPMorgan cut a deal with the Ghermezians. That deal, by design, benefited JPMorgan and the Ghermezians at Plaintiff's expense.

**RESPONSE TO PARAGRAPH 12**: The JPM Defendants deny the allegations contained in Paragraph 12 of the SAC.

13.     As the first step in this arrangement, in January 2021, JPMorgan, AB AD Lender, and the Ghermezians (including their affiliated WEM-MOA Guarantors) entered into an agreement, attached hereto as **Exhibit D**, pursuant to which JPMorgan agreed not to sue the Ghermezians, and the Ghermezians used their control over the WEM-MOA Guarantors to transfer to the JPM Defendants ownership of the WEM-MOA 49% Equity (the "**2021 Agreement**"). After the pledge of equity in Ameream Mezz pursuant to the Plaintiff Pledge Agreement, and in Ameream as set forth in the Irrevocable Direction Letter, the WEM-MOA 49% Equity was the main collateral that was supposed to remain available to repay the Plaintiff Loan. To make matters worse, the transfer occurred at a false valuation of just $50 million, even though JPMorgan received more than $1 billion in value.

**RESPONSE TO PARAGRAPH 13**: The JPM Defendants deny the allegations contained in Paragraph 13 of the SAC, and respectfully refer the Court to the 2021 Agreement and the Plaintiff Pledge Agreement, which speak for themselves.

14.     This secretly negotiated 2021 Agreement has provided JPMorgan with a massive windfall. JPMorgan did not credit any amount from the $1 billion+ value transfer towards its loan— not even the artificially reduced $50 million valuation—and thereby kept the full amount of its loan, which exceeded $1.5 billion, outstanding. As JPMorgan and the Ghermezians understood and intended, this violated Plaintiff and the lenders' contractual rights, and harmed them, in at least two ways.

**RESPONSE TO PARAGRAPH 14**: The JPM Defendants deny the allegations contained in Paragraph 14 of the SAC, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

*15.     First*, by failing to credit any amount against the JPM Loan, notwithstanding that JPMorgan had taken ownership of a $1 billion asset, the 2021 Agreement artificially inflated the outstanding balance of the JPM Loan. The JPM Loan should have been less than $500 million, but this scheme kept it in excess of $1.5 billion. This hindered and delayed Plaintiff from being able to assert a claim against the WEM-MOA Guarantors to recover on the Plaintiff Loan because, under the Intercreditor Agreement, Plaintiff cannot pursue enforcement against the WEM-MOA Guarantors or the Ghermezians (as they are "Shared Guarantors" under the Intercreditor Agreement) until the JPM Loan is fully repaid.

**RESPONSE TO PARAGRAPH 15**: The JPM Defendants deny the allegations contained in Paragraph 15 of the SAC, except admit that Plaintiff cannot pursue enforcement against Shared

Guarantors until at least the JPM Loan is fully repaid, and respectfully refer the Court to the 2021

Agreement, JPM Loan documents, and Intercreditor Agreement, which speak for themselves.

16.    ***Second***, by falsely valuing the WEM-MOA 49% Equity at a mere $50 million, Defendants destroyed valuable subrogation, contribution, and reimbursement claims the WEM-MOA Guarantors hold against the borrower on the JPM Loan (*i.e.*, Ameream) ("**Reimbursement Claims**"). Since Ameream's debt was guaranteed by the WEM-MOA Guarantors, when their WEM-MOA 49% Equity was transferred to JPMorgan, the WEM-MOA Guarantors held contingent Reimbursement Claims against Ameream equal to the amount of the reduction of the JPM Loan. By falsely valuing the WEM-MOA 49% Equity at $50 million, the WEM-MOA Guarantors intentionally reduced their Reimbursement Claims from over $1 billion to $50 million. The Reimbursement Claims are unencumbered assets of the WEM-MOA Guarantors. Had the WEM-MOA Guarantors not conspired with JPMorgan to give away their $1 billion assets for $50 million and received the fair value of $1 billion, then the WEM-MOA Guarantors today would have nearly $600 million even after fully repaying the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 16**: To the extent the allegations contained in Paragraph

16 of the SAC set forth legal conclusions, no response is required.  To the extent a response is

required, the JPM Defendants deny the allegations contained in Paragraph 16 of the SAC.

17.    Defendants negotiated the 2021 Agreement in secret, without Plaintiff's involvement or consent. By doing so, JPMorgan secured a massive windfall for itself, and, in exchange, shielded the Ghermezians from having to repay Plaintiff for years, if ever. Indeed, the assets that the WEM-MOA Guarantors were supposed to preserve to repay Plaintiff were transferred to JPMorgan at a small fraction of their true value. And for their part, the Ghermezians continue to own a majority of the West Edmonton Mall and Mall of America, and to own 100% and control the American Dream Mall, free of the threat of losing those assets to JPMorgan and, most critically, Plaintiff and the lenders.

**RESPONSE TO PARAGRAPH 17**: The JPM Defendants deny the allegations contained

in Paragraph 17 of the SAC.

18.    ***The October 2022 Agreements***. Defendants' schemes did not end with the 2021 Agreement. There was (as admitted by several Defendants) a "step two" 18 months later. In order to further ensure that the Ghermezians would be able to retain their ownership interests in the malls, notwithstanding their obligations to repay the defaulted Plaintiff Loan, Defendants and the Ghermezians entered into a series of agreements in October 2022, namely the Standstill Agreement, attached hereto as **Exhibit E**, and the 7th Amendment, attached hereto as **Exhibit F** (together, the "**October 2022 Agreements**"). Those agreements had the intended effect of conclusively eliminating Plaintiff's interests in the WEM-MOA 49% Equity, Ameream and the Outparcel Entities, in violation of the Payment Guaranty, the Irrevocable Direction Letter, and the Intercreditor Agreement. Plaintiff is supposed to receive any and all excess from any collections, sales, or other dispositions of such assets immediately after the JPM Loan and 2017 Mezz Loan

were repaid. The October 2022 Agreements interfere with these rights, even though Defendants have confirmed the validity and enforceability of these rights as recent as March of this year.

**RESPONSE TO PARAGRAPH 18**: The JPM Defendants deny the allegations contained in Paragraph 18 of the SAC, except admit that JPMorgan entered into the October 2022 Agreements, and respectfully refer the Court to the October 2022 Agreements, Payment Guaranty, Irrevocable Direction Letter, and Intercreditor Agreement, which speak for themselves.

19.    The October 2022 Agreements took effect immediately after the AB AD Lender foreclosed on Ameream Mezz's ownership of Ameream (the "**Strict Foreclosure**").

**RESPONSE TO PARAGRAPH 19**: The JPM Defendants deny the allegations contained in Paragraph 19 of the SAC, and respectfully refer the Court to the October 2022 Agreements, which speak for themselves.

20.    Plaintiff knew about the Strict Foreclosure, and understood that, with the 2017 Mezz Loan now fully satisfied, all of the AB AD Lender's rights under all of its 2017 Mezz Loan documents and the Intercreditor Agreement were terminated. From the moment of the Strict Foreclosure, the Plaintiff Loan was only junior to the JPM Loan. The Plaintiff Loan is ahead of the Ghermezians and is ahead of any refinancing of the JPM Loan or any replacement loans.

**RESPONSE TO PARAGRAPH 20**: The JPM Defendants deny the allegations contained in Paragraph 20 of the SAC, except admit that Plaintiff knew about the Strict Foreclosure and that the Intercreditor Agreement terminated following the Strict Foreclosure. The JPM Defendants aver that Section 6(b) survived termination of the Intercreditor Agreement.

21.    What Plaintiff did not know was that, simultaneously with the Strict Foreclosure, Defendants entered into the October 2022 Agreements, which were designed to eliminate the rights of Plaintiff that vested in Plaintiff upon completion of the Strict Foreclosure, as the lender to be repaid immediately after satisfaction of the JPM Loan, now that the 2017 Mezz Loan is fully satisfied.

**RESPONSE TO PARAGRAPH 21**: The JPM Defendants deny the allegations contained in Paragraph 21 of the SAC.

22.    Despite the 2017 Mezz Loan being fully discharged as a result of the Strict Foreclosure, the October 2022 Agreements mandate that JPMorgan, upon repayment of its loan, transfer ownership of the WEM-MOA 49% Equity, or any excess funds from the collections, sales,

or other disposition of the WEM-MOA 49% Equity, Ameream and the Outparcel Entities, to the AB AD Lender instead of Plaintiff, in violation of the Intercreditor Creditor Agreement and the Irrevocable Direction Letter, which requires that such collateral or funds be directed to Plaintiff to satisfy its loan. All of this was done with the full cooperation of the Ghermezians and their affiliates, who secretly retained ownership in the American Dream Mall.

**RESPONSE TO PARAGRAPH 22**: The JPM Defendants deny the allegations contained in Paragraph 22 of the SAC, and respectfully refer the Court to the October 2022 Agreements, which speak for themselves.

23.    JPMorgan also obtained extra, undeserved benefits through the October 2022 Agreements, at the expense of Plaintiff and the lenders. The October 2022 Agreements provide that if the JPM Loan is refinanced, the WEM-MOA 49% Equity can be pledged to support it, without regard to Plaintiff's rights. This is not permitted by the contracts with Plaintiff, which provide that any funds available from the WEM-MOA 49% Equity after payment of the JPM Loan are to be directed to satisfy the Plaintiff Loan. And the 7th Amendment states that WEM-3 (which owns 51% of the West Edmonton Mall and is a guarantor of the Plaintiff Loan) is to receive a $48.5 million distribution of cash but immediately give it away to support operating costs of the American Dream Mall. This extraordinarily non-commercial provision makes no sense for WEM-3 and violates the Payment Guaranty.

**RESPONSE TO PARAGRAPH 23**: The JPM Defendants deny the allegations contained in Paragraph 23 of the SAC, and respectfully refer the Court to the October 2022 Agreements, which speak for themselves.

24.    Thus, Defendants used the 2021 Agreement, with its false valuation of the WEM-MOA 49% Equity, to create an artificial cushion ahead of repayment on the Plaintiff Loan; and Defendants used the October 2022 Agreements to remove Plaintiff from having access to its collateral securing its loan and contractual rights altogether.

**RESPONSE TO PARAGRAPH 24**: The JPM Defendants deny the allegations contained in Paragraph 24 of the SAC.

***Plaintiff's Claims for Relief***

25.    Plaintiff asserts multiple claims arising out of Defendants' scheme, including claims for fraudulent transfer; breach of contract and/or tortious interference with the Payment Guaranty, the Irrevocable Direction Letter, and the Intercreditor Agreement; breach of the covenant of good faith and fair dealing; and declaratory relief.

**RESPONSE TO PARAGRAPH 25**: The JPM Defendants deny the allegations contained in Paragraph 25 of the SAC, except admit that Plaintiff purports to assert claims for fraudulent transfer, anticipatory breach of contract, tortious interference, breach of the implied covenant of good faith and fair dealing, and declaratory relief against the JPM Defendants.

26.    While these claims set forth different legal theories, and involve a complex array of agreements and Defendants' and the Ghermezians' affiliated entities, there is a common thread: JPMorgan's recourse following default should have been to either dispose of collateral in a commercially reasonable manner, with all excess value available to pay the Plaintiff Loan, or to seek and obtain Plaintiff's consent to a restructuring of the parties' rights on their respective loans. JPMorgan did neither. It instead conspired with the Ghermezians to secure a windfall for itself, at Plaintiff's expense.

**RESPONSE TO PARAGRAPH 26**: To the extent the allegations contained in Paragraph 26 of the SAC set forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 26 of the SAC.

27.    Plaintiff brings this action to right these wrongs.

**RESPONSE TO PARAGRAPH 27**: The JPM Defendants admit that Plaintiff commenced this action and deny the remainder of the allegations contained in Paragraph 27 of the SAC.

### PARTIES AND RELEVANT NON-PARTIES

28.    Plaintiff SOL-MM III LLC is a Delaware limited liability company, having a registered office at c/o Cogency Global Inc., 850 New Burton, Suite 201, Dover, Delaware 19904. SOL-MM III LLC is the successor to Western Asset Mortgage Capital Corporation, the original Administrative Agent of the Plaintiff Loan. Reference to "Administrative Agent" herein includes Plaintiff and its predecessor in interest.

**RESPONSE TO PARAGRAPH 28:** The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of Paragraph 28 of the SAC, and deny them on that basis.

*The JPMorgan Defendants*

29.    Defendant JPMorgan Chase Bank N.A. is a national banking association with a home office in Columbus Ohio and an address at c/o CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219. JPMorgan is the administrative agent under

the JPM Loan documents and also a lender thereunder. It is a party to the 2021 Agreement and the October 2022 Agreements.

**RESPONSE TO PARAGRAPH 29**: The JPM Defendants admit the allegations contained in Paragraph 29 of the SAC.

30.     Defendant D5 Hawks LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan with an address at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, (ii) was formed on February 26, 2021, and (iii) as a result of the consummation of the 2021 Agreement, is the sole member of MOA Holdings II LLC, which owns a 49% equity interest in MOA Holdings I LLC, the indirect sole owner of the Mall of America.

**RESPONSE TO PARAGRAPH 30**: The JPM Defendants admit the allegations contained Paragraph 30 of the SAC.

31.     Defendant WE Tahoe 1 LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan with an address at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, (ii) was formed on February 26, 2021, and (iii) as a result of the consummation of the 2021 Agreement, owns 970 common shares of West Edmonton Mall Properties Inc. ("**WEMPI**"), the owner of the West Edmonton Mall.

**RESPONSE TO PARAGRAPH 31**: The JPM Defendants admit the allegations contained in Paragraph 31 of the SAC.

32.     Defendant WE Tahoe 2 LLC (i) is a Delaware limited liability company that is owned and operated by JPMorgan with an address at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, (ii) was formed on February 26, 2021, and (iii) as a result of the consummation of the 2021 Agreement, owns 10 common shares of WEMPI.

**RESPONSE TO PARAGRAPH 32**: The JPM Defendants admit the allegations contained in Paragraph 32 of the SAC.

33.     At all times relevant to this action and currently, on information and belief, JPMorgan owns, operates, and controls Defendants JPM-D5, JPM-WEM 1, and JPM-WEM 2. These entities received the WEM-MOA 49% Equity at the direction of JPMorgan and would be "designees or nominees" under the 2021 Agreement.

**RESPONSE TO PARAGRAPH 33**: The JPM Defendants admit the allegations contained in Paragraph 33 of the SAC.

*West Edmonton Mall Guarantor Defendants*

34.    Defendant New WEM Holdings Affiliate 1 Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, and an address at c/o CT Corporation System, 28 Liberty Street, New York, New York 10005, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPM Loan and the foreclosed and discharged 2017 Mezz Loan, and (iv) a party to the 2021 Agreement and the 7th Amendment. It previously indirectly owned 24.5 % of the West Edmonton Mall.

**RESPONSE TO PARAGRAPH 34**: The claims against Defendant New WEM Holdings

Affiliate 1 Ltd. were dismissed pursuant to the Court's ruling on the JPM Defendants' motion to

dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in

Paragraph 34 of the SAC.    MTD Decision.    To the extent a response is required, the JPM

Defendants deny the remainder of the allegations contained in Paragraph 34 of the SAC, and

respectfully refer the Court to the Payment Guaranty, JPM Loan documents, 2017 Mezz Loan

documents, 2021 Agreement and 7th Amendment, which speak for themselves.

35.    Defendant New WEM Holdings 2 Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, and an address at c/o CT Corporation System, 28 Liberty Street, New York, New York 10005, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPM Loan and the foreclosed and discharged 2017 Mezz Loan, and (iv) a party to the 2021 Agreement and the 7th Amendment. It previously indirectly owned 0.5 % of the West Edmonton Mall.

**RESPONSE TO PARAGRAPH 35**: The claims against Defendant New WEM Holdings

Affiliate 2 Ltd. were dismissed pursuant to the Court's ruling on the JPM Defendants' motion to

dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in

Paragraph 35 of the SAC.    MTD Decision.    To the extent a response is required, the JPM

Defendants deny the remainder of the allegations contained in Paragraph 35 of the SAC, and

respectfully refer the Court to the Payment Guaranty, JPM Loan documents, 2017 Mezz Loan

documents, 2021 Agreement and 7th Amendment, which speak for themselves.

36.    Defendant New WEM Holdings Ltd. is (i) incorporated in Canada and has its principal place of business in Edmonton, Alberta, Canada, and an address at c/o CT Corporation System, 28 Liberty Street, New York, New York 10005, (ii) a guarantor under the Payment

Guaranty, (iii) a guarantor under the payment guarantees for the JPM Loan and the foreclosed and discharged 2017 Mezz Loan, and (iv) a party to the 2021 Agreement and the 7th Amendment. It previously indirectly owned 100% of the West Edmonton Mall and now owns only 51% of the West Edmonton Mall.

**RESPONSE TO PARAGRAPH 36**: The claims against Defendant New WEM Holdings Ltd. were dismissed pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 36 of the SAC.  MTD Decision.  To the extent a response is required, the JPM Defendants deny the remainder of the allegations contained in Paragraph 36 of the SAC, and respectfully refer the Court to the Payment Guaranty, JPM Loan documents, 2017 Mezz Loan documents, 2021 Agreement and 7th Amendment, which speak for themselves.

37.    WEM-1, WEM-2, and WEM-3 are collectively referred to as the "**WEM Guarantors**."

**RESPONSE TO PARAGRAPH 37**: The JPM Defendants admit that the SAC refers to WEM-1, WEM-2, and WEM-3 collectively as the WEM Guarantors.

*Mall Of America Guarantor Defendant*

38.    Defendant MOA Holdings III, LLC is (i) a Delaware limited liability company with its principal place of business in Bloomington, Minnesota, and an address at 60 East Broadway, Bloomington, Minnesota 55425, (ii) a guarantor under the Payment Guaranty, (iii) a guarantor under the payment guarantees for the JPM Loan and the foreclosed and discharged 2017 Mezz Loan, and (iv) a party to the 2021 Agreement and the 7th Amendment. It previously indirectly owned 49% of the Mall of America.

**RESPONSE TO PARAGRAPH 38**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in section (i) of the first sentence and the second sentence of Paragraph 38 of the SAC, and deny them on that basis. The JPM Defendants deny the remainder of the allegations contained in Paragraph 38 of the SAC, and respectfully refer the Court to the Payment Guaranty, JPM Loan documents, 2017 Mezz Loan documents, 2021 Agreement and 7th Amendment, which speak for themselves.

*Ameream and the Outparcel Entities*

39.     Defendant Ameream, LLC (i) is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073, (ii) is the borrower of the JPM Loan, (iii) is a party to the 2021 Agreement and the 7th Amendment, and (iv) prior to the Strict Foreclosure, was indirectly wholly owned by Ameream Mezz, whose 100% ownership was pledged to Plaintiff as collateral for the Plaintiff Loan. According to the 7th Amendment, Ameream is now owned by the newly created entity, AB AMEREAM MEMBER LLC ("**Successor Ameream Mezz**").

**RESPONSE TO PARAGRAPH 39**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in section (i) of the first sentence of Paragraph 39 of the SAC, and deny them on that basis. The JPM Defendants deny the remainder of the allegations contained in Paragraph 39 of the SAC, and respectfully refer the Court to the JPM Loan documents, Plaintiff Loan documents, 2021 Agreement and 7th Amendment, which speak for themselves.

40.     MEADOW A-B OFFICE, LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073. It is a party to the 7th Amendment.

**RESPONSE TO PARAGRAPH 40**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 40 of the SAC, and deny them on that basis.  The JPM Defendants deny the allegations contained in the second sentence of Paragraph 40 of the SAC, and respectfully refer the Court to the 7th Amendment, which speaks for itself.

41.     MEADOW C-D OFFICE, LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073. It is a party to the 7th Amendment.

**RESPONSE TO PARAGRAPH 41**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained the first sentence of Paragraph 41 of the SAC, and deny them on that basis.  The JPM Defendants deny the allegations contained

in the second sentence of Paragraph 41 of the SAC, and respectfully refer the Court to the 7th Amendment, which speaks for itself.

42.    MEADOW HOTEL, LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073. It is a party to the 7th Amendment.

**RESPONSE TO PARAGRAPH 42**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 42 of the SAC, and deny them on that basis. The JPM Defendants deny the allegations contained in the second sentence of Paragraph 42 of the SAC, and respectfully refer the Court to the 7th Amendment, which speaks for itself.

43.    MEADOW BASEBALL, LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073. It is a party to the 7th Amendment.

**RESPONSE TO PARAGRAPH 43**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 43 of the SAC, and deny them on that basis. The JPM Defendants deny the allegations contained in the second sentence of Paragraph 43 of the SAC, and respectfully refer the Court to the 7th Amendment, which speaks for itself.

44.    Meadow A-B Office, LLC, Meadow C-D, LLC, Meadow Hotel, LLC, and Meadow Baseball, LLC are collectively referred to as the "**Outparcel Entities**."

**RESPONSE TO PARAGRAPH 44**: The JPM Defendants admit that the SAC refers to Meadow A-B Office, LLC, Meadow C-D, LLC, Meadow Hotel, LLC, and Meadow Baseball, LLC collectively as the Outparcel Entities.

*Relevant Non-Parties*

45.    Non-party Don Ghermezian is (i) a natural person, having an address at 14A Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a director or officer of one or more of the WEM-MOA Guarantors, and (iv) a party to the 2021 Agreement and the 7th Amendment.

**RESPONSE TO PARAGRAPH 45**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in sections (i), (ii), and (iii) of Paragraph 45 of the SAC, and deny them on that basis. The JPM Defendants deny the allegations contained in section (iv) of Paragraph 45 of the SAC, and respectfully refer the Court to the Payment Guaranty, 2021 Agreement, and 7th Amendment, which speak for themselves.

46.    Non-party Eskandar Ghermezian is (i) a natural person, having an address at 17 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement and the 7th Amendment.

**RESPONSE TO PARAGRAPH 46**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in sections (i), (ii), and (iii) of Paragraph 46 of the SAC, and deny them on that basis. The JPM Defendants deny the allegations contained in section (iv) of Paragraph 46 of the SAC, and respectfully refer the Court to the Payment Guaranty, 2021 Agreement, and 7th Amendment, which speak for themselves.

47.    Non-party David Ghermezian is (i) a natural person, having an address at 14A Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement and the 7th Amendment.

**RESPONSE TO PARAGRAPH 47**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in sections (i), (ii), and (iii) of Paragraph 47 of the SAC, and deny them on that basis. The JPM Defendants deny the allegations contained in section (iv) of Paragraph 47 of the SAC, and respectfully refer the Court to the Payment Guaranty, 2021 Agreement, and 7th Amendment, which speak for themselves.

48.    Non-party Syd Ghermezian is (i) a natural person, having an address at 722 W. 232nd Street, Bronx, New York 10463, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement and the 7th Amendment.

**RESPONSE TO PARAGRAPH 48**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in sections (i) and (ii) of

Paragraph 48 of the SAC, and deny them on that basis. The JPM Defendants deny the allegations contained in section (iii) of Paragraph 48 of the SAC, and respectfully refer the Court to the Payment Guaranty, 2021 Agreement, and 7th Amendment, which speak for themselves.

49.    Non-party Bahaman Ghermezian is (i) a natural person, having an address at 15 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement and the 7th Amendment.

**RESPONSE TO PARAGRAPH 49**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in sections (i) and (ii) of Paragraph 49 of the SAC, and deny them on that basis. The JPM Defendants deny the allegations contained in section (iii) of Paragraph 49 of the SAC, and respectfully refer the Court to the Payment Guaranty, 2021 Agreement, and 7th Amendment, which speak for themselves.

50.    Non-party Raphael Ghermezian is (i) a natural person, having an address at 18 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement and the 7th Amendment.

**RESPONSE TO PARAGRAPH 50**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in sections (i) and (ii) of Paragraph 50 of the SAC, and deny them on that basis. The JPM Defendants deny the allegations contained in section (iii) of Paragraph 50 of the SAC, and respectfully refer the Court to the Payment Guaranty, 2021 Agreement, and 7th Amendment, which speak for themselves.

51.    Non-party Nader Ghermezian is (i) a natural person, having an address at 16 Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-3, and (iv) a party to the 2021 Agreement and the 7th Amendment.

**RESPONSE TO PARAGRAPH 51**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in sections (i), (ii), and (iii) of Paragraph 51 of the SAC, and deny them on that basis. The JPM Defendants deny the

allegations contained in section (iv) of Paragraph 51 of the SAC, and respectfully refer the Court

to the Payment Guaranty, 2021 Agreement, and 7th Amendment, which speak for themselves.

52.     Non-party Marshall Ghermezian is (i) a natural person, having an address at 17 Wellington Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, and (iii) a party to the 2021 Agreement and the 7th Amendment.

**RESPONSE TO PARAGRAPH 52**: The JPM Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations contained in sections (i) and (ii) of

Paragraph 52 of the SAC, and deny them on that basis.  The JPM Defendants deny the allegations

contained in section (iii) of Paragraph 52 of the SAC, and respectfully refer the Court to the

Payment Guaranty, 2021 Agreement, and 7th Amendment, which speak for themselves.

53.     Non-party Tony Ghermezian is (i) a natural person, having an address at 14B Wellington Crescent, Edmonton, Alberta T5N 3V2, Canada, (ii) a guarantor under the Payment Guaranty, (iii) a member of the board of directors of WEM-1 and WEM-2, and (iv) a party to the 2021 Agreement and the 7th Amendment.

**RESPONSE TO PARAGRAPH 53**: The JPM Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations contained in sections (i), (ii), and (iii)

of Paragraph 53 of the SAC, and deny them on that basis.  The JPM Defendants deny the

allegations contained in section (iv) of Paragraph 53 of the SAC, and respectfully refer the Court

to the Payment Guaranty, 2021 Agreement, and 7th Amendment, which speak for themselves.

54.     Each Ghermezian family member listed in paragraphs 45-53 is an "**Individual Guarantor**," and collectively the "**Individual Guarantors**".

**RESPONSE TO PARAGRAPH 54**: The JPM Defendants admit that the SAC refers to

each Ghermezian family member listed in Paragraphs 45-53 of the SAC as an "Individual

Guarantor" and that the SAC refers to the Ghermezian family members listed in Paragraphs 45-53

of the SAC collectively as the "Individual Guarantors."

55.     Non-party Original WEMPI Inc. ("**Original WEMPI**") is (i) an Alberta corporation, having an address at 8882-170 Street North West, Edmonton, Alberta, T5T 4M2, Canada, and an address at c/o CT Corporation System, 111 Eighth Avenue, New York, New York

10011, (ii) a guarantor under the payment guarantee for the JPM Loan, and (iii) a party to the 2021 Agreement and the 7th Amendment. Original WEMPI wholly owns WEM-3.

**RESPONSE TO PARAGRAPH 55**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in sections (i) and (ii) of the first sentence of Paragraph 55 of the SAC, as well as the last sentence of Paragraph 55 of the SAC, and deny them on that basis.  The JPM Defendants deny the allegations contained in section (iii) of the first sentence of Paragraph 55 of the SAC, and respectfully refer the Court to the JPM Loan documents, 2021 Agreement, and 7th Amendment, which speak for themselves.

56.     Non-party Triple Five Investment Ltd. ("**Triple Five**") is (i) a British Columbia corporation, having an address at 8882 170 Street, Edmonton, Alberta, Canada T5T 4M2, and an address at c/o Ameream LLC, One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073, and (ii) a Non-Shared Guarantor for the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 56**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 56 of the SAC, and deny them on that basis.

57.     Non-party 7 Crowns Corporation ("**7 Crowns**") is (i) an Alberta corporation, having an address at 8882 170 Street, Edmonton, Alberta, Canada T5T 4M2, and an address at c/o Ameream LLC, One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073, and (ii) a Non-Shared Guarantor for the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 57**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in sections (i) and (ii) of Paragraph 57 of the SAC, deny them on that basis, and respectfully refer the Court to the Plaintiff Loan documents, which speak for themselves.

58.     Non-party MEADOW OUTPARCELS DEVELOPER, LLC, is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073. It is a party to the Irrevocable Direction Letter and wholly owns the Outparcels Entities.

**RESPONSE TO PARAGRAPH 58**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of

Paragraph 58 of the SAC, and deny them on that basis.  The JPM Defendants deny the allegations contained in the second sentence of Paragraph 58 of the SAC, and respectfully refer the Court to the Irrevocable Direction Letter, which speaks for itself.

59.    Non-party TRIPLE FIVE OF MINNESOTA, INC. is (i) a Minnesota corporation with its principal place of business in Bloomington, Minnesota, and an address at 60 East Broadway, Bloomington, Minnesota 55425, and (ii) a party to the 7th Amendment.

**RESPONSE TO PARAGRAPH 59**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in section (i) of Paragraph 59 of the SAC, and deny them on that basis.  The JPM Defendants deny the allegations contained in section (ii) of Paragraph 59 of the SAC, and respectfully refer the Court to the 7th Amendment, which speaks for itself.

60.    Non-party REGENT MOA MANAGEMENT LLC is (i) a Delaware limited liability company with its principal place of business in Bloomington, Minnesota, and an address at 60 East Broadway, Bloomington, Minnesota 55425, and (ii) a party to the 7th Amendment.

**RESPONSE TO PARAGRAPH 60**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in section (i) of Paragraph 60 of the SAC, and deny them on that basis.  The JPM Defendants deny the allegations contained in section (ii) of Paragraph 60 of the SAC, and respectfully refer the Court to the 7th Amendment, which speaks for itself.

61.    Non-party ROYCE MOA HOLDINGS I, LLC is (i) a Delaware limited liability company with its principal place of business in Bloomington, Minnesota, and an address at 60 East Broadway, Bloomington, Minnesota 55425, and (ii) a party to the 7th Amendment.

**RESPONSE TO PARAGRAPH 61**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in section (i) of Paragraph 61 of the SAC, and deny them on that basis.  The JPM Defendants deny the allegations contained in section (ii) of Paragraph 61 of the SAC, and respectfully refer the Court to the 7th Amendment, which speaks for itself.

62.     Non-party AB AMEREAM MEMBER PARENT LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073. It was formed in September 2022 and wholly owns AB AMEREAM MEMBER LLC. According to the 7th Amendment, AB AMEREAM MEMBER PARENT LLC is indirectly wholly owned by the Ghermezian family through T5 AD, LLC, and the AB AD Lender owns all of the preferred equity of AB AMEREAM MEMBER PARENT LLC. AB AMEREAM MEMBER PARENT LLC is the alleged borrower under a new $475 million loan provided by the AB AD Lender. Plaintiff asserts that AB AMEREAM MEMBER PARENT LLC is the successor to American Dream Borrower. It is a party to the 7th Amendment.

**RESPONSE TO PARAGRAPH 62**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first, second, third, fourth, and sixth sentences of Paragraph 62 of the SAC, deny them on that basis, and respectfully refer the Court to the 7th Amendment, which speaks for itself. To the extent the fifth sentence of Paragraph 62 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in the fifth sentence of Paragraph 62 of the SAC.

63.     AB AMEREAM MEMBER LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073. It was formed in September 2022 and wholly owns AMEREAM. Its parent company is AB AMEREAM MEMBER PARENT LLC. Plaintiff asserts that AB AMEREAM MEMBER LLC is the successor to Ameream Mezz. It is a party to the 7th Amendment.

**RESPONSE TO PARAGRAPH 63**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first, second, and third sentences of Paragraph 63 of the SAC, and deny them on that basis.  To the extent the fourth sentence of Paragraph 63 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in the fourth sentence of Paragraph 63 of the SAC.  The JPM Defendants deny the allegations contained in the fifth sentence of Paragraph 63 of the SAC, and respectfully refer the Court to the 7th Amendment, which speaks for itself.

64.     Non-party T5 AD, LLC is a Delaware limited liability company with its principal place of business in East Rutherford, New Jersey, and an address at One Meadowlands Plaza, 3rd Floor, East Rutherford, New Jersey 07073. At all times, T5 AD, LLC, through its ultimate beneficiaries, has indirectly wholly owned the American Dream Mall, first through American Dream Borrower, and now through its successor, AB AMEREAM MEMBER PARENT LLC. T5 AD, LLC is wholly owned by Individual Guarantors and other Ghermezian family members.

**RESPONSE TO PARAGRAPH 64**: The JPM Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations contained in the first and third sentences

of Paragraph 64 of the SAC and deny them on that basis. To the extent the second sentence of

Paragraph 64 of the SAC sets forth legal conclusions, no response is required. To the extent a

response is required, the JPM Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations contained in the second sentence of Paragraph 64 of the SAC, and

deny them on that basis.

65.     Non-party AB ADM Syndicate Joint Venture LP, also known as the AB AD Lender, is a Delaware limited partnership with its principal place of business in New York, New York, and an address at 645 5th Avenue, 8th Floor, New York, New York 10019. AB ADM Syndicate Joint Venture LP provided the 2017 Mezz Loan to Ameream Mezz in 2017. It purportedly made a $475 million loan to AB AMEREAM MEMBER PARENT LLC in connection with the execution of the October 2022 Agreements and owns preferred equity in AB AMEREAM MEMBER PARENT LLC. AB ADM Syndicate Joint Venture LP is a party to the Intercreditor Agreement, 2021 Agreement, and the Standstill Agreement, and conducted the Strict Foreclosure.

**RESPONSE TO PARAGRAPH 65**: The JPM Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations contained in the first sentence of

Paragraph 65 of the SAC and deny them on that basis.  The JPM Defendants deny the remainder

of the allegations contained in Paragraph 65 of the SAC, except admit that AB AD Lender provided

the 2017 Mezz Loan to Ameream Mezz, and respectfully refer the Court to the 2017 Mezz Loan

documents, Intercreditor Agreement, 2021 Agreement, and the Standstill Agreement, which speak

for themselves.

## JURISDICTION

66.     This action was originally brought in New York state court (the "**New York Action**") by filing a notice and summons on March 23, 2023, with the Initial Complaint subsequently filed on July 18, 2023, and the First Amended Complaint filed on November 29, 2023.

**RESPONSE TO PARAGRAPH 66**: The JPM Defendants admit the allegations contained in Paragraph 66 of the SAC.

67.     On July 26, 2023, Defendants removed the New York Action to this Court pursuant to 12 U.S.C. § 611, *et seq.* (the "**Edge Act**"). This Court has jurisdiction pursuant to the Edge Act.

**RESPONSE TO PARAGRAPH 67**: The JPM Defendants admit the allegations contained in Paragraph 67 of the SAC.

68.     Venue is proper in this district by agreement of the parties per Section 7.3 of the Payment Guaranty and Section 18(g) of the Intercreditor Agreement, pursuant to which JPMorgan and the WEM-MOA Guarantors consented to the jurisdiction of New York State and federal courts in New York County. Venue is also proper under 28 U.S.C. § 1391(b)(3), CPLR § 501, and CPLR § 503, including on grounds that all Defendants do substantial business in this County, their contracts are governed by New York law with New York venue selection clauses, and all Defendants derive substantial revenue from activities carried out in this County.

**RESPONSE TO PARAGRAPH 68**: To the extent Paragraph 68 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 68 of the SAC, except admit that the parties consented to the jurisdiction of the United States District Court of the Southern District of New York pursuant to Section 18(g) of the Intercreditor Agreement and that venue is proper in this district because it is the district where the New York Action was pending at the time of removal, and respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.

## FACTUAL BACKGROUND

**A.     American Dream Mall, Mall of America, and West Edmonton Mall**

69.     The claims Plaintiff brings relate to three of the largest and most valuable shopping malls in North America—the American Dream Mall in New Jersey; the Mall of America in Minnesota; and the West Edmonton Mall in Alberta, Canada. Each mall has been owned and/or

managed by the Ghermezian family, which has developed and operated several of the world's largest shopping malls since the 1970s. The Ghermezian family operates through its family investment group, the Triple Five Group, of which Don Ghermezian is currently the President. Don Ghermezian is also purportedly the CEO and President of American Dream Mall.

**RESPONSE TO PARAGRAPH 69**: The JPM Defendants deny the allegations contained

in Paragraph 69 of the SAC.

70.    Over the years, the Ghermezian family established an elaborate web of companies to hold its ownership stakes in the three malls. **Appendix Chart "B"** is the tangled corporate organization for all three malls existing immediately prior to the 2021 Agreement—when the JPM Loan, 2017 Mezz Loan, and Plaintiff Loan were all still in place. **Appendix Chart "C"** is the corporate organization after (a) the consummation of JPMorgan's acquisition of WEM-MOA 49% Equity in March 2021 pursuant to the 2021 Agreement, and (b) the Strict Foreclosure, based on a notice provided to Plaintiff by the AB AD Lender in October 2022. **Appendix Chart "D"** is the corporate organization of the three malls after the consummation of the October 2022 Agreements.

**RESPONSE TO PARAGRAPH 70**: The JPM Defendants deny the allegations contained

in Paragraph 70 of the SAC (including the allegations contained in Appendix Charts "B," "C," and

"D").

*American Dream Mall*

71.    The American Dream Mall is a 3.3-million square foot retail and entertainment complex in East Rutherford, New Jersey. It is the second largest retail and entertainment center in the United States (behind Mall of America), boasting an impressive array of entertainment, shopping, and dining experiences. American Dream Mall features a Nickelodeon Indoor Theme Park with more than 35 rides and attractions, an NHL-regulation-size ice skating rink, a DreamWorks Water Park, North America's only indoor-year-round ski and snow resort, a Legoland Discovery Center, a Sea Life Aquarium, and the world's only indoor surfing wave pool.[2]

**RESPONSE TO PARAGRAPH 71**: The JPM Defendants deny the allegations contained

in Paragraph 71 of the SAC and respectfully refer the Court to the article entitled *The Ultimate

2024 Guide to the American Dream Mall* cited by Plaintiff, which speaks for itself.

72.    At the time of the Plaintiff Loan in 2019, the American Dream Mall was valued at $4.3 billion upon completion, and $5.6 billion upon post-completion and stabilization.

---

[2] Loving New York, The Ultimate 2023 Guide To The American Dream Mall (Mar. 2, 2023), https://loving-newyork.com/american-dream-mall-nj/.

**RESPONSE TO PARAGRAPH 72**: The JPM Defendants deny the allegations contained in Paragraph 72 of the SAC.

73.     At all relevant times, the Ghermezian family has, through corporate entities, owned Ameream, the entity that owns the American Dream Mall. The Ghermezian family and Defendants sought to hide the Ghermezian family's continued ownership following the Strict Foreclosure by the AB AD Lender in October 2022, described in ¶¶ 182-187 below. The Strict Foreclosure should have extinguished the Ghermezians' ownership interest, but, as a result of the breaches described herein, did not. Thus, the Ghermezians continue to own and run the American Dream Mall even today.

**RESPONSE TO PARAGRAPH 73**: The JPM Defendants deny the allegations contained in Paragraph 73 of the SAC.

74.     While the American Dream Mall, like virtually all shopping malls around the globe, suffered during the COVID-19 pandemic, it has come back strong. In 2023, Don Ghermezian bragged about the mall's success in 2022 and the fact that high-end retailers were seeking to open stores within the mall.[3] The American Dream Mall itself was, in early 2021, and remains, worth far more than the amount owed to JPMorgan under the JPM Loan, even without accounting for the more than $1 billion in value associated with the WEM-MOA 49% Equity that JPMorgan intentionally refused to credit against the JPM Loan.

**RESPONSE TO PARAGRAPH 74**: The JPM Defendants deny the allegations contained in Paragraph 74 of the SAC.

75.     According to American Dream Mall's public statements disclosed in October 2023, the American Dream Mall generated $520.8 million in gross sales in the previous 12 months, with 86.0% of the property leased.[4]

---

[3] See David Moin, American Dream, Post-COVID-19, Capturing Crowds, WOMEN'S WEAR DAILY (Jan. 23, 2023), http://wwd.com/business-news/real-estate/american-dream-progress-report-1235481459/.

[4] Gross Sales Report as of November 1, 2023, ELECTRONIC MUNICIPAL MARKET ACCESS (Nov. 2, 2023), https://emma.msrb.org/P21743801-P21339131-P21773617.pdf; American Dream Leasing Status Update as of October 2, 2023, ELECTRONIC MUNICIPAL MARKET ACCESS (Oct. 4, 2023), https://emma.msrb.org/P21731041-P21329945-P21763647.pdf.

**RESPONSE TO PARAGRAPH 75**: The JPM Defendants deny the allegations contained in Paragraph 75 of the SAC, and respectfully refer the Court to the referenced public statements, which speak for themselves.

76.     Additionally, Ameream's affiliates, the Outparcel Entities, own valuable adjacent leasehold properties zoned for office and hotel complexes, a minor league baseball stadium, as well as other expansion rights, including an option to purchase land.

**RESPONSE TO PARAGRAPH 76**: The JPM Defendants deny the allegations contained Paragraph 76 of the SAC.

***Mall of America***

77.     Prior to March 2021, the Ghermezian family, through various corporate entities, owned 100% of Mall of America. The Ghermezian family continues to operate this mall.

**RESPONSE TO PARAGRAPH 77**: The JPM Defendants deny the allegations contained in Paragraph 77 of the SAC.

78.     Mall of America is the United States' largest retail and entertainment complex, spanning 5.6 million square feet.[5] Mall of America currently attracts over 40 million visitors annually and has a $1.9 billion economic impact annually. Mall of America has more than 520 stores, two hotels, and a theme park.

**RESPONSE TO PARAGRAPH 78**: The JPM Defendants deny the allegations contained in Paragraph 78 of the SAC, and respectfully refer the Court to the webpage cited by Plaintiff, which speaks for itself.

79.     Based on company-provided financial statements, Mall of America's revenue and net operating income for 2021 were $176,749,907 and $80,288,227, respectively.

---

[5] TripleFive Group of Companies, Mall of America® Today, https://www.triplefive.com/moa/moa-today/ (last visited Mar. 27, 2023).

**RESPONSE TO PARAGRAPH 79**: The JPM Defendants deny the allegations contained in Paragraph 79 of the SAC, and respectfully refer the Court to the referenced financial statements, which speak for themselves.

80.     The value of Mall of America has increased since 2020. As of March 2021, Mall of America was valued at approximately $1.99 billion. As of October 2022, it was valued at approximately $2.1 billion. With approximately $1.38 billion in debt as of March 2021, there is (and was at the time of the 2021 Agreement) a sizeable equity cushion in the ownership of Mall of America.

**RESPONSE TO PARAGRAPH 80**: The JPM Defendants deny the allegations contained in Paragraph 80 of the SAC.

81.     Mall of America's revenue and net operating income for 2023 were $208.7 million and $92.7 million, respectively, per company-provided financial statements.

**RESPONSE TO PARAGRAPH 81**: The JPM Defendants deny the allegations contained in Paragraph 81 of the SAC, and respectfully refer the Court to the referenced financial statements, which speak for themselves.

*West Edmonton Mall*

82.     Prior to March 2021, the Ghermezian family, through various corporate entities, also owned 100% of the West Edmonton Mall. The Ghermezian family continues to operate this mall.

**RESPONSE TO PARAGRAPH 82**: The JPM Defendants deny the allegations contained in Paragraph 82 of the SAC.

83.     West Edmonton Mall, referred to by its owners as "the greatest indoor show on earth," is an entertainment and retail "city" that spans 5.3 million square feet, hosting more than 30 million people annually.[6] West Edmonton Mall has over 800 stores and services, including a hotel, and over 100 dining venues, and is "accredited as a zoo." West Edmonton Mall also includes (i) the world's largest indoor amusement park, (ii) a triple loop rollercoaster, (iii) a lake (complete with a replica of Christopher Columbus' Santa Maria), (iv) a wave pool, and (v) a permanent bungee tower.

---

[6] TripleFive Group of Companies, West Edmonton Mall, https://www.triplefive.com/wem/.

**RESPONSE TO PARAGRAPH 83**: The JPM Defendants deny the allegations contained in Paragraph 83 of the SAC, and respectfully refer the Court to the referenced webpage, which speaks for itself.

84.    Until March 2021, WEM-3 owned 75% of the West Edmonton Mall, and WEM-1 and WEM-2 collectively owned 25% of the West Edmonton Mall. As a result of the 2021 Agreement and subsequent transfers, only WEM-3 retains ownership, which ownership was reduced to 51%, with the JPM Defendants owning the other 49%.

**RESPONSE TO PARAGRAPH 84**: The JPM Defendants deny the allegations contained in Paragraph 84 of the SAC.

85.    The Ghermezians have boasted that West Edmonton Mall is the number one tourist attraction in Alberta and "remains the ultimate entertainment and shopping experience."[7] Three high-end major luxury brands joined West Edmonton Mall since the summer of 2019—Louis Vuitton, Saint Laurent, and Gucci—and all three have experienced remarkable success, despite the pandemic, leading to other luxury retailers exploring opening locations.[8] Nike announced plans to open a flagship store at West Edmonton Mall, which upon opening will be its largest store in Canada.[9]

**RESPONSE TO PARAGRAPH 85**: The JPM Defendants deny the allegations contained in Paragraph 85 of the SAC, and respectfully refer the Court to the referenced webpage and article, which speak for themselves.

86.    West Edmonton Mall has generated an enormous economic benefit for the province of Alberta and has experienced steady growth. West Edmonton Mall's revenue and net operating income for 2021 were Canadian $230 million and Canadian $140 million, respectively, per company-provided financial statements. West Edmonton Mall's revenue and net operating income for 2022 were the highest since 2015, reaching Canadian $295.8 million and Canadian $168.7 million, respectively, per company-provided financial statements. West Edmonton Mall's revenue

---

[7] Id.

[8] Craig Patterson, West Edmonton Mall Looking to Add More Luxury Retailers After Seeing Success with 3 Big Players, RETAIL INSIDER (Mar. 22, 2022), https://retail-insider.com/retail-insider/2022/03/west-edmonton-mall-looking-to-add-more-luxury-retailers-after-seeing-success-with-3-big-players/.

[9] Craig Patterson, Nike to Open Largest Store in Canada at West Edmonton Mall, RETAIL INSIDER (June 18, 2023), https://retail-insider.com/retail-insider/2023/06/nike-to-open-largest-store-in-canada-at-west-edmonton-mall/.

and net operating income for 2023 were Canadian $311.8 million and Canadian $171.3 million, respectively, per company-provided financial statements.

**RESPONSE TO PARAGRAPH 86**: The JPM Defendants deny the allegations contained in Paragraph 86 of the SAC, and respectfully refer the Court to the referenced financial statements, which speak for themselves.

**B.     The American Dream Mall Financing**

*The JPM Loan and 2017 Mezz Loan*

87.     In 2017, JPMorgan and other lenders provided the JPM Loan, a $1,195,000,000 senior secured financing, to Ameream, the direct owner of the American Dream Mall. The collateral supporting the JPM Loan, as discussed further below, primarily consisted of (a) mortgages covering Ameream's rights, title, and interest to, *inter alia*, the American Dream Mall together with the future development rights to the properties owned by the Outparcel Entities, (b) a pledge of Ameream Mezz's ownership interests in Ameream, (c) pledges of the WEM-MOA 49% Equity as described in ¶¶ 90-92, (d) a pledge of an additional 25% cash flow in the West Edmonton Mall as described in 93, and (e) a second mortgage in the amount of Canadian $425 million on the West Edmonton Mall (the "**WEM Second Mortgage**"). There is no doubt that at all times the JPM Loan has been overcollateralized.

**RESPONSE TO PARAGRAPH 87**: The JPM Defendants admit the allegations contained in the first sentence of Paragraph 87 of the SAC.  The JPM Defendants deny the allegations contained in the second and third sentences of Paragraph 87 of the SAC, and respectfully refer the Court to the JPM Loan documents, which speak for themselves.

88.     At the same time, in 2017, the AB AD Lender provided the 2017 Mezz Loan, a $475,000,000 loan, to Ameream Mezz, which owned 100% of the equity interests of Ameream. The AB AD Lender was assigned JPMorgan's first priority security interest in all of Ameream Mezz's ownership interests in Ameream.

**RESPONSE TO PARAGRAPH 88**: The JPM Defendants deny the allegations contained in Paragraph 88 of the SAC, and respectfully refer the Court to the 2017 Mezz Loan documents, which speak for themselves.

89.     Thus, the AB AD Lender was subordinated to JPMorgan with respect to the American Dream Mall, but if there was a default, the AB AD Lender was positioned to foreclose on the equity interests of Ameream and become the new equity owner of the American Dream Mall, subject to a list of conditions that heavily favored JPMorgan, including (a) curing all

monetary defaults under the JPM Loan, and (b) replacing the guarantees provided by the Ghermezian family with credit worthy entities.[10]

**RESPONSE TO PARAGRAPH 89**: The JPM Defendants admit that the AB AD Lender was subordinated to JPMorgan and that if there was a default on its loan, the AB AD Lender had the right to foreclose on its equity interests in Ameream. The JPM Defendants deny the remainder of the allegations contained in Paragraph 89 of the SAC (including the allegations contained in footnote 10 of the SAC).

### *WEM-MOA Guarantors' and Ghermezian Family's Credit Support for the JPM Loan and 2017 Mezz Loan*

90.    The WEM-MOA Guarantors each guaranteed, and pledged assets as collateral for, the JPM Loan, pursuant to the WEM-JPMorgan Pledge Agreement and the MOA-JPMorgan Pledge Agreement provided to JPMorgan by each of the respective WEM-MOA Guarantors. The WEM-MOA Guarantors each similarly guaranteed the 2017 Mezz Loan.

**RESPONSE TO PARAGRAPH 90**: The JPM Defendants admit that the WEM-MOA Guarantors each provided guarantees in connection with the JPM Loan and the 2017 Mezz Loan. The JPM Defendants deny the remaining allegations contained in Paragraph 90 of the SAC, and respectfully refer the Court to the WEM-JPMorgan Pledge Agreement and the MOA-JPMorgan Pledge Agreement, which speak for themselves.

91.    As noted above, the WEM-MOA Guarantors owned the WEM-MOA 49% Equity, which consisted of 49% of the equity in the West Edmonton Mall and Mall of America. The WEM-MOA 49% Equity was an incredibly valuable asset, having a value of at least $1.045 billion as of March 2021.

**RESPONSE TO PARAGRAPH 91**: The JPM Defendants deny the allegations contained in Paragraph 91 of the SAC.

92.    In the case of WEM-3 (the 75% owner of the West Edmonton Mall prior to the 2021 Agreement consummation), JPMorgan's recourse under its payment guaranty was limited to

---

[10] When the AB AD Lender did foreclose in October 2022, JPMorgan waived all such requirements (including being owed at least a $100 million payment) and permitted such foreclosure. The AB AD Lender also had a right to purchase the JPM Loan, but it did not exercise that right.

WEM-3 24% Equity, which constituted 24% of WEM-3's then 75% ownership stake in WEMPI. Thus, under any circumstances and regardless of whether the JPM Loan was in default, JPMorgan could, as to WEM-3, only foreclose on the WEM-3 24% Equity.

**RESPONSE TO PARAGRAPH 92**: The JPM Defendants deny the allegations contained

in Paragraph 92 of the SAC, and respectfully refer the Court to JPMorgan's payment guaranty,

which speaks for itself.

93.      In addition to the WEM-MOA 49% Equity, Original WEMPI, which wholly owns WEM-3, guaranteed and pledged, as collateral for a portion of the JPM Loan, operating and capital proceeds with respect to an additional 25% equity in the West Edmonton Mall received by Original WEMPI, pursuant to the WEM 25% Cash Flow Pledge provided to JPMorgan by Original WEMPI.

**RESPONSE TO PARAGRAPH 93**: The JPM Defendants deny the allegations contained

in Paragraph 93 of the SAC, and respectfully refer the Court to the JPM Loan documents and

WEM 25% Cash Flow Pledge, which speak for themselves.

94.      Once the JPM Loan had been repaid, or once a WEM-MOA Guarantor is released (or terminated by operation of law or otherwise) from its obligations and liabilities under the JPMorgan payment guaranty, each WEM-MOA Guarantor could assert any existing Reimbursement Claims against Ameream. If any Payment Guarantor either paid to satisfy or reduce the JPM Loan, or used its assets to pay JPMorgan under the JPM Loan, such Payment Guarantor would hold a Reimbursement Claim in the same dollar amount against Ameream—the owner of the American Dream Mall.[11] That would provide an unencumbered asset to satisfy the Plaintiff Loan whenever the JPM Loan was paid in full or in the event any guarantor was otherwise released (including a termination of such guaranty by operation of law or otherwise) from its obligations and liabilities to JPMorgan.

**RESPONSE TO PARAGRAPH 94**: To the extent the allegations contained in Paragraph

94 of the SAC set forth legal conclusions, no response is required.  To the extent a response is

required, the JPM Defendants deny the allegations contained in Paragraph 94 of the SAC

(including the allegations contained in footnote 11 of the SAC).

---

[11] This would also be true for the 2017 Mezz Loan, though because it was fully discharged via the Strict Foreclosure, the WEM-MOA Guarantors hold no Reimbursement Claims relating to the 2017 Mezz Loan.

95.    In addition to the guarantees by the WEM-MOA Guarantors, the Individual Guarantors—the key nine individual members of the Ghermezian family—personally guaranteed the JPM Loan and the foreclosed 2017 Mezz Loan (and Plaintiff Loan, as described below).

**RESPONSE TO PARAGRAPH 95**: The JPM Defendants deny the allegations contained in Paragraph 95 of the SAC, and respectfully refer the Court to the referenced guarantees, which speak for themselves.

96.    Given the pledges above, JPMorgan was poised to directly take over 49% ownership of the West Edmonton Mall (and receive a majority of the cash flow) and 49% ownership of the Mall of America, if there was a default by Ameream. And having provided personal guarantees, the Ghermezian family members would face substantial personal exposure in the event of a default.

**RESPONSE TO PARAGRAPH 96**: The JPM Defendants deny the allegations contained in Paragraph 96 of the SAC, and respectfully refer the Court to the referenced guarantees, which speak for themselves.

97.    These agreements gave JPMorgan immense leverage, providing it with an array of remedies upon an event of default under the JPM Loan. Because there were also junior secured lenders supporting the American Dream Mall, however, these agreements also set standards that would apply for sale of the pledged equity interests in the malls if there were such an event of default. JPMorgan could not simply do anything it wanted following a default by Ameream, but needed to take measures to maximize the value of the collateral used to repay its loan to ensure that amounts would be left over to pay the junior creditors, including Plaintiff.

**RESPONSE TO PARAGRAPH 97**: The JPM Defendants deny the allegations contained in Paragraph 97 of the SAC, and respectfully refer the Court to the referenced agreements, which speak for themselves.

98.    For example, Section 4.1(b) of the WEM-JPMorgan Pledge Agreement allows, upon an event of default, for JPMorgan to effectuate the transfer of any or all of the WEM Guarantors' collateral through a sale in accordance with procedures specified in Section 5 of that agreement. Section 5.6 of the WEM-JPMorgan Pledge Agreement requires loan collateral to be sold through a public auction or public tender and prohibits a private sale under any circumstances.

**RESPONSE TO PARAGRAPH 98**: The JPM Defendants deny the allegations contained in Paragraph 98 of the SAC, and respectfully refer the Court to the WEM-JPMorgan Pledge Agreement, which speaks for itself.

99.    Sections 3.4(c), 3.5(b), and 3.5(d) of the MOA-JPMorgan Pledge Agreement similarly require a public sale or deemed public sale of the MOA 49% Equity only to "a restricted group of [highly qualified] offerees and purchasers who fulfill certain suitability standards."

**RESPONSE TO PARAGRAPH 99**: The JPM Defendants admit that Paragraph 99 of the SAC contains selective quotes from the MOA-JPMorgan Pledge Agreement, and respectfully refer the Court to the MOA-JPMorgan Pledge Agreement, which speaks for itself.  The JPM Defendants deny the remainder of the allegations contained in Paragraph 99 of the SAC.

100.    Finally, the Payment Guarantors (defined in ¶ 110) also provided an environmental indemnity (the "**Environmental Indemnity**"), pursuant to which the Payment Guarantors agreed to defend, indemnify, and hold harmless JPMorgan for certain environmental hazards. [12] On information and belief, the Payment Guarantors have never been called to defend, indemnify, or hold harmless JPMorgan under the Environmental Indemnity.

**RESPONSE TO PARAGRAPH 100**: To the extent Paragraph 100 of the SAC (including footnote 12 thereto) sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 100 of the SAC (including the allegations contained in footnote 12 thereto), except admit that the Payment Guarantors provided an Environmental Indemnity, and respectfully refer the Court to the Environmental Indemnity, which speaks for itself.

101.    In all, JPMorgan, as senior secured lender, received substantial and interrelated collateral relating to ownership of three of the most well-known and valuable malls in North America, along with guarantees from the ultimate owners of all three malls. JPMorgan thus was not only oversecured, but also had significant leverage over the Ghermezian family in the event of financial difficulties for Ameream. If the American Dream Mall project failed, or had any financial distress leading to a default, JPMorgan had the power to strip the Ghermezians of their mall empire.

**RESPONSE TO PARAGRAPH 101**: The JPM Defendants deny the allegations contained in Paragraph 101 of the SAC.

---

[12] In the case of WEM-3, pursuant to the express provisions of Section 30 of the Environmental Indemnity, JPMorgan's recourse was limited to the WEM-3 24% Equity. Thus, if WEM-3 disposed of that 24% to a JPMorgan Defendant, then WEM-3's liability under the Environmental Indemnity was discharged.

*The Plaintiff Loan*

102.    In 2019, Plaintiff entered into the $300 million Plaintiff Loan, pursuant to a loan agreement (the "**Plaintiff Loan Agreement**") and secured by the collateral under the Plaintiff Pledge Agreement and additional credit support, to provide additional funding for the American Dream Mall.

**RESPONSE TO PARAGRAPH 102**: The JPM Defendants deny the allegations contained in Paragraph 102 of the SAC, and respectfully refer the Court to the Plaintiff Loan Agreement and the Plaintiff Pledge Agreement, which speak for themselves.

103.    To evidence and secure the Plaintiff Loan Agreement, American Dream Borrower executed five loan notes (the "**Plaintiff Loan Notes**"). Pursuant to the express terms of the Plaintiff Loan Notes, American Dream Borrower was required to make monthly payments of interest to Plaintiff, followed by a final payment of principal and outstanding interest due upon the maturity date, June 29, 2021.

**RESPONSE TO PARAGRAPH 103**: The JPM Defendants deny the allegations contained in Paragraph 103 of the SAC, and respectfully refer the Court to the Plaintiff Loan Notes, which speak for themselves.

104.    Failure to make any regularly scheduled monthly payment of interest on the payment date was an event of default under the Plaintiff Loan Agreement. Following numerous Events of Default, including the cross defaults resulting from Ameream's defaults under the JPM Loan, the Plaintiff Loan became immediately due and payable, and interest accrued at a contractually defined Default Rate. Plaintiff is empowered to exercise all rights under the Plaintiff Loan Agreement on behalf of the lenders.

**RESPONSE TO PARAGRAPH 104**: The JPM Defendants deny the allegations contained in Paragraph 104 of the SAC, except admit that the borrowers defaulted under the Plaintiff Loan and JPM Loan, and respectfully refer the Court to the Plaintiff Loan Agreement and JPM Loan documents, which speak for themselves.

105.    The Plaintiff Loan Agreement contained a covenant (at Section 5.2.13) that, at all times, American Dream Borrower remains a special purpose company, prohibiting it from incurring any debt other than the Plaintiff Loan. As described below, the 2022 Mezz Loan (which did not actually advance any money) to Successor American Dream Borrower violates the Plaintiff Loan Agreement.

**RESPONSE TO PARAGRAPH 105**: The JPM Defendants deny the allegations contained in Paragraph 105 of the SAC, and respectfully refer the Court to the Plaintiff Loan Agreement, which speaks for itself.

106.    The Plaintiff Loan Agreement incorporates by reference three agreements—the Payment Guaranty, Plaintiff Pledge Agreement, and the Intercreditor Agreement (each described further below). These agreements, together with the Irrevocable Direction Letter (also described below), worked to ensure Plaintiff and the lenders' interests were protected and their rights delineated from the JPM Loan and 2017 Mezz Loan, especially with respect to the valuable collateral which secured or provided credit support for all of the loans.

**RESPONSE TO PARAGRAPH 106**: The allegations contained in Paragraph 106 of the SAC purport to characterize the contents of the Plaintiff Loan Agreement, Payment Guaranty, Plaintiff Pledge Agreement, Intercreditor Agreement, Irrevocable Direction Letter, JPM Loan documents, and 2017 Mezz Loan documents. The JPM Defendants deny the allegations contained in Paragraph 106 of the SAC and respectfully refer the Court to the referenced documents, which speak for themselves.

107.    The Plaintiff Loan is currently junior only in priority to the JPM Loan,[13] and the Plaintiff Loan is ahead of the Ghermezians and all of their affiliates in the capital structure; the Ghermezians, in the event of a default under the Plaintiff Loan, cannot retain ownership and control or the benefits of the collateral they granted secured interest in or designated to guarantee payment of the Plaintiff Loan. The Plaintiff Loan also enjoys substantial protections, including the Irrevocable Direction Letter that gave Plaintiff a unique interest in the WEM-MOA 49% Equity and interests in additional pledges (including the pledge in favor of JPMorgan of the equity in Ameream and the Outparcel Entities) and the protections under the Intercreditor Agreement concerning "Shared Guarantors" and the "Non-Shared Guarantors" (each as defined in the Intercreditor Agreement).

**RESPONSE TO PARAGRAPH 107**: The JPM Defendants deny the allegations contained in Paragraph 107 (including the allegations contained in footnote 13 of the SAC), except admit that the Plaintiff Loan is junior in priority to the JPM Loan, and respectfully refer the Court

---

[13] The Plaintiff Loan was also junior in priority to the 2017 Mezz Loan prior to the Strict Foreclosure (described below).

to the Plaintiff Loan documents, JPM Loan documents, Irrevocable Direction Letter, and Intercreditor Agreement, which speak for themselves.

### *Plaintiff Pledge Agreement*

108.    Pursuant to the Plaintiff Pledge Agreement, American Dream Borrower pledged its ownership stake in Ameream Mezz (including any successors to Ameream Mezz) to Plaintiff as collateral to secure repayment of the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 108**: The JPM Defendants deny the allegations contained in Paragraph 108 of the SAC, and respectfully refer the Court to the Plaintiff Pledge Agreement, which speaks for itself.

109.    This pledge was designed to ensure that before the Ghermezians could retain ownership in the American Dream Mall, they would have to ensure that all three loans—the JPM Loan, the 2017 Mezz Loan, and the Plaintiff Loan—were repaid.

**RESPONSE TO PARAGRAPH 109**: The JPM Defendants deny the allegations contained in Paragraph 109 of the SAC, and respectfully refer the Court to the Plaintiff Pledge Agreement, which speaks for itself.

### *The Guarantees of the Plaintiff Loan*

110.    In connection with the Plaintiff Loan Agreement, the Payment Guarantors (constituting the WEM-MOA Guarantors and Individual Guarantors) executed the Payment Guaranty as credit support for the Plaintiff Loan. The Payment Guaranty is a full recourse guarantee. It states:

> each [Payment] Guarantor hereby irrevocably and unconditionally guarantees to [Plaintiff] for the benefit of Lenders the payment of the Guaranteed Obligations. (b) If all or any part of the Guaranteed Obligations shall not be paid when due . . . pursuant to the Loan Agreement, . . . [Payment] Guarantor shall, within ten (10) Business Days after demand . . . pay the amount then due on account of the Guaranteed Obligations . . . .

Payment Guaranty § 1.2.

**RESPONSE TO PARAGRAPH 110**: The JPM Defendants admit that Paragraph 110 of the SAC contains selective quotes from the Payment Guaranty, and respectfully refer the Court to

the referenced document, which speaks for itself. The JPM Defendants deny the remainder of the allegations contained in Paragraph 110 of the SAC.

111.    The Payment Guaranty was a key component of the Plaintiff Loan structure and a material inducement to Plaintiff to enter into the Plaintiff Loan Agreement. The Payment Guarantors acknowledged that the lenders were not willing to make the Plaintiff Loan to American Dream Borrower *but for* the Payment Guarantors' unconditional guarantee of certain obligations, including, among other things, payment to Plaintiff of all amounts due in accordance with the Plaintiff Loan Agreement.

**RESPONSE TO PARAGRAPH 111**: The JPM Defendants deny the allegations contained in Paragraph 111 of the SAC, and respectfully refer the Court to the Plaintiff Loan Agreement and Payment Guaranty, which speak for themselves.

112.    The Payment Guarantors also acknowledged that beneficial owners of the WEM-MOA Guarantors are beneficial owners of the American Dream Borrower and that the Payment Guarantors will benefit from the agreement by the lenders in making the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 112**: The JPM Defendants deny the allegations contained in Paragraph 112 of the SAC, and respectfully refer the Court to the Payment Guaranty, which speaks for itself.

113.    Each Payment Guarantor agreed that it would be liable for guaranteed obligations as a primary obligor and would satisfy monetary obligations of the American Dream Borrower, to the extent not paid when due, within ten days of demand by Plaintiff as the Administrative Agent.

**RESPONSE TO PARAGRAPH 113**: The JPM Defendants deny the allegations contained in Paragraph 113 of the SAC, and respectfully refer the Court to the Payment Guaranty, which speaks for itself.

114.    Until the guaranteed obligations under the Plaintiff Loan are satisfied, pursuant to Section 6.2 of the Payment Guaranty, the WEM-MOA Guarantors covenanted to (i) ensure that the collective value of the WEM-MOA 49% Equity was at least $680,000,000.00[14] and (ii) continue to own at least 49% interest in Mall of America and West Edmonton Mall. Further, Section 6.3 of the Payment Guaranty expressly prohibits any WEM-MOA Guarantor from entering

---

[14] This covenant thus excluded from the net equity calculation 51% of the West Edmonton Mall equity owned by WEM-3.

into, or effectuating, any transaction with an "Affiliate"[15] if it would cause the net worth covenant to be violated.[16]

**RESPONSE TO PARAGRAPH 114**: To the extent Paragraph 114 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 114 of the SAC (including the allegations contained in footnotes 14, 15, and 16 thereto), and respectfully refer the Court to the Payment Guaranty and 7th Amendment, which speak for themselves.

115. These covenants were not in any way limited by the JPM Loan or the Intercreditor Agreement.

**RESPONSE TO PARAGRAPH 115**: The JPM Defendants deny the allegations contained in Paragraph 115 of the SAC, and respectfully refer the Court to the Payment Guaranty, JPM Loan documents, and Intercreditor Agreement, which speak for themselves.

116. Similar to JPMorgan's payment guaranty, in the case of WEM-3, Plaintiff's recourse was limited to the identical WEM-3 24% Equity that provided credit support for JPMorgan. Thus, under any circumstances, Plaintiff could only seek from WEM-3, as guarantor, the WEM-3 24% Equity to satisfy the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 116**: The JPM Defendants deny the allegations contained in Paragraph 116 of the SAC, and respectfully refer the Court to the Payment Guaranty, which speaks for itself.

---

[15] The term "Affiliate," as used in the Payment Guaranty, is defined in the Plaintiff Loan Agreement as: as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person. The following Persons shall be deemed to constitute "Affiliates" of the Borrower: (i) the Guarantors, (ii) the Ghermezian Family Members (Ameream), (iii) any trusts established for the benefit of the Persons described in the foregoing clauses (i) and (ii), and (iv) any Person in which any of the Persons described in the foregoing clauses (i) through (iii) owns or holds ten percent (10%) or more of the direct or indirect ownership interests.

[16] As described in paragraphs 155, 299, 390-391 below, that is precisely what happened in both the 2021 Agreement and the 7th Amendment.

117.    No provision of the Payment Guaranty allows the WEM-MOA Guarantors to enter into a private agreement voluntarily divesting their equity interests in favor of JPMorgan. Rather, to ensure Plaintiff and the lenders were protected from abuse by the senior lenders ahead of them, JPMorgan had to act in a commercially reasonable manner in taking the WEM-MOA 49% Equity in partial or total satisfaction of the JPM Loan. Further, the WEM-MOA Guarantors could not enter into agreements that had the effect of giving away the WEM-MOA 49% Equity. As described below, both the 2021 Agreement and the 2022 Agreements violate the Payment Guaranty.

**RESPONSE TO PARAGRAPH 117**: The JPM Defendants deny the allegations contained in Paragraph 117 of the SAC, and respectfully refer the Court to the Payment Guaranty, JPM Loan documents, 2021 Agreement, and October 2022 Agreements, which speak for themselves.

118.    Multiple Ghermezian corporate affiliates provided corporate guarantees to Plaintiff but purposefully did not provide guarantees to JPMorgan or the AB AD Lender. This "Non-Shared Guarantor" status was a material element in inducing the lenders to make the Plaintiff Loan, since Plaintiff can enforce its remedies against the Non-Shared Guarantors should any of Ameream, Ameream Mezz, or the American Dream Borrower commit any bad acts described in the recourse guaranty, even if the JPM Loan is outstanding. JPMorgan was keenly aware of the importance to Plaintiff of these Non-Shared Guarantors.

**RESPONSE TO PARAGRAPH 118**: The JPM Defendants deny the allegations contained in Paragraph 118 of the SAC, and respectfully refer the Court to the referenced guarantees, which speak for themselves.

119.    These Non-Shared Guarantors are Triple Five Investment Ltd. and 7 Crowns Corporation. However, as described in paragraph 194 hereof, JPMorgan attempted to convert a Non-Shared Guarantor into a Shared Guarantor. In September 2022, the Ghermezians caused the Non-Shared Guarantors to deliver a similar guaranty to JPMorgan. As the Non-Shared Guarantors were not Shared Guarantors at the time the Plaintiff Loan was made, the Non-Shared Guarantors can never become Shared Guarantors.

**RESPONSE TO PARAGRAPH 119**: The JPM Defendants deny the allegations contained in Paragraph 119 of the SAC, and respectfully refer the Court to the referenced guarantees, which speak for themselves.

***The Irrevocable Direction Letter***

120.    The Irrevocable Direction Letter, dated August 2, 2019, further protected Plaintiff in the event of a default on the Plaintiff Loan. The WEM-MOA Guarantors and other Ghermezian

family affiliates, including the Outparcel Owner and Ameream Mezz, directed JPMorgan and the AB AD Lender, as applicable, to pay any excess proceeds from the collections, sale, or other disposition of the WEM-MOA 49% Equity and JPMorgan's liens on the ownership of Ameream and the Outparcel Entities directly to Plaintiff. This irrevocable direction protected Plaintiff in the circumstances where senior loans were paid off because it made sure that whatever was remaining collateral securing such senior loans, Plaintiff would receive the value, not the Ghermezians, and not any third party. The Irrevocable Direction Letter states, "[i]f proceeds of any collection, sale or other disposition under the Pledge remain after the [JPM Loan and 2017 Mezz Loan] are satisfied in full, you are authorized and instructed to pay such excess proceeds over directly to [Plaintiff] within 10 business days of receipt, to be applied to repayment of the [Plaintiff Loan], notwithstanding any contrary direction in the Pledge or any related Loan Document (as defined in the respective Pledge)."

**RESPONSE TO PARAGRAPH 120**: The JPM Defendants admit that Paragraph 120 of the SAC contains selective quotes from the Irrevocable Direction Letter, and respectfully refer the Court to the referenced document, which speaks for itself. The JPM Defendants deny the remainder of the allegations contained in Paragraph 120 of the SAC.

121.    The Irrevocable Direction Letter provides Plaintiff a unique interest in, among other things, the WEM-MOA 49% Equity, the Ameream equity, and the Outparcel Entities' equity.

**RESPONSE TO PARAGRAPH 121**: The allegations contained in Paragraph 121 of the SAC purport to characterize the contents of the Irrevocable Direction Letter. The JPM Defendants deny the allegations contained in Paragraph 121 of the SAC and respectfully refer the Court to the Irrevocable Direction Letter, which speaks for itself.

122.    The critical protections provided by the Irrevocable Direction Letter are now front and center in light of Defendants' scheming. With the 2017 Mezz Loan fully discharged following the Strict Foreclosure (as described in paragraphs 182-186), the Irrevocable Direction Letter ensures that if JPMorgan collects, sells, or otherwise disposes of collateral securing the JPM Loan that is listed in the Irrevocable Direction Letter, any excess proceeds must be paid to Plaintiff and the lenders; such proceeds cannot first go to the Ghermezians or AB AD Lender as the lender of the so-called new Junior Loan in the Standstill Agreement (or anyone else, such as a replacement lender).

**RESPONSE TO PARAGRAPH 122**: The allegations contained in Paragraph 122 of the SAC purport to characterize the contents of the Irrevocable Direction Letter. The JPM Defendants

deny the allegations contained in Paragraph 122 of the SAC, and respectfully refer the Court to the Irrevocable Direction Letter, which speaks for itself.

123.    The Irrevocable Direction Letter also expressly acknowledges that it, like the Payment Guaranty, was "a material inducement" to Plaintiff and the lenders to make the Plaintiff Loan. And JPMorgan understood that the Irrevocable Direction Letter, which it signed, was critical to Plaintiff, and a key inducement for the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 123**: The JPM Defendants admit that Paragraph 123 of the SAC contains selective quotes from the Irrevocable Direction Letter, and respectfully refer the Court to the Irrevocable Direction Letter, which speaks for itself.  The JPM Defendants deny the remainder of the allegations contained in Paragraph 123 of the SAC.

124.    On information and belief, all Defendants were at all times aware of the terms of the Irrevocable Direction Letter. During the negotiations over the Plaintiff Loan, for instance, JPMorgan made clear to Plaintiff that it understood that the Irrevocable Direction Letter was unconditional and irrevocable. As described in paragraphs 204-242, the October 2022 Agreements are designed to breach, and in fact cause parties to breach, the Irrevocable Direction Letter.

**RESPONSE TO PARAGRAPH 124**: The JPM Defendants deny the allegations contained in Paragraph 124 of the SAC, and respectfully refer the Court to the Irrevocable Direction Letter and October 2022 Agreements, which speak for themselves.

*The Intercreditor Agreement*

125.    In 2019, JPMorgan, the AB AD Lender, and Plaintiff signed the Intercreditor Agreement.

**RESPONSE TO PARAGRAPH 125**: The JPM Defendants deny the allegations contained in Paragraph 125 of the SAC, and respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.

126.    The purpose of the Intercreditor Agreement was to "provide for the relative priority of, and to evidence certain agreements with respect to. . . [the Plaintiff Loan]," including the documents which protected Plaintiff's and the lenders' rights under the Plaintiff Loan—*i.e.*, the Payment Guaranty and the Irrevocable Direction Letter.

**RESPONSE TO PARAGRAPH 126**: The JPM Defendants admit that Paragraph 126 of

the SAC purports to characterize the contents of the Intercreditor Agreement and contains selective

quotes from the Intercreditor Agreement, and respectfully refer the Court to the referenced

document, which speaks for itself. The JPM Defendants deny the remainder of the allegations

contained in Paragraph 126 of the SAC.

127.    Section 6(b) of the Intercreditor Agreement echoes the rights set forth in the
Payment Guaranty and Irrevocable Direction Letter to protect Plaintiff and the lenders in the event
of a foreclosure of assets of the WEM-MOA Guarantors under the JPM Loan or the 2017 Mezz
Loan:

> In the event that (i) [JPMorgan] and/or [AB AD Lender] hold proceeds received
> pursuant to the foreclosure of, with respect to [JPMorgan], the MOA Pledge and
> the WEM Pledges (each as defined in the Senior Loan Agreement), or, with respect
> to [AB AD Lender], foreclosure of the MOA Pledge and the WEM Pledges (each
> as defined in the Mezzanine Loan Agreement (Senior)), and (ii) both the [JPM]
> Loan and the [2017 Mezz Loan] have been fully and indefeasibly repaid, then
> [JPMorgan] or [AB AD Lender], as applicable, shall disburse such excess proceeds
> in accordance with the terms of the letters of direction from MOA Guarantor and
> WEM Guarantor (each as defined in the Senior Loan Agreement), respectively.

**RESPONSE TO PARAGRAPH 127**: The JPM Defendants admit that Paragraph 127 of

the SAC contains selective quotes from the Intercreditor Agreement, and respectfully refer the

Court to the referenced document, which speaks for itself. The JPM Defendants deny the

remaining allegations contained in Paragraph 127 of the SAC.

128.    This provision entitles Plaintiff to any amount remaining after collections, sale, or
other disposition of the WEM-MOA 49% Equity and repayment of the JPM Loan and the 2017
Mezz Loan, but also precludes Plaintiff from suing any "Shared Guarantor" (which includes the
WEM-MOA Guarantors and the Individual Guarantors) as long as the JPM Loan is outstanding.
The Intercreditor Agreement works with the Irrevocable Direction Letter, binding both JPMorgan
and the AB AD Lender to the Irrevocable Direction Letter's terms.

**RESPONSE TO PARAGRAPH 128**: The JPM Defendants deny the allegations

contained in Paragraph 128 of the SAC, except admit that Section 6(b) of the Intercreditor

Agreement precludes Plaintiff from suing any "Shared Guarantors" as long as the JPM Loan

remains outstanding, and respectfully refer the Court to the Intercreditor Agreement and Irrevocable Direction Letter, which speak for themselves.

129.    The Intercreditor Agreement terminated in October 2022 when the AB AD Lender conducted the Strict Foreclosure, and the 2017 Mezz Loan was extinguished.[17] The only provision that survived termination was Section 6(b). No other provision of the Intercreditor Agreement survives termination, including any waivers of rights, including with respect to marshaling.

**RESPONSE TO PARAGRAPH 129**: The JPM Defendants admit that the Intercreditor Agreement (excluding Section 6(b) thereof) terminated in October 2022, and deny the remaining allegations contained in the first and second sentence of Paragraph 129 of the SAC (including the allegations contained in footnote 17 thereof). The JPM Defendants deny the allegations contained in the third sentence of Paragraph 129 of the SAC, and respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.

130.    But for the limitation in Section 6(b), Plaintiff would have sued the WEM-MOA Guarantors and the Ghermezian family members to collect on the Payment Guaranty after American Dream Borrower defaulted in 2021.

**RESPONSE TO PARAGRAPH 130**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 130 of the SAC and deny them on that basis.

## C.    Ameream Defaults in 2020 on the JPM Loan, Causing Substantial Exposure for the Ghermezians

131.    On or around May 13, 2020, JPMorgan informed Plaintiff that an event of default had occurred under the JPM Loan.

**RESPONSE TO PARAGRAPH 131**: The JPM Defendants admit the allegations contained in Paragraph 131 of the SAC.

---

[17] The WEM-MOA Guarantors (falsely) suggested in one filing with this Court that the Intercreditor Agreement did not terminate because the 2017 Mezz Loan remained outstanding.

132.    As a result of such event of default, JPMorgan had the right to seek recovery from Ameream and the Ghermezian family, including by enforcing various corporate and personal guarantees, and by foreclosing against the American Dream Mall mortgages. The Ghermezians also faced personal exposure as Individual Guarantors.

**RESPONSE TO PARAGRAPH 132**: To the extent Paragraph 132 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 132 of the SAC.

133.    Thus, the Ghermezian family was at risk of losing (a) all of its equity in the American Dream Mall, (b) all of its leasehold interests owned by Outparcel Entities, (c) the WEM-MOA 49% Equity, and (d) operating and capital proceeds with respect to an additional 25% equity in the West Edmonton Mall pursuant to the WEM 25% Cash Flow Pledge. Simultaneously, nine members of the Ghermezian family (*i.e.*, the Individual Guarantors) faced immediate enforcement against their respective personal guarantees for the repayment of the JPM Loan.

**RESPONSE TO PARAGRAPH 133**: To the extent Paragraph 133 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 133 of the SAC.

134.    Further, on information and belief, the Ghermezian family and their affiliates feared that in a public sale, as required under the WEM-JPMorgan Pledge Agreement and MOA-JPMorgan Pledge Agreement, there would be legitimate third-party purchasers who would acquire the WEM-MOA 49% Equity at fair market value, meaning that an unaffiliated third party would own the WEM-MOA 49% Equity, reaping 49% of the economic and voting rights with respect to the West Edmonton Mall and Mall of America.

**RESPONSE TO PARAGRAPH 134**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 134 of the SAC, deny them on that basis, and respectfully refer the Court to the WEM-JPMorgan Pledge Agreement and MOA-JPMorgan Pledge Agreement, which speak for themselves.

135.    The Ghermezians, the WEM-MOA Guarantors, and Ameream could have sought insolvency protection. Indeed, Ameream engaged well-known restructuring counsel who often represent corporate families as debtors in United States bankruptcy proceedings.

**RESPONSE TO PARAGRAPH 135**: To the extent the first sentence of Paragraph 135 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is

required, the JPM Defendants deny the allegations contained in the first sentence of Paragraph 135 of the SAC. The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 135 of the SAC and deny them on that basis.

136.    However, an insolvency filing would be expensive and time-consuming, and likely embarrassing to the Ghermezians, even though it would ultimately be a means to maximize value and treat creditors and stockholders fairly.

**RESPONSE TO PARAGRAPH 136**: The JPM Defendants deny the allegations contained in Paragraph 136 of the SAC.

137.    Recognizing the risks facing the Ghermezians, JPMorgan saw an opportunity for a windfall for itself resulting from Ameream's default while continuing to have favorable relationships with the Ghermezian family, including future lending opportunities. The path to this windfall opportunity was by means of abusing the rights of Plaintiff and the lenders.

**RESPONSE TO PARAGRAPH 137**: The JPM Defendants deny the allegations contained in Paragraph 137 of the SAC.

138.    Thus, rather than exercise remedies like a traditional lender would following default, JPMorgan negotiated in secret a two-step sweetheart deal, in which it would secure substantial upside in exchange for permitting the Ghermezians to avoid making good on their personal guarantees, shielding them from suit by Plaintiff and letting them continue to operate, control, and own the American Dream Mall. JPMorgan, the AB AD Lender, and the Ghermezian family spent years secretly negotiating such a deal, benefitting themselves to the detriment of Plaintiff and the lenders, and violating JPM Loan documents and promises therein, on which Plaintiff relied.

**RESPONSE TO PARAGRAPH 138**: The JPM Defendants deny the allegations contained in Paragraph 138 of the SAC.

**D.    JPMorgan and the Ghermezian Family Execute the 2021 Agreement and, in March 2021, Improperly Transfer a Billion Dollars of Value Away from the WEM-MOA Guarantors, Harming Plaintiff and the Lenders**

139.    On or about January 29, 2021, JPMorgan, the AB AD Lender, Ameream Mezz, the other Ghermezian-affiliated Defendants, the Ghermezian family members (as Individual Guarantors), and various Ghermezian affiliates, entered the 2021 Agreement. Even though Plaintiff and the lenders were important parties to the financing of the American Dream Mall and

parties to multiple contracts with signatories to the 2021 Agreement, the Defendants, the AB AD Lender, and the Ghermezian family members negotiated and entered into the 2021 Agreement in secret. They did so to conceal that they were freezing out and knowingly harming Plaintiff and the lenders.

**RESPONSE TO PARAGRAPH 139**: The JPM Defendants deny the allegations contained in Paragraph 139 of the SAC, except admit that JPMorgan entered into the 2021 Agreement on January 29, 2021, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

140.    By design, the 2021 Agreement called for JPMorgan to forego exercising its available remedies as a lender, including foreclosure through a public sale of the WEM-MOA 49% Equity that it was required to conduct under its own agreements, in exchange for the windfall described below.

**RESPONSE TO PARAGRAPH 140**: The JPM Defendants deny the allegations contained in Paragraph 140 of the SAC, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

### *The Planned WEM-MOA 49% Equity Transfer*

141.    The 2021 Agreement expressly provided that JPMorgan would not prosecute a foreclosure, exercise any power of sale, or take any other enforcement action. The 2021 Agreement provided that, "[i]n lieu of" JPMorgan exercising those rights, the WEM-MOA Guarantors would convey to JPMorgan their most valuable assets—the 49% ownership stakes in Mall of America and the West Edmonton Mall.

**RESPONSE TO PARAGRAPH 141**: The JPM Defendants deny the allegations contained in the first sentence of Paragraph 141 of the SAC.  The JPM Defendants admit that the second sentence of Paragraph 141 of the SAC contains selective quotes from the 2021 Agreement, and respectfully refer the Court to the referenced document, which speaks for itself.  The JPM Defendants deny the remainder of the allegations contained in the second sentence of Paragraph 141 of the SAC.

142.    Plaintiff was not a party to the 2021 Agreement. It did not even know of it until after it had been executed.

**RESPONSE TO PARAGRAPH 142**: The JPM Defendants admit the allegations contained in the first sentence of Paragraph 142 of the SAC. The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 142 of the SAC and deny them on that basis.

143. The transfer of ownership of the WEM-MOA 49% Equity is a violation of the pledge agreements that required JPMorgan to engage in a public sale of those assets in the event of a default, which Plaintiff was entitled to rely on under the Intercreditor Agreement. It also violated the WEM-MOA Guarantors' covenants in the Payment Guaranty.

**RESPONSE TO PARAGRAPH 143**: The JPM Defendants deny the allegations contained in Paragraph 143 of the SAC, and respectfully refer the Court to the referenced pledge agreements, the Intercreditor Agreement, and the Payment Guaranty, which speak for themselves.

144. Key to the transfer scheme was that the parties to the 2021 Agreement invented an aggregate value of the assets transferred to JPMorgan that was absurdly, and intentionally, low— a price far below what would have been realized through a public sale. The WEM 49% Equity was "stipulated" to be worth only $49 million, when, in fact, it was worth approximately $800 million. And the MOA 49% Equity was "stipulated" to be worth only $1 million, when, in fact, it was worth approximately $245 million.

**RESPONSE TO PARAGRAPH 144**: To the extent Paragraph 144 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 144 of the SAC, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

145. Thus, JPMorgan and the WEM-MOA Guarantors severely undervalued the 49% equity interests in both the West Edmonton Mall and Mall of America. Fully embracing these false valuations, the 2021 Agreement states that the parties, including the WEM-MOA Guarantors, "irrevocably and unconditionally agree[d]" among themselves that $50 million "is a reasonable estimate of the sale proceeds that [JPMorgan] would have received pursuant to a sale of the [WEM-MOA 49% Equity] through a public auction conducted on commercially reasonable terms."

**RESPONSE TO PARAGRAPH 145**: The JPM Defendants admit that Paragraph 145 of the SAC contains selective quotes from the 2021 Agreement, and respectfully refer the Court to the 2021 Agreement, which speaks for itself. To the extent the remainder of Paragraph 145 of the

SAC sets forth legal conclusions, no response is required. To the extent a response is required, the

JPM Defendants deny the allegations contained in the remainder of Paragraph 145 of the SAC.

146. JPMorgan knew the "stipulated" values were false. Each "Borrower Party" (as defined in the 2021 Agreement) represented and warranted that all financial data with respect to the WEM-MOA Guarantors was true and accurate as of (a) January 29, 2021 and (b) March 25, 2021, as a condition precedent to consummate the WEM-MOA 49% Equity transfer. The financial data, including the appraisals of the West Edmonton Mall and Mall of America, delivered to JPMorgan by March 2021 show vastly higher value for the WEM-MOA 49% Equity. Therefore, the parties knew they were using a massively reduced valuation in the 2021 Agreement, contrary to their depiction of $50 million as a "reasonable estimate" of what would result from a public sale of the WEM-MOA 49% Equity.

**RESPONSE TO PARAGRAPH 146**: The JPM Defendants deny the allegations

contained in Paragraph 146 of the SAC, and respectfully refer the Court to the 2021 Agreement

and the referenced financial data, including the appraisals of the West Edmonton Mall and Mall of

America, which speak for themselves.

147. No reasonable borrower or guarantor acting in its own interests or for the interests of its creditors ever would have agreed to these made-up values, at least not without some improper incentive. One of the reasons the WEM-MOA Guarantors "agreed" to these fake values is because JPMorgan was providing the Ghermezian family members (*i.e.*, the owners of the WEM-MOA Guarantors) with numerous benefits, including, chief among them, the ability to avoid their obligations to Plaintiff.

**RESPONSE TO PARAGRAPH 147**: The JPM Defendants deny the allegations

contained in Paragraph 147 of the SAC.

148. The 2021 Agreement was a purely private arrangement. The parties to the agreement, acting contrary to the WEM-JPMorgan Pledge Agreement and the MOA-JPMorgan Pledge Agreement, failed to conduct a public auction or tender for the WEM-MOA 49% Equity. Had they done so, they would have realized far more than their false $50 million valuation.

**RESPONSE TO PARAGRAPH 148**: The JPM Defendants deny the allegations

contained in Paragraph 148 of the SAC, and respectfully refer the Court to the 2021 Agreement

and the referenced pledge agreements, which speak for themselves.

149. JPMorgan accepted the transfer of ownership of the WEM-MOA 49% Equity in exchange for releasing and discharging the WEM-MOA Guarantors of their guaranty obligations under the payment guaranty for the JPM Loan. JPMorgan provided no reasonably equivalent value,

*inter alia*, because of the improper capping of Reimbursement Claims as described in ¶¶ 150, 160. 164. It would have been better for the WEM-MOA Guarantors and their creditors if the WEM-MOA Guarantors had not been released and discharged from their guaranty obligations and kept their Reimbursement Claims uncapped.

**RESPONSE TO PARAGRAPH 149**: The JPM Defendants deny the allegations

contained in the first sentence of Paragraph 149 of the SAC and respectfully refer the Court to the

2021 Agreement and referenced payment guaranty, which speak for themselves. To the extent the

second and third sentences of Paragraph 149 of the SAC sets forth legal conclusions, no response

is required.  To the extent a response is required, the JPM Defendants deny the allegations

contained in the second and third sentences of Paragraph 149 of the SAC.

### *The 2021 Agreement's Planned Destruction of Reimbursement Claims Held by the WEM-MOA Guarantors*

150.    The anticipated transfer of the WEM-MOA 49% Equity called for in the 2021 Agreement not only deprived the WEM-MOA Guarantors of their most valuable asset, but the artificially "stipulated" values also had the effect of capping Reimbursement Claims at $50 million. This utterly destroyed any ability of the WEM-MOA Guarantors to repay Plaintiff on account of the Payment Guaranty because the Reimbursement Claims—an important asset of each WEM-MOA Guarantor—would be worth far less than their actual value and far less than the debt owed to Plaintiff and the lenders. Conversely, had the Reimbursement Claims reflected the actual value of at least $1.045 billion, then the WEM-MOA Guarantors would have retained close to $600 million even after fully repaying the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 150**: To the extent the allegations contained in

Paragraph 150 of the SAC set forth legal conclusions, no response is required.  To the extent a

response is required, the JPM Defendants deny the allegations contained in Paragraph 150 of the

SAC, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

151.    When the transfers contemplated by the 2021 Agreement were consummated in late March 2021, the WEM-MOA Guarantors necessarily were rendered balance sheet insolvent—they had, at most, $50 million in improperly-capped, contingent Reimbursement Claims to pay the defaulted Plaintiff Loan, and they now owed $400 million to Plaintiff and the lenders.

**RESPONSE TO PARAGRAPH 151**: To the extent the allegations contained in

Paragraph 151 of the SAC set forth legal conclusions, no response is required.  To the extent a

response is required, the JPM Defendants deny the allegations contained in Paragraph 151 of the

SAC.

152.    Moreover, following consummation of the 2021 Agreement, the WEM-MOA Guarantors lacked reasonable capital to pay the Plaintiff Loan—they will never have sufficient assets to repay the Judgment, which is an obligation of theirs under the Payment Guaranty.

**RESPONSE TO PARAGRAPH 152**: The JPM Defendants deny the allegations

contained in Paragraph 152 of the SAC.

### *The 2021 Agreement's Additional Problematic Provisions*

153.    The 2021 Agreement has numerous other problematic provisions. These include:

**RESPONSE TO PARAGRAPH 153**: The allegations contained in Paragraph 153 of the

SAC purport to characterize the contents of the 2021 Agreement. The JPM Defendants deny the

allegations contained in Paragraph 153 of the SAC and respectfully refer the Court to the 2021

Agreement, which speaks for itself.

154.    A recital that "Secured Party [JPMorgan] has agreed to accept the MOA Interests and be admitted as a member of MOA Holdings II (the 'MOA Conveyance') to hold in custody to facilitate the partial satisfaction of the Debt pursuant to Section 9-620 of the Uniform Commercial Code as in effect in the State of New York." A similar representation is made with respect to the WEM 49% Equity. The 2021 Agreement, however, does not indicate for whom JPMorgan is holding the WEM-MOA 49% Equity in "custody." It *cannot be* for the WEM-MOA Guarantors, because under the 2021 Agreement, the only way for the WEM-MOA Guarantors (who gave up any right of redemption) or any other third person or entity to get the WEM-MOA 49% Equity is by paying the purchase price that a third-party buyer would pay, pursuant to a marketing and sales process solely conducted and controlled by JPMorgan.

**RESPONSE TO PARAGRAPH 154**: The JPM Defendants admit that Paragraph 154 of

the SAC purports to characterize the contents of the 2021 Agreement and contains selective quotes

from the 2021 Agreement, and respectfully refer the Court to the referenced document, which

speaks for itself.  The JPM Defendants deny the remainder of the allegations contained in

Paragraph 154 of the SAC.

155.    The 2021 Agreement contains a representation and warranty by, among others, the WEM-MOA Guarantors that the "execution, delivery and performance of this Agreement by such Borrower Party . . . does not conflict with or constitute a breach of, or constitute a default under, any contract, agreement or other instrument by which such Borrower Party is bound or to which it is a party." This was necessarily false because performance under the 2021 Agreement, including transferring the WEM-MOA 49% Equity at a false valuation, breached covenants under the Payment Guaranty. Following the 2021 Agreement, the WEM-MOA Guarantors would no longer own the WEM-MOA 49% Equity, would no longer be worth at least $680 million, and had effectuated a transaction (the 2021 Agreement transactions) with Affiliates (as defined in the Payment Guaranty) that the Payment Guaranty expressly prohibited.

**RESPONSE TO PARAGRAPH 155**: The JPM Defendants admit that Paragraph 155 of the SAC purports to characterize the contents of the 2021 Agreement and contains selective quotes from the 2021 Agreement, and respectfully refer the Court to the referenced document, which speaks for itself.  The JPM Defendants deny the remainder of the allegations contained in Paragraph 155 of the SAC.

156.    The WEM-MOA Guarantors, MOA Holdings II LLC, WEMPI, other Borrower Parties, and JPMorgan agreed on an "Intended Tax Treatment" in Section 3(c) of the 2021 Agreement that provides that, for federal, state, and local income tax purposes, the WEM-MOA Guarantors will remain as the beneficial owners, even though all economic ownership rights, including all capital and operating income generated by the direct owners of the Mall of America and the West Edmonton Mall, shall be paid to and retained by the JPM Defendants, together with all voting rights. The parties to the 2021 Agreement further covenanted that in any income tax audits by the Internal Revenue Service or any state tax authority, each of the WEM-MOA Guarantors and JPMorgan "shall not permit any of its Affiliates to take, any position on any income tax return or in connection with any income tax audit that is inconsistent with the Intended Tax Treatment."

**RESPONSE TO PARAGRAPH 156**: The JPM Defendants admit that Paragraph 156 of the SAC purports to characterize the contents of the 2021 Agreement and contains selective quotes from the 2021 Agreement, and respectfully refer the Court to the referenced document, which speaks for itself. The JPM Defendants deny the remainder of the allegations contained in Paragraph 156 of the SAC.

157.    Even though the WEM-MOA Guarantors were released and discharged from "all liability and/or obligations from the beginning to the end of time" owed to JPMorgan under their payment guaranty, the 2021 Agreement was designed to ensure that they remained "Shared Guarantors" under the Intercreditor Agreement, thus blocking Plaintiff from suing the WEM-

MOA Guarantors. Specifically, they were not released under the Environmental Indemnity. This ploy operated to bar Plaintiff, under the provision of the Intercreditor Agreement precluding suit against Shared Guarantors, from suing the WEM-MOA Guarantors until the falsely inflated balance of the JPM Loan was repaid.

**RESPONSE TO PARAGRAPH 157**: The JPM Defendants admit that Paragraph 157 of

the SAC purports to characterize the contents of the 2021 Agreement and contains selective quotes

from the 2021 Agreement, and respectfully refer the Court to the 2021 Agreement, which speaks

for itself.  The JPM Defendants deny the remainder of the allegations contained in Paragraph 157

of the SAC, and respectfully refer the Court to the 2021 Agreement and the Intercreditor

Agreement, which speak for themselves.

158.    JPMorgan also agreed to modify the Individual Guarantors' payment guarantees of the JPM Loan obligations so that they were enforceable only as a last resort after realization of the value of all JPM Loan collateral, including after mortgage foreclosure of the American Dream Mall—a highly unusual concession by a traditional lender, which, as a practical matter, operated to release the Individual Guarantors of their repayment obligations. This is further evidence of the private, sweetheart deal nature of the 2021 Agreement—a benefit to the Ghermezian family members in exchange for the windfall to JPMorgan.

**RESPONSE TO PARAGRAPH 158**: The allegations contained in Paragraph 158 of the

SAC purport to characterize the contents of the 2021 Agreement and referenced payment

guarantees.  The JPM Defendants deny the allegations contained in Paragraph 158 of the SAC and

respectfully refer the Court to the 2021 Agreement and referenced payment guarantees, which

speak for themselves.

***The 2021 Agreement Parties Consummate the Transfers in March 2021***

159.    The 2021 Agreement was subject to several conditions precedent, including several outside the control of the parties thereto. Section 8(b) stated that the "release of the Transaction Documents is conditioned upon the satisfaction or the written waiver of each of the following conditions. . . as determined by [JPMorgan] in its reasonable discretion." The conditions required, *inter alia*, that "(i) The representations and warranties contained in this [2021] Agreement shall be true and correct in all material respects; (ii) The conditions set forth in Section 15.2.3 of the WEM Indenture shall have been satisfied; and (iii) The notice requirement set forth in the MOA Senior Loan Agreement shall have been satisfied." The deliverables in Sections 8(b)(ii) and (iii) were not waivable by JPMorgan, and the parties were not certain whether the Borrower Parties (as defined in the 2021 Agreement) could satisfy those third-party conditions.

**RESPONSE TO PARAGRAPH 159**: The JPM Defendants admit that Paragraph 159 of the SAC purports to characterize the contents of the 2021 Agreement and contains selective quotes from the 2021 Agreement, and respectfully refer the Court to the referenced document, which speaks for itself. To the extent the remainder of Paragraph 159 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in the remainder Paragraph 159 of the SAC.

160. It took nearly two months for the parties to complete the transfers of the WEM-MOA 49% Equity and the resulting capping of the Reimbursement Claims. These transfers, detailed below, are referred to as the "**Challenged Transfers**."

**RESPONSE TO PARAGRAPH 160**: To the extent the allegations contained in Paragraph 160 of the SAC set forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 160 of the SAC.

161. On or about March 25, 2021, and consistent with the 2021 Agreement, the MOA Guarantor transferred the MOA 49% Equity to JPM-D5 (the "**MOA Interests Transfer**"), and JPM-D5 was admitted as the sole member of MOA Holdings II LLC (which indirectly owns 49% of the Mall of America).

**RESPONSE TO PARAGRAPH 161**: To the extent Paragraph 161 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants admit that the MOA Guarantor transferred the MOA 49% Equity to JPM-D5 on or about March 25, 2021. The JPM Defendants deny the remainder of the allegations contained in Paragraph 161 of the SAC, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

162. As part of the MOA Interests Transfer, the MOA Guarantor's Reimbursement Claim was capped at $1 million.

**RESPONSE TO PARAGRAPH 162**: To the extent Paragraph 162 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 162 of the SAC.

163. On the same date, the WEM Guarantors—WEM-1, WEM-2, and WEM-3—conveyed their common shares in WEMPI, the direct owner of the West Edmonton Mall, as follows (collectively, the "**WEM Interests Transfer**"): WEM-3 conveyed 480 of its 1500 Common Shares in WEMPI to JPM-WEM 1, WEM-1 conveyed all of its 490 Common Shares in WEMPI to JPM-WEM 2, and WEM-2 conveyed all of its 10 Shares in WEMPI to JPM-WEM 2.

**RESPONSE TO PARAGRAPH 163**: The JPM Defendants admit that the WEM Guarantors conveyed their common shares in WEMPI to JPM-WEM 2. The JPM Defendants deny the remainder of the allegations contained in Paragraph 163 of the SAC, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

164. As part of the WEM Interests Transfer, the WEM Guarantors' Reimbursement Claims were capped at $49 million.

**RESPONSE TO PARAGRAPH 164**: To the extent Paragraph 164 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 164 of the SAC.

165. Pursuant to March 25, 2021 amendments to the limited liability agreements of MOA Holdings I LLC and WEMPI,[18] JPM-D5, JPM-WEM 1, and JPM-WEM 2 confirmed their rights to dividends on account of the WEM-MOA 49% Equity, even after the JPM Loan is repaid. This is further evidence that the WEM-MOA Guarantors transferred ownership of the WEM-MOA 49% Equity when the 2021 Agreement transactions were consummated.

**RESPONSE TO PARAGRAPH 165**: To the extent Paragraph 165 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 165 of the SAC (including the allegations

---

[18] As set forth in Appendix C, the JPMorgan Defendants received the benefits of the WEM-MOA 49% Equity through their ownership in MOA Holdings I LLC and WEMPI.

contained in footnote 18 thereto), and respectfully refer the Court to the referenced limited liability agreements, which speak for themselves.

166.    Both JPMorgan and the WEM-MOA Guarantors failed to timely deliver to Plaintiff the two amendments described in ¶ 165, in violation of the Intercreditor Agreement and the Payment Guaranty, respectively. In fact, Plaintiff only received the two amendments on June 2, 2021; the Ghermezians sent the amendments to Plaintiff and the lenders in connection with the lenders proposing to make a new $250 million loan, which is when Plaintiff first learned that the Challenged Transfers had been completed in March 2021.

**RESPONSE TO PARAGRAPH 166**: To the extent the first sentence of Paragraph 166 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in the first sentence Paragraph 166 of the SAC, and respectfully refer the Court to the Intercreditor Agreement and the Payment Guaranty, which speak for themselves.  The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 166 of the SAC and deny them on that basis.

167.    To this date, the Defendants have failed to deliver, notwithstanding Plaintiff's demands, the remaining Transaction Documents (as defined in the 2021 Agreement), including an amendment to the JPMorgan payment guaranty known to exist, which contains the termination and release of the WEM-MOA Guarantors from all obligations and liabilities under the JPMorgan payment guaranty. Such release makes the WEM-MOA Guarantors no longer Shared Guarantors.

**RESPONSE TO PARAGRAPH 167**: The JPM Defendants deny the allegations contained in Paragraph 167 of the SAC.

***The Materially Adverse Effects of the 2021 Agreement and Contemplated Transfers on Plaintiff and the Lenders***

168.    There were multiple effects of the 2021 Agreement that benefitted Defendants while harming Plaintiff.

**RESPONSE TO PARAGRAPH 168**: The JPM Defendants deny the allegations contained in Paragraph 168 of the SAC, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

169.    **One**, because the so-called "partial satisfaction of the JPM Loan" amount was a meager $50 million, JPMorgan would retain its senior secured JPM Loan against Ameream in the full amount of $1.5 billion, while gaining the upside of owning nearly 50% of two valuable malls. In fact, JPMorgan did not even reduce its loan by a dime. This harms Plaintiff and the lenders because its ensures that the JPM Loan is recorded as still outstanding, which, pursuant to the Intercreditor Agreement, precludes Plaintiff from pursuing enforcement actions against the Shared Guarantors.

**RESPONSE TO PARAGRAPH 169**: To the extent Paragraph 169 of the SAC sets forth

legal conclusions, no response is required.    To the extent a response is required, the JPM

Defendants deny the allegations contained in Paragraph 169 of the SAC, and respectfully refer the

Court to the 2021 Agreement, which speaks for itself.

170.    JPMorgan should have credited the true value, in excess of $1 billion, of the WEM-MOA 49% Equity to the outstanding amount of the JPM Loan, which would have reduced the JPM Loan by at least $1 billion and would have reduced interest expenses. JPMorgan would have been owed less than $500 million, secured by the American Dream Mall, which was worth far in excess of that amount and would have provided a sufficient cushion to ensure repayment of the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 170**: The JPM Defendants deny the allegations

contained in Paragraph 170 of the SAC, and respectfully refer the Court to the 2021 Agreement,

which speaks for itself.

171.    JPMorgan not only failed to credit the true value of the WEM-MOA 49% Equity, it also did not even credit the artificial $50 million value assigned in the 2021 Agreement. Indeed, JPMorgan's own July 2021 "Total Outstanding Principal Balance of the Loan" statements show *no reduction whatsoever* to the JPM Loan resulting from the receipt of a $1 billion asset. These statements show the JPM Loan balance before the March 2021 transfer of the WEM-MOA Equity as $1,145,000,000. After the transfer, it is reduced by $50 million to $1,095,000,000; however, the same $50 million is added back to the total amount due as a *new line item* of "Purchase Price & Preferred Return" plus Preferred Return thereon on the post-transfer statements.

**RESPONSE TO PARAGRAPH 171**: The JPM Defendants deny the allegations

contained in Paragraph 171 of the SAC, and respectfully refer the Court to the referenced

statements, which speak for themselves.

172.    This is nonsensical—it leaves the JPM Loan totally intact, notwithstanding JPMorgan's receipt of a $1 billion asset. JPMorgan is now reaping the benefits of the ownership of the WEM-MOA 49% Equity without applying the value of that asset to reduce the balance of

the JPM Loan. With the JPM Loan intact, Plaintiff remains precluded from suing the Individual Guarantors to enforce repayment of the Plaintiff Loan, or to otherwise obtain satisfaction of the Judgment. Defendants' scheme demonstrates the lengths to which JPMorgan and the Ghermezians have gone to harm Plaintiff. As described in Sections E and G below, such machinations continued 18 months later, when Defendants undertook "step two" and executed the October 2022 Agreements.

**RESPONSE TO PARAGRAPH 172**: The JPM Defendants deny the allegations contained in Paragraph 172, except admit that Plaintiff is precluded from suing the Individual Guarantors while the JPMorgan Loan remains outstanding.

173.    *Two*, by virtue of keeping the WEM-MOA Guarantors as guarantors under the Environmental Indemnity, Defendants sought to shield the WEM-MOA Guarantors from any collection action by Plaintiff, since Plaintiff would be barred under the Intercreditor Agreement from asserting such claims against "Shared Guarantors" while the JPM Loan remains outstanding.[19]

**RESPONSE TO PARAGRAPH 173**: To the extent Paragraph 173 (and footnote 19 thereto) of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 173 of the SAC (including the allegations contained in footnote 19 thereto), and respectfully refer the Court to the Environmental Indemnity and Intercreditor Agreement, which speak for themselves, except admit that footnote 19 of the SAC purports to describe the relief sought in Count 7 of the SAC, which was dismissed pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC.

174.    *Three*, the Ghermezians likewise (a) would be shielded from any immediate action by JPMorgan (and Plaintiff) seeking to enforce the payment guarantees against the Individual Guarantors, (b) would continue to receive management fees, (c) would retain the large sum of management fees accrued prior to the opening of the American Dream Mall, and (d) most importantly, would be in a position to continue to *own* all three malls, even after the New York state court in the New York Action rendered the Judgment to repay the Plaintiff Loan and despite the Ghermezians' contractually guaranteed obligations and secured obligations to use their mall equity interests to repay the Plaintiff Loan.

---

[19] As described in ¶ 167, the WEM-MOA Guarantors are in fact no longer Shared Guarantors, and Count 7 seeks a declaration to this effect.

**RESPONSE TO PARAGRAPH 174**: To the extent Paragraph 174 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 174 of the SAC.

175.    **Four**, by stripping the WEM-MOA Guarantors of their most valuable asset, *i.e.*, the WEM-MOA 49% Equity, the 2021 Agreement leaves those guarantors without assets sufficient to repay the Plaintiff Loan, in violation of the Payment Guaranty. And by stipulating the value of the transfer at just $50 million, the 2021 Agreement leaves the WEM-MOA Guarantors with Reimbursement Claims against Ameream capped at that artificially low amount. This further destroyed any ability by the WEM-MOA Guarantors to repay Plaintiff because the Reimbursement Claims would be worth far less than their actual value and far less than the debt owed to Plaintiff and the lenders.

**RESPONSE TO PARAGRAPH 175**: To the extent Paragraph 175 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 175 of the SAC, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

176.    **Five**, JPMorgan took steps to undermine its obligations under the Irrevocable Direction Letter. As stated above, the 2021 Agreement mandated that JPMorgan would become the owner of 49% of the equity in each mall but could also assign that equity ownership to any designee or nominee. Whatever "designee or nominee" ended up owning the 49% would be entitled to keep all distributions or dividends. JPMorgan did in fact assign such equity ownership to the other JPM Defendants, which are affiliates of JPMorgan created *after* the 2021 Agreement was entered into, but are not, on information and belief, lenders to Ameream.

**RESPONSE TO PARAGRAPH 176**: To the extent Paragraph 176 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 176 of the SAC, and respectfully refer the Court to the 2021 Agreement, the Irrevocable Direction Letter, and the referenced assignments, which speak for themselves.

177.    **Sixth**, nothing in the 2021 Agreement requires the JPM Defendants to take any steps to sell the WEM-MOA 49% Equity, even after the JPM Loan is paid in full, thereby defeating one of the central purposes of the Irrevocable Direction Letter, which provided, *inter alia*, that all proceeds from any collections, sale, or other disposition exceeding the outstanding balance of the JPM Loan would be paid to Plaintiff. In effect, the 2021 Agreement permits the JPM Defendants to indefinitely own the WEM-MOA 49% Equity, earning dividends on account of the WEM-MOA

49% Equity, even after the JPM Loan is fully repaid, all while depriving Plaintiff of the benefit of the collateral backing the Plaintiff Loan. And, as described in Section G, *infra*, Defendants took the added measure of entering into the October 2022 Agreements for the purpose of "directing" proceeds from any collections, sales, or other dispositions of the WEM-MOA 49% Equity, away from satisfying the Plaintiff Loan, notwithstanding that Defendants had committed to use the proceeds for that purpose in the Irrevocable Direction Letter, and knowing that the terms of the Irrevocable Direction Letter mandate JPMorgan to comply notwithstanding any contrary direction in any JPM Loan document, including the 7th Amendment.

**RESPONSE TO PARAGRAPH 177**: To the extent Paragraph 177 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 177 of the SAC, and respectfully refer the Court to the 2021 Agreement, the Irrevocable Direction Letter, and October 2022 Agreements, which speak for themselves.

178. These arrangements flatly contradict JPMorgan's representation to this Court that it would "never receive one dime beyond what it was owed on its loan, and any surplus proceeds generated by a sale of the WEM-MOA Equity (after the Senior Lenders were repaid) would be distributed to Plaintiff in accordance with the ICA and Irrevocable Letter of Direction."

**RESPONSE TO PARAGRAPH 178**: The JPM Defendants admit that Paragraph 178 of the SAC contains selective quotes from certain pleadings and filings by the JPM Defendants in this action, and respectfully refer the Court to the referenced pleadings and filings, which speak for themselves. The JPM Defendants deny the remainder of the allegations contained in Paragraph 178 of the SAC.

179. In fact, the 2021 Agreement was engineered to provide JPMorgan with indefinite ownership of the WEM-MOA 49% Equity, with a right to receive 49% of distributions or dividends from MOA Holdings II LLC and WEMPI, even after the JPM Loan is fully repaid, and the October 2022 Agreements, discussed below, further ensured that JPMorgan would never provide Plaintiff with its stake in the WEM-MOA 49% Equity.

**RESPONSE TO PARAGRAPH 179**: The JPM Defendants deny the allegations contained in Paragraph 179 of the SAC, and respectfully refer the Court to the 2021 Agreement and the October 2022 Agreements, which speak for themselves.

180.    The schemes papered by the 2021 Agreement allowed the Ghermezian family to save face, avoid any public relations nightmare of insolvency proceedings, retain control and ownership of the American Dream Mall, and retain its 51% equity stake intact in the West Edmonton Mall and Mall of America, notwithstanding that the Ghermezians have defaulted on multiple loans. The Individual Guarantors, all of whom are members of the Ghermezian family, benefitted by converting the Individual Guarantors' guaranty obligations into a last resort payment obligation while remaining "Shared Guarantors," meaning Plaintiff cannot sue them until the JPM Loan is repaid in full (or such guarantees are released or terminated by operation of law or otherwise), which, on account of the false valuation of the WEM-MOA 49% Equity, has been stalled indefinitely.

**RESPONSE TO PARAGRAPH 180**: The JPM Defendants deny the allegations contained in Paragraph 180 of the SAC, except admit that Plaintiff cannot sue the "Shared Guarantors" until at least the JPM Loan is repaid in full, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

181.    Through this scheme, JPMorgan secured a massive windfall. It gained, at zero expense, and with no reduction of the JPM Loan, assets worth over $1 billion, while concurrently blocking Plaintiff from immediate recourse against the WEM-MOA Guarantors and Individual Guarantors.

**RESPONSE TO PARAGRAPH 181**:  To the extent Paragraph 181 of the SAC sets forth legal conclusions, no response is required.   To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 181 of the SAC.

E.    **The AB AD Lender Strictly Forecloses on Ameream Mezz's 100% Ownership of Ameream, Resulting in Termination of the Intercreditor Agreement**

182.    On October 3, 2022, Plaintiff received notice of the Strict Foreclosure. Specifically, the AB AD Lender delivered notice that, on September 30, 2022, the AB AD Lender had exercised its option to have the equity interests in Ameream registered in its name (or the name of its designee); that it was pursuing a strict foreclosure pursuant to N.Y. U.C.C. § 9-620; and that it would retain the equity interests in Ameream in full satisfaction of its 2017 Mezz Loan. The AB AD Lender further advised that Ameream Mezz had 20 days to object. The 20th day would have been October 20, 2022.

**RESPONSE TO PARAGRAPH 182**:    The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 182 of the SAC and deny them on that basis.  The remaining allegations

contained in Paragraph 182 of the SAC purport to characterize the contents of the notice of the Strict Foreclosure, and the JPM Defendants respectfully refer the Court to the referenced documents, which speak for themselves.

183.    On October 25, 2022, the AB AD Lender provided notice that it had acquired title to Ameream through the Strict Foreclosure noticed on October 3, 2022. The AB AD Lender further reported that AB AMEREAM MEMBER LLC (the "**Successor Ameream Mezz**"), at the same address as the AB AD Lender, had become the owner of Ameream.

**RESPONSE TO PARAGRAPH 183**:    The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 183 of the SAC and deny them on that basis.  Paragraph 183 of the SAC purports to characterize the contents of the alleged notice, and the JPM Defendants respectfully refer the Court to the referenced notice documents, which speak for themselves.

184.    The AB AD Lender did not disclose to Plaintiff the existence of the October 2022 Agreements, which had been executed four days earlier, on October 21, and did not disclose that the Ghermezians actually owned, via AB AMEREAM MEMBER PARENT LLC (the "**Successor American Dream Borrower**"), Successor Ameream Mezz and, in turn, Ameream.

**RESPONSE TO PARAGRAPH 184**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 184 of the SAC and deny them on that basis.

185.    As a result of the Strict Foreclosure, the 2017 Mezz Loan is satisfied. The AB AD Lender was (and is) no longer owed anything by Ameream Mezz, or any guarantor (including the Individual Guarantors and the WEM-MOA Guarantors), and has no right to receive any proceeds from the collections, sale, or other disposition of the WEM-MOA 49% Equity, or any other proceeds from the pledges listed in the Irrevocable Direction Letter.

**RESPONSE TO PARAGRAPH 185**: To the extent Paragraph 185 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 185 of the SAC.

186.    From the moment of the Strict Foreclosure through the present, the **only** debt senior to the Plaintiff Loan is the JPM Loan. Thus, under the terms of the Irrevocable Direction Letter, if the JPM Loan were paid in full, the Plaintiff Loan would be next in line to be repaid through all

available collateral, including specifically any excess proceeds from the disposition of the WEM-MOA 49% Equity.

**RESPONSE TO PARAGRAPH 186**: To the extent Paragraph 186 of the SAC sets forth legal conclusions, no response is required.   To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 186 of the SAC, and respectfully refer the Court to the Irrevocable Direction Letter, which speaks for itself.

187.   Although Plaintiff did not know it yet, Defendants executed the October 2022 Agreements alongside the Strict Foreclosure, and did so as part of a plan to destroy Plaintiff's lien on its collateral pursuant to the Plaintiff  Pledge Agreement; to redirect funds that should have been available for repayment of the Plaintiff Loan to the AB AD Lender (through its newly created Successor American Dream Borrower); and to keep the Ghermezians in ownership of the American Dream Mall, notwithstanding that they should have lost their ownership stake through the Strict Foreclosure. As explained below, this all started to come to light when Plaintiff sued American Dream Borrower and various Ghermezian entities in Canada (the "**Canadian Proceeding**"), and pursued discovery to enforce the Judgment it secured in its favor.

**RESPONSE TO PARAGRAPH 187**: The JPM Defendants deny the allegations contained in Paragraph 187 of the SAC, and respectfully refer the Court to the October 2022 Agreements, which speak for themselves.

188.   The Strict Foreclosure caused the Intercreditor Agreement to automatically terminate in accordance with Section 18(m) thereto.[20] The only surviving provision is Section 6(b).

**RESPONSE TO PARAGRAPH 188**: The JPM Defendants admit the allegations contained in Paragraph 188 of the SAC, respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.  The JPM Defendants deny the allegations contained in footnote 20 of the

---

[20] The JPMorgan Defendants and WEM-MOA Defendants have confirmed that the Strict Foreclosure automatically terminated the Intercreditor Agreement (save Section 6(b)), despite JPMorgan's prior counsel threatening to seek enforcement against Plaintiff for purported breach of Sections 5, 6(a), 10(a) and 10(b) when Plaintiff commenced the New York Action, and the WEM-MOA Guarantors' flip-flopping in submissions to this Court.

SAC, and respectfully refer the Court to the referenced filings in this action, which speak for themselves.

## F.    Plaintiff Sues American Dream Borrower for Defaults under the Plaintiff Loan

189.    American Dream Borrower failed to remit the regularly scheduled monthly payment of interest due on the Plaintiff Loan in full on May 10, 2021. On or about May 26, 2021, Plaintiff notified American Dream Borrower in writing of this event of default and demanded payment in full of all amounts then due. American Dream Borrower did not pay.

**RESPONSE TO PARAGRAPH 189**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 189 of the SAC and deny them on that basis, except admit that the American Dream Borrower defaulted on the Plaintiff Loan.

190.    On February 7, 2023, Plaintiff sued American Dream Borrower in New York state court, filing a summary judgment motion in lieu of a complaint. American Dream Borrower did not oppose Plaintiff's summary judgment motion.

**RESPONSE TO PARAGRAPH 190**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 190 of the SAC and deny them on that basis.

191.    On April 10, 2023, the New York state court granted Plaintiff's motion for summary judgment and, on May 3, 2023, entered the Judgment. As of the date the Judgment was entered, American Dream Borrower owed Plaintiff $404,399,512.87. The Judgment remains outstanding, and interest accrues at the New York state statutory rate.

**RESPONSE TO PARAGRAPH 191**: The JPM Defendants admit that the New York state court entered the Judgment in the amount of $404,399,512.87 on May 3, 2023.  The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 191 of the SAC and deny them on that basis.

192.    After obtaining the Judgment against the American Dream Borrower, Plaintiff sought post-judgment discovery. Counsel representing the American Dream Borrower is the same counsel representing the WEM-MOA Guarantors and Ameream in this proceeding, despite an apparent conflict. Specifically, the WEM-MOA Guarantors hold Reimbursement Claims against

Ameream, and as discussed herein, WEM-3 gave away $48.5 million to pay for operating costs of the American Dream Mall.

**RESPONSE TO PARAGRAPH 192**: To the extent Paragraph 192 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and second sentence of Paragraph 192 of the SAC and deny them on that basis. The JPM Defendants deny the allegations contained in the third sentence of Paragraph 192 of the SAC.

193.    As part of the discovery, Plaintiff sought (a) the JPM Loan documents in connection with JPMorgan's loan extension, which the WEM-MOA Defendants publicly touted, and (b) the documents executed in connection with the Strict Foreclosure. This would have called for production of the October 2022 Agreements, but the American Dream Borrower refused to produce them and did not disclose their existence to Plaintiff. The American Dream Borrower did, however, produce the WEM 2022 Audited Financial Statements, dated April 29, 2023. Those statements depict a significantly different ownership structure than the one depicted in Appendix Chart "C," which was set forth in a notice provided to Plaintiff by the AB AD Lender on or about October 25, 2022.

**RESPONSE TO PARAGRAPH 193**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 193 of the SAC (including the allegations contained in Appendix Chart "C") and deny them on that basis.

194.    Plaintiff learned from the same statements that in September 2022, just before the AB AD Lender conducted the Strict Foreclosure and assumed ownership of Ameream, JPMorgan obtained a new Recourse Guaranty from the Non-Shared Guarantors. This appears to be an improper attempt to turn the Non-Shared Guarantors into "Shared Guarantors" under the Intercreditor Agreement, which would further block Plaintiff's avenues for satisfaction of the Judgment.

**RESPONSE TO PARAGRAPH 194**: The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation concerning what Plaintiff learned from the referenced financial statements. The JPM Defendants deny the remainder of the

allegations contained in Paragraph 194 of the SAC, and respectfully refer the Court to the

Intercreditor Agreement and referenced financial statements, which speak for themselves.

## G.    Plaintiff Obtains Copies of the October 2022 Agreements, Which Give Rise to Additional Claims and Confirm Plaintiff's Suspicions

195.    On or about October 21, 2022, JPMorgan, the AB AD Lender, the WEM-MOA Guarantors, the Individual Guarantors, the Outparcel Entities, Ameream, the other Mall of America 51% owner Ghermezian affiliates, and the Successor Entities entered into one or both October 2022 Agreements.

**RESPONSE TO PARAGRAPH 195**: The JPM Defendants deny the allegations

contained in Paragraph 195 of the SAC, and respectfully refer the Court to the October 2022

Agreements, which speak for themselves.

196.    Plaintiff received copies of the October 2022 Agreements, for the first time, in May 2024, only after they were revealed to exist in the Canadian Proceeding. Until this revealing by certain of the WEM-MOA Guarantors, Defendants had gone out of their way to hide the existence of the October 2022 Agreements.

**RESPONSE TO PARAGRAPH 196**: The JPM Defendants lack knowledge or

information sufficient to form a belief as to the truth of the allegations contained in the first

sentence of Paragraph 196 of the SAC and deny them on that basis.  The JPM Defendants deny

the allegations contained in the second sentence of Paragraph 196 of the SAC.

197.    The October 2022 Agreements are each described in detail below. Two key predicates to each agreement were the Strict Foreclosure and the formation of entities to ensure that the Ghermezians would never lose ownership of the American Dream Mall.

**RESPONSE TO PARAGRAPH 197:** The first sentence of Paragraph 197 of the SAC

purports to characterize the contents of the October 2022 Agreements, which speak for themselves.

The JPM Defendants deny the allegations contained in the second sentence of Paragraph 197 of

the SAC.

198.    For example, shortly before execution of the October 2022 Agreements, an entity known as T5 AD LLC ("**T5**") was formed. T5 is solely owned by Ghermezian family members.

**RESPONSE TO PARAGRAPH 198:** The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 198 of the SAC and deny them on that basis.

199.    Notwithstanding the Strict Foreclosure, which was supposed to wipe out the Ghermezian family's ownership in the American Dream Mall, T5 is the managing member and the 100% owner of Successor American Dream Borrower, which itself was formed in September 2022, on information and belief, by the AB AD Lender. T5's formation certificate is signed by Alan Glazer, an Associate Counsel of Triple Five Group. An amendment to the certificate to Successor American Dream Borrower was filed in February 2023 and signed by Daniel Ghermezian.

**RESPONSE TO PARAGRAPH 199:** The JPM Defendants deny the allegations contained in the first sentence of Paragraph 199 of the SAC. The JPM Defendants deny the allegations contained in the second and third sentences of Paragraph 199 of the SAC and respectfully refer the Court to the referenced formation certificates, which speak for themselves.

200.    Successor American Dream Borrower owns 100% interest in Successor Ameream Mezz, who in turn owns Ameream, the owner of the American Dream Mall. Thus, AB AD Lender is not the owner of Successor American Dream Borrower, but it purposely misled Plaintiff to believe it is in connection with the Strict Foreclosure. Indeed, Appendix "C" depicts the capital structure of the American Dream Mall following the Strict Foreclosure as represented to Plaintiff by AB AD Lender; T5 is not disclosed, even though (as Plaintiff now knows) it had been formed before the Strict Foreclosure.

**RESPONSE TO PARAGRAPH 200:** The JPM Defendants deny the allegations contained in Paragraph 200 of the SAC, including the allegations contained in Appendix Chart "C".

201.    These facts were hidden from Plaintiff for nearly a year. Indeed, the Ghermezian affiliates have consistently refused to deliver documentation relating to Successor American Dream Borrower in order to hide the fact that the Ghermezian family continues to own Ameream and how they have managed to do so after the Strict Foreclosure.

**RESPONSE TO PARAGRAPH 201:** The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 201 of the SAC and deny them on that basis.

202.    It was only by coincidence, in separate proceedings between several parties to this action that are ongoing in Canada, that Plaintiff learned of the October 2022 Agreements. On April 25, 2024, the defendants in the Canadian Proceeding, which includes the WEM Guarantors but not the JPM Defendants, submitted a joint "Statement of Defence." In this document, the WEM Guarantors *admitted* that the 2021 Agreement was merely the first part of a bigger transaction, the second phase of which occurred in October 2022. The Statement of Defence expressly referred to two documents Plaintiff had not heard of previously—the October 2022 Agreements. Plaintiff immediately requested they be provided, and on May 7, 2024, Plaintiff received copies of each, thereby learning for the first time the full extent of Defendants' scheme.

**RESPONSE TO PARAGRAPH 202:** The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 202 of the SAC and deny them on that basis, and respectfully refer the Court to the referenced "Statement of Defence," which speaks for itself.  To the extent the allegations contained in the third sentence of Paragraph 202 of the SAC purport to characterize the contents of the 2021 Agreement and 2022 Agreements, the JPM Defendants deny them and respectfully refer the Court to the referenced documents, which speak for themselves.

203.    Further, there have been a number of agreements executed either immediately before or in conjunction with the October 2022 Agreements that Plaintiff has not seen, including several listed on a schedule to the Standstill Agreement.

**RESPONSE TO PARAGRAPH 203:** The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 203 of the SAC and deny them on that basis.

### The 7th Amendment

204.    The 7th Amendment is one of the two October 2022 Agreements. It is an amendment to the JPM Loan but also a substantial reshuffling of rights between JPMorgan, AB AD Lender, and the Ghermezians. The 7th Amendment contains numerous provisions that cause breaches of, or otherwise interfere with, the Irrevocable Direction Letter, the Payment Guaranty, and Section 6(b) of the Intercreditor Agreement.

**RESPONSE TO PARAGRAPH 204:**    The JPM Defendants admit that the 7th Amendment is one of the two October 2022 Agreements.  The JPM Defendants deny the remaining

allegations contained in Paragraph 204 of the SAC, and respectfully refer the Court to the 7th

Amendment, Irrevocable Direction Letter, Payment Guaranty, and Intercreditor Agreement, which

speak for themselves.

205.    For example, the 7th Amendment refers to a new "Mezzanine Loan," in the amount
of $475 million and between the "Mezzanine Lender" (the AB AD Lender) and "Mezz Borrower"
(the Successor American Dream Borrower) (the "**2022 Mezz Loan**").[21]

**RESPONSE TO PARAGRAPH 205:** The JPM Defendants deny the allegations

contained in Paragraph 205 of the SAC (including allegations contained in footnote 21 of the

SAC), and respectfully refer the Court to the 7th Amendment and Standstill Agreement, which

speak for themselves.

206.    The 7th Amendment purports to pledge as collateral or transfer, to the AB AD
Lender to repay the newly created 2022 Mezz Loan, the WEM-MOA 49% Equity and the equity
interests of Ameream and the Outparcel Entities, which are designated in the Irrevocable Direction
Letter to repay the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 206:** The JPM Defendants deny the allegations

contained in Paragraph 206 of the SAC, and respectfully refer the Court to the 7th Amendment

and Irrevocable Direction Letter, which speak for themselves.

207.    This 2022 Mezz Loan is simply a fictional version of the 2017 Mezz Loan, payable
to the AB AD Lender (using the same address as in the 2017 Mezz Loan), despite the 2017 Mezz
Loan being fully discharged as a result of the Strict Foreclosure. The AB AD Lender provided no
funds in support of this new loan, and all Defendants knew and understood that the assets
committed as collateral for this (false) loan had already been committed as collateral for repayment
of the Plaintiff Loan and cannot be redirected to AB AD Lender.

**RESPONSE TO PARAGRAPH 207:** The JPM Defendants deny the allegations

contained in Paragraph 207 of the SAC.

208.    No party to the Irrevocable Direction Letter was permitted to pledge or contract to
give any excess value from its assets to support this (false) "new" 2022 Mezz Loan. Defendants
clearly engineered the October 2022 Agreements (including contracts that have not been disclosed

---

[21] This Mezz Loan is called the "Junior Loan" in the Standstill Agreement.

to Plaintiff but are listed as existing as of October 2022) to do exactly what the Irrevocable Direction Letter bars until the Plaintiff Loan is paid in full.

**RESPONSE TO PARAGRAPH 208:** The JPM Defendants deny the allegations contained in Paragraph 208 of the SAC, and respectfully refer the Court to the October 2022 Agreements and Irrevocable Direction Letter, which speak for themselves.

209.    Further, Section 7 of the 7th Amendment states: "the Borrower Parties hereby acknowledge and agree that in connection with any Realization Event, to the extent [JPMorgan] receive[s] cash in excess of the amount necessary for the indefeasible repayment in full of the Senior Loan Liabilities, [JPMorgan] will cause such excess to be delivered to [AB AD] Lender for application against amounts outstanding under the [2022 Mezz] Loan." The term "Borrower Parties," as used in the 7th Amendment, includes the WEM-MOA Guarantors and other parties (including the Outparcel Entities) that are parties to the Irrevocable Direction Letter. By its plain language, Section 7 of the 7th Amendment mandates that the WEM-MOA Guarantors and the Outparcel Entities contract to give up cash that should be used to pay Plaintiff, in favor of the AB AD Lender on account of a newly created fictional loan.[22]

**RESPONSE TO PARAGRAPH 209:** The JPM Defendants admit that Paragraph 209 of the SAC contains selective quotes from the 7th Amendment. To the extent the remainder of Paragraph 209 of the SAC asserts allegations to which a response is required, the JPM Defendants deny them (including the allegations contained in footnote 22 of the SAC), and respectfully refer the Court to the 7th Amendment and Irrevocable Direction Letter, which speak for themselves.

210.    Under the terms of the Irrevocable Direction Letter, this excess cash belongs to Plaintiff, not to the AB AD Lender, and cannot be designated as collateral to repay a loan that was already fully discharged and no longer exists. Thus, Section 7 of the 7th Amendment directly causes a breach of the Irrevocable Direction Lender.

---

[22] Because Successor Ameream Mezz is the successor to Ameream Mezz, Successor Ameream Mezz likewise is bound to honor the Irrevocable Direction Letter. Plaintiff intends to proceed in New York state court to seek successor liability as against both Successor American Dream Borrower and Successor Ameream Mezz. Plaintiff notes Defendants admit successor liability in Section 7(e) of the Standstill Agreement, which expressly deems the 2022 Mezz Loan to be the same as the 2017 Mezz Loan, and deems Successor Ameream Mezz as successor to Ameream Mezz. Additionally, in Section 11(b) of the 7th Amendment, the Successor Ameream Mezz irrevocably and unconditionally confirms and ratifies all aspects of the JPM Loan agreement, including the 2021 Agreement, in its capacity as the successor to Ameream Mezz.

**RESPONSE TO PARAGRAPH 210:** The JPM Defendants deny the allegations contained in Paragraph 210 of the SAC, and respectfully refer the Court to the 7th Amendment and Irrevocable Direction Letter, which speak for themselves.

211.   Because the 2017 Mezz Loan was fully satisfied upon the Strict Foreclosure and ***before*** the 7th Amendment, there was no debt senior to the Plaintiff Loan other than the JPM Loan. By requiring JPMorgan to use excess proceeds from the sale of the WEM-MOA 49% Equity to pay the new (false) 2022 Mezz Loan, the WEM-MOA Guarantors, the Outparcel Entities, and Ameream caused a breach of the Irrevocable Direction Letter.

**RESPONSE TO PARAGRAPH 211:** To the extent Paragraph 211 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 211 of the SAC, and respectfully refer the Court to the 7th Amendment and Irrevocable Direction Letter, which speak for themselves.

212.   Further, Section 7(b) of the 7th Amendment also expressly addresses the WEM-MOA 49% Equity and causes breaches of contracts with Plaintiff. First, it ratifies and incorporates Section 3(a) (MOA Interests) and Section 3(b) (WEM Interests) of the 2021 Agreement, meaning that it confirms that JPMorgan owns the WEM-MOA 49% Equity but remains subject to the Irrevocable Direction Letter.[23]

**RESPONSE TO PARAGRAPH 212:** The JPM Defendants deny the allegations contained in Paragraph 212 (including the allegations contained in footnote 23 of the SAC), and respectfully refer the Court to the 7th Amendment, 2021 Agreement, and Irrevocable Direction Letter, which speak for themselves.

213.   Yet Section 7(b) of the 7th Amendment provides, in direct violation of the Irrevocable Direction Letter and Section 6(b) of the Intercreditor Agreement, that JPMorgan will cause the WEM-MOA 49% Equity to be transferred to AB AD Lender when the JPM Loan is paid in full. Section 7(b)(iv) of the 7th Amendment provides: "[JPMorgan] and the Borrower Parties hereby acknowledge and agree that, upon the monetary Senior Loan Liabilities being Paid in Full (as defined in the Standstill and Recognition Agreement), (i) [JPMorgan] shall convey all of its right, title and interests in the [WEM-MOA 49% Equity] to [AB AD] Lender (or its designee) subject to and in accordance with the terms and conditions of Section 7(c) and Section 8(c) of the

---

[23] The JPMorgan Defendants have repeatedly represented that Plaintiff's rights under the Irrevocable Direction Letter have been preserved, but this simply cannot be true in light of what they concocted in the October 2022 Agreements.

Standstill and Recognition Agreement[.]" This provision directly contradicts the obligations of the "Borrower Parties," which JPMorgan understood, to transfer all proceeds of the WEM-MOA 49% Equity to Plaintiff once the JPM Loan had been paid in full.[24]

**RESPONSE TO PARAGRAPH 213:** The JPM Defendants admit that Paragraph 213 of the SAC contains selective quotes from the 7th Amendment. To the extent Paragraph 213 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 213 of the SAC (including the allegations contained in footnote 24 thereto), and respectfully refer the Court to the 7th Amendment, Irrevocable Direction Letter, and Intercreditor Agreement, which speak for themselves.

214.    JPMorgan further agreed in Section 7(b)(i) of the 7th Amendment that it "shall not cause or permit (1) any sale of all or any portion of the MOA 49% Interests or the WEM 49% Interests or (2) commence or complete a foreclosure, or commence or complete any other realization, upon the WEM Property pursuant to the WEM Second Mortgage, in either case, prior to the occurrence of a Trigger Default[.]" No mention is made of Plaintiff's rights to those assets under the Irrevocable Direction Letter anywhere in the 7th Amendment.

**RESPONSE TO PARAGRAPH 214:** The JPM Defendants admit that Paragraph 214 of the SAC contains selective quotes from the 7th Amendment. The JPM Defendants deny the remainder of the allegations contained in Paragraph 214 of the SAC, and respectfully refer the Court to the 7th Amendment, which speaks for itself.

215.    Section 7(b) of the 7th Amendment further states that from "and after the occurrence of a Trigger Default, and notwithstanding anything to the contrary in the MOA JV Agreement or WEM Shareholder Agreement," JPMorgan may commence and complete any transfer of the WEM-MOA 49% Equity. Again, there is no mention of the Irrevocable Direction Letter or that, under the Intercreditor Agreement, JPMorgan must sell or otherwise dispose of the WEM-MOA 49% Equity in a commercially reasonable manner to maximize value.

---

[24] Section 7(b) refers only to JPMorgan, not the other JPMorgan Defendants, even though it was other JPMorgan Defendants who hold the WEM-MOA 49% Equity. This confirms JPMorgan fully controls all JPMorgan Defendants.

**RESPONSE TO PARAGRAPH 215:** The JPM Defendants admit that Paragraph 215 of the SAC contains selective quotes from the 7th Amendment.  To the extent the remainder of Paragraph 215 of the SAC asserts allegations to which a response is required, the JPM Defendants deny them, and respectfully refer the Court to the 7th Amendment and Intercreditor Agreement, which speak for themselves.

216.    It was not enough that JPMorgan fraudulently took the WEM-MOA 49% Equity at a false valuation in March 2021 to put that asset out of reach to repay the Plaintiff Loan, Defendants expanded on that initial fraudulent conveyance by these sections of the 7th Amendment, which provide that any funds generated from the collection, sale, or other disposition of that asset be directed, not to Plaintiff (as required under the Irrevocable Direction Letter), but to AB AD Lender on a phantom loan and a phantom preferred equity investment in the amount of $25 million.

**RESPONSE TO PARAGRAPH 216:** The allegations contained in Paragraph 216 of the SAC purport to characterize the contents of the 7th Amendment.  The JPM Defendants deny the allegations contained in Paragraph 216 of the SAC, and respectfully refer the Court to the 7th Amendment and Irrevocable Direction Letter, which speak for themselves.

217.    Several provisions of the 7th Amendment confirm the JPM Defendants *own* the WEM-MOA 49% Equity, and will not credit the fair value of it to reduce the amount owed under the JPM Loan.

**RESPONSE TO PARAGRAPH 217:** The JPM Defendants deny the allegations contained in Paragraph 217 of the SAC, and respectfully refer the Court to the 7th Amendment for, which speaks for itself.

218.    For example, in Section 7(b)(iii), WEM-3 is obligated to hold all of its received "Capital Transactions" cash for the benefit of JPMorgan, on account of its 51% ownership in the West Edmonton Mall, and the 51% owners of Mall of America do the same with their cash and distribute such cash to JPMorgan to pay down the JPM Loan. But the same *does not* happen with respect to the WEM-MOA 49% Equity. The only way 49% of cash distributed from the West Edmonton Mall and Mall of America do not reduce the JPM Loan (whereas 51% does) is if the JPM Defendants own the WEM-MOA 49% Equity.

**RESPONSE TO PARAGRAPH 218:** The allegations contained in Paragraph 218 of the SAC purport to characterize the contents of the 7th Amendment.  The JPM Defendants deny the

allegations contained in Paragraph 218 of the SAC, and respectfully refer the Court to the 7th

Amendment, which speaks for itself.

219.    Further, nowhere in the 7th Amendment does it provide that the WEM-MOA
Guarantors ever get back this asset, even after the JPM Loan is repaid from other sources. In other
words, the WEM-MOA 49% Equity was transferred to JPMorgan, and the purported "custody"
was (and is) a farce.

**RESPONSE TO PARAGRAPH 219:** The allegations contained in Paragraph 219 of the

SAC purport to characterize the contents of the 7th Amendment.  The JPM Defendants deny the

allegations contained in Paragraph 219 of the SAC, and respectfully refer the Court to the 7th

Amendment, which speaks for itself.

220.    Defendants in Section 4(c) of the 7th Amendment brazenly commit another
fraudulent conveyance, resulting in a fraudulent conveyance 2.0; they cause WEM-3 to transfer its
cash to fund operations of the American Dream Mall. According to this Section, the West
Edmonton Mall was sitting on $48.5 million in cash as of March 2022. Rather than using such
$48.5 million to reduce the JPM Loan (as JPMorgan owns the WEM 49% Interest and has the right
to the 51% operating cash under the cashflow pledge from WEM-3 as described in paragraph 218),
Section 4(c) provides that cash is distributed all to WEM-3. And instead of that cash being used to
repay debt, WEM-3 *gives all $48.5 million to pay for operating costs of the American Dream
Mall*. Other than the fact that both are ultimately owned by the Ghermezians, there is no connection
or reason why WEM-3 would give away its cash for Ameream's benefit. This transfer of cash for
the benefit of an "Affiliate" violates the Payment Guaranty.

**RESPONSE TO PARAGRAPH 220:** To the extent Paragraph 220 of the SAC sets forth

legal conclusions, no response is required.  To the extent a response is required, the allegations

contained in Paragraph 220 of the SAC purport to characterize the contents of the 7th Amendment.

The JPM Defendants deny the allegations contained in Paragraph 220 of the SAC, and respectfully

refer the Court to the 7th Amendment, which speaks for itself.

221.    Thus, the 7th Amendment did the following, all in derogation of Plaintiff's rights:

- Confirms that JPMorgan, vested with the power to transfer the WEM-MOA
  49% Equity, took *ownership* of those assets through the consummation of the
  2021 Agreement, confirming violations of the Payment Guaranty's covenants;
- Obligates JPMorgan to transfer, upon payment in full of the JPM Loan, to AB
  AD Lender, instead of Plaintiff, the WEM-MOA 49% Equity, other assets, and

cash, which violates the Irrevocable Direction Letter and Intercreditor Agreement; and

- Permits WEM-3 to give away $48.5 million in cash to its "Affiliate," in violation of the Payment Guaranty.

**RESPONSE TO PARAGRAPH 221:** To the extent Paragraph 221 of the SAC sets forth legal conclusions, no response is required. To the extent Paragraph 221 of the SAC asserts allegations to which a response is required, the JPM Defendants deny them, and respectfully refer the Court to the 7th Amendment, which speaks for itself.

*The Standstill Agreement*

222.    On the same date the 7th Amendment was executed, JPMorgan and the AB AD Lender (acting as the "new" "Mezzanine Lender" and as "Investor" in Successor American Dream Borrower, and labeled the "Junior Lender") signed the Standstill Agreement.

**RESPONSE TO PARAGRAPH 222:** The JPM Defendants deny the allegations contained in Paragraph 222 of the SAC, except admit that JPMorgan and the AB AD Lender entered into the Standstill Agreement, and respectfully refer the Court to the Standstill Agreement, which speaks for itself.

223.    The problems with the Standstill Agreement start in the WHEREAS clauses. The Standstill Agreement falsely states that as of October 21, 2022, AB AD Lender succeeded to the ownership of the Successor Ameream Mezz, which owns Ameream. AB AD Lender never succeeded to the ownership of Successor Ameream Mezz. Indeed, the very next page states that T5 is the equity owner of the Successor American Dream Borrower, which in turn is the owner of Successor Ameream Mezz.[25]

**RESPONSE TO PARAGRAPH 223:** The allegations contained in Paragraph 223 of the SAC purport to characterize the contents of the Standstill Agreement. The JPM Defendants deny the allegations contained in Paragraph 223 of the SAC (including the allegations contained in

---

[25] For the scheme to work, it was critical that the Ghermezians stay as owners. Section 8(a) of the Standstill Agreement states that AB AD Lender shall not do anything that would result in a change of control of Successor American Dream Borrower, which means it is a violation under the Standstill Agreement if the Ghermezians no longer own the American Dream Mall. This provision establishes that the Strict Foreclosure was a mere name change.

footnote 25 of the SAC), and respectfully refer the Court to the Standstill Agreement, which speaks

for itself.

224.    In another "WHEREAS" clause, the Standstill Agreement discloses that the AB AD Lender and T5 had entered into an operating agreement for Successor American Dream Borrower, and that AB AD Lender received preferred equity in Successor American Dream Borrower and purportedly provided a new $475 million loan to Successor American Dream Borrower (and apparently $25 million of this (fake) $475 million loan was converted into preferred membership interests in Successor American Dream Borrower).

**RESPONSE TO PARAGRAPH 224:** The allegations contained in Paragraph 224 of the

SAC purport to characterize the contents of the Standstill Agreement.  The JPM Defendants deny

the allegations contained in Paragraph 224 of the SAC, and respectfully refer the Court to the

Standstill Agreement, which speaks for itself.

225.    These transactions are artificial and shams. The AB AD Lender advanced no money to Successor American Dream Borrower pursuant to this supposed "loan," and there is no legitimate reason that a sophisticated financial lender like AB AD Lender would trade an equity interest it already owned (resulting from the Strict Foreclosure) in Ameream for an unsecured loan in a structurally subordinate entity (Successor American Dream Borrower) and a mere preferred member status.

**RESPONSE TO PARAGRAPH 225:** The JPM Defendants deny the allegations

contained in Paragraph 225 of the SAC.

226.    The true explanation for this transaction is revealed by the October 2022 Agreements, which show that the Ghermezians are the owners of the Ameream equity and confirm that the new loan the AB AD Lender claims to have made does not exist.

**RESPONSE TO PARAGRAPH 226:** The allegations contained in Paragraph 226 of the

SAC purport to characterize the contents of the 2022 Agreements.  The JPM Defendants deny the

allegations contained in Paragraph 226 of the SAC, and respectfully refer the Court to the 2022

Agreements, which speak for themselves.

227.    The Standstill Agreement expressly states that as a result of the Strict Foreclosure, the 2017 Mezz Loan had been fully discharged, and that the AB AD Lender had no claims against any guarantor, including the WEM-MOA Guarantors. That means, at the moment of the Strict

Foreclosure, the 2017 Mezz Loan is no longer ahead of the Plaintiff Loan in respect of the WEM-MOA 49% Equity or any of the collateral listed in the Irrevocable Direction Letter.[26]

**RESPONSE TO PARAGRAPH 227:** The JPM Defendants deny the allegations contained in Paragraph 227 of the SAC (including the allegations contained in footnote 26), and respectfully refer the Court to the Standstill Agreement and the Irrevocable Direction Letter, which speak for themselves.

228.    Unbeknownst to Plaintiff, JPMorgan consented to the Strict Foreclosure only through working with the AB AD Lender (in its brand new capacity as investor in Successor American Dream Borrower), the Ghermezians, and Defendants to harm rights that belong to Plaintiff.

**RESPONSE TO PARAGRAPH 228:** The JPM Defendants deny the allegations contained in Paragraph 228 of the SAC.

229.    As described in footnote 26, one immediate improper benefit JPMorgan obtained for itself was Successor Ameream Mezz giving the pledge of the equity in Ameream to JPMorgan to secure the JPM Loan, no doubt gearing up for a future refinancing, to delve out to future mezzanine lenders. This was effectuated through Sections 2 and 4 of the Standstill Agreement. Section 2 states that AB AD Lender confirms that every one of its existing liens on the equity of Ameream and the Outparcel Entities had been extinguished. In Section 4(b)(x), AB AD Lender "hereby irrevocably and unconditionally relinquishes and disclaims the existence of any interest, whether direct or indirect, perfected or unperfected, fixed or contingent or present or future, by [AB AD] Lender in and to either or both of [Ameream and the Outparcel Entities equity]."

**RESPONSE TO PARAGRAPH 229:** Paragraph 229 of the SAC purports to characterize the contents of the Standstill Agreement and contains selective quotes from the Standstill Agreement, and the JPM Defendants respectfully refer the Court to the referenced document, which speaks for itself.  The JPM Defendants deny the remainder of the allegations contained in Paragraph 229 of the SAC.

---

[26] The one exception would be the pledge of Ameream ownership to secure the JPM Loan, since that pledge was assigned by JPMorgan to AB AD Lender and presumably was the basis for the Strict Foreclosure. However, it is obvious that the Strict Foreclosure itself was designed to end-run the Irrevocable Direction Lender because AB AD Lender is credited with making the fake 2022 Mezz Loan, and Successor Ameream Mezz immediately pledged Ameream ownership to secure the JPM Loan.

230.    To the extent that the Standstill Agreement was harsh towards AB AD Lender—it gave up its ownership in Ameream and the pledge of the Outparcel Entities in exchange for an unsecured (and fake) loan to Successor American Dream Borrower—Section 13(b) was JPMorgan's way of rewarding AB AD Lender. Section 13(b) states that "[JPMorgan] and Senior Lender hereby acknowledge and agree that in connection with any Transfer of the [American Dream Mall], the Equity Collateral *and/or any other collateral* securing the [JPM] Loan to the extent [JPMorgan] or Senior Lenders receive cash in excess of the amount necessary for the Discharge of Senior Loan Liabilities, [JPMorgan] will cause such excess to be delivered to [AB AD] Lender for application against amounts outstanding under the [2022 Mezz] Loan." (emphasis added).

**RESPONSE TO PARAGRAPH 230:** Paragraph 230 of the SAC purports to characterize the contents of the Standstill Agreement and contains selective quotes from the Standstill Agreement, and the JPM Defendants respectfully refer the Court to the Standstill Agreement, which speaks for itself.  The JPM Defendants deny the remainder of the allegations contained in paragraph 230 of the SAC.

231.    By Section 13(b), JPMorgan agrees that after it has been paid in full, in the event it receives excess cash from the American Dream Mall, any equity interest in American Dream Mall or the Outparcel Entities, or any other collateral securing the JPM Loan (including those that are listed in the Irrevocable Direction Letter), JPMorgan will give that cash to AB AD Lender on account of its fake loan.[27]

**RESPONSE TO PARAGRAPH 231:** The allegations contained in Paragraph 231 of the SAC purport to characterize the contents of the Standstill Agreement.   The JPM Defendants deny the allegations contained in Paragraph 231 of the SAC (including the allegations contained in footnote 27), and respectfully refer the Court to the Standstill Agreement, which speaks for itself.

232.    This very convoluted way of putting AB AD Lender into effectively the same position it had been in prior to January 2021 could only be accomplished through interfering with Plaintiff's rights under the Irrevocable Direction Letter, Intercreditor Agreement, and Payment Guaranty. JPMorgan did not have the pledge of the equity of Ameream prior to the October 2022 Agreements, so it was keen to get it back. JPMorgan and the AB AD Lender had already agreed in the Irrevocable Direction Letter to give this pledge to Plaintiff once their loans were discharged in full.

---

[27] Section 13(b) acts in many ways as a version of the Irrevocable Direction Letter, just for the benefit of AB AD Lender.

**RESPONSE TO PARAGRAPH 232:** To the extent Paragraph 232 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the allegations contained in Paragraph 232 of the SAC purport to characterize the contents of the 2022 Agreements.  The JPM Defendants deny the allegations contained in Paragraph 232 of the SAC and respectfully refer the Court to the October 2022 Agreements, Irrevocable Direction Letter, Intercreditor Agreement, and Payment Guaranty for their contents, which speak for themselves.

233.    By orchestrating the Strict Foreclosure, JPMorgan got back that very pledge (on Ameream equity) with Plaintiff cut out of the American Dream Mall ownership structure. Now only JPMorgan has the liens on American Dream Mall. The removal of encumbrances that favored Plaintiff was one of JPMorgan's driving goals, but in order to do so, JPMorgan had to violate the Irrevocable Direction Letter.[28]

**RESPONSE TO PARAGRAPH 233:** To the extent Paragraph 233 of the SAC (and footnote 28 thereto) sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in extent Paragraph 233 of the SAC (including the allegations contained in footnote 28 thereto), and respectfully refer the Court to the 7th Amendment, which speaks for itself.

234.    The Standstill Agreement has provisions concerning the WEM-MOA 49% Equity similar to the 7th Amendment that interfere with Plaintiff's rights. Section 7(c), for example, states:

> If, as of the date on which the Discharge of Senior Loan Liabilities occurs, the Senior Lenders directly or indirectly own the MOA 49% Interests and/or the WEM 49% Interests, then, subject to the provisions of Section 8(c) hereof, the Senior Lenders shall thereafter convey the MOA 49% Interests and/or the WEM 49% Interests, as applicable, to [AB AD] Lender (or its designee) (without recourse, representations or warranties, except for representations as to power and authority to enter into the applicable assignment documentation and as to Secured Party's (or its designee's or nominee's) ownership and not having previously transferred its rights in such interests as of the consummation of such assignment). [AB AD] Lender shall accept the conveyance of the WEM 49% Interests subject to the terms

---

[28] JPMorgan demanded as part of the 7th Amendment's conditions precedent that it receive an insurance policy for this pledge of equity, but it could waive this requirement. This is bizarre—no sophisticated lender to an enterprise such as the American Dream Mall would waive such insurance.

and conditions of the WEM Shareholder Agreement and accept the conveyance of the MOA 49% Interests subject to the terms and conditions of the MOA JV Agreement, as applicable.

**RESPONSE TO PARAGRAPH 234:** To the extent Paragraph 234 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 234 of the SAC, except admit that Paragraph 234 of the SAC contains selective quotes from the Standstill Agreement and respectfully refer the Court to the Standstill Agreement, which speaks for itself.

235.    Section 7(c) of the Standstill Agreement, like the 7th Amendment, thus provides that if the JPM Loan has been paid in full, JPMorgan must transfer the WEM-MOA 49% Equity to the "Junior Lender" (which is the AB AD Lender). This (a) confirms that JPMorgan took ownership of the WEM-MOA 49% Equity by consummating the 2021 Agreement, (b) violates the Irrevocable Direction Letter, which expressly requires that JPMorgan transfer the WEM-MOA 49% Equity, not to the AB AD Lender, but to Plaintiff in satisfaction of the Plaintiff Loan, and (c) violates Section 6(b) of the Intercreditor Agreement.

**RESPONSE TO PARAGRAPH 235:** To the extent Paragraph 235 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 235 of the SAC, and respectfully refer the Court to the Standstill Agreement, 7th Amendment, 2021 Agreement, Irrevocable Direction Letter, and Intercreditor Agreement, which speak for themselves.

236.    The Standstill Agreement, in Section 8(c), further interferes with Plaintiff's contractual rights. The Intercreditor Agreement states that any limitation on Plaintiff's contractual rights ends when the JPM Loan is satisfied, including through a refinancing. Section 8(c) purports to undermine Plaintiff's rights by mandating that the JPM Loan could be refinanced and secured by collateral *ahead* of the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 236:** To the extent Paragraph 236 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 236 of the SAC, and respectfully refer the Court to the Standstill Agreement and Intercreditor Agreement, which speak for themselves.

237.    In the event of a "Senior Loan Refinancing," JPMorgan and AB AD Lender agree that:

[Ameream], Mezz Pledgor and/or AD Holdco shall have the right to transfer or pledge, or cause a transfer or pledge of, to the Refinancing Senior Lender the MOA 49% Interests, the WEM 49% Interests and/or [JPMorgan's] and Senior Lenders' interests in the WEM Second Mortgage, which such pledge shall be senior to any claim by the [AB AD] Lender or Investor thereto and shall be governed by the provisions of this Agreement or a Successor Recognition Agreement (as hereinafter defined), and upon request by [Ameream], the Senior Lenders shall convey the MOA 49% Interests, the WEM 49% Interests and/or [JPMorgan's] and Senior Lenders' interests in the WEM Second Mortgage and/or [JPMorgan's] and Senior Lenders' interests in the WEM Second Mortgage, as applicable, to such Refinancing Senior Lender upon Discharge of the Senior Loan Liabilities.

**RESPONSE TO PARAGRAPH 237:** The JPM Defendants deny the allegations contained in Paragraph 237 of the SAC except admit that Paragraph 237 contains selective quotes from the Standstill Agreement and respectfully refer the Court to the referenced document, which speaks for itself.

238.    Thus, Section 8(c) necessarily violates Plaintiff's contractual rights under the Irrevocable Direction Letter, Section 6(b) of the Intercreditor Agreement, and the Payment Guaranty. The Plaintiff Loan is only subordinated to the existing JPM Loan. If it is refinanced, JPMorgan cannot "otherwise dispose of" the collateral referenced in Section 8(c) of the Standstill Agreement without violating the Irrevocable Direction Letter, Section 6(b) of the Intercreditor Agreement, and the Payment Guaranty.

**RESPONSE TO PARAGRAPH 238:** To the extent Paragraph 238 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 238 of the SAC, and respectfully refer the Court to the Standstill Agreement, Irrevocable Direction Letter, Intercreditor Agreement, and Payment Guaranty, which speak for themselves.

239.    As described in paragraphs 230-231 above, Section 13(b) of the Standstill Agreement, like the 7th Amendment, provides that if the JPM Loan is discharged in full and JPMorgan receives cash from any the collateral securing its loan, JPMorgan agrees to transfer such cash over to AB AD Lender. This violates the Irrevocable Direction Letter, Section 6(b) of the Intercreditor Agreement, and the Payment Guaranty because any excess cash relating to the WEM-MOA 49% Equity, or the collateral listed in the Irrevocable Direction Letter, must be transferred to Plaintiff.

**RESPONSE TO PARAGRAPH 239:** To the extent Paragraph 239 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 239 of the SAC, and respectfully refer the Court to the Standstill Agreement, 7th Amendment, Irrevocable Direction Letter, Intercreditor Agreement, and Payment Guaranty, which speak for themselves.

240.    Similarly, Section 13(e) of the Standstill Agreement states "[u]pon Discharge of Senior Loan Liabilities, [JPMorgan] shall transfer to [AB AD] Lender all amounts then remaining and being held by [JPMorgan] in escrow, including, without limitation, all amounts on deposit in the Reserve Accounts." Because JPMorgan could be holding amounts in escrow that are proceeds of assets listed in the Irrevocable Direction Letter, this provision too violates Plaintiff's rights.

**RESPONSE TO PARAGRAPH 240:** The JPM Defendants admit that Paragraph 240 of the SAC contains selective quotes from the Standstill Agreement. To the extent the second sentence of Paragraph 240 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in the remainder of Paragraph 240 of the SAC, and respectfully refer the Court to the Standstill Agreement and Irrevocable Direction Letter, which speak for themselves.

241.    Defendants were careful not to reveal the existence of the October 2022 Agreements in any United States litigation or in response to any demand for information by Plaintiff. No Defendant disclosed the existence, much less the contents, of either October 2022 Agreement. To the contrary, JPMorgan touted that they were safeguarding Plaintiff's "unique interests" under the Irrevocable Direction Letter and the Intercreditor Agreement, when, in fact, JPMorgan was working to undermine those interests by securing assets for itself that had been designated as collateral for the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 241:** The JPM Defendants deny the allegations contained in Paragraph 241 of the SAC.

242.    The October 2022 Agreements were executed without Plaintiff's knowledge, much less consent. Defendants knew that the provisions of the October 2022 Agreement would never be acceptable to Plaintiff, and would violate Plaintiff's contractual rights, because in May, June, and July 2022, Defendants and Plaintiff had worked on a consensual restructuring, and Defendants had proposed certain of the same provisions that are in the October 2022 Agreements, except that all of Plaintiff's rights were preserved, there was no contemplated Strict Foreclosure, and, importantly, Plaintiff was a party to the draft version of the Standstill Agreement that preserved Plaintiff's rights.

**RESPONSE TO PARAGRAPH 242:** To the extent Paragraph 242 of the SAC sets forth legal conclusions, no response is required. To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 242 of the SAC.

**H.    Defendants' Ever-Changing Stories to this Court**

243.    Since Plaintiff filed the Initial Complaint, Defendants made representations to this Court that turn out not to be true.

**RESPONSE TO PARAGRAPH 243:** The JPM Defendants deny the allegations contained in Paragraph 243 of the SAC.

***Whether the 2017 Mezz Loan Remains Outstanding***

244.    In a letter sent to this Court on October 9, 2023 (Dkt. No. 25), the WEM-MOA Guarantors asserted that the 2017 Mezz Loan is still outstanding. They also asserted that under the Intercreditor Agreement, Plaintiff could not sue the WEM-MOA Guarantors until all senior loans (*i.e.*, including the 2017 Mezz Loan) were paid in full. They added: "Plaintiff now seeks to jump ahead of JPMorgan and the [AB AD] Lender—who still have not been paid in full—by bringing this lawsuit against the JPM Defendants and the WEM-MOA Guarantors to unwind the 2021 Agreement."

**RESPONSE TO PARAGRAPH 244:** The JPM Defendants admit that a letter dated October 9, 2023 from the WEM-MOA Guarantors to the Court can be found on the docket for this action as Dkt. No. 25. The JPM Defendants also admit that Paragraph 244 of the SAC contains selective quotes from certain pleadings and filings in this action, and respectfully refer the Court to the referenced documents, which speak for themselves. The JPM Defendants deny the remainder of the allegations contained in Paragraph 244 of the SAC.

245.    The statement that the 2017 Mezz Loan is still outstanding was false, which Plaintiff pointed out in a filing to this Court on October 10, 2023 (Dkt. No. 26). The WEM-MOA Guarantors acknowledged the falsity in their motion to dismiss filed on November 8, 2023 (Dkt. No. 39), when they confirmed that the AB AD Lender foreclosed on Ameream Mezz's interest in Ameream and that the 2017 Mezz Loan is fully repaid. Counsel representing American Dream Borrower (the same counsel representing the WEM-MOA Guarantors and Ameream) also wrote to Plaintiff on November 23, 2023, confirming that the 2017 Mezz Loan had been repaid, in full:

The statement by the WEM-MOA Guarantors on page 2 of their letter to Judge Koeltl dated October 9, 2023 that "Plaintiff now seeks to jump ahead of JPM[organ]

and the [AB AD] Lender – who still have not been paid in full – by bringing this lawsuit against the JPM Defendants and the WEM-MOA Guarantors to unwind the 2021 Agreement" was in no way intended to suggest that the 2017 Mezz Loan is still outstanding. Rather, as set forth on page 3 of that letter, it is the *Senior* Loan that remains outstanding and not repaid in full.

**RESPONSE TO PARAGRAPH 245:** The JPM Defendants admit that a letter dated October 10, 2023 from Plaintiff to the Court can be found on the docket for this action as Dkt. No. 26. The JPM Defendants also admit that Paragraph 245 of the SAC contains selective quotes from certain pleadings and filings in this action, and respectfully refer the Court to the referenced documents, which speak for themselves. The JPM Defendants deny the remainder of the allegations contained in Paragraph 245 of the SAC.

246. Yet the WEM Guarantors flip-flopped again in the Statement of Defence in the Canadian Proceedings, dated April 25, 2024. In that filing, the WEM Guarantors asserted that the 2017 Mezz Loan was still outstanding. Stunningly, the WEM Guarantors admit that through ***both*** sets of agreements, when the JPM Loan is paid in full, all of the WEM 49% Equity would be conveyed by JPMorgan "to the [AB AD] Lender to be held as security for the 2017 Mezz Loan." This is the same "2017 Mezz Loan" that was fully repaid before October 21, 2022, which repayment has been confirmed by the AB AD Lender and Defendants.

**RESPONSE TO PARAGRAPH 246:** The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 246 of the SAC, and deny them on that basis.

247. Noticeably, until the Canadian Proceeding, there was no mention of the October 2022 Agreements or the (fake) 2022 Mezz Loan.

**RESPONSE TO PARAGRAPH 247:** The JPM Defendants deny the allegations contained in Paragraph 247 of the SAC.

***Whether the JPM Defendants Own the WEM-MOA 49% Equity***

248. The JPM Defendants have stridently asserted that they did not take ownership of the WEM-MOA 49% Equity, notwithstanding the terms of the 2021 Agreement. And, like the WEM-MOA Guarantors, the JPM Defendants were very deliberate not to reveal the existence of the October 2022 Agreements in their submission to this Court.

**RESPONSE TO PARAGRAPH 248:** The JPM Defendants deny the allegations contained in Paragraph 248 of the SAC.

249.    As set forth in paragraphs 212-235 above, through the October 2022 Agreements, it is crystal clear that the JPM Defendants *do* own the WEM-MOA 49% Equity.

**RESPONSE TO PARAGRAPH 249:** The JPM Defendants deny the allegations contained in Paragraph 249 of the SAC, and further reassert, reallege and reincorporate by reference their responses to Paragraphs 212-235 of the SAC above. The JPM Defendants respectfully refer the Court to the October 2022 Agreements, which speak for themselves.

## FIRST CAUSE OF ACTION

**(Fraudulent Transfer – 2021 WEM Guarantor Transfer, Against JPMorgan, JPM-WEM 1, and JPM-WEM 2)**

250.    Plaintiff repeats and realleges each allegation in paragraph(s) "1" through "249" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 250:** The JPM Defendants admit that Paragraph 250 of the SAC purports to incorporate prior paragraphs of the SAC, and the JPM Defendants reassert, reallege and reincorporate by reference its responses to Paragraphs 1 through 249, above.

251.    The WEM Interests Transfer (defined in paragraph 163) by the WEM Guarantors to JPMorgan is a fraudulent transfer and a fraudulent preference under Alberta law, and Plaintiff should be paid the value of the WEM 49% Equity up to at least $404,399,512.87 plus interest thereon at the statutory rate, which is less than the value of such transferred assets.

**RESPONSE TO PARAGRAPH 251:** To the extent Paragraph 251 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 251 of the SAC.

252.    Plaintiff and the lenders were creditors of the WEM Guarantors at the time the 2021 Agreement was signed, and at the time that the 2021 Agreement closed in March 2021, by virtue of the debt owed under the Payment Guaranty. They remain creditors today.

**RESPONSE TO PARAGRAPH 252:** The JPM Defendants deny the allegations contained in Paragraph 252 of the SAC, and respectfully refer the Court to the Payment Guaranty, which speaks for itself.

253.    Plaintiff did not learn of the consummation of the WEM Interests Transfer contemplated by the 2021 Agreement until June 2, 2021.

**RESPONSE TO PARAGRAPH 253:** The JPM Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 253 of the SAC, and deny them on that basis.

254.    In March 2021, the true value of the WEM 49% Equity and accompanying Reimbursement Claims exceeded the amount owed on account of the JPM Loan. This is because the value of Ameream exceeded the amount of the JPM Loan, and, regardless of whether

JPMorgan first foreclosed on the WEM 49% Equity, the WEM Guarantors would have recourse available to pay the Plaintiff Loan after payment in full of the JPM Loan.

**RESPONSE TO PARAGRAPH 254:** The JPM Defendants deny the allegations contained in Paragraph 254 of the SAC.

255.    JPMorgan and the WEM Guarantors (controlled by the Ghermezian family) entered into and carried out the transfers contemplated by the 2021 Agreement with the intent to defraud, hinder, and delay creditors of the WEM Guarantors, particularly Plaintiff and the lenders, as evidenced by multiple "badges of fraud" or equivalents under applicable law, including the following:

**RESPONSE TO PARAGRAPH 255:** To the extent Paragraph 255 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 255 of the SAC.

256.    *First*, the nominal consideration allotted to the transfers was grossly inadequate:

- The $49 million "reasonable estimate" of the WEM 49% Equity set forth in the 2021 Agreement was artificial, not based on any objective value, and, at no more than 6% of its actual value, reflects no, or nominal, consideration;
- JPMorgan and the WEM Guarantors agreed that $49 million was a reasonable estimate of the proceeds JPMorgan would have received had the WEM 49% Equity been sold via a public auction. This was knowingly false;
- JPMorgan did not apply the true value of the WEM 49% Equity, or even the paltry $49 million "credit," to reduce the JPM Loan by a single dollar; and
- The value of a 49% equity stake in the West Edmonton Mall was at least $800 million in and before March 2021, which was known to the JPM Defendants in January 2021 and March 2021.

**RESPONSE TO PARAGRAPH 256:** To the extent Paragraph 256 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 256 of the SAC, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

257.    *Second*, the 2021 Agreement and the transfers thereunder benefitted insiders of the WEM Guarantors:

- The Ghermezian family and related entities have retained control of and retained benefits of the operations of the West Edmonton Mall, among others;

- WEM-3 itself, as holder of the remaining 51% interest in the West Edmonton Mall, continues to receive higher operating cash flows from WEMPI, which also benefits affiliates of the WEM-MOA Guarantors;
- The liability of Ameream arising from the Reimbursement Claims has been capped at $50 million, making it easier for the Ghermezian family to retain ownership of the American Dream Mall without having to face liability from Plaintiff and the lenders; and
- Four of the nine Individual Guarantors who received a stay on enforcement of their individual guarantees are directors of one or more of the WEM Guarantors. As of March 2021, the Ghermezian family and WEM Guarantors were on notice that Ameream had defaulted, and they faced immediate risk on their guarantees, including to Plaintiff.

**RESPONSE TO PARAGRAPH 257:** To the extent the allegations contained in Paragraph 257 of the SAC set forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 257 of the SAC, and respectfully refer the Court to the 2021 Agreement, which speaks for itself.

258.    *Third*, the WEM Guarantors transferred to, or for the benefit of, JPMorgan, JPM-WEM 1, and JPM-WEM 2 substantially all of their assets, in a transfer designed to leave the WEM Guarantors with only a $49 million Reimbursement Claim that itself had been manipulated and reduced in value.

**RESPONSE TO PARAGRAPH 258:** The JPM Defendants deny the allegations contained in Paragraph 258 of the SAC.

259.    *Fourth*, the transfers were completed at a time when the Plaintiff Loan was in default, by way of the automatic cross-default caused by the default of the JPM Loan.

**RESPONSE TO PARAGRAPH 259:** To the extent Paragraph 259 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 259 of the SAC, except admit that the Plaintiff Loan and JPM Loan were both in default.

260.    *Fifth*, the transfers were accomplished quickly, in the span of approximately two months between the signing of the 2021 Agreement in January 2021 and the transfers in March 2021.

**RESPONSE TO PARAGRAPH 260:** The JPM Defendants deny the allegations contained in Paragraph 260 of the SAC.

261.    ***Sixth***, the transfers were completed secretly, without involvement of Plaintiff in the negotiation of the 2021 Agreement and without notice to Plaintiff that the transfer had been consummated until June 2021, and in violation of the Payment Guaranty.

**RESPONSE TO PARAGRAPH 261:** To the extent Paragraph 261 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 261 of the SAC.

262.    The transfer of WEM 49% Equity for $49 million, and the capping of the Reimbursement Claim under and in furtherance of the 2021 Agreement, are also voidable as a fraudulent preference under Alberta law.

**RESPONSE TO PARAGRAPH 262:** To the extent Paragraph 262 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 262 of the SAC.

263.    By virtue of the value of the American Dream Mall, but for the WEM Interests Transfers, each of the WEM Guarantors would be solvent, even after paying in full the Plaintiff Loan, given the true value of their Reimbursement Claims. However, by transferring the WEM 49% Equity for a $49 million "credit," the WEM Guarantors' only asset is a $49 million Reimbursement Claim, which is woefully inadequate to repay the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 263:** The JPM Defendants deny the allegations contained in Paragraph 263 of the SAC.

264.    The conveyance of the WEM Interests Transfer left the WEM Guarantors with unreasonably small capital as a consequence of their respective transfers of the WEM 49% Equity, including the capping of the Reimbursement Claim at $49 million.

**RESPONSE TO PARAGRAPH 264:** The JPM Defendants deny the allegations contained in Paragraph 264 of the SAC.

265.    Under applicable law of the Province of Alberta, Canada, Plaintiff is entitled either to money damages or to a declaration that the WEM Interests Transfer is void as against Plaintiff.

**RESPONSE TO PARAGRAPH 265:** To the extent Paragraph 265 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 265 of the SAC.

## SECOND CAUSE OF ACTION

### (Fraudulent Transfer – October 2022 $48.5 Million Cash, Against Ameream)

266.    Plaintiff repeats and realleges each allegation in paragraph(s) "1" through "265" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 266:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 266 of the SAC.  Memorandum Opinion and Order, March 27, 2025 (ECF No. 125) (the "MTD Decision").  Furthermore, the Second Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required.

267.    WEM-3's transfer of $48.5 million in cash, as set forth in Section 4(c) of the 7th Amendment, to pay for operating costs of the American Dream Mall is a fraudulent transfer and a fraudulent preference under Alberta law.

**RESPONSE TO PARAGRAPH 267:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 267 of the SAC.  MTD Decision.  Furthermore, the Second Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required.

268.    Plaintiff and the lenders were creditors of the WEM Guarantors at the time the 7th Amendment was signed, by virtue of the debt owed under the Payment Guaranty. They remain creditors today.

**RESPONSE TO PARAGRAPH 268:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 268 of the SAC.  MTD Decision.  Furthermore, the Second Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required.

269.    Plaintiff did not learn of the 7th Amendment until May 7, 2024.

**RESPONSE TO PARAGRAPH 269:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 269 of the SAC. MTD Decision. Furthermore, the Second Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required.

270.    Ameream and WEM-3 (each controlled by the Ghermezian family and "Affiliates" under the Payment Guaranty) entered into and carried out the 7th Amendment with the intent to defraud, hinder, and delay Plaintiff and the lenders, as evidenced by multiple "badges of fraud" or equivalents under applicable law, including the following:

**RESPONSE TO PARAGRAPH 270:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 270 of the SAC. MTD Decision. Furthermore, the Second Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required.

271.    ***First***, WEM-3 received ***no value*** for giving away $48.5 million in cash to benefit Ameream.

**RESPONSE TO PARAGRAPH 271:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 271 of the SAC. MTD Decision. Furthermore, the Second Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required.

272.    ***Second***, the cash transfer benefitted insiders of the WEM Guarantors. The Ghermezian family and related entities have retained control of and retained benefits of the operations of the West Edmonton Mall and Ameream. They received significant benefits under the 7th Amendment.

**RESPONSE TO PARAGRAPH 272:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the

allegations contained in Paragraph 272 of the SAC. MTD Decision. Furthermore, the Second

Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response

is required.

273.    ***Third***, Defendants knew that Plaintiff did not know about the transactions contemplated by the October 2022 Agreements and that the Strict Foreclosure was done in a way to mislead who owned Ameream.

**RESPONSE TO PARAGRAPH 273:** Pursuant to the Court's ruling on the JPM

Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the

allegations contained in Paragraph 273 of the SAC. MTD Decision. Furthermore, the Second

Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response

is required.

274.    ***Fourth***, the transfers were completed at a time when the Plaintiff Loan was in default.

**RESPONSE TO PARAGRAPH 274:** Pursuant to the Court's ruling on the JPM

Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the

allegations contained in Paragraph 274 of the SAC. MTD Decision. Furthermore, the Second

Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response

is required.

275.    ***Fifth***, the WEM-3 cash transfer violated the Payment Guaranty.

**RESPONSE TO PARAGRAPH 275:** Pursuant to the Court's ruling on the JPM

Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the

allegations contained in Paragraph 275 of the SAC. MTD Decision. Furthermore, the Second

Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response

is required.

276.    Under applicable law of the Province of Alberta, Canada, Plaintiff is entitled to money damages equal to the amount of cash WEM-3 transferred to Ameream.

**RESPONSE TO PARAGRAPH 276:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 276 of the SAC.  MTD Decision. Furthermore, the Second Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required.

## THIRD CAUSE OF ACTION

### *(Fraudulent Transfer – 2021 MOA Guarantor Transfer, Against JPMorgan, JPM-D5, and MOA Guarantor)*

277.    Plaintiff repeats and realleges each allegation in paragraph(s) "1" through "276" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 277:** Pursuant to the Court's ruling on both the JPM

Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion

to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to

the allegations contained in Paragraph 277 of the SAC.  MTD Decision; Memorandum Opinion

and Order, May 5, 2025 (ECF No. 142) (the "Reargument Decision").

278.    The MOA Interests Transfer (defined in paragraph 161) by the MOA Guarantor to JPMorgan is both an actual and constructive fraudulent transfer under Minnesota law, and Plaintiff should be paid the value of the MOA 49% Equity up to at least $404,399,512.87 plus interest thereon at the statutory rate.

**RESPONSE TO PARAGRAPH 278:** Pursuant to the Court's ruling on both the JPM

Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion

to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to

the allegations contained in Paragraph 278 of the SAC. MTD Decision; Reargument Decision.

279.    Plaintiff and the lenders were creditors of the MOA Guarantor at the time the 2021 Agreement was signed, and at the time that the 2021 Agreement closed in March 2021, by virtue of the debt owed under the Payment Guaranty. They remain creditors today.

**RESPONSE TO PARAGRAPH 279:** Pursuant to the Court's ruling on both the JPM

Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion

to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to

the allegations contained in Paragraph 279 of the SAC.  MTD Decision; Reargument Decision.

280.    Plaintiff did not learn of the consummation of the MOA Interests Transfer contemplated by the 2021 Agreement until June 2, 2021.

**RESPONSE TO PARAGRAPH 280:** Pursuant to the Court's ruling on both the JPM Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to the allegations contained in Paragraph 280 of the SAC.  MTD Decision; Reargument Decision.

281.    In March 2021, the value of the MOA 49% Equity and the accompanying Reimbursement Claim exceeded the amount owed on account of the JPM Loan. This is because the value of Ameream exceeded the amount of the JPM Loan and, regardless of whether JPMorgan first foreclosed on the MOA 49% Equity, the MOA Guarantor would have recourse available to pay the Plaintiff Loan after payment in full of the JPM Loan.

**RESPONSE TO PARAGRAPH 281:** Pursuant to the Court's ruling on both the JPM Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to the allegations contained in Paragraph 281 of the SAC.  MTD Decision; Reargument Decision.

282.    JPMorgan and the MOA Guarantor (controlled by the Ghermezian family) entered into and carried out the transfers contemplated by the 2021 Agreement with the intent to defraud, hinder, and delay creditors of the MOA Guarantor, particularly Plaintiff and the lenders, as evidenced by multiple "badges of fraud" or equivalents under applicable law, including the following:

**RESPONSE TO PARAGRAPH 282:** Pursuant to the Court's ruling on both the JPM Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to the allegations contained in Paragraph 282 of the SAC.  MTD Decision; Reargument Decision.

283.    *First*, the nominal consideration allotted to the transfers was grossly inadequate:

- The $1 million "reasonable estimate" set forth as the value of MOA 49% Equity in the 2021 Agreement was no more than 0.5% of its actual value. Mall of America was worth approximately $1.99 billion in March 2021, with an equity value of over $500 million. The 49% equity stake in the Mall of America was worth at least $245 million, which meant that JPMorgan and the Ghermezian family, in a non-arm's length agreement in violation of the MOA-JPMorgan Pledge Agreement, decided the "value" was only $1 million. Adding salt to the wound, JPMorgan did not reduce its loan balance by even a dollar after acquiring the MOA 49% Equity for a mere $1 million.

- JPMorgan acquired the MOA 49% Equity in an agreement that $1 million was a reasonable estimate of the proceeds JPMorgan would have received had the MOA 49% Equity been sold via a public auction. This was knowingly false.

**RESPONSE TO PARAGRAPH 283:** Pursuant to the Court's ruling on both the JPM Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to the allegations contained in Paragraph 283 of the SAC. MTD Decision; Reargument Decision.

284. *Second*, the 2021 Agreement and the transfers thereunder benefitted insiders of the MOA Guarantor:

- The Ghermezian family and related entities have retained control of and retained benefits of the operations of Mall of America, among others; and
- As of March 2021, the Ghermezian family and the MOA Guarantor were on notice that Ameream had defaulted, and they faced immediate risk on their guarantees, including to Plaintiff.

**RESPONSE TO PARAGRAPH 284:** Pursuant to the Court's ruling on both the JPM Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to the allegations contained in Paragraph 284 of the SAC. MTD Decision; Reargument Decision.

285. *Third*, the MOA Guarantor transferred to, or for the benefit of, JPMorgan and JPM-D5 substantially all of its assets, in a transfer designed to leave the MOA Guarantor with only a $1 million Reimbursement Claim that itself had been manipulated and reduced in value.

**RESPONSE TO PARAGRAPH 285:** Pursuant to the Court's ruling on both the JPM Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to the allegations contained in Paragraph 285 of the SAC. MTD Decision; Reargument Decision.

286. *Fourth*, the transfers were completed at a time when the Plaintiff Loan was in default, by way of the automatic cross-default caused by the default of the JPM Loan.

**RESPONSE TO PARAGRAPH 286:** Pursuant to the Court's ruling on both the JPM Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion

to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to

the allegations contained in Paragraph 286 of the SAC.  MTD Decision; Reargument Decision.

287.    *Fifth*, the transfers were accomplished quickly, in the span of approximately two months between the signing of the 2021 Agreement in January 2021 and the transfers in March 2021.

**RESPONSE TO PARAGRAPH 287:** Pursuant to the Court's ruling on both the JPM

Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion

to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to

the allegations contained in Paragraph 287 of the SAC.  MTD Decision; Reargument Decision.

288.    *Sixth*, the transfers were completed secretly, without involvement of Plaintiff in the negotiation of the 2021 Agreement, and without notice to Plaintiff that the transfer had been consummated until June 2021.

**RESPONSE TO PARAGRAPH 288:** Pursuant to the Court's ruling on both the JPM

Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion

to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to

the allegations contained in Paragraph 288 of the SAC.  MTD Decision; Reargument Decision.

289.    The MOA Interests Transfer for $1 million, and the capping of the Reimbursement Claim under and in furtherance of the 2021 Agreement, are also voidable as constructive fraudulent transfers under Minnesota fraudulent transfer law.

**RESPONSE TO PARAGRAPH 289:** Pursuant to the Court's ruling on both the JPM

Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion

to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to

the allegations contained in Paragraph 289 of the SAC.  MTD Decision; Reargument Decision.

290.    By virtue of the value of the American Dream Mall, but for the MOA Interests Transfer, the MOA Guarantor would be solvent, even after paying in full the Plaintiff Loan, given the true value of its Reimbursement Claim. However, by transferring the MOA 49% Equity for a $1 million "credit," the MOA Guarantor's only asset is a $1 million Reimbursement Claim, which is woefully inadequate to repay the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 290:** Pursuant to the Court's ruling on both the JPM Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to the allegations contained in Paragraph 290 of the SAC.  MTD Decision; Reargument Decision.

291.    The MOA Guarantor was rendered insolvent by, or left with unreasonably small capital as a consequence of, its MOA Interests Transfer, including the capping of the Reimbursement Claim at $1 million.

**RESPONSE TO PARAGRAPH 291:** Pursuant to the Court's ruling on both the JPM Defendants' motion to dismiss the SAC and the American Dream Defendants' subsequent Motion to Reargue, dismissing Count III in its entirety, the JPM Defendants are not required to respond to the allegations contained in Paragraph 291 of the SAC.  MTD Decision; Reargument Decision.

**FOURTH CAUSE OF ACTION**

**(Tortious Interference Against JPMorgan – 2021 Agreement)**

292.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "291" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 292:** The JPM Defendants admit that Paragraph 292 of the SAC purports to incorporate prior paragraphs of the SAC, and the JPM Defendants reassert, reallege and reincorporate by reference its responses to Paragraphs 1 through 291, above.

293.    Plaintiff and the WEM-MOA Guarantors are parties to the Payment Guaranty, which was and is a valid and enforceable contract.

**RESPONSE TO PARAGRAPH 293:** The JPM Defendants deny the allegations contained in Paragraph 293 of the SAC, except admit that the WEM-MOA Guarantors are parties to the Payment Guaranty, and respectfully refer the Court to the Payment Guaranty, which speaks for itself.

294.    Until the Guaranteed Obligations (as defined in the Payment Guaranty) are satisfied, pursuant to Section 6.2 of the Payment Guaranty, the WEM-MOA Guarantors covenanted to (i) ensure that the collective value of the WEM-MOA 49% Equity was at least $680,000,000.00, and (ii) continue to own at least 49% interest in Mall of American and the West Edmonton Mall.

**RESPONSE TO PARAGRAPH 294:** The JPM Defendants deny the allegations contained in Paragraph 294 of the SAC, and respectfully refer the Court to the Payment Guaranty, which speaks for itself.

295.    No provision of the Payment Guaranty allowed the WEM-MOA Guarantors to enter into a private agreement voluntarily divesting their equity interests in favor of JPMorgan.

**RESPONSE TO PARAGRAPH 295:** The JPM Defendants deny the allegations contained in Paragraph 295 of the SAC, and respectfully refer the Court to the Payment Guaranty, which speaks for itself.

296.    Moreover, if any Payment Guarantor paid JPMorgan or used assets to pay JPMorgan, such Payment Guarantor would hold a Reimbursement Claim in the same dollar

amount against Ameream, thereby preserving value for the repayment of other loans. The only condition to the assertion of the Reimbursement Claim is the repayment in full of the JPM Loan or such guarantees are released or terminated by operation of law or otherwise.

**RESPONSE TO PARAGRAPH 296:** The JPM Defendants deny the allegations

contained in Paragraph 296 of the SAC, and respectfully refer the Court to the Payment Guaranty,

which speaks for itself.

297.     Pursuant to the 2021 Agreement, the MOA Guarantor no longer owns 49% of the Mall of America, and the WEM Guarantors no longer own 49% of the West Edmonton Mall.

**RESPONSE TO PARAGRAPH 297:** The JPM Defendants deny the allegations

contained in Paragraph 297 of the SAC, and respectfully refer the Court to the 2021 Agreement,

which speaks for itself.

298.     In the 2021 Agreement, the WEM 49% Equity was stipulated to be worth only $49 million, and the MOA 49% Equity was stipulated to be worth only $1 million, when the true value of these assets exceeded $800 million and $245 million, respectively.

**RESPONSE TO PARAGRAPH 298:** The JPM Defendants deny the allegations

contained in Paragraph 298 of the SAC, and respectfully refer the Court to the 2021 Agreement,

which speaks for itself.

299.     As a result of WEM-MOA Guarantors entering into the 2021 Agreement, the collective value of the WEM-MOA 49% Equity owned by the WEM-MOA Guarantors is effectively zero, and the WEM-MOA Guarantors have no ability to collectively maintain a value of $680 million, as they committed to do under the Payment Guaranty.

**RESPONSE TO PARAGRAPH 299:** The JPM Defendants deny the allegations

contained in Paragraph 299 of the SAC.

300.     As a result of the false valuations in the 2021 Agreement, the JPM Loan remains outstanding in full, and the stipulated value of the assets caps the WEM-MOA Guarantors' Reimbursement Claims at $50 million.

**RESPONSE TO PARAGRAPH 300:** To the extent Paragraph 300 of the SAC sets forth

legal conclusions, no response is required.   To the extent a response is required, the JPM

Defendants deny the allegations contained in Paragraph 300 of the SAC, except admit that the JPM

Loan remains outstanding.

301.    The WEM-MOA Guarantors have breached Section 6.2 of the Payment Guaranty.

**RESPONSE TO PARAGRAPH 301:** To the extent Paragraph 301 of the SAC sets forth

legal conclusions, no response is required.  To the extent a response is required, the JPM

Defendants deny the allegations contained in Paragraph 301 of the SAC.

302.    At all times, JPMorgan was aware of Section 6.2 of the Payment Guaranty and its
importance to Plaintiff. Indeed, JPMorgan was heavily involved in negotiations over all documents
relating to the Plaintiff Loan, including the Payment Guaranty.

**RESPONSE TO PARAGRAPH 302:** The JPM Defendants deny the allegations

contained in Paragraph 302 of the SAC.

303.    JPMorgan negotiated the 2021 Agreement with the WEM-MOA Guarantors and
induced the WEM-MOA Guarantors to enter into the 2021 Agreement, intentionally and for the
unjustified purpose of preventing Plaintiff from recovering on the Plaintiff Loan from the WEM-
MOA Guarantors.

**RESPONSE TO PARAGRAPH 303:** To the extent Paragraph 303 of the SAC sets forth

legal conclusions, no response is required.  To the extent a response is required, the JPM

Defendants deny the allegations contained in Paragraph 303 of the SAC.

304.    In negotiating and executing the 2021 Agreement, JPMorgan intentionally did not
act in a commercially reasonable way. Had it done so, the WEM-MOA Guarantors would not have
breached their Payment Guaranty to Plaintiff, and they would still hold valuable Reimbursement
Claims against Ameream—the owner of the American Dream Mall.

**RESPONSE TO PARAGRAPH 304:** To the extent Paragraph 304 of the SAC sets forth

legal conclusions, no response is required.  To the extent a response is required, the JPM

Defendants deny the allegations contained in Paragraph 304 of the SAC.

305.    Instead, JPMorgan took advantage of the desire of the WEM-MOA Guarantors and
the Ghermezians to avoid their obligations to Plaintiff, and negotiated an agreement whereby it
received at least $1 billion in assets for zero consideration, while causing the WEM-MOA
Guarantors to breach Section 6.2 of the Payment Guaranty.

**RESPONSE TO PARAGRAPH 305:** To the extent Paragraph 305 of the SAC sets forth legal conclusions, no response is required.   To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 305 of the SAC.

306.    JPMorgan's conduct, which caused the WEM-MOA Guarantors to breach Section 6.2 of the Payment Guaranty, has damaged Plaintiff by diminishing the value of the WEM-MOA Guarantors' Reimbursement Claims to a figure insufficient to repay Plaintiff's outstanding Judgment.

**RESPONSE TO PARAGRAPH 306:** To the extent Paragraph 306 of the SAC sets forth legal conclusions, no response is required.   To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 306 of the SAC.

## FIFTH CAUSE OF ACTION

### *(*Marshaling Against JPMorgan)

307.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "306" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 307:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 307 of the SAC.  MTD Decision.

308.    As of March 2021, JPMorgan was a secured creditor of the WEM-MOA Guarantors, including being pledged the WEM-MOA 49% Equity, which, until the 2021 Agreement, secured the JPM Loan. Any excess of the WEM-MOA 49% Equity is to be applied to the Plaintiff Loan pursuant to the terms of the Intercreditor Agreement and the Irrevocable Direction Letter.

**RESPONSE TO PARAGRAPH 308:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 308 of the SAC.  MTD Decision.

309.    The JPM Loan was, and still is, secured by mortgages on the American Dream Mall.

**RESPONSE TO PARAGRAPH 309:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 309 of the SAC.  MTD Decision.

310.    Under the JPM Loan documents, JPMorgan has the right to resort to both the WEM-MOA 49% Equity and its mortgage collateral.

**RESPONSE TO PARAGRAPH 310:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 310 of the SAC.  MTD Decision.

311.    Plaintiff does not have a right to such mortgage collateral, which secured the JPM Loan.

**RESPONSE TO PARAGRAPH 311:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 311 of the SAC.  MTD Decision.

312.    Plaintiff has a unique interest in the WEM-MOA 49% Equity by virtue of the Irrevocable Direction Letter, such that any sale of such asset by JPMorgan that produces sale proceeds in excess of the JPM Loan must be paid to reduce the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 312:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 312 of the SAC.  MTD Decision.

313.    JPMorgan would not be prejudiced by resorting to its other collateral before looking to the WEM-MOA 49% Equity to satisfy its debt. In fact, the value of the American Dream Mall, which is collateral for the JPM Loan, alone exceeds the amount of the JPM Loan.

**RESPONSE TO PARAGRAPH 313:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 313 of the SAC.  MTD Decision.

314.    Entry into the 2021 Agreement was inequitable conduct, overreaching, and/or fraud by JPMorgan.

**RESPONSE TO PARAGRAPH 314:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 314 of the SAC.  MTD Decision.

315.    Applying marshaling to the JPM Loan would be the just and equitable response to the efforts of JPMorgan and the WEM-MOA Guarantors, among others, to unfairly deprive Plaintiff of the WEM-MOA 49% Equity through their non-arm's length agreement that artificially depresses the value of the WEM-MOA 49% Equity.

**RESPONSE TO PARAGRAPH 315:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 315 of the SAC.  MTD Decision.

316.    Failure to apply marshaling to the defaults under the JPM Loan would unfairly deprive Plaintiff of its right to enforce and collect from the WEM-MOA Guarantors on the Payment Guaranty, which assured the repayment of the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 316:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 316 of the SAC.  MTD Decision.

317.    Any waiver of marshaling by Plaintiff was terminated when the Intercreditor Agreement was terminated.

**RESPONSE TO PARAGRAPH 317:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 317 of the SAC.  MTD Decision.

## SIXTH CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against JPMorgan – 2021 Agreement)**

318.     Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "317" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 318:** The JPM Defendants admit that Paragraph 318 of the SAC purports to incorporate prior paragraphs of the SAC, and the JPM Defendants reassert, reallege and reincorporate by reference its responses to Paragraphs 1 through 317, above.

319.     Plaintiff, JPMorgan, and the AB AD Lender entered into the Intercreditor Agreement, which is governed by New York law.

**RESPONSE TO PARAGRAPH 319:** The JPM Defendants deny the allegations contained in Paragraph 319 of the SAC and respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.

320.     Implied in all contracts governed by New York law is a covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

**RESPONSE TO PARAGRAPH 320:** To the extent Paragraph 320 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 320 of the SAC.

321.     The Intercreditor Agreement provides that Plaintiff cannot proceed against the WEM-MOA Guarantors or any other "Shared Guarantors," even if American Dream Borrower has defaulted, if the JPM Loan or the 2017 Mezz Loan is outstanding, unless such guarantors are released, or the relevant guaranty is terminated by operation of law or otherwise.

**RESPONSE TO PARAGRAPH 321:** The JPM Defendants deny the allegations contained in Paragraph 321 of the SAC, and respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.

322.     Section 6(b) of the Intercreditor Agreement provides that in the event JPMorgan and/or the AB AD Lender receive proceeds from a foreclosure of the WEM-MOA 49% Equity,

and the JPM Loan and 2017 Mezz Loan are fully repaid, then excess proceeds shall be disbursed to Plaintiff.

**RESPONSE TO PARAGRAPH 322:** The JPM Defendants deny the allegations contained in Paragraph 322 of the SAC, and respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.

323.  The Intercreditor Agreement, in conjunction with the Payment Guaranty and Irrevocable Direction Letter, ensured Plaintiff's interests were protected and its rights delineated from the JPM Loan and 2017 Mezz Loan, especially with respect to the collateral securing and providing credit support for the loans.

**RESPONSE TO PARAGRAPH 323:** The JPM Defendants deny the allegations contained in Paragraph 323 of the SAC, and respectfully refer the Court to the Intercreditor Agreement, Payment Guaranty, and Irrevocable Direction Letter, which speak for themselves.

324.  Plaintiff's interests were protected in part because if a Payment Guarantor paid JPMorgan or used its assets to pay JPMorgan, such Payment Guarantor would hold a Reimbursement Claim in the same dollar amount against Ameream, thereby preserving value to satisfy the Plaintiff Loan.

**RESPONSE TO PARAGRAPH 324:** The JPM Defendants deny the allegations contained in Paragraph 324 of the SAC.

325.  The AB AD Lender's Strict Foreclosure resulted in the full satisfaction of the 2017 Mezz Loan. Thus, the Intercreditor Agreement has terminated, except that Section 6(b) survives termination.

**RESPONSE TO PARAGRAPH 325:** To the extent Paragraph 325 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 325 of the SAC, except admit that the Intercreditor Agreement terminated following the Strict Foreclosure and Section 6(b) survived termination. The JPM Defendants respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.

326.  At all relevant times, JPMorgan knew Section 6(b) was important to protect Plaintiff's interests under the Plaintiff Loan Agreement. Plaintiff and the lenders were induced to

provide the Plaintiff Loan because of the Payment Guaranty, the Intercreditor Agreement and the Irrevocable Direction Letter containing the same protections.

**RESPONSE TO PARAGRAPH 326:** The JPM Defendants deny the allegations contained in Paragraph 326 of the SAC, and respectfully refer the Court to the Payment Guaranty, Intercreditor Agreement, and Irrevocable Direction Letter, which speak for themselves.

327.    At all times relevant to this litigation, JPMorgan owed a duty to Plaintiff to act in good faith and deal fairly with it under the Intercreditor Agreement, including (i) not unfairly abusing JPMorgan's rights under Section 6(b) by artificially lowering the value of the WEM-MOA 49% Equity, thereby failing to reduce the amount of the JPM Loan or reducing any subrogation/reimbursement rights of the WEM-MOA Guarantors against Ameream, (ii) conducting a public sale of assets, as required under its loan documents, to obtain the highest purchase price for the WEM-MOA 49% Equity, and (iii) properly applying the purchase price of the WEM-MOA 49% Equity to the reduction of the amount due under the JPM Loan.

**RESPONSE TO PARAGRAPH 327:** To the extent Paragraph 327 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 327 of the SAC, and respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.

328.    Rather than foreclose against these assets based on their actual value of approximately $1 billion, JPMorgan acquired the WEM-MOA 49% Equity at an artificially low valuation of $50 million and has the purported right to receive dividends on account of the WEM-MOA 49% Equity indefinitely, even after the JPM Loan is repaid.

**RESPONSE TO PARAGRAPH 328:** The JPM Defendants deny the allegations contained in Paragraph 328 of the SAC.

329.    Plaintiff was not informed of the negotiations of the 2021 Agreement, and Plaintiff was not aware of the terms until after the 2021 Agreement had been signed.

**RESPONSE TO PARAGRAPH 329:** The JPM Defendants deny the allegations contained in Paragraph 329 of the SAC.

330.    The 2021 Agreement was structured so that JPMorgan could purposefully avoid obligations under the Intercreditor Agreement and block Plaintiff's rights to recovery under the Intercreditor Agreement, Plaintiff Loan Agreement, Payment Guaranty, or the Irrevocable Direction Letter, which would have provided for payment to Plaintiff upon JPMorgan's foreclosure under the JPM Loan.

**RESPONSE TO PARAGRAPH 330:** The JPM Defendants deny the allegations contained in Paragraph 330 of the SAC.

331.    JPMorgan compounded its bad faith mistreatment of Plaintiff by failing to credit even $50 million against the outstanding JPM Loan.

**RESPONSE TO PARAGRAPH 331:** To the extent Paragraph 331 of the SAC sets forth legal conclusions, no response is required.   To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 331 of the SAC.

332.    JPMorgan breached its covenant to act in good faith and deal fairly with Plaintiff under the Intercreditor Agreement.

**RESPONSE TO PARAGRAPH 332:** To the extent Paragraph 332 of the SAC sets forth legal conclusions, no response is required.   To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 332 of the SAC.

333.    As a result of JPMorgan's breaches, Plaintiff sustained damages because the WEM-MOA Guarantors no longer have sufficient assets to repay the Plaintiff Loan or satisfy the Judgment. The WEM-MOA Guarantors would have been able to assert Reimbursement Claims that would have repaid the Plaintiff Loan but for JPMorgan's bad faith actions.

**RESPONSE TO PARAGRAPH 333:** To the extent Paragraph 333 of the SAC sets forth legal conclusions, no response is required.   To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 333 of the SAC.

334.    Additionally, as a result of JPMorgan's breach of the implied covenant, Plaintiff is damaged because its right to recover from the WEM-MOA Guarantors is blocked by JPMorgan's outstanding senior priority that should have been reduced by $1 billion, but instead remains outstanding at its full amount.

**RESPONSE TO PARAGRAPH 334:** To the extent Paragraph 334 of the SAC sets forth legal conclusions, no response is required.   To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 334 of the SAC.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief Against JPMorgan – Intercreditor Agreement)

335.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "334" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 335:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 335 of the SAC. MTD Decision.

336.    Plaintiff currently holds the Judgment in the amount of $404,399,512.87. The Judgment remains outstanding, and interest accrues at the New York state statutory rate.

**RESPONSE TO PARAGRAPH 336:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 336 of the SAC. MTD Decision.

337.    Plaintiff, JPMorgan, and the AB AD Lender are parties to the Intercreditor Agreement, which is governed by New York law.

**RESPONSE TO PARAGRAPH 337:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 337 of the SAC. MTD Decision.

338.    Section 6(b) of the Intercreditor Agreement (i) limits Plaintiff's ability to pursue enforcement actions and collections against the WEM-MOA Guarantors or Individual Guarantors on account of the Payment Guaranty or otherwise, and (ii) contains a provision to pay JPMorgan any amount recovered by Plaintiff from the Payment Guarantors to the reduction of the JPM Loan.

**RESPONSE TO PARAGRAPH 338:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 338 of the SAC. MTD Decision.

339.    Implied in all contracts governed by New York law is a covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

**RESPONSE TO PARAGRAPH 339:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 339 of the SAC.  MTD Decision.

340.    JPMorgan breached the implied covenant of good faith and fair dealing when it negotiated and entered the 2021 Agreement, including by (i) unfairly abusing Plaintiff's rights under Section 6(b) by artificially lowering the value of the WEM-MOA 49% Equity, thereby failing to reduce the amount of the JPM Loan and reducing any Reimbursement Claim rights of the WEM-MOA Guarantors against Ameream, (ii) failing to conduct a public sale of assets, as required under its loan documents, to obtain the highest purchase price for the WEM-MOA 49% Equity, (iii) failing to properly apply the purchase price of the WEM-MOA 49% Equity to the reduction of the amount due under the JPM Loan, and (iv) on information and belief, knowingly facilitating (x) the AB AD Lender to foreclose on the Ameream equity interest without complying with the curing of all monetary defaults under the JPM Loan and providing substitute guarantees, and (y) the Ghermezian family to leap-frog ahead of Plaintiff in the American Dream Mall capital structure.

**RESPONSE TO PARAGRAPH 340:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 340 of the SAC.  MTD Decision.

341.    Because JPMorgan has breached the implied covenant, Plaintiff is excused from Section 6(b)'s limitations and provisions.

**RESPONSE TO PARAGRAPH 341:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 341 of the SAC.  MTD Decision.

342.    Additionally, WEM-3's obligations under the Environmental Indemnity were satisfied upon the transfer to a JPMorgan affiliate of the WEM-3 24% Equity under the 2021 Agreement. Section 30 of the Environmental Indemnity explicitly states that JPMorgan's recourse under the Environmental Indemnity is limited to the WEM-3 24% Equity. Thus, under any circumstances, WEM-3 is no longer bound by the Environmental Indemnity.

**RESPONSE TO PARAGRAPH 342:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 342 of the SAC.  MTD Decision.

343.     Plaintiff seeks a declaration that any limitations under Section 6(b) on Plaintiff and/or the lenders from seeking enforcement actions and collections from the Payment Guarantors are null and void, and Plaintiff shall be entitled to retain and keep any and all amounts or other consideration received from the Payment Guarantors for application to the reduction of the Plaintiff Loan, even if the JPM Loan has not been repaid or otherwise satisfied.

**RESPONSE TO PARAGRAPH 343:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 343 of the SAC.  MTD Decision.

344.     Plaintiff seeks a declaration that WEM-3 is not a Shared Guarantor by operation of law because WEM-3 has fully performed under the Environmental Indemnity.

**RESPONSE TO PARAGRAPH 344:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 344 of the SAC.  MTD Decision.

### EIGHTH CAUSE OF ACTION

### *(*Declaratory Relief Against All Defendants – Amount of Reimbursement Claims)

345.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "344" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 345:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 345 of the SAC.  MTD Decision.

346.    Plaintiff currently holds the Judgment in the amount of $404,399,512.87. The Judgment remains outstanding, and interest accrues at the New York state statutory rate.

**RESPONSE TO PARAGRAPH 346:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 346 of the SAC.  MTD Decision.

347.    Plaintiff was and is a creditor of each of the WEM Guarantors and the MOA Guarantor, who are guarantors to the American Dream Borrower.

**RESPONSE TO PARAGRAPH 347:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 347 of the SAC.  MTD Decision.

348.    On March 25, 2021, the JPM Defendants acquired the WEM-MOA 49% Equity.

**RESPONSE TO PARAGRAPH 348:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 347 of the SAC.  MTD Decision.

349.    As a result of the WEM Guarantors and the MOA Guarantor having their property satisfy obligations Ameream owed to JPMorgan, each of the WEM Guarantors and the MOA Guarantor hold Reimbursement Claims against Ameream.

**RESPONSE TO PARAGRAPH 349:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 349 of the SAC. MTD Decision.

350.    The 2021 Agreement improperly valued the 49% equity ownership in the West Edmonton Mall at $49 million, which approximates 6% of the actual value of the WEM 49% Equity as of March 2021.

**RESPONSE TO PARAGRAPH 350:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 350 of the SAC. MTD Decision.

351.    The 2021 Agreement improperly valued the 49% equity ownership in Mall of America at $1 million, which approximates 0.5% of the actual value of the MOA 49% Equity as of March 2021.

**RESPONSE TO PARAGRAPH 351:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 351 of the SAC. MTD Decision.

352.    By virtue of the 2021 Agreement, each of the WEM Guarantors and the MOA Guarantor hold Reimbursement Claims against Ameream that, if the 2021 Agreement is enforced, may be limited to $50 million in the aggregate, with the WEM Guarantors collectively being limited to a $49 million Reimbursement Claim and the MOA Guarantor being limited to a $1 million Reimbursement Claim.

**RESPONSE TO PARAGRAPH 352:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 352 of the SAC. MTD Decision.

353.    Plaintiff was not a party to the 2021 Agreement and did not, and does not, consent to the capping of the Reimbursement Claims at $50 million.

**RESPONSE TO PARAGRAPH 353:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 353 of the SAC. MTD Decision.

354.    Plaintiff seeks a declaration that the value of the 49% equity stake in the West Edmonton Mall is worth at least $800 million as of March 2021, resulting in aggregate Reimbursement Claims of such amount.

**RESPONSE TO PARAGRAPH 354:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 354 of the SAC. MTD Decision.

355.    Plaintiff seeks a declaration that the value of the 49% equity stake in the Mall of America is worth at least $245 million as of March 2021, resulting in aggregate Reimbursement Claims of such amount.

**RESPONSE TO PARAGRAPH 355:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 355 of the SAC. MTD Decision.

356.    Further, to the extent that WEM-3's transfer of $48.5 million in cash is not a fraudulent conveyance, the transfer of $48.5 million in cash as required by Section 4(c) of the 7th Amendment gives rise to a Reimbursement Claim against Ameream.

**RESPONSE TO PARAGRAPH 356:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 356 of the SAC. MTD Decision.

357.    Plaintiff was not a party to the 7th Amendment and did not, and does not, consent to WEM-3 giving away its cash to Ameream.

**RESPONSE TO PARAGRAPH 357:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 357 of the SAC. MTD Decision. 358. Plaintiff seeks a declaration that any cash WEM-3 transferred to Ameream, or to pay for costs of the American Dream Mall, gives rise to a Reimbursement Claim in like amount.

**RESPONSE TO PARAGRAPH 358:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 358 of the SAC.  MTD Decision.

## NINTH CAUSE OF ACTION

### (Breach of the Irrevocable Direction Letter and Intercreditor Agreement Against JPMorgan – 2022 Agreements)

359.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "358" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 359:** The JPM Defendants admit that Paragraph 359 of the SAC purports to incorporate prior paragraphs of the SAC, and the JPM Defendants reassert, reallege and reincorporate by reference its responses to Paragraphs 1 through 358, above.

360.    JPMorgan is a party to the Intercreditor Agreement with Plaintiff. Though it has terminated, Section 6(b) remains valid and enforceable.

**RESPONSE TO PARAGRAPH 360:** To the extent Paragraph 360 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 360 of the SAC, except admit that JPMorgan is a party to the Intercreditor Agreement and that Section 6(b) thereof remains valid and enforceable.  The JPM Defendants respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.

361.    JPMorgan, among others, is a party to the Irrevocable Direction Letter, which was and is a valid and enforceable contract, which was confirmed by JPMorgan as recent as March 2024.

**RESPONSE TO PARAGRAPH 361:** To the extent Paragraph 361 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 361 of the SAC, except admit that JPMorgan is a party to the Irrevocable Direction Letter, and respectfully refer the Court to the Irrevocable Direction, which speaks for itself.

362.    The Irrevocable Direction Letter is a loan document under the Plaintiff Loan and is enforceable by Plaintiff. It expressly states: "[a]s a material inducement to [Plaintiff] to make the Junior Mezz Loan to Borrower, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned, in connection with each

Pledge under which it is a Pledgor, hereby irrevocably directs Senior Agent and [AB AD Lender] as follows as to each Pledge delivered for its benefit[.]"

**RESPONSE TO PARAGRAPH 362:** The JPM Defendants deny the allegations contained in the first sentence of Paragraph 362 of the SAC. The JPM Defendants admit that the second sentence of Paragraph 362 of the SAC contains selective quotes from the Irrevocable Direction Letter, and respectfully refer the Court to the referenced document, which speaks for itself.

363. The Irrevocable Direction Letter further states: "you [JPMorgan and AB AD Lender] are authorized and instructed to pay such excess proceeds over directly to [Plaintiff] within 10 business days of receipt, to be applied to repayment of the Junior Mezz Loan [the Plaintiff Loan], notwithstanding any contrary direction in the Pledge [listed on Schedule A] or any related Loan Document [JPM Loan Documents or the 2017 Mezz Loan Documents, as applicable] (as defined in the respective Pledge)."

**RESPONSE TO PARAGRAPH 363:** The JPM Defendants admit that Paragraph 363 of the SAC contains selective quotes from the Irrevocable Direction Letter, and respectfully refer the Court to the referenced document, which speaks for itself.

364. Schedule A to the Irrevocable Direction Letter lists 11 pledges, including a pledge by Ameream Mezz of the equity in Ameream, pledges by the WEM-MOA Guarantors, and pledges by the Outparcel Owner of each Outparcel Entity.

**RESPONSE TO PARAGRAPH 364:** The JPM Defendants deny the allegations contained in Paragraph 364 of the SAC, and respectfully refer the Court to the Irrevocable Direction, which speaks for itself.

365. The Irrevocable Direction Letter obligates JPMorgan and AB AD Lender to pay over to Plaintiff and the lenders the proceeds of any collection, sale, or other disposition under each pledge after their "Obligations" (as defined in each pledge) are satisfied in full.

**RESPONSE TO PARAGRAPH 365:** The JPM Defendants deny the allegations contained in Paragraph 365 of the SAC, and respectfully refer the Court to the Irrevocable Direction, which speaks for itself.

366.     Section 6(b) of the Intercreditor Agreement mandates that when the JPM Loan is satisfied in full, to the extent that JPMorgan holds or receives proceeds from the disposition of the WEM-MOA 49% Equity, it will pay such proceeds to Plaintiff.

**RESPONSE TO PARAGRAPH 366:** The JPM Defendants deny the allegations contained in Paragraph 366 of the SAC, and respectfully refer the Court to the Intercreditor Agreement, which speaks for itself.

367.     The 2017 Mezz Loan was satisfied in full when the AB AD Lender consummated the Strict Foreclosure.

**RESPONSE TO PARAGRAPH 367:** The JPM Defendants deny the allegations contained in Paragraph 367 of the SAC.

368.     The only condition under either the Irrevocable Direction Letter or Section 6(b) of the Intercreditor Agreement for Plaintiff to receive such proceeds is the satisfaction in full of the JPM Loan.

**RESPONSE TO PARAGRAPH 368:** The JPM Defendants deny the allegations contained in Paragraph 368 of the SAC, and respectfully refer the Court to the Irrevocable Direction Letter and Intercreditor Agreement, which speak for themselves.

369.     The Standstill Agreement and the 7th Amendment, which JPMorgan signed, provide that when the JPM Loan is satisfied in full, JPMorgan agrees to transfer to either (i) the AB AD Lender (not on account of the fully satisfied 2017 Mezz Loan, but on account of the "new" 2022 Mezz Loan) or (ii) the new lenders who take out the JPM Loan, in each case, all of the collateral pledged to support the JPM Loan. This includes the WEM-MOA 49% Equity, excess cash, and the assets listed in the Irrevocable Direction Letter.

**RESPONSE TO PARAGRAPH 369:** The JPM Defendants deny the allegations contained in Paragraph 369 of the SAC, and respectfully refer the Court to the Standstill Agreement and 7th Amendment, which speaks for themselves.

370.     The Standstill Agreement authorizes the pledging of the WEM-MOA 49% Equity as collateral for any refinancing of the JPM Loan, which is not permitted under Section 6(b) of the Intercreditor Agreement or the Irrevocable Direction Letter.

**RESPONSE TO PARAGRAPH 370:** The JPM Defendants deny the allegations contained in Paragraph 370 of the SAC, and respectfully refer the Court to the Standstill Agreement, Intercreditor Agreement, and Irrevocable Direction Letter, which speak for themselves.

371.    JPMorgan has anticipatorily breached the Irrevocable Direction Letter.

**RESPONSE TO PARAGRAPH 371:** To the extent Paragraph 371 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 371 of the SAC.

372.    JPMorgan has anticipatorily breached Section 6(b) of the Intercreditor Agreement.

**RESPONSE TO PARAGRAPH 372:** To the extent Paragraph 372 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 372 of the SAC.

373.    As a result of these breaches, Plaintiff will sustain damages.

**RESPONSE TO PARAGRAPH 373:** To the extent Paragraph 373 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 373 of the SAC.

374.    Plaintiff is entitled to damages equal to the amount of the Judgment plus interest thereon at the statutory rate.

**RESPONSE TO PARAGRAPH 374:** To the extent Paragraph 374 of the SAC sets forth legal conclusions, no response is required.  To the extent a response is required, the JPM Defendants deny the allegations contained in Paragraph 374 of the SAC.

375.    Plaintiff is also entitled to a declaration that, notwithstanding the October 2022 Agreements or any other document, the WEM-MOA 49% Equity, the pledge of Ameream equity, any other assets covered pursuant to the Pledges listed in Schedule A of the Irrevocable Direction Letter, and their respective proceeds cannot be transferred by JPMorgan to any person other than

Plaintiff when it has been repaid in full, or be pledged as collateral to secure any refinancing of the JPM Loan or any new loan (including the 2022 Mezz Loan).

**RESPONSE TO PARAGRAPH 375:** The JPM Defendants deny the allegations contained in Paragraph 375 of the SAC, except admit that Plaintiff purports to seek declaratory relief.

**TENTH CAUSE OF ACTION**

**(Tortious Interference with the Irrevocable Direction Letter and Intercreditor Agreement – Ameream and Outparcel Entities)**

376.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "375" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 376:** The Tenth Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required to Paragraph 376 of the SAC.

377.    Plaintiff is a party to the Intercreditor Agreement and the beneficiary of the Irrevocable Direction Letter, each of which was and is a valid and enforceable contract.

**RESPONSE TO PARAGRAPH 377:** The Tenth Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required to Paragraph 377 of the SAC.

378.    The Standstill Agreement and the 7th Amendment, which JPMorgan signed, provide that when the JPM Loan is satisfied in full, JPMorgan agrees to transfer to either (i) the AB AD Lender (not on account of the fully satisfied 2017 Mezz Loan, but on account of the "new" 2022 Mezz Loan) or (ii) the new lenders who take out the JPM Loan, in each case, all of the collateral pledged to support the JPM Loan. This includes the WEM-MOA 49% Equity, excess cash, and the assets listed in the Irrevocable Direction Letter.

**RESPONSE TO PARAGRAPH 378:** The Tenth Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required to Paragraph 378 of the SAC.

379.    The Standstill Agreement authorizes the pledging of the WEM-MOA 49% Equity as collateral for any refinancing of the JPM Loan, which is not permitted under Section 6(b) of the Intercreditor Agreement or the Irrevocable Direction Letter.

**RESPONSE TO PARAGRAPH 379:** The Tenth Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required to Paragraph 379 of the SAC.

380.    This violates the Irrevocable Direction Letter and Section 6(b) of the Intercreditor Agreement.

**RESPONSE TO PARAGRAPH 380:** The Tenth Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required to Paragraph 380 of the SAC.

381.    At all times, Ameream and the Outparcel Entities were aware of the Irrevocable Direction Letter, the Intercreditor Agreement, and their importance to Plaintiff. Indeed, affiliates of each Defendant were directly involved in the drafting of such documents.

**RESPONSE TO PARAGRAPH 381:** The Tenth Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required to Paragraph 381 of the SAC.

382.    Plaintiff participated in negotiations in May, June, and July 2022, and expressly identified respecting Plaintiff's contractual rights (including the Irrevocable Direction Letter and Intercreditor Agreement) as critical to any such restructuring.

**RESPONSE TO PARAGRAPH 382:** The Tenth Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required to Paragraph 382 of the SAC.

383.    The October 2022 Agreements, executed three months after Defendants stopped negotiating with Plaintiff, and done in secret, cause breaches of such contracts with Plaintiff.

**RESPONSE TO PARAGRAPH 383:** The Tenth Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required to Paragraph 383 of the SAC.

384.    Each interfering Defendant received substantial benefits through the October 2022 Agreements.

**RESPONSE TO PARAGRAPH 384:** The Tenth Cause of Action in the SAC was not alleged against the JPM Defendants, and therefore no response is required to Paragraph 384 of the SAC.

385.    Each interfering Defendant entered into the October 2022 Agreements intentionally and for the unjustified purpose of preventing Plaintiff from recovering on the Plaintiff Loan and interfering with Plaintiff's contractual rights set forth in the Irrevocable Direction Letter and the Intercreditor Agreement.

**RESPONSE TO PARAGRAPH 385:** The Tenth Cause of Action in the SAC was not

alleged against the JPM Defendants, and therefore no response is required to Paragraph 385 of the

SAC.

386.    Each Defendant's conduct in entering into the October 2022 Agreements, which caused breaches of the Irrevocable Direction Letter and the Intercreditor Agreement, has damaged Plaintiff.

**RESPONSE TO PARAGRAPH 386:** The Tenth Cause of Action in the SAC was not

alleged against the JPM Defendants, and therefore no response is required to Paragraph 386 of the

SAC.

## ELEVENTH CAUSE OF ACTION

### (Tortious Interference with the Payment Guaranty – JPMorgan, Ameream, and Outparcel Entities)

387.    Plaintiff repeats and realleges each allegation contained in Paragraphs "1" through "386" as if fully set forth herein.

**RESPONSE TO PARAGRAPH 387:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 387 of the SAC.  MTD Decision.

388.    Plaintiff is a party to the Payment Guaranty, which was and is a valid and enforceable contract, which was confirmed by JPMorgan as recent as March 2024.

**RESPONSE TO PARAGRAPH 388:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 388 of the SAC.  MTD Decision.

389.    The Payment Guaranty contains covenants mandating that the net worth of the WEM-MOA Guarantors is at least $680 million, that each own 49% of the equity of the West Edmonton and Mall of America, and that they do not enter into transactions with "Affiliates" that would have the effect of violating the net worth covenant.

**RESPONSE TO PARAGRAPH 389:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 389 of the SAC.  MTD Decision.

390.    The October 2022 Agreements mandate JPMorgan to transfer the WEM-MOA 49% Equity (either to AB AD Lender or as collateral for a refinancing senior lender). This confirms that the WEM-MOA Guarantors do not and will not own the WEM-MOA 49% Equity, in violation of the Payment Guaranty covenants.

**RESPONSE TO PARAGRAPH 390:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 390 of the SAC.  MTD Decision.

391.    WEM-3's transfer of $48.5 million in cash to pay for costs of the American Dream Mall is a transaction with an Affiliate (as defined in the Payment Guaranty) that violates the net

worth covenant because the WEM-MOA Guarantors are not worth $680 million following the consummation of the 2021 Agreement transactions, and as confirmed in the October 2022 Agreements.

**RESPONSE TO PARAGRAPH 391:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 391 of the SAC. MTD Decision.

392.    At all times, JPMorgan, Ameream, and the Outparcel Entities were aware of the Payment Guaranty and its importance to Plaintiff. Indeed, affiliates of each Defendant were directly involved in the drafting of such document.

**RESPONSE TO PARAGRAPH 392:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 392 of the SAC. MTD Decision.

393.    Plaintiff participated in negotiations in May, June, and July 2022, and expressly identified respecting Plaintiff's contractual rights as critical to any such restructuring.

**RESPONSE TO PARAGRAPH 393:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 393 of the SAC. MTD Decision.

394.    The October 2022 Agreements were executed three months after Defendants stopped negotiating with Plaintiff, and done in secret, and caused parties to breach the Payment Guaranty with Plaintiff.

**RESPONSE TO PARAGRAPH 394:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 394 of the SAC. MTD Decision.

395.    Each interfering Defendant received substantial and undeserved benefits through the October 2022 Agreements.

**RESPONSE TO PARAGRAPH 395:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 395 of the SAC. MTD Decision.

396.    Each interfering Defendant entered into the October 2022 Agreements intentionally and for the unjustified purpose of preventing Plaintiff from recovering on the Plaintiff Loan and interfering with Plaintiff's contractual rights set forth in the Irrevocable Direction Letter and the Intercreditor Agreement.

**RESPONSE TO PARAGRAPH 396:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 396 of the SAC.  MTD Decision.

397.    Each Defendant's conduct in entering into the October 2022 Agreements, which caused breaches of the Irrevocable Direction Letter and the Intercreditor Agreement, has damaged Plaintiff.

**RESPONSE TO PARAGRAPH 397:** Pursuant to the Court's ruling on the JPM Defendants' motion to dismiss the SAC, the JPM Defendants are not required to respond to the allegations contained in Paragraph 397 of the SAC.  MTD Decision.

## PRAYER

WHEREFORE, Plaintiff SOL-MM III LLC requests that this Court enter judgment as follows:

(a)    Awarding Plaintiff a judgment against the JPM Defendants for the value of the Challenged Transfers (defined in paragraph 160) up to the amount of the Judgment plus interest thereon at the statutory rate;

(b)    Awarding Plaintiff a judgment against all Defendants for compensatory and punitive damages in an amount to be proven at trial, plus interest thereon at the statutory rate;

(c)    Awarding Plaintiff statutory costs, expenses, and reasonable attorneys' fees as against all Defendants plus interest thereon at the statutory rate;

(d)    Declaring void the Challenged Transfers under applicable law;

(e)    Declaring that Section 6(b) of the Intercreditor Agreement does not bar Plaintiff from (i) seeking enforcement actions and collections from the Payment Guarantors, and (ii)

retaining and keeping any and all amounts and other considerations received from the Payment Guarantors for application to the reduction of the Plaintiff Loan, even if the JPM Loan has not been repaid or otherwise satisfied;

(f)      Declaring that WEM-3 is not a Shared Guarantor by operation of law and that WEM-3 has fully performed under the Environmental Indemnity;

(g)      Declaring that the aggregate value of the Reimbursement Claims held by the WEM Guarantors is or exceeds $848.5 million, an amount to be proven at trial;

(h)      Declaring that the aggregate value of the Reimbursement Claims held by the MOA Guarantor is or exceeds $245 million, an amount to be proven at trial;

(i)      Declaring that notwithstanding the October 2022 Agreements or any other document, the WEM-MOA 49% Equity, the pledge of Ameream equity, any other assets covered pursuant to the Pledges (as defined in the Irrevocable Direction Letter) listed in Schedule A of the Irrevocable Direction Letter, and their respective proceeds cannot be transferred by JPMorgan to any person other than Plaintiff when the JPM Loan has been repaid in full, or be pledged as collateral to secure any refinancing of the JPM Loan or any new loan (including the 2022 Mezz Loan); and

(j)      Granting such other and further legal and equitable relief as this Court may deem just and proper.

**RESPONSE TO PRAYER FOR RELIEF**: The JPM Defendants deny that Plaintiff is entitled to any of the relief Plaintiff requests, or any other relief in this proceeding.  The JPM Defendants deny the allegations contained in subparagraphs (a) through (j) and the remaining requests for relief in the first, fourth, sixth, ninth, and tenth causes of action.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof, persuasion, or production not otherwise legally assigned to it, and without prejudice to the denials set forth in the Answer, the JPM Defendants assert and aver the following Affirmative Defenses to the SAC.  The JPM Defendants hereby reserve all affirmative defenses, at law or in equity, that may now or in the future be available based on fact discovery or further factual investigation.  The assertion of a defense is not a concession that the JPM Defendants have the burden of proving the matter.

### FIRST AFFIRMATIVE DEFENSE

The SAC fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

The allegations contained in the SAC are barred by Plaintiff's own admissions.

### THIRD AFFIRMATIVE DEFENSE

The allegations in the SAC are barred, in whole or in part, because Plaintiff lacks standing.

### FOURTH AFFIRMATIVE DEFENSE

The allegations in the SAC are precluded by documentary evidence.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the express terms of the Intercreditor Agreement, the Irrevocable Direction Letter, and the governing loan documents.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the principal applied in *United States Bank N.A., as trustee of Registered Holders of GS Mortgage Securities Corp. II, Comm. Mortgage Pass Through Certificates, Series 2012-GCJ9 v. Mattone*, No. 23-cv-11035, 2025 WL 756639, at *12 (S.D.N.Y. Feb. 21, 2025) (citing *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 388 (1987)) which provides that "[t]he existence of a valid and enforceable written

contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."

## SEVENTH AFFIRMATIVE DEFENSE

The SAC must be dismissed on the grounds that Plaintiff lacks legal capacity to bring or maintain this proceeding.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims must be dismissed in whole or in part because Plaintiff has failed to plead its allegations of fraudulent conduct and misrepresentations with the requisite particularity.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by operation of the applicable statute(s) of limitation or repose, and by the doctrines of waiver, estoppel, laches, ratification, and /or other related equitable doctrines.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, for failure to meet condition(s) precedent.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, for failure to mitigate damages.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff would be unjustly enriched if it were permitted to obtain any recovery in this action.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because the JPM Defendants were broadly empowered to dispose of their collateral following an event of default.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by Plaintiff's, or Plaintiff's agents', representatives', consultants', or predecessors' inequitable conduct.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claim for tortious interference of contract is barred, in whole or in part, because of the "economic interest" defense, pursuant to which JPMorgan was justified under the ICA—as the senior secured creditor of the WEM-MOA Guarantors—to protect its own economic interests and protect the value of the collateral by entering into the 2021 Agreement.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claim for the implied covenant of good faith and fair dealing is barred, in whole or in part, because the implied convent cannot be used to contradict the express terms of the Intercreditor Agreement.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because the JPMorgan Defendants at all times complied with the obligations imposed by the Intercreditor Agreement.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff breached the Intercreditor Agreement.

### NINETEENTH AFFIRMATIVE DEFENSE

The damages alleged in the SAC are too speculative to be recoverable at law.

### TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Plaintiff has not suffered any damages as a result of the conduct of the JPM Defendants.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff is not entitled to indemnification and/or attorneys' fees under the Intercreditor Agreement or applicable law.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The JPM Defendants have not knowingly or intentionally waived any applicable affirmative defenses and reserve the right to assert and rely on such other applicable defenses as may become available by law, or pursuant to statute, or appear during the proceedings in this action.  The JPM Defendants hereby adopt and incorporate by reference any other defenses asserted or to be asserted by any of the other defendants to the extent that the JPM Defendants may share in such a defense.  The JPM Defendants reserve the right to amend their answer and/or affirmative defenses accordingly and assert any such defense.

## COUNTERCLAIM

JPMorgan,[29] by its undersigned attorneys, upon knowledge as to itself and its own actions, and upon information and belief as to all other matters, alleges the following Counterclaim against Counterclaim Defendant SOL-MM III LLC ("Counterclaim Defendant") as follows:

## NATURE OF THE ACTION

1.     This action arises from a desperate attempt by Counterclaim Defendant, the junior-most lender on the American Dream Mall project in New Jersey (the "Project"), to upend the priority-of-payments provision in the Intercreditor Agreement and cut to the front of the contractually established repayment priority line, ahead of JPMorgan, the Project's senior-most lender.

---

[29] Unless otherwise noted, the Counterclaim adopts the definitions used in the above Answer.

2.    Counterclaim Defendant and its purported predecessor-in-interest, Western Asset Mortgage Capital Corporation ("WAMCO"), entered the Project with eyes wide open.[30]  The Intercreditor Agreement expressly subordinated Counterclaim Defendant's repayment rights to those of JPMorgan and the AB AD Lender (the "Senior Lenders") and expressly prohibited Counterclaim Defendant from seeking to collect any amounts from a Shared Guarantor, including the WEM-MOA Guarantors, unless and at least until the Senior Loans were repaid in full (which has not yet occurred).

3.    As set forth in more detail below, Counterclaim Defendant and its purported predecessor-in-interest did nothing when the Project's borrowers fell into default (including declining to exercise its own bargained for protections under the Intercreditor Agreement), and instead, waited for the Senior Lenders to take the actions required to safeguard the Project, fund the operating deficits and capital needs for the Project (despite the fact that the Senior Lenders had no obligation to do so), and protect the value of all of the collateral.

4.    Counterclaim Defendant instead sued the borrower on its junior mezzanine loan (the "Junior Mezz Borrower") and obtained the Judgment.  But since the Junior Mezz Borrower did not even have enough funds to make its loan payments to Counterclaim Defendant, the Judgment was essentially worthless.  However, because Section 6(b) of the Intercreditor Agreement (to which Counterclaim Defendant and its purported predecessor-in-interest expressly consented) prohibited Counterclaim Defendant from recovering from the WEM-MOA Guarantors while the JPMorgan Loan remained outstanding, Counterclaim Defendant was left without any further recourse.

---

30   References to "Counterclaim Defendant" occurring prior to any purported assignment of the Junior Mezz Loan interest are directed toward Counterclaim Defendant's purported predecessor-in-interest, WAMCO.

5.      Notwithstanding the clear prohibition contained in Section 6(b), Counterclaim Defendant prematurely seeks to recover on the Judgment and its defaulted Junior Mezz Loan from the WEM-MOA Guarantors through this action and separate litigations filed in both Canada and New York Supreme Court.  Counterclaim Defendant's commencement of these actions constitute a breach of Section 6(b) of the Intercreditor Agreement.

6.      Counterclaim Defendant's unjustifiable efforts to interfere with JPMorgan's exercise of its legitimate contractual rights has substantially damaged the Senior Lenders and made the collateral less valuable for all lenders.  Moreover, Counterclaim Defendant's litigation tactics have caused significant harm to the Project by entangling the Project in a web of unsubstantiated and premature lawsuits.

7.      As such, JPMorgan brings this counterclaim to (i) recover the damages that Counterclaim Defendant (and its purported predecessor-in-interest) has caused through their deliberate breach of the Intercreditor Agreement,  (ii) seek a declaration that Counterclaim Defendant is required to immediately remit any amounts it receives from the Shared Guarantors, and (iii) seek an injunction preventing Counterclaim Defendant from continuing to prosecute any ongoing or new litigations against the Shared Guarantors while the JPMorgan Loan remains outstanding.

**<u>PARTIES</u>**

8.      JPMorgan Chase Bank, N.A., is a national banking association with a home office in Columbus, Ohio and an address at c/o CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.  JPMorgan is the administrative agent under the JPM Loan documents and also a lender thereunder.  It is a party to the Intercreditor Agreement.

9.      Counterclaim Defendant SOL-MM III LLC is a Delaware limited liability company, having a registered office at c/o Cogency Global Inc., 850 New Burton, Suite 201,

Dover, Delaware 19904. SOL-MM III LLC is the purported successor to WAMCO, [31] the original

Administrative Agent of the Plaintiff Loan.  As the purported successor to WAMCO, Counterclaim

Defendant is a party to the Intercreditor Agreement.

## JURISDICTION

10.    This Court has jurisdiction pursuant to 12 U.S.C. § 611, *et seq*. (the "Edge Act").

11.    Venue is proper in this district by agreement of the parties per Section 18(g) of the

Intercreditor Agreement, pursuant to which Counterclaim Defendant consented to the jurisdiction

of the United States District Court for the Southern District of New York.

## FACTUAL ALLEGATIONS

*Counterclaim Defendant enters the loan structure as a subordinate lender*

12.    The Project was originally financed in 2017 with two tranches of senior debt: (i)

the $1.195 billion loan from JPMorgan and a syndicate of other lenders to Ameream, LLC (the

"JPMorgan Loan"); and (ii) the $475 million loan from the Senior Mezz Lender (and, together

with JPMorgan, the "Senior Lenders") to Ameream Mezz (the "Senior Mezz Loan," and together

with the JPMorgan Loan, the "Senior Loans").

13.    As security for the Senior Loans, JPMorgan received a second mortgage equivalent

to $425 million in Canadian currency on the West Edmonton Mall ("WEM").  JPMorgan and the

Senior Mezz Lender also received, among other things, full payment guarantees from the WEM-

MOA Guarantors,[32] which were secured for the benefit of the Senior Lenders by first- and second-

---

[31]  JPMorgan presently lacks knowledge or information as to the validity of the purported assignment from WAMCO to Counterclaim Defendants.  JPMorgan reserves the right to amend its pleading to challenge the purported assignment if, and to the extent, discovery reveals a basis for such claims.

[32]  Pursuant to the payment guaranty executed in connection with the JPMorgan Loan (the "JPM Payment Guaranty"), the WEM-MOA Guarantors are affiliates of the Senior Lenders'

priority pledges (the "Senior Pledge Agreements"), respectively, in the WEM-MOA Guarantors' 49% equity interests in the WEM and the Mall of America ("MOA")—i.e., the WEM-MOA Equity.  The Senior Lenders also received personal payment guaranties from various members of the Ghermezian family.

14.     Under the loan documents, the Senior Lenders had broad rights, in their sole discretion, to modify or amend their loan documents or execute against the collateral securing the Senior Pledge Agreements following a default.   Moreover, nothing in these documents required the Senior Lenders to exercise their rights in a particular way.  Instead, as is customary in complex commercial loan agreements, and as Counterclaim Defendant acknowledges, the Senior Lenders had a menu of options following a default.

15.     In August 2019, Counterclaim Defendant's purported predecessor-in-interest accepted a deeply subordinated position by loaning $300 million to Ameream Mezz I, LLC (the "Junior Mezz Borrower"), despite the fact that the Project continued to have budget shortfalls. When it entered the Project, Counterclaim Defendant's purported predecessor-in-interest executed the Intercreditor Agreement to memorialize its subordinated position in the capital structure, as follows:

---

borrowers under the Senior Loans including, inter alia, MOA Holdings III LLC, New WEM Holdings Affiliate 1 Ltd., New WEM Holdings Affiliate 2 Ltd., and New WEM Holdings Ltd.



16.    Like the Senior Lenders, Counterclaim Defendant also received the Payment Guaranty from the WEM-MOA Guarantors.  However, unlike the Senior Lenders, Counterclaim Defendant's guaranty was unsecured.  Thus, counterclaim Defendant does not have—and has never had—any security interest in the WEM-MOA Equity or any proceeds thereof.

***The Intercreditor Agreement governs the respective rights and priorities among the lenders***

17.    The Intercreditor Agreement sets forth the respective rights and priorities of repayment under the Project's three-tiered loan structure, including Counterclaim Defendant's subordinated position.

18.    *First*, as Counterclaim Defendant agreed to in the Intercreditor Agreement, Counterclaim Defendant is a "sophisticated lender" and "investor in real estate," who expressly

agreed to subordinate its repayment rights to the Senior Lenders' rights to be repaid on their loans, "and all rights, remedies, terms and covenants contained therein."

19.    *Second*, pursuant to Section 3(a) of the Intercreditor Agreement, Counterclaim Defendant "consent[ed] to and approve[d]" each of the JPMorgan Loan Documents.  Therefore, Counterclaim Defendant agreed that following a default, among other remedies, JPMorgan was entitled (but not required) to modify or amend its loan documents or foreclose upon, or otherwise take title to the WEM-MOA Equity in any time or manner it saw fit.

20.    *Third*, Counterclaim Defendant also specifically agreed that its rights and remedies would be severely restricted at least until the Senior Lenders were repaid in full (unless, of course, Counterclaim Defendant decided to cure following a default, which it did not).  More fully, Counterclaim Defendant was expressly barred from "accept[ing] or receiv[ing]" payments, or seeking to collect any amounts from a "Shared Guarantor" (including the WEM-MOA Guarantors).

21.    Specifically, Section 6(b) of the Intercreditor Agreement provides:

Notwithstanding anything to the contrary contained in this Agreement including without limitation Section 11(d), if a Guarantor under any Senior Loan Document, including, without limitation, any Senior Loan Guaranty (each, a "Senior Loan Guarantor") or under any Mezzanine Loan Document (Senior) (each, a "Mezzanine Loan Guarantor (Senior)") has agreed to be personally liable for any obligations of a Mezzanine Borrower (Junior) to Mezzanine Agent (Junior) and/or Mezzanine Lenders (Junior) or Senior Loan Guarantor or Senior Mezzanine Loan Guarantor is otherwise a party to any Mezzanine Loan Document (Junior) (each such Senior Loan Guarantor or Mezzanine Loan Guarantor (Senior), a "Shared Guarantor"), then Mezzanine Agent (Junior) and/or Mezzanine Lenders (Junior) may not commence any action or proceeding against such Shared Guarantor in connection with the Mezzanine Loan (Junior) or otherwise seek to collect any amounts or otherwise assert or enforce any rights or remedies against such Shared Guarantor in connection with the Mezzanine Loan (Junior).

22.    The WEM-MOA Guarantors constitute "Shared Guarantors" pursuant to Section 6(b) of the Intercreditor Agreement because they provided payment guarantees agreeing to be "personally liable for any obligations" of the Junior Mezz Borrower in connection with the Senior Loan, the Senior Mezzanine Loan, and the Plaintiff Loan.

23.    In addition, under Section 18(o) of the Intercreditor Agreement, Counterclaim Defendant acknowledged and agreed that "monetary damages are not an adequate remedy to redress a breach" by the Counterclaim Defendant and that such a breach "would cause irreparable harm" to Counterclaim Plaintiff.

24.    Therefore, Section 6(b) of the Intercreditor Agreement bars Counterclaim Defendant from initiating any action or proceeding against the WEM-MOA Guarantors (or collecting any amounts or otherwise asserting or enforcing any rights or remedies against the WEM-MOA Guarantors), at least until both Senior Loans, including the JPMorgan Loan, are repaid in full.

25.    As long as the Senior Loans remain outstanding, Section 6(b) of the Intercreditor Agreement further requires Counterclaim Defendant to immediately remit any amounts received from the Shared Guarantors (or on account of a claim against a Shared Guarantor), including the WEM-MOA Guarantors, to the Senior Lenders.

26.    As Counterclaim Defendant does not dispute, the JPMorgan Loan remains outstanding to this day.

27.    Therefore, Counterclaim Defendant was and is barred from initiating any action or proceeding against the WEM-MOA Guarantors, including this very action and the litigation in Canada that Counterclaim Defendant improperly commenced.  Similarly, Counterclaim Defendant has no right to recover any amounts from the WEM-MOA Guarantors (or on account of a claim

against the WEM-MOA Guarantors), such that any amounts recovered by Counterclaim Defendant from the WEM-MOA Guarantors must be immediately turned over to JPMorgan.

28.     *Fourth*, Section 6(b) of the Intercreditor Agreement further provides that if both Senior Loans are fully repaid and the Senior Lenders still hold proceeds from any disposition of the WEM-MOA Equity, those proceeds shall be disbursed "in accordance with the terms of the letters of direction" from the WEM-MOA Guarantors.

29.     Pursuant to Section 6(b), the WEM-MOA Guarantors (and other pledgors) also provided the Irrevocable Letter of Direction (the "IDL"), which, in its Schedule A, memorializes the 11 pledges (the "IDL Pledges") encumbering the WEM-MOA Equity, including the Senior Pledge Agreements.  Counterclaim Defendant does not and never had a security interest in connection with any of the IDL Pledges.

30.     The IDL provided that before Counterclaim Defendant could receive any excess proceeds from the WEM-MOA Equity (or any other IDL Pledge), three conditions must be met: (1) the Senior Loans must be fully repaid; (2) there actually has to be leftover proceeds from the WEM-MOA Equity after satisfying the Senior Loans; and (3) the IDL Pledges would have to remain in effect for the IDL to remain effective.  Therefore, in the event the WEM-MOA Equity was sold, the Intercreditor Agreement specified that any excess proceeds from the IDL Pledges securing the WEM-MOA Equity (once the Senior Lenders were repaid) would be distributed "in accordance with the terms of" the IDL, if the IDL remained in effect.  Thus, the IDL created Counterclaim Defendant's sole, residual interest in surplus proceeds (if any) generated from a sale of the WEM-MOA Equity under the IDL Pledges.  And, by its terms, the IDL would only "remain in full force and effect and be irrevocable so long as any [of the 11 IDL] Pledge[s] remains in

effect." If no IDL Pledges remain in effect at the time that the WEM-MOA Equity is sold, then JPMorgan has no obligation to distribute proceeds from that sale in accordance with the IDL.

31.     *Fifth,* pursuant to Section 8(a) of the Intercreditor Agreement, Counterclaim Defendant also acknowledged that JPMorgan "shall have the right without the consent of [Plaintiff], in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver…of the [JPMorgan] Loan or the [JPMorgan] Loan Documents." As such, while the Intercreditor Agreement was in effect, JPMorgan had broad authority to restructure its loan with its borrower, including by terminating the IDL Pledges, without involving Plaintiff.

32.     *Finally*, and critically, the Intercreditor Agreement provided Counterclaim Defendant with specific means of protecting its subordinate position following a default under the Senior Loans including (i) curing the defaults under both loans; and (ii) purchasing the Senior Loans in full.

### JPMorgan exercises its contractual right to enter into the 2021 Agreement

33.     In May 2020, JPMorgan informed Counterclaim's purported predecessor-in-interest Defendant that Ameream had defaulted under the JPMorgan Loan. Counterclaim Defendant's purported predecessor-in-interest elected not to cure the JPMorgan Loan default or exercise any of its other bargained for rights (e.g., purchasing the defaulted loan) to protect its junior investment, and therefore, under the plain terms of the Intercreditor Agreement and the governing loan documents, JPMorgan was free to exercise its remedies.

34.     On January 29, 2021, to safeguard the Project, the Senior Lenders and others entered into the 2021 Agreement.

35.     In March 2021, JPMorgan exercised its rights under the JPMorgan Loan Documents, and JPMorgan's affiliates took custody of the WEM-MOA Equity.  At the same time, JPMorgan also provided $75 million in protective advances to support the Project.

36.     The 2021 Agreement also expressly terminated the second priority Senior Pledge Agreements (Pledges 5–7 on Schedule A of the IDL) from the WEM-1, WEM-3, and MOA Guarantors, as the Senior Lenders were entitled to do without restriction.

37.     On October 3, 2021, WAMCO was advised that a Junior Purchase Option Event had occurred under Section 14(b) of the Intercreditor Agreement, but it again elected not to exercise its Junior Purchase Option right or any of its other bargained for rights to protect its deeply subordinate position.  Therefore, the Senior Lenders were permitted to again exercise their available remedies.

38.     Therefore, the 2021 Agreement was a commercially reasonable and legitimate exercise of JPMorgan's rights and remedies under its loan documents and entirely consistent with the Intercreditor Agreement.  The 2021 Agreement provided that although JPMorgan's loan was reduced by the $50 million stipulated value for the WEM-MOA Equity, if the WEM-MOA 49% Equity interests were sold, JPMorgan would receive no more than that $50 million stipulated value, and any excess proceeds from the sale of the WEM-MOA Equity would be distributed in accordance with the IDL and the Intercreditor Agreement.  Thus, JPMorgan assumed the risk that the WEM-MOA Equity could be worth less than $50 million, but received none of the upside if it later turned out the WEM-MOA collateral was worth more than $50 million.

***JPMorgan enters into the October 2022 Agreements, as it was free to do after the IDL Pledges Terminated***

39.     On October 21, 2022, JPMorgan executed an Acknowledgment and Agreement of Termination of Pledge Agreements, which terminated the first-priority Senior Pledge Agreements

(Pledges 2–4 on Schedule A of the IDL) from the WEM-1, WEM-3, and MOA Guarantors, as it was entitled to do without restriction.  As a result, those pledges terminated.

40.     On October 21, 2022, although the Senior Loans remained in default, Counterclaim Defendant still declined to exercise its rights to protect its junior position.  Therefore, as it was entitled to do, the Senior Mezz Lender proceeded with its own enforcement efforts and consummated a strict foreclosure on Ameream Mezz's interest in the Project (the "Senior Mezz Foreclosure").  As a result, the Intercreditor Agreement terminated—except for Section 6(b)—which expressly survived termination.

41.     On October 21, 2022, in furtherance of its efforts to keep the Project afloat, JPMorgan and the Senior Mezz Lender executed the October 2022 Agreements, including the Standstill Agreement, and the 7th Amendment.  In accordance with the October 2022 Agreements, (i) the Senior Lenders committed to fund an additional $170,762,812.84 into the American Dream Mall, (ii) the Senior Mezz Lender converted its position to preferred equity (and a restated unsecured mezzanine loan (the "Restated Mezz Loan")), and (iii) after the Senior Mezz Lender foreclosed, it admitted Triple Five as new common equity because Triple Five's experience better equipped it to manage the day-to-day operations of a shopping mall of such scale, and because Triple Five's affiliates provided additional collateral to both JPMorgan and the Senior Mezz Lender.  Meanwhile, Counterclaim Defendant (and its purported predecessor-in-interest) declined to participate and contributed nothing.

42.     Under the Standstill Agreement, JPMorgan exercised its right to terminate certain pledge agreements securing the JPMorgan Loan, including the remaining IDL Pledges (pledges 1, and 8–11 on Schedule A of the IDL), and consequently, the turnover provision in the IDL.  In other words, as of October 21, 2022, the IDL Pledges were terminated, extinguishing all "force and

effect" of the IDL and rendering it impossible for any proceeds to be generated thereunder or for JPMorgan to breach the turnover provision of the IDL (and Section 6(b) of the Intercreditor Agreement).

43.     The 2022 Agreements were consistent with the surviving subordination provisions of the Intercreditor Agreement.  Pursuant to Section 13(b) of the Standstill Agreement, the Senior Lenders agreed that any excess proceeds received in connection with any Transfer of the American Dream Mall, the Equity Collateral and/or any other collateral securing the JPMorgan Loan shall be delivered to Senior Mezz Lender.  Similarly, Section 7(c) of the Standstill Agreement provides that JPMorgan will transfer the WEM-MOA Equity to the Senior Mezz Lender after the JPMorgan Loan liabilities discharged.  The 7th Amendment also requires JPMorgan to distribute excess proceeds from the WEM-MOA Equity to the Senior Mezz Lender, after the JPMorgan Loan has been repaid in full, as the Intercreditor Agreement had always provided.

44.     JPMorgan was at all times in compliance with Section 6(b) of the Intercreditor Agreement (the only surviving section of the Intercreditor Agreement) when it executed the October 2022 Agreements because following the termination of the IDL Pledges, the IDL's turnover provision no longer had any force and effect, and JPMorgan no longer had any obligation to distribute proceeds from any disputation of the WEM-MOA Equity in accordance with the IDL.

***In violation of Section 6(b) of the Intercreditor Agreement, Counterclaim Defendant initiated multiple actions.***

45.     In May 2021, an Event of Default occurred under the Plaintiff Loan.

46.     On February 7, 2023, Counterclaim Defendant commenced an action against the Junior Mezz Borrower in the Supreme Court of the State of New York, captioned *SOL-MM III LLC v. Ameream Mezz I, LLC*, Index No. 650751/2023.  On May 3, 2023, Counterclaim Defendant obtained the Judgment in the amount of $404,399,512.87.  As mandated by the Intercreditor

Agreement, Counterclaim Defendant is required to hold any funds received in connection with the judgment in trust for the benefit of, and immediately pay over such proceeds to, JPMorgan.

47.     On March 23, 2023, Counterclaim Defendant filed this action against JPMorgan, its affiliates, and the WEM-MOA Guarantors, in breach of Section 6(b) of the Intercreditor Agreement because, among other things, the JPMorgan Loan has not been repaid in full.

48.     On March 23, 2024, Counterclaim Defendant also filed the Canadian Proceeding against the WEM-MOA Guarantors and certain Individual Guarantors in Alberta, Canada, captioned *SOL-MM III LLC v. New WEM Holdings Affiliate 1 Ltd., et. al.*, File No. 2303 05334 (Court of King's Bench of Alberta Mar. 23, 2024), in breach of Section 6(b) of the Intercreditor Agreement because, among other reasons, the JPMorgan Loan remains outstanding.  The Canadian Proceeding caused damage to the Project and JPMorgan by further entangling the Project in unsubstantiated litigation, requiring JPMorgan to incur attorneys' fees, and impacting JPMorgan's ability to be repaid through a refinancing of its note.

## FIRST COUNTERCLAIM
**(Breach of Contract)**

49.     JPMorgan repeats and realleges Counterclaim Paragraphs 1–48 as if fully set forth herein.

50.     As the purported successor to WAMCO, Counterclaim Defendant is a party to the Intercreditor Agreement with JPMorgan.

51.     The Intercreditor Agreement constituted a valid and binding contract between Counterclaim Defendant and JPMorgan.  Though the Intercreditor Agreement has otherwise terminated, as Plaintiff expressly concedes, Section 6(b), which governs Counterclaim Defendant's claims in the SAC, remains in full force and effect.

52.    JPMorgan has complied with all of its duties and obligations under the Intercreditor Agreement.

53.    JPMorgan's execution of the 2021 Agreement and the 2022 Agreements are wholly consistent with an in accordance with its rights and obligations under the Intercreditor Agreement and the governing loan documents.

54.    Pursuant to Section 6(b) of the Intercreditor Agreement, Counterclaim Defendant is expressly barred from initiating any action or proceeding against the WEM-MOA Guarantors (or collecting any amounts or otherwise asserting or enforcing any rights or remedies against the WEM-MOA Guarantors) at least until the JPMorgan Loan is repaid in full.

55.    The JPMorgan Loan has not been repaid in full (and may never be repaid in full).

56.    On March 23, 2023, Counterclaim Defendant initiated this action against JPMorgan, its affiliates, and the WEM-MOA Guarantors, and the Canadian Proceeding against the WEM-MOA Guarantors and certain Individual Guarantors, seeking compensatory and punitive damages from the WEM-MOA Guarantors, among other things, in connection with its defaulted and subordinated Junior Mezz Loan.

57.    Counterclaim Defendant's commencement of this action and the Canadian Proceeding against the WEM-MOA Guarantors, constitutes a breach of Section 6(b) of the Intercreditor Agreement because Counterclaim Defendant initiated these actions against WEM-MOA Guarantors in an attempt to assert rights and remedies against the Shared Guarantors and recover amounts from the Shared Guarantors in connection with its Junior Mezz Loan before the JPM Loan has been repaid in full.

58.    Counterclaim Defendant is aware that it breached Section 6(b) of the Intercreditor Agreement by bringing this action against the WEM-MOA Guarantors because the SAC requested

a declaration (which the Court has properly dismissed) from this Court that Section 6(b) of the Intercreditor Agreement does not bar Counterclaim Defendant from (i) seeking enforcement actions and collections from the WEM-MOA Guarantors, and (ii) keeping any and all amounts received from the WEM-MOA Guarantors, which would retroactively validate Counterclaim Defendant's blatant breach of contract.

59.    Counterclaim Defendant's breach of Section 6(b) of the Intercreditor Agreement is continuing.

60.    Counterclaim Defendant's breach of the Intercreditor Agreement has damaged, and continues to damage JPMorgan.

61.    As Counterclaim Defendant expressly agreed in Section 18(o) of the Intercreditor Agreement, Counterclaim Defendant's breach of the Intercreditor Agreement has and will continue to cause immediate, continuing, and irreparable harm to JPMorgan (as well as to all of the lenders by lowering the value of the Shared Guarantor collateral).

62.    As Counterclaim Defendant also expressly agreed in Section 18(o) of the Intercreditor Agreement, JPMorgan has no adequate remedy at law for Counterclaim Defendant's breach of the Intercreditor Agreement.

63.    As a direct and proximate result of Counterclaim Defendant's breach of the Intercreditor Agreement and interference with the Project through multiple vexatious and unsubstantiated litigations, the Court should: (i) declare that the JPMorgan has no obligation, financial or otherwise, to Counterclaim Defendant under the Intercreditor Agreement; (ii) enjoin Counterclaim Defendant from proceeding with this litigation, the Canadian Proceeding, and any other litigation or proceeding to recover any amounts from the Shared Guarantors so long as they remain Shared Guarantors under Section 6(b) of the Intercreditor Agreement; and (iii) award

JPMorgan monetary damages in an amount to be determined at trail, but which is not less than $75,000, plus allowable interest under applicable law.

64.     Furthermore, in accordance with Section 6(b) of the Intercreditor Agreement, which remains in effect today, the Court should declare that Counterclaim Defendant is required to immediately remit any amounts it does receive from the Shared Guarantors (or on account of a claim against a Shared Guarantor), including the WEM-MOA Guarantors, to JPMorgan while the JPMorgan Loan remains outstanding.

## PRAYER FOR RELIEF

**WHEREFORE**, JPMorgan respectfully requests that the Court:

(a)     Grant judgment in favor of JPMorgan on its counterclaim(s);

(b)     Declare that Counterclaim Defendant breached the Intercreditor Agreement by bringing this action against the WEM-MOA Guarantors;

(c)     Declare that the JPMorgan has no obligation, financial or otherwise, to Counterclaim Defendant under the Intercreditor Agreement;

(d)     Declare that Counterclaim Defendant is required to immediately remit any amounts it does receive from the Shared Guarantors (or on account of a claim against a Shared Guarantor) to JPMorgan while the JPMorgan Loan remains outstanding;

(e)     Issue an order enjoining Counterclaim Defendant from proceeding with this litigation, the Canadian Proceeding, and any other litigation or proceeding to recover any amounts from the Shared Guarantors (or on account of a claim against a Shared Guarantor) so long as they remain Shared Guarantors under Section 6(b) of the Intercreditor Agreement;

(f)     Award JPMorgan its reasonable costs and expenses in this action under applicable law and the Intercreditor Agreement, including, but not limited to, reasonable attorneys' fees incurred by JPMorgan in connection with exercising or enforcing its rights under the Intercreditor Agreement, with Counterclaim Defendant's failure to perform or observe the provisions of the Intercreditor Agreement; and

(g)     Grant JPMorgan such other and further relief as this Court may deem just and proper.

Dated:    New York, New York
          May 12, 2025

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP

By: _____
              Janice Mac Avoy

One New York Plaza
New York, New York 10004-1980
(212) 859-4000
janice.macavoy@friedfrank.com

HOGAN LOVELLS LLP

William J. Trunk
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-6582
william.trunk@hoganlovells.com

*Attorneys for Defendants*
  *JPMorgan Chase Bank, N.A., D5 Hawks LLC,*
  *WE Tahoe 1 LLC and WE Tahoe 2 LLC*

151